## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

AARON L. HARTMAN

     Plaintiff,

     v.

NATIONAL BOARD OF MEDICAL
EXAMINERS,

     Defendant.

Case No. 09-5028

---

## NATIONAL BOARD OF MEDICAL EXAMINERS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Jurisdictions across the country rely upon the United States Medical Licensing Examination, or "USMLE," as an important part of their licensure process for ensuring the qualifications of prospective physicians. There are multiple components of the USMLE, taken at different times in an individual's medical education and training. One component is known as the Step 2 Clinical Skills ("CS") examination. The Step 2 CS exam uses simulated doctor-patient encounters, in a standardized environment, to evaluate a prospective physician's fact-gathering, communication and interpersonal skills.

The Americans with Disabilities Act ("ADA") requires that examinations such as the USMLE be administered "in a place and manner accessible to persons with disabilities...." 42 U.S.C. § 12189. This will sometimes require that auxiliary aids or other reasonable accommodations be provided to disabled examinees. For example, a reader might be needed to allow a blind examinee to take a bar examination, while extra

testing time might be needed by someone with a reading disability.  *See* 29 C.F.R. § 36.309(b) (2009).  The purpose of such accommodations is to ensure that the exam accurately measures the knowledge and/or skills that the exam is intended to measure, rather than irrelevant functional limitations that result from a disability.

Auxiliary aids and other accommodations are ***not*** required, however, if the functional limitations that result from a disability involve the very skills or knowledge that an exam is intended to measure.  *See* 28 C.F.R. § 36.309(b)(1)(i).  Thus, an individual who suffers from dyscalculia -- which is a learning disability in mathematics -- would not be entitled to use a calculator on a test that measures math skills.  Allowing him to do so would "fundamentally alter the measurement of the skills or knowledge the examination is intended to test."  28 C.F.R. § 36.309(b)(3).  Likewise, if a test "is designed to measure the ability to read written material," it is entirely proper for that exam "to be administered in a written form" to an individual "with a vision impairment … that limits the ability to read written material," even though the individual "may be unable to pass [the] examination because of [her] limited reading ability."  U.S. Dep't of Justice, *The Americans with Disabilities Act Title III Technical Assistance Manual*, at 40 (1993). Auxiliary aids or an alternative exam format are not required in this context because they would prevent the exam results from "accurately reflect[ing] the individual's reading ability," and that is what the examination is intended to measure.  *Id.*

This is precisely the situation presented here.  Plaintiff Aaron Hartman is asking to use an auxiliary aid on the Step 2 CS exam -- namely, text-to-speech software loaded on a laptop computer or other electronic device on which he can type.  Mr. Hartman's request is based upon an impairment that, by his own admission, substantially limits the

"verbal or oral communication, speech, and interpersonal skills which are necessary to take the USMLE Step 2 CS examination." Complaint ¶ 11. In other words, the speech, communication and interpersonal skills which the Step 2 CS exam is intended to assess are skills for which he is requesting an accommodation.

Mr. Hartman is like an individual with a math disability who wants to use a calculator in order to pass an exam that assesses math skills. In his case, he has impaired speaking, communication and interpersonal skills and wants to use technology in order to pass an exam that assesses speaking, communication and interpersonal skills.[1]  Moreover, Plaintiff wants to do so on a licensing exam that is used to help determine whether prospective physicians have the knowledge and skills needed to deliver safe and effective healthcare. The ADA does not support, much less compel, that outcome.

Mr. Hartman's Complaint seeks a permanent injunction that requires NBME to provide him with the following accommodations on the USMLE Step 2 CS examination: (1) "use of computer or electronic device(s) with text-to-speech software to communicate during patient encounters;" (2) "an additional 15 minutes (double time) on each patient encounter;" and (3) "face to face encounters instead of a telephone encounter...." Complaint at 14, ¶ 2. He has filed a Motion for Preliminary Injunction ("Pl. Motion") seeking the same relief, and a Memorandum of Law ("Pl. Mem.") in support of that motion.

---

[1]      In fact, without considering the skills the Step 2 CS exam assesses, Plaintiff's Expert recommends that Mr. Hartman should be permitted to utilize whatever "accommodation best assures his success on the Step 2 CS Examination" and whatever accommodation would make Plaintiff "more successful in meeting his potential." Tetnowski Dep. Trans. (relevant pages), Exhibit "1" hereto, p.182, lines 22-25; and p.180, lines 25-25, p.181, lines 1-7. This is not the ADA standard.

Mr. Hartman is not entitled to any such injunction, preliminary or permanent; his motion for a preliminary injunction clearly falls well short of meeting the applicable standard for such extraordinary relief.  He has not shown a likelihood of success on the merits of his ADA claim.  Nor has he established that he would suffer any irreparable harm if his motion is denied, shown that the balance of equities tips in his favor, or demonstrated that an injunction is in the public interest.  Plaintiff's request for a preliminary injunction should be denied.

## STATEMENT OF FACTS

**I.      NBME And The USMLE**

The National Board of Medical Examiners ("NBME") is a non-profit organization, based in Philadelphia, whose mission is to protect the health of the public by providing a common, consistent, state-of-the-art system of assessment of health professionals. *See* Declaration of Dr. Peter Katsufrakis, Exhibit "2" hereto, ¶ 3.  In conjunction with the Federation of State Medical Boards, another non-profit corporation, the NBME has developed the USMLE. *Id.* at ¶¶ 1-3.

The USMLE is designed to assess whether an individual has the minimal knowledge and skills deemed necessary for safe and effective patient care. *Id.* at ¶ 2.It is administered each year to over 100,000 examinees, and medical licensing authorities in every state rely upon it to help assess the qualifications of candidates for licensure for the general undifferentiated practice of medicine. *Id.* at ¶ 2.

There are three parts of the USMLE, known as "Steps."  Passage of all three Steps is accepted by U.S. medical licensing authorities to satisfy the examination requirements for licensure as a physician.  Step 1 assesses whether an applicant can

understand and apply important concepts of the sciences basic to the practice of medicine.  *Id.* at ¶ 4. Step 2 assesses whether the applicant can apply medical knowledge, skills, and understanding of clinical science essential for provision of patient care under supervision.  *Id.* Step 2 consists of a Clinical Knowledge (CK) component (a multiple-choice examination) and a Clinical Skills (CS) component (a simulation of doctor-patient encounters).   *Id.* Step 3 assesses whether the applicant can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine.  *Id.*

The USMLE is an integral component of each state's effort to ensure that only competent and qualified individuals are licensed to practice medicine.   *Id.* at ¶ 3. Maintaining the integrity of the testing process is thus an essential part of protecting the public safety and welfare.  *Id.*

## II.    The Step 2 Clinical Skills Examination

### A.    Description of the Step 2 CS Exam

Step 2 of the USMLE assesses "the principles of clinical sciences and basic patient-centered skills that provide the foundation for the safe and effective practice of medicine."  USMLE, *2010 Step 2 Clinical Skills (CS) Content Description and General Information* at 3 (attached as Ex. "1" to Pl. Motion).  As noted above, there are two components of Step 2, Clinical Knowledge (CK) and Clinical Skills (CS). "Step 2 CK uses the multiple-choice examination format to test clinical knowledge.  Step 2 CS uses standardized patients to test medical students and graduates on their ability to gather information from patients, perform physical examinations, and communicate their

findings to patients and colleagues." *Id.*   The present lawsuit involves the Step 2 CS examination.

