# EXHIBIT "1"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


AARON L. HARTMAN


VERSUS                    NO. 09-5028


NATIONAL BOARD OF MEDICAL

EXAMINERS

* * * * * * * * * * * * * * * * * * * * * *


The deposition of DR. JOHN

TETNOWSKI, taken in connection with

the captioned cause, pursuant to the

following stipulations before Nicole

Poirrier, Certified Court Reporter,

at the University of Louisiana at

Lafayette, Burke-Hawthorne Hall, Room

203, Lafayette, Louisiana, on the 3rd

day of February, 2010, beginning at

9:34 a.m.

1  APPEARANCES:

2

3

  FOR THE PLAINTIFF, AARON L. HARTMAN:

4

     CHARLES WEINER

5     LAW OFFICE OF CHARLES WEINER

     179 NORTH BROAD STREET

6     DOYLESTOWN, PA 18901

     (215) 348-4283

7

8

9

10

11 FOR THE DEFENDANT, NATIONAL BOARD OF MEDICAL
  EXAMINERS:

12

     JANE LEOPOLD-LEVENTHAL

13    EASTBURN & GRAY

     60 EAST COURT STREET

14    DOYLESTOWN, PA 18901

     (215)345-7000

15

16

17

18

19

20

21

22

23

24

25

1                        STIPULATION

2     It is hereby stipulated by and among

3 counsel for the parties hereto that the

4 deposition of

5                 DR. JOHN TETNOWSKI,

6 be taken before Nicole R. Poirrier, Certified

7 Court Reporter, for all purposes, pursuant to

8 notice and to the provisions of the

9 appropriate statutes of the Federal Rules of

10 Civil Procedure.

11     The parties hereto waive all formalities

12 in connection with the taking of said

13 deposition, including the reading and signing

14 thereof, and except for the swearing of the

15 witness and the reduction of the questions

16 and answers to typewriting.

17     Counsel for all parties reserve all

18 objections, except as to the form of the

19 question and responsiveness of the answer, at

20 the time of taking said deposition, but they

21 also reserve the right to make objections at

22 the time said deposition or any part thereof

23 may be offered in evidence, with the same

24 rights as if the testimony had been taken and

25 given in Open Court.

1                               INDEX

2

3 EXAMINATION BY MS. LEOPOLD-LEVANTHAL . . . 5

4

5

6

7

8

9

   EXHIBIT #1 - SCORE SHEET . . . . . . . . . 30

10

   EXHIBIT #2 - DOWNLOADED INFORMATION . . . .30

11

   EXHIBIT #3 - E-MAIL FROM EMILY MCCAFFERTY .39

12

   EXHIBIT #4 - 9/17/09 LETTER TO NBME . . . .39

13

   EXHIBIT #5 - UNDATED LETTER . . . . . . . .40

14

   EXHIBIT #6 - OLDEMEYER'S REPORT . . . . . .40

15

   EXHIBIT #7 - STEP 2 CS GUIDELINES . . . . .65

16

   EXHIBIT #8 - CLINICAL SKILLS RESEARCH LIST 83

17

   EXHIBIT #9 - MCCAFFERTY'S THERAPY NOTES . 166

18

   EXHIBIT #10 - TETNOWSKI'S FILE . . . . . .187

19

   EXHIBIT #11 - DECLARATION . . . . . . . . 207

20

   EXHIBIT #12 - PERSONAL STATEMENT . . . . .238

21

   EXHIBIT #13 - ANSWERS TO WRITTEN QUESTIONS 245

22

   EXHIBIT #14 - STONY BROOK RECORDS . . . . 263

23

24

25

Page 5

1                    DR. JOHN TETNOWSKI

2                 UNIVERSITY OF LOUISIANA

3                      P.O. BOX 43170

4                    LAFAYETTE, LA 70504

5 after having been duly sworn, was examined and

6 did testify as follows:

7 EXAMINATION BY MS. LEOPOLD-LEVENTHAL:

8 Q     Good morning, Dr. Tetnowski.  My name is

9       Jane Leopold-Leventhal and I represent the

10       National Board of Medical Examiners in a

11       lawsuit that Aaron Hartman has brought

12       against the NBME in the United States

13       District Court for the Eastern District of

14       Pennsylvania.  This will be a question and

15       answer session and I would ask you first

16       whether or not you've ever had your

17       deposition taken before?

18 A     Yes, I have.

19 Q     How many times?

20 A     Twice.

21 Q     In what context?

22 A     It was with people who -- it always had to

23       do with stuttering by the way, and clients

24       who had acquired stuttering where the

25       thing that was due to some type of

1    accident in other words.

2 Q   In those particular cases were you a fact

3    witness or an expert witness?

4 A   An expert witness.

5 Q   Did you testify in court with respect to

6    either one?

7 A   Yes.

8 Q   Do you recall the case caption that has

9    been -- names of the parties and what year

10   those matters were heard?

11 A  Let's see, it was in -- the last time I

12   did it, the time I actually went to court

13   was in Portland, Oregon and my guess is it

14   would have been probably 1997, probably

15   have been the last time.  And --

16 Q  You know the plaintiff's name?

17 A  Let's see.  Charles -- I -- I could -- I

18   could get that for you.

19 Q  Was that in state or federal court, if you

20   know?

21 A  I believe state court.

22 Q  Were you qualified as an expert in that

23   hearing, if you recall?

24 A  Tell me what that means.

25 Q  That means whoever you're representing,

1     their attorney asks you certain  questions

2     --

3 A    Yes.

4 Q    -- and then asks the court to have you

5     qualified as an expert.

6 A    Yes.  Uh-huh.

7 Q    Do you know in what field or area you were

8     qualified as an expert?

9 A    In speech pathology.

10 Q   Okay.  And in the other matter where you

11    gave a deposition, did you also testify in

12    court?

13 A   Well, you know, let me go back and say

14    that where I went to court, was hired as

15    an expert witness for stuttering, that was

16    one time.  I have done a collection of

17    information for -- for cases but where I

18    was not the primary person.

19 Q   Okay.  Thank you.  That having been said,

20    let me just give you some very easy

21    instructions that'll guide our proceedings

22    this morning and this afternoon.  I'd ask

23    you to let me finish speaking before you

24    begin answering and the court reporter

25    will probably ask you the same thing.  And

1     I will try not to talk over you when

2     you're answering one of my questions.

3          To the extent that you can, provide a

4     verbal response rather than some gesturing

5     or shrugging or shaking of your head.

6     That way the court reporter can take down

7     your full response.

8          If I ask a question that uses phrases

9     or words that you would like a definition

10    for, please ask me to do so.  If I ask you

11    a compound question, which I tend to do,

12    and you're uncomfortable asking the --

13    answering the question, please ask me to

14    repeat or break down the question and I'm

15    happy to -- to do so.

16          If you need to take a break at any

17    time, please let Mr. Weiner or me know.

18          Where did you attend medical school?

19  A   I did not attend medical school.  I'm a

20    speech pathologist and I did my doctorate

21    at Florida State University.

22  Q   What year did you graduate college?

23  A   I had my bachelor's degree in 1981, my

24    master's degree in 1982 and my Ph.D. in

25    1993.

1 Q    What did you obtain a bachelor's degree

2      in?

3 A    In communicative disorders.

4 Q    At what school?

5 A    University of Central Florida.

6 Q    And where did you obtain your master's

7      degree, Doctor?

8 A    Also the University of Central Florida.

9 Q    In what field?

10 A   Communicative disorders.

11 Q   And what is your doctorate in?

12 A   The title as it's stated on my degree is

13     Audiology and Speech Pathology.

14 Q   After securing your master's degree from

15     the University of Florida, what --

16     describe your job experiences, really up

17     until today.

18 A   My job experiences up until that time --

19     as part of that training by the way, I

20     externed in two different facilities.  One

21     of them was the Brain Injury

22     Rehabilitation Center.  The other one was

23     an evaluation center for augmentative

24     communication devices.  After that, I went

25     to work for Lake County Public School

1    System and my job there was working at a -

2    - at a school and a school that had

3    children with a large number of

4    disabilities.  And the other half of my

5    position there was at a children's

6    hospital.

7  Q    From when until when were you with Lake

8    City?

9  A    I was there for one year.

10  Q    And what year was that then?

11  A    So that would have been 1983.

12  Q    What did you do next?

13  A    After that, I worked in private practice

14    and saw multiple different clients at

15    different settings from sheltered

16    workshops, as they were called, to nursing

17    facilities to, you know, office

18    individuals.

19  Q    And where was your private practice

20    located?

21  A    That was in Orlando, Florida.

22  Q    For how long did you do that?

23  A    Did that for about two years.

24  Q    Did you work with or run into a Dr.

25    Charles Golden by any chance?

Page 136

1  A     Text-To-Speech in therapy.  I have used

2        various different augmentative

3        communication devices over the years but -

4        - but indeed, those were a number of years

5        ago and my practice was a little bit

6        different.

7  Q     I know that there are all hosts of

8        augmented devices that aid stuttering --

9  A     Absolutely.

10 Q     -- that a physician like yourself could

11       use but my question is have you ever

12       actually used a Text-To-Speech device as

13       an augmentative device in therapy?

14 A     For a person who stutters, no.

15 Q     Have you ever recommended, other than with

16       respect to Mr. Hartman, that a patient use

17       a Speech-To-Text device in any context?

