```
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                                 - - -

AARON L. HARTMAN              :  CIVIL ACTION NO. 09-5028
                             :
          v.                 :  Philadelphia, Pennsylvania
                             :  March 1, 2010
NATIONAL BOARD OF MEDICAL    :  2:23 o'clock p.m.
EXAMINERS                    :
. . . . . . . . . . . . . . . .

                             HEARING
               BEFORE THE HONORABLE LOUIS H. POLLAK
                UNITED STATES DISTRICT COURT JUDGE

                                 - - -

APPEARANCES:

For the Plaintiff:      CHARLES WEINER, ESQUIRE
                        Law Office of Charles Weiner
                        179 North Broad Street
                        Doylestown, PA  18901


For the Defendant:      GRACE M. DEON, ESQUIRE
                        Eastburn & Gray PC
                        60 East Court Street
                        POBX 1389
                        Doylestown, PA  18909-0137



                                 - - -

Audio Operator:         A.J. Follmer

Transcribed by:         Grace L. Williams, CET

(Proceedings recorded by For The Record Gold digital sound
recording; transcript provided by AAERT-certified
transcriber.)

                                 - - -
```

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

```
 1              (The following occurred in open court at 2:23

 2   o'clock p.m.:)

 3              THE COURT:  Good afternoon.

 4              COUNSEL:  Good afternoon, your Honor.

 5              (Pause.)

 6              THE COURT:  Well, I'm glad that we could now get

 7   together and from this application for a preliminary

 8   injunction do counsel wish to make any opening statements?

 9              MR. WEINER:  Your Honor, Charles Weiner representing

10   the plaintiff.  I have with me Dr. John Tetnowski.  He has

11   been on a whirlwind travel between work and other

12   obligations.  He flew in last night and unfortunately has to

13   return on a 5:35 flight this evening.  He has classes

14   tomorrow which he's teaching as well as a number of meetings

15   in Lafayette, Louisiana.  And unfortunately we couldn't get

16   him on a later flight or on a morning flight because of his

17   schedule.

18              I would like to propose that we -- we will brief

19   this case.  I'd like to propose that we forego any opening

20   arguments and what I was going to further propose is I would

21   limit my testimony, I'll streamline it, keep it to an hour,

22   give as much time to defense counsel for cross-examination

23   and allow Dr. Tetnowski to try and leave here in two hours.

24              THE COURT:  All right.  Let's do it.

25              MS. DEON:  Your Honor, we would be happy to waive
```

1    any opening statement. I think the issues are before you in

2    the brief.  I can't promise that I'll be finished Dr.

3    Tetnowski's cross in an hour.  I think the problem is that

4    the plaintiff has submitted a nine-page expert report to your

5    Honor and a five-page declaration so certainly Dr.

6    Tetnowski's testimony is laid out in those items.

7              It puts us at a bit of a disadvantage if our

8    cross-examination is shortened. I want an opportunity to, you

9    know, fully explore the things in the expert report as well

10   as Dr. Tetnowski's testimony here today.

11             I don't expect to go on for several hours but I

12   don't think it's fair to limit the cross-examination of a key

13   witness.

14             THE COURT:  Well, let's see how things go and if

15   there's really a failure of time I suppose we'll have to ask

16   the witness to return.  But let's get moving and not engage

17   in conjecture as to how much examination is going to be

18   required.

19             MR. WEINER:  I'd like to call Dr. John Tetnowski.

20             THE COURT:  All right.

21             JOHN A. TETNOWSKI, Plaintiff's Witness, Sworn.

22             THE COURT CLERK:  Please state your full name, spell

23   your last name for the record.

24             THE WITNESS:  John, middle initial is A, Tetnowski,

25   T-e-t-n-o-w-s-k-i.

4

```
 1              THE COURT CLERK:  Please be seated.

 2              THE WITNESS:  Okay.  Thank you.

 3              MR. WEINER:  And, your Honor, I have, you're holding

 4    it in your hand, I have placed the binder in front of you.

 5    Those are the exhibits that plaintiff has put together.  I

 6    believe there's a second binder before you that defendant has

 7    also --

 8              THE COURT:  All right.

 9              MR. WEINER:  -- put with their exhibits.

10              THE COURT:  Well, all right.  Go ahead.

11                          DIRECT EXAMINATION

12    BY MR. WEINER:

13    Q   Dr. Tetnowski, can you please state what your current

14    employment is?

15    A   I am -- excuse me -- currently the blanco endowed

16    professor in communicative disorders at the University of

17    Louisiana at Lafayette.

18    Q   Can you summarize your education and degrees that you've

19    earned?

20    A   Yes.  I've earned a Bachelor's degree in communication

21    disorders in 1981, a Master's degree in communication

22    disorders in 1982 and a Ph.D. in audiology and speech

23    pathology 1993.

24    Q   Can you describe any certifications or board recognitions

25    that you have received in your field?
```

1  A   Yes.  I have -- I hold the Certificate of Clinical

2  Competence which is the -- it's the certificate that allows

3  you to practice as a clinical speech language pathologist and

4  I also have a Board -- Board recognized specialization in

5  fluency disorders.

6  Q   What is Board recognition?

7  A   Well, in every other field it's actually called

8  certification and for some reason that the American Speech

9  Language and Hearing Association has chosen to call it Board

10 recognition.

11 Q   And is that a specialization of speech pathology fluency?

12 A   Yes, it's an additional certification beyond the basic

13 certification to practice.

14 Q   And what is speech fluency?

15 A   Speech fluency is really a group of disorders that most

16 of them relate to stuttering, by the way, that has an impact

17 on the forward flow of a person's speech.

18 Q   Can you summarize your employment history?

19 A   Yes.  I did several interns and residencies as a student

20 but upon graduation I -- I worked for a school system where

21 my jobs were -- one was with a school that had children with

22 special needs with it, I worked there.  My other placement

23 was at a orthopedic hospital.

24         After that I worked in a private practice where we

25 worked with various different types of clients from people in

1    nursing homes to people who had various different

2    disabilities.  Beyond that I worked then as a clinic director

3    where I supervised students in a university setting,

4    eventually became the director of that clinic, opened my own

5    private practice.

6              Then in 1989 I went back to school and I worked on

7    my Ph.D.  After my Ph.D. I went to Portland State University

8    and worked there for about four and a half years and then

9    went to the University of Lafayette.  I kind of worked my way

10   up the ladder there.

11   Q   Can you describe your different roles at the University

12   of Louisiana?

13   A   Yes, mm-hmm.  In my job over there currently my role is

14   the blanco endowed professor and that particular job allows

15   me to teach courses in speech language pathology with an

16   emphasis on courses in stuttering, two, I work with doctoral

17   students who are interested in careers in research and, you

18   know, writing up the research, things like that.  And I also,

19   as part of that job, engage in some clinical activities as

20   well, seeing patients for demonstration purposes, difficult

21   cases and some things like that.

22   Q   Is there a particular field of discipline or focus for

23   your teaching?

24   A   Yes, it is, it's currently in the area of stuttering.

25   Q   And apart from your employment with the University of

Tetnowski - Direct                                    7

1   Louisiana do you also have a private practice in the area of

2   speech pathology?

3   A   Yes, yes, occasionally I will see some patients privately

4   and they're usually quite difficult cases so it's really

5   quite limited.

6   Q   Is there a field of specialization for your private

7   practice?

8   A   Yes, it's usually people who stutter who have had

9   difficulty and have failed at other strategies, different

10  techniques and so on, they typically come to me.

11  Q   In connection with any of your employment or consultation

12  that you've just summarized have you been involved in the

13  evaluation and identification of individuals with speech

14  related disorders or disabilities?

15  A   Yes, I have.

16  Q   Can you describe how that is?

17  A   Yes, uh-huh.  I do it either through the university or

18  through some limited private practice but I typically

19  evaluate and provide some therapeutic services almost

20  exclusively these days for people who stutter.

21  Q   In connection with any of your employment or your

22  consultation that you've identified have you identified or

23  recommended auxiliary aids for individuals with speech

24  related disorders?

25  A   For speech related disorders I've done that in the past

1   several years ago but not for people who have stuttered.

2   Q    What is an auxiliary aid?

3   A    An auxiliary aid, let me go back and just clarify the

4   statement that I know really I've been traveling so much my

5   voice is kind of going bad on  me.

6            There's really kind of within the realm of fluency

7   there might be two kind of auxiliary aids that we're talking

8   about.  One of them are some devices that specifically are

9   used to promote fluency.  They're devices like a delayed

10  auditory feedback is a very common type of a tool that's used

11  for people who stutter.  Frequency altered feedback is

12  another one.  And then there's another group of auxiliary

13  devices that are used to allow people, a person to

14  communicate a little bit more easily.

15  Q    Have you conducted any research or been published

16  concerning speech disorders or disabilities?

17  A    Yes, I have.

18  Q    Has there been a particular area of focus to your

19  research?

20  A    Yes, the area of focus has been almost exclusively in the

21  area of stuttering.

22  Q    And --

23  A    There's a few other related things but --

24  Q    I'm sorry.  In the binder in front of you, plaintiff's

25  binder.

1    A    The black one?

2    Q    Yes.  Under Tab 14.

3              MR. WEINER:  And I'd like to mark that as Exhibit 1.

4              THE COURT:  All right.

5              (Discussion off the record.)

6    BY MR. WEINER:

7    Q    What is Exhibit 1?

8    A    Exhibit 1 is my curriculum vitae.

9    Q    And is that an accurate reflection of your education and

10   employment history as well as your publications and

11   professional experience?

12   A    Yes, it is.

13   Q    It appears that you've conducted research and written

14   over 40 publications.  Is that accurate?

15   A    Yeah, that's fairly accurate, right.

16   Q    And the publications you've indicated focused mainly on

17   speech dysfluency or stuttering?

18   A    Yes, mm-hmm.

19   Q    Now your CV also identifies over 120 professional

20   presentations that you've made.  Is this an accurate list?

21   A    Yes, in addition to the ones I've done just over the past

22   several weeks which we haven't added to it.

23   Q    And what has been the focus of your presentations?

24   A    Particularly over the last 15 years or so it's been

25   speech fluency.

1    Q    Have you received any special honors or awards in

2    connection with your field?

3    A    Yes, I have.  There's two that I received that I'm quite

4    proud of.  One of them is from the National Stuttering

5    Association which is a consumer organization, I was given the

6    outstanding speech language pathology award in 2006.  And

7    then in 2008 I was recognized as the DeCarlo Award winner

8    from the State of Louisiana which is outstanding contribution

9    to the clinical practice from the American Speech Language

10   Association.

11   Q    Are you on the board of any organizations?

12   A    Yes, I am.

13   Q    What organizations?

14   A    Currently I'm on the board of the National Stuttering

15   Association and I'm also on the board of the College of

16   Communication and Information at Florida State University, my

17   alma mater.

18   Q    Have you previously testified as an expert in any matter?

19   A    Yes, I have.

20   Q    In how many matters?

21   A    Where I actually went to court there was one case.  I've

22   collected data for several others though.

23   Q    And how long ago was that when you testified?

24   A    It was in Oregon so it was -- I've been in Louisiana for

25   just over 10 years so it was probably about 12 years ago.

1    Q    So testifying as an expert is not one of your common

2    experiences?

3    A    I'm not sure how much call there is for it but I do when

4    I can help.

5    Q    And in what area did you testify as an expert in that

6    matter?

7    A    It was in the area of stuttering, by the way.

8    Q    Do you regard yourself as an expert in the area of the --

9    in the area of identification and treatment of speech

10   disorders, speech dysfluency and stuttering?

11   A    Being modest it's difficult but I would say yes, I am.

12   Q    And what's the basis of your opinion?

13   A    Based upon the clinical experiences that I've had over

14   the years as well as the research that I've produced as well

15   as just staying as current as I do, the teaching and

16   everything else involved with it.

17   Q    Do you regard yourself as an expert in the area of

18   evaluating and identification of auxiliary aids for people

19   with speech dysfluency and stutter?

20   A    I have some -- some expertise in that area.

21   Q    And is that the same basis that you just mentioned

22   previously?

23   A    Clinical experiences, yes.

24             MR. WEINER:  I would like to have Dr. Tetnowski

25   testify as an expert in the area of evaluation,

1    identification and treatment of people with speech

2    dysfluencies, stuttering as well as the identification of

3    auxiliary aids for people with impaired speech.

4            THE COURT:  Do you wish to cross-examine with

5    respect to the expertise?

6            MS. DEON:  I would like to, your Honor.  We have no

7    objection to the first component of Mr. Weiner's request.  I

8    would like to ask the witness some questions with respect to

9    his identification as an expert in someone evaluating the use

10   of auxiliary aids.

11           THE COURT:  As an expert in evaluating what?

12           MS. DEON:  The use of auxiliary aids.

13           THE COURT:  Auxiliary aids?

14           MS. DEON:  Yes, your Honor.

15           THE COURT:  All right.

16                      VOIR DIRE EXAMINATION

17   BY MS. DEON:

18   Q   Dr. Tetnowski, I thought I understood you to say

19   initially that with respect to auxiliary aids you have never

20   recommended those for individuals who stutter, did I mishear

21   you?

