IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| AARON L. HARTMAN | : | CIVIL ACTION NO. 09-5028 |
| | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | March 2, 2010 |
| NATIONAL BOARD OF MEDICAL | : | 9:48 o'clock a.m. |
| EXAMINERS | : | |

. . . . . . . . . . . . . . . . .

PRELIMINARY INJUNCTION HEARING - DAY 2
BEFORE THE HONORABLE LOUIS H. POLLAK
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiff:        CHARLES WEINER, ESQUIRE
                          Law Offices of Charles Weiner
                          179 North Broad Street
                          Doylestown, PA  18901

For the Defendant:        JANE E. LEOPOLD-LEVENTHAL, ESQUIRE
                          Eastburn & Gray, PC
                          60 East Court Street
                          P.O. Box 1389
                          Doylestown, PA  18901

ESR Operator:             Megan McDevitt/Jeff Lucini

Transcribed By:           Paula Curran, CET
                          Jo-Anne L. Hutt,
                          Laws Transcription Service

- - -

(Proceedings recorded by For the Record Gold digital sound
recording; transcript provided by above transcription
service.)

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

1              (The following occurred in open court at 9:48

2    o'clock a.m.)

3              THE COURT:  Good morning.

4              MS. LEOPOLD-LEVENTHAL:  Good morning, your Honor.

5              MR. WEINER:  Good morning, your Honor.

6              THE COURT:  Mr. Weiner, is Mr. Hartman ready?

7              MR. WEINER:  Yes, your Honor.

8              THE COURT:  All right.

9              (Pause.)

10             Good morning, sir.

11             MR. HARTMAN:  Good morning.

12             (Witness Aaron Hartman uses voice recognition text

13   to speech software.)

14             AARON HARTMAN, after having been previously duly

15   sworn as a witness, resumed, and was examined and testified

16   as follows:

17             MR. WEINER:  May I proceed, your Honor.

18             THE COURT:  You may resume.

19             MR. WEINER:  Thank you.

20                       DIRECT EXAMINATION

21   BY MR. WEINER:

22   Q   Mr. Hartman, at the close of yesterday's session, I had

23   requested that you have the ability to utilize the text to

24   speech.  Do you recall that request?

25   A   Yes, I do.

1    Q    And can you describe what text to speech software is?

2    A    Sure.

3              THE COURT:  I look forward to your explanation,

4    because I'm totally ignorant.  Mr. Robins here, and his

5    fellow law clerks, are trying to educate me as to these

6    matters, but I'm not a very good student.

7              THE WITNESS:  The software allows an individual to

8    type anything that they want, and it then voices what you

9    have typed.  If you want, I can show you how it works.

10   BY MR. WEINER:

11   Q    What you were saying is that when you want to speak, you

12   type it on your computer, and a voice modulates out of the

13   computer?

14   A    Yes.

15             THE COURT:  I'm afraid I don't understand the word

16   "modulate," as you use it.

17   BY MR. WEINER:

18   Q    A voice is produced from the computer.

19   A    I can show it to you, if you would like, sir.

20   Q    When you use the text to speech, can you change the pitch

21   of the voice?

22   A    I believe so, yes.

23   Q    Okay.  And I was going to ask you --

24             THE COURT:  Mr. Weiner, excuse me.

25             I understood the witness to be saying that he'd be

1    glad to show us the process, and obviously it's up to you

2    with your client's acquiescence and cooperation aside, what

3    you want to show demonstratively.

4            As far as I'm concerned, I'm certainly willing to --

5            MR. WEINER:  Thank you, your Honor.

6            THE COURT:  -- be an audience for whatever you and

7    Mr. Hartman would like to show me, if there is something.

8    BY MR. WEINER:

9    Q   Well, during the course of your testimony, I'm going to

10   ask that you utilize the text to speech as you would utilize

11   it in taking Step 2 CS examination.  Is that okay with you?

12   A   Yes, it is.

13   Q   In July 2008, you applied to accommodations for taking

14   the Step 2 CS exam?

15   A   Yes.

16   Q   And I'd like you to turn to Tab 2, which will be

17   Plaintiff's Exhibit 4.

18   A   (Witness complies.)

19   Q   Is this a copy of the application and documents you

20   provided with that application when you applied for

21   accommodations in July of 2008?

22   A   Yes, it is.

23   Q   What accommodations did you request?

24   A   I had requested double time for the patient encounter.

25   Q   And was that your only request for accommodations?

1    A    At this time, yes, it was.

2    Q    Prior to you applying in July 2008 for accommodations,

3    had you applied for accommodations in medical school for oral

4    or clinical-type examinations?

5    A    Yes, I had.

6    Q    And did you provide a report from a speech therapist to

7    explain -- to support your request to the medical school?

8    A    I had provided a report from Leslie Oldemeyer (ph), a

9    speech therapist to support the request.

10   Q    Was Leslie Oldemeyer a speech therapist providing any

11   treatment for you?

12   A    No, she was not.

13   Q    How did it come about that you went to Ms. Oldemeyer?

14   A    What happened was, I was in my third year of medical

15   school, and I had asked the school * if they would give me

16   the request.  They said that they would be happy to, but if

17   -- they knew how severe my dysfluency was, but that they just

18   wanted the -- the report as well.

19          MS. LEOPOLD-LEVENTHAL:  Objection, your Honor.  Move

20   to strike that answer as non-responsive.  Mr. Hartman is

21   characterizing what the specialists knew in their own minds.

22   I don't know that he's in a position to testify to that.

23          MR. WEINER:  I'm sorry.  I think Mr. Hartman was

24   testifying that when he went to the Disability Services

25   Office they requested that he provide a report.

1          MS. LEOPOLD-LEVENTHAL:  I believe he said the speech

2  therapist knew how severe his stutter was.

3          THE WITNESS:  That's not true.

4  BY MR. WEINER:

5  Q   Do you want to repeat what you had just explained?

6  A   Yes, the school wanted some report, some documentation,

7  to justify the request.

8  Q   And did the Office of Disability Services refer you to

9  Ms. Oldemeyer?

10 A   No, I --

11         THE COURT:  I appreciate there's an objection of

12 counsel that I didn't rule on --

13         MR. WEINER:  I'm sorry, your Honor.

14         THE COURT:  -- that I'm prepared to address and deny

15 the motion on the basis of the clarification just being

16 offered by plaintiff.

17         MS. LEOPOLD-LEVENTHAL:  And, frankly, given the

18 clarification, I withdraw my objection.

19         THE COURT:  All right.

20         THE WITNESS:  Would you repeat that?

21 BY MR. WEINER:

22 Q   Did the Office of Disability Services refer you to Ms.

23 Oldemeyer?

24 A   No, I sought her out myself.

25 Q   When was that evaluation done?

1    A    I think it was May 2007.

2    Q    And did you provide that report to your medical school to

3    support a request for accommodations on clinical and oral

4    examinations?

5    A    Yes, I did.

6    Q    And did your medical school provide you with

7    accommodations on clinical and oral examinations at that

8    time?

9    A    Yes, they granted me double time for all oral

10   examinations.

11   Q    And you said that that evaluation was done in May of

12   2007?

13   A    Yes, it was.

14   Q    How would you compare your condition presently to your

15   condition back in May of 2007, when that evaluation was done?

16   A    I would say say that I'm more severe now.

17   Q    When you applied to the NBME for accommodations in July

18   of 2008, was the report from Ms. Oldemeyer used to support

19   that request?

20   A    Yes, it was.

21   Q    Was there any other speech evaluation done between May of

22   2007, and July of 2008, to support that request?

23   A    I don't believe so.

24   Q    Did you provide any other information to the NBME to

25   support your request for accommodations in July 2008?

1   A    No.

2   Q    Did you provide any information or certification from

3   your medical --

4   A    Oh, yes, the school provided a certification that they

5   had, indeed, granted me double time.

6   Q    Did the NBME provide you with accommodations or respond

7   to your request for accommodations?

8   A    Yes, they had given me one-and-a-half times.

9   Q    So they gave you something less than what you requested?

10  A    Yes.

11  Q    Did you supplement your request in October of 2008?

12  A    Yes, I had requested that I be allowed to use a TTY

13  device.

14  Q    What is a TTY device?

15  A    It's stand for tele-typewriter.

16  Q    And when is a tele-typewriter, or TTY, utilized?

17  A    It's a device that plugs into your phone that allows

18  someone to make phone calls who has a verbal impairment.

19  Q    So is this something you type into and there's a live

20  person who communicates to the listener?

21  A    Yes.

22  Q    Why would this be necessary or why did you request to use

23  this on your Step 2 CS examination?

24  A    On the USMLE website, they say how one of the cases on

25  the Step 2 CS exam involves calling a patient, and since my

1   stutter is more severe over the phone, I had requested that

2   they let me use it as well.

3   Q    What was NBME's response to your request for use of the

4   TTY?

5   A    They denied that request, but offered to substitute a

6   live patient encounter for any phone encounter.

7   Q    Under Tab 3, which I'll introduce as Exhibit 5, is that a

8   copy of the application, or your supplemental application,

9   which you submitted in October of 2008?

10  A    Yes, it is.

11  Q    And in support of that request, you provided a report

12  from a different speech pathologist?

13  A    Yes, Emily McCafferty.

14  Q    Is that the speech therapist who was providing you with

15  speech therapy at the time?

16  A    Yes, she was.

17  Q    In June of 2009, did you take the Step 2 CS exam?

18  A    Yes, I did.

19  Q    Between July of 2008, when you applied for the

20  accommodations, to June 2009, when you took the Step 2 CS,

21  had anything changed regarding the nature of your dysfluency?

22  A    It got worse.

23  Q    Do you have an explanation as to why it got worse?

24  A    Yes, the stress of the examination made it -- the stutter

25  much more severe.

1   Q   Can you explain what you mean by "the stress of the

2   examination"?

3   A   The --

4           THE COURT:  I'm sorry.  What you mean by what?

5           MR. WEINER:  The stress caused by the examination.

6           THE COURT:  Okay.

7           THE WITNESS:  Sure.  The -- about a month prior to

8   the exam, I was feeling anxious about -- I needed to pass the

9   exam to graduate medical school, so the weight of this exam

10  seemed immense.

11  BY MR. WEINER:

12  Q   Couldn't you simply take the exam and take it until you

13  passed?

14  A   I'm sorry, sir?

15  Q   Couldn't you simply take the exam over and over again

16  until you passed?

17  A   No, the school gives you only three chances to pass.  If

18  you don't, your subject to dismissal.

19  Q   What was different about the Step 2 CS exam from any

20  other exam that you encountered in medical school?

21  A   A lot.  This exam was graded differently.  This exam

22  utilized patients who I've never seen before.

23          The purpose of my other exams was education, and

24  nature, and this had many more patients, and was conducted

25  over a longer period as well.

1   Q    In your preparation for the Step 2 CS examination, did

2   you familiarize yourself with how -- with the exam?

3   A    Yes, I did.

4   Q    And is that information contained on their website?

5   A    Yes, it is.

6   Q    Can you describe the Step 2 CS examination?

7   A    Sure, the exam involves patients who are actors that

8   portray --

9   Q    Can you repeat that again?

10  A    Sure, portray symptoms and signs, and then we have to

11  interview them, do the physical, and examination, and then

12  later write we have to write a patient note, and then list

13  the possible reasons they're having these complaints, and

14  what tests we want to order.

15  Q    How many patients are you seeing during the Step 2 CS

16  examination?

17  A    Ten through 12.  It varies I think.

18  Q    And under standard conditions, how much time would you

19  have with each patient?

20  A    Fifteen minutes.

21  Q    And with double time, that would be 30 minutes?

22  A    Yes.

23  Q    And do the patients fall into one particular discipline

24  or study of medicine, or could run the gamut of internal

25  medicine, orthopedics, cardiology?

1  A    It can be anything.

2  Q    Any discipline of medicine?

3  A    Yeah.

4  Q    And can you state what areas that you are assessed on the

5  Step 2 CS examination?

6  A    There's three major categories.  The integrated clinical

7  encounter, the communications, and the interpersonal skills,

8  and the spoken English proficiency.

9        The ICE, they assess how well you gather the data

10  from the patient, and how well you wrote the patient note.

11  The CIS, they are looking for things like if you asked

12  open-ended questions, if you were professional, and if you

13  were -- you were able to have a rapport.  The SEP looks at

14  the clarity of your spoken English, and how the listener's

15  ease in understanding you.

16  Q    In grading or assessing one's score on the exam, does one

17  need to pass all three sections?

18  A    Yes, you do.

19  Q    If you fail one section, and pass two sections, what's

20  the result?

21  A    It's a failure.

22  Q    Did you actually take the Step 2 CS examination in June

23  of 2009?

24  A    Yes, I did.

25  Q    Did you encounter any difficulties with respect to your

1    speech dysfluency?

2    A    Yes, I had a very difficult time having an interactive --

3    interactive dialogue.  I wasn't able to keep the listener's

4    attention because of the -- the length of my remarks.  I

5    wasn't able to establish a rapport with the patient.  I

6    wasn't able to ask all of the questions that I had wanted,

7    and answered all of his or her concerns.

8    Q    What kind of difficulty did you encounter in establishing

9    a rapport?

10   A    A rapport is a relationship.  You need that so that the

11   patient trusts you and I felt that we just did not have that.

12   Q    Did you have to alter or change the way you spoke to the

13   standardized patients during the Step II CS examination?

