```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                          - - -

AARON L. HARTMAN            :  CIVIL ACTION NO. 09-5028
                           :
            v.             :  Philadelphia, Pennsylvania
                           :  March 3, 2010
NATIONAL BOARD OF MEDICAL   :  2:42 o'clock p.m.
EXAMINERS                   :
. . . . . . . . . . . . . . .

             PRELIMINARY INJUNCTION HEARING - DAY 3
            BEFORE THE HONORABLE LOUIS H. POLLAK
              UNITED STATES DISTRICT COURT JUDGE

                          - - -

APPEARANCES:

For the Plaintiff:        CHARLES WEINER, ESQUIRE
                          Law Offices of Charles Weiner
                          179 North Broad Street
                          Doylestown, PA  18901

For the Defendant:        JANE E. LEOPOLD-LEVENTHAL, ESQUIRE
                          Eastburn & Gray, PC
                          60 East Court Street
                          P.O. Box 1389
                          Doylestown, PA  18901


ESR Operator:             Megan McDevitt

Transcribed By:           Tracey Williams, CET
                          Laws Transcription Service

                          - - -


(Proceedings recorded by For the Record Gold digital sound
recording; transcript provided by above transcription
service.)




                   Laws Transcription Service
                    48 W. LaCrosse Avenue
                    Lansdowne, PA 19050
                       (610) 623-4178
```

1          (The following occurred in open court at 2:42

2     o'clock p.m.:)

3          THE COURT:  My apologies for the delay.

4          (Discussion held off the record.)

5          MR. WEINER:  Your Honor, if I may address the Court?

6          THE COURT:  Yes, sir.

7          MR. WEINER:  Dr. Tetnowski has flown back this

8     morning to have his testimony on cross be taken.

9     Unfortunately, once again, the last flight leaving

10    Philadelphia and going back to Louisiana is 5:35, is the best

11    we could do.  What I was going to propose and defendant's

12    counsel agrees is that Dr. Tetnowski would retake the stand

13    for cross-examination to finish his cross-examination, as you

14    have requested, for the next hour, and then resume Mr.

15    Hartman's cross-examination.  It's our belief that the two

16    cross-examination of the witnesses will probably take us to

17    the end of the day, somewhere around 5:30, and with your

18    Honor's permission, if we could then resume defendant's case.

19    I believe defendant has three witnesses on another day, if

20    you're available Thursday, if not Friday.

21         THE COURT:  I can give you at least some time

22    available Thursday, tomorrow.  We can get together at 11:30

23    and be able to use this courtroom tomorrow at 11:30, but

24    around the lunch hour we'll have to shift over to a different

25    courtroom.

1          All right, go ahead.

2          MR. WEINER:  Is that acceptable to your Honor, the

3  schedule?

4          THE COURT:  Go ahead.

5          MR. WEINER:  Thank you very much.

6          JOHN TETNOWSKI, Plaintiff's Witness, Previously

7  Sworn, Resumed.

8          THE COURT:  Welcome back.

9          THE WITNESS:  Thank you.  By the way, thank you for

10  your flexibility and for the respect you showed me the other

11  day when I needed to leave and come back.

12          THE COURT:  We're instructed to be flexible and even

13  to make a pretense of being polite.

14          THE WITNESS:  I appreciate it, thank you.

15          THE COURT:  Please sit down.

16                  CONTINUED CROSS-EXAMINATION

17  BY MS. LEOPOLD-LEVENTHAL:

18  Q    Good afternoon, Doctor.

19  A    Good afternoon.  How are you?

20  Q    We meet again.  Maybe this will be the last time, I'm

21  sure you're hoping that.

22  A    Yeah.  I said you've seen all my ties already, so...

23          (Laughter.)

24          MS. LEOPOLD-LEVENTHAL:  May I proceed, your Honor?

25          THE COURT:  Yes, indeed.

1   BY MS. LEOPOLD-LEVENTHAL:

2   Q    To refresh your recollection, I was in the process of

3   asking you questions with respect to essentially the use and

4   approval of a text-to-speech device as an augmentative aid

5   for those with a speech dysfluency, just jarring your memory.

6   A    Sure, thanks.

7   Q    You serve on the Board of Directors for the National

8   Stuttering Association, correct?

9   A    That is correct.

10  Q    What is the National Stuttering Association?

11  A    The National Stuttering Association is a group, it's

12  actually a self-help group for people who do stutter.

13  Q    To the best of your knowledge, Dr. Tetnowski, the

14  National Stuttering Association has never recommended that

15  individuals who stutter seek therapeutic recommendations from

16  technicians or engineers or people of that nature, correct?

17  A    The National Stuttering Association is very careful not

18  to make recommendations about any particular type of therapy,

19  period.

20  Q    Is it fair to say that they wouldn't seek information on

21  augmentative devices from an engineer or technician, someone

22  not certified as a speech therapist?

23  A    You know, I'm on that board and I know that we don't

24  really just go off and seek information like that for no

25  particular reason.  If someone brought it up, I suppose there

1   would be some type of investigation into it.

2   Q    To the best of your knowledge, the National Stuttering

3   Association has never recommended a text-to-speech device as

4   an augmentative therapy, correct?

5   A    The National Stuttering Association hasn't recommended

6   any type of therapy, period.

7   Q    Well, you would agree that the National Stuttering

8   Association has conducted two different studies over the

9   years with respect to augmentative devices, correct?

10  A    They have done two surveys, the purpose of them had

11  nothing to do with augmentative devices.

12  Q    Okay, and that wasn't my understanding.  You participated

13  in one of those studies, correct?

14  A    Yes, I did.

15  Q    And didn't those studies list alternatives to therapies

16  for persons who have a stutter?

17  A    They did list some nontraditional effects or some

18  nontraditional means of interventions.

19  Q    And you would agree with me that text-to-speech device

20  was not listed as either a traditional or nontraditional

21  augmentative device for persons with a stuttering condition,

22  correct?

23  A    It was not.

24  Q    And to the best of your knowledge, at least, information

25  about the text-to-speech device has never appeared in any NSA

1  materials, newspapers, brochures or literature, correct?

2  A    There has been nothing to the best of my knowledge

3  regarding text-to-speech.

4  Q    Now, referring you back to the date of your deposition, I

5  believe it was about February 2nd --

6  A    Sure.

7  Q    -- when I asked you during your deposition why it was

8  that you believed Mr. Hartman needed an accommodation

9  different from the accommodations he has received throughout

10 his entire life you responded, quote, "because the stakes are

11 particularly high," end quote, in this setting; do you recall

12 that testimony?

13 A    Could I look at it --

14 Q    Absolutely.

15 A    -- just to make sure?

16 Q    I believe it is Exhibit -- it's the second-to-last --

17 A    Oh, which book, this one or this one?

18 Q    The one that's -- yes, it's the one that's marked

19 Defendant's Exhibits.

20 A    Thank you.

21 Q    And if you take a look at Exhibit 36.

22 A    36, okay.

23 Q    Let me know when you have that in front of you.

24 A    I've got 36.   Page?

25 Q    Page 225.

```
 1            (Pause.)

 2    A    Okay, I'm there.

 3    Q    And directing your attention to Line 7 --

 4    A    Got it.

 5    Q    -- my question to you was, "Why is it that you believe

 6    Mr. Hartman needs an accommodation that is different from the

 7    accommodations he has received throughout his entire life and

 8    even in his medical school career?"

 9            And you answered, at Line 12, "I think that whatever

10    he has used in the past may not work at this particular

11    level.  I think that the stakes are particularly high."

12            Do you see that?

13    A    Yes, I do.

14    Q    So, you would agree with me that part of the reason why

15    you believe Mr. Hartman needs an accommodation different from

16    that which he has been given in medical school or had

17    throughout his entire life is because the stakes of this

18    examination are particularly high?

19    A    That's not exactly what I meant by that statement and, to

20    maybe further clarify, I would say that stuttering really

21    does vary from situation to situation and sometimes it can be

22    different over periods of time as well too.  Stuttering is

23    often exacerbated by periods of stress or anxiety.  So, this

24    particular situation is probably quite different from any

25    other situation that he has been in.
```

1    Q    Well, let me ask you this if you're saying it's quite

2    different than any other examination --

3    A    Actually --

4    Q    -- when you wrote your evaluation report, were you aware

5    of what oral examinations Mr. Hartman had taken in medical

6    school?

7    A    Not exactly, no.

8    Q    Well, I'm not sure what you mean by not exactly.  When I

9    asked you what oral --

10   A    I know that he has taken --

11   Q    -- let me finish my question --

12   A    Sure.

13   Q    -- what oral examinations he took as part of the

14   curriculum at Stonybrook, you said you had no idea, is that

15   correct?

16   A    I said that I did not know exactly what exams he took.  I

17   assumed that as a student and a professor that there was some

18   type of examination that went on, but knowing exactly which

19   ones they were, no, I do not know exactly which ones they

20   were.

21   Q    And I'm not being facetious here, you're not a medical

22   doctor, are you?

23   A    Absolutely not, I am not.

24   Q    And you have not been through medical school?

25   A    I have not been through medical school.

1   Q    You didn't examine the curriculum at Stonybrook Medical

2   Center before you wrote your evaluation, correct?

3   A    I did not.

4   Q    So, other than having a vague idea that there are

5   examinations, you didn't know when they were given, how many

6   he took, whether he passed or what they examined, is that

7   fair to say?

8   A    Just from what he had told me.

9   Q    And you didn't go the extra step to take a look at the

10  Stonybrook Web sites to examine what oral examinations might

11  have been part of the curriculum, correct?

12  A    I did not.

13  Q    You just indicated that --

14  A    I wish I had, but I hadn't.

15  Q    We all wish we had a time machine.

16  A    Sure.

17  Q    You would agree with me that if there were oral

18  examinations in medical school that Mr. Hartman was required

19  to pass in order to graduate that these would come with a

20  degree of stress, would you agree with that?

21  A    I guess I really can't say that, it would just be an

22  assumption to make, the degree of stress that he has at a

23  particular time.  And, again, I would just kind of like to

24  say that I do know that issues of stress, issues of his

25  speech, probably change from situation to situation and

1    probably from day to day, month to month, year to year, for

2    sure.

3    Q    And that's a fair answer.

4    A    Right.

5    Q    So, you're not willing to say that if Mr. Hartman took an

6    examination in medical school that was oral that he had to

7    pass to graduate that he had any more stress that day than

8    another day, is that fair?

9    A    I don't think I would be able to say that, I just don't

10   know what his levels of stress are.  You know, I know my

11   students, for example, have various different levels of

12   stress at different points, but when it comes to the point

13   where they have a capstone type of issue like their

14   dissertation defense that -- they have said that it brings

15   out more anxiety, that's all I know --

16   Q    And --

17   A    -- I don't know how it reacts to him though.

18   Q    And that's fair.  So, you can't say one way or the other

19   for Mr. Hartman, fair?

20   A    Yes, correct.

21   Q    So that if he were to repeat the Step 2 CS examination,

22   you can't sit here today and say that that's going to provide

23   additional stress to him either?  You're unable to predict

24   the future of Mr. Hartman's stress level, correct?

25   A    Only from what he tells me, that's the only way I have of

1    predicting it.

2    Q    Are you familiar at all with the other steps of the USMLE

3    examination that Mr. Hartman and other medical students are

4    required to pass before being certified?