The Step 2 CS exam consists of 12 patient encounters, each of which lasts 15 minutes under standard testing time. *Id.* at 6.   (For some examinees, one of these encounters may be a telephone encounter. *Id.* at 7-8.)   "The testing area...consists of a series of examination rooms equipped with standard examination tables, commonly used diagnostic instruments..., non-latex gloves, sinks and paper towels....  Outside of each examination room is a cubical equipped with a computer, where [the examinee] can compose the patient note" after conducting the examination and diagnostic interview. *Id.* at 6.

When examinees enter the examination room, they encounter a "standardized patient" who has been trained to portray a clinical problem.   *Id.* at 6.   Prospective examinees receive the following information regarding the patient encounter:

> When you take the Step 2 CS examination, you will have the same opportunity as all other examinees to demonstrate your clinical skills proficiency....
>
> By asking this patient relevant questions and performing a focused physical examination, you will be able to gather enough information to develop a preliminary differential diagnosis and a diagnostic work-up plan.
>
> You will be expected to communicate with the standardized patients in a professional and empathetic manner.   As you would when encountering real patients, you should answer any questions they may have, tell them what diagnoses you are considering, and advise them on what tests and studies you will order to clarify their diagnoses....
>
> The cases are developed to present in a manner that simulates how patients present in real clinical settings....   Based on the patient's presenting complaint and the additional information you obtain as you begin taking the history, you should consider all possible diagnoses and explore the relevant ones as time permits....

You should perform physical examination maneuvers correctly and expect that there will be positive physical findings in some instances….

You should attend to appropriate hygiene and to patient comfort and modesty….   Female patients will be wearing bras which you may ask them to loosen or move if necessary for a proper examination.

*Id.* at 4, 6-7.

### B.    Purpose of the Step 2 CS Exam

Research has shown that "poor communication" is "the most important factor affecting patients' trust in their doctors," and that improving the communication skills of physicians "can lead to more accurate diagnoses, better patient compliance, higher retention rates, more referrals, lower staff turnovers, reduced malpractice premiums, and fewer lawsuits."[2]  "Evidence shows that many patient, provider, and health system benefits can result from the combination of clinical expertise and effective communication, including greater patient and physician satisfaction, greater patient understanding and acceptance of treatment plans, reduced patient distress, and fewer lawsuits."[3]

Consistent with this research, communication and interpersonal skills are now a required component of the curriculum in every U.S. medical school.[4]  These skills are also one of six core competencies that must be included in the curriculum of all

---

[2]      R. Emanuel, "Communication: Humanities' Core Discipline," 9 American Communication Journal (Summer 2007) (citations omitted).

[3]      G. Gordon, "Defining the Skills Underlying Communications Competence," 5 Seminars in Medical Practice 20 (Sept. 2002)

[4]      *See* Liaison Committee on Medical Education, *Standards for Accreditation of Medical Education Programs Leading to M.D. Degree,* ED-19 (June 2008) ("There must be specific instruction in communication skills as they relate to physicians' responsibilities, including communication with patients, families, colleagues, and other health professionals.").

accredited residency programs.[5]  "The ability to communicate effectively with patients, demonstrating appropriate interpersonal skills, is essential to safe and effective patient care," and the "Step 2 CS [exam] is intended to determine whether physicians seeking an initial license to practice medicine in the United States … can communicate effectively." *Step 2 Clinical Skills Description* at 10 (attached as Ex. "1" to Pl. Motion).

###     C.      Elements and Scoring of the Step 2 CS Exam

"Carefully developed rating scales, as well as intensive training in their use, are used by the standardized patients to assess communication, interpersonal skills, and English-speaking skills" on the Step 2 CS exam.  *Id.* at 10.  "Examinees are scored in three separate subcomponents:  Integrated Clinical Encounter ("ICE"), Communication and Interpersonal Skills ("CIS"), and Spoken English proficiency ("SEP").  Each of the three subcomponents must be passed in a single administration in order to achieve a passing performance on Step 2 CS."  *Id.*

The **ICE subcomponent** assesses (1) the examinee's ability to obtain information from and about the patient during the interview and physical examination, and (2) the examinee's ability to document what she has learned in a note that summarizes the findings of the patient encounter and the diagnostic impressions.  *Id.* The trained patients score the data-gathering element, while trained physician raters score the patient note.  *Id.*

---

[5]      *See* Accreditation Council for Graduate Medical Education, *Common Program Requirements: General Competencies* (Feb. 13, 2007) ("Interpersonal and Communication Skills:  Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals.").

The **SEP subcomponent** assesses the "[c]larity of the examinee's spoken English communication within the context of the doctor-patient encounter (*e.g.*, pronunciation, word choice, and minimizing the need to repeat questions or statements)." *Id.* at 11. The examinee's SEP performance is evaluated "by the standardized patients using rating scales and is based upon the frequency of pronunciation or word choice errors that affect comprehension, and the amount of listener effort required to understand the examinee's questions and responses." *Id.*

The **CIS subcomponent** includes assessment of:

- *Questioning skills* – examples include:

    - use of open-ended questions, transitional statements, facilitating remarks

    - avoidance of leading or multiple questions, repeat questions unless for clarification, medical terms/jargon unless immediately defined, interruptions when the patient is talking

    - accurately summarizing information from the patient

- *Information-sharing skills* – examples include:

    - acknowledging patient issues/concerns and clearly responding with information

    - avoidance of medical terms/jargon unless immediately defined

    - clearly providing counseling when appropriate and closure, including statements about what happens next

- *Professional manner and rapport – examples include:*

    - asking about expectations, feelings, and concerns of the patient; and about support systems and impact of illness, with attempts to explore these areas

    - showing consideration for patient comfort during the physical examination, and attention to cleanliness through hand washing or use of gloves

- providing opportunity for the patient to express feelings/concerns

- encouraging additional questions or discussion

- making empathetic remarks concerning patient issues/concerns, and making patient feel comfortable and respected during the encounter

*See id.* at 10-11.   Standardized patients assess examinee performance on the CIS subcomponent and provide a global rating of these skills using a series of rating scales. *Id.* at 11.


## III.   Aaron Hartman

Aaron Hartman is a fourth-year medical student enrolled at the State University of New York's School of Medicine at Stony Brook University Medical Center.   Complaint ¶ 6.[6]   Mr. Hartman "is affected by a significant speech dysfluency (stuttering)." *Id.* at ¶ 9.   His "speech is characterized by severe dysfluencies in the form of extended pauses between syllables, prolongations and repetitions of initial sounds as well as sounds within words," and "accompanying physical concomitants such as jaw muscle tensing, eye blinking, lip pressing, and poor eye contact when speaking." *Id.*   His dysfluencies "become significantly more pronounced" during "periods of elevated stress," such as when he talks with people he does not know. *Id.* As a result, he "participates minimally in activities that require speaking," and he "refuses to speak on the telephone with strangers." *Id.* ¶ 11.

---

[6]   This statement of facts relating to Mr. Hartman relies primarily upon the allegations in his complaint.   NBME does not contest those facts for purposes of Mr. Hartman's preliminary injunction motion.   Nor does NBME contest, for purposes of this motion, that Mr. Hartman is disabled within the meaning of the ADA.