18 A     Text-To-Speech.  By the way, the delays,

19       I'm just trying to think back because I

20       used to work in augmentative systems years

21       ago and I know I've recommended them for

22       people and I -- I think there were some

23       Text-To-Speech and not always Text-To-

24       Speech necessarily.  Because some of these

25       devices, you know, do some other things

1    too where they're touch screens and you,

2    you know, touch a picture or -- or a

3    syllable or things like that and they

4    produce speech as well.

5 Q  Let's focus on the device that Mr. Hartman

6    brought to you --

7 A  Yes.

8 Q  -- the day you examined him.

9 A  Okay.

10 Q  Have you ever recommended that a patient

11   use one of those devices, a Text-To-Speech

12   device, in any context other than Mr.

13   Hartman?

14 A  No.

15 Q  You said no?

16 A  I said no.

17 Q  Okay.  What is a Text-To-Speech device

18   designed to do?

19 A  Well, my -- my understanding is it

20   certainly was developed for business

21   reasons 'cause that's where it -- it

22   actually came from.  The things that we

23   use on the -- on the telephone, the

24   automated answering systems, things like

25   that, that's where it was developed.  My

1    guess is that there was probably some

2    utility for it in, you know, other

3    context, I don't know, maybe military or

4    something.  I'm not -- I'm not --

5  Q  Right.  The question is --

6  A  -- I'm not perfectly familiar.

7  Q  -- just is what it designed to do.

8  A  Within the -- within the realm -- oh,

9    okay.  What it is designed to do?

10 Q  Yes.

11 A  It is designed to take the text that we

12   enter into a computer and covert it to

13   electronic sound that sounds like spoken

14   speech.

15 Q  When Mr. Hartman demonstrated it for you

16   on December 7th, was that the first time

17   that you had seen it used in practice or

18   seen it used in front of you in a live

19   encounter?

20 A  No.

21 Q  When was the first time you saw that used?

22 A  I have -- probably the first time I had

23   seen it would have been back in the -- in

24   the early 80s.

25 Q  In what context?

1  Q    I'm sorry you said see how --

2  A    By the way, there's somebody trying to get

3       in here.  Can -- I heard somebody knock

4       several times.  I don't want them to

5       interrupt.  I'd rather if we take a -- a

6       natural break rather than --

7  Q    Well, okay.

8  A    Okay.

9  Q    Well, you started to say to see how

10      successful he would be.  I -- see how

11      successful he would be on what?

12 A    To see how successful he might potentially

13      be on -- on the USMLE.

14 Q    I'm not sure I understand --

15 A    What he had said is that he had taken the

16      exam one time with the extra time

17      accommodation that was -- that was made

18      for him and that he did not pass the exam.

19      And he wanted to see, okay, if I would

20      evaluate him and look at his skills and

21      look at methods that might help him do

22      better when he took the examination again.

23 Q    So when you said that Aaron told you how

24      successful he would be, am I -- am I

25      stating this correctly to say that Mr.

1       Hartman communicated to you that he wanted

2       to investigate with you what methods might

3       be used to make him more successful on the

4       Step 2 CS Examination?

5  A    What would make him more successful in

6       meeting his potential as he took this

7       exam.

8           MR. WEINER:

9               Did you want to take a break?

10          MS. LEOPOLD-LEVENTHAL:

11              After about four more question and

12          that'll be a good natural point for a

13          break if that's okay.

14 BY MS. LEOPOLD-LEVENTHAL:

15 Q    What did you understand he meant by

16      meeting his potential?

17 A    Well, that he didn't feel like his

18      performance really reflected his true

19      abilities.

20 Q    Do you know whether his failing grade on

21      the second component could have occurred

22      completely distinct and separate from his

23      stuttering condition, any idea?

24 A    Do I know that to be the case?  I don't

25      know that to be the case.

1 Q     The second opinion, what was the first

2       opinion that you said he came to you about

3       getting a second opinion?

4 A     Well, that he had been in -- in therapy

5       and had been evaluated on several

6       occasions in the past.  And that they had

7       -- that he was in some therapy and --

8 Q     But with respect to an accommodation, do

9       you know what the -- the first opinion was

10      that he was looking for you to confirm

11      with the second opinion?

12          MR. WEINER:

13              Objection to the form.

14 A    I think that his first opinion was

15      basically that therapy would help.

16 BY MS. LEOPOLD-LEVENTHAL:

17 Q    Okay.

18          MS. LEOPOLD-LEVENTHAL:

19              Why don't we take a break?

20          -- OFF THE RECORD, BREAK TAKEN --

21 BY MS. LEOPOLD-LEVENTHAL:

22 Q    Do you believe that Mr. Hartman should be

23      offered an examination which best assures

24      his success on the Step 2 CS Examination?

25 A    Certainly.

Page 240

1  Q    Anything else?

2  A    Sometimes I would just kind of experiment

3       a little bit and talk over him, cut him

4       off a little bit on purpose.

5  Q    Any other time pressures?

6  A    Probably the last one would be at the end

7       of the evaluation because we needed to

8       wrap it up.  He needed to catch his plane

9       and I'd made some previous commitments as

10      well.

11 Q    You've never seen an oral clinical skills

12      examination actually administered have

13      you?

14 A    No, I have not.

15 Q    Are you able to characterize how the time

16      pressures that you put Mr. Hartman under

17      during the evaluation compare to those he

18      would face on the CS Exam?

19 A    Well, since I haven't seen that, I don't

20      know for sure.  The closest thing that I

21      could probably come to that is one of my

22      doctoral students a couple of years ago

23      was a person who stuttered and when he was

24      doing his comprehensive examinations I saw

25      how much that stress, the impact it had on

Page 241

1      his speech.   It's probably the closest

2      thing I can come to.

3  Q    I'd like to take a look and have you take

4      a look now at the plaintiff's answers to

5      written questions that the NBME served

6      upon him.

7           MS. LEOPOLD-LEVENTHAL:

8               I'm going to mark this as

9           plaintiff's answers to defendant

10          National Board of Medical Examiners

11          interrogatories to plaintiff, Aaron

12          Hartman.   We'll mark it as 13.

13              -- EXHIBIT 13 ATTACHED --

14  BY MS. LEOPOLD-LEVENTHAL:

15  Q    You're welcome to read through the whole

16      thing, however, I'm going to be asking you

17      about page 10.

18  A    Okay.

19  Q    So a good place to start is at question

20      six on page nine.

21  A    Is there a reason why his neurology OSCE

22      was not graded?

23  Q    I don't know.   Good question.

24  A    Okay.

25  Q    Directing your attention to the very first

1    entry which is an internal medicine

2    practical examination, February 2008.  Do

3    you know specifically, Doctor, what skills

4    were assessed on that internal medicine

5    practice exam, February '08?

6  A    No, I do not.

7  Q    Do you know what the severity of Mr.

8    Hartman's stutter was at that time?

9  A    No.

10  Q    And you -- it indicates that he passed

11    that examination, correct?

12  A    Yes, it does.

13  Q    And you -- it doesn't indicate what

14    accommodation he received, correct?

15  A    Correct.

16  Q    Did -- were you aware of Mr. Hartman

17    having taken and passed this examination

18    February 2008 prior to today?

19  A    No.

20  Q    And you would agree with me based on your

21    having read the description in this

22    interrogatory response that this exam

23    included some oral component, correct?

24        MR. WEINER:

25            Objection to the form.

Page 243

1 A    The physical examination doesn't require -

2      - I don't know if that requires -- I guess

3      I don't know what's involved with that

4      exam enough to say that there's an oral

5      component.

6 BY MS. LEOPOLD-LEVENTHAL:

7 Q    Well, it indicates it involved the bedside

8      history.

9 A    Bedside history.

10 Q   Would you expect that to be in an oral

11     component, sir?

12 A   Bedside history, yeah.  I know much of the

13     history is probably taken from charts but

14     a bedside history probably involved some

15     question asking.

16 Q   And you have no idea really what this

17     examination consists?

18 A   I have no idea.

19 Q   Okay.  And the ambulatory care OSCE, March

20     2008, Mr. Hartman never conveyed this

21     information to you, correct?

22 A   Correct.  Yeah.

23 Q   And you don't --

24 A   I didn't ask but he didn't convey that --

25 Q   -- you don't know what skills were

1     assessed during the ambulatory care OSCE

2     in March '08, correct?

3  A    No.

4  Q    And Mr. Hartman -- and these are his

5     answers just so you know, indicates that

6     he was given double time as an

7     accommodation on that examination.

8  A    Uh-huh.

9  Q    And you don't know whether there was an

10     oral component to that exam do you?

11  A    No.

12  Q    And you see now that Mr. Hartman passed

13     that examination, correct?

14  A    Correct.

15  Q    Now, Mr. Hartman characterized his stutter

16     at that point in time as severe.  Do you

17     see that?

18  A    Okay.  Let's see.  No.  I don't see where

19     that is.

20  Q    (Reading):

21          I was given two times secondary to

22       a severe stutter.

23     Under the --

24  A    Secondary to the severe stutter.

25  Q    You see that?

1   A     Yes, I do.

2   Q     And -- and you understand today that Mr.

3         Hartman passed that examination which had

4         oral components with double time in spite

5         of the fact that his stutter was severe at

6         that time, correct?

7   A     As described by him, severe stutter.

8   Q     Yes.

9   A     Severe stutter has many components to it,

10        by the way.  Some of those things,

11        feelings, not just the outward symptoms.