22   A   Again, that's why I tried to go back and clarify, too.

23   Auxiliary aids that are designed specifically for people who

24   stutter, I have used them in therapy with clients in the

25   past.  Auxiliary aids such as the one that we will be talking

1   about later today, no.  Not for people who stutter, that's

2   correct.

3   Q   As I understand it you've never recommended a text to

4   speech device for anyone who stutters in the context of

5   therapy?

6   A   That is correct.

7            MS. DEON:  We have no objection to this witness

8   being qualified as an expert in that field.

9            THE COURT:  All right.  I'm glad to welcome you as

10  an expert, Dr. Tetnowski.

11           THE WITNESS:  Thank you.

12           THE COURT:  I think it's the first time, I'm not

13  sure, the first time that I've heard a proposed expert asked

14  whether he or she regards himself or herself as an expert

15  and--

16           THE WITNESS:  It's a tough question to answer.

17           THE COURT:  I'm not even quite sure what an

18  affirmative answer signifies before you've been determined to

19  be an expert.  But now that we've regarded you as such you

20  can go back and give that some weight.

21           THE WITNESS:  Yeah, I'd list that on my CV now, too.

22  Thanks.

23                   DIRECT EXAMINATION CONTINUED

24  BY MR. WEINER:

25  Q   Dr. Tetnowski, did you have an opportunity to evaluate

1    Aaron Hartman?

2    A   Yes, I did.

3    Q   And when did you evaluate Mr. Hartman?

4    A   Is that date in here?   Just I can try to give you the

5    right day.

6    Q   Yes, I believe that would be under Tab 15 and I'd like to

7    introduce --

8    A   Yes, it was on December 7th.

9    Q   -- Tab 15.  And what was the date?

10   A   It was December 7th, 2009.

11   Q   And Exhibit 2, can you describe what that is?

12   A   Yes, it is a copy of my report that I drafted after

13   seeing Aaron Hartman.

14   Q   What was the purpose of your evaluation of Mr. Hartman?

15   A   The purpose of my assessment as he contacted me was to

16   evaluate his speech skills as they exist right now.  And he

17   had explained to me that he was taking the USMLE, the United

18   States Medical Licensure Exam.  And he wanted me to evaluate

19   his speech for that purpose.

20   Q   Can you explain what stuttering is and the process used

21   to determine whether --

22   A   Yes, mm-hmm.

23   Q   -- stuttering exists and the severity of it?

24   A   Yes, stuttering is a breakdown in the forward flow of

25   speech.  And it's particularly characterized by a couple of

1   behaviors.  The first of those behaviors is part word

2   repetitions.

3   Q    What is part word, part word repetition?

4   A    Yeah, like you just did, okay, it's pa part word

5   repetitions, that's one form of stuttering.  And then the

6   other form of stuttering that is commonly recognized are

7   single syllable word repetitions and those would be if I was

8   saying something like I, I, I, I, I, I have a 5:30 flight

9   today, just to remind everyone, that would be an example of a

10  single syllable word repetition.

11            And another type of speech behavior that is regarded

12  as stuttering is prolongations and that would be where a

13  person is talking and it wooooo would sound like this for a

14  period of time.  And then the other behavior that's involved

15  are called blocks.  And blocks, blockages, attempts, pauses,

16  there's a few different names for them and it's where a

17  person tries to speak and simply nothing comes out.  And I've

18  tried to demonstrate those as I went through.

19            Now the way you look at those behaviors is you

20  typically evaluate a person's speech in lots of different

21  settings, lots of different scenarios.  So that's one of the

22  first things that you would do.  And the way you look at that

23  is you really count up how much a person spoke in a period of

24  time, how many syllables they spoke.  And within that time

25  you would count how many times they actually stuttered or how

1   many episodes of stuttering.  So if they said something like

2   ru ru ru ru ru ru running that's not ten examples of

3   stuttering, that's one example of stuttering.  I just wanted

4   to make that clear for you.

5           But what I do is I collect the samples across

6   various different modalities and the variances from different

7   types of length, different types of activities, different

8   levels of the cognitive demand and I look at that across

9   several different levels.  For example, we'll do it with

10  single words but we'll do it with single words when a person

11  is reading, when a person is repeating something, when a

12  person is spontaneously naming something.  And I would do

13  that with single syllable words and then multi syllable words

14  and then phrases and sentences and then move up to some

15  connected speech tasks, you know, reading paragraphs, a

16  monologue, a dialogue and then eventually what I would like

17  to do would be to take the person outside the confines of an

18  office and put them in a more naturalistic setting.  And you

19  can't quite do the same thing there but you can take some

20  field notes as to what happens.

21          And basically look at a couple different behaviors.

22  One of them is the percentage of stuttered syllables that he

23  used in those situations.  You'd also look at the type of

24  behaviors that, the specific types of starting behaviors that

25  he was using.  You would typically look at the severity, the

1    length of those blocks.  If he was exhibiting any behaviors,

2    bodily movements, head jerks, eye movements, things like that

3    that are associated with it as well and then you would look

4    at if they were avoiding certain words and you try to get a

5    feel for that as well.

6    Q    Doctor, how long was your evaluation of Mr. Hartman?

7    A    I believe that we took almost six hours that day.

8    Q    By the way, what causes stuttering, if it's known?

9    A    There's some conjecture about it.  As a matter of fact

10   there was a really a very, very important article that just

11   came out last week in the New England Journal of Medicine

12   that reported on a cohort study, a large family of people who

13   stuttered where there was a lot of inter-marriage and things

14   like that, too.  And there what they found is that there is a

15   very strong genetic link to stuttering.  There's an

16   abnormality on chromosome 12 that has been identified and

17   it's a fairly reliable marker at this point, not perfect but

18   quite reliable in nature.

19          And the impact that that has is it seems like the

20   current theory says that it has an impact on certain type of

21   brain functioning.  There's a --

22   Q    Is it known what exacerbates or triggers stuttering?

23   A    Yes, uh-huh.  In most people there seems to be a

24   relationship between the genetic components, the neurological

25   input of a person and how they react with environmental

1    demands.  There's a very, very popular theory called the

2    demands and capacities theory actually written by Woody

3    Starkweather, a Philadelphia person, by the way, that is

4    fairly widely accepted that talks about the interaction

5    between a person's genetic, a person's genealogical makeup

6    and then the impact of the environment upon it.

7    Q    And what are some common triggers that causes a person's

8    stuttering to be exacerbated?

9    A    There can be quite a few.  Probably the most common ones

10   are stress, anxiousness, excitement, anxiety, but there could

11   be others as well.  It could be linguistic length and

12   complexity.  It could be how many people they're speaking to.

13   It could be a certain group of individuals that they're

14   talking to, you know, a person of power, you know, something

15   like that that could have an impact, the newness of a person,

16   whether you're familiar with them or not.  Those could all be

17   environmental stressors.

18   Q    Prior to preparing your report did you review any records

19   related to Mr. Hartman?

20   A    Prior to seeing him I did not really review his records.

21   Q    And why is that?

22   A    Well, because the reason he was asking me for this report

23   was he -- he was really looking at what he could do at the

24   current stage, he wasn't asking me to make recommendations

25   for therapy.  I guess if he was asking for a recommendation

1    for therapy, if he had lived locally or something like that,

2    I probably would have looked at it a little bit different.

3    But, you know, at the time he explained that he was taking

4    this medical exam, the -- can I use that term, USMLE because

5    that's -- okay, he was preparing to take the USMLE and he

6    wanted to see what could potentially be done to be able to

7    take that test.

8    Q    During the course of your evaluation did you obtain a

9    history from Mr. Hartman?

10   A    Yes, I did a history but I took the history from his

11   perspective.

12   Q    Can you explain what the role of the history is and its

13   importance?

14   A    Yeah, in this particular case I used a methodology that's

15   well documented in the literature.  Carol Westby is a person

16   who has promoted its use but I used an ethnographic interview

17   strategy where I'm looking at the -- the problem in question

18   from his point of view literally, it's making him the expert

19   so that he can tell me about himself.  And then as I would

20   ask questions along those lines as he would make a point I

21   would try to clarify on those things and expand on the

22   particular points that he made.

23   Q    All right.  Directing your attention to your report which

24   has been marked as Exhibit 2 can you discuss the various test

25   measures that you applied and their purpose and the results?

1   A    Yeah, if you actually read that, could give the results

2   as well, too.  And the first thing that I'll start with is to

3   measure the severity, his stuttering at various different

4   tasks and various different levels.  The first thing that I

5   looked at was just one-syllable words, something relatively

6   simple, and I just had him repeat those words after me.  And

7   what that forms to do is kind of keep the cognitive demand

8   fairly low, he's just repeating single-syllable words.

9   Q    And is this the results contained on Page 3 of your--

10  A    Yes, they are, mm-hmm, yeah.  And doing tasks like that

11  he stuttered at like 70 percent of the syllables.  By the

12  way, that is really, really quite high.

13  Q    What, clinically, what is in terms of a percentage basis,

14  what is clinically significant stuttering?

15  A    The most current information, the information that most

16  people use, really signifies that stuttering levels about

17  three percent or higher are clinically significant.

18  Q    And in Mr. Hartman's case for one-syllable word

19  repetition he was demonstrating 70 percent?

20  A    70 percent, correct, mm-hmm.  And I'd like to add as well

21  that I took some averages and some counts as well, too, and

22  his stuttering during those times were primarily blocks.  By

23  the way, he had a few part word repetition but he had these

24  blocks.  And in the, just the one-syllable word repetition

25  task they averaged about three and a half seconds but there

1   were some that were as long as eight seconds.

2           Then I did the same type of thing but I did it in a

3   more spontaneous task where I really just showed him pictures

4   and he was able to just tell me what was on the page.  He

5   stuttered on about 60 percent of those words but the severity

6   got even worse and during one time he had a block of 27

7   seconds during that time.

8           Did a single-syllable word reading where he just --

9   he just read a one-syllable word off a sheet of paper, still

10  stayed around 70 percent and had a block as long as six

11  seconds.

12          The next thing we did was just to make those

13  utterances a little bit longer by looking at multi-syllable

14  words and in repetition tasks and naming tasks and reading

15  tasks he was still quite severe at those levels, 43, 50 and

16  41 percent.  And the numbers actually look a little bit lower

17  than the single syllable word counts but that's because when

18  they're multi-syllable words he would generally stutter on

19  the first syllable of those words and so he wouldn't stutter

20  on the second syllable of the word like ba-ba baseball.  So

21  he stuttered on baseball.

22          So, you know, the percentage looks a little bit

23  lower but once again you've got these durations 15, 20 and

24  even six seconds which is really, really a long time.  I know

25  sometimes I, you know, I like to demonstrate that.  If I was

Tetnowski - Direct                                          22

1   to have a block for, you know, say 20 seconds if I was

2   talking and I would go --

3              (Pause.)

4              That's only ten seconds, that's only ten seconds.

5   So when we start talking about blocks of 20, 27 seconds or

6   longer, that's a long period of time.  I mean five seconds is

7   a long period of time to have the silence.

8              Beyond that I went through some connected speech

9   tasks, some phrases, some sentences, whether he was reading

10  them, formulating, whatever and he still stayed up in that 40

11  to 50 percent range.  I mean sometimes every other word for

12  sure every other word when he was doing these limited tasks.

13  Still long durations on them as well.

14             Then we went to the longer tasks of reading a short

15  paragraph, engaged in a dialogue, engaged in a monologue and

16  the percentage of stuttering goes down slightly there because

17  sometimes he does get on a little bit of a roll and he says

18  two, three, four or five words together without stuttering

19  and then he'll kind of go back and stutter at every word

20  again.

21             I think what's worth noting there is that the length

22  of these blocks again are quite severe, 20, 21 and 13 seconds

23  within those behaviors.

24  Q   Are the blocks the most significant aspect of Mr.

25  Hartman's speech dysfluency?

1   A   Yes, they are.

2   Q   All right.  But he also has part word repetitions as

3   well?

4   A   Yeah, mm-hmm, he'll occasionally have some part word

5   repetitions but the dominant type of stuttering is certainly

6   blocks.

7   Q   What other measures did you conduct in connection with

8   your evaluation?

9   A   Along those lines I also took him outside of the office

10  to he could talk with people that he was unfamiliar with in

11  different settings.  Now of course I can't walk around with a

12  camera because that changes everything but what I'll do is

13  I'll just take little notes and jot a few things down for

14  myself so it's not very obvious.

15          So, as an example, one of the things that Aaron and

16  I did was we went, we talked to some strangers.  We went into

17  restaurants, we talked to various people as well.  And in

18  that setting Aaron again stuttered quite severely.  As a

19  matter of fact that's where some of his most severe

20  stuttering was,  you know, frankly, some of the more severe

21  stuttering that you ever see.  And there were a few times

22  within that context where when he had these blocks they

23  lasted for almost two minutes.  And you know, there was some

24  pressure there.  I know that one of them, by the way, is when

25  we were waiting in line, it was lunchtime, it was a fairly

1    busy restaurant.  You walk up to the counter and you do your

2    ordering.  And there are, there are other people there and

3    other people behind him in kind of a noisy setting and, you

4    know, he tried to order for himself and it took an extremely

5    long time to do that.