14   A    At the start of each patient, I would say who I am, but

15   then I would explain that I have a stutter to put the patient

16   at ease.  This also helped to ease me, too.

17   Q    By telling the patient up front that you had a stutter,

18   were you attempting to build a rapport?

19   A    Yes, I was.

20   Q    And in terms of the way you would speak with the

21   patients, did you alter the way your spoke in terms of

22   shortening or lengthening what you had to say?

23   A    Yes.  I minimized the number of words that I would say.

24   Q    Is that something you would often do as a result of your

25   speech dysfluency?

1   A    Yes.  I would do this in most contacts.

2   Q    Was your dialogue with the patients during the Step II CS

3   examination responsive to their immediate needs?

4            MS. LEOPOLD-LEVENTHAL:  Objection, your Honor, I'm

5   not sure how Mr. Hartman can testify with respect to whether

6   or not what he said or responded to the SP's immediate needs,

7   to the extent he doesn't even know what those needs are.

8   Now, he's going to be saying whether or not what he said

9   answered whatever their concerns were.

10           THE COURT:  I think that's an objection well taken.

11           MR. WEINER:  Then I'll change the question.  I

12  wasn't really going at that angle.

13  BY MR. WEINER:

14  Q    Was your -- I'll withdraw the question, your Honor.

15           THE COURT:  All right, Mr. Weiner, let me interrupt

16  you for a moment.  Somewhere along here, we should take a

17  break, we've been at for about an hour.  Could you tell me

18  what would be a convenient time?  I mean, if there are

19  particular things you want to cover without interruption, go

20  ahead.

21           MR. WEINER:  We could take a break now and I'm at a

22  point where we can break.

23           THE COURT:  All right.  There's, at least, one phone

24  call that I will have to take.  It may take some time.  So,

25  let's plan on a 15-minute recess.

1          MR. WEINER:  Yes, your Honor.

2          (Court in recess 10:52 to 11:37 o'clock a.m.)

3          THE COURT:  Please sit down and more than that,

4    please accept my apologies.  As you can see, a telephone call

5    turned out to be considerably more extensive than I had in

6    mind.  And I'm afraid I've wasted a lot of your time.  Well,

7    gosh, it's already 20 of 12:00.  My plan is to recess for

8    lunch at 12;30.  We'll see what we can do up until then.

9    I really am sorry to take up so much of your time, Mr.

10   Weiner.

11         MR. WEINER:  Thank you, your Honor.

12         THE COURT:  When I voiced that apology, I didn't

13   want to add that I have no reason to expect than any of you

14   would, in fact, forgive me.  If I were you, I would not.

15         MR. WEINER:  Forgiveness is divine.

16   BY MR. WEINER:

17   Q   During your June of 2008 Step II CS examination, I'm

18   sorry, June of 2009 Step II CS examination, did you observe

19   any of the encounters -- do you have any observations about

20   how your encounters went with the standardized patients?

21   A   Yes, I do.  The encounters were very difficult.

22   Q   In what way?

23   A   The patients seemed to have a difficult time following me

24   to my halting speech. They -- I had trouble having an

25   interactive dialogue.  And asking all of the questions I

1    wanted to ask and to address all of the patient's concerns.

2    Q    Do you believe your dysfluency impaired your ability to

3    demonstrate your achievements or your skills that you

4    acquired in medical school?

5    A    Certainly, yes.

6    Q    In what way?

7    A    It was able to do very well academically in medical

8    school.  I passed all of the examinations that I needed to

9    and I received mostly high passes.  Some passes, some honors,

10   as well.

11   Q    And how is it that your dysfluency impaired your ability

12   to demonstrate your achievements?

13   A    Well, I have the ability to do very well.  But the

14   dysfluency made that very difficult to be shown my score on

15   the Step II CS examination.

16   Q    Before receiving your results, did you believe that you

17   had passed the Step II CS examination?

18   A    Yes, I did.

19   Q    And why do you believe you passed?

20   A    I believe that I as able to get all of the things that

21   were necessary of me.

22   Q    Meaning the different components on the scores that are

23   mentioned, that you mentioned previously?

24   A    Yes.  At the time, I was not familiar in detail with how

25   it was assessed.  And I wasn't aware this was graded

1    differently than the examinations given at Stoney Brook.

2    Q    Was that the reason why you had felt you had passed this

3    exam?

4    A    Yes.

5    Q    And previously, when you had taken other clinical type

6    examinations, you had passed those examinations?

7    A    Yes, I did.

8    Q    I'd like you to turn to Tab 4 of the plaintiff's booklet

9    and that document will be Exhibit 6.

10   A    Okay.

11   Q    Can you identify that document, please?

12   A    You said six, right?

13   Q    I'm sorry?  Tab 4.

14   A    Oh, Tab 4, I'm sorry.

15   Q    It's Exhibit 6, but Tab 4.

16   A    Yes.  This is the score report that the NBME sent to me

17   after the Step II CS examination.

18   Q    And how did you do on -- what was your overall

19   performance on the exam?

20   A    I failed it.

21   Q    On the ICE component, the integrated clinical encounter,

22   how was your -- how did you perform?

23   A    As I mentioned earlier, the ICE is composed of two

24   components.  I did in the borderline performance on the data-

25   gathering component.

1    Q    Is that reflected on the second page under Tab 4?

2    A    Yes, it is.

3    Q    Is that where you're looking right now?

4    A    Yes, I am.

5    Q    All right, so, when  you say you were in the borderline

6    performance, the document you're looking at, has an area for

7    a higher performance, a middle area for borderline

8    performance and then another area for lower performance.

9    A    Yes.

10   Q    And the data gathering, in what areas did your scores

11   range?

12   A    It was in the borderline range.

13   Q    Is some of it -- does some of your score appear to be in

14   the higher performance range for data gathering?

15   A    It looks -- no, well, it's -- some of it's throughout all

16   three, it seems.

17   Q    Right, so, there's a band and it goes from lower

18   performance, borderline performance to higher performance?

19   A    Yes.

20          MS. LEOPOLD-LEVENTHAL:  Your Honor, I'd object to

21   this line of questioning, only because we're happy to

22   stipulate to what the reports reflect.  There are certainly

23   Xs, it's a document that's, you know, in evidence.  But to

24   have Mr. Hartman summarize what the written document says,

25   when the document says it and we're happy to agree to that.

```
                      Hartman - Direct                    19
```

1        THE COURT:  Well, that sounds useful.  Let's do it
2   that way.
3        MR. WEINER:  Okay, that's fine, your Honor.
4   BY MR. WEINER:
5   Q   And in the data gathering, does that involve speaking?
6   A   Yes, it does.   The actors grade you on this portion.
7   Q   And on the patient note, it appears that your performance
8   was more towards the higher performance end?
9   A   Yes, it was.
10  Q   All right.  Does that portion involve any speaking?
11  A   No, this is solely -- is only graded by physicians.  This
12  is only graded by physicians.
13  Q   And in the three sub-components of the communications and
14  interpersonal skills, it's been stipulated that your score
15  falls in the lower performance for all three sub-component
16  areas?
17  A   Yes, it is.
18  Q   And do these three areas involve your ability to speak?
19  A   Yes, it does.
20  Q   And was the score you received affected by your speech
21  dysfluency?
22  A   Yes, it was.
23  Q   The spoken English proficiency, it appears that you
24  scored slightly above the borderline region?
25  A   Yes, I did.

1   Q    During the course of the exam, did you speak any language

2   other than English?

3   A    No, English is the only language that I speak.

4   Q    Does the results on the July, 2009 Step II CS examination

5   correspond with your belief that your dysfluency impaired

6   your ability to demonstrate your achievements?

7           MS. LEOPOLD-LEVENTHAL:  Objection, your Honor, I

8   don't know how he can testify to that.

9           THE COURT:  Well, I don't think it will hurt to get

10  the answer.

11          THE WITNESS:  Yes, certainly, looking at even the

12  SEP portions, this is well evident.  This is, looking at the

13  clarity of how well I speak English.  And I believe that my

14  clarity is excellent, so by that alone -- more the CIS

15  portion, which looks at how well one communicates is

16  definitely impacted by dysfluency.  For example, in the

17  questioning skills, I did, indeed, ask open-ended questions

18  and things like this.  I did share information with the

19  patient and these reports would indicate otherwise.

20  BY MR. WEINER:

21  Q    Have you reviewed the USMLE's website to determine what

22  the pass rate is for the Step II CS examination?

23  A    Yes.

24          MS. LEOPOLD-LEVENTHAL:  Objection, your Honor.  I'm

25  not sure what relevance this has to the case.  Did I speak

1    too low?

2              THE COURT:  I'm sorry, would you?

3              MS. LEOPOLD-LEVENTHAL:  I'm not sure what relevance,

4    if any, the USMLE's pass rate and the Step II CS examination

5    has to this case.

6              THE COURT:  Do you want to tell us, Mr. Weiner?

7              MR. WEINER:  Sure, your Honor.  Mr. Hartman was

8    among one of the very few who failed this examination.  I

9    think that's relevant.

10             THE COURT:  And?

11             MR. WEINER:  Well, it's relevant because he is

12   stating that he was affected by his disability.  He's a good

13   student.  He's passed other medical school examinations.  The

14   way this examination, because of the pressure or because of

15   the circumstances, his dysfluency completely interfered with

16   his ability to pass, putting him among some of the very few

17   people who did not pass the exam.

18             THE COURT:  All right, that sounds legitimate to the

19   Court.

20             THE WITNESS:  For MD schools, the pass rate is about

21   97 percent.

22   BY MR. WEINER:

23   Q   That's for medical schools in America and Canada, those

24   are the students?

25   A   Yes.

1   Q   Were you surprised that you were among the less than

2   three percent to fail this examination?

3   A   I was, given my history in medical school, I expected to

4   do much better.

5   Q   And is part of the information that you reviewed on the

6   USMLE website, did you notice if they break down the pass

7   rate for the different sub-components?

8   A   Yes, they do.

9   Q   For the communications and interpersonal skills, the CIS

10  section, which you had failed, what is the pass rate?

11  A   I think it's over 99 percent.  I'm sorry, that's for

12  American students.

13  Q   So, the pass rate for American and Canadian medical

14  students?

15  A   Yes, yes.

16  Q   The pass rate under the CIS section os 99 percent?

17  A   Yes, I believe so.

18  Q   And were you surprised that you were among the one

19  percent that failed the CIS portion of the examination?

20  A   Yes, I was.

21  Q   How did you perform while you were in medical school?

22  A   I did very well.  I had mostly high passes, but I also

23  had some passes and honors.

24  Q   I'd like you to turn to Tab 19 and that will be

25  introduced as Exhibit 7.  Can you explain what this is?

1   A    Sure.   This is my medical school transcript.   I should

2   note that in the official transcript, they do not list high

3   passes.

4   Q   On some other record that you've received, they do

5   indicate high passes?

6   A   Yes, that's correct.

7   Q   Okay, what type of grades do you receive in, I suppose,

8   the un-official transcript?

9   A   Five categories, there is honors, high pass, pass, low

10  pass, and fail.

11  Q   And on the official transcript, where you had a high pass

12  that would merely be reflected as a pass?

13  A   Yes.

14  Q   You had given an authorization for the release of your

15  records from Stoney Brook Medical School to Ms.

16  Leopold-Leventhal, is that correct?

17  A   Yes, I did.

18  Q   In reviewing your transcript in the fall of 2004, the

19  grades there area all I's, what does that mean?  That I

20  stands for incomplete.

21  Q   Can you explain what occurred during the fall of 2004,

22  that caused you to have incompletes in that year?

23  A    In the summer of that year, my grandmother was diagnosed

24  with cancer.  She was brought to Stoney Brook University

25  Hospital, where she ultimately died.  I was involved with her

1    care.  So, her death hit me pretty hard.  So, ultimately, I

2    chose to take a leave of absence.

3    Q    And that extend the amount of years that you were in

4    medical school?

5    A    Yes.  I took the leave of absence for one year.  So that

6    would extend it by one year.

7    Q    In reviewing your transcripts, I see a number of P's for

8    a grade.  What does that mean?

9    A    Pass.

10   Q    And the H represents?

11   A    Honors.

12   Q    In September of 2009, had you applied for accommodations

13   on the Step II CS examination again?

14   A    Yes, I did.

15   Q    I'd like you to turn to Tab 5 and that would be Exhibit

16   8.

17   A    Okay.

18   Q    Can you explain what that is?

19   A    This is the form that I filled out and sent to the NBME,

20   requesting an accommodation on the Step II CS examination.

21   Q    What accommodation were you requesting at this time?

22   A    I wanted to type my questions and answers on a laptop

23   computer and have an orator say it.

24   Q    And how would that work?

25   A    I would type whatever I wanted on it on a computer and

1    then someone else would say what I typed.

2    Q    And how was your dysfluency condition in September, 2009,

3    compared to the present?

4              THE COURT:  Compared to?

5              MR. WEINER:  The present.

6              THE WITNESS:  It is the same.

7    Q    Why were you requesting a different accommodation in

8    September of 2009 than what you previously requested on your

9    first administration of the Step II CS?

10   A    I felt that the exam the first time would not, I'm sorry,

11   did not accurately assess my skills.

12   Q    Do you feel that if it had given you double time, that

13   that would have assisted your skills?