5    A    For example, the Step 1 and Step 2 and things -- could I

6    look at it?

7    Q    You're familiar with those?

8    A    Yes.  Could I look at it to refresh my memory or not?

9    Q    I'm not actually going to ask you any substance, but

10   you're more than welcome to refresh your recollection, if you

11   would like.

12   A    Okay.  Could I, please?

13   Q    Sure.  It is in that same book that's in front of you,

14   it's Exhibit 1.  There's a 2009 information booklet and a

15   2010 information booklet, although I think that that only

16   refers to Step 2 CS.  I did not introduce as an exhibit any

17   information with respect to Step 1 or Step 2 CK.

18   A    I'm on Page 10, is that where you want me to be?

19   Q    That only refers to Step 2 CS --

20   A    Okay, sure.

21   Q    -- so it probably won't help you.

22   A    Okay.

23   Q    I sent you on a wild-goose chase.

24        Mr. Hartman didn't tell you that he took the Step 2

25   CK examination the exact same week he took the Step 2 CS

                        Tetnowski - Cross                    12

1   examination, did he?

2   A   He did not tell me that it was the exact same week.

3   Q   If you would, take a look at Exhibit 20 in the binder

4   that's in front of you.

5   A   Okay.

6           (Pause.)

7   Q   Have you had an opportunity to look at that?

8   A   Just the one page, right?

9   Q   Yes, sir.

10          (Pause.)

11  A   Okay.

12  Q   And this is an e-mail from Mr. Weiner to you dated

13  December 8th, 2009, correct?

14  A   Correct.

15  Q   And there is a site that you can click on a link that

16  would take you to the Step 2 Clinical Skills examination,

17  correct?

18  A   Correct.

19  Q   And this e-mail of December 8th, 2009, that was actually

20  the day after you evaluated Mr. Hartman in your home office,

21  correct?

22  A   Correct.

23  Q   And you would agree with me, Dr. Tetnowski, that this

24  December 8th e-mail certainly suggests that you did not have

25  the link NBME Web site including information about the Step 2

1    CS exam until the day after --

2    A    No, Aaron --

3    Q    -- you evaluated Mr. Hartman?

4    A    -- Aaron brought a copy of that handout with him.

5    Q    Why did Mr. Weiner send it to you the day after then?

6    A    I don't know that.

7    Q    Okay.  And you recall in the course of this case your

8    records were subpoenaed, correct?

9    A    Correct.

10   Q    And when we went through those records at the date of

11   your deposition the information on the Step 2 CK was in your

12   file, but it wasn't part of the documents you sent me, was

13   it?

14   A    I don't believe so.

15   Q    Let's talk for a minute about the December 7th

16   evaluation.

17   A    Yes.

18   Q    You would agree with me that other than perhaps bringing

19   some information about the Step 2 CS examination with him Mr.

20   Hartman brought no other records or documents with him for

21   his evaluation on December 7th, correct?

22   A    No, he did bring a couple of other things with him.

23   Q    What else did he bring?

24   A    Let's see, I believe he showed me two reports that he had

25   had in the past, one was quite -- it was a few years ago, I'm

1   trying to think of the person's name --

2   Q    It was Lee Oldomier, is that --

3   A    -- it was Oldomier and --

4   Q    Was the second a Ms. McCafferty?

5   A    McCafferty, right.

6   Q    And he didn't give you any other information, correct, in

7   writing?

8   A    I don't believe so.  He brought the handout on the exam,

9   the two reports -- oh, he also had brought me his scores from

10  the USMLE.

11  Q    Okay.  And before writing your evaluation report you

12  didn't ask Mr. Hartman to provide you with any other written

13  information, correct?

14  A    No, I didn't.

15  Q    And you did testify at your deposition that you believed

16  Mr. Hartman had participated in speech therapy for about

17  seven months with a Ms. McCafferty at the point in time when

18  you evaluated him in December, correct?

19  A    Can I look at my deposition?

20  Q    Sure.

21  A    Because I see I get in trouble when I kind of say, yes,

22  seven months, eight months, ten months, and I know that that

23  was now I think about 16 months at the time.

24  Q    It's the second-to-the-last exhibit.

25  A    So, that's 37?  36?

1            (Pause.)

2    A   36, is it, or --

3    Q   36.

4    A   36, okay.

5    Q   Directing your attention to --

6            THE COURT:  You're always entitled to look at a

7    transcript of a deposition or at least sometimes -- sometimes

8    counsel forget about that, I don't mean present counsel, but

9    at some hearings that has happened and it ends up to the

10   Judge to insist that the witness have the deposition

11   transcript.

12           THE WITNESS:  Thank you.

13   BY MS. LEOPOLD-LEVENTHAL:

14   Q   And actually I had asked you to look at a page earlier

15   and that's Page 43.  And when I ask you any of these

16   questions, if I direct you to a particular page and you feel

17   like you need to read a couple pages in advance of that, I

18   don't mean to limit you.

19   A   Okay, sure.

20   Q   If you need to put it into context, please feel free to

21   do that.

22   A   Thank you.

23   Q   And if you take a look at Page 43, Line 13.  "How long

24   had Mr. Hartman been treating with Ms. McCafferty before

25   December 7th, 2007?"

1        THE COURT:  I'll interrupt again to tell --

2        MS. LEOPOLD-LEVENTHAL:  Yes, your Honor.

3        THE COURT:  -- Dr. Tetnowski that Ms. Leopold-

4   Leventhal's invitation to you to feel free to read pages in

5   advance of whatever was particularly under examination, that

6   exhibits a generosity of spirit which does not always --

7        MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

8        THE COURT:  -- find voice in the courtroom.

9        MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

10  BY MS. LEOPOLD-LEVENTHAL:

11  Q   And if you look at your response, which is found at Line

12  24, you indicated, "I believe it was several months."

13        And I must not have been hearing very well because I

14  said, "I'm sorry?"

15        And then on the next page you answered again, "I

16  believe it was -- I believe it was about seven months, if I

17  remember correctly from what Aaron told me."

18        Did I read that correctly?

19  A   Yes.

20  Q   So, as of the December 7th evaluation, you believed he

21  had been treating with Ms. McCafferty for about seven months,

22  correct?

23  A   At the time of the deposition, that was the best that I

24  could recall at that particular time, yes.

25  Q   And you didn't ask Mr. Hartman for the records related to

1  the McCafferty treatment at the time of the evaluation,

2  correct?

3  A   No, I didn't, and that was probably purposeful.

4  Q   Okay, and we'll get to that.

5  A   Sure, okay.

6  Q   And you didn't ask him for those records before writing

7  your evaluation report, correct?

8  A   That's correct, I did not.

9  Q   And in fact, as we learned later, if you had asked for

10  Ms. McCafferty's therapy notes or asked Mr. Hartman to

11  produce them, it would have shown you that Mr. Hartman had

12  been treating with Ms. McCafferty about a year and a half

13  actually --

14  A   Yes.

15  Q   -- rather than the seven months that you thought,

16  correct?

17  A   Yes.  One time over here I said nine months, the other

18  time I said seven months.  So, I did not know what the exact

19  time was, but it was a significant portion of time for sure.

20  Q   Okay.  And you commented actually in your evaluation

21  report on the first page that Mr. Hartman had participated in

22  significant speech therapy; do you recall making that

23  comment?

24  A   Which exhibit is that, by the way?  I just want to make

25  sure I'm reading what I said correctly.

1   Q    It's actually in the other binder, which would be

2   Plaintiff's binder.

3   A    Sure.  It's also 32 in here?  Okay.

4   Q    Yes.

5          (Pause.)

6   A    Thank you, okay.  And --

7          THE COURT:  Where are we?

8          MR. WEINER:  In Defendant's binder, 32.

9          THE COURT:  32.

10         MS. LEOPOLD-LEVENTHAL:  Page 1.

11         (Discussion held off the record.)

12         THE COURT:  All right.  Okay.

13  BY MS. LEOPOLD-LEVENTHAL:

14  Q    Directing your attention to the first paragraph --

15  A    Sure.

16  Q    -- Dr. Tetnowski.

17  A    Okay, thank you.

18  Q    The last full sentence indicates, "although Aaron has

19  been evaluated in the past and has received significant

20  speech therapy, he stated he wanted a second opinion from a

21  board-recognized specialist in the field of stuttering."

22         Do you see that entry?

23  A    Yes, I do.

24  Q    So, you would agree with me that in your evaluation

25  report on Page 1 you did have an entry indicating he had

Tetnowski - Cross                      19

1   participated in significant speech therapy, correct?

2   A    Yes, including the 15 years or so that's mentioned in the

3   next paragraph as well.

4   Q    And, as we've discussed, you didn't request any of the

5   records from that speech therapy, that was by design,

6   correct?

7   A    I would say that, yes.

8   Q    Okay.  And we'll shortly get to your explanation --

9   A    Sure, okay.

10  Q    -- as to why you elected not to request additional

11  records.

12          Before writing your report, is it fair to say that

13  you never called Stonybrook or wrote to them and asked them

14  for Mr. Hartman's academic records in medical school?

15  A    I did not.

16  Q    You did not.  And I believe we established that you

17  didn't contact anyone from Stonybrook Medical Center about

18  Mr. Hartman's curriculum, correct?

19  A    Correct.

20  Q    And you never reviewed or requested any information

21  regarding oral assessments Mr. Hartman may have had at

22  Stonybrook, is that also correct?

23  A    That is also correct.

24  Q    Okay.  And in fact is it fair to say, Dr. Tetnowski, that

25  you have no idea whether or not Mr. Hartman took the same

1   kind of standardized patient examinations or encounters as

2   part of his Stonybrook curriculum as the Step 2 CS

3   examination?

4   A    I did not ask those questions, right.

5   Q    And you didn't know one way or the other; fair?

6   A    Uh...

7         THE COURT:  I'm not quite clear about part of this

8   series of questions, Counselor.  Is a predicate for the

9   questions the assumption that if Dr. Tetnowski had written to

10  Stonybrook, Stonybrook would have been prepared to disclose

11  academic records and related matters of a student?

12        MS. LEOPOLD-LEVENTHAL:  It is unlikely that they

13  would have.  In all likelihood, Mr. Hartman would have had to

14  have provided an authorization which, because he went to Dr.

15  Tetnowski for an evaluation, he could have given him an

16  authorization, Dr. Tetnowski could have then provided that to

17  Stonybrook and they would have provided all of Mr. Hartman's

18  records, in the same way that they did to me in this case

19  when Mr. Hartman was nice enough to provide us with an

20  authorization.

21        THE COURT:  But some such step would have been

22  called for?

23        MS. LEOPOLD-LEVENTHAL:  Yes.  Although, I suppose

24  Mr. Hartman could have asked for his records from Stonybrook

25  and provided them to Dr. Tetnowski as well.  And what I'm

1   really trying to get at here is that this doctor didn't have

2   any of those records, whether by asking himself or having

3   them provided.

4              THE COURT:  Right.

5              MR. WEINER:  Your Honor, we can stipulate that Dr.

6   Tetnowski didn't have any of Mr. Hartman's educational

7   records.

8              THE COURT:  All right.

9              MS. LEOPOLD-LEVENTHAL:  Fair enough.

10  BY MS. LEOPOLD-LEVENTHAL:

11  Q   So that if Mr. Hartman had taken oral examinations at

12  Stonybrook with some type of accommodation or another, that

13  wasn't something you knew, correct?