According to Mr. Hartman, his speech dysfluency "substantially limits the major life activities of verbal or oral communication, speech and interpersonal skills…." *Id.* ¶ 11.   Mr. Hartman acknowledges that these are some of the very skills which are "necessary to take the USMLE Step 2 CS examination." *Id.*

The speech expert Mr. Hartman recently consulted -- Dr. Tetnowski -- has also acknowledged that Mr. Hartman's functional limitations involve some of the very skills that the Step 2 Clinical Skills exam is intended to assess:

> Aaron appears to be greatly affected by his stuttering.  As of this time, Aaron has not been able to pass the CS section of the USMLE.   His scores from June 26, 2009 indicate that he did pass two of the three sections of the USMLE Step 2 CS.  His report indicates that he did pass the Integrated Clinical Encounter (ICE) section and the Spoken English Proficiency (SEP) section of the test.   He did however *FAIL* the Communication and Interpersonal Skills (CIS) section of the test. According to information from the USMLE website, the CIS subcomponent includes assessment of questioning skills, information sharing skills, and professional manner and rapport.  Many of the skills listed in this section are verbal in nature and include "asking about expectations, feelings, and concerns of the patient," and "making empathetic remarks concerning patient issues/concerns."   These are specific tasks that Aaron would struggle with due to his severe stuttering.

*See* Tetnowski Decl., Ex. "15" at p.6.

## IV.   Mr. Hartman's Requests For Accommodations On The Step 2 CS Exam

Mr. Hartman first applied for accommodations on the USMLE Step 2 CS examination in July 2008, requesting double the standard testing time.  Complaint ¶ 18. He later supplemented this application by asking to use a teletypewriter ("TTY") if his exam included a "telephone patient encounter." *Id.*   NBME granted Mr. Hartman accommodations, albeit not precisely those he had requested.   NBME granted Mr. Hartman 50% more time for the encounter than standard, and assigned to him a form of

the exam that substitutes a live patient encounter for any telephone encounter, thereby making the use of a TTY unnecessary. *Id.* ¶ 19.

On June 26, 2009, Mr. Hartman took the Step 2 CS exam with these accommodations and secured a passing grade on two of three subcomponents. *Id.* ¶¶ 20, 21.   He passed the Integrated Clinical Encounter and the Spoken English Proficiency subcomponents.   *Id.*   However, he received a failing score on the Communication and Interpersonal Skills subcomponent. *Id.* ¶ 21.   As a result, he did not pass the Step 2 CS exam.

Mr. Hartman applied for accommodations again in September 2009, in advance of re-taking the Step 2 CS exam. *Id.* ¶ 23.   This time, he requested permission to type his questions and responses on a laptop computer during the patient encounter, with an "orator" to read to the patient what Mr. Hartman had typed. *Id.* ¶ 23.   He also requested that "the standard patient rating scales be modified to reflect the use of an orator." *Id.* ¶ 23, n.2.   In other words, he recognized that his requested accommodations (in that instance, a computer and a human "orator") would affect the demonstration of the skills that are assessed on the exam, so he asked the NBME to score his exam in a different manner.   *See* Hartman Decl. ¶ 21; *see also* Pl. Motion, Ex. "5" at 4 ("I would also like the SP rating scales to be modified so that the use of an orator would not negatively impact my score").

NBME denied Mr. Hartman's request to use a computer and an orator. Complaint ¶ 25.   However, NBME agreed to give Mr. Hartman additional time to demonstrate his skills.   NBME granted Mr. Hartman double time -- *i.e.*, an additional 15

minutes -- for each patient encounter.  *Id.*  NBME also agreed, as before, that his exam would not include a telephonic patient encounter.

"Through follow up phone calls and letters to NBME," Mr. Hartman subsequently requested "the use of assistive technology such as text-to-speech software," which he would operate using "either a laptop computer or iPod with keyboard and speaker attachment." *Id.* ¶ 26.  Mr. Hartman had never used text-to-speech software in any context prior to making this request, *see id.* at ¶ 23, n.2,  and passed all oral examinations in medical school, including those similar to Step 2 CS, with only the accommodation of extra time.   Pl's Interrogatory Resps., Exhibit "3" hereto, pp.9-10. Mr. Hartman suggests in his preliminary injunction papers that Dr. Tetnowski recommended his use of the text-to-speech technology as an accommodation.  Pl. Mem. pp.23-24. However, Mr. Hartman actually requested this accommodation at the suggestion of his attorney, in advance of filing this lawsuit.  Tetnowski Dep. Trans., Exhibit "1",  at pp.158-59; Pl's Interrogatory Set II Resps., Exhibit "4" hereto, p.5.

Mr. Hartman has now abandoned his request to use a laptop computer and an "orator," as well as his request to have the scoring of the exam changed, and does not seek these accommodations in his Complaint or preliminary injunction motion. Apparently, even Mr. Hartman recognizes that these accommodations would alter what the Step 2 CS exam is trying to measure.[7]  (Of course, all he has really done is substitute a mechanical "orator" for the human orator that he originally requested -- and,

---

[7]    *See* Pl. Mem. pp.25-26 (attempting to distinguish the present case from a case in which a disabled plaintiff asked to have an exam scored differently for her, and noting that the court in the other case "held that a modification in the scoring of an exam is, by its very nature, ... a modification which fundamentally alters the measurement of the skills or knowledge the examination is intended to test;" in contrast, says Mr. Hartman, his current request "seeks no change in the grading process" of the Step 2 CS exam).

as before, the requested accommodation would modify the measurement of the skills that the Step 2 CS exam is intended to assess.)

## ARGUMENT

### I. Preliminary Injunction Standard

As the Supreme Court recently emphasized, a preliminary injunction is "an extraordinary remedy" and requires "a clear showing that the plaintiff is entitled to such relief." *Winter v. National Resources Defense Council, Inc.*, 129 S. Ct. 365, 376 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 374. If a party fails to satisfy any of these factors, the preliminary injunction must be denied. *See id.* at 374-81.

A plaintiff's burden is even higher when the requested relief is mandatory in nature, as here. Rather than maintain the status quo, the requested injunction would provide Mr. Hartman with the very relief that he would obtain if he were to prevail on the merits. Such an injunction "should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33-34 (3d Cir. 1995) (citations omitted).

Mr. Hartman has not shown that he is entitled to a preliminary injunction under this demanding standard.

II.  **Mr. Hartman Is Unlikely To Prevail On The Merits Of His Claims**

A.  **The ADA Requirements Relating to Examinations**

Under Title III of the ADA, organizations that offer "examinations...related to applications, licensing, certification or credentialing for secondary or post-secondary education, professional, or trade purposes [must] offer such examinations in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  42 U.S.C. § 12189.

The regulations promulgated by the U.S. Department of Justice ("DOJ") to implement Section 12189 provide, in relevant part, as follows:

(b)  "*Examinations.*  (1) Any private entity offering an examination covered by this section must assure that --

(i)  The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory manual, or speaking skills, the examination results, accurately reflect the individuals aptitude or achievement level whatever other factor the examination purports to measure, rather than reflecting the individuals impaired sensory, manual, or speaking skills *(except where those skills are the factors that the examination purports to measure)....*

\* \* \*

(3)  A private entity offering an examination covered by this section shall provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills, *unless that private entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the measurement of the skills or knowledge the examination is intended to test* or would result in an undue burden...."