12        But yes, I do see that.

13  Q     And is this information that you would

14        have wanted to have had when you evaluated

15        Mr. Hartman before preparing your expert

16        report?

17  A     I think it would have been helpful.

18  Q     Next entry is Family Medicine Oral Exam,

19        April 2008.  Do you see that?

20  A     Yes.

21  Q     Now, it appears that Mr. Hartman was given

22        unlimited time due to a severe stutter.

23        Do you see that?

24  A     Yes.

25  Q     And you would agree with me that Mr.

1  Hartman passed that examination, correct?

2 A  That's what it says.  Correct.

3 Q  And Mr. Hartman didn't provide you with

4  any of the information on the Family

5  Medicine Oral Exam when you evaluated him

6  on December 7th, correct?

7 A  No.

8 Q  And information about this examination is

9  -- is one additional piece of information

10  you would have wanted before you wrote

11  your expert report, correct?

12    MR. WEINER:

13      Objection to the form.

14 BY MS. LEOPOLD-LEVENTHAL:

15 Q  Correct?

16 A  Yes.

17 Q  Next entry is Surgery Oral Examination,

18  August 2008.  Do you have any idea what

19  skills this examination assesses?

20 A  No.

21 Q  Do you agree with me that that point in

22  time Mr. Hartman, again, characterizes his

23  stutter as a severe stutter, correct?

24 A  That's what it says on here.

25 Q  And Mr. Hartman indicates that he passed

1      this examination but he didn't convey that

2      information to you when he -- you

3      evaluated him, right?

4  A   All that he told me was that he was able

5      to pass all the exams up to this point.

6      Yes.

7  Q   Is this another piece of information that

8      you would have wanted before you prepared

9      your expert report?

10  A   Yes.

11  Q   Next entry is Psychiatry OSCE, November

12      2008.  Do you know what skills this

13      examination assesses?

14  A   No.

15  Q   Do you know what the severity of Mr.

16      Hartman's stutter was at the time that he

17      took this exam in November 2008?

18  A   Only now in that he reported his

19      stuttering to be severe.

20  Q   And Mr. Hartman indicates he was given

21      double time on this examination.  Do you

22      see that entry?

23  A   Yes.

24  Q   And Mr. Hartman passed that examination

25      with double time, correct?

1 A     Yes.

2 Q     And you don't know whether or not that

3       examination included oral components?

4 A     No.

5 Q     And is this another piece of information

6       that you would have wanted before

7       preparing your expert report in this case?

8 A     Yes.

9 Q     Next entry is Neurology OSCE, December

10      2008.  Do you know what skills this

11      examination assesses?

12 A    No.

13 Q    Do you know what the severity of Mr.

14      Hartman's stutter was at that time?

15 A    No.

16 Q    And you would agree with me that, at least

17      according to Mr. Hartman, he was given

18      double time on that examination for a

19      severe stutter, correct?

20 A    That's what it says.

21 Q    And you have no idea whether or not or to

22      what degree that examination included an

23      oral component?

24 A    No.

25 Q    Next entry is OB/GYN Oral Examination,

1      February 2009, so that was about a year

2      ago, correct?

3  A   Correct.

4  Q   And you don't know what skills or

5      knowledge that examination assesses,

6      correct?

7  A   No.

8  Q   And you don't know what severity of Mr.

9      Hartman's stutter was at that time on --

10     other than his reporting that his stutter

11     was severe at that time?

12 A   Other than he reported that it was severe.

13 Q   And you understand that he passed that

14     evaluation, correct?

15 A   Yes.

16 Q   And you don't know whether that

17     examination assessed any skills having to

18     do with oral communication, correct?

19 A   No, I do not.

20 Q   And you would agree with me that that's

21     another piece of information that you

22     would have wanted before writing your

23     expert report, correct?

24 A   Correct.

25 Q   Next entry is OBGYN OSCE, February 2009.

1  I think I just asked you about the oral

2  examination February 2009.  Do you have

3  any idea what the OBGYN OSCE attempts to

4  assess?

5 A No, I don't.

6 Q Do you know what the severity of Mr.

7  Hartman's stutter was in February 2009

8  when he took this exam?

9 A Only that he says it is severe, self

10  reported.

11 Q And you understand that Mr. Hartman passed

12  that examination, correct?

13 A It's what it says here.  Yes.

14 Q And do you know whether or not that

15  examination included the assessment of

16  oral communication skills?

17 A No, I don't.

18 Q And would you agree with me that that is

19  another piece of information that you

20  would have wanted before you wrote your

21  expert report?

22 A Yes.

23 Q And finally, the Clinical Practice

24  Examination, CPX.  And I had asked you

25  about this very early on in the

1    deposition.  Were you aware that Mr.

2    Hartman took a CPX Exam in April of 2009?

3 A    Yes.

4 Q    You were.  Were you aware of that before

5    you wrote your report?

6 A    I'm -- I'm sorry.  Okay?  I know you'd

7    asked me if whether I -- I knew he was

8    taking all these tests.  I knew he was

9    taking some.  I don't know them by these

10    terms, you know, CPX, OSCE, things like

11    that.  I do know that he had described

12    some tests that he had taken and was given

13    extra time for.

14 Q    Do you know what the CPX assesses?

15 A    No.

16 Q    Do you know if it assesses oral

17    communication skills?

18 A    No.

19 Q    And in Mr. Hartman's description, he

20    indicates that, quote, (reading):

21        This was a formal examination

22      involving actors in an objective

23      standardized clinical examination.

24    Do you see that?

25 A    Yes.

Page 252

1   Q    And would you agree with me that that

2        sounds very similar to what is assessed on

3        the Step 2 CS Examination?

4           MR. WEINER:

5              Objection to the form.

6   A    I --

7 BY MS. LEOPOLD-LEVENTHAL:

8   Q    Can you tell?

9   A    -- I don't know that.

10   Q    Okay.  Do you know whether that

11        examination assessed oral communication

12        skills?

13   A    I don't know that.

14   Q    Mr. Hartman didn't give you any specific

15        information on this examination when you

16        evaluated him in December, correct?

17   A    Specifics?  No.

18   Q    Do you know what the -- do you know what

19        the severity of Mr. Hartman's stutter was

20        in April 2009 when he took and passed the

21        CPX Examination?

22   A    No.  And he doesn't say here either.

23   Q    He doesn't.  Now, he -- it indicates that

24        he was given time and a half rather than

25        double time.  Do you know why?

Page 253

1  A    No.

2  Q    Does it surprise you that Mr. Hartman in

3       April of 2009 was able to pass an

4       examination involving actors in a clinical

5       setting with only time and a half?

6            MR. WEINER:

7                 Objection to the form.

8  A    I don't know what's involved with that

9       test so I -- I -- I don't know.

10 BY MS. LEOPOLD-LEVENTHAL:

11 Q    Now, Doctor, you would agree with me that

12      information regarding this CPX

13      Examination, what it assesses, the

14      severity of Mr. Hartman's stutter, would

15      have been relevant to you on a piece of

16      information you would have wanted before

17      you prepared your expert report?

18 A    I would have liked to know how he did on

19      all these oral exams.

20 Q    And would you also have wanted to know

21      what component of the examinations were

22      oral?

23 A    To some degree, yes.  I'd like to know

24      what made up the exams.

25 Q    Okay.  And would you also have wanted to

Page 274

1                    CERTIFICATE

2          This certification is valid only for a

3 transcript accompanied by my original stamped seal

4 in blue ink on this page.

5          I, Nicole R. Poirrier, Certified Court

6 Reporter, in and for the State of Louisiana, as

7 the officer before whom this testimony was taken,

8 do hereby certify that Dr. John Tetnowski after

9 having been duly sworn by me upon authority of

10 Rule 28(a) of the Federal Rules of Civil

11 Procedure, did testify on the 3rd day of February,

12 2010, in Lafayette, Louisiana, as hereinbefore set

13 forth in the prior 278 pages; that this testimony

14 was reported by me in the voicewriting method, was

15 prepared and transcribed by me by me or under my

16 supervision, and is true and correct to the best

17 of my ability and understanding; that I am not

18 related to counsel, I am in no manner associated

19 with counsel for any of the interested parties to

20 this litigation, and I am in no way concerned with

21 the outcome thereof.

22          This 8th day of February, 2010,

23 Lafayette, Louisiana.

24          _____

             Nicole Poirrier, CCR-CVR #23009

25

# EXHIBIT "2"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

AARON L. HARTMAN

        Plaintiff,

    v.

NATIONAL BOARD OF MEDICAL
EXAMINERS,

        Defendant.

Civil Action No.:  09-5028

## DECLARATION OF PETER KATSUFRAKIS, M.D., M.B.A.

I, Peter Katsufrakis, declare as follows:

1.     I am employed by the National Board of Medical Examiners ("NBME") as Vice President, Assessment Programs.  My duties include providing strategic and developmental planning for the United States Medical Licensing Examination ("USMLE") Step 2 Clinical Skills ("CS") examination administration and providing general NBME/USMLE program oversight as a senior medical advisor.    A copy of my curriculum vitae is attached hereto as Exhibit "A".

2.     The NBME is a private non-profit corporation which, together with the Federation of State Medical Boards of the United States, Inc. ("FSMB"), another non-profit corporation, has established the USMLE.  The USMLE is an examination designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care. Each state's medical licensing authority sets its own rules and regulations for those seeking a license to practice in that jurisdiction. Results of the USMLE are reported to these

1

authorities for use in evaluating applicants seeking an initial license to practice medicine.  The USMLE provides these authorities with a common evaluation system for these applicants.  The goals of the USMLE include: (i) providing licensing authorities with meaningful information from assessments of physician medical knowledge and skills that are important to the provision of safe and effective patient care; and (ii) assuring fairness and equity to physicians through the highest professional testing standards.