6             Beyond that, by the way, I would also look at a few

7    things.  One of the things I looked at would be a scale

8    that's called speech naturalness.  It's a nine-point scale.

9    And it's subjective in nature but it's actually been shown to

10   be fairly reliable.  And he falls on the far end of that

11   scale where his speech is judged to be quite unnatural in

12   nature.  And it's mostly because of the severity of these

13   long blocks.

14   Q   What does that mean, natural or unnatural?

15   A   It's a scale, if I can give you an example that is

16   commonly used.  Sometimes people use techniques to maybe not

17   stutter and they may be talking like that.  So even though

18   they're not stuttering it's quite unnatural in nature and

19   that's really what the scale was devised for.

20            And we also -- I also did, by the way, a

21   standardized test as well.  And I did the standardized test

22   so that we could compare him to other people who stutter.

23   And the most commonly used standardized test today is the

24   stuttering severity instrument and I used the third edition

25   of that particular test.  And it looks at several different

1    behaviors, including how much he stutters, how long he

2    stutters and if he has some physical symptoms that accompany

3    his stuttering.  Those are listed in there, by the way,

4    because it's quite common for people who stutter to have,

5    they are called physical concomitants, sometimes they're

6    called secondary behaviors.

7    Q    Does Mr. Hartman have those?

8    A    Surprisingly they're not as severe as I would have

9    expected them to be.

10   Q    And what do you account -- what in your professional

11   opinion do you account for his lack of physical concomitants?

12   A    Well, at this point I think I know because we've

13   discussed this to some degree and he's actually probably had

14   some therapy before that.  And like if somebody was

15   stuttering and they were, you know, kind of blinking their

16   eyes and things like that it's a learned behavior and

17   therefore it can be unlearned.  And in discussing some of

18   those things with Aaron there were some things like that that

19   he had -- that he had done in his therapies in the past.

20            So it's really kind of, it's kind of different to

21   see that.  By that way, most people who stutter to the degree

22   that Dr. Hartman -- I keep calling him Mr. Hartman, I know

23   he's Dr. Hartman --

24   Q    He's still Mr. Hartman.

25   A    Mr. Hartman, okay, still Mr. Hartman, okay.  That Mr.

1    Hartman uses you would expect him to have a lot more struggle

2    behaviors than he actually does.  As a matter of fact it's

3    interesting because in the standardized test he really

4    doesn't have a high score on the physical concomitants

5    portion of that test but he stutters to such a large degree

6    and with such a high duration that on the standardized test

7    he still gets a severity rating of very severe and scores at

8    the 96th to 99th percentile.  And that's only for people who

9    stutter, by the way, that's not comparing him to the general

10   population.  Amongst the people who stutter he's amongst the

11   worst of the worst or the most severe of the most severe, I

12   should say.

13   Q   Is that another way of saying out of 100 individuals who

14   stutter Mr. Hartman falls somewhere between the 96th to 99th

15   worse?

16   A   Yeah, you would --

17           MS. DEON:  Objection to the form of the question,

18   your Honor.

19           THE COURT:  I beg your pardon?

20           MS. DEON:  Objection, leading.

21           THE COURT:  Overruled.  No, you go ahead.

22           THE WITNESS:  Yeah, I mean, you know, simply what

23   percentiles mean if we said 96th percentile it means that he

24   does this behavior, in this case stuttering, more so than 96

25   percent of the rest of the population.

1   BY MR. WEINER:

2   Q    How often in a typical sense is Mr. Hartman experiencing

3   blocks?

4   A    He, you know, from a practical standpoint during much of

5   the evaluation sometimes the tasks were almost every word

6   when you're doing single words.  When he would get into some

7   more connected speech sometimes every other word but

8   sometimes he gets on a little bit of a run, but, you know,

9   three, four or five words and then he'll stutter.  Rarely, if

10  ever, will he get through a full sentence without stuttering

11  at all.

12  Q    Based on your evaluation and assessment do you have an

13  opinion within a reasonable degree of professional certainty

14  whether Mr. Hartman has a disability?

15  A    Mr. Hartman, in my mind, has a severe disability related

16  to his stuttering.

17  Q    And based on your evaluation of -- do you have an opinion

18  regarding the severity of this condition?

19  A    Yes, it's very severe.

20  Q    And is your opinion based on a reasonable degree of

21  professional certainty?

22  A    I'm quite certain that at the time that I evaluated him

23  that his stuttering was quite severe.  And it wasn't just, by

24  the way, on the -- those observable measures where I was

25  counting, I also did some other testing as well.  And in that

1   case what I did is there's another tool that I used where you

2   allow him to do some self-assessment so that he can judge the

3   impact that that stuttering has on his life.

4          And, for example, there are some people who stutter

5   very, very little but literally never leave the home because

6   they're so impaired by it.  And then there's other people who

7   stutter quite a bit but it really doesn't affect their

8   personal, their professional life.  So, you know, those are

9   things the only way you can really get at some of those

10  things is to ask the individual.  And there's a measure that

11  is commonly used for that, it's actually the acronym is

12  called the OASES, it's the overall assessment of the

13  speaker's -- the speakers-- let me get that -- of the

14  speaker's experience of stuttering.

15          THE COURT:  Would you try that phrase again?

16          THE WITNESS:  Yeah, uh-huh.  Yeah, it's the overall

17  assessment of the speaker's experience of stuttering.

18          THE COURT:  I heard it starting with the word

19  overall oasis, it sounded interesting but I --

20          THE WITNESS:  Yeah, OASES is good, you've got to

21  have these cute acronyms if you're going to sell these

22  things.  But, by the way, also developed here in

23  Pennsylvania.  But what this measure actually looks at is the

24  speaker's, how stuttering actually impacts their own life.

25  And I gave that to Aaron as well.  And the scores for that,

1    it breaks the scores down into several different categories

2    based on general information.  And he knows quite a bit about

3    that but he still has a moderate to severe impact rating

4    there.

5              His reactions to stuttering are severe, his

6    communication, daily stuttering is severe and even quality of

7    life is moderate to severe and that gives him an overall

8    severity rating of moderate to severe in the way that

9    stuttering affects his own life.

10             The next thing that I also did, by the way, was to

11   look at if there were things that I could do with Aaron that

12   for many people who stutter help to eliminate stuttering in a

13   very, very rapid manner.  And we know these things through

14   the research.

15             And, for example, one of the tools is delayed

16   auditory feedback and, for your knowledge, you hear yourself

17   speaking like there's feedback.  And for people who stutter--

18   BY MR. WEINER:

19   Q    Is this a device that you do?

20   A    Yeah, it's a device.  It has, you know, a microphone and

21   a headset with it as well and you hear yourself speaking just

22   a fraction of a second after you actually say something.  And

23   for most people who stutter that remedies stuttering

24   significantly almost immediately.  I tried that with Aaron

25   and it didn't -- it didn't eliminate his stuttering

1    completely, he was still left with about 26 percent

2    stuttering.

3    Q    Did you also utilize this to try and assess what type of

4    an accommodation might be useful?

5    A    Well, what I was looking for is if there was something

6    that was readily available that could allow him to speak

7    without stuttering since that was really one of the purposes

8    that he asked me to do this evaluation.  So I mean it would

9    have been great if we could have just popped one of these

10   devices in his ear and he would have gotten fluent right

11   away, but that wasn't the case.

12           And we -- I also tried it with delayed auditory

13   feedback and frequency altered feedback together.  And

14   frequency altered feedback is the same thing where you speak

15   into a microphone and you hear yourself back directly into

16   your ears but frequency altered feedback is you hear yourself

17   in a different manner than the way you normally do.  So it's

18   if you set the frequency really low it kind of sounds like a

19   Darth Vader type of voice and you hear yourself speaking in

20   that fashion where if you set it real high it kind of sounds

21   like a Mickey Mouse type voice.  And you -- you get the

22   feedback that way as well.

23           And, once again, that's been shown in a number of

24   people to eliminate their stuttering almost completely,

25   particularly when it's used in combination with delayed

1    auditory feedback.  With Mr. Hartman it had a -- it had a

2    minimal effect.  So I tried some other things, by the way,

3    and I tried some things where he didn't actually need

4    devices.  These are some commonly used tools that we as

5    speech pathologists use with people who stutter to see if we

6    can greatly reduce the amount of stuttering.  They're

7    techniques like a prolonged speech where you speak real slow

8    and that can have an impact on stuttering, not a great impact

9    unfortunately for Mr. Hartman.

10           I also tried an easy onset where he would kind of

11   alter the breathing at the beginning of his speech and he

12   would get out that first word real easy and that, once again,

13   for many people who stutter has a great impact.  And

14   unfortunately that didn't work for him.  We got his

15   stuttering down to 38 percent but that's still way too much.

16           There is one thing that I did try that did have some

17   success though and that technique is called choral speech.

18   And what choral speech is is that I give him a transcript of

19   something to read and I read it along with him.  And we were

20   reading the same things together.  That did eliminate his

21   stuttering very significantly, down to about two percent, by

22   the way, but it only works in reading tasks.

23           THE COURT:  Only works in?

24           THE WITNESS:  Reading, reading, when we're reading

25   the same transcript.  I would hand him something and say

1    okay, you read this and I'll read it along with you.

2              So we did that and I also did a measure of how rapid

3    he speaks.  And the reason I did that was to really kind of

4    look at the impact of his speech, how much he could actually

5    get off within a reasonable period of time.  And we usually

6    speak, you know, 200 syllables per minute or greater and I

7    took several different samples of Aaron's speech and his

8    ratings were 54 syllables per minute.  That was his best, by

9    the way.  The other ones were 20 syllables per minute and

10   then 30 syllables per minute, so greatly, greatly reduced

11   output from what we would expect.

12             Let's see, what else did we do.

13   BY MR. WEINER:

14   Q   Well, in your private practice can you describe the

15   typical patients that you see?

16   A   You know, I see patients who for whatever reason come to

17   me with really severe symptoms.  They come with real severe

18   symptoms and people who have been in therapy for a long time

19   and haven't had success with a technique or a type of therapy

20   that they were doing and for -- and very often for some

21   reason in their life they come to me out of frustration or

22   second opinions, things like that.

23   Q   In your, when looking at your practice and comparing Mr.

24   Hartman with some of your other patients how would you rate

25   his severity to some of your other patients?

1   A    I would say that in my career Mr. Hartman is probably

2   near the top.  He's certainly within the most five severe

3   stutterers I've ever seen in my life, probably the top three.

4   And, just for clarification, I'm adding that not just to --

5   the people who I have seen myself but people I see through

6   self-help groups and support groups and conferences and

7   different venues as well.  Mr. Hartman is at the far end of

8   severity.

9   Q    Based on your research and study is there a body of

10  information which has identified the impact that speech

11  dysfluencies have on listeners?

12  A    Yes, there is.  And I think that one of the best series f

13  articles in that area was done by Normal Lass at West

14  Virginia University and some of his colleagues where they

15  build profiles of people who stutter and they actually ask

16  people to listen to them and to rate what they thought of

17  them.  And they ask people to describe them with various

18  different adjectives and they used a standard list where the

19  adjectives were either rated as negative or positive.  And

20  the people who stutter had with the judges that they looked

21  at, not your type of judge but the judges in an experiment,

22  the people who were looking at these individuals' speech

23  rated them highly negative in nature.  So they published

24  that.

25           And I like what they did because they took the study

1    a little bit further in their next publication and they

2    thought, well, these people aren't really trained so they did

3    it with other people.  So they completed the study next with

4    teachers and they looked at the opinions that teachers had of

5    individuals who stutter.  And unfortunately once again the

6    results turned out the same where they had a negative opinion

7    of the people who stuttered.

8            They took the study a little bit further and they

9    thought well, maybe these people aren't trained as special

10   educators so they did it with special education teachers.

11   And once again they still got the same results, that the

12   people who stuttered were rated significantly more negative.

13           They didn't stop there, they went to the next step

14   and they did the same thing with administrators because they

15   are the ones who are generally making decisions on special

16   education and things like that and unfortunately they still

17   got the same results, they were viewed as, people who stutter

18   were being viewed as more and more negative

19           And the final step, maybe a little bit of an

20   embarrassment to my profession, is they did the same thing

21   with speech language pathologists and even the panel of

22   speech language pathologists listed the people who stutter in

23   a more negative fashion.

24   Q   And would this research have included people who have

25   stuttering as severe as Mr. Hartman?

1   A    Probably not to that degree, just because there aren't

2   many people who stutter to that degree.

3   Q    You --

4              THE COURT:  May I interrupt for one moment?

5              MR. WEINER:  I'm sorry, your Honor.

6              THE COURT:  I'm not sure but maybe you said it and

7   if so I didn't get it.

8              THE WITNESS:  Sure.

9              THE COURT:  What would a negative estimate signify?

10  How does one register that?

11             THE WITNESS:  Well, linguists have rated adjectives

12  as being positive or negative.  You know, for an example, if

13  you said something that the person is dishonest, you know,

14  that's viewed as negative, honest is viewed as positive.  If

15  you said they were dirty, that's viewed as negative, you

16  know, clean and stuff.  So they actually write a list of

17  adjectives and then they compared them to a list whether

18  these adjectives were rated as being positive or negative.