14   A    No.

15   Q    Why is that?

16             MS. LEOPOLD-LEVENTHAL:  I'd object to this, your

17   Honor.  I don't know how Mr. Hartman can speculate as to

18   whether or not he is given double time, how that all that's

19   going to impact his score and how successfully he would take

20   the Step II CS exam with double time.

21             THE COURT:  Well, I think that's an area that Mr.

22   Hartman would have had an opinion about.  I think any of us

23   could make an estimate, it may be inaccurate, but could make

24   an estimate as to what they -- a different environment --

25   might produce in terms of an examination that any of would

1   take.  Certainly, don't think you want me to be over

2   biographical in any way.  But I certainly remember

3   examination situations which I would have wished had been

4   different.  Go ahead, it could happen.  Forget my frivolity

5   and respond as you wish.

6           THE WITNESS:  Would you repeat that, please?

7           MR. WEINER:  Is there a way to read back the

8   question?

9           THE CLERK:  No.

10  BY MR. WEINER:

11  Q   Why wouldn't double time have assisted you more

12  appropriately?

13  A   Okay, well, even if I have more time, I still minimize

14  what I say.  So, the -- as I have said, stuttering is

15  extremely exhausting and this makes it worse.  So, for me,

16  the extra time would physically exhaust me and not help.

17  Q   And what was the NBME's response to your request for your

18  September, 2009 application for accommodations?

19  A   They denied my request and offered me double time.

20  Q   I'd like you to turn to Tab 6, which I will introduce as

21  Exhibit 9.  Can you explain what this is?

22  A   This is a letter from Dr. Farmer, who is the Manager of

23  the Disability Services at the NBME and she, in here, she

24  says that they will not grant my request.  And that they

25  would give me 15 extra minutes on the patient encounter.

1    Q    What did you do after you received that response?

2    A    I believe that I called her with the assistance of my

3    father.

4    Q    And what was the purpose of that phone call?

5    A    I wanted to find out why they had denied my request and

6    to try to come to some resolution.

7    Q    Why did you make the call with your father?

8    A    I have an extremely hard time speaking on the telephone.

9    I wanted my father to help express my concerns to Dr. Farmer.

10   Q    Was that phone call made from your house?

11   A    I was at home and my father was at his office.

12   Q    Do you have a TTY system or tele-typewriter system at

13   your house?

14   A    Yes, I do.

15   Q    Why didn't you use it for that phone conversation?

16   A    I felt that having her hear the extent of my dysfluency

17   may impact her decision.

18   Q    In previous occasions, in speaking with individual

19   associated with the USMLE, did you have any untoward contacts

20   utilizing TTY?

21   A    Yes, there was one time that the person on the other end

22   was rude to the operator and then hung up the phone.

23   Q    Just with respect to Dr. Farmer, that wasn't Dr. Farmer

24   though, was it?

25   A    No, it was not Dr. Farmer.

                          Hartman - Direct                    28

1  Q   And --

2            THE COURT:  Mr. Weiner, about now we should be

3  recessing for lunch.  You tell me if this a good time or are

4  there a few other questions you want to --

5            MR. WEINER:  Just a couple of question along this

6  line.  It will be just a couple of minutes and you can take a

7  break.

8            THE COURT:  Good, you tell me when we should pause.

9            MR. WEINER:  Okay.

10  Q   Did that also influence your decision whether or not to

11  utilize the TTY?

12  A   Did my father -- I'm sorry?

13  Q   In having your father speak, rather than utilize the TTY,

14  was your decision also influenced by the prior unfortunate

15  experience that you had utilizing TTY?

16  A   Yes.  I felt that it would be more effective if we call

17  them.

18  Q   And why didn't you simply make the phone call yourself?

19  A   Well, on several other occasions, the person on the other

20  end would hang up on me.

21  Q   Is that something that occurs when you're on the

22  telephone?

23  A   Frequently, yes.

24  Q   Did you and your father, in fact, connect with Dr.

25  Farmer?

Hartman - Direct                    29

1   A   Yes, we did.

2   Q   And what was the results of that conversation?

3   A   Even though she heard firsthand the severity of my

4   stutter, she would only grant me double time.

5   Q   And what did you do after that conversation?  Did you

6   follow up with a letter?

7   A   Yes, I did.

8   Q   I'd like you to turn to Tab 7, which I'll mark as Exhibit

9   10.  Is this the letter that you wrote to Dr. Farmer

10  following your conversation?

11  A   Yes, it is.

12  Q   What was the purpose of that letter?

13  A   I wanted to express how the accommodation that they

14  granted would not be sufficient for my severity of

15  stuttering.

16  Q   Why didn't you communicate that on telephone?

17  A   I was having extreme blocks and when I tried to call her,

18  the person on the other end would hang up.

19  Q   Well, when you were on the phone initially, you and your

20  father and Dr. Farmer, did your call get disconnected?

21  A   Yes, it did.

22  Q   And then you attempted to call back?

23  A   Yes.

24  Q   Okay.  And when you attempted to call back, the person

25  who received the call, would hang up?

                          Hartman - Direct                    30

1    A    They would presumably think that no one was on the line

2    and then hang up the phone.

3              MR. WEINER:  We can take a break, your Honor.

4              THE COURT:  All right.

5              MS. LEOPOLD-LEVENTHAL:  Your Honor, before we break

6    for lunch, might we talk about scheduling just for a moment.

7    We're trying to line up our witnesses for later today and

8    also determine what your Honor expects from the parties and

9    counsel for tomorrow, to the extent that we don't finish

10   today.

11             THE COURT:  Well, we have all of this afternoon.  I

12   thought we'd recess until 1:30 or if you want more time than

13   that, 1:45 would be fine.  And go on through the afternoon,

14   like we did yesterday, until say 5:30, quarter of 6:00,

15   something like that.  Tomorrow I can't be with you before the

16   afternoon.  So, I would expect we'd begin, say 2:00

17   approximately, tomorrow afternoon.  Then we would have the

18   afternoon.  Are you contemplating that the testimony is

19   likely to take beyond tomorrow afternoon?

20             MS. LEOPOLD-LEVENTHAL:  It's difficult to estimate.

21   I don't know when Mr. Weiner is going to finish his direct or

22   his cross.  I think at the end of today, I'll have a better

23   idea or at least, be able to estimate a little bit better

24   what I think tomorrow will bring.

25             THE COURT:  All right.

                        Hartman - Direct                    31

1              MS. LEOPOLD-LEVENTHAL:  I'll obviously streamline

2     the direct examination, as much as I can, but I do have three

3     witnesses.

4              THE COURT:  Sure.  All right, well, then we'll give

5     you the bidding at the end of the afternoon.  Have a good

6     lunch.  See you at 1:45.

7              MR. WEINER:  Thank you, your Honor.

8              MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

9              (Court in recess 12:40 to 1:45 o'clock p.m.)

10             THE COURT:  Please sit down.  All right.

11             MR. WEINER:  May I proceed, your Honor?

12             THE COURT:  Indeed.

13    BY MR. WEINER:

14    Q   Following your initial phone call to Dr. Farmer, did you

15    then follow up with any additional letters?

16    A   Yes, I did.

17    Q   And I'd like you to turn to Tab 8 and I will have that

18    marked as Exhibit 11.  Can you identify this document?

19    A   This is letter to Ms. Azari, one of the vice presidents

20    in the NBME.  This is to Ms. Azari, one of the vice

21    presidents of the NBME.

22    Q   And how is it that you decided to write to Ms. Azari?

23    A   As I recall, I found out that she is Dr. Farmer's

24    supervisor.  So, when I wasn't getting anywhere with Dr.

25    Farmer, I think I had sent Ms. Azari this letter.

1   Q    And what was the purpose of this letter?

2   A    I wanted her to reconsider the decision made by Dr.

3   Farmer, who would only give me double time on the Step II CS

4   examination.

5   Q    Did you advise Ms. Azari that you would even allow

6   yourself to be subject their own evaluator?

7   A    I did.

8   Q    At this point in time, your request for an accommodation

9   was to type out your question or dialogue to the standardized

10  patient and allow an orator to read that?

11  A    That's correct.

12  Q    Did you, in any way, express that you were open to other

13  types of accommodations, as well?

14  A    Yes.  I wanted to find out what they felt was reasonable.

15  Why they felt that my request was not.  And I wanted to work

16  with her to find something reasonable.

17  Q    Did NBME indicate they'd be interested in having you

18  evaluated?

19  A    They were not.  I had asked them if I could come down and

20  meet with them to discuss this, but they declined my offer.

21  Q    How was that declined?  Well, first of all, who declined

22  that?

23  A    I don't know if it was Dr. Farmer or Ms. Azari.

24  Q    Did you receive a response to your letter, which was

25  under Tab 8?  That was a letter dated October 5, 2009?

                              Hartman - Direct                    33

1    A    Yes, I did.

2    Q    Can you turn to Tab 9, which I will mark as Exhibit 12?

3    A    Sure.

4    Q    Is this a copy, which is a letter dated October 13, 2009?

5    A copy of the response you received from the NBME?

6    A    Yes, it is.

7    Q    And what did you do in response to that letter?

8              THE COURT:  Is this Exhibit 12?

9              MR. WEINER:  That was our last exhibit, Exhibit 12.

10   It's under Tab 9.

11             THE WITNESS:  I had called you to try to help me.

12   Q    Can you turn to Tab 10, which I'll mark as Exhibit 13.

13   This is a letter from my office, dated October 16th to Shelly

14   Green, Esquire of the NBME.  Did you receive a copy of this

15   letter?

16   A    Yes, I did.

17   Q    Did you authorize me to send this letter on your behalf?

18   A    Yes, I did.

19   Q    In this letter, Text To Speech, as an accommodation on

20   the Step II CS examination, is introduced.  Was this the

21   first request that was made to NBME, setting forth your

22   request for Text To Speech?

23   A    Yes, it was.

24   Q    Can you explain how it came to pass that you were

25   interested in utilizing Text To Speech software?

1   A    You had told me that you spoke with some experts.  And

2   that they suggested this might be a possible solution.

3   Q    After I made that suggestion to you, did you make an

4   attempt to utilize Text To Speech?

5   A    Yes.  I had previously never heard of it.  So, once you

6   told me about it, I wanted to find out more, so I bought the

7   software.  And I started to use it.

8   Q    Was Text To Speech software similar to any other assisted

9   device that you've used in the past?

10  A    It was similar to the TTY device.  But this would be more

11  useful.  Since it would allow me to directly control the

12  conversation.

13  Q    Did find the attributes with using Text To Speech

14  software that weren't available with your previously proposed

15  accommodation, which was to have an orator?

16  A    This would allow me directly to control how much I

17  communicated with the device.

18  Q    And when you didn't use the device, what would you be

19  doing?

20  A    Can you say that again?

21  Q    In the context of a patient encounter, if you weren't

22  using the device, what would you be doing?

23  A    I would be severely blocking for long periods of time.

24  Q    I'd like you to turn to Tab 11, which will be marked as

25  Exhibit 14.  This is a letter dated October 27, 2009 from the

1    National Board of Medical Examiners to you.  Did you receive

2    a copy of this letter?

3    A    Yes, I did.

4    Q    What was your understanding of what was being conveyed to

5    you?

6    A    That they refused the request for a Text To Speech

7    device.

8    Q    And was this in response to the letter that I had sent to

9    Ms. Green?

10   A    Yes, it was.

11   Q    If you were permitted to use the Text To Speech software

12   in the context of the Step II CS examination, how did you

13   plan to use it?

14   A    I planned to verbally communicate and have it supplement

15   my verbal speech.

16   Q    Is it your intention to use the Text To Speech

17   exclusively?

18   A    No, it is not.

19   Q    Would you -- is it your expectation that you would use it

20   more than regular speech?

21   A    No.

22   Q    How can you be sure that you won't use the Text To Speech

23   in the context of a patient encounter more than regular

24   speech?

25   A    It's in my interest to verbally, as much as I can,

1   because the SEP portion of the exam requires spoken English.

2   Q   Are you finished, I'm sorry.

3   A   Yes.

4   Q   Do you see any benefits to using it?

5   A   Certainly, it will let me show my true communication of

6   interpersonal skills.

7   Q   Do you see any other benefits to utilizing it in a

8   patient encounter?

9   A   It will let me say more and it will put me at ease.

10  Q   Who would it put at ease?

11  A   Me and the patient.

12  Q   Will the Text To Speech program enable you to better

13  demonstrate your achievement over regular speech?

14  A   Yes, it will.

15  Q   Does the Text To Speech allow you to demonstrate your

16  full achievement?

17          MS. LEOPOLD-LEVENTHAL:  Objection, your Honor.

18          THE COURT:  Overruled.

19          THE WITNESS:  No, I don't believe that there is an

20  accommodation that can't allow me to show my full

21  achievement.  However, this will let me to more closely

22  demonstrate my achievement.

23  BY MR. WEINER:

24  Q   More closely demonstrate your achievement than what?

25  A   Then if I simply, verbally spoke.

1  Q    Have you used your Text To Speech program in any clinical

2  setting?

3  A    Yes, I have.  I used it with three real patients that I

4  saw.

5  Q    When was that?

6  A    It was the fall of '09, after I first learned about the

7  Text To Speech.

8  Q    Was this in connection with any of your medical school

9  classes?

10  A    Yes, it was during an elective in state medicine.

11  Q    Did you have a mentor or supervisor or anyone observe

12  your use of the Text To Speech in those patient encounters?