14  A   Correct.

15  Q   And you would agree with me, Dr. Tetnowski, that in spite

16  of not requesting Stonybrook records or looking at the

17  Stonybrook curriculum or asking for prior treatment records

18  that it is standard practice in your profession to secure as

19  much background information as possible before conducting an

20  evaluation on stuttering, correct?

21  A   I know where you're reading that from, where it comes

22  from, but the reason for this particular exam was to evaluate

23  his speech at the current time.  He wasn't asking me for

24  therapy, he was asking me to evaluate his speech at this

25  particular time.

Tetnowski - Cross                           22

1   Q   I understand that, but during your deposition it was your

2   testimony, and that's what I was actually quoting, that it

3   is, quote, "standard practice to secure as much background

4   information as possible before conducting an evaluation on

5   stuttering," end quote.

6   A   And where would that be, could you tell me, please?

7   Q   Sure.  Take a look at Page 51.

8   A   Okay.  Thank you.

9        (Pause.)

10  Q   And directing your attention to Line 16, I asked you,

11  "Doctor, isn't it standard practice to secure as much

12  background information as possible before conducting an

13  evaluation on stuttering?"

14            Answer:  "Yes."

15        (Pause.)

16  A   Right, yes.  And I went on and I said that he said he was

17  doing fine in the curriculum.  So, I certainly didn't feel

18  like if -- that that was appropriate to even be asking at

19  that time.

20  Q   Are you bound by the American Speech Language Hearing

21  Association's code of ethics?

22  A   Yes, I am.

23  Q   And would you agree with me that under Principle 1, Rule

24  B, it provides in part, "individuals shall use every resource

25  to ensure that high-quality service is provided"?

Tetnowski - Cross                23

1   A    Is that directly from -- quoted from the code of ethics,

2   I assume?

3   Q    Yes.

4   A    Because I assume that's where that comes from.  You know,

5   everything that I felt was pertinent to this case I certainly

6   did.  I mean, if I wanted to collect everything for his case,

7   I suppose I could have gone back to his elementary school

8   records and grade school records and things like that.  So,

9   he said he was doing well in the curriculum, I took him for

10  his word on that and that was where it went.

11  Q    And I'm not here today to suggest that you should have

12  secured Mr. Hartman's records from show-and-tell in the first

13  grade, you don't think that's what I'm suggesting, do you?

14  A    No, no.

15  Q    What I was asking you about is, don't you think it would

16  have been important to find out how Mr. Hartman had done on

17  similar oral examinations with accommodations in the year or

18  two before he came to see you, and I understand your answer

19  is no?

20  A    Well, I think that, you know, the issue is that with

21  people who stutter, the way they were communicating a year

22  ago is likely to be different from the way that they are

23  communicating at the present time.

24  Q    Would you agree with me that the code of ethics phrase,

25  "every resources," would include securing background

1    information on the patient?

2    A    I did receive some background information from him

3    through the interview I conducted of him.

4    Q    You testified under direct examination from Mr. Weiner

5    that you conducted an ethno-graphic interview, is that

6    correct?

7    A    Correct.

8    Q    Would you describe for the Court what an ethno-graphic

9    interview is?

10   A    Yes.  An ethno-graphic interview is a type of interview

11   where you ask a lot of open-ended questions and you try to

12   understand as much as you can about the individual's life,

13   taking an open stance, an open-mind -- well, an open stance

14   is the correct word for it, so that you assume that they are

15   the expert and they are telling you their own story in

16   narrative form.

17   Q    And I believe you just used the phrase, as much as you

18   can about the individual's life, is that correct?

19   A    Yes.

20   Q    Okay.  And in fact --

21   A    About the pertinent story, sure, yes.

22   Q    Sure.  We wouldn't want to know --

23   A    Yes, right --

24   Q    -- how he did in baseball in tenth grade.

25   A    -- exactly, right.

1    Q    And you did conduct an ethno-graphic interview on

2    December 7th with respect to Mr. Hartman, correct?

3    A    Yes.

4    Q    And in fact, Dr. Tetnowski, you wrote an article in 2003

5    entitled, "Implications for Description and Assessment," I

6    guess you co-authored that, correct?

7    A    Yes.

8    Q    And in that article you explained that, quote, "The

9    ethno-graphic interview should be non-judgmental" --

10   A    Correct, yes.

11   Q    -- "open-ended and open to the ideas of parents, teachers

12   and others in the client's environment," correct?

13   A    Correct.

14   Q    And you would agree with me that other than asking Mr.

15   Hartman about his background you didn't take an additional

16   step of contacting any others who were in his environment

17   other than perhaps his father?

18   A    Yes, that's correct.

19   Q    And during your deposition you recall that we reviewed

20   some interrogatory responses that Mr. Hartman had provided in

21   this case.

22   A    Okay, sure.

23   Q    And I'll ask you to take a look at those in the

24   Defendant's Exhibit binder in front of you.

25   A    That's the smaller one here?

1   Q    It's the larger one.

2   A    Okay.  The larger one, okay.

3   Q    And I would direct your attention to Exhibit 28, which is

4   Aaron Hartman's Interrogatory Responses, Set 1.

5            (Pause.)

6   A    I see it, okay.

7   Q    And during your deposition we discussed this particular

8   page, correct?

9   A    This particular page here?

10  Q    Yes.

11  A    I believe so.

12  Q    And we talked about or I asked you whether or not you

13  knew about all of the oral examinations that were listed on

14  this page prior to preparing your evaluation report, do you

15  recall that?

16  A    Not off the top of my head, but I'm sure I can read it

17  and you'll tell me where it is.

18  Q    Okay.  Well, let me ask you this -- I mean, I can direct

19  you to your transcript, it's Page 242 and 250.

20  A    Okay.

21  Q    Essentially, you looked at this and testified that you

22  weren't familiar with these tests other than what he told you

23  orally.

24  A    242?

25  Q    But take your time to refresh your recollection.

1    A   Okay.

2            (Pause.)

3    A   Okay.  And you also said 250, is that correct?

4    Q   It's actually 242 to 250 --

5    A   Oh, 242 to 250?  Okay.

6    Q   -- we went through every single examination and I asked

7    you questions about them.

8    A   Okay.

9            (Pause.)

10   A   I've gone as far as 245 and I understand the concept that

11   we were talking about now, so we can move forward.

12   Q   Okay.

13   A   I'll look back if I need to.

14   Q   And essentially you would agree with me that we went

15   through each of these oral examinations and you indicated

16   that at least when you prepared your evaluation report you

17   weren't aware of these examinations or the accommodation Mr.

18   Hartman received, correct?

19   A   That's correct.

20   Q   And in fact you were rather candid, I thought, with me.

21   I asked you whether or not you would have liked to have had

22   this information when you evaluated Mr. Hartman and you

23   confirmed that, yes, in retrospect, you would have liked to

24   have had that information; is that your recollection?

25   A   Yeah, I think that I would say -- I mean, at the time,

1   because these have come up so many times, I assume that they

2   are very important to this case.  So, yes, I would have liked

3   to have seen them.

4   Q   In fact you testified, and I quote, if you had to

5   question Mr. Hartman again at this point, you would probably

6   ask Mr. Hartman these questions?

7   A   Sure.  I would have asked him, yeah, these questions

8   about which exams he took and how he did on them and if there

9   was an oral component.  Was that your question?

10  Q   Yes.

11  A   Yes.

12  Q   And how he was accommodated?

13  A   Yes.

14  Q   And you would agree with me that you weren't even aware

15  that two months before Mr. Hartman took the Step 2 CS

16  examination he took an exam very similar to the Step 2 CS

17  examination at Stonybrook, you weren't aware of that,

18  correct?

19  A   Which exam was that?

20  Q   That was the CPX exam.

21  A   The CPX exam.

22  Q   And it's actually the last exam identified on the exhibit

23  in front of you --

24  A   Okay.

25  Q   -- at the bottom of Page 10, it's a clinical practice

Tetnowski - Cross                              29

1    examination.

2              (Pause.)

3    Q    If you look at the bottom of that page --

4    A    Yes, of Page 10.

5    Q    -- it describes it was a formal examination involving

6    actors in an objective standardized clinical examination

7    where Mr. Hartman used time and a half.

8    A    Okay.  The one that says April, 2009, right?  Is that the

9    one you're talking about?

10   Q    Yes, Doctor.

11   A    Okay.  All right.

12   Q    And my question was, you would agree with me that you

13   weren't aware that Mr. Hartman took that examination two

14   months before the Step 2 CS, was granted time and a half as

15   an accommodation and passed that oral examination, correct?

16   A    Exactly those exams, no, I didn't ask those questions.

17   You know, again, I assumed he had taken exams that had some

18   oral components to them.

19   Q    And you would agree with me that if you could conduct Mr.

20   Hartman's evaluation over again you would like to ask Mr.

21   Hartman how the accommodation of either double time or time

22   and a half impacted his performance on all of these oral

23   examination at Stonybrook?

24   A    Certainly in more detail than I did, yes.

25   Q    Please turn to Exhibit 21 in the large binder in front of

1   you.

2   A    Okay.

3            (Pause.)

4   A    Okay.

5   Q    The first page is a letter from Stonybrook to me dated

6   January 25th indicating what records are included.  I would

7   ask you to turn to the second page, please?

8   A    Okay.

9            MS. LEOPOLD-LEVENTHAL:  And, your Honor, I'll try

10  not to duplicate the questions that I asked yesterday and

11  sort of shorten things this afternoon.

12  BY MS. LEOPOLD-LEVENTHAL:

13  Q    Take a look in the middle of the page as related to

14  emergency care, emergency medicine rotation.

15  A    Yes, mm-hmm.  Okay.

16  Q    And you would agree with me that Mr. Hartman received in

17  the area of effective communication the grade of high pass,

18  correct?

19            MR. WEINER:  Objection, your Honor.  Dr. Tetnowski

20  just testified he hadn't reviewed these records, he's not

21  familiar with these records.  To simply read a report to him

22  is -- it's outside the scope of what he was asked to do.

23            MS. LEOPOLD-LEVENTHAL:  And that's exactly my point,

24  that it was outside the scope of what he was asked to do, but

25  it should have been inside the scope of what he reviewed.

1          THE COURT:  All right, go ahead.

2          MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

3    BY MS. LEOPOLD-LEVENTHAL:

4    Q    Do you see that, Doctor?

5    A    Which portion are you asking me to there?

6    Q    And I was referring to the --

7    A    Can I read the whole thing here, is that okay?

8    Q    Sure.

9          (Pause.)

10   A    Okay.

11   Q    And if you take a look at the next page -- and I'll only

12   ask you about three of these --

13   A    Sure.

14   Q    -- to shorten things -- and I'm directing your attention

15   to the "Family Medicine" portion at the top.

16   A    Yes.

17   Q    There's a highlighted portion in front of you that

18   indicates Mr. Hartman demonstrated outstanding communication

19   skills?

20   A    I see that.

21   Q    And do see where it says, "Aaron did a good job of

22   establishing trust and rapport with his patients"?

23   A    Yes, I do.

24   Q    Look further down on the page under "OB/GYN," do you see

25   that?

1    A    Yes, I do.

2    Q    And the highlighted portion indicates that Mr. Hartman

3    received high-pass marks for communication, correct?