28 C.F.R. §§ 36.309 (b)(1)(i) and 36.309 (b)(3) (emphasis added).

**B.     NBME Is Not Required To Provide Accommodations That Would Affect The Assessment Of Skills That Are Intended To Be Assessed As Part Of The Clinical Skills Exam**

Mr. Hartman's requested accommodation relates directly to skills that the exam is intended to measure.  The ADA does not require such accommodations.  Mr. Hartman recognizes this self-evident and dispositive flaw in his claim, which is why he "anticipates" and attempts to refute such an argument in his opening brief.  *See* Pl. Mem. pp.23-27.    Mr. Hartman has called the relevant case authority to the Court's attention, but is wrong in suggesting that his requested accommodation differs in any material way from the accommodations that these other cases rejected.

Under the ADA regulations quoted above, a testing organization is not required to provide accommodations that are intended to address "impaired sensory, manual or speaking skills" if "those skills are the factors that the examination purports to measure." 28 C.F.R. § 36.309(b)(1)(i).  This point is made again in the regulatory language which provides that auxiliary aids are not required if they "would fundamentally alter the measurement of the skills or knowledge the examination is intended to test."  *Id.* at § 36.309(b)(3).  The DOJ also makes this point in its guidelines relating to Title III:

> ILLUSTRATION 2:  ABC Testing Service administers written examinations designed to test specific skills or areas of knowledge.   An individual with a vision impairment or learning disability that limits the ability to read written material may be unable to pass such examination because of limited reading ability, regardless of his or her knowledge or ability in the area that the test is designed to measure.   ABC must administer the test in a manner that enables the applicant to demonstrate his or her skills or knowledge, rather than the ability to read.

> BUT:  If the test is designed to measure the ability to read written material, it may be administered in written form because the result will accurately reflect the individual's reading ability.

U.S. DOJ, *ADA Title III Technical Assistance Manual*, at 40 (1993).[8]

Similarly, the Equal Employment Opportunity Commission has promulgated a regulation under Title I of the ADA that addresses the administration of tests in the employment context.   *See* 29 C.F.R. § 1630.11 (employers must administer employment tests to disabled individuals so as "to ensure that … the test results accurately reflect … whatever … the test purports to measure, rather than [the disability]").  EEOC has offered the following guidance with respect to this regulation:

> This provision does not apply to employment tests that require the use of sensory, manual, or speaking skills where the tests are intended to measure those skills. Thus, an employer could require that an applicant with dyslexia take a written test for a particular position if the ability to read is the skill the test is designed to measure. Similarly, an employer could require that an applicant complete a test within established time frames if speed were one of the skills for which the applicant was being tested.

29 C.F.R. Part 1630, App., at 385 (2009).[9]   Thus, EEOC has also recognized that testing accommodations are not required under the ADA if they relate to a skill that the test is intended to measure.

Applying the DOJ regulations quoted above, the Second Circuit recently rejected an examinee's claim that the ADA obligated the State of New York to administer a teacher certification exam to the examinee in an oral format because of her disability, dyslexia:

---

[8]   *See also Standards for Educational and Psychological Testing* at 101-02 (1999) (published by the American Education Research Ass'n, the American Psychological Ass'n, and the Nat'l Council on Measurement in Education) ("[A]ccommodations are not needed or appropriate under a variety of circumstances.  First, the disability may, in fact, be directly relevant to the focal [exam] construct.  For example, no accommodation is appropriate for a person who is completely blind if the test is designed to measure visual spatial ability.  Similarly, in employment testing it would be inappropriate to make test modifications if the test is designed to assess essential skills required for the job and the modifications would fundamentally alter the constructs being measured….  Professional judgment necessarily plays a substantial role in decisions about test accommodations.").

[9]   *See also* EEOC, "Job Applicants and the [ADA]," Q&A 4 ("Example:  An employer gives a written test for a proofreading position.  The employer does not have to offer this test in a different format (*e.g.,* orally) to an applicant who has dyslexia because the job itself requires an ability to read.").

[W]here a test applicant seeks an accommodation that would prevent her scores from accurately evaluating the skills intended to be measured by the test, the denial of the requested accommodation is not unlawful.

Here, Falchenberg's request for an "oral" examination that does not require her to indicate spelling, punctuation, capitalization and paragraphing would effectuate precisely the type of fundamental alteration that need not be made as a matter of law.  It is undisputed that spelling, punctuation, capitalization and paragraphing are among the skills tested on the LAST.  Falchenberg's competency at these skills -- competencies that all other examinees are required to demonstrate -- cannot be tested without requiring her to actually spell, punctuate, capitalize and paragraph. NES granted Falchenberg every accommodation she requested that did not interfere with the measurement of skills actually tested on the LAST…. However, NES was not legally obligated to grant her additional accommodations fundamentally altering the LAST.

*Falchenberg v. N.Y. State Dep't of Ed.*, 2009 U.S. App. LEXIS 12213, ** 4-5 (2d Cir. 2009) (citing 28 C.F.R. §§ 36.309(b)(1)(i) and 36.309(b)(3)).   The appellate court affirmed summary judgment in favor of defendants.  *See* 567 F. Supp. 2d 513, 521 (S.D.N.Y. 2008) ("If a skill is measured, it is fundamental to the examination at issue, and a requested accommodation that would waive measure of the skill need not be granted as a matter of law.").

One of the cases the Second Circuit relies upon in *Falchenberg* is *Powell v. Nat'l Bd. of Medical Examiners*, 364 F.3d 79 (2d Cir. 2004).  The plaintiff in *Powell* was a second-year medical student who claimed to have an attention deficit disorder.  She requested extra testing time on Step 1 of the USMLE, which she was required to pass in order to continue into her third year of medical school.  The request was denied, she failed Step 1, and was dismissed from medical school.  *Id.* at 81-82.  She then sued her medical school (for not waiving the Step 1 requirement) and NBME (for not providing her the accommodations she requested).  The district court granted summary judgment for both the school and NBME, and the court of appeals affirmed:

[A] defendant need not make an accommodation at all if the requested accommodation "would fundamentally alter the nature of the service, program, or activity."

It was well within UConn's authority to decide that in order for it to adhere to the demanding standards of a medical school responsible for producing competent physicians, it needed to require plaintiff to pass Step 1.  The accommodation requested by plaintiff, that she be allowed to continue in the program without first passing Step 1, would have changed the nature and substance of UConn's program.  Other underperforming students were required to prove their mastery of this knowledge before being allowed to advance.  Permitting a student who did not definitively prove her mastery of basic medical sciences to advance into the later stages of medical school, and become a treating physician who had direct contact with patients was something the medical school correctly believed would unreasonably alter the nature of its program.

* * *

With respect to the National Board, it is clear that it followed its standard procedure when it determined that appellant was not entitled to a test accommodation.  Its procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination.  As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it.

* * *

Were the National Board to depart from its procedure, it would be altering the substance of the product because the resulting scores would not be guaranteed to reflect each examinee's abilities accurately.

*Powell*, 364 F.3d at 88-89.  Much of this reasoning applies equally here.

The same is true of the reasoning applied in *Jacobsen v. Tillman*, where the plaintiff asked to have the math component of a teacher certification test waived, or to have "an alternative test method" used to assess her skills.  *See* 17 F. Supp. 2d 1018, 1022-23 (D. Minn. 1998).  She sued when these accommodations were not provided, and the district court granted summary judgment for the defendants on her ADA claim:

Minnesota state law requires that MBOT choose an examination to evaluate the skills of reading, writing, and mathematics as part of the state licensure process for teachers. MBOT has chosen the PPST. A court grants a Minnesota state agency, specifically charged with enforcing a particular area of state law, a deferential standard of review....