3.    The mission of the NBME is to protect the health of the public by providing a common, consistent, state-of-the-art system of assessment for health professionals. Maintaining the integrity of the testing process is a critical part of the NBME's obligation to protect the public safety.  In order to ensure the integrity and meaning of the scores, the NBME ensures that the USMLE is administered under standard conditions and that no examinee or group of examinees receives unfair advantage over another on the examination.

4.    There are three major segments to the USMLE, known as "Steps."  Step 1 assesses whether an applicant can understand and apply important concepts of the sciences basic to the practice of medicine, with special emphasis on the principles and mechanisms underlying health, disease, and modes of therapy.  Step 2, which consists of separate clinical knowledge ("CK") and clinical skills ("CS") components, assesses whether an applicant can apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision, with an emphasis on health promotion and disease prevention.  Step 3 assesses whether an applicant can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine, with emphasis on patient management in ambulatory settings.

5.    Step 2 CS was first introduced in June, 2004 in response to a large body of

2

literature showing that poor communication, interpersonal and clinical skills were related to a higher incidence of malpractice suits, lower treatment compliance by patients and decreased patient satisfaction. Research shows that a small but significant number of examinees who pass the portions of USMLE that assess scientific and clinical knowledge lack the basic clinical and communication skills that are important to the safe and effective practice of medicine.

6.     Step 2 CS was designed to simulate how patients present in actual clinical settings. The scoring rubric is composed of three separate subcomponents: Integrated Clinical Encounter ("ICE"), Spoken English Proficiency ("SEP"), and Communication and Interpersonal Skills ("CIS"). Each of the three subcomponents must be passed in a single administration in order to achieve a passing performance on Step 2 CS.

7.     The ICE subcomponent assesses (1) the examinee's ability to obtain information from and about the patient during the interview and physical examination, and (2) the examinee's ability to document what he or she has learned in a note that summarizes the findings of the patient encounter and his or her diagnostic impressions. The trained patients score the data-gathering element, while trained physician raters score the patient note.

8.     The SEP subcomponent assesses the clarity of the examinee's spoken English communication within the context of the doctor-patient encounter (*e.g.*, pronunciation, word choice, and minimizing the need to repeat questions or statements). Standardized patients evaluate the examinee's SEP performance using rating scales based upon the frequency of pronunciation or word choice errors that affect comprehension, and the amount of listener effort required to understand the examinee's questions and responses.

9.     The use of an assistive device, such as text-to-speech technology, which replaces

the examinee's speech during Step 2 CS, prevents the consistent assessment throughout the encounter of the examinee's word pronunciation, word choice, and number of repetitive statements, and the effort required to understand him or her, thereby fundamentally altering the SEP portion of Step 2 CS.

10.     Even the intermittent use of text-to-speech technology for portions of the Step 2 CS examination would diminish the information available about the examinee's proficiency, thereby reducing the sample size used to assess the examinee, changing the conditions used in determining thresholds for satisfactory performance, and fundamentally altering the scoring of the SEP portion of Step 2 CS.

11.     The CIS includes assessment of the examinee's questioning skills, information sharing skills and professional manner and rapport.  More specifically:

- *Questioning skills* – examples include:
  - use of open-ended questions, transitional statements, facilitating remarks
  - avoidance of leading or multiple questions, repeat questions unless for clarification, medical terms/jargon unless immediately defined, interruptions when the patient is talking
  - accurately summarizing information from the patient

- *Information-sharing skills* – examples include:
  - acknowledging patient issues/concerns and clearly responding with information
  - avoidance of medical terms/jargon unless immediately defined
  - clearly providing counseling when appropriate and closure, including statements about what happens next

- *Professional manner and rapport – examples include:*

4

- asking about expectations, feelings, and concerns of the patient; and about support systems and impact of illness, with attempts to explore these areas

- showing consideration for patient comfort during the physical examination, and attention to cleanliness through hand washing or use of gloves

- providing opportunity for the patient to express feelings/concerns

- encouraging additional questions or discussion

- making empathetic remarks concerning patient issues/concerns, and making patient feel comfortable and respected during the encounter

13.    Examinee performance on the CIS subcomponent is assessed by the standardized patients, who provide a global rating of these skills using a series of rating scales. The use of an assistive device, such as text-to-speech technology, which eliminates or decreases the need for an examinee to speak during Step 2 CS, would affect the assessment of the skills that are evaluated on the CIS portion of Step 2 CS. For example, an examinee who utilizes this technology during Step 2 CS could have difficulty establishing rapport with a patient for several reasons, including the examinee's focus on the computer potentially reducing eye contact with the SP, and the monotone, unaffected speech the text-to-speech device produces.

14.    The plaintiff in this matter, Aaron Hartman ("Plaintiff" or "Mr. Hartman") took Step 2 CS on June 26, 2009 with the accommodation of time and one half on the patient encounter. He failed to achieve a passing score on the CIS component of the exam, indicating a deficiency during that particular administration in his questioning skills, information sharing skills and/or his professional manner and rapport. He received a passing score on the SEP and ICE components of his Step 2 CS, indicating adequate spoken English proficiency and data-gathering skills during that particular administration.

15.    The Step 2 CS examination is administered continuously throughout the year at

five locations in the US, including Philadelphia.  A cohort process is utilized for scoring to perform psychometric equating and other quality control prior to issuance of score reports, thereby ensuring the comparability of test results across all five examinations centers.  Examinee score reports are batched into seven groups each year; within a batch, examinees receive their scores within a preset scoring window that allows time for the notes to be rated by physicians, in some instances multiple times.

16.    For 2010, examinees who test between January 1 and February 28 will receive their scores between April 1 and April 29.  Examinees who test between March 1 and March 28 will receive their scores between April 29 and May 27.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 12th DAY OF
FEBRUARY, 2010

Peter Katsufrakis

6

# EXHIBIT "3"

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AARON L. HARTMAN,                          :
                                           :
                    Plaintiff              :        No.  09-5028
                                           :
        v.                                 :
                                           :
NATIONAL BOARD OF MEDICAL                  :
EXAMINERS,                                 :
                                           :        Civil Action
                    Defendant              :

**PLAINTIFF'S ANSWERS TO**
**DEFENDANT, NATIONAL BOARD OF MEDICAL EXAMINERS',**
**INTERROGATORIES TO PLAINTIFF, AARON HARTMAN**

NATIONAL BOARD OF MEDICAL EXAMINERS, Defendant, by its attorneys, Eastburn and Gray, P.C., Esquires, hereby propounds the following Interrogatories under and pursuant to Federal Rule of Civil Procedure No. 26. These Interrogatories are deemed continuing so as to require further answer from now until the time of trial, without further notice, if you learn further information called for herein. These Interrogatories are addressed to you as a party to this action, and your Answers shall be based upon the information known to you, your attorney or other representative.

These Interrogatories must be answered separately and fully by you in writing under oath. The answers are to be inserted in the spaces provided after each Interrogatory. If there is insufficient space to answer the Interrogatory, the remainder of the answer should follow on a supplementary sheet.

The Answers must be signed by you and under the applicable Rules of Civil Procedure. You must file and serve your Answers on the Defendant's attorney within thirty (30) days after service of these Interrogatories, or in accordance with the Scheduling Order issued by the Court.

# I. DEFINITIONS

As used in the Interrogatories, the words and terms set forth below are defined as follows unless a contrary meaning is apparent from the context:

1. "Plaintiff" refers to Aaron Hartman.

2. "Defendant" refers to the National Board of Medical Examiners.

3. "Describe", "specify", and/or "state" shall mean to set forth fully and unambiguously, using technical terms or words of art, if necessary, each and every fact relevant to the answer called by the Interrogatory of which the answering party or their agents, employees or representatives have knowledge.

4. "Person" or "persons" means all individuals and entities, including without limitation, individuals, representative persons (including any officer, director, employee, agent, or any person acting on behalf of or purporting to act on behalf of the designated entity), agencies, associates, companies, corporations, partnerships, limited partnerships, joint ventures, trusts, estates, public agencies, division, bureaus, boards and every other organization.

5. "Agreement" means any common understanding reached by two or more people or entities, whether written or oral, formal or informal.

6. "You" or "your" means the party separately answering the Interrogatory.

7. Whenever appropriate, a word in the singular shall include the plural thereof.  The masculine shall include the feminine, the feminine shall include the masculine, and the neuter shall include both the masculine and feminine.

8. "Document" means any written, printed, typed or other graphic material of any kind or nature however created or stored, and all mechanical, electronic, or sound recordings in your possession or control, or known by you to

2

exist.  It shall also mean all drafts or non-identical copies of documents by whatever means made.

9.    "Communicate" or "communication" means every manner or means of disclosure or transfer or exchange of information of any kind whether orally or by document or whether face-to-face, by telephone, mail, personal, electronic or any other means of delivery.