19             THE COURT:  I see.  Go ahead.

20  BY MR. WEINER:

21  Q    You had previously mentioned that you had utilized some

22  auxiliary aids to determine whether that can improve Mr.

23  Hartman's speech.  What was the purpose of making that

24  particular assessment?

25  A    Well, you know, to see if there was anything that could

1   help him immediately.  He did tell me that his timeline was

2   relatively short so rather than evaluating him the way that I

3   normally would as if we were looking at long-term therapy I

4   tried to evaluate him for anything that could be done within

5   a relatively short period of time.

6   Q    And in order to identify an auxiliary aid that might be

7   applicable did you try to familiarize yourself with the USMLE

8   Step Two CS examination?

9   A    I read a little bit about the USMLE examination.

10  Q    Can you turn to Tab 1?

11  A    Sure.

12  Q    And I'd like to introduce the document under Tab 1 as

13  Exhibit 3.

14          THE COURT:  All right.

15  BY MR. WEINER:

16  Q    Is this the document you reviewed to familiarize yourself

17  with the USMLE Step Two CS examination?

18  A    Yes, it is.  I probably read it online, by the way, just

19  for what it's worth.

20  Q    The document before you describes one of the

21  subcomponents of the Step Two CS examination as the

22  integrated clinical encounter.  Do you see that page?

23  A    Okay.

24          (Pause.)

25  A    Okay.  So we are talking about the portion on Page 10, is

1  that correct?

2  Q   Yes.

3  A   Okay.

4  Q   In reviewing the content information would Mr. Hartman's

5  disability impair his achievement in this particular section,

6  that being the integrated clinical encounter?

7  A   Well, with the integrated clinical model as I understand

8  it that's really a portion that looks at medical diagnosis

9  and the complete lists of how people are actually diagnosed

10  by a physician.  And to the best of my understanding that is

11  scored by physicians, by the way, who are familiar with

12  various different medical disabilities and things like that

13  so, you know, I guess I'm not a -- I wouldn't consider myself

14  to be an expert in that area.  And I would say that the only

15  way he could possibly be impaired by that would be when he

16  gathers data during that, gathers history, physical

17  examinations, things like that, but bottom line is I wouldn't

18  be an expert in that area.

19  Q   In terms of Mr. Hartman's ability to collect information

20  and taking a history from the patient --

21  A   Mm-hmm.

22  Q   -- would his disability impair him in that regard?

23  A   I think that his -- he would be impaired in that he would

24  probably put the listener at some type of level of

25  discomfort.  He takes a long time to speak, he doesn't have

1    the physical characteristics that you see when a person is

2    really struggling.  So, you know, other than the time that's

3    involved and maybe some discomfort of the listener there

4    might be some disadvantage there.  But from my understanding

5    of that particular component that it really has to do with

6    diagnosis and the physicians score that portion.

7    Q   The integrated clinical role encounter also involves the

8    physical examination of the patient.  Do you see that in the

9    material?

10   A   Okay.  Yes, I do, under data gathering, yes, mm-hmm.

11   Q   Would Mr. Hartman's impairment affect that?

12            THE COURT:  Where are we looking at?

13            MR. WEINER:  I'm sorry, your Honor, it's on -- it's

14   under Tab 1, Page 10.

15            THE WITNESS:  It's at the top of the right-hand

16   column.

17            THE COURT:  All right.

18            THE WITNESS:  You know, under data gathering,

19   patient information collected by history taking, there's, you

20   know, it just takes a long time and -- but once again, you

21   know, I don't really know what they're looking for in this

22   particular test.  I know that he would probably be impaired

23   to the degree that he could put patients in an uncomfortable

24   mode and that it takes a long time.

25   BY MR. WEINER:

1    Q    The integrated clinical encounter also requires

2    documentation, completion of the patient note.

3              MS. DEON:  Your Honor, I'm -- I'm sorry, go ahead,

4    Mr. Weiner, I thought you were finished.

5    BY MR. WEINER:

6    Q    Does that involve speech at all?

7    A    It doesn't appear that from what I see here.

8              MS. DEON:  Your Honor, I'd like to object.  The

9    witness has indicated he really doesn't know, he's merely

10   speculating with respect to what these various subcomponents

11   actually assess.  We can all read what's there but he's

12   indicated that he doesn't know and I think that his answer

13   then is mere speculation and he shouldn't be permitted to

14   answer.

15             THE COURT:  That seems to me an objection well

16   taken.  The witness has very candidly said that has-- can't

17   profess any expertise here so it's not really clear that he's

18   doing more than being a thoughtful reader of text.  And so I

19   don't think it really would be of any great assistance to

20   examine him further on the document.

21             MR. WEINER:  Okay.

22   BY MR. WEINER:

23   Q    Does Mr. Hartman's impairment affect his ability to ask

24   questions?

25   A    The content of the questions, no.  The delivery of the

1    questions, yes.

2    Q    Would Mr. Hartman's impairment affect his ability to

3    share information with a standardized patient?

4    A    The content of what he shared, no, but the delivery of

5    that sharing of information, yes.

6    Q    Would Mr. Hartman's impairment affect his ability to

7    establish a rapport or have a professional manner with a

8    standardized patient?

9    A    Establish rapport might be difficult for people who

10   wouldn't have an open mind about people with disabilities, I

11   would guess.  In terms of establishing, the second part of

12   the question was establishing rapport, did you say or --

13   Q    Yes.

14   A    Establishing rapport. You know, I think he could

15   establish rapport but the bottom line is I think that

16   listeners when they interact with people like Mr. Hartman are

17   very, very often put ill at ease.

18   Q    And do you have an opinion regarding the amount of

19   listener effort that would be required when Mr. Hartman

20   speaks?

21   A    I think that there's probably a significant amount of

22   effort that is taken.  However, it's not because he speaks

23   unclearly, okay?  When he does speak he is indeed easy to

24   understand.  That's not the issue.  The issue is that

25   sometimes people can kind of just get uncomfortable with it

                              Tetnowski - Direct                        41

1    because he is -- his moments of stuttering, his stuttering

2    blocks really, really, really are quite severe and out of the

3    ordinary.  I think that when we see people who do stutter I

4    think that very often the general population has a pretty

5    good idea of what stuttering sounds like.  There's a, you

6    know, Mel Tillis, the singer from years ago, even the Porky

7    Pig cartoons, things like that, you know, give people an idea

8    of what stuttering is like.  But rarely do you see someone

9    who has the blocks to the degree that Mr. Hartman does.

10   Q    When Mr. Hartman came to you did he indicate that he had

11   an interest in utilizing text to speech software on the Step

12   Two C examination?

13   A    When he came to me he brought a portable computer with

14   him and he wanted to know if we could examine that as well

15   and if he could use it.  And I remember what my response was.

16   And I said to him that we could try it but only after I

17   finish my assessment of his skills first.

18   Q    Do you know how it is that it came to Mr. Hartman's

19   attention to utilize text to speech?

20   A    Yes, I do.

21   Q    And what is that?

22   A    That you had done some research and you had recommended

23   that he look at that as an option.  And I do know that in one

24   of his earlier reports that he asked if he could type some

25   things out and use an orator.

1    Q    Did you have an opportunity to observe Mr. Hartman

2    utilize text to speech software?

3    A    You know, I did have the opportunity to observe that and,

4    quite honestly, his flight was ready to leave at that time,

5    it was at the end of the evaluation.  And it seems like it

6    had an impact and what I actually did, since I did get in

7    late yesterday evening and I knew that Mr. Hartman was here

8    so I actually measured the impact that it did have.  I went

9    off and made comparisons.

10   Q    You were deposed last month or a couple months ago?

11   A    Yes, mm-hmm.

12   Q    Do you recall that?

13   A    Yes, I do.

14   Q    By the way, how long was your deposition?

15   A    Five hours.

16   Q    When Mr. Hartman utilized the text to speech software

17   after your evaluation how much time did you spend with him

18   with that?

19   A    Prior to the deposition, you're saying?

20   Q    Yes.

21   A    Okay.  It was a relatively short time.  I think I did a--

22   let me check my notes here just to make sure.

23              (Pause.)

24   A    Yes, about, I think, ten or fifteen minutes.

25   Q    In your report you state when referring to the text to

1  speech software you state "Although the method was somewhat

2  slow it was indeed faster than any other form of

3  communication that Aaron exhibited prior to this attempt."

4          Did you quantify that back at the time of your

5  report?

6  A   At the time of the report I didn't but I came back and

7  quantified it now.

8  Q   Right.  And --

9          MS. DEON:  Your Honor, I'd object to this line of

10  questioning.  I believe what the witness is about to testify

11  with respect to is outside of the four corners of the expert

12  report.  I haven't been provided with a supplement.  It looks

13  like Dr. Tetnowski after the fact engaged in some

14  calculations.  I don't know what he's going to say and it

15  certainly hasn't been provided in advance today.

16          MR. WEINER:  Your Honor, this is an ongoing matter

17  and Mr. Hartman and Dr. Tetnowski had a meeting yesterday and

18  he wanted to verify information he had previously provided.

19  He contained in the report that he speaks faster, he's just

20  going to provide some numbers to it.

21          THE COURT:  To what extent do you feel that your

22  examination would be impaired by this?  You can't tell

23  because you haven't heard it, is that right?

24          MS. DEON:  That's true.  And I would dispute what

25  Mr. Weiner said.  It's not verification, it's supplemental

1   information.  He wasn't verifying information in the report,

2   he was creating new information.  I haven't had an

3   opportunity to review it, to consult with whomever I need to

4   and it's not fair.

5            THE COURT:  Well, I think we will let Mr. Weiner go

6   ahead with the examination and if this is going to call for

7   further deposition or -- then so be it.  We'll have to get

8   Dr. Tetnowski back at a later time.  We've already supposed

9   that may be the case and I think the defendant is entitled to

10  examine the expert in full.  And I think what we're now going

11  to get testimony on has not been presented so far and so to

12  the extent that counsel feels that she needs a further

13  opportunity to examine, her cross-examination on this will

14  not suffice, so be it, we'll have to extend the hearing.

15           MR. WEINER:  I will then withdraw my question.

16  BY MR. WEINER:

17  Q   Back at the time of your evaluation did you determine

18  that whether or not in comparing Mr. Hartman's spontaneous

19  speech and comparing that with his use of text to speech were

20  you able to determine which he is able to speak more with?

21  A   Only subjectively.

22  Q   And what was your determination?

23  A   That he is able to produce more speech or more

24  communication in a shorter period of time when he uses the

25  text to speech device.  And, by the way, I, for your

1   knowledge, I wasn't recommending that he use it all the time

2   to produce all his speech.  He has these long blocks and if

3   he has a block that's when I'd recommend that he would use

4   the text to speech so he could get past that word and then he

5   could continue on beyond that.

6   Q    In your deposition you had provided Ms. Leopold-Levanthal

7   your philosophy about accommodations for people with

8   stuttering disorders.  Can you restate what your philosophy

9   was?

10  A    Yeah, I think I know what you're talking about because

11  this is my philosophy.  And that is to give the person who

12  stutters as much as they need to be successful and nothing

13  more.  Is that the part --

14  Q    Yes.

15  A    -- you were referring to?

16  Q    Can you explain what you meant by that?

17  A    Yeah, I'd really like to clarify that.  Within the field

18  of stuttering there are -- probably all rehabilitation, by

19  the way, too, there's people who abide by a certain

20  philosophy.  And they use this philosophy on every single one

21  of their patients.

22          For example, some people think that people who

23  stutter are really nervous and need to relax so they'll

24  always use a component of relaxation therapy as part of their

25  therapy for the person who stutters.  And what I believe is

 1   that you should go through the evaluation and see if they

 2   need relaxation, then if they need relaxation well then you

 3   should implement that as part of the therapy but nothing

 4   more, okay?

 5           In other words, we're looking for what will be

 6   successful for this person.  You know, if they need to use

 7   one of these ear devices that you put in your ear that brings

 8   you fluent, that makes you fluent, well, then, you know,

 9   let's use that.  But if they don't also need to modify their

10   breathing at the same time well then you wouldn't expect them

11   to do that as well.  You know, I kind of think of it as

12   rubbing your belly and patting your head or however that is.

13   You know, if you only have to do one of them, let's only do

14   one of them and not force you to do the other thing if you

15   don't need it.

16   Q   Can you apply your philosophy to the recommendations that

17   you've made regarding Mr. Hartman utilize the text to speech?

18   A   Right, yeah, I think it fits into that fairly well

19   because if he needed to use the text to speech component for

20   all of his speech, well, that's what I would have

21   recommended.  But once he comes to one of these blocks if he

22   uses the text to speech it helps him get past that block he

23   can get on with his communication, so that's all I

24   recommended in terms of its use.  I didn't recommend that he

25   use the text to speech as an alternative to his verbal

1    communication but to use it only when he needs it.

2    Q    Prior to preparing your report did you review Mr.

3    Hartman's records from prior speech therapists?

4    A    I only reviewed the two short reports that he had

5    received from -- I always forget their names.