13  A    Yes, I did.

14  Q    Did you solicit any feedback from your mentor or

15  supervisor?

16  A    Yes, she --

17          MS. LEOPOLD-LEVENTHAL:  Objection, your Honor, it

18  calls for hearsay.

19          MR. WEINER:  I just asked if he received feedback.

20          MS. LEOPOLD-LEVENTHAL:  I understand that he said

21  yes and was about to describe what his mentor told him.

22          MR. WEINER:  Okay, I'll ask a follow-up question.

23  BY MR. WEINER:

24  Q    Based on the feedback you received, were you encouraged

25  or discouraged to utilize the Text To Speech?

1          MS. LEOPOLD-LEVENTHAL:  Objection, your Honor.  It

2   still calls for hearsay, just a reformulation of the

3   question, asking the same thing.

4          MR. WEINER:  I didn't ask for what they said, I just

5   asked if he was encouraged or discouraged by what he was

6   told.

7          THE COURT:  Overruled.

8          THE WITNESS:  I was encouraged by what they said.

9   BY MR. WEINER:

10  Q   Have you gone on any interviews for any residency

11  program?

12  A   Yes, I have.

13  Q   And these are residency programs in pathology?

14  A   Yes, they are.

15  Q   Have you used the Text To Speech in connection with any

16  of your interviews on residency programs?

17  A   I have, yes.

18  Q   How many?

19  A   One program -- I used it during four interviews.

20  Q   You used it during how many interviews?

21  A   Four, possibly more.

22  Q   Were there interviews that you didn't use the Text To

23  Speech?

24  A   There were, yes.

25  Q   How many interviews did you go on where you didn't use

1    the Text To Speech program?

2    A    I think like seven of them or so.

3    Q    Okay.  Did you deliberately not use the Text To Speech in

4    those interviews?

5    A    Yes.

6    Q    Why did you stop using the Text To Speech?

7              MS. LEOPOLD-LEVENTHAL:  I'm sorry, your Honor, to

8    interrupt.  I didn't hear Mr. Hartman's answer to the

9    question before that, as to how many resident interviews he

10   did not use his Text To Speech on.  I just didn't hear it.

11             THE WITNESS:  There were about seven of them or so.

12   BY MR. WEINER:

13   Q    There were about seven interviews total or about seven

14   interviews that you did not use it?

15   A    That I did not use it.

16   Q    And why did you choose not to use the Text To Speech?

17   A    There's a couple of reasons.  One of them was that one of

18   the interviewers was a resident who suggested it might be

19   better for me to verbally communicate.

20   Q    Were there any other reasons?  I thought you said there

21   were several reasons.

22   A    Also after I had those interviews, I felt that the Text

23   To Speech was not necessary, since I felt more comfortable.

24   Q    You felt that the Text To Speech was more comfortable --

25   A    No, that --

1   Q   -- or not more comfortable during the interview?

2   A   -- I felt that the device was not necessary because I

3   felt more comfortable after my first interview.

4   Q   When you utilized Text To Speech, are you always able to

5   maintain eye contact with whomever you're speaking with?

6   A   No, I'm not.

7   Q   Do you feel that eye contact is something that's

8   important in the context of a physician/patient encounter?

9   A   No, there are lots of times during a physician/patient

10  encounter in which there is no eye contact.

11  Q   What are some of those times?

12  A   When we take notes and when we physically examine the

13  patient.

14  Q   So, during a typical patient/physician encounter, when

15  you take the notes or when you're conducting an examination,

16  those are the examples when you wouldn't maintain eye

17  contact?

18  A   Yes.

19  Q   Other than those episodes, would you try and maintain eye

20  contact when you were either taking the note, utilizing Text

21  To Speech or conducting a physical exam?

22  A   Yes, I would.

23  Q   During medical school, did you take other clinical or

24  oral examinations?

25  A   Yes, may I refer to the interrogatories?

Hartman - Direct                    41

1  Q   Okay, that would be at Tab 31.  This would be plaintiff's

2  answers to defendant's interrogatories.  And Tab 31 will be

3  marked as Exhibit 15.

4          THE COURT:  15?

5          MR. WEINER:  15, your Honor.

6  Q   In the answers to interrogatories, you had provided a

7  list of the different clinical and oral examinations?

8  A   Yes, I did.

9  Q   And I believe the interrogatory starts at page 9, that's

10  Interrogatory 6 and carries over to page 10 and 11.  The

11  first bullet point is the internal medicine practical

12  examination.  It was administered in February of 2008.  How

13  was your speech dysfluency during February of 2008?

14  A   It was less severe than it is now.

15  Q   You still had a speech dysfluency though, didn't you?

16  A   Yes, I did.

17  Q   And can you explain what the difference is that exists

18  between the internal medicine practical examination and the

19  Step II CS examination?

20  A   Sure.  This exam involved a real patient, with an

21  attending physician observing me.  Whereas the Step II CS had

22  actors, this exam was not timed.  The Step II CS exam was

23  timed.  This one involved one patient.  The Step II CS

24  involved, I think, 12 patients and --

25  Q   How many disciplines of medicine were involved on the

 1   internal medical practical examination?

 2   A   One, they were only with -- it only involved a patient

 3   with an internal medicine problem.  The Step II CS exam

 4   involved approximately eight medical specialties.

 5   Q   What was the purpose of the internal medicine practical

 6   examination?

 7   A   It was an educational tool.  Afterward, the doctor who

 8   observed me gave me feedback.

 9   Q   The doctor who observed you, were you familiar with that

10   doctor?

11   A   Yes, I had been working with him for about two months.

12   Q   And what impact does that have on you with respect to

13   your speech dysfluency?

14   A   With people who I know, the severity of my stutter

15   decreases.

16   Q   You mentioned that the internal medical practical

17   examination was a teaching or educational tool.  The Step II

18   CS, is that a teaching or educational tool?

19   A   No, it's used to assess your achievements.

20   Q   What, if any, significance does that, the difference

21   between one being an educational tool and one to measure your

22   achievement, with respect to your speech dysfluency?

23   A   I was a lot less stressed, so my speech dysfluency was a

24   lot less with the internal medicine exam.

25   Q   Looking further down on page 10 of Tab 31, the second to

                              Hartman - Direct                    43

1    last bullet point, is the ob/gyn oral examination

2    administered in February of 2009.

3    A    Yes.

4    Q    Did that have some of the same similarities that you just

5    mentioned with respect to the internal medicine practical

6    examination?

7    A    This also wasn't timed, however, this involved presenting

8    a Powerpoint.

9    Q    Did it involve a patient?

10   A    No.

11   Q    Looking at page 10, through the other bullet points that

12   are on that page, there are a series of examinations that

13   referred to as OSCE.  What does OSCE stand for?

14   A    Objective Standardized Clinical Examination.

15   Q    And these are commonly referred to OSCEs?

16   A    Yes.

17   Q    Can you describe what the OSCEs were like?

18   A    They involved three or four actors, who were pretending

19   to be patients.

20   Q    So, they were similar to a standardized patient?

21   A    They were not.  I had the same actors throughout medical

22   school.

23   Q    So, the patient actors on the OSCEs were people who you

24   had seen during the course of your medical school experience?

25   A    Yes.

1   Q    What, if any, relevance does that have with respect to

2   your speech dysfluency?

3   A    As I come to know someone, the severity of my speech

4   dysfluency decreases.

5   Q    Is that different from the experience that you had on the

6   Step II CS examination?

7   A    Yes, those actors I had never met before.

8   Q    And the OSCEs, how many patients would you see during the

9   examination period?

10  A    Three or four.

11  Q    And with the Step II CS examination that are 12 patients

12  that you saw?

13  A    Somewhere between 10 to 12.

14  Q    And the purpose of the OSCEs, can you explain what that

15  was when you were taking these in medical school?

16  A    They were teaching tools.  Some of them, I mean, the

17  psychiatry OSCE was given on the very first day.  The psych

18  OSCE was given on the first day to show us the types of

19  patients that we may encounter.

20  Q    What type of accommodations did you have when you took

21  the OSCEs?

22  A    I had double time.

23  Q    And how was your performance on the OSCEs?

24  A    I passed all of them.

25  Q    It appears that the OSCEs took place between March of

1   2008 through February of 2009.  What was the state of your

2   dysfluency during that period of time?

3   A   I was less severe than I am now.

4   Q   Did the dysfluency that you were experiencing, during the

5   period of March, 2008 through February of 2009, impair your

6   ability to demonstrate your achievement level on the OSCEs?

7   A   Yes, it did.

8   Q   But you passed these exams, how can you say that?

9   A   Passing is minimum performance.  Even though I passed the

10  exam, I was unable to show my communication and interpersonal

11  skills.

12  Q   Why didn't you request a different accommodation than

13  double time, such as Text To Speech for the OSCEs?

14  A   I wasn't aware that it existed.

15  Q   On page 11, under Tab 31, there is an exam that was

16  administered in April, 2009.  Can you identify that

17  examination?

18  A   This is the clinical practice examination.  It's supposed

19  to --

20          THE COURT:  I'm sorry, Mr. Weiner, where is it?

21          MR. WEINER:  It's under Tab 31, page 11, your Honor.

22          THE COURT:  Page 11.  All right.

23          THE WITNESS:  It's supposed to be there.  You put

24  the Step II CS examination.

25  Q   Can you describe how this particular exam, the CPX

                          Hartman - Direct                    46

1    examination is formatted?

2    A    It's similar to the OSCEs.  There's actors who present

3    with problems and we have to interview them and do a physical

4    examination.

5    Q    So, when you say it's similar to the OSCEs, that there

6    were actors.  Were these same actors who were being used when

7    you took the OSCEs?

8    A    Yes, they were.

9    Q    All right.  And in that regard, that would be different

10   than the Step II CS examination?

11   A    Yes.

12   Q    How many, for the CPX, how many patient/actors would you

13   examine during the course of that examination?

14   A    There were ten patients.

15   Q    So, in that regard, it's somewhat similar to the Step II

16   CS examination?

17   A    Yes, that's correct.

18   Q    And did this, the CPX examination, involve different

19   disciplines of medicine?

20   A    Yes, it did.

21   Q    And that would also be similar to the Step II CS

22   examination?

23   A    Yes.

24   Q    What was the purpose of the CPX examination?

25   A    It was used to assess your skills.

1  Q    Was there any other purpose, other than as an assessment?

2  A    Also as -- it was used as practice for the Step II CS

3  exam.

4  Q    Was the CPX examination considered a teaching tool?

5  A    We did receive feedback, so, I suppose so.

6  Q    The accommodations you had on the CPX examination, that

7  was time and a half?

8  A    Yes, it was.

9  Q    And did you have time and a half as opposed to double

10  time because the CPX was to track the same accommodation that

11  you received for the Step II CS exam?

12  A    Correct.  However, this exam was scored differently than

13  the Step II CS exam.

14  Q    How was it scored differently?

15  A    There's no spoken English proficiency portion of the

16  exam.  Also, it's everything is averaged, so, even if you do

17  poorly in one area, you can still pass the exam.

18  Q    And is that different from the Step II CS examination?

19  A    Yes, it is.

20  Q    In the Step II, if you fail one of the three sections,

21  you fail the entire exam?

22  A    Correct.

23  Q    How did you do on the CTS examination?

24  A    I passed it.

25  Q    I'd like to direct your attention to Tab 22 and that will

                              Hartman - Direct                    48

1   be Exhibit 16.  This is a letter from Stoney Brook University

2   Medical Center, dated September 3, 2009.  Can you identify

3   this letter?

4   A    This is from Dr. Chondrin, the Vice Dean of Undergraduate

5   Medical Education.

6   Q    And does this give an explanation of your score on the

7   CPX examination?

8   A    Yes, it does.

9   Q    Does it identify the different components or

10  sub-components of the examination?

11  A    It says that they have four main scores.  History taking,

12  physical exam skills, patient/physician interaction and

13  completion of an inter-station note.

14  Q    How did you do in those four different areas of testing?

15  A    I was above the mean for the physical exam category.  At

16  the mean for history and below the mean for a

17  patient/physician interaction.

18  Q    Does below the mean for the patient/physician interaction

19  mean you've failed that particular discipline of the exam?

20  A    Yes, it does.

21  Q    However, averaged out between the four different

22  sections, you received a pass score on this CPX examination?

23  A    Yes, that's correct.

24  Q    Can you describe or compare your dysfluency condition in

25  April, 2009, compared to today?

1   A   It was a little less severe than now.

2   Q   Okay.  Was it more severe in April, 2009 then it was

3   during the OSCEs, for example?

4   A   It was about the same.

5   Q   Did your dysfluency impair your ability to demonstrate

6   your achievement on the CPX exam in April of 2009?

7   A   Yes, it did.

8   Q   Were you deposed by Ms. Leopold-Leventhal in this matter?

9   A   Yes, I was.

10  Q   And for how long were you deposed?

11  A   About eight hours.

12  Q   My recollection was you were deposed from 10:30 to

13  approximately, 5:30 in the evening.  Does that refresh your

14  recollection?

15          MS. LEOPOLD-LEVENTHAL:  Objection, your Honor.

16          THE WITNESS:  Yes.

17          THE COURT:  Well, I think we'll have to rely on the

18  witness' recollection, with all respect, rather than

19  counsel's.