4    A    Correct.

5    Q    And actually the last sentence of that paragraph

6    indicates that "Aaron's disability is no obstacle to good

7    performance."  Do you see that as well?

8    A    I see that as well.

9    Q    And finally if you look at the next page, it's with

10   respect to the "Pediatric Rotation"?

11   A    Sure.

12   Q    And the highlighted portion indicates, "residents were

13   impressed with his knowledge, rapport with patients and

14   enthusiasm for learning," correct?

15   A    Correct.

16   Q     In fact, the additional highlighted portion indicates,

17   "he had excellent rapport with his patients," correct?

18   A     Correct.

19   Q    And it's your understanding that Mr. Hartman is not

20   utilizing any electronic devices while he engaged in these

21   rotation programs at Stonybrook, correct?

22   A    Yeah, and these are from several years ago as well,

23   that's why I assume he wasn't.

24   Q    Well, actually the OB/GYN is from -- and that's on Page 3

25   of the document in front of you -- the period of time was

1    from January 5th, 2009 to, coincidentally, March 1st, 2009,

2    which was just about a year ago, correct?

3    A    That's correct, yes.

4    Q    So that wasn't a couple of years ago, that was last year?

5    A    Well, the 2007s that we looked through were a couple

6    years ago, and 2008s --

7    Q    And there's also --

8    A    -- 2007, 2008.  I'm sure there's some that -- across the

9    line here that --

10   Q    Sure.

11   A    -- I mean, I don't want to argue the point, but not all

12   of them are current, yes.

13   Q    I don't either, I just directed you to the OB/GYN --

14   A    Right.

15   Q    -- which was about a year ago, correct?

16   A    Yes.

17   Q    So, when you said these were from several years ago, in

18   fact one was just last year at this time, correct?

19   A    I said several were from a few years ago.

20   Q    Okay.  And if you could conduct Mr. Hartman's evaluation

21   over again, you would want to ask Mr. Hartman how he had

22   performed in these settings without the use of the text-to-

23   speech device with actual patients, correct?

24   A    I probably would do that.

25   Q    In fact, again, you were candid enough at your deposition

1   to admit that if you could do it all over again you would

2   have wanted all of Mr. Hartman's records from Stonybrook

3   before you ever wrote your report, correct?

4   A   I would want a -- I would like to have as complete a

5   picture as possible necessary to evaluate him.  You know, I'm

6   saying that now because all these things are brought up in

7   the courtroom; I'm not sure the clinical significance of some

8   of them, but I will agree with you absolutely for sure, if I

9   were to do this again, I would have liked to have seen all

10  these reports.

11  Q   In that same vein, Dr. Tetnowski, when you evaluated Mr.

12  Hartman, you were not aware that he was right in the middle

13  of participating in residency interviews for his residency,

14  correct?

15  A   I was aware of him being in the concept of residencies,

16  but not exactly how many he had completed, how many he was

17  going to, except that he was in the process of going through

18  some residency interviews.

19  Q   And in fact while you weren't here Mr. Hartman testified

20  that he has now participated in nine different residency

21  interviews and only for one of those he used the text-to-

22  speech device; are you aware of that?

23  A   Uh, I know that he has gone through a bunch of interviews

24  and I know that he has used it on one of them, yes.

25  Q   Okay.  And when I asked you at your deposition whether it

1   surprised you that at that point in time Mr. Hartman had not

2   used the text-to-speech device for five of his six residency

3   interviews, you indicated that that information surprised

4   you, is that correct?

5   A   I know I said that, but can I check it --

6   Q   Absolutely.

7   A   -- just to make sure of my accuracy for it?

8   Q   Page 170.

9   A   Thank you.

10          (Pause.)

11  A   Okay.  And...

12  Q   And actually if you turn back a page, my question was at

13  Line 23, "Does it surprise you that Mr. Hartman engaged in

14  residency interviews at five different residency programs,

15  probably involving doctors that he didn't know, and that he

16  did not use a text-to-speech device for those interviews, and

17  this was almost the same time that you examined him?"

18          Mr. Weiner objected.

19          And you answered, "It did surprise me."

20          Do you see that?

21  A   Yes, I said it surprised me, "and I would say maybe

22  mildly surprised me," in the next line.

23  Q   In fact, one other factor was that you testified at your

24  deposition that you thought Mr. Hartman was only in the

25  second year of medical school rather than in the fourth, is

1  that correct?

2  A    I know I mis -- you know, misworded myself there, but I

3  know that's what I said in the deposition and, reading it

4  over, I realized that I had made a mistake, yes.

5  Q    And looking back at the day that Mr. Hartman took the

6  Step 2 CS examination in June of 2009, you have no idea what

7  the severity of what Mr. Hartman's stutter was on that day,

8  do you?

9  A    Okay.  And that was from the deposition, you said?

10 Q    Yes.

11 A    Okay.  What page and line again?

12 Q    Page 106.

13 A    Page 106, thank you.

14        (Pause.)

15 A    Okay, Page 106.  And which line is that?

16 Q    That would be Line 3.

17 A    Line 3.

18 Q    Question:  "You don't know what the severity of Mr.

19 Hartman's stutter was the day he took the Step 2 exam in

20 June, 2009, correct?"

21        Answer:  "I do not, no."

22 A    Correct, yes, mm-hmm, yes.

23 Q    And I also asked you whether or not you were aware that

24 Mr. Hartman had submitted a request for accommodations on the

25 Step 2 CK examination, which is a written examination,

1    claiming that he had a reading disability, and when I asked

2    you that at your deposition you said you were not aware of

3    that?

4    A    And that is page what again?

5    Q    Is that true, that you were not aware that he had applied

6    for those accommodations for a reading disability on the Step

7    2?

8    A    And what page is that -- yes, I'll say yes.

9    Q    I'm happy to give you the page again.

10   A    Yes, that's okay.

11   Q    And then, continuing with that line, you admitted at your

12   deposition that you were, quote, "surprised that information

13   didn't come out some place in your evaluation," end quote.

14   Do you recall that testimony?

15   A    Yes.  Tell me the page on that again?

16   Q    Sure.  That's Page 233, Line 16.

17   A    Okay.

18           (Pause.)

19   Q    At Line 3 I asked --

20   A    Yes, yes.

21   Q    I quoted your testimony correctly --

22   A    Sure, yes.

23   Q    -- did I not?

24   A    Yes.

25   Q    Take a look at Exhibit 3 in the binder in front of you.

1  A   Okay.

2           (Pause.)

3  A   Okay.

4  Q   During your deposition you discussed this letter that is

5  at Tab Exhibit 3 that Mr. Hartman had submitted; do you

6  recall that discussion?

7  A   Uh, let me read this over and I'll tell you.

8  Q   Sure.  I'll be asking you actually about the last two

9  sentences --

10  A   Oh, okay.

11  Q   -- but take your time, this isn't a race.

12  A   Why don't you ask me about the last two sentences?

13  Q   This is a personal statement that Mr. Hartman submitted

14  to the NBME in support of his first request for

15  accommodations on the Step CS examination.

16  A   Okay.

17  Q   And you would agree with me that Mr. Hartman didn't share

18  his personal statement with you before you prepared your

19  evaluation report, correct?

20  A   Uh, yes.

21  Q   He did not?

22  A   He did not.

23  Q   And directing your attention to the third full paragraph,

24  the last two sentences --

25  A   Okay.

1  Q   -- four lines up from the bottom.

2  A   Okay.

3  Q   Mr. Hartman states that his, quote, "medical school

4  granted him double time for the clinical examination" --

5  A   Okay, wait.  The third paragraph?  That's the last one,

6  right?

7  Q   Yes.

8  A   Okay.  The fourth line from the bottom?

9  Q   Yes.

10  A   "After undergoing" --

11  Q   "After undergoing a speech evaluation by a speech

12  pathologist" --

13  A   Okay, got it.  Okay.

14  Q   -- okay? -- "the medical school granted me double time

15  for the clinical examinations.  Even though I continued to

16  use the entire time for the examination, I was able to

17  complete the history and physical examination on the

18  patient."

19          Do you see that, Doctor?

20  A   Yes, I do.

21  Q   And you testified at your deposition, and these are your

22  own words, that that information, quote, "surprised you

23  greatly."  Do you recall saying that?

24  A   Tell me the line, I'd like to look at the context.

25  Q   Sure, it's Page 236.

1    A   Okay.

2            (Pause.)

3    A   Okay.  And I'm just going to go back and read the context

4    a second, okay?

5    Q   All right.

6            (Pause.)

7    A   Okay.

8    Q   And directing your attention to Page 236, Line 10 --

9    A   Okay.

10   Q   -- my question was, "And does it surprise you that in his

11   own words he is explaining to the NBME that he was able to

12   complete these oral examinations, including the oral

13   component and physical examination, with the accommodation of

14   double time?"

15           And you answered, "That surprises me greatly."

16   A   Yes.

17   Q   And it's fair to say that you would have liked to have

18   seen that information as part of your evaluation of Mr.

19   Hartman, correct?

20   A   Yes.

21   Q   In fact, you'll admit that you would have liked to have

22   studied that information further before you wrote your

23   evaluation report, correct?

24   A   That's a little bit of a difficult question to ask,

25   because I know that I was -- at the time of the evaluation, I

1   was assessing his speech at the current time and, you know,

2   this information would probably add a clearer picture to it

3   and I think it probably would have been helpful... especially

4   since you keep asking me how did I guess, so...

5   Q   Take a look at Page 235 of your deposition, please.

6   A   I see it, okay.

7            MR. WEINER:  I'm sorry, what page?

8            MS. LEOPOLD-LEVENTHAL:  235.

9   BY MS. LEOPOLD-LEVENTHAL:

10  Q   We had just been talking about that, the two lines of Mr.

11  Hartman's personal statement.  And at the bottom of the page

12  on Page 234 I asked you, "And was that information that you

13  would have wanted to assist you in completing a fuller

14  picture of Mr. Hartman and his past history with respect to

15  his stuttering condition and oral examinations?"

16           And you answered, "Yes, I would like to have seen

17  that and examined it a little bit further."

18           Do you agree that's what --

19  A   That was on Page 234, did you say?

20  Q   235 and 236.

21  A   235 and 236, gotcha.  Okay.

22           (Pause.)

23  Q   I have not misquoted your statement, have I, Dr.

24  Tetnowski?

25  A   No, you haven't.

1    Q    Certainly then, Dr. Tetnowski, we can agree that with

2    regard to Mr. Hartman's prior speech therapy and speech

3    treatment, his personal statement, his oral examinations at

4    Stonybrook, accommodations at Stonybrook and professor

5    evaluations of Mr. Hartman on his oral communication skills,

6    that this is all information that if you could do it over

7    again you would have wanted to have before you wrote the

8    evaluation report, correct?

9    A    Yes.  At the time I was writing the evaluation, I

10   evaluated his speech the way it is currently and, frankly, I

11   think that that's the most -- the most important issue.  A

12   lot of these other things add more -- more color to the

13   evaluation, add more completeness, more depth to it, yes, but

14   my goal at the time was certainly to evaluate his

15   communication at the current time.

16   Q    Sure.  And I wasn't asking you --

17   A    Yes, mm-hmm.

18   Q    -- to rank these items with your personal observations, I

19   was simply asking that isn't it true you would have wanted

20   this information too?

21   A    Sure.

22   Q    Because certainly, based on your own article and the code

23   of ethics, in conducting an ethno-graphic interview you want

24   to try to find as much information as you can, including

25   what's in the client's environment, correct?