The objective ability to perform and demonstrate math skills is an inherent part of a teacher's duties. The State, which publicly validates the competence of a teacher by issuing a license, is entitled to demand and receive an objective demonstration of competence....

The court finds plaintiff's request for waiver of the math portion of the PPST an unreasonable modification that would fundamentally alter the nature of Minnesota's certification of qualified individuals ... to teach the children of the state.

*Id.* at 1024-26.

Similarly, the Florida Supreme Court held that an individual who had been diagnosed with a learning disability and attention deficit disorders was not entitled to have the scores on two parts of her bar examination averaged as an accommodation to her disabilities:

Assuming S.G. is disabled under the ADA, the Board must reasonably accommodate her in administering the bar exam to ensure that the exam reflects the substantive legal knowledge, reasoning ability, and analytical skills it is intended to test rather than S.G's disability.... However, modification which would "fundamentally alter the measurement of the skills or knowledge the examination is intended to test" are not required....

Here, S.G. originally requested and was given extra time to complete the bar examination. S.G.'s present request, however, is of a very different nature. She now requests not an accommodation in the administration of the exam, but an accommodation in the scoring of her exam. A modification in the scoring of an exam is, by its very nature, a modification which "fundamentally alters the measurement of the skills or knowledge the examination is intended to test." Such a modification or accommodation is not required under the ADA.

*Florida Bd. of Bar Examiners re: S.G.*, 707 So. 2d 323, 324-25 (Fla. 1998) (citations omitted).[10]

The fact that the ADA does not require fundamental alterations to academic or professional requirements by way of accommodations is not surprising, given its history. Enacted in 1990, the ADA was modeled after Section 504 of the Rehabilitation Act. "Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Southeastern Community College v. Davis*, 442 U.S. 397, 413 (1979). Thus, in *Davis*, the Supreme Court held that a nursing school did not violate Section 504 by refusing to admit a prospective student who had a "serious hearing disability," and that the school was not required to undertake "affirmative action that would dispense with the need for effective oral communication," such as having "individual supervision by faculty members whenever she attends patients directly," or dispensing with certain required courses for the plaintiff. *Id.* at 988-89. These broad principles apply equally here. The ADA does not require NBME to "dispense with the need for effective oral communication" as measured by the Step 2 CS exam, by allowing Mr. Hartman to use text-to-speech technology as an accommodation. Requiring NBME to do so would be a

---

[10]     *See also Maczaczyj v. State of N.Y.,* 956 F. Supp. 2d 403 (W.D.N.Y. 1997) (graduate school not required to allow plaintiff to participate in a program electronically rather than in person because of an impairment that affected his ability to interact with people, because that would be a fundamental alteration of the program); *Breece v. Alliance Tractor-Trailer Training II, Inc.*, 824 F. Supp. 576, 579 (E.D. Va. 1993) (rejecting plaintiff's claim that a truck driving school could have accommodated him by, *inter alia*, allowing "a sign language interpreter … with him in the truck cab" or a speaker on his shoulder … amplifying his instructor's voice," and holding that plaintiff's hearing impairment could not be accommodated "without fundamentally altering the nature of Alliance's intensive training program").

lowering of the standards that are reflected in the Step 2 CS exam and a substantive modification of this portion of the USMLE. [11]

Mr. Hartman's own papers establish that he seeks accommodations that relate directly to skills that the Step 2 CS exam assesses. *See, e.g.,* Complaint ¶ 11 ("Hartman's speech dysfluency … substantially limits the … verbal or oral communication, speech, and interpersonal skills which are necessary to take the USMLE Step 2 CS examination"); Pl. Motion, Ex. "15", at p.6 (Tetnowski assessment report) (Step 2 CS exam includes "assessment of questioning skills, information sharing skills, and professional manner and rapport," and these are "specific tasks that Aaron would struggle with"); Hartman Decl. at ¶ 18 (stating that, when he took the Step 2 CS exam in September 2009, his impaired speech made it "difficult to establish rapport, engage in an interactive discussion with the standardized patient, respond to patient inquiries, maintain eye contact and have sufficient opportunity [to] ask questions"). Mr. Hartman claims that his speech impairment affects his speaking, communication and interpersonal skills by, among other things, limiting his ability to make contact with patients, establish rapport, and engage in an interactive dialogue, and these are skills

---

[11]     *See also Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1049 (9th Cir 1999) (citing *Davis*, among other cases, in holding that, under the ADA, a medical school did not have to modify its clerkship policies in order to accommodate the plaintiff's disability because doing so "would have fundamentally altered the nature of the Medical School curriculum"); *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 436-37 (6th Cir. 1998) (citing *Davis*, among other cases, in holding that neither the ADA nor the Rehabilitation Act required the defendant to allow plaintiff to take an abbreviated biochemistry course or to retake an exam she failed); *Doherty v. Southern College of Optometry*, 862 F.2d 570, (6th Cir. 1988) (holding that the defendant was not required to excuse defendant from demonstrating his ability to use various instruments during a "pathology clinical proficiency examination," and that the college's "refusal to waive the clinical proficiency requirement was not a failure to reasonably accommodate the plaintiff"); *Doe v. New York Univ.*, 666 F.2d 761, 775 (2d Cir. 1981) ("if the handicap could reasonably be viewed as posing a substantial risk that the applicant would be unable to meet its reasonable standards, the institution is not obligated by the [Rehabilitation] Act to alter, dilute or bend them to admit the handicapped applicant").

which the Spoken English Proficiency and the Communication and Interpersonal Skills components of the Step 2 CS exam are intended to assess. Hartman Decl. at ¶ 18.

Moreover, Mr. Hartman has acknowledged, at least implicitly, that the accommodation that he initially requested from NBME would fundamentally alter the Step 2 CS exam -- namely, use of a human "orator" to read what Mr. Hartman typed on a computer, and modification of the rating scales that are used to evaluate an examinee's performance.   Similarly, his expert, Dr. Tetnowski, identified a technique that "greatly reduced" Mr. Hartman's stuttering -- "choral speech" -- but he concluded that this technique was not an appropriate option for "the USMLE Step 2 CS in that it only works during reading and would require the assistance of another person, thereby invalidating a standardized test like the USMLE Step 2 CS."  Pl. Motion, Ex. "15", at p.8 (Tetnowski assessment report).    "It was [also] suggested by the examiner [(Dr. Tetnowski)] that a nurse or Physician Assistant be used in conjunction with Aaron to help him communicate.  After some discussion among Dr. Tetnowski and Mr. Hartman, it was also decided that this would likely invalidate the testing procedure."  *Id.*

Mr. Hartman is not pursuing the alternative accommodations that Mr. Hartman and Dr. Tetnowski considered because Plaintiff apparently concluded that they would affect the measurement of the skills that the Step 2 CS exam assesses.  However, by changing his requested accommodation from an orator to a text-to-speech device, plaintiff does not avoid this problem.   With that accommodation, as with the accommodations that Mr. Hartman and/or Dr. Tetnowski concluded would be inappropriate, there would still be a fundamental alteration of the measurement of skills that the exam is intended to test.