10. a. "Identify" or "identity" when used with respect to a natural person means to state his or her full name, present or last known address, present or last known position or business affiliation, all positions or business affiliations during the time period of the Interrogatory, and general description of the business in which he or she is or was engaged in each such position.

b. "Identify" or "identity" when used with respect to any other entity means to state its full name, the address, the address of its principal place of business and the names of its officers and directors.

c. "Identify" or "identity" when used with respect to a document means to state the name and title of the document, the type of document (e.g., letter, memorandum, telegram, chart, e-mail messages, electronic file, etc...), its date, the person who wrote it, the person who signed it, the person to whom it was sent, its present location, its present custodian, and the author and date of any handwritten notations on the document.  If any such document was, but is no longer in your possession or subject to your control, state what disposition was made of it and explain the circumstances surrounding, and the authorization for, such disposition.  Please state also the date or approximate date thereof.  Documents prepared prior to the period covered by the Interrogatory, but which relate or refer thereto are to be included.

d. "Identify" or "identity" when used with respect to any unwritten communication means to state the identity of the natural person making and receiving the communication, their respective principals or employers at the time of the communication, the date, manner, and place of the communication, and the substance of the communication.

e. "Identify" or "identity" when used with respect to a meeting means to state the nature of the meeting (formal gathering, conversation, telephone call, etc.), to identify all persons participating, to provide the date, duration, and location(s), and to state the substance of the discussion.

11.    "USMLE CS" means the United States Medical Licensing Exam Step 2 Clinical Skills portion.

12.   Requests for accommodations or accommodations refers only to your claim of a dysfluency disorder and no prior claims of disorders.

## II. **INSTRUCTIONS**

1.   The information requested is for all information known to you and available at the time of answering these Interrogatories, including information in the possession of your agents.

2.   To the extent any information called for by an Interrogatory is unknown to you, so state, and set forth such remaining information as is known.  If any estimate or general description can reasonably be made in place of unknown information, set forth your best estimate or general description, clearly designating the answer as such, in place of unknown information, and the basis upon which the estimate or general description is made.

3.   If any document that refers to or relates to anything about which the Interrogatory asks is no longer in your possession or subject to your control, or is no longer in existence, identify the document and state whether it is missing, lost, destroyed, voluntarily or involuntarily transferred to others, or has otherwise been disposed.  Also specify the circumstance surrounding the disposition, the date of the disposition, and the names of all persons responsible for the disposition.

4.   To the extent any Interrogatory is objected to, set forth all reasons therefore and supply all information sought by such Interrogatory to the extent that there is no objection.

5.   If you claim any privilege as a ground for not answering any Interrogatory, whether in whole or in part, describe the factual basis for your claim of privilege in sufficient detail so as to permit the Court to adjudicate the validity of the claim.

6.   These Interrogatories shall be deemed to be continuing, so as to require additional answers if further information is obtained between the time answers are served and the time of trial.   Such additional information and answers shall be served from time to time, but not later than fifteen (15) days after such additional information is received by you, or your agent, or becomes available to you or your agent.

7.   If, in responding to the Interrogatory, any ambiguity in construing the Interrogatory, a Definition, or an Instruction is encountered, set forth the matter deemed ambiguous and the construction chosen in responding to the Interrogatory.

8.   All interrogatories are directed to Aaron Hartman, unless specified otherwise.

4

## I.    GENERAL INTERROGATORIES

1.    List all witnesses you intend to call at the hearing/trial of this case, including their names, addresses, telephone numbers, relationship to the case and the Plaintiff, and a summary of the subject matter of each witness' testimony, including an identification of all documents and materials furnished, supplied or provided to you or your agents, from said witness, to the extent that you have not already provided this information.

**Aaron Hartman, 30 Great Oak Road, Saint James, NY- 631-862-6510**
**Plaintiff, Subjects of information related to the factual basis of Plaintiffs' claims.**

**JOHN A. TETNOWSKI, Ph.D., CCC-SLP, BRS/M-FD, 218 Acacia Drive Lafayette, LA  70509**
**Expert testimony on speech dysfluencies and accommodations, his evaluation of Plaintiff including but not limited to the subject areas contained in his CV and report attached to Plaintiff's Responses to Request for Production of Documents.**


**Plaintiff reserves the right to call any witness and introduce into evidence and rely upon any document included in Defendants responses to written discovery, whether or not said witnesses or documents are included in the Plaintiffiff's responses to discovery.**

2.    List all exhibits and documents you intend to introduce into evidence at the hearing/trial of this case, including an explanation as to how and when you came into possession of said exhibit and/or document, and an identification of the

author of any handwritten notations or notes that appear on said document or exhibit.

**See Documents annexed to Plaintiff's Responses to Request for Production of Documents**

3.      Please identify by name, address, telephone number and title, any doctors, therapists, chiropractors, mental health doctors, mental health practitioners, psychologists, psychiatrists, or mental health providers, and/or other medical practitioners with whom you have treated or consulted during your lifetime, for the condition(s) regarding which you seek an accommodation or accommodations on the USMLE Step 2 CS.

**Objection as to doctors, therapists, chiropractors, mental health doctors, mental health practitioners, psychologists, psychiatrists, or mental health providers and or other medical practitioners as unreasonable, overbroad, privileged and not designed to lead to the discovery of relevant or admissible evidence.  To the extent the request seeks discoverable evidence, Plaintiff answers as follows:**

**JOHN A. TETNOWSKI, Ph.D., CCC-SLP, BRS/M-FD**
**218 Acacia Drive**
**Lafayette, LA  70509**
**(337) 247-0787**

**EMILY McCAFFERTY, M.S., CCC-SLP**
**THE SUFFOLK CENTER FOR SPEECH THERAPY**
**215 Hallock Road**
**Stony Brook, NY  11790**
**(631) 689-6858**

**LESLIE OLDEMEYER, M.S. CCC-SLP**
**Speech, Language, and Hearing Program**
**Stony Brook University Medical Center**
**33 Research Way**
**East Setauket, NY 11733-3489**
**(631) 444-4191**

**CATHERINE MONTGOMERY, M.S., CCC-SLP, BRS/FD**
**American Institute for Stuttering**
**27 West 20th Street Suite 1203**
**New York, NY 10011**
**(212) 633-6400**

**MICHELLE ZLOTNICK, M.S. CCC-SLP**
**6 South Path**
**Saint James, NY 11780-4015**
**(631) 584-3283**

      4.      Have you ever sought an accommodation, or an altered, modified, revised or accommodated testing circumstance or environment over the course of your lifetime (collectively "Accommodation") for the speech dysfluency disability you identify in your Complaint and Petition for Injunctive Relief? If your answer to this Interrogatory is in the affirmative, for each request for accommodations or an altered, modified, revised or accommodated testing circumstance or environment, please explain and provide the following information:

      a.      the nature of each requested Accommodation;

      b.      the context for the requested Accommodation;

      c.      the entity or institution from whom you requested the Accommodation;

      d.      when you requested the Accommodation;

      e.      why you requested the Accommodation;

      f.      an identification of what materials you supplied to and received from the entity or institution from whom you requested the Accommodation;

      g.      whether the Accommodation was granted;

h.     what Accommodation was granted; and

i.     whether you utilized the Accommodation that was granted and, if so, how often, in what context and describe the accommodation(s) utilized.

In high school – Smithtown High School and in college, SUNY Geneseo certain courses may have required an oral presentation. On several occasions, teachers and professors would allow me to present a paper in lieu an oral presentation.

At the State University of New York (SUNY) at Stony Brook, I requested and was granted extended time for all oral examinations as of August 9, 2007. At this time, I was beginning my third year of medical school, which involves clinical rotations.  At the conclusion of each clinical rotation, there were Objective Standardized Clinical Examinations (OSCEs) which involves interviewing a patient and performing a physical exam.  Although I had completed other OSCEs during my first and second years of medical school, these were not graded.  Because they were not graded, the staff in the Clinical Skills Center (where the OSCEs take place) gave me as long as I needed to interview the patient secondary to a severe stutter.

When I began my clinical rotations, however, with graded examinations, I requested a formal accommodation from the School of Medicine.  I was evaluated by Leslie Oldemeyer, M.S. CCC-SLP, a speech pathologist at the Speech, Language, and Hearing Program at Stony Brook University Medical Center on May 14, 2007.  The School of Medicine granted me 2x time for all oral examinations. I did, indeed, utilize the 2x time that I was granted during oral examinations, including OSCEs.  In a few instances, I went over the allotted time, but the staff in the Clinical Skills Center allowed me to continue with my examination.  There were several exams (detailed below in #6)  for which I received and utilized 2x time and other exams were untimed. However, for the Clinical Practice Examination (CPX) administered by Stony Brook University Medical Center in or about the Spring of 2009, I utilized 1.5x time.

For the USMLE Step 2 CS examination (June 26, 2009), I requested 2x time for the patient encounter secondary to a severe stutter.  To the NBME, I provided a formal request for test accommodations (dated 7/11/08), a personal statement describing how my stutter impacts my life, a certification of prior test accommodations, and the speech evaluation written by Ms. Leslie Oldemeyer (identified as "Speech Pathology: Speech/Fluency Evaluation"). Instead of 2x time, the NBME granted me 1.5x time for the patient encounter.

I subsequently requested the use of a TTY (teletypewriter) device for use during any telephone encounter. To the NBME, I provided a cover letter stating my request for accommodation and explaining that I use an Ameriphone Q90D device, which hooks up to any regular telephone connection. I also provided another formal request (dated 10/31/08) for test accommodations, and a letter from Emily McCafferty, M.S. CCC-SLP, my speech pathologist. Rather than approve my request for a TTY device, the NBME stated that they would substitute a patient encounter for any telephone encounter. During the examination, I utilized the extra time for the patient encounter.