6    Q    Dr. Oldemeier?

7    A    Dr. Oldemeier and Ms. --

8    Q    I'm sorry, it's Ms. Oldemeier and Ms. McCafferty.

9    Q    McCafferty, right, uh-huh.

10   Q    Did you review any of Ms. McCafferty's therapy notes?

11   A    No, I didn't.

12   Q    Would it have been important for you to review them to

13   determine the severity of Mr. Hartman's disability?

14   A    If I was evaluating him for therapy I would have said yes

15   but since I was only evaluating him to see what he could do

16   in the near future to help him with the USMLE I didn't think

17   that that was really pertinent at the time.

18   Q    Have you since reviewed those records?

19   A    Yes, I have since reviewed them.

20   Q    And has your opinion changed regarding either the

21   severity of Mr. Hartman's disability or your recommendation

22   regarding the use of text to speech software?

23   A    No, it hasn't really changed.

24   Q    At the time of your report were you aware that Mr.

25   Hartman had passed several clinical or oral type examinations

1   in medical school?

2   A    From what he had told me, yes.

3   Q    And did you review the results of any of those

4   examinations?

5   A    No, I didn't.

6   Q    Should you have?

7   A    You know, in hindsight now it probably would have been

8   helpful but, you know, again this was set up relatively

9   quickly and I was looking to see what he could do into the

10  future.  And besides, you know, stuttering does change from,

11  literally from day to day.  I mean sometimes it changes

12  significantly from month to month, year to year as well.

13  And, you know, and truth be told that what he did a year ago

14  in terms of his communication skills probably really doesn't

15  hold that much validity for how he's doing today.

16          MR. WEINER:  That's all I have, your Honor.

17          THE COURT:  May I?  Will you indulge the Court one

18  question to the witness before we start cross?

19          MS. DEON:  Sure, your Honor, absolutely.

20          THE COURT:  What I have been wondering as I listened

21  to your testimony, Dr. Tetnowski, does the disability vary in

22  intensity depending on the nature of the material being

23  communicated?

24          THE WITNESS:  It's possible that it could but what

25  those factors are really do vary from person to person.  I'm

1    not sure if you've ever been around young children who

2    stutter, by the way, because if they do, what parents very

3    commonly tell me is they say, oh, yeah, but they only stutter

4    when they're really excited.  Well, you know, I mean for me I

5    say well, that doesn't surprise me at all.  But what clients

6    tell me is the stressor for them is only something that they

7    can determine.  Years ago I had a client who came to me and

8    he said oh, I stutter on every word that starts with X.  And

9    I just kind of looked weird and I said so like a word like

10   Xerox.  And he said, oh, yeah, I would stutter on that for

11   sure.  And I said about a word like x-ray.  And he said oh,

12   yeah, I would stutter on that for sure.  And I tested him and

13   he indeed did.  But if you think of the sounds involved in

14   Xerox it's the Z sound or x-ray which is really the beginning

15   of an e-k sound, you know, he did stutter on all of those.

16          So what actually determines the stressor, you know,

17   very often is internal.  And I'm really afraid of snakes and

18   you might say, oh, you know, they won't harm you.  So, you

19   know, it's kind of hard to determine what that is and that's

20   why we quiz individuals on what those factors actually are.

21          THE COURT:  Okay, thanks.

22          MS. DEON:  You can have a second, if you'd like.

23          THE COURT:  No.

24          THE WITNESS:  My voice is coming back a little bit

25   but I may have to stop for the bathroom.

1                      CROSS-EXAMINATION

2    BY MS. DEON:

3    Q    Good afternoon, Dr. Tetnowski, it's nice to see you

4    again.

5    A    Likewise.

6    Q    When Mr. Hartman came to see you --

7              THE COURT:  Excuse me, let me inquire.  Would you

8    like a recess before we --

9              THE WITNESS:  No, I'm going to use every possible

10   minute we can.  I know my students will be happy if I get out

11   so...

12   BY MS. DEON:

13   Q    When Mr. Hartman came to see you for an evaluation on

14   December 7th he brought the text to speech device with him,

15   correct?

16   A    Yes, he did, that's correct.

17   Q    And even before you ever evaluated him for his

18   dysfluency, before you ever asked him any questions Mr.

19   Hartman wanted to show you the text to speech device,

20   correct?

21   A    Correct.

22   Q    And when he came to see you he told you that he did not

23   feel that more time was an adequate accommodation and that he

24   wanted to use the text to speak as an alternative, correct?

25   A    Well, he had said that he did take the test with extra

1    time and he did not pass the test with it.

2    Q    Yes.

3    A    So that's say the same thing then it's the same thing, a

4    little different on semantics.

5    Q    Well, didn't he tell you that additional time was not

6    going to satisfy him and he wanted you to recommend the text

7    to speech device?

8    A    He had said that he didn't want more time and I believe

9    that maybe he said if he had two or three more times that

10   that really wouldn't make much difference.  But he thought

11   that something else would be a better -- a better

12   accommodation.

13   Q    And did he indicate to you that he wanted you to

14   recommend the text to speech device?

15   A    He wanted me to evaluate him using the text to speech

16   device.

17   Q    Didn't he tell you he wanted you to recommend that as an

18   accommodation for him?

19   A    He wanted to see if that was a possibility that I could

20   recommend it for him.

21   Q    If you would take a look and I'd like you to look at a

22   couple pages from your deposition transcript.

23   A    Okay.

24   Q    It is the second to last exhibit --

25   A    Yeah, that's in the other one, got it, okay.

1    Q    Use the other binder, it will be easier for you.

2    A    Sure, okay.

3    Q    It's Exhibit 36 in that binder.

4    A    Got it.

5    Q    And I would ask you to turn to Page 22, the Minuscripts?

6    It's a little difficult to navigate.

7    A    Okay, Page 22 of up in the right-hand corner, right?

8    Q    Yes.

9    A    Okay.  Okay.  I'm on Page 22.

10   Q    Okay.  And if you take a look at Line 20 --

11   A    Okay, Line 20.

12   Q    -- this is your answer.

13   A    Okay.

14   Q    And I had asked at Line 17: "Did he advise you what

15   accommodations he was seeking for the NBME."

16   A    I think I'm on a different page.  You're not talking

17   about the Page 21 in this corner, you're talking about the--

18   Q    22.

19   A    -- 22 on the -- oh, I'm sorry.

20   Q    At the top.

21   A    There, we got it, okay.

22   Q    Okay.  Line 17.

23   A    Yeah, go ahead.

24   Q    The question was "Did he advise you what accommodations

25   he was seeking from NBME that had been denied?"

1            And you answered "No, let me think.  At the time of

2     the evaluation, yes, he did say that he wanted to, that he,

3     that he wanted either more time than was provided but that he

4     didn't feel he could get through it under those circumstances

5     and he did want to use text to speech as an alternative."  Do

6     you see that?

7     A   Yes, I do.

8     Q   So you would agree with me that when Mr. Hartman came to

9     you he didn't feel that additional time would help and he

10    wanted for you to recommend text to speech as an alternative

11    on the USMLE Step 2 --

12            THE COURT:  I'm not clear or I mean there may be

13    more but it seems to me that the answer given doesn't tell us

14    that Mr. Hartman wanted the witness to make a recommendation.

15    It certainly tells us that he wanted to use it.  Am I wrong?

16    I thought the point that you were undertaking to make was

17    that the witness had been requested --

18            MS. DEON:  It was, your Honor.

19            THE COURT:  -- by Mr. Hartman to make a particular

20    recommendation.  And maybe the witness did but I don't think

21    this answer demonstrates that.

22            MS. DEON:  Okay, that's fine.  I'll move on.

23    BY MS. DEON:

24    Q   And before you ever met Mr. Hartman face to face you had

25    concluded that he had a severe stutter.  That's before you

1   ever began your face-to-face encounter on December 7th, is

2   that correct?

3   A   I had spoken to him on the phone and when he spoke to me

4   on the phone he did stutter very severely.  And, for the

5   record, people who stutter very typically do have a very

6   difficult time on the phone, much more so than in other

7   situations.

8   Q   I understand.

9   A   Yeah, uh-huh.

10  Q   But before you met him you concluded his stutter was

11  severe, is that fair to say?

12  A   I had concluded that his stuttering was severe while on

13  the telephone.

14  Q   Okay.  Now let's talk a moment about the goals.  When Mr.

15  Weiner was examining you a few minutes ago --

16  A   Sure.

17  Q   -- I believe you said your goal or your purpose in

18  evaluating Mr. Hartman was to evaluate speech skills as they

19  exist right now for taking the USMLE, is that a fair

20  statement of your testimony?

21  A   Yes.

22  Q   And Mr. Hartman told you that the purpose of the

23  evaluation was to look at methods that would help him do

24  better on the Step 2 CS exam, is that what he told you?

25  A   I'm not exactly sure whether I had put that exact word in

1    my deposition or in the folder or not.  I mean he wanted to

2    perform at the level of his abilities as he took the USMLE

3    Step 2.

4    Q   If you'd take a look at Page 180 --

5    A   Okay.

6    Q   -- of the deposition transcript in front of you?

7    A   Sure.  Okay.  Which line?

8    Q   Line 9 and I was stating, "Well, you started to say to

9    see how successful he would be and see how successful he

10   would be on what?"  And your answer "To see how successful he

11   might potentially be on the USMLE."  And I indicated "I'm not

12   sure I understand."  And at Line 19 you said: "Okay, if I

13   would evaluate him and look at his skills and look at methods

14   that might help him do better when he took the examination

15   again," do you see that?

16   A   Yes, I do.

17   Q   So you would agree with me that at least one of Mr.

18   Hartman's goals or Mr. Hartman's goal in coming to you was to

19   have you recommend an accommodation that would help him do

20   better on the Step 2 exam, is that fair?

21   A   Well, as you put it in that context, I mean he wasn't

22   there for to be tutored to do better on the exam but to

23   exhibit his abilities the best that he possibly could.

24   Q   And his statement --

25   A   And that was the point I was trying to make here in the

1    deposition, too.

2    Q    Okay.  And now getting back to what your goals, your

3    purpose of the evaluation was, isn't it true that the purpose

4    of your evaluation was to try to find some method or some

5    accommodation that would help Mr. Hartman pass the test?

6    A    No, that was to help him perform at the best of his

7    abilities.

8    Q    Was one of your goals to endeavor to find an

9    accommodation that would make him more successful in meeting

10   whatever his potentials are?

11   A    Yes.

12   Q    Okay.  That's fair.  And with respect to standardized

13   patients I know you quoted a study, I believe it was a study

14   from Norman Lass, did I get that name right?

15   A    Yes, the name's Norman Lass.

16   Q    Let's talk about the standardized patients for a minute.

17   A    Sure.

18   Q    Did Mr. Hartman and his father tell you on the telephone

19   before you'd ever met him that the standardized patients

20   probably had never seen anyone like Aaron in the past and

21   didn't know how to react?

22   A    I mean frankly I don't really recall exactly that, that

23   question.  I don't believe so but did I say that in my

24   deposition?

25   Q    You did.

1   A    Yeah, okay.  Would you show me where so I could look at

2   it in that context?

3   Q    Take a look at Page 24.

4   A    Thank you.  Okay.

5   Q    And if you will take a look at Lines 6 to 13.

6   A    6 to 13.

7   Q    And you indicated "That's the way they were described to

8   me in these conversations but that his interaction with these

9   actors was very poor because it took a long time and that

10  these actors probably had not seen anyone like Aaron in the

11  past and didn't know how to react to it."

12  A    Okay.

13  Q    That was your testimony, correct?

14  A    Yes, it was.

15  Q    Okay.

16  A    Mm-hmm.

17  Q    And Mr. Hartman and his father also told you that Mr.

18  Hartman felt like the actors were making judgments about his

19  stutter and that they didn't have really the expertise to

20  rate someone like Aaron.  You testified to that as well,

21  correct?

22  A    Could I see that in the context?

23  Q    Sure, take a look at Page 24 again.

24  A    Okay.  Sure.  All right, and --

25  Q    Lines 13 to 17.

1    A    13 to 17, okay.

2    Q    There is also -- I think there's a typo -- some comments

3    made about that he felt like the actors were making judgments

4    and that they didn't have the expertise to rate someone like

5    Aaron.

6    A    Okay.

7    Q    That's your testimony, correct?

8    A    Yes, yes, mm-hmm.

9    Q    And you feel the same way today as Mr. Hartman told you.

10   A    And I do feel that way, yes.

11   Q    And of course you would agree with me that some

12   sensitivity training or training might be able to overcome

13   such preconceived notions like that which Dr. Hartman and Mr.

14   Hartman described, training could reduce or eliminate that

15   sort of bias that you've described, correct?

16           THE COURT:  Excuse me, you're talking about training

17   of the patients?

18           MS. DEON:  The standardized patients.

19           THE COURT:  Yes.

20           MS. DEON:  We haven't yet had an opportunity to

21   describe the tests and when I'm using standardized patients,

22   the way -- if the record could reflect the way these

23   examinations occur is there's a standardized patient who acts

24   as an actor.

25           THE COURT:  Yes, I think I understand --

 1            MS. DEON:  They present the symptoms and that's what

 2    I'm talking about.

 3            THE COURT:  I understand that.

 4            THE WITNESS:  Okay.

 5    BY MS. DEON:

 6    Q   You would agree with me that the training could reduce or

 7    eliminate that bias, sensitivity training?