20          THE WITNESS:  Okay.

21  BY MR. WEINER:

22  Q   Did you also sign authorizations allowing defendant's

23  counsel to have access or to receive copies of all your

24  school records from Stoney Brook Medical School?

25  A   Yes, I did.

1  Q   And you signed authorizations for defendant's counsel to

2  receive records from your two speech therapists that you went

3  to during medical school?

4  A   Yes, I did.

5  Q   If you're not given use of the Text To Speech on the Step

6  II CS, how will you be harmed?

7  A   I will not graduate medical school and I will not be able

8  to begin a residency program.

9  Q   Why is it necessary for this Honorable Court to grant the

10  injunction now?

11  A   The residency match, which determines where we go to a

12  residency program, is on March 18th.

13  Q   March 18th?

14  A   Yes, that's correct.

15  Q   And what harm will occur if you can't take the exam with

16  the Text To Speech software soon and have it scored as soon

17  as possible, as well?

18          THE COURT:  Do you need some water, sir?

19          THE WITNESS:  Thank you.  The -- in order to be

20  eligible for the Step II CS exam, you must be a student or a

21  graduate of a medical school.  So, I will have to pay

22  tuition.

23  Q   And tuition is about $225,000 for medical school?

24  A   A year, yes.

25  Q   Is that the only harm that will occur if you can't take

1    the Step II CS now?

2    A    I will be unable to start my residency program.

3    Q    I'd like you to go to Tab 17 and this document will be

4    introduced as Exhibit 17.  Can you identify this letter?

5    A    It was written by Dr. Chondrin.

6    Q    And Dr. Chondrin wrote this letter which dated October 5,

7    2009, to you, is that correct?

8    A    Yes, she did.

9    Q    And was this letter sent to you to explain to you what

10   the requirements are with respect to graduating medical

11   school?

12   A    Yes, I had asked the school to waive the requirement for

13   passing the Step II CS examination and they denied my

14   request.

15   Q    And does the letter also articulate that you must take

16   and pass this Step II CS in order to graduate medical school?

17   A    Yes.

18   Q    Why did you request the relief of having the Step II CS

19   waived?

20   A    I wanted to see if I could be relieved from having to pay

21   tuition.

22   Q    Have you also checked with any residency programs that

23   you are interested in or applied to, to determine whether

24   they require you to pass the Step II CS examination?

25   A    I have, yes.

1  Q   And I'm going to refer to, collectively, Tabs 3 -- 23,

2  excuse me, your Honor.  Tabs 23, 24 and 25 and I will put

3  them in collectively as Exhibit 18.  Are these responses from

4  different residency programs to a request for information

5  about whether or not the residency program requires you to

6  pass the Step II CS examination?

7  A   Yes.

8  Q   And the response you received was what?

9  A   They required a Step II CS examination.

10 Q   If you can't take and receive a score on the Step II CS

11 examination, what if any, consequences are there?

12 A   I will be denied from entering a residency program.  From

13 starting a residency program.  I want to be able to enter

14 these programs.

15         MR. WEINER:  Your Honor, that's all I have for a

16 direct of Mr. Hartman.

17         THE COURT:  All right.  Suppose we take a 15-minute

18 recess.  We've been at this for quite a while.

19         (Court in recess 3:23 to 3:54 o'clock p.m.)

20         THE COURT:  Please sit down, folks.  Mr. Hartman, I

21 guess we'll ask you to return to the witness stand for

22 cross-examination.  Mr. Hartman, you're a very patient man to

23 sit all day answering questions.

24         THE WITNESS:  Thank you.

25         THE COURT:  You may proceed.

                          CROSS-EXAMINATION

1

2    BY MS. LEOPOLD-LEVENTHAL:

3    Q    Good afternoon, Mr. Hartman.  I just wanted to clarify

4    one point before I get into my cross-examination.  Have you

5    interviewed for 11 different residency programs, was that

6    correct?

7    A    Nine.

8    Q    Nine, okay.  I thought you testified that for four of the

9    residency interviews you utilized the Text To Speech device

10   and for seven, you did not.  But if you could correct me?

11   A    What I said or meant, was that there were four interviews

12   at the first residency program.

13   Q    So, as I understand it, there were four interviews at the

14   first residency program interview and you utilized the Text

15   To Speech for that interview, but not for the balance of the

16   residency interviews, is that correct?

17   A    Yes.

18   Q    Okay, just to clarify, you testified earlier today that

19   you took a leave of absence from medical school during your

20   first year, is that correct?

21   A    Yes.

22   Q    And that was a full year leave of absence, correct?

23   A    Yes, it was.

24   Q    And you actually started medical school in the fall of

25   2004, but the full-year leave of absence that you took

1    included your receiving three incompletes on your transcript

2    for that fall term, is that correct?

3    A    Yes, it is.

4    Q    And you would agree with me that that leave of absence

5    delayed your completion of medical school for an entire year,

6    correct?

7    A    Yes.

8    Q    And Mr. Hartman, you also failed your internal medicine

9    final written exam, correct?

10   A    Yes, I did.

11   Q    And that failure delayed your completion of medical

12   school for four months, isn't that also true?

13   A    Yes, it is.

14   Q    Let's talk about the Step I examination that the USMLE

15   provides.  You actually failed the Step I exam of the USMLE

16   the first time you took it, isn't that correct?

17            MR. WEINER:  Objection, your Honor, it's irrelevant.

18   Step I is not an oral examination.  He's not seeking

19   accommodation from the Step I.

20            MS. LEOPOLD-LEVENTHAL:  Your Honor, Mr. Hartman

21   testified this morning and yesterday, that he graduated Summa

22   Cum Laude from college, with honors, high honors and with

23   passing grades in other courses.  He testified that the only

24   examinations he's done poorly on are oral examinations.  And

25   he's always performed very well and proficiently on written

Hartman - Cross                          55

1   examinations and that's not true.  I'd like an opportunity to

2   explore that.

3           MR. WEINER:  I don't think that's an accurate

4   assessment.  I don't think he said he did well on that, but I

5   still maintain it's not relevant to this proceeding.

6           THE COURT:  I think counsel's entitled to pursue it.

7           MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

8           THE COURT:  We'll sift out what's more or less

9   relevant as we approach a decision.

10          MS. LEOPOLD-LEVENTHAL:  Thank you for your patience.

11  BY MS. LEOPOLD-LEVENTHAL:

12  Q   Again, Mr. Hartman, you failed the Step I of the USMLE

13  the first time you took that exam, correct?

14  A   Yes, I failed that.

15  Q   And you would agree with me that the Step I exam is a

16  multiple choice examination, correct?

17  A   Yes, it is.

18  Q   And the Step I examination that you failed does not

19  include any oral assessment, isn't that also right?

20  A   Yes.  However, I have been diagnosed with a reading

21  disorder that possibly could have explained that.

22  Q   I understand that.  I'm going to ask you questions about

23  that reading disorder now and thank you for introducing that

24  subject.  You took the Step I written exam, after you failed

25  it a second time, without accommodations and you passed that

1  the second time, didn't you?

2  A    Yes.

3  Q    And if you had failed the Step I exam the second time,

4  Mr. Hartman, you would agree with me that you would have been

5  forced to stop all clinical rotations and prevented from

6  beginning any further course work, until you passed that Step

7  I exam, correct?

8            THE COURT:  Well, which question are you putting,

9  Counsel?

10            MS. LEOPOLD-LEVENTHAL:  I'm asking him whether or

11  not, if he failed the exam a second time, he would have been

12  forced to stop clinical rotations and prevented from

13  beginning any further course work, pending passing that exam?

14            THE WITNESS:  Yes.

15  Q    You testified this morning and maybe I can job your

16  memory, with respect to the pass rate on the Step II CS exam

17  and I believe you said it was in the mid-90 percent, is that

18  your understanding?

19  A    I said the pass rate was over 97 percent for U.S. --

20  Q    If it helps, you're welcome to use the Text To Speech

21  device in the same way that you used it for Mr. Weiner.  It's

22  certainly your call, but if it helps, feel free to do that.

23  A    You know, at the deposition, you had asked me to use it

24  after 26 minutes.  And then --

25            MS. LEOPOLD-LEVENTHAL:  Your Honor, I'd object to

1    that answer and move to strike.  First of all, I just

2    suggested that Mr. Hartman feel free to use the Text To

3    Speech device.  But secondly, during the deposition, Mr.

4    Weiner and I discussed the use intermittent or in any fashion

5    of the Text To Speech device and both agreed that we wouldn't

6    use that for cross-examination or for examination purposes at

7    a hearing before your Honor.  I'm now uncomfortable with that

8    answer, because I believe the witness is trying to suggest

9    that I formed certain opinions and asked that he use the TTS

10   device, at a certain point in the deposition and we did

11   discuss that on the record and agreed that that wouldn't be a

12   subject for today's hearing.

13            THE COURT:  Well, if that's correct, then -- is that

14   your understanding, Mr. Weiner?

15            MR. WEINER:  We had a discussion.  I don't have a

16   problem with counsel's move to strike the last statement.

17            THE COURT:  All right.

18            MS. LEOPOLD-LEVENTHAL:   Thank you.

19   BY MS. LEOPOLD-LEVENTHAL:

20   Q   So, my next question was, what is the pass rate, first

21   time around, for the Step I examination, the one that you

22   didn't pass the first time, do you know?

23   A   I don't know.

24   Q   Now, you just testified about your reading disability.

25   Is it fair to say that after you failed the Step I exam, you

1   applied for accommodations to the National Board of Medical

2   Examiners, on the Step II clinical knowledge exam, correct?

3   A    Yes.

4   Q    And the Step II clinical knowledge exam, again, is a

5   multiple choice examination, correct?

6   A    Yes, it is.

7   Q    And the Step II CK examination does not include any oral

8   assessment, correct?

9   A    Yes.

10  Q    And your request for accommodations on the Step II CK

11  exam, was based on your claim that you had a reading

12  disability, is that correct, Mr. Hartman?

13  A    Yes.

14  Q    And you would agree with me that you never requested

15  accommodations in high school, college or during your first

16  two years of medical school, based upon a reading disability,

17  did you?

18  A    No.

19  Q    In fact, I recollect that you testified yesterday that

20  you graduated Summa Cum Laude from college, is that correct,

21  Mr. Hartman?

22  A    Yes, it is.

23  Q    And you also testified that you have done very well in

24  medical school academically, that is, receiving high honors

25  and high pass and pass on all of you courses, is that

Hartman - Cross                                    59

1    correct?

2              THE COURT:  I'm not quite sure which question you're

3    asking.  What's correct, what he testified to or --

4              MS. LEOPOLD-LEVENTHAL:  Yes, your Honor.

5              THE COURT:  -- whether he had high honors or what?

6    Q   Did you have high honors, honors and pass in all of your

7    courses in medical school?

8    A   No.

9    Q   I understood your testimony this morning to be different,

10   but please explain why I'm wrong.

11   A   If I said that, well, I had -- as we discussed, failed

12   that and internal medicine final exam, so --

13   Q   I'm looking at your transcript from Stoney Brook

14   University School of Medicine and I just counted.  It appears

15   that there are 32 either pass or H, which is the high honors,

16   is that correct?  Would you like to take a look?  It's

17   Exhibit P-7, which is Tab 18 in that binder up on the --

18   actually, it's not that binder.

19             THE COURT:  Exhibit 27?  I'm sorry, is that what you

20   said?

21             MS. LEOPOLD-LEVENTHAL:  No, Tab 19, Mr. Weiner

22   marked that as Exhibit P-7.

23             THE COURT:  Oh, I see.  I'm sorry, I was looking in

24   the defense book.

25   Q   Do you have that in front of you, sir?

Hartman - Cross                                60

1    A    Yes, I do.

2    Q    And you would agree with me that almost every single

3    grade, at least in medical school, that you received,

4    excluding the incompletes, are either a pass or a high

5    honors, correct?

6    A    Most, yes.

7    Q    And you, the first time you applied for accommodations

8    based upon a reading disability was in the summer of 2008,

9    correct?

10   A    I don't recall that.  Oh, when I had requested it.

11   Q    You did ask one of your professors in medical school, a

12   Dr. London, to write to the NBME in support of your request

13   for accommodations on the Step II CK exam, correct?

14            MR. WEINER:  Your Honor, I'm going to object.

15   There's been a line of questioning here about accommodations

16   on a written exam for a reading disorder.  It has no

17   relevance to this case, which is about an oral exam for a

18   speech dysfluency disorder.

19            MS. LEOPOLD-LEVENTHAL:  I don't have a lot more

20   questions on this.

21            THE COURT:  Where did it come in?  What?

22            MS. LEOPOLD-LEVENTHAL:  Well, Mr. Hartman testified

23   and this is my recollection, that he had done very well in

24   medical school on all examinations other than oral

25   examinations.  That when there are oral examinations, he had

1    a problem as a result of his speech dysfluency.  And

2    actually, that's not absolutely accurate, but the point of my

3    questioning is to show that when Mr. Hartman began to have a

4    problem on written examinations, he went and got an

5    assessment to suggest that he was reading disabled.  He then

6    asked his professor to support that, the professor refused.

7    He submitted that request to the NBME.  That was denied and

8    he passed the test anyway.  I have maybe a half a dozen more

9    questions about this, but Mr. Weiner spent a good deal of

10   time, yesterday and today, talking about Mr. Hartman's

11   record.

12            THE COURT:  Well --

13            MS. LEOPOLD-LEVENTHAL:  And I think the history of

14   this is relevant.