1    A    As much information that is pertinent to the case at the

2    time, sure.

3    Q    Do you know that if Mr. Hartman passes his Step 2 CS exam

4    and the other licensing examinations, and then completes

5    medical school, that he will receive what is called an

6    undifferentiated license?

7    A    I know that because you told me that at the deposition,

8    yes.

9    Q    Do you know what an undifferentiated license is?

10   A    Yes -- well, as you explained it, that's my knowledge of

11   an undifferentiated license, yes.

12   Q    You understand that an undifferentiated license would

13   allow Mr. Hartman to establish a residency or take up

14   practice in any field, including surgery or psychology,

15   pediatrics, OB/GYN, radiology, pathology, is that correct?

16   A    Well, not psychology, but --

17            MR. WEINER:  Objection, objection.

18            THE WITNESS:  Okay.

19            THE COURT:  Excuse me just one moment.

20            (Pause.)

21            THE COURT:  All right.

22            MR. WEINER:  Defendant's Counsel had just requested

23   that Dr. Tetnowski testify about the licensing for medical

24   doctors, that's beyond Dr. Tetnowski's expertise -- not only

25   is it beyond his expertise, but what relevance that has.

1          THE COURT:  Well, I gather that the witness was

2     simply acquiescing to the information or characterization

3     supplied by Counsel.  I don't think the witness has contended

4     that he knows what a differentiated -- undifferentiated

5     license is.

6          MS. LEOPOLD-LEVENTHAL:  And of course we haven't put

7     any testimony on yet.  Certainly, we will have a witness who

8     will explain what an undifferentiated license is and what

9     impact that would have --

10          THE COURT:  I can't wait.

11          MS. LEOPOLD-LEVENTHAL:  Really?

12          (Laughter.)

13          MS. LEOPOLD-LEVENTHAL:  He's actually very

14     interesting, he may be the most flamboyant witness we have.

15          (Laughter.)

16     BY MS. LEOPOLD-LEVENTHAL:

17     Q   So that if Mr. Hartman ultimately becomes an emergency

18     room doctor, would you anticipate that he would use his text-

19     to-speech device during his residency in that field?

20          MR. WEINER:  Objection.  I don't think the Doctor --

21     Dr. Tetnowski is in a position to be able to testify what he

22     would use or intend to use.

23          MS. LEOPOLD-LEVENTHAL:  Well, actually at his

24     deposition he testified that he did believe he would use his

25     text-to-speech device in the emergency-room setting.

Tetnowski - Cross                          45

1              MR. WEINER:  That was at a deposition.

2              THE COURT:  That may be a demonstration of his lack

3    of expertise in the area.  Hah, see, that was like a joke.

4              (Laughter.)

5              THE WITNESS:  I was laughing on the inside.

6              THE COURT:  I think -- I don't think you need to get

7    that thought one way or another from this witness.

8              MS. LEOPOLD-LEVENTHAL:  I'm sorry, you do not think

9    so?

10             THE COURT:  He probably hasn't spent a great deal of

11   time administering an ER.

12             MS. LEOPOLD-LEVENTHAL:  That's fair enough.

13             THE COURT:  Okay.  Around now may be a good time for

14   us to have an afternoon recess, you tell me when is a good

15   time.

16             MS. LEOPOLD-LEVENTHAL:  I'll be finished in under

17   ten minutes.  So, if I could finish the cross-examination --

18             THE COURT:  You'll be through in ten minutes?

19             MS. LEOPOLD-LEVENTHAL:  Yes.

20             THE COURT:  All right.

21             MS. LEOPOLD-LEVENTHAL:  Ready?  I do not intend to

22   go over that.

23   BY MS. LEOPOLD-LEVENTHAL:

24   Q   You would agree with me that an emergency-room setting

25   can involve trauma situations, correct?

1            MR. WEINER:  Objection.

2            THE COURT:  Go ahead.

3            THE WITNESS:  Emergency-room situations can involve

4      trauma, sure.  I've been in the emergency room, that's my

5      experience with it.

6      BY MS. LEOPOLD-LEVENTHAL:

7      Q   And there are certainly settings in which a doctor might

8      find themselves where speed of communication is an important

9      facility to have, would you agree with that?

10     A   Speed of --

11           THE COURT:  Are you really asking this witness for

12     testimony of that proposition?

13           MS. LEOPOLD-LEVENTHAL:  I will withdraw that

14     question.

15           THE COURT:  Like the witness, I too have been in an

16     ER and in fact I would guess that might be a not uncommon

17     experience for others in the courtroom; I hope not, but...

18     BY MS. LEOPOLD-LEVENTHAL:

19     Q   Dr. Tetnowski, you don't know what legal standard applies

20     to the Court's decision of what accommodation Mr. Hartman

21     should be granted, do you?

22     A   The legal standard of his accommodation?

23     Q   Of what the Court is required to do now?  But you do

24     believe that --

25     A   No, I do not.

1  Q   -- you do believe that Mr. Hartman should receive

2  whatever accommodation best assures his success on the

3  examination, is that your --

4  A   Not best assures his success, the best represents his

5  abilities, that's all I would say.

6  Q   Okay.

7  A   I mean, if -- I won't say any more.

8  Q   Is it your belief, Dr. Tetnowski, that anyone who cannot

9  meet the goals of their life has a disability?

10         (Pause.)

11         THE COURT:  Would you repeat that question?

12         MS. LEOPOLD-LEVENTHAL:  Sure.

13         THE COURT:  Did I get it correctly, the idea is --

14  BY MS. LEOPOLD-LEVENTHAL:

15  Q   Anyone who cannot meet the goals of their life has a

16  disability?

17  A   Anyone who cannot meet the goals of their life --

18         MR. WEINER:  Your Honor, I'm going to object.

19  Counsel is asking for a legal determination of what a

20  disability is.  She objected when I asked that question

21  before, it was -- the objection was sustained --

22         THE COURT:  I think the objection is a proper one.

23         MS. LEOPOLD-LEVENTHAL:  The witness did testify to

24  that at his deposition.  In fact, when I asked him whether --

25         THE COURT:  Maybe he was a member of the Bar at that

1  time, but he isn't now.

2          MS. LEOPOLD-LEVENTHAL:  No further questions, your

3  Honor.

4          THE COURT:  All right.  We'll take a 15-minute

5  recess.  You may step down.

6          (Court in recess; 3:41 to 3:42 o'clock p.m.)

7          (Sidebar discussion held off the record.)

8          (Court in recess 3:46 to 4:11 o'clock p.m.)

9          THE COURT:  Good afternoon, again.  Please sit down.

10  You may resume.

11          (Pause.)

12                    REDIRECT EXAMINATION

13  BY MR. WEINER:

14  Q    Good afternoon, Dr. Tetnowski.

15  A    Good afternoon.

16  Q    Dr. Tetnowski, is it significant that you did not review

17  Ms. McCafferty's records with respect to the purpose of your

18  evaluation?

19  A    Yes.

20  Q    It is significant?

21  A    I think so.

22  Q    And why is that?

23  A    Well, I just, you know, wanted to see what his speech was

24  like at the current time, I think that was the most pertinent

25  factor in speech -- in terms of fluency changes over a period

1   of time, so...

2   Q   Is it significant that you did not review Mr. Hartman's

3   medical school records?

4   A   Well, you know, once again, I thought I was evaluating

5   his stuttering.  You know, in hindsight, once again, it's

6   been brought up so many times in this case, I wish that I

7   had, but I hadn't and, you know --

8   Q   And is that -- when you say you should have reviewed the

9   records because you've been asked questions on it --

10  A   I've been asked questions about that, sure.

11  Q   -- was it significant in terms of determining the

12  severity of Mr. Hartman's speech dysfluency at the time that

13  you conducted it?

14  A   Well, no.  I mean, I was, you know, once again, hired to

15  evaluate his stuttering and that's what I did.

16  Q   And your evaluation was what it was like on the day you

17  evaluated it?

18  A   It was like in the day that I evaluated him, yes, mm-hmm.

19  Q   Did you review Ms. Oldomier's report prior to preparing

20  your report?

21  A   I had looked at her report, because Aaron had -- I mean,

22  I just really didn't pay attention to it.  I mean, I looked

23  at it very briefly and saw that he had been evaluated in the

24  past and, when I saw what the date was, just -- well, I

25  didn't --

1  Q    And I noticed that you hadn't mentioned Ms. Oldomier's

2  report in your report, is there a reason for that?

3  A    Well, because her report was from several years ago,

4  it -- my opinion was that it wasn't pertinent to the way his

5  speech was right now, the way it was today, or the day of the

6  evaluation, I would say.

7  Q    I would like you to take a look at Ms. Oldomier's report,

8  you can find it in Plaintiff's binder, which is the smaller

9  binder.

10 A    Sure.

11 Q    And it would be located under Tab 3.  And it would be

12 Pages --

13 A    Tab 3.

14 Q    I'm sorry, it's under Tab 2.

15 A    Okay, got it.  Okay.

16 Q    And it's from Pages 9 through 11.

17 A    Got it.

18          (Pause.)

19 A    Okay.

20 Q    Did -- in Dr. Oldomier's report, did she evaluate the

21 severity of Mr. Hartman's speech dysfluency?

22 A    In the section called, "Fluency," it looks like she did

23 an assessment of his speech fluency there.

24 Q    And what was her assessment in terms of the severity?

25 A    Well, according to -- it looks like the -- in terms of

Tetnowski - Redirect                        51

1   his fluency, it looks like that's the only test that she

2   conducted was that she said that he was a moderate in

3   severity, that he scored at the 48th percentile with a

4   severity rating of moderate.

5   Q    When you evaluated Mr. Hartman, in what percentile did he

6   fall?

7   A    I believe it was 96 to 99th.  Which exhibit is my report?

8   But I'm quite sure it was 96 to 99.

9   Q    Tab 16.

10  A    Tab 16.

11  Q    I'm sorry, it's at Tab 15.

12  A    15.

13           (Pause.)

14  A    Yes, 96 to 99th percentile.

15  Q    And is it your opinion that at the time of your

16  evaluation Mr. Hartman's condition was more severe than was

17  Ms. McCafferty -- I mean, excuse me, Ms. Oldomier had

18  evaluated?

19  A    Well, you know, again, I wasn't there, so I'll be

20  consistent with that.  But the scores are very different and

21  the severity of 96 to 99th percentile versus the 40th

22  percentile is a very different type of score.

23  Q    Are there any other differences in terms of your

24  evaluation of Mr. Hartman in December of 2009 versus Ms.

25  Oldomier's evaluation which occurred in 2007?

1    A    Yes.  Well, as I look at it now, she spent some time

2    doing an oral exam and a voice assessment and a speech

3    assessment, which is basically articulation assessment, and

4    then did a -- really only one measure of speech fluency,

5    which is the SSI-3.  So, my guess is that it's -- I would

6    guess that it's not as in-depth, because the SSI is really

7    based upon just upon three small speech samples.  So, I would

8    guess that mine was probably more in depth of his current

9    speech.

10   Q    In terms of her opinions, are there any differences

11   between your opinions?

12            (Pause.)