Mr. Hartman nevertheless asserts that the text-to-speech device would not result in a fundamental alteration.  *See* Pl. Mem. pp.23-26.  He bases this assertion on three propositions:  (1) the requested accommodation would not provide "any advantage over non-disabled examinees;" (2) the description of the Step 2 CS exam "does not disclose any credible contention that text-to-speech fundamentally alters the exam;" and (3) "on information and belief, the NBME has approved other examinees with disabilities for accommodations which were similar to Mr. Hartman's or perhaps created a greater ministerial change," such as "the use of sign language for examinees with hearing and speech impairments," or "the assistance of an aid" for "students who are blind or with significant visual impairments."  *Id.* at pp.24-25.

None of these propositions withstands analysis.  First, whether other examinees would be disadvantaged if Mr. Hartman were allowed to use text-to-speech technology is irrelevant to whether he has the legal right to such an accommodation.  In all events, other examinees are clearly disadvantaged -- or at least treated unfairly -- if they have to demonstrate important clinical skills in order to progress in their medical education and training, while someone else does not.  *See, e.g., Powell v. NBME*, 364 F.3d at 88-89, *see also* Pl. Motion, Ex. "1", at 4 (Step 2 CS exam Content Description:  "When you take the Step 2 CS examination, you will have the same opportunity as all other examinees to demonstrate your clinical skills proficiency").

Nor is Mr. Hartman correct in suggesting that the published Step 2 CS exam materials do not identify skills that would be affected by his requested accommodation.  *See* Pl. Mem pp.24-25.  Several of the skills referenced in those materials are skills the

measurement of which would be affected by text-to-speech software.[12]   Plaintiff's own expert immediately recognized this when he reviewed the content description of the Step 2 CS exam.  *See* Pl. Motion, Ex. "15", at p.6.

For Mr. Hartman to assert that the measurement of these skills would not be affected by his typing on a laptop computer or other keyboard whenever he begins to stutter during his patient encounters, and then having a "monotone" computer voice read what he has typed, at a pace "slower than ordinary speech" (*see* Pl. Mem. pp.24-25), defies common understanding of communication and interpersonal skills.  Indeed, it is precisely because his impairment affects skills that the Step 2 CS exam assesses that he wants to use the text-to-speech software; that is also why he originally wanted to use a human "orator" and then have the rating scale modified.

Mr. Hartman may think he should not be required to demonstrate every skill that is assessed on every subcomponent of the Step 2 CS exam in order to achieve a passing score, or to pass the Step 2 CS exam in order to continue with medical school, begin a residency program, and become a licensed physician.  These, however, are judgments for the NBME, Mr. Hartman's medical school, and the state licensing boards to make.  "As the courts have repeatedly held, states are accorded great deference in establishing standards for licensing professionals within their borders."  *Onyiuke v. N.J. State Sup. Ct.,* 242 Fed. Appx. 794, 797 (3d Cir. 2007). "'Educational requirements and

---

[12]      *See* pp.9-10, *supra* (skills assessed on the Step 2 CS exam include "[c]larity of the examinee's spoken English communication ... (*e.g.,* pronunciation, word choice, and minimizing the need to repeat questions or statement);" "Questioning skills -- examples include ... use of open-ended questions, transitional statements, facilitating remarks;" "Information-sharing skills -- examples include... Acknowledging patient issues/concerns and clearly responding with information;" and skills relating to "Professional manner and rapport -- examples include ... asking about expectations, feelings, and concerns of patient ... with attempts to explore these areas," "providing opportunity for the patient to express feelings/concerns," "encouraging additional questions or discussion," "making empathetic remarks concerning patient issues/concerns," and "making patient feel comfortable and respected during the encounter").

proficiency examinations are time-tested means of assuring that practitioners meet minimum standards of competence.'" 601 F.2d 305, 308 (7th Cir. 1979) (citation omitted). And when an applicant requests accommodations regarding such educational requirements and proficiency examinations, courts have consistently granted a degree of deference to the institution which has determined that the accommodations are unwarranted or inappropriate.[13] Not surprisingly, many of these cases involved requirements that were imposed upon individuals who wanted to become doctors.

Third, the fact that NBME may have provided different accommodations to examinees who are blind, deaf or have other impairments different from Mr. Hartman's does not establish that his requested accommodation would not fundamentally alter the measurement of skills that the Step 2 CS exam assesses. No examinee has ever been allowed to use text-to-speech software to communicate with standard patients during the Step 2 CS exam. Declaration of Dr. Cathy Farmer, Exhibit "5" hereto, ¶ 15. Nor has

---

[13]     *See Doe v. The Haverford School*, 2003 U.S. Dist. LEXIS 15473, *23 (E.D. Pa. 2003) (denying preliminary injunction and noting that "Courts generally will not substitute their judgment for that of an educational institution regarding what modifications fundamentally alter [their] policies"); *see also Betts v. Rector & Visitors of the Univ. of Virginia*, 145 Fed. Appx. 7, 13-14 (4th Cir. 2005) ("the University made all reasonable accommodations consistent with its fundamental educational judgment, its duty to the medical profession, and its obligation to the Commonwealth"); *McGuinness v. Univ. of New Mexico School of Medicine,* 170 F.3d 974, 979-80 (10th Cir. 1998) ("Educational institutions are accorded deference with regard to the level of competency needed for an academic degree…. An impairment limited to specific stressful situations, such as … exams which trigger … anxiety, is not a disability…. Nor is granting the plaintiff a passing grade a reasonable accommodation if university officials believe that he has not demonstrated competency in subject matter necessary for a medical degree."); *Zukle,* 166 F.3d at 1051 ("We defer to the Medical School's academic decision that the in-hospital portion of clerkship is a vital part of medical education and that allowing a student to be excused from this requirement would sacrifice the integrity of its program"); *Kaltenberger,* 166 F.3d at 436-37 ("Courts must also give deference to professional academic judgments when evaluating the reasonable accommodations requirement…. The decision of the college not to waive [its biochemistry exam] requirement and lower the standards for continued training in podiatric medicine is entitled to deference."); *Doherty,* 862 F.2d at 567-77 ("The federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum. This is the case especially regarding degree requirements in the healthcare field when to conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession."); *cf. Strathie v. Dep't of Transp.*, 716 F.2d 227, 231 (3d Cir. 1983) (program administrators were entitled to "some measure of deference" in determining the reasonableness of a requested accommodation).

any examinee ever been allowed to use any other electronic technology to substitute for the examinee's communication during the Step 2 CS exam.  *Id.* On one occasion, several years ago, an examinee was allowed to use a sign language interpreter as an accommodation.  However, because of the interpreter, the examinee did not receive an overall score on the Step 2 CS exam. *Id.* at ¶ 14.  Instead, the score report showed her scores on two subcomponents (the ICE and CIS subcomponents) and stated that no score could be obtained on the other component (the SEP subcomponent).  *Id.* at ¶ 14.

Finally, even if, arguendo, a human sign language interpreter were deemed to be analogous to text-to-speech software, plaintiff would not be entitled to his novel proposed accommodation merely because, for a prior examinee, NBME permitted an accommodation that altered the measurement of skills that the Step 2 CS exam is intended to measure.   "There is not a statutory provision that converts prior modifications into required reasonable modifications for an indefinite time period.... Entities that make genuine efforts to integrate the disabled into society should not be subjected to liability when the entities provided more than the law required."  *Doe v. The Haverford School*, 2003 U.S. Dist. LEXIS 15473, **26-27 (E.D. Pa. 2003).