Subsequent requests for accommodations are detailed in the Complaint and Motion For Preliminary Injunction.

     5.    Have you ever utilized, relied upon or been granted the opportunity to

use or rely upon a computer or electronic device(s) with text to speech software to

communicate during any examination in your life including, but not limited to,

college or medical school? If your answer is in the affirmative, please describe

what device you utilized, for what examination, in what setting and on what date

this occurred.

During a clinical rotation in psychiatry in or about the Fall 2008, I contacted a patient's wife and utilized a TTY device during the conversation.

During a clinical rotation in the Fall of 2009, part of my evaluation involved interviewing a real patient and performing a physical examination. I utilized a laptop and the text-to-speech software called NextUp Talker. I interviewed three patients during this evaluation using this format. This took place in a hospital examination room.

     6.    Have you ever taken any oral examination or examination with any

oral component while attending the S.U.N.Y Stony Brook Medical Center for

Medical school? If your answer is in the affirmative, please describe: when you

took the examination, who administered it, the type of examination you took

(including scope, time limit and a description of the examination), whether you

received any accommodations for speech dysfluency, whether/what type, if any, of

accommodations you received on that examination, and your score/scoring scale

on that examination (including whether you passed).

**Yes, Examinations:**
- **Internal Medicine Practical Examination (February 2008): this was an examination involving a bedside history and physical examination of a patient in front of an attending physician. Due to my stutter, the attending physician did not give me a formal time limit for this exam. I passed this examination.**
- **Ambulatory Care OSCE (March 2008): this was a formal examination involving actors in an Objective Standardized Clinical Examination (OSCE). During the examination, I interviewed a patient/actor and performed a physical exam. As part of my formal accommodation with the School of Medicine at Stony Brook, I was given 2x time secondary to a severe stutter. The examination was administered by the Clinical Skills Center staff. I passed this examination.**
- **Family Medicine Oral Examination (April 2008): I was given unlimited time to answer the questions by the course director due to a severe stutter. I passed this examination.**
- **Surgery Oral Examination (August 2008): I was given unlimited time to answer the questions by the course director due to a severe stutter.   I passed this examination.**
- **Psychiatry OSCE (November 2008): this was a formal examination involving actors in an Objective Standardized Clinical Examination (OSCE). As part of my formal accommodation with the School of Medicine at Stony Brook, I was given 2x time secondary to a severe stutter. The examination was administered by the Clinical Skills Center staff. I passed this examination.**
- **Neurology OSCE (December 2008): this was a formal examination involving actors in an Objective Standardized Clinical Examination (OSCE). As part of my formal accommodation with the School of Medicine at Stony Brook, I was given 2x time secondary to a severe stutter. The examination was administered by the Clinical Skills Center staff. This examination was not graded.**
- **Ob/Gyn Oral Examination (February 2009): during this evaluation, I had to present a Powerpoint presentation. Whereas all of the other students gave the presentations in a group, due to my severe stutter, the course director allowed me to do it individually with unlimited time. I passed this evaluation.**
- **Ob/Gyn OSCE (February 2009): this was a formal examination involving actors in an Objective Standardized Clinical Examination (OSCE). As part of my formal accommodation with the School of Medicine at Stony Brook, I was given 2x time secondary to a severe**

stutter.  The examination was administered by the Clinical Skills Center staff.  I passed this examination.
- Clinical Practice Examination (CPX) (April 2009): this was a formal examination involving actors in an objective standardized clinical examination. I utilized 1.5x time.  The examination was administered by the Clinical Skills Center staff.  I passed this examination.

## II.  <u>EXPERT INTERROGATORIES</u>

7.  State the name and business address of all persons you expect to call as expert witnesses at the trial of in this matter, and state the person's occupation; whether he or she specializes in any particular field, and if so, the area or areas of specialization; and the person's qualifications including but not limited to the following:

**JOHN A. TETNOWSKI, Ph.D., CCC-SLP, BRS/M-FD**
**218 Acacia Drive**
**Lafayette, LA  70509**
**See Curriculum Vitae attached to Plaintiffs Responses to Request for Production.**

a.  The schools or training programs that each has attended, including the years in attendance, any degrees or certificates received;

b.  Experience in particular fields of endeavor, whether related or unrelated to their areas of specialty, including names and addresses of employers with years of employment;

c.  A list of all publications authored by said persons including the title of the work, the name of the periodical or book in which it was printed, and the date of its publication; and

d.  If any of the experts listed above has a resume or curriculum vitae or other summaries of qualifications that provide all of the information requested herein, you may attach a copy of same hereto.

11

8. For each expert named above, set forth: the subject matter on which the expert is expected to testify; the substance of the facts to which the expert is expected to testify; the substance of the opinions to which the expert is expected to testify; the summary of the grounds for each opinion of the expert, including, but not limited to, any textual material upon which the expert witness may or will rely. For any such texts, please identify the name of the text, the author, the edition, the year of publication and the page or pages of said text to be relied upon.

**See Report of John Tetnowski dated 12/7/2009 (date of evaluation).**

***Please note that your answer to this Interrogatory is to be given with respect to each expert you expect to call as an expert witness at the trial in this matter. In the alternative, you may supply, as your answer, a Report of the expert. In either event, the answer or the separate report shall be signed by the expert.

9. Set forth in detail the factual information supplied to each such expert including, but not limited to: all persons, objects and materials examined by the expert; the type of said objects or materials examined by the expert; the source of all objects or materials examined by the expert; the date and place of examination of said persons, objects or materials by the expert; a description of all records, reports, medical documents, information, or other documents or information reviewed by such experts; a description of all written documents and/or records reviewed by the expert, including the contents of same.

**See Report of John Tetnowski dated 12/7/2009 (date of evaluation).**

10.     Please identify all individuals who participated in the preparation of the answers to these Interrogatories.

**Aaron Hartman**


                                        Respectfully submitted

                                        By:_____ /S/ _____
                                              Charles Weiner, Esquire
                                              PA Attorney I.D. #52926
                                              Counsel for Aaron Hartman
                                              179 North Broad Street
                                              Doylestown, PA 18901
                                              215-348-4283
                                               (FAX) 215-340-2412
                                              e-mail: charles@charlesweinerlaw.com

Dated:  January 22, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AARON L. HARTMAN<br>        Plaintiff<br><br>        v.<br><br>NATIONAL BOARD OF MEDICAL<br>EXAMINERS,<br>        Defendant | Civil Action  09-5028 |

### VERIFICATION

I, Aaron L. Hartman, having answered the foregoing questions, do state upon my oath,

that all Plaintiff's Answers to Interrogatories are fully and completely true and correct to the best

of my knowledge information and belief.

Date:  1/21/10                              _Aaron Hartman_
                                            Aaron L. Hartman

- 1 -

# EXHIBIT "4"

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AARON L. HARTMAN, | : | |
| | : | |
| Plaintiff | : | No.  09-5028 |
| | : | |
| v. | : | |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| | : | Civil Action |
| Defendant | : | |

### PLAINTIFF'S ANSWER TO
### DEFENDANT, NATIONAL BOARD OF MEDICAL EXAMINERS',
### <u>INTERROGATORIES (SET II) TO PLAINTIFF, AARON HARTMAN</u>

NATIONAL BOARD OF MEDICAL EXAMINERS, Defendant, by its attorneys, Eastburn and Gray, P.C., Esquires, hereby propounds the following Interrogatories under and pursuant to Federal Rule of Civil Procedure No. 26. These Interrogatories are deemed continuing so as to require further answer from now until the time of trial, without further notice, if you learn further information called for herein.  These Interrogatories are addressed to you as a party to this action, and your Answers shall be based upon the information known to you, your attorney or other representative.

The answer is to be inserted in the spaces provided after each Interrogatory.  If there is insufficient space to answer the Interrogatory, the remainder of the answer should follow on a supplementary sheet.

The Answer must be signed by you and under the applicable Rules of Civil Procedure. You must file and serve your Answer on the Defendant's attorney within

thirty (30) days after service of these Interrogatories, or in accordance with the Scheduling Order issued by the Court.

# I. DEFINITIONS

As used in the Interrogatories, the words and terms set forth below are defined as follows unless a contrary meaning is apparent from the context:

1. "Plaintiff" refers to Aaron Hartman.

2. "Defendant" refers to the National Board of Medical Examiners.

3. "Describe", "specify", and/or "state" shall mean to set forth fully and unambiguously, using technical terms or words of art, if necessary, each and every fact relevant to the answer called by the Interrogatory of which the answering party or their agents, employees or representatives have knowledge.

4. "Person" or "persons" means all individuals and entities, including without limitation, individuals, representative persons (including any officer, director, employee, agent, or any person acting on behalf of or purporting to act on behalf of the designated entity), agencies, associates, companies, corporations, partnerships, limited partnerships, joint ventures, trusts, estates, public agencies, division, bureaus, boards and every other organization.

5. "Agreement" means any common understanding reached by two or more people or entities, whether written or oral, formal or informal.

6. "You" or "your" means the party separately answering the Interrogatory.

7. Whenever appropriate, a word in the singular shall include the plural thereof. The masculine shall include the feminine, the feminine shall include the masculine, and the neuter shall include both the masculine and feminine.

8. "Document" means any written, printed, typed or other graphic material of any kind or nature however created or stored, and all mechanical, electronic, or sound recordings in your possession or control, or known by you to exist. It shall also mean all drafts or non-identical copies of documents by whatever means made.