 8    A   If they saw someone as severe potentially as Aaron I

 9    think that it could, it might help.  Certainly familiarity

10    with someone stuttering as severe as Aaron could be helpful

11    in that regard.

12    Q   Well, and Mr. Hartman even told you that the standardized

13    patients had never seen someone with a stutter as severe as

14    Aaron's but you have no idea whether that's true, do you, Dr.

15    Tetnowski?

16    A   I do not know if they have seen anyone as severe as Mr.

17    Hartman, that's correct.

18    Q   And you have no idea what the training regimen or

19    training standards are, if they even exist, with respect to

20    standardized patients, correct?

21    A   Well, it depends if you're asking me that question now or

22    at the time of the deposition because after you quizzed me on

23    the deposition I went back and I kind of read that a little

24    bit more.

25    Q   Well, at least at the point that I took your deposition

1   you had no idea what those were?

2   A    That's correct.

3   Q    And in Norman Lass' study, I know you rattled off several

4   different types of people that --

5   A    Sure, right.

6   Q    -- were examined, there were administrators and there

7   were teachers and I think there were even speech

8   pathologists.

9   A    Yes, there were.

10  Q    That study didn't include standardized patients on the

11  NBME, did it?

12  A    I -- I doubt whether there was any standardized patients

13  who were a part of that sample.

14  Q    And at the time of your deposition you could not say one

15  way or the other whether the standardized patients are

16  trained to be sensitive to applicants who have an impairment,

17  isn't that right, Dr. Tetnowski?

18  A    At the time of the deposition that's what I said,

19  correct.

20  Q    And you don't even know whether the NBME uses any quality

21  control measures to eliminate --

22  A    Well, now I do.

23  Q    What quality control measures does the NBME employ -- and

24  let me finish my question --

25  A    Sure, okay, I'm sorry.

1   Q   -- to reduce standardized patient bias due to an

2   impairment or racial prejudice?

3   A   Yeah, it says that they go through a rigorous and

4   standard training mode to make sure that they are making

5   correct judgments.

6   Q   Do you know anything more about the training than that

7   sentence?

8   A   In terms of the number of hours they go through and

9   things like that, no, but I read several articles about the

10   reliability of judgments and things, so...

11   Q   Right.  But you don't know what that rigorous training

12   includes, do you?

13   A   No, I do not.

14   Q   Let's talk about the Step 2 CS exam now.

15   A   Okay.

16   Q   As of the date of your deposition which was about --

17   A   Okay.

18   Q   -- three and a half weeks ago --

19   A   Sure.

20   Q   -- you didn't even know how long the standardized patient

21   encounter was, did you?

22   A   Specifically, no, I did not.

23   Q   Okay.  And when you were deposed about three weeks ago

24   you testified that the NBME had granted Mr. Hartman double

25   time as an accommodation when he took the exam in June of

Tetnowski - Cross                                                    62

1    2009, correct?

2    A    Correct.

3    Q    And you know now that that was incorrect, that he was

4    actually granted time and a half and not double time?

5    A    Time and a half is what he was given, correct.

6    Q    And actually you also testified, and I'd like to get to

7    question you a little bit with respect to Pages 10 and 11 of

8    that information booklet --

9    A    Sure.

10   Q    -- that we talked about earlier.

11   A    Oh, yeah, so that's -- that's back on Exhibit 1.

12   Q    I believe it's Exhibit 1 and it's Pages 10 and 11.

13   A    Okay.

14   Q    Let me just ask you.  You talked about listener effort,

15   do you recall talking about that?

16   A    Yes.

17   Q    Okay.  Which, without looking, do you know which

18   component that falls under?  Is that the Ice component, the

19   Sep component or the CIS (ph.)?

20          MR. WEINER:  Objection, your Honor.  I think the

21   witness should be allowed to look at the document and not

22   have to recall things from his --

23          THE WITNESS:  Actually, I know it's with the speech

24   proficiency.

25   BY MS. DEON:

Tetnowski - Cross                                      63

1   Q    Okay.  So standard English proficiency looks at listener

2   effort, is that correct?

3   A    That's one of the components that's in there, yes.

4   Q    And with respect to the CIS component, do you believe

5   that Mr. Hartman's speech impairment would affect his

6   evaluation or assessment on that second component?

7   A    Yes, I do.

8   Q    Okay.  Now at your deposition didn't you say that there

9   are no skills tested on the CIS component that are affected

10  by Mr. Hartman's speech impairment?

11  A    There are no skills that are affected.  What I know about

12  this test is what is in this document right here.  And I am

13  certainly not an expert on the USMLE but I do know that the

14  skills that are mentioned in here like questioning skills,

15  sharing -- sharing skills, acknowledging patient issues,

16  clearly providing counseling when appropriate, I think that

17  in terms of the delivery of those things Mr. Hartman would

18  have a difficult time with that.

19  Q    Okay.  Take look at Page 76 and 77 of your deposition

20  transcript.

21  A    Okay.

22  Q    I think that was Exhibit 37.

23  A    Okay.  And what pages did you say, 36 --

24  Q    70 -- I'm sorry -- 76 and 77.

25  A    Okay.  Okay.  I'm there.

1  Q    Okay.  And at Line 21 I ask "Are there any skills that

2  are tested on the CIS component affected by Mr. Hartman's

3  impairment?  Any skills that are tested, that's what I'm

4  looking for."

5           And you answered: "Skills?"

6           And I said "Yes," and you said "No, to the best that

7  I understand the exam."

8  A    Yeah, okay, because the skills that are involved with

9  them, I hope I made this clearer to you this time.  In terms

10  of what those skills are, you know, those aren't necessarily

11  affected by his speech but the delivery of those skills, you

12  know, he may know how to counsel a patient and I can't assess

13  that because I don't know what those abilities are.  But in

14  order to deliver that counseling that he would use, whether

15  it be correct or incorrect, he has a difficult time with

16  that.

17  Q    At the time of your deposition you testified that you

18  didn't know exactly what is even in the clinical skills test,

19  do you recall saying that?

20  A    Yes.

21  Q    And as of the date of your deposition which was only a

22  few weeks ago you had no independent recollection or

23  knowledge as to what the three sub-components were, isn't

24  that correct?

25  A    What the three sub-components are?  No, I did know what

1   the sub-components were.  I probably couldn't name them off

2   the top of my -- top of my head for you but I do know that

3   there were three components because Aaron had showed me his

4   scores and I had, you know, reviewed this document at that

5   point.

6   Q   My question was you didn't have any independent

7   recollection, you recall me asking you those questions and

8   you saying I don't know, I need to refer to the written

9   manual, I can't recall.

10  A   Oh, yes, absolutely.

11  Q   That's all I was getting at.

12  A   Yes, yes, mm-hmm.

13  Q   And in spite of that it's your conclusion that the NBME

14  should change the rating system on the Step 2 CS to evaluate

15  Mr. Hartman, correct?

16          MR. WEINER:  Objection.  I don't believe Dr.

17  Tetnowski ever testified that they should change the rating

18  system.

19          THE COURT:  As of today I don't think he's given any

20  testimony about rating.

21  BY MS. DEON:

22  Q   Would you take a look at Page 94?

23  A   Yes.

24  Q   Line 19 I asked, but maybe you'll answer it, "You don't

25  believe that changing the grading criteria or rating scale

1   used in evaluating the examinees performance on the Step 2 CS

2   exam would be na appropriate accommodation, correct?"

3           And if you go to the next page at Line 2 your answer

4   was "I think that maybe changing the rating system would be

5   an appropriate" --

6           MR. WEINER:  Your Honor, I had objected to that

7   question at that time, too.

8           MS. DEON:  "Would be an appropriate accommodation."

9           THE COURT:  Are you pursuing that objection now?

10          MR. WEINER:  Yes, your Honor.  Dr. Tetnowski has not

11  testified that the rating system has changed -- should be

12  changed.  We have not requested that the rating system should

13  be changed.

14          THE COURT:  I think we're going to let the question

15  and the answer stand.  I can't imagine what difference it

16  makes.  I'll instruct the jury, if you wish, to disregard

17  your objection.

18  BY MS. DEON:

19  Q   Dr. Tetnowski, it's fair to say that you have absolutely

20  no idea whether it's possible for someone with a severe

21  stutter to take and pass the Step 2 CS examination with the

22  accommodation of only additional time, isn't that correct?

23  A   Say that one more time?  I just want to --

24  Q   Sure, you have no idea whether or not it is or isn't

25  possible for someone with a severe stutter to pass the Step 2

1    CS examination with only the accommodation of additional

2    time?

3    A    Today I would say I just really don't know how someone

4    with as severe a stutter as Mr. Hartman does could be

5    evaluated positively in terms of his communication skills.

6    Q    Now I'm wondering why your testimony today appears to be

7    different from that taken at your deposition but maybe I'm

8    misquoting.  Would you take a look at Page 238, please?

9    A    I sure will.

10             THE COURT:  238?

11             MS. DEON:  Yes, your Honor.

12             (Pause.)

13   BY MS. DEON:

14   Q    Take a look at Line 10.  My question --

15   A    Okay.

16   Q    -- was, well, do you think it's possible for someone to

17   take a Step 2 CS examination and pass it even if they had a

18   severe stutter only with the accommodation of an additional

19   time.  Do you think it's possible?"

20             And you answered, quote, "I'm not familiar enough

21   with the exam so I don't know.

22   A    Okay.

23   Q    Do you stand by that testimony today?

24             (Pause.)

25             MR. WEINER:  Your Honor, I'm going to object to the

1   extent that she's asking what can possibly, what is possible,

2   a very ambiguous question.

3          THE COURT:  I'll let him answer --

4          THE WITNESS:  I think I'm going to go with my answer

5   here in the deposition that which I am not familiar enough

6   with the exam to know exactly if someone for sure could or

7   could not pass it.

8   BY MS. DEON:

9   Q   You do know that the third subcomponent of the Step 2 CS

10  exam is the spoken English proficiency, correct?

11  A   I do know that, that's correct.

12  Q   But you would agree with me that the NBME would not be

13  able to evaluate Mr. Hartman's spoken English proficiency,

14  the third component, if he typed all of his questions on the

15  text to speech device?

16         MR. WEINER:  Objection.  We have established that

17  Dr. Tetnowski is not familiar enough with the exam to testify

18  as an expert.

19         THE COURT:  Sustained.

20         MS. DEON:  Your Honor, in Paragraph 20 of Dr.

21  Tetnowski's declaration which is Page 5 of Exhibit 16 in Mr.

22  Weiner's -- in the plaintiff's book Dr. Tetnowski indicates

23  that he doesn't believe the use of a text to speech device

24  would fundamentally alter the skills that the Step 2 CS

25  examination is designed to assess.  That was his statement,

1    it's not mine.  I think I should be permitted to establish

2    that this witness admitted that if a text to speech device

3    was used he admitted at his deposition that the NBME would

4    not be able to evaluate one of the three subcomponents.  It's

5    Paragraph 20, Page 5.

6              THE WITNESS:  Exhibit which number is that?

7              THE COURT:  Start again, which page?  Page 5 of

8    what--

9              THE WITNESS:  I'm in your book.

10             THE COURT:  Which exhibit are we talking about?

11             MS. DEON:  It's plaintiff's book which is the

12   thinner one, it's Tab 16.

13             THE COURT:  16.

14             MS. DEON:  And it's Page 5, Paragraph 20.

15             (Pause.)

16             THE COURT:  You said Page 5, Paragraph 1?

17             MS. DEON:  20, your Honor.

18             THE COURT:  Oh, 20.

19             MS. DEON:  It's the first sentence, "Furthermore,

20   allowing Mr. Hartman to use a text to speech program would

21   not alter the skills or knowledge the Step 2 CS is intended

22   to measure."

23             THE COURT:  All right.

24             MS. DEON:  And I'll ask my question again.

25   BY MS. DEON:

1    Q    You would agree with me that the NBME would not be able

2    to evaluate Mr. Hartman's spoken English proficiency, the sub

3    sub component if he typed all of his questions on the exam?

4              MR. WEINER:  Objection, your Honor.  Dr. Tetnowski's

5    recommendation was that Mr. Hartman not use the text to

6    speech software all the time but use it to augment his speech

7    when he has a prolonged block.

8              THE COURT:  Well, I don't see any difficulty with

9    the question.  You can pursue it on redirect if you wish but

10   counsel is addressing her question to the first sentence of

11   Paragraph 20, it seems to me a legitimate inquiry.

12             THE WITNESS:  So your question is on No. 20?

13   BY MS. DEON:

14   Q    No, my question was --

15   A    Okay.  All right.

16   Q    -- wouldn't you agree with me that the NBME could not

17   evaluate Mr. Hartman's spoken English proficiency if he

18   utilized only the text to speech device during the

19   standardized patient encounter?

20   A    Gosh, you know, I mean I'm really not sure what you're

21   asking.  I understand the words, okay.  I don't know exactly

22   how they make the evaluation, okay?  It says from what I know

23   of the test that one of the things that they're looking at in

24   that third component is the effort that is involved with

25   listening to -- to the person who's making the

1    recommendations and so on.  And I know that there is a lot of

2    effort that is involved to listening with someone like Aaron.