15            THE COURT:  -- I just want to see if I can

16   understand the line of argument.  Is the line of argument

17   that requesting an accommodation on the basis of a reading

18   disability, was likely to be a disingenuous request?

19            MS. LEOPOLD-LEVENTHAL:  That's correct.  And I do

20   believe that it impacts upon Mr. Hartman's credibility and

21   I'd like the opportunity to explore that.

22            MR. WEINER:  Your Honor, may I be heard on this?

23   That, I mean, to say that it's a disingenuous request, Mr.

24   Hartman provided an evaluation that was conducted by a

25   trained physician.  They don't have any expert to show that

Hartman - Cross                                    62

1    it is disingenuous.  And it's not really relevant to this

2    case.

3              THE COURT:  Well --

4              MR. WEINER:  It's really a collateral matter.

5              THE COURT:  -- if the defendant wishes to pursue

6    this line of defense, I guess defendant is entitled to do

7    that.  But let's keep it focused on just what it is one wants

8    to demonstrate.

9              MS. LEOPOLD-LEVENTHAL:  I will, your Honor, thank

10   you.

11   BY MS. LEOPOLD-LEVENTHAL:

12   Q   My question to Mr. Hartman was, did you approach one of

13   your professors at Stoney Brook, a Dr. London and ask him to

14   write to the NBME to support your request for accommodations

15   on the Step II CK exam, based upon a reading disability?

16   A   I asked her to call and I believe she also wrote a

17   letter, as well.

18   Q   Would you please take a look at Exhibit 23, it's in

19   defendant's exhibit binder, not the plaintiff's but the

20   defendant's.

21   A   Okay.

22   Q   And the top portion of that is a letter you wrote to Dr.

23   London, asking her to support your accommodation request to

24   the NBME, is that correct?

25             THE COURT:  I'm sorry, where are we looking now?

1          MS. LEOPOLD-LEVENTHAL:  I'm sorry, it's Defendant's

2     Exhibit 23.  It's a single-page letter.

3          THE COURT:  23, all right.

4     Q    That's a letter you wrote to Dr. London?

5     A    I don't know who wrote the written, I wrote the text

6     though.

7     Q    Okay, you wrote the text portion at the top-half of the

8     page, is that correct?

9     A    Yes, I did.

10    Q    Okay.  And you would agree with me that in the middle of

11    that paragraph, you indicated to Dr. London that you were

12    hoping to redeem your Step I failure with an admirable score

13    on the Step II CK, is that correct?

14    A    Yes.

15    Q    And you sought accommodations on the Step II CK multiple

16    choice exam, because you were hoping that a good score would

17    help to place your Step I score in a better light, is that

18    correct?

19    A    I was hoping to -- better.

20    Q    And Dr. London refused to contact the NBME on your

21    behalf, didn't she?

22    A    That's not true.

23    Q    Well, let's take a look at the bottom of the page.

24    There's some handwriting.  Is that Dr. London's, to the best

25    of your understanding?

1          MR. WEINER:  Objection.  No foundation that he would

2   know Dr. London's handwriting.

3   BY MS. LEOPOLD-LEVENTHAL:

4   Q   Do you know whether that's Dr. London's handwriting --

5          MR. WEINER:  Excuse me, there's an objection.

6          THE COURT:  Well, the witness can certainly answer

7   whether he knows her handwriting or not.  I think counsel

8   simply wished to know whether you recognize this handwriting

9   as Dr. London's handwriting or not.

10          THE WITNESS:  No, I don't know if that's her

11   handwriting.

12   BY MS. LEOPOLD-LEVENTHAL:

13   Q   Do you know if this is Dr. London's response to you

14   letter?

15          MR. WEINER:  Objection, your Honor, he doesn't know

16   if this is Dr. London's handwriting.

17          THE COURT:  How did you phrase your question?  I'm

18   sorry.

19          MS. LEOPOLD-LEVENTHAL:  Whether he knew whether this

20   was Dr. London's response to his request that she assist him.

21          THE COURT:  I don't -- I'm not quite clear.  If he

22   doesn't her handwriting, it's hard to know how he would know

23   whether this is her response --

24          MS. LEOPOLD-LEVENTHAL:  Do you know whose

25   handwriting this is?

1          THE COURT:  -- if there's some other statement,

2   whether oral or written --

3          MS. LEOPOLD-LEVENTHAL:  Okay, I'll withdraw the

4   question.

5   Q   After, at some point in time, you did take the Step II CK

6   examination without the accommodation of additional time,

7   correct?

8   A   Yes, I did.

9   Q   And you passed that Step II CK examination the first time

10  you took it, correct?

11  A   Yes.

12  Q   And you also took an examination called the MCAT before

13  you were admitted to medical school, correct?

14  A   Yes, I did.

15  Q   And you did not receive accommodations on the MCAT

16  examination, correct?

17  A   Yes.

18  Q   If you would, Mr. Hartman, take a look at Exhibit 3,

19  Exhibit 3 in the binder in front of you.  It's your personal

20  statement to the NBME.  Have you had an opportunity to look

21  at that document, Mr. Hartman?

22          THE COURT:  You may take your time in looking at it.

23          THE WITNESS:  Okay.

24          THE COURT:  At your statement.

25          THE WITNESS:  Thank you.

1          (Pause.)

2          THE WITNESS:  Yes, I have read it.

3   Q    And you submitted this personal statement with other

4   documents, to the NBME, correct?

5   A    Yes, I did.

6   Q    And when you submitted it, this was in support of your

7   request for a double-time accommodation on the Step II CS

8   examination, correct?

9   A    Yes, it was.

10  Q    And if you take a look, please, at the last two full

11  sentences, at the bottom of this page.  Take a moment to read

12  that, please.

13  A    Okay.

14  Q    And that first sentence, that begins after undergoing.

15  That confirms that Stoney Brook granted you double time on

16  clinical examinations at medical school, correct?

17  A    Yes, it does.

18  Q    And you would agree with me that in the last sentence,

19  you confirmed that even though you continued to use the

20  entire time for those examinations, you were able to complete

21  the history and physical examination on the patients,

22  correct?

23  A    I was able to elicit the information from the patient, I

24  was.

25  Q    And you were able to do that in the double-time

1   accommodation at Stoney Brook granted to you, is that

2   correct?

3   A   Yes, it is.

4   Q   If you would, take a look at Exhibit 27, also in the

5   exhibit binder in front of you.

6   A   Okay.

7   Q   You testified this morning that the Step II CS

8   examination had many more patients than other examinations

9   that you took at Stoney Brook, is that correct or am I

10  misstating your testimony?

11  A   I was talking about the OSCEs.

12  Q   For the CPX examination, there were ten standardized

13  patient encounters, correct?

14  A   Yes.

15  Q   And just like the Step II CS examination, they last 15

16  minutes under the standard administration, correct?

17  A   Usually, for me, I had longer than that.

18  Q   Right, but the standard administration is 15 minutes on

19  the CPX exam, correct?

20  A   Yes, it is.

21  Q   And the standard administration on the Step II CS exam is

22  15 minutes also, correct?

23  A   Yes, it is.

24  Q   And the CPX examination is designed to be similar to the

25  clinical skills in Step II examination, isn't it?

1    A    It's supposed to be.   However, it's not.

2    Q    And earlier today, when Mr. Weiner was asking you

3    questions, you identified this letter of September 3, 2009,

4    from Vice Dean Chondrin, correct?

5    A    Yes.

6    Q    And your counsel marked this as an exhibit and it's

7    already been introduced and I'd like to ask you then, in the

8    fourth line down, Dean Chondrin indicates that the CPX

9    examination is designed to be similar to the clinical skills

10   Step II CS examination, do you see that?

11   A    That --

12   Q    Do you see that?

13   A    -- yeah, I see it, it's on the paper.

14   Q    Okay.   And as far as the areas that the CPX is designed

15   to assess, would you agree with me that it includes a

16   history-taking section?

17   A    Yes, it does.

18   Q    And it includes a physical exam section?

19   A    Yes, it does.

20   Q    And you're also scored in the patient/physician

21   interaction, correct?

22   A    Yes.

23   Q    And the last section is a completion of an inter-station

24   note, is that your understanding, Mr. Hartman?

25   A    That's what it says.

1   Q    And with respect to that examination, you would agree

2   with me that you passed that examination the first time you

3   took it, correct?

4   A    I passed this examination.

5   Q    And Stoney Brook granted you time and a half as an

6   accommodation on that CPX exam, correct?

7   A    Yes, they did.

8   Q    And you took that CPX examination, with time and a half,

9   and passed it two months before you took the Step II CS exam

10  in June of 2009, correct?

11  A    Yes.

12  Q    You were required to pass the CPX examination in order to

13  graduate from medical school, correct?

14  A    I think so.

15  Q    You testified yesterday that your stress was increased

16  because of the Step II CS exam and you knew you needed to

17  pass that in order to graduate medical school, is that

18  correct?

19  A    Yes, it is.

20  Q    Certainly, you would agree with me then that there was

21  additional stress in taking the CPX exam, as well, knowing

22  that if you didn't pass that examination, you couldn't

23  graduate from medical school either, correct?

24  A    No, the stress with this one was different.  I knew how

25  the OSCEs were -- I knew who the actors were and I had no

1    reason to think I would not pass it.  So, to say that the

2    stress was the same is not accurate.

3    Q    I didn't suggest that the stress was the same.  My

4    question was, isn't it true that the CPX exam was a stressful

5    experience for you, because you knew if you didn't pass it,

6    you couldn't graduate from medical school?

7    A    It was somewhat stressful, however, I wasn't -- I

8    wouldn't say it's because I had to -- pass it to finish med

9    school.

10   Q    With respect to the Step II CS exam that you took in June

11   of 2008, you would agree with me that your testimony is that

12   you didn't feel you had enough time to ask all of the

13   questions that you would have wanted to, is that correct?

14   A    Yes, it is.

15   Q    And your testimony was that you weren't able to answer

16   all off the patient's concerns due to an inadequate amount of

17   time, is that also correct?

18   A    Yes, it is.

19   Q    You didn't contact the NBME after you took the Step II CS

20   exam until after you received your failing score, is that

21   correct?

22   A    Yes, it is.

23   Q    And the only information that you had as to why you

24   actually failed the Step II CS exam is contained on that two-

25   page score sheet that the NBME provided to you, that Mr.

1    Weiner marked as Exhibit P-6, correct?

2    A    Which tab was that?

3    Q    Tab 4.

4    A    Yes, it is.

5    Q    And Mr. Hartman, I'd invite you to use the Text To Speech

6    device, if you'd like.  You know, certainly as we agreed at

7    the deposition, I'm not going to try to use that as some

8    negative reflection upon you and the to extent that you feel

9    comfortable using that in same way you did with Mr. Weiner

10   this morning.  It's possible, isn't it, that you failed the

11   Step II CS exam because you failed to perform the right

12   diagnostic examinations on the standardized patients?

13   A    It is possible.

14   Q    And it's also possible that you failed, not because you

15   didn't ask enough questions, but because you didn't ask the

16   right questions, correct, Mr. Hartman?

17   A    Based on my -- would you prefer that I solely use this?

18   Q    I have no preference.  I would only ask that you use the

19   Text To Speech device in the same way you used it all day

20   today when Mr. Weiner was questioning you.

21   A    Why?  He was asking me to illustrate how I would on the

22   exam.

23   Q    Again, my question to you was, isn't it possible that you

24   failed not because you did not ask enough questions, but

25   because you failed to ask the right questions?  The question

1   is, is that possible?

2   A    Given the education that I have, it's very unlikely.

3   Q    Wasn't that the same education that led you to fail the

4   Step I examination, Mr. Hartman?

5   A    No.  No, I'm referring to my training through the

6   education in the clinical skills center.

7   Q    And you would agree with me that the document you have in

8   front of you, which is the second page, looks kind of like

9   this.

10  A    Yeah.

11  Q    Indicates that you had lower performance on the

12  questioning skills aspects of the Step II CS examination,

13  correct?

14  A    Yes, it does.

15  Q    And it's your testimony that it's not possible that you

16  failed the Step II CS examination as a result of the content

17  of your questions?  Is that your testimony, it's not

18  possible?

19  A    It's unlike --

20         THE COURT:  Your question is, it's not possible

21         MS. LEOPOLD-LEVENTHAL:  Yes, I believe that's what

22  he said and I'm asking him in reverse.

23         THE WITNESS:  No, that's not what I said.  I said

24  it's unlikely.

25  Q    And you understand that the Step II CS exam is designed

1    to assess, at least, in part, the content of the questions

2    you asked the standardized patients, correct?

3    A    Yes.

4    Q    And you testified this morning that you don't believe

5    that double time would help you, because a 30-minute

6    encounter would be likely to exhaust you, is that correct?

7              MR. WEINER:  I'm going to object, your Honor.  I'm

8    not sure if the question is was that his testimony this

9    morning or whether a 30-minute encounter will exhaust him.

10             MS. LEOPOLD-LEVENTHAL:  My question was, didn't you

11   testify this morning a 30-minute encounter would exhaust you?

12             THE WITNESS:  No, I did not.  What I meant is that

13   verbal communication exhausts -- me and that to give me the

14   time that to allow me to say everything that a fluent speaker

15   would say, would certainly exhaust me.