13   A    Yes, I think so, yes.

14   Q    What are some of the differences?

15   A    Well, the differences are is that she considers his

16   stuttering to be moderate and she also scored the duration of

17   his three longest speech blocks to be an average of three

18   seconds each.  You know, that's nothing close to what it was

19   like when I saw him on my evaluation in December.  And

20   certainly, as I have been speaking with him the last few days

21   here as well, on Monday and today, his blocks are

22   significantly longer than three seconds that she talks about

23   here.

24   Q    During your evaluation, what were the range of blocks

25   that you experienced?

                            Tetnowski - Redirect                    53

1   A    The formal -- or the in-clinic assessment, in-the-office

2   assessment, there was a range of like 27 seconds, 20 seconds,

3   21 seconds, 20 seconds, significantly longer.  The way this

4   SSI-3 is scored is you take the average of the three longest

5   blocks.  So, you know, the average of the three longest

6   blocks, you know, the simple math would say that nine

7   seconds, eight seconds could be the longest that one of them

8   could be if the average is three, so...

9   Q    And you said that your assessment of the blocks, the one

10  was done in-clinic, what about outside?

11  A    Outside of clinic, they were two minutes and longer.

12  Q    And is that a consider amount more in terms of severity

13  than what Ms. Oldomier wrote?

14  A    Significantly, and that would actually affect the score.

15  I know the way that this test is scored to a duration score

16  of eight.  You know, if you just change the length of the

17  durations, that's on an 18-point scale, to what Mr. Hartman

18  does on the day of the evaluation, that would change the

19  severity rating quite considerably.

20  Q    Ms. Oldomier notes, and this is on the second page, which

21  is Page 10, under Tab 2 --

22  A    Okay.

23  Q    -- "specifically this test showed that the frequency of

24  dysfluence speech occurred more in versus a reading task

25  versus spontaneous speaking tasks."  Do you see that?

Tetnowski - Redirect                                54

1   A    Yes, I do.

2   Q    Was that your experience when you evaluated Mr. Hartman?

3        (Pause.)

4   A    I think that there's a typo on her report, by the way.

5   But, specifically, this test showed the frequency of

6   dysfluence speech occurred more in what versus a reading

7   task, okay?

8   Q    Well, it seems --

9   A    More on a reading task than a spontaneous speaking task,

10  okay.

11  Q    Yes.

12  A    So, she said that he stuttered more in a reading task

13  than a spontaneous speech task.  Okay?  And if we look at my

14  stuff, he seemed to stutter more when he was doing

15  formulation tasks than reading tasks.

16  Q    And formulation tasks would be spontaneous speaking?

17  A    Well, if we look for example at sentencing reading versus

18  sentence formulation, the average was five at formulation,

19  three versus -- three during reading, the longest block 14

20  seconds versus six seconds in that.

21       THE COURT:  Are we looking at Page 3?

22       THE WITNESS:  On Page 3 of 9, yeah, on that -- it's

23  like the -- one, two, three, four -- fourth and fifth from

24  the bottom.

25       THE COURT:  Okay.

1          THE WITNESS:  But at the same time, you know,

2    reading a short paragraph was 20 seconds, dialogue 21

3    seconds.  They're both significant, I mean, way, way more

4    than the previous report.

5    BY MR. WEINER:

6    Q    And the previous report back in 2007, is that what you're

7    referring to?

8    A    Yes, uh-huh, yes.

9    Q    Why didn't you request the records from Mr. Hartman's

10   speech therapist?

11   A    Well, because I was evaluating his speech currently.  You

12   know, I asked him some questions regarding his history, but

13   the way his speech was in, you know, 2006, 2007, versus the

14   end of 2009, you know, can be greatly different and, you

15   know, I wanted to evaluate his speech today, not the way it

16   was three years ago.  I guess if I was seeing him for therapy

17   it might have been a different story, but we were assessing

18   him to see what his speech was like now.

19   Q    Now, if you were receiving Mr. Hartman as a patient in

20   order to do speech therapy, then Ms. McCafferty's records

21   would have been more important to you?

22   A    Well, I would have been more concerned with what had been

23   done in the past, yes.

24          (Pause.)

25   Q    In your deposition, can you turn to Page 51?  Line 16.

1          (Pause.)

2    Q    You were asked -- and let me know when you get there.

3    A    Sure, okay, I'm here.  Got it, okay.

4          MS. LEOPOLD-LEVENTHAL:  What page?  I'm sorry.

5          MR. WEINER:  Page 51.

6    BY MR. WEINER:

7    Q    You were asked about this particular passage on Page 51

8    and 52.

9    A    Yes, I see it.

10   Q    About the standard practice.  Can you explain, when you

11   were talking about standard practice, were you talking about

12   conducting an evaluation for your purpose or were you talking

13   about evaluating a person for the purposes of doing speech

14   therapy?

15   A    Well, I wasn't doing it for my purpose, I was doing it

16   for the purpose that Mr. Hartman had expressed and that he

17   wanted to evaluate how is speech was at the current time.  He

18   had a short time line and a short time window and that's what

19   I was looking at.

20   Q    The code of ethics that Counsel had referred to, is that

21   code of ethics referring to a treatment of a patient in

22   speech therapy?

23   A    It's the guiding code of practice for what we normally

24   do.

25   Q    And does that involve providing actual therapy?

1    A    It's providing therapy, yes, and evaluations as well.

2    Q    The records that Ms. Leopold-Leventhal had showed you

3    from Mr. Hartman's medical school --

4    A    Yes.

5    Q    -- where it stated generally that he was a good

6    communicator, he established a rapport, does that have any

7    impact on your opinion about the severity of Mr. Hartman's

8    speech dysfluency?

9    A    Well, what I do know is from when I evaluated him that he

10   is a very poor communicator.  I mean, I certainly didn't have

11   access to -- I don't know if I can say this or not, but if he

12   testified yesterday or if you met him, I think that it's very

13   obvious to all of us that he is greatly impaired as a

14   communicator.  And that may not have been the case two or

15   three years ago as well, so...

16   Q    In Defendant's Exhibit 3, I believe that's the personal

17   statement that defense counsel had referred to.

18   A    Okay.

19   Q    She had showed you the passage in there contained in the

20   last three lines, do you see that?

21   A    On the first page?

22   Q    Yes.

23   A    Okay.  Starting with, "After," correct?

24   Q    Yes.

25   A    Okay.

Tetnowski - Redirect                               58

1    Q    In your deposition at Page 236, I believe it was Lines 9

2    through 17, she had asked you about that passage and you had

3    stated at the deposition and you confirmed that here that you

4    were greatly surprised?

5              (Pause.)

6    A    Okay, I see that.

7    Q    What did you mean by that?  And you can certainly --

8              THE COURT:  I'm sorry, tell me what page we're on.

9              MR. WEINER:  I'm sorry, your Honor, Page 236,

10   starting at Line 9.

11   BY MR. WEINER:

12   Q    You had stated at your deposition and confirmed it here

13   that you were surprised greatly.  Did you go on in your

14   deposition to explain what you meant there?

15             (Pause.)

16   A    Yes.  I went on at -- it's on the bottom of 230 -- I'm

17   sorry, on the bottom of 236 and the top of 237, that frankly

18   I didn't know what his speech was like at the time when he

19   took any of these other exams.  Was that the question?  I'm

20   sorry.

21   Q    Yes.  I mean, why would it surprise you that he was able

22   to complete a history?

23   A    Well, because when I had observed him that his

24   communication skills were so -- that his stuttering was so

25   severe at the time and, you know, in my -- in my assessment

1    of his speech fluency, his stuttering is just really, really

2    severe.  And, you know, whatever he does, this -- it seems

3    like -- I'm wandering.  Why don't you redirect your question?

4    Q    I was just saying, you were surprised -- were you

5    surprised that he was able to finish his history, as you

6    stated in your deposition?

7    A    Well, right.  I mean, you know, the bottom line is, you

8    know, his speech was so severe at the time that I saw him

9    that I am surprised he could complete these tasks, yes, I was

10   surprised.

11   Q    And your surprise was based on your assessment in

12   December, not based on how he performed while he was in

13   medical school?

14   A    Well, that's all the information I had, of course, was

15   how he communicated with me now.

16   Q    The differences in severity between Ms. McCafferty -- Ms.

17   Oldomier's report and your report, is that something that

18   occurs with stutterers?

19   A    It can indeed happen with people who stutter that their

20   speech can vary from situation to situation and certainly

21   over periods of time, yes.

22            MR. WEINER:  I have nothing further, your Honor.

23            THE COURT:  Any recross?

24            MS. LEOPOLD-LEVENTHAL:  Very briefly recross -- or

25   redirect, your Honor.

Tetnowski - Redirect                    60

1           THE WITNESS:  Thanks.  5:35, okay, great.

2           MS. LEOPOLD-LEVENTHAL:  Three questions and we'll

3    get you out of here.

4           THE WITNESS:  Thanks.

5                        RECROSS-EXAMINATION

6    BY MS. LEOPOLD-LEVENTHAL:

7    Q    The day that you evaluated Mr. Hartman, that was one day

8    and you spent six hours with him?

9    A    That's correct.

10   Q    And you chose to ignore almost four years of medical

11   school and his history of communication in favor of the

12   information you elicited on one day, is that fair?

13   A    I think that I would quantify that by saying, the way his

14   speech was four years ago, it could be very different from

15   the way it was the day I evaluated him, yes.

16   Q    I understand that --

17   A    Yes.

18   Q    -- but you chose to ignore all of that information and

19   never asked for it in favor of what you elicited on that one

20   day, is that correct?

21   A    Well, that was the reason why I was doing the evaluation

22   was to evaluate it today.

23   Q    To see how he performed on one day, correct?

24   A    To see how he performed on -- at the current time period,

25   yes.

                         Tetnowski - Recross                    61

1    Q    Okay.

2             MS. LEOPOLD-LEVENTHAL:  Nothing further.

3             THE WITNESS:  Okay.  Thank you very much.

4             MS. LEOPOLD-LEVENTHAL:  Go catch your plane.

5             THE WITNESS:  Thanks.   Thank you, your Honor.

6             THE COURT:  Thank you.

7             (Witness excused.)

8             (Discussion held off the record.)

9             MS. LEOPOLD-LEVENTHAL:  Your Honor, can I finish

10   with Mr. Hartman's cross-examination?

11            THE COURT:  Please.

12            AARON L. HARTMAN, Plaintiff's Witness, Previously

13   Sworn, Resumed.

14            THE COURT:  Good afternoon, Mr. Hartman.  Please sit

15   down.

16            THE WITNESS:  Hello.  Thank you.

17            (Pause.)

18                   CONTINUED CROSS-EXAMINATION

19   BY MS. LEOPOLD-LEVENTHAL:

20   Q   Mr. Hartman, which schools have you interviewed with,

21   medical schools, for a residency program?

22            (Pause.)

23   A   I have interviewed at... I believe nine schools.  I

24   don't... I don't know... if I can... name all of them... but

25   they included Stonybrook.

Hartman - Cross                                              62

1   Q   Let me ask you this --

2   A   Sure.

3   Q   -- what were the last three you interviewed with?  You

4   identified six during your deposition, but I wasn't aware of

5   the additional three, if you know.

6   A   Could I review the deposition or --

7   Q   You don't have the last three interviews you had?  It's

8   fine if you don't, I just wasn't aware.