**C.     NBME Has Administered The Step 2 CS Exam To Mr. Hartman In An Accessible Manner**

Mr. Hartman's ADA claim would fail even if his requested accommodations did not directly relate to skills that the Step 2 CS exam is intended to measure.  In that situation, the Court would have to decide whether the accommodations NBME offered were reasonable accommodations in light of Mr. Hartman's claimed impairments; that

is, did they enable him to access the Step 2 CS exam and demonstrate his proficiencies?

The accommodations NBME offered meet this requirement.  On his most recent accommodation request, NBME offered Mr. Hartman double the standard testing time as the primary accommodation. Farmer Declaration, Exhibit "4", ¶¶ 11-12. This accommodation mirrors the accommodation that Mr. Hartman used on at least four oral proficiency exams in medical school.  *See* Pl's Interrogatory Resps., Exhibit "3", pp.9-10.  In fact, it exceeds the  amount of extra time that Stony Brook granted Mr. Hartman on an exam known as the Clinical Practice Examination (CPX) in 2009.  *Id.*  "The CPX examination is given to all third year medical students and is designed to be similar to the Clinical Skills Step 2 examination."  *See* Sept. 3, 2009 Letter from Stony Brook Medical Center, Exhibit "6" hereto.  Stony Brook granted Mr. Hartman only  50% additional time on the CPX exam, which he passed. Pl's Interrogatory Resps., Exhibit "3", p.10.[14]

Indeed, Mr. Hartman has already taken the actual Step 2 CS examination, with accommodations the NBME approved (extra testing time and no telephonic patient encounter).   He passed two of the three subcomponents, both of which required him to demonstrate communication skills, and both of which were scored (at least in part) by the standardized patients. Farmer Declaration, Exhibit "5", ¶ 9. These undisputed facts establish that NBME has already administered the Step 2 CS exam to Mr. Hartman in

---

[14]      Dr. Tetnowski conceded during his Deposition that when he prepared and submitted his Expert Report and Declaration he was totally unaware of Stony Brook's curriculum, whether Mr. Hartman was required to take and pass oral skills examinations at Stony Brook, what skills Stony Brook may have assessed on its oral examinations and whether, if Mr. Hartman did take such examinations during medical school, he was accommodated with extra time (and how much).   Tetnowski Dep. Trans., Exhibit "1", pp.241-52. Dr. Tetnowski also admitted that he "would have liked to know how [Mr. Hartman] did on all these oral exams" at Stony Brook before preparing his Expert Report.  *Id.* at p.253, lines 11-24.

an accessible manner.  NBME has offered to do so again when he re-takes the exam.

Therefore, NBME has met its statutory obligation under the ADA.  *See* 42 U.S.C. §

12189 (examinations must be offered "in a place and manner accessible to persons with

disabilities").  *See* Farmer Declaration, *generally*, Exhibit "5".

Mr. Hartman is asking the NBME to provide additional accommodations that he

believes will help him pass the exam.    He wants, in effect, his preferred

accommodations (the use of text-to-speech software), not just reasonable

accommodations.[15]  In the view of Plaintiff's Expert, Dr. Tetnowski, NBME should be

required to provide Mr. Hartman with the accommodations that will help him pass the

Step 2 CS Examination.  Tetnowski Dep. Trans., Exhibit "1", p.182.  The ADA, however,

does not entitle Mr. Hartman to his preferred accommodations or those that might

assure his success.[16]

Other cases involving testing accommodation requests illustrate this proposition.

For example, in *Fink v. New York City Dep't of Personnel*, 855 F. Supp. 68 (S.D.N.Y.

1994), two visually impaired individuals claimed that their employer violated the

Rehabilitation Act by refusing to provide an employment-related test in Braille.[17]  The

---

[15]     Mr. Hartman's attorney, Mr. Weiner, apparently suggested this alternative accommodation after having telephone conversations with various sources who ostensibly knew nothing of Mr. Hartman, the Step 2 CS examination or the degree of Mr. Hartman's speech dysfluency.  Only after Mr. Weiner proposed this accommodation to Mr. Hartman, who then suggested it to Dr. Tetnowski, did Dr. Tetnowski recommend text-to-speech technology as a "suitable" accommodation.  Pl's Interrogatory Set II Resps., Exhibit "4", p.5.  Dr. Tetnowski conceded during his deposition that apart from this litigation, he had had never recommended that even one of his patients should use a text-to-speech device in any setting. Tetnowski Dep. Trans., Exhibit "1", p.137, lines 10-16.

[16]     *Cf. Shelton v. Univ. of Medicine & Dentistry of N.J.*, 223 F.3d 220, 225 (3d Cir. 2000) (holding that, with respect to Title VII's "reasonable accommodation" requirement for religious discrimination, "a sufficient religious accommodation need not be the 'most' reasonable one (in the employee's view), it need not be the one the employee suggests or prefers, and it need not be the one that least burdens the employee….  [T]he employer satisfies its Title VII religious accommodation obligation when it offers any reasonable accommodation.") (citing *Ansonia Bd. of Ed. v. Philbrook*, 479 U.S. 60, 68-69 (1986)).

[17]     "There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.  Thus, courts have applied the same analysis to claims brought under both

employees were offered other accommodations, including "the examination on tape, a tape recorder, a reader, and extra time," but argued that they were entitled to "their preferred accommodation" unless the defendants could prove that this would be "unduly burdensome." Id. at 72-73.  The court rejected this argument:

> Plaintiffs' first argument, that defendants have not established the impracticability of offering the examination in Braille, appears to stem from a misunderstanding of the statutory requirements.... There is no provision requiring the employer to take account of the disabled individual's preferences in choosing the means of accommodation.  So long as the means chosen allow the individual to fairly compete, the employer satisfies his legal obligation.  In this case, therefore, the question of whether defendants could have offered the examination in Braille without undue hardship and expense is not the proper question with which to begin.  Rather, I must first determine whether the efforts made by defendants were reasonable accommodations....
>
> As a matter of law ... I find that the accommodations offered by defendants were sufficient to satisfy their statutory obligation.  By providing a taped version of the exam, a tape player, a reader, and extra time, defendants afforded sufficient aid so that plaintiffs' blindness should not have been a disadvantage to them in taking the examination.

Id. at 72.  The Second Circuit affirmed, holding that Section 504 "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation is reasonable," and that the accommodations provided were reasonable as a matter of law.  53 F.3d 565, 567 (2d Cir. 1995).

Similarly, in Jaramillo v. Professional Exam. Serv., Inc., 2008 NDLR (LRP) LEXIS 205 (D. Conn. 2008), the court granted summary judgment to the defendant on a Section 504 claim asserted by a legally blind examinee.  The examinee was allowed to take a licensing exam using CCTV supplemented by a live reader, and was given

---

statutes, and courts routinely look to Rehabilitation Act case law to interpret the rights and obligations created by the ADA."  Zukle v. Regents of the Univ. of Calif., 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) (citations omitted).

extended testing time.  The court concluded that "no reasonable jury could find that the accommodations provided…were unreasonable," and noted that the examinee had been successful in the past with identical accommodations.  *Id.* at **13-14.  The court also noted that "the fact that Ms. Jaramillo might now prefer other accommodations, such as the use of computer programs like JAWS and ZoomText, does not make the accommodations previously provided by the [defendant] unreasonable."  *Id.* at *11.[18]

III.  **Mr. Hartman Will Not Suffer Irreparable Harm If His Motion Is Denied**

Mr. Hartman argues that "[i]rreparable harm may be presumed when the offending party engages in acts or practices prohibited by [a] federal statute that provides for injunctive relief."  Pl. Mem. p.27. That is incorrect.  Even if Mr. Hartman could establish a likelihood of success on the merits (which he cannot), he would still have to prove that he would suffer significant irreparable harm.  The Supreme Court's 2008 decision in *Winter v. NRDC* makes clear that a likelihood of irreparable harm must be shown to obtain a preliminary injunction.  *See* 129 S. Ct. at 374.  To the extent that the older, lower court cases Mr. Hartman cites suggested otherwise, they are no longer viable.