9. "Communicate" or "communication" means every manner or means of disclosure or transfer or exchange of information of any kind whether orally or by

2

document or whether face-to-face, by telephone, mail, personal, electronic or any other means of delivery.

10. a. "Identify" or "identity" when used with respect to a natural person means to state his or her full name, present or last known address, present or last known position or business affiliation, all positions or business affiliations during the time period of the Interrogatory, and general description of the business in which he or she is or was engaged in each such position.

b. "Identify" or "identity" when used with respect to any other entity means to state its full name, the address, the address of its principal place of business and the names of its officers and directors.

c. "Identify" or "identity" when used with respect to a document means to state the name and title of the document, the type of document (e.g., letter, memorandum, telegram, chart, e-mail messages, electronic file, etc...), its date, the person who wrote it, the person who signed it, the person to whom it was sent, its present location, its present custodian, and the author and date of any handwritten notations on the document.  If any such document was, but is no longer in your possession or subject to your control, state what disposition was made of it and explain the circumstances surrounding, and the authorization for, such disposition. Please state also the date or approximate date thereof.  Documents prepared prior to the period covered by the Interrogatory, but which relate or refer thereto are to be included.

d. "Identify" or "identity" when used with respect to any unwritten communication means to state the identity of the natural person making and receiving the communication, their respective principals or employers at the time of the communication, the date, manner, and place of the communication, and the substance of the communication.

e. "Identify" or "identity" when used with respect to a meeting means to state the nature of the meeting (formal gathering, conversation, telephone call, etc.), to identify all persons participating, to provide the date, duration, and location(s), and to state the substance of the discussion.

11.    "USMLE CS" means the United States Medical Licensing Exam Step 2 Clinical Skills portion.

12.    Requests for accommodations or accommodations refers only to your claim of a dysfluency disorder and no prior claims of disorders.

3

## II. <u>INSTRUCTIONS</u>

1.   The information requested is for all information known to you and available at the time of answering these Interrogatories, including information in the possession of your agents.

2.   To the extent any information called for by an Interrogatory is unknown to you, so state, and set forth such remaining information as is known.  If any estimate or general description can reasonably be made in place of unknown information, set forth your best estimate or general description, clearly designating the answer as such, in place of unknown information, and the basis upon which the estimate or general description is made.

3.   If any document that refers to or relates to anything about which the Interrogatory asks is no longer in your possession or subject to your control, or is no longer in existence, identify the document and state whether it is missing, lost, destroyed, voluntarily or involuntarily transferred to others, or has otherwise been disposed.  Also specify the circumstance surrounding the disposition, the date of the disposition, and the names of all persons responsible for the disposition.

4.   To the extent any Interrogatory is objected to, set forth all reasons therefore and supply all information sought by such Interrogatory to the extent that there is no objection.

5.   If you claim any privilege as a ground for not answering any Interrogatory, whether in whole or in part, describe the factual basis for your claim of privilege in sufficient detail so as to permit the Court to adjudicate the validity of the claim.

6.   These Interrogatories shall be deemed to be continuing, so as to require additional answers if further information is obtained between the time answers are served and the time of trial.   Such additional information and answers shall be served from time to time, but not later than fifteen (15) days after such additional information is received by you, or your agent, or becomes available to you or your agent.

7.   If, in responding to the Interrogatory, any ambiguity in construing the Interrogatory, a Definition, or an Instruction is encountered, set forth the matter deemed ambiguous and the construction chosen in responding to the Interrogatory.

8.   All interrogatories are directed to Aaron Hartman, unless specified otherwise.

**(numbering continued from Interrogatories/Revised Set I)**

11.     At Plaintiff's Deposition, Plaintiff testified that his attorney, Charles Weiner, Esquire, first suggested to Plaintiff the use of a Text To Speech ("TTS") device sometime in approximately the Fall of 2009 and, that neither a medical professional, nor a speech therapist first suggested the use of the TTS device to Plaintiff.  Please provide the source of the suggested use of the TTS device.  Who provided this information to Mr. Weiner/Plaintiff?  When was this information first shared/communicated?  What was the context of this suggestion?  What information, documentation and/or materials were provided to the person or source of the suggestion of the use of a TTS device?

In or about mid-October 2009 (approximately Oct. 13-14) Plaintiff's counsel contacted Gregg C. Vanderheiden, University of Wisconsin-Madison.  During a telephone conversation, Vanderheiden suggested use of text-to-speech (TTS) application for use during the USMLE exam.  He noted that many laptops running on Vista or MACs have TTS build in. He noted that software programs can also be purchased.   He further noted that IPhones can also obtain TTS applications.  No documentation was provided to Dr. Vanderheiden.

In or about mid-October 2009 (approximately Oct. 13-14) Plaintiff's counsel contacted Amy Goldman, Project Director of Pennsylvania Initiative on Assistive Technology ("PIAT").  Amy Goldman or a woman from her staff spoke with Plaintiff's counsel, identified TTS as an accommodation and also identified PIAT's website (http://disabilities.temple.edu/programs/assistive/piat/#b) as a resource.  No documentation was provided to Amy Goldman.

In or about mid-October 2009 (approximately Oct. 13-14) Plaintiff's counsel believes Dennis Anson, Director of Research and Development Assistive Technology Research Institute at Misericordia University was contacted.  However, no conversation ensued and no documentation was provided.

Respectfully submitted

February 10, 2010

By:_____/S/_____
Charles Weiner, Esquire
PA Attorney I.D. #52926
Counsel for Aaron Hartman
179 North Broad Street
Doylestown, PA 18901
215-348-4283
 (FAX) 215-340-2412
e-mail: charles@charlesweinerlaw.com

## Lori M. French

| | |
|---|---|
| **From:** | JELL |
| **Sent:** | Wednesday, February 10, 2010 9:08 PM |
| **To:** | Lori M. French |
| **Subject:** | FW: Hartman v. NBME |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |
| **Attachments:** | Leventhal 2-10-2010.pdf; Plaint Answrs - Interrogatories Set II.pdf |

Important.  Please print off letter and Rog response and return to me in a subfile marked PI's answers to Interrogatories Set II.


**From:** Charles Weiner [mailto:charles@charlesweinerlaw.com]
**Sent:** Wednesday, February 10, 2010 2:59 PM
**To:** JELL; Grace M. Deon
**Cc:** 'Aaron Hartman'
**Subject:** Hartman v. NBME

Jane & Grace:

Please see attached letter and document.

Charles Weiner, Esq.
179 N. Broad Street
Doylestown, PA 18901
215-348-4283
866-497-9597 (Toll Free)
215-340-2412 (FAX)
charles@charlesweinerlaw.com

This e-mail is from the Law Office of Charles Weiner, and may contain information that is confidential or privileged.   If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and any attachments.  Thank you.

# EXHIBIT "5"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AARON L. HARTMAN<br><br>          Plaintiff,<br>   v.<br><br>NATIONAL BOARD OF MEDICAL<br>EXAMINERS,<br><br>          Defendant. | Civil Action No.:  09-5028 |

## DECLARATION OF CATHERINE FARMER, PSY.D.

I, Catherine Farmer, hereby declare:

1.  I am employed by the National Board of Medical Examiners ("NBME" or "the NBME") as Manager, Disability Services and ADA Compliance Officer, Testing Programs.  As Manager, my duties include, among other things, operational responsibility for the office that receives and processes requests for test accommodations for the United States Medical Licensing Examination™ ("USMLE").  I am responsible for making decisions and recommendations to approve such requests as well as the appropriate accommodation(s) to be provided.  A copy of my curriculum vitae is attached hereto as Exhibit "A".

2.  The NBME's Office of Disability Services is responsible for implementing the policy of providing test accommodations to individuals with recognized disabilities as defined by the Americans with Disabilities Act as amended ("ADA").  In doing so, the Office of Disability Services reviews requests for test accommodations for the USMLE.  Upon

1

receipt and review of an examinee's request for test accommodations and the submitted supporting documentation, NBME consults with experts with expertise in the assessment, diagnosis, and treatment of the claimed disability to assist in determining whether the documents the examinee submitted demonstrate that he or she has a substantial limitation in a major life activity and, if so, what accommodation is appropriate.

3.    NBME denies any request for test accommodations that does not rise to the level of a disability as defined by the ADA and will deny requests which fundamentally alter the construct being measured.

4.    The plaintiff, Aaron Hartman ("Mr. Hartman" or "the Plaintiff") submitted his initial request for accommodations for USMLE Step 2 Clinical Skills ("CS") in July 2008. On his initial request form, Mr. Hartman requested double time for each patient encounter of Step 2 CS, 30 minutes, instead of the standard 15 minutes, per encounter provided in a standard CS administration.

5.    After thoroughly reviewing the information submitted by Mr. Hartman, I approved the accommodation of 50% additional time for each patient encounter and informed Mr. Hartman of this decision on August 21, 2008.   I based this decision on the documentation Mr. Hartman provided from his speech-language evaluator who recommended additional time, but did not specify an amount.   In addition, the documentation from Mr. Hartman's medical school did not specify the amount of additional time provided by the medical school as an accommodation on its clinical skills examinations.

6.    I have received requests for test accommodations for Step 2 CS from other applicants with a speech dysfluency (i.e. stutter) rising to the level of a disability under the ADA.

Additional time for the patient encounter is the most frequently requested accommodation by individuals with a speech dysfluency. Other examinees with speech dysfluencies rising to the level of a disability under the ADA who have requested and received additional time for the patient encounter have successfully achieved a passing score on Step 2 CS.