3    If that affects the score, the scoring of it, then I think it

4    would be quite difficult.

5    Q    Let me ask it this way: do you know whether the NBME

6    could evaluate Mr. Hartman's spoken English proficiency if he

7    utilized the text to speech device throughout the entire

8    encounter, do you know whether they could?

9    A    They could evaluate it, sure.  I don't know whether it

10   would be positive or negative but they could certainly

11   evaluate it.  Okay.

12   Q    And of course you have absolutely no way of predicting

13   what percentage of the time Mr. Hartman would use the text to

14   speech device during his Step 2 CS exam if he took it again,

15   isn't that right, Dr. Tetnowski?

16   A    That is correct, absolutely.

17   Q    And in fact it's your conclusion that there are points in

18   time when Mr. Hartman speaks without stuttering at all,

19   correct?

20   A    For short periods of time, short bursts of words, yes.

21   Q    And it's your testimony that Mr. Hartman at points in

22   time is quite easy to understand without any effort at all,

23   correct?

24   A    I believe that for periods of four and five words in a

25   row, yes, that is true.

1  Q    Let's talk about a moment about your expert report and

2  the percentages of --

3  A    Sure.

4  Q    -- speech dysfluency.  I know I heard figures like 70

5  percent and 60  percent.

6  A    Yes, mm-hmm.

7  Q    And there was also a range of 40 to 50 percent, correct?

8  A    Correct.

9  Q    When you were talking about the 70 percent that was an

10  evaluation of one syllable word repetition, correct?

11  A    Right, yes.

12  Q    And that's not simulated on the Step 2 CS exam, right?

13  A    I don't think so.  I don't, you know, know what's on that

14  but I think that sometimes, you know, a patient asks you a

15  question like if I were to say to you am I going to be out of

16  here by 4:30 you could say yes or no.  And that's a

17  reasonable encounter.  I, again, I'm not an expert on the

18  test but I think there's probably some questions that are

19  answered yes or no or five, ten, you know, whatever questions

20  like that might come up.

21  Q    You would agree with me that with connected speech the

22  highest frequency of stuttering for Mr. Hartman was about 40,

23  50 percent, that range, correct?

24  A    Yes, uh-huh, much less than the single words.

25  Q    And that's sentence reading, correct?

1   A    Yes.

2   Q    And do you know does the NBME test Mr. Hartman on his

3   sentence reading, is that a component of the Step 2 CS exam,

4   if you know?

5   A    I don't know.

6   Q    Okay.  And would you agree with me that connected speech

7   is not nearly as relevant as continuous speech for the

8   purposes of your evaluation?

9            THE COURT:  I'm sorry, would you remind me which

10  number the evaluation is?

11           MS. DEON:  It is Exhibit 15 in the plaintiff's book

12  and I am looking at Page 3 of 9.

13           THE COURT:  15.

14           MS. DEON:  Exhibit 15, Page 3.

15           THE COURT:  Gotcha, all right.

16  BY MS. DEON:

17  Q    And my question was for the purposes of your evaluation

18  of Mr. Hartman to see whether or not he should receive

19  certain accommodation on a Step 2 CS exam wouldn't you agree

20  with me that continuous speech is more relevant than

21  connected speech?

22  A    What is continuous speech versus connected speech?  I

23  mean connected speech --

24  Q    Do you know what continuous speech is?

25  A    In the context that you're using it, no, I don't.

1    Q    Okay.  Well, I'm using continuous speech to examine the

2    last two entries in your chart on Page 3.

3    A    Sure, mm-hmm.

4    Q    And one is dialogue with the examiner and one is a

5    monologue with the clinician, that's what I'm using.

6    A    Okay.  That's what I thought.  Okay, no, monologue and

7    dialogue are indeed certainly quite different, right.

8    Q    Are they continuous speech, are they types of continuous

9    speech?

10   A    They're both types of continuous speech.  They're both

11   also types of connected speech, too.

12   Q    Okay.  Well, would you agree with me that continuous

13   speech is more relevant to your evaluation of Mr. Hartman

14   than connected speech or not?

15   A    I just don't know what the difference is.

16   Q    Okay.  Now with respect to continuous speech which as I

17   just identified is dialogue with the examiner, that would be

18   you, correct?

19   A    Yes.

20   Q    And a monologue with the clinician.  So that would be a

21   monologue --

22   A    Sure.

23   Q    -- between Mr. Hartman and you, correct?

24   A    Correct?

25   Q    And in those two categories Mr. Hartman's fluency was

1    closer to about 33 percent, wasn't it?

2    A    Correct.

3    Q    It was 26 percent for reading a paragraph and 34 percent

4    in dialogue and 28 percent for the monologue with you,

5    correct?

6    A    That is correct.

7    Q    So even in that circumstance you would agree with me that

8    Mr. Hartman was fluent on two of every three words, correct?

9    A    No, on two out of every three syllables.

10   Q    Two out of every three syllables, okay.

11   A    Yeah, big difference.

12   Q    So that when you evaluated Mr. Hartman in these areas he

13   was at least fluent with respect to these two barometers with

14   respect to two out of every three syllables?

15   A    He was fluent on two out of every three syllables,

16   correct.

17   Q    And that's about 66 percent, correct?

18   A    That is correct.

19   Q    Let's talk for a minute about the text to speech device

20   itself.  You've never actually used a text to speech device

21   as an augmentative device in therapy for person who stutters,

22   is that correct?

23   A    For a person who -- that is correct, prior to Aaron, no.

24   Q    Well, you didn't use it as an augmentative device for

25   therapy for Mr. Hartman, correct?

1    A    No, I used it just to evaluate him, correct.

2    Q    You never provided any therapy to Mr. Hartman?

3    A    No, I did not provide therapy.

4    Q    So again you've never used the text to speech device as

5    something to augment speech therapy, correct?

6    A    Yes.

7    Q    And you have never recommended that a patient use a text

8    to speech device in any context, never, other than Mr.

9    Hartman, is that correct?

10   A    For a person who stutters, never.

11   Q    And in the last 25 years, Dr. Tetnowski, you have never

12   used a text to speech device as part of a single diagnostic

13   evaluation other than with Mr. Hartman who brought it with

14   him, correct?

15            MR. WEINER:  Objection.  It presupposes that text to

16   speech has been around for 25 years.

17            THE COURT:  All right, however many years.  Go

18   ahead.

19   BY MS. DEON:

20   Q    Dr. Tetnowski, you testified, didn't you, that in the

21   early 1980's that you were familiar with a text to speech

22   device in a completely different context, correct?

23   A    In a completely different context, yes.

24   Q    So you would agree with me that it's been around for at

25   least 30 years, right?

1    A    Yes, it has been.

2    Q    Now back to my question.  In the last 25 years at least

3    you've never used a text to speech device as part of a single

4    diagnostic evaluation other than with Aaron Hartman, correct?

5    A    For people who stutter, yes.

6    Q    Okay.  And for people who stutter, Dr. Tetnowski, you

7    don't know of a single published report, not one, where the

8    text to speech technology is identified as either an

9    alternative or an augmentative aid for communication,

10   correct?

11   A    I do not know of any at this point.

12   Q    And you're not aware --

13   A    I'd like to put it in print myself, but that's another

14   issue.

15   Q    And you're not aware of any studies that have ever been

16   done on a use of a text to speech device with individuals who

17   stutter that might be found in any index like Pubmed or

18   Medline or anywhere else?

19   A    That is correct.

20   Q    And in fact in this case I believe you testified in

21   response to Mr. Weiner's questions that the first time the

22   text to speech device was suggested was apparently as a

23   result of Mr. Weiner contacting someone who was not a speech

24   pathologist, is that correct?

25   A    No, they work in the Department of Communicative

1    Disorders at the University of Wisconsin.  It's Dr.

2    Vanderheiden, Vanderheiden.

3                THE COURT:  Do we know how to spell that name?

4                THE WITNESS:  I believe it's

5    V-a-n-d-e-r-h-e-i-d-e-n.

6                MS. DEON:  I apologize, technical difficulties.

7    BY MS. DEON:

8    Q    Professor Vanderheiden, he's out of the University of

9    Wisconsin, correct?

10   A    Correct.

11   Q    Isn't he an engineer and not a speech language

12   pathologist?

13   A    Do you know what?  Maybe he is an engineer.  But I do

14   know that he is fairly well known for his work in

15   augmentative communication.

16   Q    Right, but he's not a speech pathologist, correct?  Do

17   you know?

18   A    I don't know.

19   Q    May I --

20   A    I know he's published in that area though so...

21               MS. DEON:  May I approach the witness, your Honor?

22               THE COURT:  Yes, indeed.

23               MS. DEON:  I'm showing the witness a two-page

24   document printed off of Greg C. Vanderheiden,

25   V-a-n-d-e-r-h-e-i-d-e-n's website which identifies his

1   biographical information.

2   BY MS. DEON:

3   Q    Would you take a look at that for a moment?

4   A    Yes, okay.

5   Q    And Professor Vanderheiden has a Ph.D. in technology in

6   communications, correct?

7   A    He has a technology and communication rehabilitation and

8   child development, yes.

9   Q    And you would agree with me that Professor Vanderheiden's

10  field of interests include ergonomics, mobile computing,

11  universal design, computer interface design, rehabilitative

12  engineering and a few other areas, none of which have to do

13  with actually speech therapy, is that correct?

14  A    Well, I believe that's what rehabilitative engineering

15  actually is is taking technologies and using them with people

16  who are in rehabilitation units who need rehabilitation.

17  I've worked with some rehabilitation engineers in my life and

18  they support the work of occupational therapists, speech

19  pathologists, stuff like that.

20  Q    Do you know whether Dr. Vanderheiden creates the

21  technology or works with the patients in order to utilize the

22  technology, do you know which he does?

23  A    I don't know that, no.

24  Q    And of course Dr. -- Professor Vanderheiden to the best

25  of your knowledge never evaluated Mr. Hartman, correct?

1    A    I don't believe he has, no.

2    Q    And do you know anything about what his knowledge might

3    be with respect to the Step 2 CS examination?

4    A    I don't know what his --

5                THE COURT:  May I break in at this point?  It's

6    4:15.  The plane is at 5:30?

7                THE WITNESS:  5:35, yes, mm-hmm.

8                THE COURT:  Because I think if Dr. Tetnowski is to

9    make his plane we ought to get him out of here fairly

10   quickly.  If that's going to require further examination at a

11   later time, so be it.

12               THE WITNESS:  You know, your Honor, I'd be more than

13   willing to come back at any time.  Is this appropriate for me

14   to be talking to you about this or not?

15               THE COURT:  Well, we have confidence in this room, I

16   think.  Nobody's going to worry about it.

17               THE WITNESS:  Tomorrow happens to be an unusually

18   busy day for me.  That not only includes my normal teaching

19   load but it also involves an invited speaker who's coming to

20   campus to meet me and also some committees that I play a

21   major role in as well.

22               THE COURT:  You disappointed me, Dr. Tetnowski.  I

23   was hoping you were going to tell me that your daughter has a

24   Lacrosse match.

25               THE WITNESS:  Well, you know about my daughter,

1  she's 12 and there's lots of things like that, but I'd love

2  to see her, too.

3        THE COURT:  Can we -- what I understand you're busy

4  tomorrow.  Is there any time later this week, perhaps

5  Wednesday afternoon?

6        THE WITNESS:  To fly back Wednesday, I could fly

7  back Wednesday.

8        MR. WEINER:  Your Honor, can we do that by

9  telephone?  Is that a possibility?

10        THE COURT:  I guess that's a possibility.  That's

11  not sure if that's what counsel want to agree on.

12        MS. DEON:  I'd prefer --

13        THE COURT:  It's not an optimal way of examining.

14  What?

15        MS. DEON:  I'd prefer that he be in court if I get a

16  vote on this.  There are going to be a lot of documents back

17  and forth and actually things that aren't even in the exhibit

18  binders that I'm going to be showing him.  I'm not

19  comfortable giving them to him in advance so he knows what

20  I'm asking.  And I'd also like to observe him in court.

21        THE COURT:  I think we'll have to call Dr. Tetnowski

22  back in person.  Sorry to do it but --

23        THE WITNESS:  I'd be happy to.  And I'm sorry that

24  my schedule gets in the way of this stuff so...

25        THE COURT:  Academics are busy people.  Well, shall

1   we agree on Wednesday afternoon as the right time to bring

2   the witness back?

3           MS. DEON:  That's fine with me, your Honor.

4           MR. WEINER:  Your Honor, I actually object to it.

5   We're here for a preliminary injunction motion.  I

6   streamlined my direct examination to an hour, I was finished

7   at half past the hour.  I was giving the same courtesy of an

8   hour to counsel.  She deposed Dr. Tetnowski for five to six

9   hours and certainly had an opportunity to present much of his

10  testimony in her motion.  And for the purposes of this

11  preliminary injunction motion I think --

12          THE COURT:  Well, I'm not going to cut counsel's

13  cross-examination off at this time.  I hope in completing it

14  it can be done succinctly.  Counsel ought to have the

15  opportunity to complete her cross-examination.  So we'll, if

16  counsel feels that cross-examination should continue for a

17  little while.  How much more cross-examination do you expect

18  to have?