16   BY MS. LEOPOLD-LEVENTHAL:

17   Q    Would you take a look at Exhibit 28 in the defendant's

18   exhibit binder.  And so as not to confuse the Court, that's

19   the same exhibit as P-15, at Tab 31 in plaintiff's binder,

20   the interrogatory responses.  Do you have that in front of

21   you?

22   A    Which tab was that?

23   Q    It's Tab 28 in defendant's exhibit binder.  Defendant's,

24   that would be mine.  Tab 28.

25   A    Oh, I'm sorry, okay.  Okay, I have it in front of me.

1   Q    Okay, please turn to page, I believe it's 10, which is a

2   description of the oral examinations you took at Stoney

3   Brook.  Do you have that in front of you, sir?

4   A    Yes, I do.

5   Q    And you took an ambulatory care, O-S-C-E, OSCE in March

6   of 2008, correct?

7   A    Yes, I did.

8   Q    And your medical school granted you double time as an

9   accommodation on that examination, correct?

10   A    Yes.

11   Q    And you indicated in these discovery responses that you

12   were granted double time as a result of a severe stutter, is

13   that correct, Mr. Hartman?

14   A    That's what I said here.

15   Q    And you would agree with me that on a scale of one to

16   ten, ten being the most severe, that you would characterize

17   your stutter on the day you took that test as an eight out of

18   ten, correct?

19   A    I don't think that I can rate a severity and I can

20   compare how it was to now.

21   Q    Would you take a look at Exhibit 37, in the defendant's

22   exhibit binder, in front of you.  It's your deposition

23   transcript.  37, Defendant's Exhibit.

24   A    Yes.

25   Q    Would you please turn to page 123?

1   A    Okay.

2   Q    If you take a look at line 9, my question was, "And on a

3   scale of zero to ten, when you took the ambulatory care OSCE

4   examination, how would you rate the severity of your stutter,

5   at that time?"

6          "Answer:", at line 15, "As I recall it was about an

7   eight."

8          Is that correct, Mr. Hartman?

9   A    I did say that.  However, as I thought about it, I don't

10  think that I could accurately rate it and on time.

11  Q    Take a look, again, at Defendant's Exhibit 28.  I'm sorry

12  for making you flip back and forth.  Sometimes, that's that

13  nature of cross-examination.  These were the interrogatory

14  responses.  I'd ask you turn to page ten, again, sir?

15          THE COURT:  What page and exhibit?

16          MS. LEOPOLD-LEVENTHAL:  It's Defendant's Exhibit 28,

17  page 10.

18          THE COURT:  Page 10.

19  Q    You took a psychiatry OSCE in November, 2008, correct?

20  A    Yes, I did.

21  Q    And Stoney Brook gave you double time for that

22  examination, correct?

23  A    Yes, they did.

24  Q    And you indicated in this interrogatory response, that

25  you were given double time secondary to a severe stutter,

1   correct, Mr. Hartman?

2   A    Yes, I did.

3   Q    And you passed that examination with double time,

4   correct?

5   A    Yes, I did.

6   Q    And on a scale of zero to ten, you would rate the

7   severity of your stutter, in November of 2008, when you took

8   the psychiatry OSCE, as an 8 out of 10, correct, Mr. Hartman?

9   A    I can't accurately say that for the same reasons.

10  Q    But you will admit that on the date of your deposition,

11  you did rate the severity of your stutter when you took the

12  psychiatry OSCE in November of 2008, as an eight out of ten

13  on the severity scale, correct?

14  A    At the deposition, I did.

15  Q    And you --

16           THE COURT:  We're going to take a five-minute

17  recess.

18           MS. LEOPOLD-LEVENTHAL:  Okay, your Honor.

19           (Court in recess 5:00 to 5:13 o'clock p.m.)

20           THE WITNESS:  I wanted to apologize to you, Ms.

21  Leopold-Leventhal.  From now on, I will afford you the same

22  courtesy that I extended to Mr. Weiner with regards to Text

23  To Speech.  Okay.

24           MS. LEOPOLD-LEVENTHAL:  As I said, whatever you're

25  comfortable with is fine with me.

1   Q   We left off looking at Exhibit 28 in defendant's binder

2   and they were your interrogatory responses.  Do you still

3   have that in front of you?

4   A   Yes.

5   Q   You took the neurology OSCE, December of 2008, correct?

6   A   Yes.

7   Q   And by your own description, this was a formal

8   examination, correct?

9   A   Yes.

10  Q   And it involved actors, correct?

11  A   Yes.

12  Q   And Stoney Brook granted you double time on that

13  examination, correct, Mr. Hartman?

14  A   Yes, they did.

15  Q   And they did so based upon your description that this was

16  secondary to severe stutter, correct, Mr. Hartman?

17  A   No, they did so based on a report written by Ms.

18  Oldemier.

19  Q   And in your answer, you indicate that Stoney Brook gave

20  you double time secondary to a severe stutter, correct?

21  A   Yes, that's true.

22  Q   And at the point in time when you gave a deposition in

23  this case, you described on a scale of zero to ten, the

24  severity of your stutter, at that time, as an eight out of

25  ten, correct, Mr. Hartman?

1    A    Yes.

2    Q    And you took an ob/gyn oral examination in February of

3    2009, correct?

4    A    Yes, I did.

5    Q    And this was a Powerpoint presentation, is that correct?

6    A    Yes, it was.

7    Q    And you passed that evaluation, correct, Mr. Hartman?

8    A    Yes, I did.

9    Q    And you would agree with me that when you gave a

10   deposition in this case, you rated your stutter on a severity

11   scale between zero and ten, as an eight or a nine, correct?

12   A    Yes.

13   Q    And in February of 2009, you also took an ob/gyn OSCE,

14   correct?

15   A    Yes, I did.

16   Q    And this was also a formal examination which Stoney Brook

17   gave you, correct?

18   A    Yes, it was.

19   Q    And this involved actors, correct?

20   A    Yes, it did.

21   Q    And Stoney Brook granted you double time on this

22   examination, correct?

23   A    Yes, they did.

24   Q    And you passed that examination with double time,

25   correct?

1    A    Yes, I did.

2    Q    And by your own description, you were granted double time

3    as secondary to a severe stutter, correct?

4    A    Yes.

5    Q    And when you were deposed, you rated your stutter, in

6    February of 2009, when you took the ob/gyn OSCE, as an eight

7    or a nine on a severity scale of zero to ten, correct?

8    A    Yes.

9    Q    And in April of 2009, you took the CPX exam, correct?

10   A    Yes, I did.

11   Q    And that was the clinical practice examination that you

12   testified to earlier today, correct?

13   A    Yes.

14   Q    And this was a formal examination also, wasn't it, Mr.

15   Hartman?

16   A    Yes, it was.

17   Q    And this involved actors in a standardized clinical

18   setting, correct?

19   A    Yes, it did.

20   Q    And Stoney Brook granted only time and a half on that

21   examination, not double time, correct?

22   A    Yes.

23   Q    And you passed that examination the first time you took

24   it, correct?

25   A    Yes, I did.

1  Q    And you rated your stutter, when you took the CPX exam in

2  April of 2009, as an eight or a nine on a severity scale,

3  correct?

4  A    Yes, I did.

5  Q    And I believe you testified that since taking the Step II

6  examination, in June, up until the present time, your stutter

7  has been more severe than at other points in time in your

8  life.  Is that an accurate statement of your earlier

9  testimony?

10  A    Since when?

11  Q    Since taking the Step II CS examination in June of 2009?

12  A    Yes.

13  Q    However, I asked you to rate your stutter on the day of

14  your deposition and you actually rated it as a seven or an

15  eight, isn't that correct?

16  A    As I mentioned during my deposition, the severity of my

17  stutter can often change.  But answer to your question, yes.

18  Q    So, you would agree with me that your stutter was less

19  severe on the date of your deposition than when you took and

20  passed five or six examinations at Stoney Brook, oral

21  examinations, correct?

22  A    I would not say that.

23  Q    Well, we've established that on the date of your

24  deposition, you rated your stutter on a severity scale of a

25  seven to an eight, correct?

1  A    Yes.

2  Q    And you just testified that you rated your stutter on a

3  severity scale of anywhere between an eight or a nine, on at

4  least, five examinations at Stoney Brook, correct?

5  A    Yes, I did.

6  Q    And when you described your stutter as an eight or a

7  nine, on each of those occasions, you passed the particular

8  examination that was being administered by Stoney Brook,

9  correct?

10  A    Yes, I did.

11  Q    Now, Mr. Hartman, directing your attention to the Text To

12  Speech device that's in front of you and that's the same one,

13  essentially, that you're requesting to utilize on the Step II

14  CS examination, is that correct?

15  A    I would be open to using a computer provided by the NBME.

16  Q    And it would be similar to the Text To Speech device

17  that's in front of you today, correct?

18  A    Yes.

19  Q    You're 27 years old, is that correct?

20  A    Yes, I am.

21  Q    And up until the fall of 2009, you have never used a Text

22  To Speech device to communicate, had you?

23  A    That's correct.

24  Q    And certainly then you've passed all of your oral

25  examinations at Stoney Brook with the accommodation of

Hartman - Cross                          82

1    additional time only, correct?

2    A    Yes.

3    Q    And the Text To Speech device that you are asking the

4    NBME to permit you to utilize, was suggested -- not by a

5    psychologist or a speech therapist, but actually, by your

6    lawyer, Mr. Weiner, is that correct?

7    A    The device was suggested by an expert who Mr. Weiner

8    consulted, not directly by Mr. Weiner.

9    Q    And that expert who suggested that device had never

10   evaluated or examined you, correct?

11   A    Yes.

12   Q    And then that individual suggested the use of the Text To

13   Speech device, you would agree with me, that that was almost

14   two months before you ever went to see Dr. Tetnowski for an

15   evaluation, correct?

16   A    I don't know exactly when Mr. Weiner consulted the

17   expert.

18   Q    You would agree with me that Mr. Weiner put this request

19   regarding the use of a Text To Speech device, in writing to

20   the NBME on October 16, 2009, correct?

21   A    I believe so.

22   Q    And that was approximately two months before Dr.

23   Tetnowski evaluated you on December 7th, correct?

24   A    Yes, it was.

25   Q    Would you please turn to Exhibit 4 in the defendant's

Hartman - Cross                                  83

1    exhibit binder?

2    A    Okay.

3    Q    And that's a three-page report prepared by Leslie

4    Oldemier, correct?

5    A    Yes, it is.

6    Q    And that's based upon her evaluation of you on May 14,

7    2007, correct?

8    A    Yes, it is.

9    Q    And if you take a look at the third page, it indicates

10   recommendations and it has one bullet point and a second

11   bullet point, correct?

12   A    Yes, it does.

13   Q    And you submitted this letter to the NBME in support of

14   your request for double time on the Step II CS examination,

15   correct?

16   A    Yes, I did.

17   Q    And Ms. Oldemier is a speech pathologist, correct?

18   A    Yes, she is.

19   Q    And Ms. Oldemier did not suggest in this letter or

20   recommend that you be granted the accommodation of Text To

21   Speech, did she?

22   A    No, she did not.

23   Q    And she did not suggest that you be permitted to use an

24   orator to take the Step II CS exam, did she?

25   A    No, she did not.

1  Q    In fact, Ms. Oldemier concludes that you require more

2  time to verbally communicate, correct?

3  A    Yes, she did.

4  Q    And Ms. Oldemier was only advocating for more time, as an

5  accommodation, isn't that also correct?

6  A    Also speech therapy.

7  Q    Yes, but she wasn't asking the NBME to provide you with

8  speech therapy, is that --

9  A    No, she was not.

10 Q    No, so she was advocating for you to the NBME and

11 requesting that they give you additional time, correct?

12 A    No, that's not true.

13 Q    To Stoney Brook?

14 A    Yes.

15 Q    And you submitted this letter to the NBME in support of

16 your request for double time, correct?

17 A    Yes, I did.

18 Q    And when you approached the NBME, that was the nature of

19 the accommodation you wanted, double time, correct, Mr.

20 Hartman?

21 A    I'm sorry, can -- could you please say that again?

22 Q    Sure.  In your first request for accommodations on the

23 Step II CS examination, you requested double time, correct?

24 A    Yes, I did.

25 Q    And Ms. Oldemier supported that request, correct?  You

1    konw what, strike that.

2    A    Okay.

3    Q    You submitted Ms. Oldemier's letter in support of your

4    request for double time, correct?

5    A    Yes, I did.

6    Q    Getting back to the very first question I asked you when

7    I began my cross-examination, which had to do with your

8    residency interviews, you've engaged in nine residency

9    interviews, at this point in time, is that correct?

10   A    Yes.

11   Q    And when you indicated that you utilized the Text To

12   Speech device for four interviews, that was in one residency

13   interview, correct, but with four separate interviewers?

14   A    Yes.

15   Q    So, on the eight other residency interviews that you have

16   engaged in, you have not used the Text To Speech device,

17   correct, Mr. Hartman?

18   A    Yes, that is true.

19   Q    And you've participated in many of these interviews right

20   about the same time, either a week before or a few weeks

21   after Dr. Tetnowski was evaluating you, correct?

22   A    I don't -- they were accomplished months before or maybe

23   one month.  But, yes, they were relatively around the same

24   time.

25   Q    And you participated in all of those residency interviews

1    after you received your Step II CS failing score, correct?

2    A   Yes, I did.

3    Q   And you testified that from June, 2009 up until the

4    present time, you have experienced the most severe stutter

5    that you have had throughout your entire life, correct?