9   A   No, I don't know off the top of my head.

10  Q   Did you submit your rank order list to the National

11  Residency Matching Program, known as the NRMP?

12  A   Yes, I did.

13  Q   Have you withdrawn from that program?

14  A   No.

15  Q   Directing your attention to the Step 2 CS exam, you're

16  obviously familiar with what's included in the scope of that

17  examination, correct?

18  A   Yes.

19  Q   And during this examination you record information in

20  writing that you elicit from the standardized patient,

21  correct?

22          (Pause.)

23  A   Yes.

24  Q   And you would agree with me that your speech impairment

25  does not slow you down when you are recording written

Hartman - Cross                                                63

1    information on a piece of paper, correct?

2              (Pause.)

3    A    The... impairment... would not affect note-taking.

4    Q    Thank you.  And you would agree with me that the patient

5    encounters on the examination almost always include a

6    physical examination of the patient, correct?

7              (Pause.)

8    A    To my knowledge, but there are cases when this is not the

9    case.

10   Q    But for the most part they include a physical

11   examination, correct?

12   A    Yes, they do.

13   Q    And listen to my question:  If you are physically

14   examining a patient and not speaking during that physical

15   examination, you would agree with me that your speech

16   impairment would not slow you down in conducting that purely

17   physical examination?

18   A    Uh... say that... once... again, please?

19   Q    Sure.  If you are physically examining a patient --

20   A    Yes.

21   Q    -- but not speaking to the patient while examining them,

22   your speech impairment would not slow you down in conducting

23   that purely physical examination, correct?

24             (Pause.)

25             THE COURT:  I'm trying to imagine the scenario that

1   you're describing.  I mean, I understand the words that you

2   said --

3              MS. LEOPOLD-LEVENTHAL:  Sure.

4              THE COURT:  -- but I'm trying to think of -- there

5   are many scenes in which a physician is conducting a physical

6   examination without speaking to the patient, if the patient

7   is I suppose asleep or comatose, sure, but --

8              MS. LEOPOLD-LEVENTHAL:  You have a stethoscope,

9   you're listening to their heart, you have a blood-pressure

10  cuff, you are administering the cuff to determine what the

11  patient's blood pressure is; they're laying on a table,

12  you're examining different parts of their stomach; you might

13  be examining their knee for flexibility with a hammer.  I'm

14  sure there are more, but I -- those are a few that come to

15  mind.

16             THE COURT:  But --

17             MS. LEOPOLD-LEVENTHAL:  And I'm only asking whether

18  or not isn't it true that there are parts of the exam when he

19  is physically examining the standardized patient where he's

20  not speaking, he's eliciting physical information.

21             THE COURT:  Okay, you're talking -- all right, I

22  think I understand.  I suppose it's true that the blood-

23  pressure mechanism works, the doctor is saying, now I'm going

24  to take your blood pressure and it's an interval of two

25  minutes while the machine works.  Sure, okay.

1           MS. LEOPOLD-LEVENTHAL:  Okay.  And --

2           THE COURT:  I just wanted an instruction for myself

3    so I could visualize the scene that you had in mind.

4           MS. LEOPOLD-LEVENTHAL:  Sure, I'm trying to imagine

5    in my head.

6           THE WITNESS:  I just don't believe it would be

7    appropriate to physically examine a patient without speaking.

8           (Pause.)

9           THE WITNESS:  And, by that, I mean without

10   communicating with him.

11   BY MS. LEOPOLD-LEVENTHAL:

12   Q   And you would agree with me that each patient encounter

13   also includes the patient speaking to you, either responding

14   to your questions or conveying information directly to you

15   verbally, correct?

16   A   Yes, it does.

17   Q   And your speech impairment does not affect the speed at

18   which you hear and process another person's speech, is that

19   correct, Mr. Hartman?

20   A   Yes, it is.

21   Q   Mr. Hartman, you will hear whether you have been matched

22   for a residency program on March 18th, two weeks from today,

23   correct?

24           (Pause.)

25   A   Whether I hear what?

Hartman - Cross                          66

1    Q    You will learn whether you have been matched in the

2    residency program on March 18th, that's considered match day,

3    correct?

4    A    I will learn... which... program that I am matched with.

5    Q    And you will hear that on March 18th, correct?

6              (Pause.)

7    A    I will hear... where I match, yes, on that date.

8    Q    Correct.  And you could be matched on March 18th in a

9    residency program without passing the Step 2 CS examination,

10   correct?

11             (Pause.)

12   A    It is... possible.

13   Q    Mr. Hartman, please turn to Exhibit 15 of the Defendant's

14   binder, please?

15   A    Okay.

16             (Pause.)

17   Q    And you will agree with me that that is a communication

18   from the National Board of Medical Examiners dated September

19   29th, 2009 to you, correct?

20   A    It's from... Dr. Farmer.

21   Q    And you understand that Dr. Farmer works for the NBME?

22   A    Yes, absolutely.

23   Q    And the address that's identified on here, 30 Great Oak

24   Road, St. James, New York, is that your current address?

25   A    Yes.

1    Q    Was that your address in September of 2009?

2    A    Yes.

3    Q    And in the September 29, 2009 communication from Dr.

4    Farmer of the NBME you were offered double time as an

5    accommodation on the Step 2 CS examination, correct?

6    A    Yes.

7    Q    And as part of that accommodation did you understand that

8    you would be permitted to take the examination over two days

9    rather than on one day?

10   A    Just a minute, please.

11           (Pause.)

12   Q    Take a look at the bottom of the first paragraph.  It

13   indicates, "Due to the overall length of extended time" --

14   A    Yes, yes.

15   Q    And you understand that the standard administration for

16   the Step 2 CS is a one-day administration, not the two days

17   you have been offered, correct?

18           (Pause.)

19   A    Yes.

20   Q    And the first time you took the Step 2 CS examination in

21   June of 2009, you took it all in one day rather than over two

22   days, correct?

23   A    Yes, I did.

24   Q    And you would agree with me that you have elected not to

25   retake the Step 2 CS examination with the double-time

1   accommodation that the NBME has offered, correct?

2              (Pause.)

3   A   I...

4              (Pause.)

5   A   I did not feel that the accommodation was appropriate and

6   I chose not to accept it.

7   Q   And I understand that, but you could have chosen to

8   retake it with the double-time accommodation over two days at

9   any point in time after September 29th up through today,

10  correct?

11             (Pause.)

12  A   I don't know what their... schedule would allow me to do.

13  Q   But you do understand that there were probably dozens of

14  dates between September 29th and March 3rd where you could

15  have taken the examination, don't you, or are you disputing

16  that?

17  A   I accept that.

18  Q   And if you were to fail the Step 2 CS examination with

19  double time, that would be your second failure on this

20  examination, correct?

21             (Pause.)

22  A   Yes.

23  Q   And as a medical student at Stonybrook you are permitted

24  to take the Step 2 CS test at least three times, correct, Mr.

25  Hartman?

1           (Pause.)

2    A    To my knowledge, after taking it three times you are

3    subject to dismissal from medical school.

4    Q    So, you could take the Step 2 CS examination another two

5    times, correct?

6    A    Yes.

7    Q    And in fact you took the Step 1 examination, that written

8    exam, two times, right?

9           (Pause.)

10   A    Yes, I did.

11   Q    And you passed it the second time, didn't you?

12   A    Yes, I did.

13   Q    Please take a look at Plaintiff's Exhibit 15 -- actually,

14   it's Tab 15, Exhibit 17.

15   A    Plaintiff's you said?

16   Q    So, your best bet is to look at Exhibit 15.

17           (Pause.)

18   Q    Do you have that in front of you?

19           THE COURT:  Exhibit 15?

20           MS. LEOPOLD-LEVENTHAL:  Yes, your Honor.  It's Tab

21   15, but it's P-17 in the Plaintiff's binder.

22           (Discussion held off the record.)

23           MS. LEOPOLD-LEVENTHAL:  I'm sorry, it's Tab 17,

24   Exhibit 17.  It was an easy one.

25           THE WITNESS:  Okay, yes.

1    BY MS. LEOPOLD-LEVENTHAL:

2    Q    And this is a letter to you from Vice Dean for

3    Undergraduate Medical Education Chandron (ph.) from

4    Stonybrook, correct?

5    A    Yes, it is.

6    Q    And this letter is dated October 5th and it's sent to

7    your home address, correct?

8    A    Yes, it is.

9    Q    And do you believe you received this letter some time

10   within a few days of October 5th, 2009, Mr. Hartman?

11   A    Yes, I did.

12   Q    And I would direct your attention to Bullet Point 3 on

13   Page 1 and ask that you read that through, please.

14            (Pause.)

15   A    Yes, I read it.

16   Q    And according to this letter at least from Vice Dean

17   Chandron, as provided for in the second sentence, you had to

18   take -- in order to graduate this May, you would have had to

19   have taken the Step 2 CS examination by September 15th, 2009,

20   correct?

21            (Pause.)

22   A    Normally, yes, but due to my lawsuit the school said they

23   would extend this.

24   Q    Do you have a letter from Stonybrook which indicates

25   that, Mr. Hartman?

1          (Pause.)

2   A   I... I spoke with them, but I have no letter.

3   Q   Were you nervous when you took the Step 2 Clinical

4   Knowledge examination, the written examination, Mr. Hartman?

5   A   Yes, I was.

6   Q   Do you recall the week that you took the Step 2 CS

7   examination the first time in June of 2009?

8          (Pause.)

9   A   Yes, I do.

10  Q   And in fact you chose to take the Step 2 CK examination

11  and the Step 2 CS examination the exact same week in June of

12  2009, correct?

13         (Pause.)

14  A   Yes.  I felt that it would help me to study for the Step

15  2 CS exam.

16  Q   In fact you took those two anxiety-ridden examinations

17  four days apart from one another, correct?

18  A   Yes, I did.

19  Q   Finally, Mr. Hartman, you testified yesterday, and I will

20  be quoting your exact words, that if you don't pass the Step

21  2 CS examination that you will be, quote, "denied from

22  entering a residency program," end quote.  Do you recall

23  making that statement yesterday in court?

24  A   If I said that, I would clarify that... to my...

25         (Pause.)

1    A    ... to my knowledge that the pathology programs require

2    it, the ones that I applied to.

3    Q    I didn't understand the computer.

4    A    The... to my knowledge, the pathology programs that I

5    applied to require it.

6    Q    Required you to pass the Step 2 CS examination?

7    A    Yes.

8    Q    My question was, you testified that you would be denied

9    from entering the residency program, but the truth is you

10   might just be delayed, you wouldn't be denied?

11   A    I'm confused.

12         THE COURT:  I guess I'm not -- could you clarify the

13   question for me?  Maybe Mr. Hartman gets it.  The distinction

14   between denied and delayed is -- that you're making is that

15   denial imports forever being foreclosed and delayed means

16   maybe a year or six months or something --

17         MS. LEOPOLD-LEVENTHAL:  Exactly.

18         THE COURT:  -- is that the distinction?

19         MS. LEOPOLD-LEVENTHAL:  That's my point.  Thank you,

20   your Honor.

21         THE COURT:  Okay.

22   BY MS. LEOPOLD-LEVENTHAL:

23   Q    So, as a final question I would say then, failure to take

24   or pass the Step 2 CS examination in the next several months

25   wouldn't deny or preclude you from entering a residency

1    program in 2011, for example, is that correct?

2              (Pause.)

3              THE COURT:  And I hope I didn't sound fussy, Ms.

4    Leopold-Leventhal, I just wanted to be sure that I was on

5    whatever wavelength you were projecting, that's all.