In an effort to show irreparable harm, Mr. Hartman claims that "he will not receive a score on the USMLE Step 2 CS commensurate with his actual abilities" if he cannot use text-to-speech software, and that he "will be unable to complete his medical school

---

[18]     *See also Leine v. Calif. Dep't of Rehab.*, 1999 U.S. App. LEXIS 32521, **5-6 (9th Cir. 1999) ("Neither the ADA nor the Rehabilitation Act requires the defendant…to provide the accommodation of Leine's choice, only a reasonable accommodation."); *Carter v. Bennett*, 840 F.2d 63, 67-68 (D.C. Cir. 1988) (defendant is "not obligated to provide plaintiff with every accommodation he may request" so long as it provides reasonable accommodations); *Paulus v. Kaiser Permanente Med. Group*, 1999 U.S. Dist. LEXIS 7784, *13 (N.D. Cal. 1999) ("defendant is not required to provide plaintiff with her preferred accommodation, the voice activated software, but only a reasonable accommodation").

education, graduate and receive consideration for a residency position." Pl. Mem. p.28.

But there is no assurance that he would pass the Step 2 CS exam if he used text-to-speech software; conversely, there is no evidence that he would fail if he tested with the accommodations the NBME offered.   All he can assert is that, until he passes the Step 2 CS exam, his medical school education will be delayed (as it was when he failed Step 1 of the USMLE the first time that he took it, took a leave of absence his first year of medical school, and failed one of his medical school courses).   *See* Aaron Hartman Dep. Trans. (relevant pages), Exhibit "7" hereto, pp.107-08.  Any such delay is of his own making, as he could test promptly with the accommodations NBME offered.  In any event, such delay, if any, does not constitute irreparable harm.[19]

## IV.   The Equities Do Not Favor Mr. Hartman

In contrast to the minimal harm that Mr. Hartman would experience, NBME would suffer a harm that cannot be undone if a preliminary injunction issues requiring the NBME to administer the Step 2 CS exam to Mr. Hartman with his preferred accommodations.  *See Rothberg v. Law School Admission Council*, 102 Fed. Appx. 122, 126 (10th Cir. 2004) (reversing preliminary injunction that required LSAC to provide accommodations to an LSAT examinee because LSAC could not "hope for relief once

---

[19]     *See Kelly v. West Va. Bd. of Law Examiners*, 2008 U.S. Dist. LEXIS 56840, **6-7 (S.D. W.Va. 2008) (holding that bar applicant would not be irreparably harmed if he could not take the next bar exam with his requested accommodations); *Marsh v. Delaware State Univ.,* 2006 U.S. Dist. LEXIS 1658, *18 (D. Del. 2006) ("Plaintiff alleges that his education is being delayed; however, the Court is not persuaded that any delay amounts to irreparable harm."); *Baer v. Nat'l Bd. of Med. Examiners,*, 392 F. Supp. 2d 42, 48-49 (D. Mass. 2005) ("[I]t is not certain she will suffer the predicted harm; she may pass the test [without her requested accommodations].  Moreover, her inability to continue as a medical student without interruption…is not a harm that is irreparable…."); *O'Brien v. Virginia Bd. of Bar Examiners*, 1998 U.S. Dist. LEXIS 4344, *6 (E.D. Va. 1998) ("[plaintiff] will not be harmed as a result of being denied the opportunity to take the bar at this point"); *Pazer v. N.Y. State Bd. of Law Examiners*, 849 F. Supp. 284, 287-88 (S.D.N.Y. 1994) (same).

the injunction issues," whereas plaintiff would not be irreparably harmed by denial of the injunction).  The balance of the equities therefore favors NBME.

**V.     An Injunction Would Not Advance The Public Interest**

Mr. Hartman has not shown how the public interest would be advanced by requiring NBME to provide him with his preferred accommodations.  He simply argues that the ADA reflects a public interest in eliminating discrimination.  Pl. Mem. p.30. All statutes presumably further a public interest.  Plaintiff's argument therefore removes the public interest showing for all preliminary injunction motions involving statutory claims, which would be rather cavalier in light of the Supreme Court's holding in *Winter* that the moving party must establish all four factors to justify the "extraordinary" remedy of a preliminary injunction.

Moreover, Mr. Hartman ignores the public's interest in ensuring the integrity of a licensing examination.  That interest is particularly compelling in this case, where the exam in question is intended to help ensure the qualifications and fitness of physicians.

Finally, Mr. Hartman ignores the harm that might result to third parties from the issuance of a preliminary injunction.  If Mr. Hartman were to pass the Step 2 CS exam using text-to-speech technology, his medical school would rely upon that passing score by allowing Mr. Hartman to graduate.  (The school has denied a request from Mr. Hartman to "waive the requirement for passing USMLE Step 2 CS."  *See* Pl. Motion, Ex. "16", at p.2.)  Likewise, residency programs to which he applies would assume that Mr. Hartman has met the applicable eligibility requirements and has the skills necessary to pass the Step 2 CS exam, as demonstrated by his passing score.  As a result, Mr.

Hartman presumably would obtain a position with a residency program -- a position that otherwise would go to someone else. How would these actions be retracted or remedied if the Court subsequently concludes that Mr. Hartman was not, in fact, entitled to use text-to-speech software as an accommodation on his Step 2 CS exam?

## CONCLUSION

Mr. Hartman is asking this Court to enter a mandatory preliminary injunction that would give him the same relief he would obtain only if he were to prevail on the merits. He has fallen well short of justifying such extraordinary, interim relief.  His preliminary injunction motion should therefore be denied.


Respectfully submitted,


EASTBURN AND GRAY, P.C.

_____
Jane E. Leopold Leventhal
Grace M. Deon
60 East Court Street
P.O. Box 1389
Doylestown, PA  18901
Telephone:  215-345-7000
Facsimile:  215-345-9142

*Attorneys for Defendant,*
*National Board of Medical Examiners*


Dated:  February 12, 2010

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AARON L. HARTMAN, | : | |
| | : | |
| Plaintiff | : | No.  09-5028 |
| | : | |
| v. | : | |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| | : | Civil Action |
| Defendant | : | |

### CERTIFICATE OF SERVICE

Jane E. Leopold-Leventhal, counsel for Defendant, National Board of Medical Examiners, certifies that on the 12th day of February, 2010, she served via first class mail a true and correct copy of Defendant's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, to counsel of record named below:

Charles Weiner, Esquire
179 North Broad Street
Doylestown, PA  18901

EASTBURN AND GRAY, P.C.

_____
Jane E. Leopold-Leventhal
Grace M. Deon
Attorneys for Defendant,
National Board of Medical Examiners