7.  Mr. Hartman amended his request for accommodations in November 2008, acknowledging that he had been granted 8 additional minutes for each patient encounter (50% additional time), and asking to use a teletypewriter ("TTY") in the event his Step 2 CS examination included a "telephone patient encounter."

8.  On December 2, 2008, I notified Mr. Hartman in writing that he would receive a face-to-face encounter instead of a telephone encounter, thereby eliminating the need for use of the TTY device.  Because not every Step 2 CS administration includes a telephone encounter providing this accommodation did not materially alter the exam.

9.  Mr. Hartman elected to take the Step 2 CS examination on June 26, 2009.  He received a passing score on two subcomponents of the examination, Spoken English Proficiency ("SEP") and the Integrated Clinical Encounter ("ICE").  He received a failing score on the Communication and Interpersonal Skills ("CIS") subcomponent and therefore received an overall failing score on his Step 2 CS.

10.  In September 2009, Mr. Hartman submitted a subsequent request for test accommodations on Step 2 CS.   In a change from his prior request, Mr. Hartman now stated that he wanted to type his questions and responses to the standardized patients on a laptop computer during the patient encounter, and have an "orator" verbalize what he

3

typed to the standardized patients.  He also requested that the NBME modify the rating scales so that his use of an orator would not "negatively impact" his score.

11.    I denied Mr. Hartman's requests to utilize an orator during the patient encounter and to modify the rating scales used to score his examination.  In a letter dated September 29, 2009, I communicated to Mr. Hartman that he would be provided double testing time (30 minutes) for each patient encounter.  Due to the overall length of the extended time examination, Mr. Hartman's Step 2 CS examination would be administered over two consecutive days.

12.    It was my professional opinion that double testing time for the patient encounter was a reasonable and appropriate accommodation in light of the fact that Mr. Hartman had provided documentation showing that additional testing time is the only accommodation he has requested, received and utilized for other clinical skills examinations.    He provided no documentation to show that he had ever requested, received or utilized an orator in any examination, actual patient encounter, or other setting. In addition, Mr. Hartman had recently demonstrated a passing performance on Step 2 CS Spoken English Proficiency ("SEP") taken June 2009.  My opinion was reaffirmed when Mr. Hartman subsequently informed me that he "does not have a problem with clarity" (referencing his language skills) and did not expect to fail SEP.

13.    Mr. Hartman was apparently dissatisfied with the accommodation the NBME granted. Through a letter from his counsel directed to the General Counsel of the NBME, dated October 16, 2009, Mr. Hartman requested the use of additional time and text-to-speech technology, such as text-to-speech software, so that he could "communicate directly from a laptop computer by typing text which would then verbalize the typed text."

4

14.     In a letter dated October 27, 2009, I communicated to Mr. Hartman, and his counsel, that

his request to type his questions and responses using text-to-speech software rather than

speaking to the standardized patients was not a reasonable or appropriate modification of

his Step 2 CS examination and was therefore denied.    Since the inception of the

examination in June 2004, the NBME has never approved, as an accommodation on Step

2 CS, the use of text-to-speech (TTS) or any other electronic substitute for the

examinee's speech.    I am aware that one examinee was permitted to use a two-way sign

language interpreter as an accommodation for her hearing impairment.    The provision of

this accommodation prevented the measurement of spoken English proficiency and

therefore no score for spoken English proficiency was reported.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 12th DAY OF

FEBRUARY, 2010.

Catherine Farmer, Psy.D.

5

# EXHIBIT "6"



## STONY BROOK
## UNIVERSITY
## MEDICAL CENTER

*School of Medicine*

*Latha Chandran, MD, MPH*
Vice Dean
Undergraduate Medical Education

September 3, 2009

To whom it may concern:

Stony Brook University School of Medicine gives all third year medical students a Clinical Practice Examination (CPX) at the end of year three. Standardized patients use standardized scripts and evaluate the performance of medical students using check lists. The CPX examination is given to all third year medical students and is designed to be similar to the Clinical Skills Step 2 examination.  Our CPX consists of 10 cases covering common patient scenarios likely to be encountered in the third year clerkships.  The patient scenarios consist of a mix of acute and chronic problems as well as different patient ages.   The CPX scores the students in four main areas:  history-taking, physical exam skills, patient-physician interaction and completion of an inter station note.

Aaron Hartman's CPX performance:

All students have 15 minutes in the room to complete the history and physical exam and 10 minutes after the encounter to complete the inter station note.  For Aaron Hartman, we had provided him with additional time in the room (22.5 minutes) for the history and physical exam. Aaron performed above the class mean on his "Total Test Score".  He was above the class mean in the physical exam category, at the mean for history and slightly below the mean for patient physician interaction.  He passed the CPX exam and met the 1.5 standard deviation cut off set for overall score as well as each category score.

In addition to the CPX, we provide an OSCE experience in all of our required clerkships in a formative and summative manner. Given the extra time as recommended by the Office of Disabilities Service, Aaron was able to perform at or close to the class mean in the category of physician patient interaction in all these OSCEs.

If you have any questions, please feel free to contact me at (631) 444-1030.

Thank you.

Sincerely,

*Latha Chandran*

Latha Chandran MD, MPH
Vice Dean for Undergraduate Medical Education
Professor of Pediatrics

# EXHIBIT "7"

IN THE UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

---

AARON L. HARTMAN                      :
          Plaintiff            :
                        :
          vs.                   :   No. 09-5028
                        :
NATIONAL BOARD OF MEDICAL             :
EXAMINERS                             :
          Defendant            :

---

       Deposition of AARON L. HARTMAN, taken by and
before Michelle A. Katulka, Registered Professional
Reporter, at the law offices of Eastburn & Gray, P.C.,
60 East Court Street, Doylestown, Pennsylvania, on
Friday, January 22, 2010, commencing at 10:50 a.m.,
prevailing time.

-----

APPEARANCES:

     LAW OFFICE OF CHARLES WEINER
     BY:  CHARLES WEINER, ESQUIRE
         179 North Broad Street
         Doylestown, PA  18901
         (215)348-4283
     Representing the Plaintiff

     EASTBURN & GRAY, P.C.
     BY:  JANE E. LEOPOLD-LEVENTHAL, ESQUIRE
     BY:  GRACE M. DEON, ESQUIRE
         60 East Court Street
         Doylestown, PA  18901
         (215)345-7000
     Representing the Defendant

-----

I N D E X

DEPONENT:                                        PAGE:

AARON L. HARTMAN

     By:  Ms. Leopold-Leventhal                  3

-----

EXHIBITS:                                        PAGE:

A. Hartman 1 --- USMLE Step 2 CS Performance
                  Profile                         26

A. Hartman 2 --- Personal Statement, Step 2 CS
                  Exam Accommodation Request      129

-----

1   BY MS. LEOPOLD-LEVENTHAL:

2   Q.   At the present time, you've been in medical school

3   for five and a half years, correct?

4   A.   Yes.

5   Q.   So -- and you expect it to take you six to complete

6   the program?

7   A.   No.

8   Q.   How many?

9   A.   Normally it takes four years, but prior to actually

10  starting medical school I had to take a leave of absence

11  due to the death of my grandmother.

12  Q.   How long was the leave of absence?

13  A.   It had to be the entire year because I could not

14  start up mid year.

15  Q.   When did you officially matriculate to medical

16  school?

17  A.   Fall of 2004.

18  Q.   When did you take your leave of absence?

19  A.   From 2004 until 2005.

20  Q.   Is it going to take you five years to complete

21  medical school then?

22  A.   No, there was also one examination that I had to

23  repeat during my third year, and it took me a little while

24  to start up again because I had to study for that exam

25  again.

1    Q.    What examination was that that you had to repeat?

2    A.    The Internal Medicine final exam.

3    Q.    And it took you a whole other year in medical school

4    to complete that; is that correct?

5    A.    No.  I also failed the Step 1 exam and I had to

6    repeat that.

7    Q.    And are you suggesting that failing the Internal

8    Medicine exam and the Step 1 exam and having to repeat it

9    caused you to spend an extra year in medical school?

10   A.    No, it caused me to spend an extra four months.

11   Q.    Well, you officially began medical school in the fall

12   of 2005, correct?

13                  MR. WEINER:  2004.

14                  THE WITNESS:  Four.

15                  MS. DEON:  Wait.  Wait.  Can we go off the

16           record and try to ...

17                          -----

18           (Discussion held off record.)

19                          -----

20                  THE WITNESS:  This discussion reminded me

21           that for a brief time after the passing of my

22           grandmother I saw a psychologist.

23   BY MS. LEOPOLD-LEVENTHAL:

24   Q.    What did you see a psychologist for?

25   A.    In order to be granted the leave of absence, the dean

Page 132

1          I'm only preserving the right to continue

2      the deposition to question Mr. Hartman once

3      these records are received to the extent that

4      there is anything in those records that we would

5      want to ask him about.

6          Thank you.

7                       -----

8      (Deposition was concluded at 5:26 p.m.)

9                       -----

10

11

12              C E R T I F I C A T E

13

14          I hereby certify that the proceedings

15      and testimony taken by and before me are

16      contained fully and accurately in the notes

17      of testimony, and that the foregoing is a

18      true and correct transcript of the same.

19

20

21          ----------------------------

22          MICHELLE A. KATULKA, R.P.R.

23

24

25