19          MS. DEON:  45 minutes to an hour, no more than that.

20  It was a five to six hour deposition and there is a lot of

21  information I want to ask.  I've tried to cut out as much as

22  I could but --

23          THE COURT:  No more than an hour.

24          MS. DEON:  No more than an hour, that's fair.

25          And to be fair, Mr. Weiner had 70 minutes.  I've now

1  had 40 and I don't really think that's giving me a fair

2  opportunity to cross-examine this witness and represent my

3  client.

4          THE COURT:  All right, I think that we'll ask Dr.

5  Tetnowski if it's convenient for you to return.

6          THE WITNESS:  Okay.

7          THE COURT:  Be back here in time for a resumption

8  at--

9          THE WITNESS:  If I can check the airlines and I'll

10  get in as early as I can and stay as late as I can.

11          THE COURT:  Well, we would be resuming hearing at

12  2:30 in the afternoon.

13          THE WITNESS:  Okay.

14          THE COURT:  All right, I'm going to let you go.

15          THE WITNESS:  Thank you, I appreciate it.  And my

16  apologies for...

17          THE COURT:  Does one fly to New Orleans, is that?

18          THE WITNESS:  No, actually, in order to get here I

19  have to -- I live in Lafayette, I have to fly to Baton Rouge

20  and then I have to drive back to Lafayette from there.  I

21  just couldn't get a flight with that short notice, so...

22          THE COURT:  I see.

23          (Witness excused.)

24          MR. WEINER:  Your Honor, I'd like to call Aaron

25  Hartman.

1              THE COURT:  Should we take five minutes before we go

2      ahead with Mr. Hartman?

3              MR. WEINER:  That's fine, your Honor.

4              THE COURT:  All right.

5              MR. WEINER:  Until what time will be going this

6      evening?

7              THE COURT:  Well, say not beyond 6:00, perhaps 5:45.

8              MS. DEON:  What time will your Honor convene

9      tomorrow morning?

10             THE COURT:  9:30.  Is that convenient with counsel?

11             MS. DEON:  That's great.

12             THE COURT:  If that's earlier than you feel happy

13     with, we can make it later.

14             MS. DEON:  No, that is great.

15             THE COURT:  All right, let's take a few minutes

16     recess.

17             (Court in recess; 4:20 to 4:39 o'clock p.m.)

18             THE COURT:  Sorry, that my 15 minutes -- my five

19     minutes turned out to be 15.  There was a phone call sitting

20     there that I really had to take.  Sorry.

21             MR. WEINER:  Quite all right, your Honor.

22             THE COURT:  You wish to call Mr. Hartman?

23             MR. WEINER:  Yes.  Mr. Hartman, I'd like to call him

24     as a witness.

25             AARON LEE HARTMAN, Plaintiff's Witness, Sworn.

85

1          THE COURT CLERK:  Please state your full name and

2    spell your last name for the record.

3          THE COURT:  Please sit down, sir.

4          THE WITNESS:  Thank you.  Thank you.  That's --

5          THE COURT:  Mr. Hartman, you should know that my

6    main role here is providing water to witnesses.

7          (Laughter.)

8          THE WITNESS:  Thank you.  Aaron Lee Hartman,

9    H-a-r-t-m-a-n.

10                        DIRECT EXAMINATION

11   BY MR. WEINER:

12   Q    Mr. Hartman, where do you live?

13   A    30 Great Oak Road, Saint James, New York.

14   Q    How old are you?

15   A    27 years old.

16   Q    Where did you go to college?

17   A    SUNY Geneseo.

18   Q    And where is that located?

19   A    It's in Upstate --

20   Q    Upstate New York?

21   A    -- New York.

22   Q    Did you earn any degrees with distinctions at Geneseo?

23   A    I earned a Bachelor of Arts with summa cum laude.

24   Q    After college what did you do?

25   A    I entered medical school at Stonybrook.

1    Q    When did you decide to become a doctor?

2    A    When I was a young -- my father is a pediatrician and my

3    grandfather also was very interested in medicine and they got

4    me interested as well.

5    Q    In what year of medical school are you?

6    A    In my fourth year.

7    Q    What requirements do you have left in medical school in

8    order to graduate?

9    A    I must pass the Step 2 CS.

10   Q    Are you completely finished with all your course work at

11   Stonybrook?

12   A    I have finished all of my course work, rotations and

13   examinations except the Step 2 CS examination.

14   Q    Are you presently taking any courses in medical school?

15   A    No, I am not.

16   Q    How long have you stuttered?

17   A    I can recall since the age of five.  However my parents

18   say it was even before that.

19   Q    Have you received any form of speech therapy?

20   A    I've had a lot since first grade through 8th I went to a

21   speech therapist named Michele Slotnick (ph.) once a week for

22   an hour at a time then in high school I went to a three week

23   intensive program in New York City with Katherine Montgomery.

24   Usually you go once, I went twice.  I went the long year as

25   well and then in medical school I saw Emily McCafferty for

1    about a year and a half.

2    Q    Have you -- are you no longer seeing Ms. McCafferty?

3    A    THat's correct.

4    Q    Why are you no longer seeing Ms. McCafferty for speech

5    therapy?

6    A    She was transferred to another office.

7    Q    Are you presently seeing anyone else for speech therapy?

8    A    Yes.  Within the past two or three weeks i've been seeing

9    Marsha Podwal (ph.) and I see her twice a week.

10   Q    When you were in high school or college did you have any

11   accommodations involving oral examinations, oral

12   presentations?

13   A    I had arrangements with my teachers and professors that

14   if I had to verbally speak that they would let me write a

15   paper or do -- or just not call on me.

16   Q    The dysfluency that you're experiencing presently, have

17   you always spoken this way?

18   A    I haven't always been this severe but I have always had

19   some degree of dysfluency.

20   Q    Is presently is this the most severe that you've been in

21   your life?

22   A    Yes, it is.

23   Q    Have there been episodes in the past where your condition

24   has been the same or similar to what it presently is?

25   A    I think that it was similar severity when I took the Step

1   2 CS in June of 2009.  Before that I don't believe it was as

2   severe.

3   Q    Between June of 2009 and the present has there been any

4   relief from the severity of your present dysfluency?

5   A    No.

6   Q    About how long do you believe you've been as dysfluent as

7   you are presently?

8   A    About eight or nine months.

9   Q    Can you describe what it's like to speak this way?

10  A    It's terribly exhausting, it's physically uncomfortable.

11  Imagine not breathing because sometimes like I'll be blocking

12  for a long period and I'll have to remember to breathe out of

13  sheer exhaustion.

14  Q    Is there anything you do to make speaking easier for you?

15  A    I find several techniques that involve breathing

16  utilization relaxation exercises.  I've used a technique

17  called easy onset and sound prolongation that have helped but

18  only in the confines of speech therapy.  I have never learned

19  a technique that has helped me with strangers or patients.

20  Q    What is different about speech therapy and why it may --

21  why these techniques are more effective in speech therapy

22  than speaking out in public?

23  A    Sure.  Speech therapy there's no stress there.  It's and

24  I'm not thinking about other factors, what will he or she

25  think of me.  What I'm not anxious there, it's easier.

1   Q    Is one -- well, can you speak to whether or not the

2   length at which you speak is altered at all by virtue of your

3   speech dysfluency?

4   A    Certainly.  As is evident here, my speech halts.  It's

5   not flowing, it's the rhythm of exchange of information is

6   severely disrupted.  Often I will minimize what I say to say

7   what I have to with the fewest words possible.

8   Q    By minimizing what you have to say does that have an

9   impact on, for example, the way you go about practicing

10  medicine or the clinical meeting with patients in a clinical

11  setting?

12  A    Yes.  I'm able to elicit the information that I need.

13  However we're not able to have an interactive dialogue, I'm

14  not able to establish a rapport.  I'm not, frankly, I don't

15  know if I'm answering all of the patient's questions.

16  Q    Is that, with respect to what you just said are you

17  talking about presently in your present condition that's been

18  your experience?

19  A    Yes.

20  Q    Okay.  Has that always been your experience during the

21  course that you've been in medical school?

22  A    No.

23  Q    What's different?

24  A    The stress now is much more.  I have this exam I must

25  pass to graduate medical school and start residency.

1    Q   And what test is that?

2    A   The Step 2 CS examination.

3    Q   Are there particular triggers that worsen your dysfluency

4    or are there times when you find that your dysfluency

5    worsens?

6    A   Yes.  Certainly stress will make it worse, speaking with

7    strangers, speaking with patients, just ordering lunch.  I

8    mean just anything like that.

9    Q   When you're not speaking with strangers, for example,

10   you're speaking with someone who's familiar to you.

11   A   Yes.

12   Q   Is your dysfluency as severe as it is now?

13   A   No, it's less severe then.

14   Q   Has that always been the case for you that your

15   dysfluency is reduced when speaking with individuals familiar

16   to you than with strangers?

17   A   It has been, yes.

18   Q   What observations have you made about the way people

19   react to you because of your dysfluency?

20   A   Sure.

21          MS. DEON:  Objection, your Honor.  I don't know that

22   this witness can characterize other people's reactions to

23   him.

24          MR. WEINER:  I asked about his observations.

25          THE COURT:  The witness can testify as to his

1   impression of others' impressions.

2          THE WITNESS:  Well, as an example, yesterday I went

3   out to eat and I tried to order my meal and I had a severe

4   block and the waitress was looking at me funny and the -- the

5   other employees behind the counter were -- seemed confused.

6   I had people who were -- who asked me: sir, are you all

7   right?  And I'd try to answer and block and they're thinking

8   that I'm choking.  I get a lot of strange looks and I feel

9   that people are impatient with me.

10  BY MR. WEINER:

11  Q   Have you experienced discrimination because of the way

12  you speak?

13          MS. DEON:  Objection, your Honor.  It calls for some

14  sort of legal conclusion as to what discrimination is, I

15  think.

16          THE COURT:  Yes, sustained.

17  BY MR. WEINER:

18  Q   Have you been treated adversely by people because of the

19  way you speak?

20  A   I have.  Two of the most recent examples, one I had just

21  finished my pediatrics rotation and I asked the attending

22  physician who I was working --

23          THE COURT:  Excuse me.  Please excuse me.

24          (Pause.)

25  BY MR. WEINER:

1   Q   I believe you were saying you were finishing your

2   pediatric rotation?

3   A   Yes.  And I had asked the attending physician who I had

4   worked under for a letter of recommendation and she basically

5   said she would not give one if I'm applying for a residency

6   such as pediatrics which requires a lot of verbal

7   communication.  There was another incident during my surgery

8   rotation where the chief resident was counting on his fingers

9   how long it was taking me to answer his question.  But the

10  same resident would not let me verbally present the patients.

11  Q   The -- and I wasn't sure if you said a chief resident or

12  your mentor in pediatrics, did she make any recommendations

13  to you as any particular field that you should go into?

14          MS. DEON:  Objection, your Honor, it calls for

15  hearsay.

16          MR. WEINER:  I'm not looking to introduce it for the

17  truth of the matter but he was advised something and followed

18  it and it's not admissible hearsay.

19          THE COURT:  Fine, go ahead.  Are you running out of

20  water here?

21          THE WITNESS:  Thank you very much.

22          THE COURT:  You're very welcome.

23          THE WITNESS:  She had recommended a field such as

24  radiology or pathology that involved less verbal

25  communication.

1   BY MR. WEINER:

2   Q    Have you made a decision what type of residency program

3   you intend to enter?

4   A    Yes, pathology.

5   Q    Why have you chosen to go into pathology?

6   A    I have a strong interest in pathology but honestly it's

7   probably the fact that there's less verbal communication that

8   drew me to it.  Can we take a break?

9              MR. WEINER:  Your Honor, Mr. Hartman asked if we can

10  take a break.

11             THE COURT:  Oh, I'm sorry, of course.  Let's take

12  five minutes.  I'm sorry, Mr. Hartman.

13             THE WITNESS:  That's okay.

14             MR. WEINER:  Your Honor, it's about 20 to 6:00,

15  should we break and come back tomorrow or?

16             THE COURT:  All right, sure.  We'll stop and resume

17  tomorrow morning at 9:30.

18             MR. WEINER:  And, your Honor, would -- Mr. Hartman

19  did bring with him his text to speech device.  Would it be

20  acceptable to your Honor for him to use it while he's on the

21  stand, moving forward?

22             THE COURT:  Surely.

23             MR. WEINER:  Thank you, your Honor.

24             (Court adjourned at 5:36 o'clock p.m.)

94

1                                I N D E X

2    PLAINTIFF'S WITNESSES        DIRECT  CROSS  REDIRECT  RECROSS

3    John A. Tetnowski

4      By Mr. Weiner              4

5      By Ms. Deon (Voir Dire)           12

6      By Ms. Deon                       50

7    Aaron Lee Hartman

8      By Mr. Weiner              85

9                                   *  *  *

CERTIFICATION


        I hereby certify that the foregoing is a correct

transcript from the electronic sound recording of the

proceedings in the above-entitled matter.




s:/Geraldine C. Laws, CET     Dated 3/19/10
Laws Transcription Service