6    A   Yes.

7    Q   And it was during that time period that you elected to

8    participate in eight of nine residency interviews without the

9    aid of the Text To Speech device, correct?

10   A   Yes.

11   Q   You testified this morning that since learning about the

12   text to speech device, you have used that in three patient

13   encounters in medical school, correct?

14   A   Yes.

15   Q   And they occurred this fall, is that right, Mr. Hartman?

16   A   Last fall, yes, meaning --

17   Q   The occurred in the fall --

18   A   -- fall, 2009.

19   Q   Okay, when I meant last fall, I meant fall of 2009.

20   A   Of course, yes, yes.

21   Q   Now, you would also agree with me that over the course of

22   your medical school career, you've been involved in dozens,

23   upon dozens of patient encounters, correct?

24   A   Yes.

25   Q   And you participated in patient encounters in emergency

1   medicine, correct?

2   A    Yes, I did.

3   Q    And you did so without the use of the Text To Speech

4   device, correct, Mr. Hartman?

5   A    Yes.

6   Q    And you participated in patient encounters in your family

7   medicine rotation also, correct, Mr. Hartman?

8   A    Yes.

9   Q    And you did not use the Text To Speech device during

10  those patient encounters, correct?

11  A    Yes.

12  Q    And you engaged in patient encounters in your medicine

13  rotation, correct, Mr. Hartman?

14  A    Yes.

15  Q    And you didn't use the Text To Speech device during those

16  encounters, correct?

17  A    Yes.

18  Q    And you engaged in patient encounters during your

19  internal medicine rotation, correct, Mr. Hartman?

20  A    I thought you just asked about that.

21  Q    I asked about family medicine.

22  A    Oh, I'm sorry, yes.

23  Q    And you did not use the Text To Speech device for your

24  patient encounters in your medicine rotation, correct, Mr.

25  Hartman?

Hartman - Cross                                        88

1    A    Yes.

2    Q    And you participated in patient encounters in your ob/gyn

3    rotation, correct, Mr. Hartman?

4    A    Yes.

5    Q    And you didn't use a Text To Speech device for those

6    encounters either, did you?

7    A    Correct.

8    Q    And you were involved in patient encounters in pediatric

9    rotation, as well, didn't you, Mr. Hartman?

10   A    Yes.

11   Q    And you didn't use the Text To Speech device in those

12   either?

13   A    Yes.

14   Q    And finally, you were involved in patient encounters in

15   your psychiatry rotation, correct?

16   A    Yes, I was.

17   Q    And again, you did not use the Text To Speech device to

18   aid you in communicating during your psychiatry rotation

19   encounters, correct?

20   A    Yes.

21   Q    In the context of this litigation, you are aware that we

22   procured Stoney Brook Medical Center's records with respect

23   to your medical career, correct?

24   A    Yes.

25   Q    And you did not provide your records from Stoney Brook

1   Medical Center to Dr. Tetnowski before he wrote his

2   evaluation report, did you?

3   A    No, I did not.

4   Q    And you did not supply Dr. Tetnowski with your Stoney

5   Brook Medical Center records before he prepared his expert

6   report, did you?

7   A    No, I did not.

8   Q    And you did not provide Dr. Tetnowski with your Stoney

9   Brook records before he prepared the declaration on your

10  behalf, did you?

11  A    No.

12  Q    And then, you would agree with me that you, as the

13  plaintiff, submitted Dr. Tetnwoski's evaluation report and

14  his declaration and filed it with the Court before Dr.

15  Tetnowski ever had an opportunity to examine your Stoney

16  Brook records, correct?

17  A    Yes.

18  Q    Would you please turn to Exhibit 21 in the defendant's

19  binder in front of you?

20  A    Sure.

21  Q    Thank you.

22  A    Okay.

23  Q    And the first page is a letter from Stoney Brook to me,

24  enclosing your Stoney Brook Medical School records, correct,

25  Mr. Hartman?

1   A    Yes.

2   Q    Would you please turn to page 2, the second page of that

3   exhibit?

4   A    Sure.

5   Q    Thank you.  And you would agree with me that on page 2,

6   which is actually, at the top it says page 4 of 9, you are

7   evaluated with respect to your emergency medicine rotation,

8   correct?

9   A   Yes, I am.

10  Q   And if you look in the middle of the page, you would

11  agree with me that you received in the area of effective

12  communication, the grade of high pass, is that correct, Mr.

13  Hartman?

14  A   Yes, it is.

15  Q   Would you please turn to the next page, which is marked

16  as page 3 on the bottom and page 5 of 9, at the top?  And

17  directing your attention to the family medicine section.

18  A   Yes.

19  Q   You would agree with me that this Stoney Brook's

20  evaluation of your performance during the family medicine

21  rotation, as part of your medical school curriculum, correct?

22  A    This is the course director's comments.

23  Q    Okay, great.  So, then thank you for clarifying, I

24  appreciate that.  You would agree with me that the course

25  director described you as demonstrating outstanding

1   communication skills, is that correct, Mr. Hartman?

2   A    That's what he states here.

3   Q    And the course director also described you as having done

4   a good job and I'm quoting, "of establishing trust and

5   rapport with your patients," correct?

6   A    Yes, however I should tell you that this was over a

7   one-month period.

8   Q    And that's fine.  And that was during 2008, correct, Mr.

9   Hartman?

10  A    Yes.

11  Q    And the course director also described you as having

12  demonstrated "outstanding empathy, compassion and

13  sensitivity," is that correct?

14  A    Yes.

15  Q    And you would agree with me, Mr. Hartman, that you did

16  not use any electronic assistive devices to help you

17  communicate during your family medicine rotation, correct?

18  A    Yes.

19  Q    Please take a look at the middle of the same page, where

20  you are evaluated in the medicine rotation.  Do you see that,

21  Mr. Hartman?

22  A    Yes, I do.

23  Q    And was this description also provided by the course

24  director for the medicine rotation?

25  A    It was either the course director or my attending

1   physician.  I presume it was my attending physician.

2   Q   Well, for purposes of today then, would you agree with me

3   that your attending physician or course director described

4   you as "participating actively in team rounds and making

5   presentations on various clinical topics?"

6   A   Yes, I would.

7   Q   And that same individual described you as having

8   developed "excellent rapport with patients, peers and

9   ancillary clinical staff," correct, Mr. Hartman?

10  A   That's what this says, yes.

11  Q   And this is what's included as part of your Stoney Brook

12  records, correct?

13  A   Yes, it is.

14  Q   And that same individual, be it the course director or

15  the attending physician, also described you as "demonstrated

16  good history-taking skills," is that correct?

17  A   Where is that?

18          MS. LEOPOLD-LEVENTHAL:  May I approach the witness,

19  your Honor?

20          THE COURT:  Yes, indeed.

21          THE WITNESS:  I'm sorry, yeah, I now see it.

22          MS. LEOPOLD-LEVENTHAL:  Okay.

23          THE WITNESS:  Yeah.

24  Q   Was your answer yes?

25  A   Yes, I do see that.

1    Q   And that's how you were described with respect to your

2    medicine rotation, correct?

3    A   Yes.

4    Q   In fact, that same individual described you as definitely

5    putting patients at ease, correct, Mr. Hartman?

6    A   Yes.

7    Q   And you would again agree with me that you did not use

8    any electronic assistive device to help you communicate

9    during your medicine rotation, did you?

10   A   That's correct.

11   Q   Please take a look at, on the same page, your evaluation

12   with respect to your ob/gyn rotation, do you see that, Mr.

13   Hartman?

14   A   Yes, I do.

15   Q   And do you know who provided the information in that

16   description under the ob/gyn section?

17   A   I presume it was my attending physician.

18   Q   And you would agree with me that your attending physician

19   gave you "high pass marks for communication," correct?

20   A   Yes, he did.

21   Q   In fact, if you look at the last sentence of that

22   paragraph, would you agree with me that your attending

23   physician made it with respect to you, "Aaron's disability is

24   no obstacle to good performance."  Do you see that?

25   A   Yes, I do.

Hartman - Cross                    94

1  Q    And again, you did not utilize any electronic assistive

2  device to assist you in communicating with patients or at

3  all, during your ob/gyn rotation, correct, Mr. Hartman?

4  A    Yes.

5  Q    You did not?

6  A    That's right.

7  Q    And this rotation occurred just this past January,

8  January of 2009 through March, 2009, correct?

9  A    Yes, over a two-month period.

10 Q    Mr. Hartman, would you take a look at the next page,

11 please?

12 A    Sure.

13 Q    And I'm referring you to your pediatric rotation, which

14 is right after pain management, do you see that, sir?

15 A    Yes, I do.

16 Q    Do you know who provided the description under the

17 pediatric rotation for you, Mr. Hartman?

18 A    Yes, I'm sorry.

19 Q    Who was that?

20 A    It was the course director.

21 Q    And that was also over an almost two-month period in

22 September, 2008 through October, 2008, correct?

23 A    Yes, it was.

24 Q    And there was a highlighted portion in the document in

25 front of you and you would agree with me that your course

1   director in pediatrics stated, with respect to you,

2   "residents were impressed with his knowledge, rapport with

3   patients and enthusiasm for learning," correct?

4   A    Yes.

5   Q    And that same individual described you as having

6   excellent rapport with patients, didn't he?

7   A    It's a she, but yes.

8   Q    I should be punished for assuming that was a male.  And

9   you never used any electronic assistive device to help you

10  communicate during your pediatric rotation, correct?

11  A    Correct.

12  Q    Please take a look at the next page and I'll direct your

13  attention to the bottom, internal medicine, do you see that?

14  A    Yes.

15  Q    Do you know whose summary or description is provided

16  under that entry, sir?

17  A    This is a summary from one of the deans of the medical

18  school.

19  Q    And you would agree with me that the grade you received,

20  at least, according to this document, was high pass, correct,

21  Mr. Hartman?

22  A    The grade is actually with a high pass.

23  Q    And you would agree with me that that individual, one of

24  the deans, whom you believe prepared this, was aware of your

25  speech dysfluency, correct?

1  A   Yes, while --

2  Q   In fact, that same individual described you as gracefully

3  trying to overcome your speech problems, didn't they?

4  A   Yes, he did.

5  Q   And he also described you as having developed "excellent

6  rapport with patients, peers and ancillary clinical staff,"

7  correct?

8  A   Yes.

9  Q   And again, you did not use a TTS device or any orator or

10 any assistive device in your participation in the internal

11 medicine rotation, correct, Mr. Hartman?

12 A   I believe I may have used TTY device.

13 Q   Okay.  And a TTY device to assist you with respect to

14 telephone conversations, correct?

15 A   Yes, it does.

16 Q   But you didn't use a Text To Speech device or any other

17 assistive electronic technology other than a TTY device for

18 phone encounters, correct?

19 A   Yes.

20 Q   I'm correct?

21 A   Yes, your are.

22 Q   Okay, would you take a look and this is the last page for

23 this exhibit, at the next page and it's marked page 6, at the

24 bottom.  And I would direct your attention to an entry after

25 family medicine, do you see that, Mr. Hartman?

1   A    I believe you already showed us this in a different form.

2   Q    I may have.  Who prepared this summary, if you know?

3   A    One of the deans of the medical school.

4   Q    And you would agree with me that that dean described you

5   as being able to "demonstrate outstanding communication

6   skills, interacting constructively with faculty, other

7   trainees, nursing professionals and Allied Healthcare staff,"

8   correct?

9   A    No, these comments were taken directly from the course

10  director's comments.

11  Q    And you would agree with me that whoever prepared these

12  comments was aware of your speech dysfluency, correct, Mr.

13  Hartman?

14  A    Yes, he was.

15  Q    And you did not need any assistive technology device to

16  aid you with respect to this rotation, correct?

17  A    Correct.

18        THE COURT:  Ms. Leopold-Leventhal, I wonder if we're

19  not approaching a useful end for the afternoon?  It's nearly

20  6:00 o'clock.

21        MS. LEOPOLD-LEVENTHAL:  I would agree with that.

22  This is a perfect time.

23        THE COURT:  Do you have much more?

24        MS. LEOPOLD-LEVENTHAL:  I have a little bit more,

25  but this is a perfect time for a break and I can finish

1 | tomorrow morning or tomorrow afternoon.

2 |         THE COURT:  All right.  We will do that, we will

3 | recess now.

4 |         MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

5 |         THE COURT:  Mr. Hartman, you've been a target for

6 | questions from both your own attorney and defense counsel for

7 | quite awhile.  So, I'd like to liberate you, at this point.

8 |         MS. LEOPOLD-LEVENTHAL:  Are we beginning at 2:00 or

9 | 2:30, your Honor?

10 |        THE COURT:  2:00.

11 |        MS. LEOPOLD-LEVENTHAL:  Thank you.

12 |        THE COURT:  All right, see you then.  I'm sorry,

13 | let's say 2:15.  2:15 tomorrow, all right?  Very good, see

14 | you tomorrow about 2:15.

15 |        (Court adjourned 5:53 o'clock p.m.)

16 |                       - - -

1                              INDEX

2   WITNESS                    D      C      RD      RC

3   Aaron Hartman, Resumed

4     By Mr. Weiner            2

5     By Ms. Leopold-Leventhal        52

6                              - - -

CERTIFICATION


I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




s:/Geraldine C. Laws, CET      Dated 3/19/10
Laws Transcription Service