6              (Pause.)

7              THE WITNESS:  Maybe I am confused by your question,

8    but I disagree with you -- I disagree with you.

9    BY MS. LEOPOLD-LEVENTHAL:

10   Q   Well, if you take and pass the Step 2 CS examination in

11   August or September, for example, you could certainly apply

12   to the match program to begin a residency program in the

13   summer of 2011, correct?

14             (Pause.)

15   A   If I... if I pass it, then I could start the program.

16   Q   Thank you.

17             MS. LEOPOLD-LEVENTHAL:  No further questions, your

18   Honor.

19             (Pause.)

20                    REDIRECT EXAMINATION

21   BY MR. WEINER:

22   Q   Defense counsel had brought up that you requested

23   accommodations for a reading disability, do you recall your

24   testimony in that area?

25   A   Yes, I do.

1    Q    Did you receive accommodations for a reading disability

2    in medical school?

3            (Pause.)

4    A    Yes, I did.

5    Q    In order to receive those accommodations, did you have to

6    go to an individual who conducted a psycho-educational

7    evaluation?

8    A    Yes, I did.

9    Q    And did you go to a psychologist for a psycho-educational

10   evaluation?

11   A    Yes, I did.

12   Q    And how did it come to pass that you -- how did it come

13   to pass that you chose a particular psycho-educational

14   evaluator?

15   A    The medical school had chose her for me.

16   Q    So, this isn't someone who you had any type of a personal

17   relationship with?

18   A    No, not at all.

19   Q    Had you ever been to the person who conducted the psycho-

20   educational evaluation?

21   A    No, I did not.

22   Q    This was someone who was set up by your own medical

23   school?

24           (Pause.)

25   A    Yes.  In fact, they paid for the entire cost.

1  Q   And, based on the results of that psycho-educational

2  evaluation, did your medical school provide you with the

3  accommodations for a reading disability?

4  A   Yes, they did.

5  Q   So, when defense counsel suggested that your request for

6  an accommodation was disingenuous, do you disagree with that?

7  A   Not at... all.

8  Q   And the evaluator that you went to for the reading

9  disability, that evaluator was aware that you had never

10  received previous accommodations for a reading disorder?

11  A   Correct.

12      (Pause.)

13  Q   In Defendant's Exhibit 3, this is the personal statement

14  that was discussed on Dr. Tetnowski's...

15  A   Yes.

16  Q   Excuse me a minute.

17      (Pause.)

18  Q   In the final three lines where you're discussing that you

19  were able to complete the history when granted double time,

20  do you see that portion?

21  A   Yes, I do.

22  Q   During what time frame were you talking about when you

23  were able to complete the history with double time?

24      (Pause.)

25  A   During my third year of medical school, approximately.

1    Q   What year did this take place?

2            (Pause.)

3    A   2007.

4    Q   And the -- your approval of the double time in medical

5    school, was that based on Ms. Oldomier's report?

6    A   Yes, it was.

7    Q   And that report was done in 2007?

8    A   Yes, it was.

9    Q   During cross-examination there was a letter given to you,

10   a letter that you reviewed which indicates that the CPX is

11   designed to be similar to Step CS, do you recall that letter?

12           (Pause.)

13   A   Yes, I do.

14   Q   Are there ways in which the CPX is different from the

15   Step CS examination?

16   A   There's a lot.  The... the... actors who were assessing

17   me I had... seen... throughout medical school.

18   Q   And why is that significant?

19   A   Well... for me, the more that I've known... someone,

20   the... easier it is to... speak... with them.

21   Q   Other than that one difference where the standardized

22   patients in the CPX --

23   A   Yes.

24   Q   -- were familiar to you, were there any other differences

25   between the CPX and the Step 2 CS?

1   A    The way that they are scored is not the... same.  They

2   don't have this... SEP portion.

3   Q    And that's the Standard English Proficiency portion?

4   A    Yes, it is.  Also, if you do poorly in one area...

5   it's... averaged out.  However, in the... Step 2, if you fail

6   any area... you fail the whole thing.

7   Q    And when you took the CPX examination there was one area

8   in which you performed below the mean, is that correct?

9   A    Yes, it was the physician... patient interaction.

10  Q    And is that a similar subsection to the Step CS

11  examination which -- in which the subsection is the CIS?

12  A    Yes, it is.

13  Q    And is the CIS the section, the only section on which you

14  failed in the Step CS examination?

15  A    Yes, it is.

16  Q    And is the CIS the section, the only section on which you

17  failed in the Step 2 CS examination?

18  A    Yes, it is.

19  Q    And if the scoring of the CPX was similar to the way the

20  scoring is done for the Step 2 CS, you would have in fact

21  failed the CPX, is that correct?

22        MS. LEOPOLD-LEVENTHAL:  Objection, your Honor, I

23  don't know how he can draw that conclusion.

24        THE COURT:  Well, Counsel is putting the question,

25  it's up to Mr. Hartman to tell whether Mr. Weiner has got it

1   right or not.

2   BY MR. WEINER:

3   Q   Can you draw that conclusion?

4           (Pause.)

5   A   I would have... failed it, yes.

6   Q   Is that because they -- on the CPX they average out your

7   performance?

8   A   Yes, that's right.

9   Q   And during cross-examination defendant's counsel had

10  asked you if it was possible that you failed because you made

11  a wrong diagnosis, do you recall that questioning?

12  A   Yes, I do.

13  Q   And what was your response?

14          (Pause.)

15          THE COURT:  I'm sorry, are you asking what Mr.

16  Hartman's response was?

17          MR. WEINER:  Yes, I'm sorry.

18  BY MR. WEINER:

19  Q   Do you recall what your response was?

20          (Pause.)

21  A   Yes.  I said that, given... given my training and the

22  pass rate on this examination, I think it is very unlikely.

23  Q   And why was it unlikely?

24          (Pause.)

25  A   The pass rate is close to 97 percent.

1    Q    You also were asked whether it was possible that you

2    failed the Step 2 CS because you asked the wrong type of

3    questions; do you recall what your answer was to that?

4              (Pause.)

5    A    I believe that with the training that I received in

6    medical school I knew the right questions to ask.

7    Q    And were you able to demonstrate your proficiency

8    throughout all of medical school asking those type of

9    questions and making the type of diagnoses that you were

10   required to do on the Step 2 CS?

11             (Pause.)

12   A    I was not able to show my true ability.

13   Q    And why is that?

14             (Pause.)

15   A    Due to my speech dysfluency.

16   Q    Now, defense counsel had pointed out that you had failed

17   the Step 1 examination, is that accurate?

18   A    Yes, it is.

19   Q    In what year of medical school did you take the Step 1?

20   A    At the end of my second year.

21   Q    So, your experience in medical school was only for two

22   years at that point?

23   A    Yes.

24   Q    I would like you to turn to Tab 20 of Plaintiff's binder.

25             MR. WEINER:  And I believe, your Honor, that's going

1  to be in the exhibits that I... I labeled that as Exhibit 18.

2            THE COURT:  Exhibit 18?

3            MS. LEOPOLD-LEVENTHAL:  What tab is that?

4            MR. WEINER:  It is Tab 20.

5            THE COURT:  What --

6            MS. LEOPOLD-LEVENTHAL:  It's 19.

7            THE COURT:  -- where is it?  I'm sorry.

8            (Discussion held off the record.)

9            THE COURT:  I'm sorry, it's 18?

10            MR. WEINER:  This would be Exhibit 19.

11            THE COURT:  19.

12            MS. LEOPOLD-LEVENTHAL:  And which tab?

13            MR. WEINER:  And it's Tab 20.

14  BY MR. WEINER:

15  Q    Is this a copy of your medical school records?

16  A    Yes, it is.

17  Q    And this is similar to some of the records that were

18  provided to you by defense counsel during your cross-

19  examination?

20  A    Yes, they were.

21  Q    Could you turn to Page 3 of 8?

22            (Pause.)

23  A    Okay.

24  Q    Towards the bottom under, "Ambulatory Care," where it

25  says, "Course Director's Comments," do you see where I am?

1   A    Okay, yes.

2   Q    It says, "Aaron is a hardworking and conscientious

3   student.  He is insightful and added thoughtful questions and

4   observations to classroom discussions.  He also provided

5   mature feedback on our didactic session topics.  I had the

6   opportunity to observe Aaron during his ASCI (ph.) on both

7   the diabetic and geriatric patient.  His difficulties with

8   speech made it hard for him to take a comprehensive history

9   from a standardized patient."

10          Do you see that in the report?

11  A    Yes, I do.

12  Q    Defense counsel didn't bring that to your attention when

13  she was asking you about questions on ambulatory -- your

14  performance on ambulatory care, do you recall that?

15  A    She... she did not.

16  Q    And was that even contained in the records that defense

17  counsel had put in front of you?

18  A    No, it was not.

19  Q    In the same exhibit, Page 5 of 8, and I'm looking under,

20  "Third OB/GYN"?

21  A    Okay.

22  Q    Under the portion where it says ASCI it says, "His

23  patient satisfaction score ranged from good to very good.

24  His patient-physician interaction score ranged from fair to

25  very good on the ASCI exam."

1          Were you asked about that particular portion?

2          THE COURT:  I think I'm missing what page you're on.

3          MR. WEINER:  It's Page 5 of 8 under Tab 20, your

4    Honor.

5          THE COURT:  Oh, Page 5.  Okay, all right.

6          (Pause.)

7          THE WITNESS:  She... had not... mentioned it.

8          MR. WEINER:  That's all I have, your Honor.

9          THE COURT:  All right.

10         (Pause.)

11         THE COURT:  Was there any recross?

12         MS. LEOPOLD-LEVENTHAL:  No, your Honor.

13         THE COURT:  All right.  You may step down, Mr.

14   Hartman.  You had a marathon examination.

15         THE WITNESS:  Thank you.

16         (Witness excused.)

17         THE COURT:  I take it it's time for us to recess.

18         MR. WEINER:  Well, I would say that plaintiff rests

19   at this time and I request for the admission to move in and

20   admit all of the exhibits we presented.

21         THE COURT:  Am I right that there are no exhibits,

22   no proposed exhibits that the defense objects to?

23         MS. LEOPOLD-LEVENTHAL:  No objection, your Honor.

24         THE COURT:  Thank you.  All right, your exhibits

25   will be admitted.  And we will resume tomorrow morning here

1    in this courtroom at 11:30.  I think I said that after lunch

2    we'll have to move to the 12th floor, that will be a

3    satisfactory courtroom as well.

4              Thank you all and we're in recess.

5              MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

6              MR. WEINER:  Thank you, your Honor.

7              (Court adjourned at 5:26 o'clock p.m.)

8                              *  *  *

84

1                              I N D E X

2    PLAINTIFF'S WITNESSES      DIRECT  CROSS  REDIRECT  RECROSS

3    John Tetnowski (Resumed)

4      By Ms. Leopold-Leventhal          3                60

5      By Mr. Weiner                           47

6    Aaron L. Hartman (Resumed)

7      By Ms. Leopold-Leventhal         61

8      By Mr. Weiner                           73

9                           *   *   *

CERTIFICATION


        I hereby certify that the foregoing is a correct

transcript from the electronic sound recording of the

proceedings in the above-entitled matter.




s:/Geraldine C. Laws, CET      Dated 3/19/10
Laws Transcription Service