IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

AARON L. HARTMAN           :  CIVIL ACTION NO. 09-5028
                                :
          v.             :  Philadelphia, Pennsylvania
                                :  March 4, 2010
NATIONAL BOARD OF MEDICAL   :  11:47 o'clock a.m.
EXAMINERS                  :
. . . . . . . . . . . . . . . .

PRELIMINARY INJUNCTION HEARING - DAY 4
BEFORE THE HONORABLE LOUIS H. POLLAK
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiff:       CHARLES WEINER, ESQUIRE
                          Law Offices of Charles Weiner
                          179 North Broad Street
                          Doylestown, PA  18901

For the Defendant:       JANE E. LEOPOLD-LEVENTHAL, ESQUIRE
                          Eastburn & Gray, PC
                          60 East Court Street
                          P.O. Box 1389
                          Doylestown, PA  18901

ESR Operator:            Megan McDevitt

Transcribed By:         Jo-Anne L. Hutt,
                          Laws Transcription Service

- - -

(Proceedings recorded by For the Record Gold digital sound
recording; transcript provided by above transcription
service.)

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

1                    (The following occurred in open court at 11:47

2      o'clock a.m.)

3                    MR. WEINER:  Good morning, your Honor.

4                    THE COURT:  How are you today?  Please sit down.

5                    MS. LEOPOLD-LEVENTHAL:  Good morning, your Honor.

6                    (Discussion held off the record.)

7                    THE COURT:  All right.  We now move to defendant's

8      case as I understand it?

9                    MS. LEOPOLD-LEVENTHAL:  Yes, I understand that the

10     plaintiff has rested, and before beginning our case, I would

11     like to, with your Honor's permission, make a motion to

12     dismiss the preliminary injunction, if the Court will

13     indulge?

14                    THE COURT:  Well, if you want to argue it, I mean --

15                    MS. LEOPOLD-LEVENTHAL:  Yes, please.

16                    The standards, of course, are rather explicit, and

17     certainly the plaintiff and the defendant agree upon the

18     standards.  And what the Court needs to consider and

19     evaluate, in addressing whether or not the plaintiff has met

20     his burden in establishing the elements for injunctive

21     relief, the first, of course, is the likelihood of success on

22     the merits.

23                    THE COURT:  Right.

24                    MS. LEOPOLD-LEVENTHAL:  And the focus here, and I

25     believe the focus of the plaintiff's case has been, Mr.

3

1    Hartman would like this Court to order, and for the NBME to

2    be required, to give him his preferred accommodations.

3         What is required under the law is that Mr. Hartman

4    be given reasonable accommodations.

5         Now, anyone taking any sort of examination would

6    like to have whatever accommodation it is that would best

7    assure that individual's success on that examination.

8    Unfortunately, that is not what the law requires.

9         We heard Dr. Tetnowski explain that when Mr. Hartman

10   first came to him, Mr. Hartman had the text to speech device

11   already.  He was asked to evaluate his speech.  And

12   ultimately Dr. Tetnowski recommended that Mr. Hartman be

13   permitted to use that device, because that device would best

14   assure Mr. Hartman's success on the examination.

15        And in evaluating what is a reasonable

16   accommodation, as compared with the preferred accommodation,

17   we have to look at Mr. Hartman's past.  He spent four years

18   in medical school, and by his own admission, he evaluated, he

19   examined, he spoke with dozens upon dozens of patients in

20   every different specialty that was required in medical

21   school.  And he did that with the exception of three patients

22   with whom he did use the text to speech device, only with the

23   use of his spoken language.

24        In addition, Mr. Hartman testified that he is now

25   engaged in, participated in, nine different interviews with

4

1    nine different medical schools for residency programs.  By

2    his own admission, he utilized the text to speech device for

3    only one of those nine residency interviews, and this was all

4    during the period of time where Mr. Hartman testified that he

5    believes his speech dysfluency has been at its most severe.

6              And so you have to ask yourself, Why is it that Mr.

7    Hartman has come to this court and asked for an accommodation

8    different from the one he's used throughout his entire life,

9    which has been more time, and is asking this Court to order

10   something completely different?  And that is because he is

11   looking for whatever accommodation it is that will best

12   assure that he succeeds on the Step 2 CS examination.

13             Unfortunately, that's not the standard.  The

14   plaintiff possesses a very heavy burden.  He is asking this

15   Court to enter a mandatory injunction.  This injunction would

16   not maintain the status quo, but it would alter the status

17   quo.  He's asking you to order something that's going to

18   change where we are today.

19             And in addition to establishing likelihood of

20   success on the merits, which we do not believe he has come

21   close to meeting, the plaintiff is also required to establish

22   some sort of irreparable harm.  In the plaintiff's brief, in

23   support of their injunction request, they suggest that this

24   element is presumed.  That this Court should presume that

25   because the NBME clearly violated a statute.

1          I would submit that that is not the case, and we are

2    required to analyze what the actual irreparable harm is that

3    the plaintiff is suggesting he will suffer.  And I listened

4    to his direct examination very closely, and he brought up two

5    elements.

6          The first was, I believe, that he believed he would

7    be required to pay an additional $25,000 to maintain his

8    status in medical school, in order to then take the Step 2 CS

9    examination and endeavor to pass that.  And that was the

10   first element of the harm.

11         The second, and I believe the plaintiff's focus, is

12   that if this Court doesn't grant this injunction at this

13   time, Mr. Hartman will be delayed.  Not denied, but delayed,

14   and that's a huge distinction from entering into his

15   residency program.

16         We've talked a little bit about March 18th.  March

17   18th is the match day.  They call it match day, March 18th.

18   That's the day that Mr. Hartman, and all of the other

19   applicants for residency programs across the country, will

20   find out whether or not they have been matched into a

21   particular residency program.

22         March 18th is two weeks from today.  Nothing about

23   this proceeding, these hearings, or the Step 2 examination is

24   going to impact or effect match day.  Mr. Hartman has done

25   everything he needs to do, including participation in the

6

1    interviewing process in order to be matched on March 18th.

2    Regardless of his having passed or failed the Step 2 as of

3    that date, he will know whether he has been matched in a

4    program.

5            Now, of course, he will have to ultimately pass the

6    Step 2 CS examination in order to begin the residency program

7    in July, but I'd bring up that point because there's no magic

8    to the date of March 18th, which is two weeks from today.

9            When we talk about delay in entering a profession,

10   delay in entering a professional school, there are many,

11   many, many Federal Court decisions which have addressed this

12   exact issue, and they have all agreed that delay in entering

13   a profession, or delay in beginning law school or medical

14   school, does not constitute irreparable harm.

15           Added to that in this case, we have a plaintiff, who

16   in his first year of medical school, testified he had family

17   issues with respect to a grandmother who was in poor health.

18   He ultimately withdrew from the first year of medical school,

19   receiving incompletes in his courses, and he delayed his own

20   completion by a full year.

21           In addition to that, Mr. Hartman testified that he

22   failed the internal medicine written examination in medical

23   school, and that also delayed his completion another four

24   months, which I guess is another half a year.  So by his own

25   conduct, and his own decisions, Mr. Hartman, himself, has

1    delayed his entering into the residency program.

2           And that's important, but that's not the issue.  The

3    issue is what is the legal standard, and the legal standard

4    doesn't require or doesn't allow a court to find that a

5    plaintiff has been irreparably harmed simply because he will

6    be delayed in entering a particular program.

7           Added to that is the fact that the NBME has offered

8    Mr. Hartman now double time accommodations.  Mr. Hartman

9    testified that in medical school he received double time or

10   time-and-a-half.  He took the exam with time-and-a-half, he

11   didn't pass.  He passed two of the two subcomponents.  He's

12   now been offered double time, and it is his choice, his

13   election, that he didn't any time after September 29th, when

14   this was offered to him, opt to take that examination, and

15   see how he made out with the double time.

16          Yes, it's not great to fail the examination one or

17   two times, and then pass it on the third, but you have that

18   opportunity, and he already didn't pass it the first time.

19   He chose to --

20          THE COURT:  If you don't pass it on the third,

21   you're in substantial difficulty, are you not?

22          MS. LEOPOLD-LEVENTHAL:  Not necessarily, and we

23   don't have anyone here from Stoneybrook.  The letter from

24   Stoneybrook, which has been introduced into evidence says,

25   It's possible that you'll be thrown out, but you can ask for

1    a waiver of that.

2          My suspicion is that given Mr. Hartman's speech

3    dysfluency, he might just be able to get that waiver, but I

4    can't guess at that.

5          But what really is the harm in taking the test a

6    second time with the double time?  The same accommodation

7    you've had throughout your life and the same assistive

8    device, that is additional time.

9          Mr. Hartman had 15 minutes under a standard

10   administration.  He was given another seven-and-a-half

11   minutes as an accommodation.  NBME offered to double that.

12         And what I tried to illustrate yesterday is that the

13   Step 2 CS exam includes a lot of different components.  Yes,

14   one of those involves Mr. Hartman speaking.  Another

15   components involves the standardized patient speaking to him.

16   That's not slowed at all by his speech.  It involves Mr.

17   Hartman recording information.  That aspect isn't slowed by

18   his speech.  Diagnostic examinations.  That isn't slowed by

19   his speech.  So a double time accommodation gives him twice

20   as much time really to address only one of the many

21   components that are included in that examination.

22         And, so, I think it's important and illustrative

23   that Mr. Hartman has decided not to take the examination, and

24   I suppose they'll say he didn't want two strikes against him,

25   but to come to this Court and ask you to order a mandatory

1    injunction, without having first taken that step, is not

2    responsible.

3              THE COURT:  Well, let me inquire.

4              What is the defendant's rationale for providing

5    double time?

6              MS. LEOPOLD-LEVENTHAL:  The defendant's rationale

7    for providing either time-and-a-half or double time is they

8    have concluded that Mr. Hartman has a disability.  And they

9    have evaluated what the most reasonable way to accommodate

10   that disability is without altering the examination.

11             So, for example, if the NBME decided to give Mr.

12   Hartman, you know, quadruple time, or an hour for each

13   patient encounter, that, they will testify, would alter the

14   examination.  That is not going to mimic a patient-doctor

15   encounter.  So there's a point at which it becomes

16   unreasonable to allow additional time.

17             But as you will hear, there have been other test-

18   takers who have had a stutter, and they have been

19   accommodated with additional time only.  That's the only

20   accommodation that anyone with a stutter has received.  And

21   their rationale is that the double time does not alter that

22   examination.  Does not alter the skills.  Does not alter it

23   so much that it's no longer evaluating what its supposed to

24   evaluate, and --

25             THE COURT:  That leads me -- your response -- it

1   leads me to think that I really have to hear your witnesses.

2   That I can't decide the motion just on the basis of what's

3   before me on the plaintiff's case.

4           MS. LEOPOLD-LEVENTHAL:  That's fair enough.

5           And if I could just make my final point, which is

6   the last element that the injunctive cases examine is, Does

7   the public interest favor this?

8           The entire focus or thrust of the plaintiff's case

9   so far has been on Mr. Aaron Hartman.  The United States

10  medical licensing examinations aren't designed to help a

11  test-taker.  They're not designed for doctors.  They're not

12  designed for any particular person.  This is an examination

13  that is then, once you pass it, submitted to the State

14  Licensing Boards.  The licensing boards then rely upon this

15  examination to conclude that you have demonstrated the skills

16  necessary to be a physician.

17          The entire focus of this case has been on Mr.

18  Hartman, but the public interest here is really what is at

19  the heart of this case, and what our witnesses are going to

20  testify about.  So the focus is not on whether this is or

21  isn't fair to Mr. Hartman, but what are we doing to the

22  public in licensing a physician, giving them now a ticket to

23  practice medicine, when they haven't met the minimum

24  competencies.

25          And that's the balance.  That's the evaluation.  And

1  I heard nothing in the plaintiff's case about what impact

2  granting this accommodation is going to have on the general

3  public who now has a physician who's been licensed and who we

4  maintain would be licensed, having been given a preferred

5  accommodation, that fundamentally alters the entire

6  examination.  Mr. Hartman would then have a license to

7  practice any type of medicine he wanted, really having passed

8  the examination through an accommodation that just isn't

9  representative.

10          THE COURT:  Would it not be up to the licensing

11  agencies, in the various states, to determine whether a score

12  received by Mr. Hartman, with his accommodation, qualified

13  him in that state, an applicant for a medical license?

14          MS. LEOPOLD-LEVENTHAL:  No.  All they will see is

15  pass and they will assume --

16          THE COURT:  Why?

17          MS. LEOPOLD-LEVENTHAL:  I'm not sure I understand

18  your question.

19          THE COURT:  I mean, when you say, All they'll see is

20  passed, they'll be no description of the --

21          MS. LEOPOLD-LEVENTHAL:  No.

22          THE COURT:  -- task?

23          MS. LEOPOLD-LEVENTHAL:  No.

24          THE COURT:  Why not?

25          MS. LEOPOLD-LEVENTHAL:  And oftentimes, you know,

1   applicants have a condition -- let's say ADHD -- and they ask

2   for additional time on Step 1 or Step 2, and they're granted

3   time-and-a-half or double time in order to take that test.

4   And plaintiffs scream and yell about not wanting anything on

5   the examination to reflect that they passed this examination

6   through the aid of some sort of accommodation.  They want a

7   pass.  They don't want to star next to it saying, Well, he's

8   not really qualified.  He has ADHD and we gave him

9   time-and-a-half.

10          All they receive is a pass.  And all the licensing

11   boards, the State Licensing Boards will receive in this case

12   is a P.  He passed the examination.  That's it.  And they

13   rely upon that, of course.

14          THE COURT:  When the examination results are sent to

15   the medical school, and/or to the licensing agencies, and

16   perhaps -- I don't know -- perhaps also to residency

17   programs.  I don't know how large an audience, but I'm sure

18   I'll learn, the exam results have.

19          But let's consider just the report to the medical

20   school.  As I understood what you just said, all that's

21   reported is -- well, it's pass or it's failed.

22          If a pass is reported for a student who -- whether

23   it's Mr. Hartman or any other student -- who has received an

24   accommodation of time-and-a-half or double time, is that not

25   disclosed to the recipients of the score?

13

1          MS. LEOPOLD-LEVENTHAL:  The score indicates there

2    was an accommodation and that's it.  That could mean you were

3    hearing impaired and had a special device for your ear.  It

4    could mean a whole host of auxiliary devices, or aids, or

5    other accommodations, but there's no description, so...

6          THE COURT:  All right.  I assume that if there were

7    inquiries by the recipient of that report, as to what the

8    nature of the accommodation was, there would be a response?

9    That information would be disclosed?  Or is that something

10   we'll hear about?

11         MS. LEOPOLD-LEVENTHAL:  I think that's probably

12   something we'll maybe hear about.  I'm not sure I know the

13   answer to that.

14         THE COURT:  I see.  Well, this has been a very

15   helpful conversation so far, but as I say, it already

16   persuades me that I need to hear some witnesses that you've

17   brought.

18         MS. LEOPOLD-LEVENTHAL:  Thank you for hearing me

19   out, your Honor.

20         Before I call my first witness, Dr. Katsufrakis, I

21   did refer to a few exhibits during my cross-examinations of

22   Mr. Hartman and Dr. Tetnowski that I would like to move into

23   evidence at this time.

24         Tab 20 in Defendant's Exhibit Binder will be D-1.

25   And if you'd like me to describe the exhibits, I can, or

14

1   simply give you the numbers.

2           THE COURT:  I think it would enough to have the

3   numbers.

4           MS. LEOPOLD-LEVENTHAL:  Tab 21 --

5           THE COURT:  I'm assuming that Mr. Weiner's in a

6   position to let me know as we go along if there's anything

7   that's trouble.

8           Tab 21?

9           MS. LEOPOLD-LEVENTHAL:  That would be D-2.  They

10   were some records from Stoneybrook that we had subpoenaed.

11           Tab 23 would be D-23 and Tab 28 is D-4.

12           THE COURT:  Good.

13           (Defendant's Exhibit Nos. 1, 2, 3 and 4 were

14   admitted.)

15           MS. LEOPOLD-LEVENTHAL:  Great.

16           Dr. Katsufrakis.

17           THE COURT:  The record will show that I'm denying

18   the defendant's motion for a judgment at this time.

19           Sir, how do you do?

20           DR. KATSUFRAKIS:  Well.

21           PETER J. KATSUFRAKIS, M.D., after having been first

22   duly sworn as a witness, was examined and testified as

23   follows:

24                         DIRECT EXAMINATION

25   BY MS. LEOPOLD-LEVENTHAL:

1    Q    Good morning, Dr. Katsufrakis.

2    A    Good morning.

3    Q    For whom do you work at the present time?

4    A    The National Board of Medical Examiners.

5    Q    Would you please describe what the National Board of

6    Medical Examiners does?

7    A    The National -- may I use NBME?

8    Q    Sure.

9    A    The NBME administers and scores and tracks the reports of

10   examinees in the health professions, primarily having to do

11   with licensing and certification exams.

12   Q    Now, does the NBME, as far as you know, have any sort of

13   mission statement?

14   A    Yes, it does.

15   Q    And are you able to describe that mission statement for

16   the Court?

17   A    I can't quote it, but to paraphrase, it is to protect the

18   health and safety of the public through state of the art

19   assessment of health professionals.

20   Q    Would you just briefly describe your educational

21   background for the Court?

22   A    Sure.  I received my Bachelorate Degree from the

23   University of California at Berkeley.  Then went to medical

24   school at the University of California at San Diego.  Did my

25   family medicine training at Santa Monica Hospital, now a UCLA

1    affiliate.  And then received a Master's in Business

2    Administration from the University of South California.

3    Q    Are you presently licensed as a medical doctor?

4    A    Yes.

5    Q    What is your current position with the NBME?

6    A    I am the Vice President for Assessment Programs.

7    Q    And for how long have you held that position?

8    A    Just about a year.

9    Q    What does the Assessment Programs Group at the NBME do?

10   A    It's a complicated answer.  The NBME is a matrix

11   organization, so we have assessment programs, kind of on one

12   axis, and professional services on the other.

13         Assessment programs are the different examinations,

14   really.  I think that's probably the best way to think about

15   it.  Although a given client may have more than one

16   examination.  But you've kind of got examination programs

17   that are running in one direction and the professional

18   services consists of the various different staff and

19   professional activities to support an examination.  So you've

20   got the registration process, the administration, scoring,

21   research, et cetera.

22   Q    What are your current job duties and responsibilities as

23   the vice president of the Assessment Programs Group?

24   A    The two things I'm most actively involved in are a new

25   program we've developed, the assessment of professional

1  behaviors, and that's primarily targeted to residents and

2  will be moving to medical students within the next couple

3  years probably.

4          And then the comprehensive review of the USMLE,

5  which is a process we've initiated, a multi-year process, to

6  retool the medical licensing examination.

7  Q   Have you provided me with a current curriculum vitae in

8  the context of this litigation?

9  A   Yes, I have.

10 Q   Would you please take a look at Exhibit 25 in the binder

11 to the left that has a white page on top of it?

12 A   (Witness complies.)

13         Okay.

14 Q   Is this a true and correct copy of your current CV, Dr.

15 Katsufrakis?

16 A   I suspect it is, although it's -- it's not completely up

17 to date.  I notice that the first page has different headers

18 and footers, as you can do in word documents, so it shows a

19 review date of December 2008, but I think the second and

20 subsequent pages are actually correct, which showed reviewed

21 2009, so I missed that when I gave it to you.  Sorry.

22         And then I also know there should be a couple of

23 other committee appointments that I'm sure are not reflected

24 here, because they've just occurred within the past month.

25         MS. LEOPOLD-LEVENTHAL:  I'd like to mark Dr.

Katsufrakis - Direct                    18

1   Katsufrakis's curriculum vitae as Exhibit D-5, and it is Tab

2   25 in the exhibit binder, and also move that into evidence at

3   this time.

4           THE COURT:  All right.  Good.

5           (Defendant's Exhibit No. 5 was admitted.)

6   BY MS. LEOPOLD-LEVENTHAL:

7   Q   Would you briefly describe for the Court the professional

8   positions that you've held prior to jointing the NBME.  And

9   before I ask you that, when did you join the NBME?

10  A   June 2007.

11  Q   Okay.  And if you would describe those positions you held

12  prior to that time?

13  A   Okay.  So working in reverse chronological order,

14  immediately prior to coming to the NBME, I was on the faculty

15  of the Kicks School of Medicine (ph) at the University of

16  Southern California.  I was in the Department of Family

17  Medicine there as faculty.  My primary role there was an

18  administrative one.

19          I was the associate dean for student affairs.  I was

20  also the chief financial officer for educational affairs.  I

21  held both of those positions simultaneously.  Had been a

22  student affairs dean for about 14 years and education CFO for

23  I think about seven or eight years.

24          I was also -- excuse me -- the CFO for the school

25  for a year.  Prior to that, I was on the faculty, and my

Katsufrakis - Direct                          19

1    primary role was as director of clinical training for the

2    Pacific Aides Education and Training Center.

3           Again, I will -- thank you.  It's the Sudafed I took

4    this morning.

5           (Pause.)

6           Prior to that I was the director of clinical

7    training for the Pacific AETC.  That was a program to train

8    doctors and other health professionals to take care of people

9    with HIV, instituted in the late '80s, when the epidemic was

10   real prevalent, but nobody who was in practice had learned

11   how to take care of people with HIV.  So it was sort of a new

12   Government-funded program.

13          And prior to that, I was in residency.

14   Q   What were your responsibilities as the associate dean for

15   student affairs at UFC?

16   A   What I would -- what I tell the lay-public is that sort

17   of like the principal of the medical school, in that from the

18   perspective of the students, I'm -- I'm by and large the

19   voice of the institution and the authority in the primary

20   interface between the -- the institution and the school.

21          I had responsibility for tracking the performance of

22   students throughout their four years.  I was the chair of the

23   student performance committees that tracked that.

24          I also counseled individual students.  I had drop-in

25   hours every week in addition to scheduling appointments for

Katsufrakis - Direct                          20

1    students.

2              Does that answer your question or --

3    Q    That's a good description.

4    A    Okay.

5    Q    What is the United States Medical Licensing Examination,

6    also known as the USMLE?

7    A    That is the -- a joint program of NBME and the Federation

8    of State Medical Boards.  That was developed to replace

9    previous separate examinations to create a single common

10   pathway to licensure for the practice of medicine in the

11   United States.

12   Q    What are the goals and the purposes of that licensing

13   examination, if you can describe that, please?

14   A    Primarily the goal was to determine the competence of

15   individual examinees to practice medicine.  It's not the sole

16   component.  State Medical Boards have different requirements.

17   But it's probably one of the most significant ones.

18             It has other uses, not as -- not part of its

19   intended use -- but medical schools will use the performance

20   on USMLE to track individual students.  Some schools have

21   requirements about individual student's performance.  They

22   would also track student performance in the aggregate.

23   Residency programs use scores in making decisions about

24   whether to interview and how to rank their applicants, and

25   there are probably other uses that I'm forgetting right now.

1  Q   What information is provided to authorities based upon

2  how an application performs on any one or all of the

3  components of the USMLE exam?

4  A   So, for example, if the State Medical Board asks us, or

5  an examinee asks us to send information to the State Medical

6  Board, what do we send?

7  Q   What are you saying when you're sending that information?

8  What --

9  A   Well, we say whether they passed or failed.  For some of

10  our examinations, we give a numerical score.  For the Step 2

11  CS it's simply a pass/fail.

12  Q   And who relies upon the scores from the USMLE?

13  A   As I mentioned previously, the State Medical Boards are

14  the -- they're really the primary audience for these -- for

15  these scores, and they use them as a key part.  Every --

16  every licensing authority uses them as a key part in their

17  decision.

18  Q   What is the NBME/USMLE's obligation to the State

19  Licensing Medical Boards in providing that information, if

20  you understand that question?

21  A   Well, I'll give it a shot, and tell me if I missed it.

22  Q   Our obligation is to do what we had said we would do with

23  the licensing examination.  So to administer it in accordance

24  with the policies that we've developed and to develop the

25  content in a way that conforms with what we've published as

                         Katsufrakis - Direct                    22

1    being our content outline, and score it the way we said we

2    would, and just do what we said we'd do.

3    Q    I had intended to call Dr. Farmer as my first witness,

4    but you're the lucky one, so I'm going to ask you, if you

5    would, to describe for the Court really what the various

6    steps are to USMLE?

7    A    Sure.   There are three steps, three main steps, Step 1,

8    Step 2, and Step 3.

9              Step 2 actually has two parts.  Step 2 CK, which

10   stands for clinical knowledge.  And Step 2 CS, which is

11   stands for clinical skills.

12             Step 1 is a -- I think it's about a seven-hour

13   examination.  Step 2 CK, I think is about an eight-hour

14   examination.  CS is -- I think it's probably roughly half a

15   day.  I'm not sure exactly how many hours.  And Step 3 is a

16   two-day examination.

17             With the exception of Step 2 CS, the examinations

18   are administered as computer-based examinations

19             Step 1, Step 2, and a part of Step 3 consists of

20   multiple choice questions, and then there's another part of

21   Step 3, which is a clinical case simulation where we sort of

22   simulate, rather than -- than providing options for the

23   examinee to choose -- we simulate a clinical encounter, so

24   we'll present a patient scenario and then require the

25   examinee to use free text entry to identify the actions that

Katsufrakis - Direct                          23

1    they want to take.

2           THE COURT:  They're required to do what?

3           THE WITNESS:  For the -- for part of Step 3, rather

4    than having a multiple choice question where they would check

5    the best one of five, we would present a clinical scenario,

6    so a paragraph description.  And then the examinee types in

7    free form text about, Order CBC, or order chest X-ray, or

8    something like that.

9    BY MS. LEOPOLD-LEVENTHAL:

10   Q   What is the NBME and the USLME trying to examine in

11   administering Step 2 CS?

12   A   Step 2 CS is designed really to simulate the clinical

13   encounter between a physician and a patient.  So we strive to

14   measure the ability of the examinee to do everything that's

15   needed for that encounter.

16   Q   When was the Step 2 clinical skills test first

17   introduced?

18   A   It was first introduced as a required part of the

19   examination in 2004.

20   Q   And why did the NBME develop and introduce the Step 2 CS

21   exam in 2004?

22   A   When I answer the question, for me it harkens to what I'm

23   doing right now.  I mentioned that we were retooling the

24   USMLE examination.

25           Over the course of time, we -- medical education

1    changes.  Medical practice changes somewhat, but not so much.

2    And technology and particularly assessment technology change.

3    So what we try to do with the examination is to make sure

4    that we are measuring what we can of the examinee's

5    performance that is material to their function as a

6    physician.

7            In the late '90s, mid to late '90s, there was

8    increasing recognition of the importance of a number of

9    different clinical skills, particularly communication skills

10   that we did not assess in a very robust thorough manner

11   through the use of the multiple choice questions that we had

12   on the examination.  So the clinical skills examination was

13   developed to assess these abilities in a more robust fashion,

14   a more comprehensive manner.

15   Q   What influence, if any, did patient safety and patient

16   medical treatment have on the development and introduction of

17   the Step 2 CS examination?

18   A   Well, if you think about -- if you think about what

19   happens in caring for a patient, what do we do to -- what do

20   we as doctors do to or for patients?  Mostly what I can think

21   of, we start -- we give medications, we perform operations,

22   we do -- but what we really start with is communication.  And

23   there is an incredible difference in the way somebody

24   prescribes to the way I prescribe hydrochlorothiazide versus

25   another physician prescribes hydrochlorothiazide, in terms of

1    whether or not the patient understands what I said, believes

2    what I said, has doubts about me, actually -- actually will

3    follow through with taking the medication to treat their

4    blood pressure.  So communication is just a key skill.  It's

5    at the heart of patient care, and that includes patient

6    safety as well.

7            In part because of patients who don't understand,

8    say, medication orders clearly, may use the medication

9    incorrectly in a way that would jeopardize their health.

10   Also, interprofessional communication.  So communication from

11   one physician to another is a key part, or lack thereof, is a

12   key part of patient safety.

13   Q   And you mentioned that, you know, something occurred in

14   the late '90s and thereafter.  Was there some sort of

15   deficiency that was recognized and acknowledged that then,

16   therefore, ultimately result in a development of the Step 2

17   CS examination?

18   A   You know, I -- I believe that this was probably the issue

19   of communication.  It probably was addressed in the National

20   Institute of Medicines Report to Err is Human.  But I don't

21   know that for a fact.  But, in fact, there was a lot of -- a

22   lot of literature published that dealt with the role of

23   communication, and communication failures, and how those

24   translate into having an impact on patient care.  So I don't

25   know that -- there may be one centennial report that I'm just

1   not thinking of.

2   Q    With respect to the Step 2 CS examination, are there

3   skills or competencies that a student is required to have

4   competency in -- I hate to use the same word -- in order to

5   pass that examination?

6   A    Yes.

7   Q    And what are those?  Is competencies the right word?

8   A    Competencies is the word that's currently used in medical

9   education, medical assessment.  So the -- the -- and there

10  are six competencies that have been named by the American

11  Board of Medical Specialties and the Accreditation Council

12  for Graduate Education.  And they're sort of the paradigm

13  that guide most medical education and assessment activities

14  these days.  So we're also adopting those as a framework for

15  our retooling of the USMLE.

16         To use their -- to use that scheme, well, the six

17  are medical knowledge, patient care, professionalism,

18  interpersonal communication skills, practice-based learning

19  and improvement, and systems based practice.

20         And the clinical skills examination, of those

21  probably probes interpersonal communication skills most

22  effectively, but also touches on patient care, and to a

23  lesser degree medical knowledge.

24         THE COURT:  Would you permit me to ask you to give

25  those six again?

 1              THE WITNESS:  Certainly.

 2              THE COURT:  A little --

 3              THE WITNESS:  A little more slowly?

 4              THE COURT:  A little more slowly.

 5              THE WITNESS:  Medical knowledge.

 6              THE COURT:  It sounds like a good one.

 7              THE WITNESS:  Yes, patient care.

 8              THE COURT:  Right.

 9              THE WITNESS:  Professionalism, and actually we get

10    professionalism a bit with the CS also.

11              Interpersonal and communication skills.

12              THE COURT:  Interpersonal and communication skills?

13              THE WITNESS:  Yes.

14              THE COURT:  All right.

15              THE WITNESS:  Practice-based learning and

16    improvement, and systems-based practice.

17              THE COURT:  Could I ask you one further question?

18              THE WITNESS:  Certainly.

19              THE COURT:  You raised systems-based practice rolls

20    off the tongue with some difficulty, but I can get around it,

21    but what does it mean?

22              THE WITNESS:  The short answer is, there's a lot of

23    discussion around that.  I don't think it would be accurate

24    to say that there is a widely accepted definition of

25    specifically what is and is not encompassed by systems-based

1   practice.

2        Generally, I think what is intended with that

3   competency is the belief that a physician needs to have

4   awareness of how their work exists within the context of a

5   larger health care system, and how decisions they make on an

6   individual, for an individual patient touched the other parts

7   of the health care system.  And, similarly, how elements of

8   the system can be drawn in to create the best care for a

9   patient.

10        This also relates to practices where a physician

11  would analyze her or his individual practice looking at the

12  whole system of care that she or he provides, and try to

13  identify areas that would need improvement.

14        So thinking not just on the basis of one doctor, one

15  patient, but rather looking more globally to try to identify

16  opportunities for improvement, and I think it's --

17            THE COURT:  And it may -- oh, I'm sorry.

18            THE WITNESS:  And I think it's really driven by the

19  To Err is Human report I mentioned previously, which

20  estimated that between -- I think it was 100 to 200,000

21  deaths per year were attributable to preventable accidents,

22  that in part were due to systems failures.

23            THE COURT:  So we have to move to robotic medicine,

24  so there won't be human errors.

25            THE WITNESS:  Well, you know, one of the -- medicine

Katsufrakis - Direct                    29

1    has been much slower than other fields to adopt information

2    technology.

3         I mean, there's a big push presently at the level of

4    the Federal Government to adopt electronic health records.

5    And I think when used well, for example, if you've got an

6    electronic prescribing system that automatically identifies a

7    serious interaction between two medications, that that's a

8    great benefit.

9         I hope we get to the point where we take advantage

10   of the best that technology can provide and not have it move

11   us to robotic medicine.

12        THE COURT:  Let me just ask one more question:  You

13   say there's discussion as to what is the connotation or

14   content of systems based practice.

15        At least in your judgment, would both of the

16   following elements, one of the following elements, or neither

17   one of them fall under that heading?  One, the relationship

18   of a physician to the hospital setting and institution where

19   he has privileges, that is, including the extent to which

20   such a physician feels herself under direction to conform to

21   certain kinds of practice of the profession, medical care.

22   So, one, that kind of inquiry.  How do individuals fit into

23   the medical centers within the framework of which they work?

24        Second, the degree to which a pediatrician feels

25   under an obligation to conform, practice, to generalize norms

1    announced by -- I don't know whether the Pediatrics Board

2    does -- but one or another of the monitors of practice, the

3    degree to which the individual physician feels an obligation

4    to conform to, is pleased with the opportunity of getting

5    information from, is in a position perhaps contribute to the

6    formulation of more generalized canons of how to be a good

7    pediatrician?

8            I'm just wondering broadly whether either of those

9    quite separate categories is --

10           THE WITNESS:  As you described those, the first case

11   was a physician and the physician's relationship to a

12   hospital and the pressures that that physician might feel

13   with regard to managing in a particular way.  And the second

14   where you talked about a pediatrician's feelings about a

15   directive, a national guideline, for example, and presumably

16   their behavior in response to that.

17           Because you used relationship and feeling, I would

18   probably categorize those issues more under the heading of

19   professionalism, but I think if you talk about a

20   pediatrician's adherence to vaccination guidelines, that

21   would fall right in a system-based practice.  So a

22   pediatrician -- there are national guidelines for what

23   vaccines are supposed to be given to which patients at what

24   ages.  And if would be kind of a bread and butter example of

25   systems-based practice to look at a pediatrician's actual

Katsufrakis - Direct                    31

1    practice and identify how closely they conform to those

2    guidelines.

3            Similarly, with regard to hospital policies or

4    requirements, I could imagine that there might be situations

5    that would fall square into systems-based practice.  But if

6    you're talking about say the physician -- it's a little bit

7    -- it's not cut and dry.  That's how I would see it.

8            Did that answer your question?

9            THE COURT:  That's very helpful.

10           THE WITNESS:  Okay.

11           THE COURT:  At least I get the idea that either of

12    those scenarios, fields of inquiry, might fall in part or in

13    whole under one or another of the --

14           THE WITNESS:  Mm-hmm.

15           THE COURT:  -- six canons.

16           THE WITNESS:  Well, and if you imagine the scenarios

17    playing out, you could think that communication skills would

18    come in as well, so...

19           THE COURT:  Right.

20           Ms. Leopold-Leventhal, I'm sorry to have been, as

21    you might feel it, but not say it, wasting your time.

22           MS. LEOPOLD-LEVENTHAL:  Not at all.  I didn't feel

23    it.

24    BY MS. LEOPOLD-LEVENTHAL:

25    Q   With respect to the Step 2 CS examination, would you

1  agree with me that the third and fourth competencies that you
2  described, that is professionalism and interpersonal
3  communication skills, are those that are endeavored to be
4  assessed on that examination?
5  A    Yes, definitely, but also a little bit of patient care
6  and a little bit of medical knowledge as well.
7  Q    Thank you for correcting me.
8            With respect to those competencies that are
9  endeavored to be assessed on the Step 2 CS examination, did
10  the NBME believe that these competencies were not assessed by
11  the USMLE prior to the adoption and introduction of the Step
12  2 CS exam?
13  A    I wasn't at the NBME at that time.  I would suspect that
14  the staff would argue that say professionalism was assessed
15  in the previous examination, as were communication skills,
16  but in a very rudimentary limited manner, in a manner limited
17  to what would be possible using multiple choice questions,
18  you know, so you can ask questions about ethics, for example,
19  and that's an element of professionalism, but it's just a
20  small part.
21  Q    Okay.  And if you would, just provide a more expansive
22  description of what the Step 2 CS examination is designed to
23  simulate.
24  A    It's designed to simulate the clinical encounter of a
25  physician and a single patient in an outpatient setting

Katsufrakis - Direct                    33

1    primarily.  There are some cases that are telephone cases, so

2    within a given form, a form is the collection of cases that

3    an individual examinee would see, within a given form there

4    might be one telephone case which would simply be the

5    examinee communicating with the patient over the phone, but

6    most of the time it's a patient in the room with the examinee

7    in an outpatient setting for a non-emergent specific problem,

8    so not a comprehensive physical examination, but perhaps I

9    twisted my ankle yesterday.

10   Q    And is the Step 2 CS examination made up of several

11   subcomponents?

12   A    Well, the examination is made up of 12, 15-minute

13   interactions with a standardized patient, and a -- I think

14   it's a ten-minute interstation exercise as well.  So the --

15   for each case, for each of the 12 cases, the examinee would

16   typically spend 15 minutes or less, if they don't -- if they

17   choose or decide to leave early -- with the standardized

18   patient, and then they would have the remaining time with the

19   ten minutes to complete their patient note.

20   Q    And typically what is involved in that patient encounter?

21   I know you can't generalize, because they're different

22   depending on how the patient presents, but what generally

23   occurs during the SP encounter?

24   A    I think of it in the way that I organize my notes.

25   There's an acronym we use called SOAP, which stands for

Katsufrakis - Direct                    34

1    subjective objective assessment and plan.  So a subjective us

2    the process, what does the patient tell you?  Objective is

3    what did you observe?  What did you examine and find?  And

4    then what's your assessment?  What do you think's going on?

5    And the plan, what should we do?

6           So the examinee is expected, based upon the limited

7    presenting complaint, to ask appropriate questions, to

8    perform the appropriate examinations, and then explain to the

9    patient what -- what the examinee thinks is happening and

10   where we go from here.

11   Q   And then I think you indicated there's a ten-minute block

12   of time, and what occurs during that block of time after the

13   patient encounter is completed?

14   A   During that time, the examinee creates their progress

15   notes, so -- their patient note -- so they summarize their

16   findings and they're thinking about what the patient's going

17   through.

18   Q   Now, I understand that ultimately a test-taker receives

19   either a pass or a fail, correct?

20   A   Correct.

21   Q   But is the examination broken up, just for grading

22   purposes, into subcomponents?

23   A   Yes, there are three noncompensatory elements to Step 2

24   CS scoring.  And when I say "noncompensatory," that means you

25   have to pass all three.  Doing really well on one and poorly

                           Katsufrakis - Direct                    35

1    on another wouldn't suffice.

2           The three elements are the integrated clinical

3    encounter or ICE, I-C-E.  The CIS, C-I-S, which is

4    communication and interpersonal skills.  And SEP, S-E-P, the

5    spoken English proficiency.

6    Q   With respect --

7    A   Should I repeat those, Judge, or?

8           THE COURT:  I think I've got them, but tell me

9    again.

10          THE WITNESS:  ICE is integrated clinical encounter,

11   CIS, C-I-S is communication and interpersonal skills, and SEP

12   is spoken English proficiency.

13   BY MS. LEOPOLD-LEVENTHAL:

14   Q   What does the ICE subcomponent assess?

15   A   That assesses the individual's history and physical exam

16   skills, and it's -- it's dependent upon the standardized

17   patient's rating of their performance on both of those, as

18   well as the patient note, the -- their written findings that

19   follow after the examination.

20   Q   Does that -- if I were to say to you, How is it graded?

21   Was that included in your answer or is that a different

22   answer?  How that subcomponent is graded?

23   A   No, I'm -- well, I don't think it was included.

24          What I would say is that for a given case, there are

25   particular elements of the history that we have determined

Katsufrakis - Direct                                    36

1    are essential.  And so an examinee is judged upon how many of

2    those critical elements they're able to elicit from the

3    patient.

4           So using the example of a twisted ankle, they should

5    ask about the mechanism of injury, they should ask about the

6    degree of pain, they should ask about anything used to assist

7    the pain, what their response was, et cetera.

8           Physical examination similarly, the standardized

9    patients are taught how examinees are supposed to do a

10   physical examination correctly for the affected parts of the

11   body that are -- that are indicated by the particular chief

12   complaint.  And then the standardized patients will grade the

13   examinees as to whether or not they performed those maneuvers

14   appropriately.

15          And in the other part, the patient note, is graded

16   by a trained note rater who is a physician who has been

17   trained how to grade that particular case.

18          THE COURT:  May I inquire?

19          MS. LEOPOLD-LEVENTHAL:  Please.

20          THE COURT:  Maybe perhaps you were just about to get

21   to it.  I just wanted to get a sense of what the quote,

22   "grading process" is, and where it -- at least in some -- in

23   some phases results in a number or, and in others adequate,

24   high proficient, or those kinds of labels or what?

25          THE WITNESS:  I don't know the answer to that.  I

Katsufrakis - Direct                         37

1   don't know.  I would guess that, for example, with the

2   history and the physical examination, where there's a

3   checklist of things that we've identified, I suspect that --

4   just by counting, you know, counting issues, there would be a

5   number that would be generated.

6         And I don't know if our scoring considers a

7   difference between a 7 and a 9, or if we simply establish a

8   threshold for a particular case, and a particular checklist.

9         THE COURT:  All right.  Maybe I can put it this way.

10        You're the would-be physician, and I'm the patient,

11  and we have 15 minutes of interaction.  Do I then write down

12  a number or do I --

13        THE WITNESS:  No, you indicate -- there's a scoring

14  rubric, so you have to go through the history, the physical

15  examination, identify -- I don't know if you have to identify

16  how many of the history items I asked, or whether you simply

17  indicate a number.  I don't know the answer to that.

18        THE COURT:  Okay.

19        THE WITNESS:  But you would do that for each of the

20  subcomponents.

21        THE COURT:  I see.

22        THE WITNESS:  So, for example, with regard to the

23  CIS scale, there are three subscales, so the CIS is a

24  subcomponent of Step 2 CS, and then as part of CIS, there are

25  further subscales, and you need to -- you would provide a

                     Katsufrakis - Direct                    38

1    numerical score for each of those.

2              THE COURT:  I see.

3              Now, am I right that Steps 1 and 3 are both multiple

4    choice?

5              THE WITNESS:  Step 1, Step 2 CK, and most of Step 3

6    are multiple choice, but Step 3 also has that free text entry

7    part.  The CCS, the computer case simulation.

8              MS. LEOPOLD-LEVENTHAL:  And, your Honor, our third

9    witness is Dr. Clauser, who is psycho-matrition, who will

10   hopefully be able to answer all of our questions with respect

11   to the subtleties in the grading process.

12             THE WITNESS:  Undoubtedly.

13             THE COURT:  Mr. Vice President, I'm sorry that I've

14   --

15             THE WITNESS:  You've exposed my ignorance.

16             THE COURT:  -- gone and -- I expect there's a lot of

17   responsibility.

18   BY MS. LEOPOLD-LEVENTHAL:

19   Q   With respect to the second subcomponent of CIS, would you

20   describe what that assesses?

21   A   That looks at information gathering, so the ability of

22   the examinee to obtain information from the standardized

23   patient.  Information sharing, which is what its name sounds

24   like.  And then a physician manner and rapport.  So the

25   professionalism of the examinee.

1   Q   And how is the CIS subcomponent graded?

2   A   Each of those categories -- those three categories I just

3   described, information, gathering information, sharing, and

4   PMR, have a separate scale that the standardized patient

5   rates, and, yes, I think it's a numerical scale.

6   Q   Now, with respect to the third subcomponent, the spoken

7   English proficiency or SEP --

8   A   Well, that's -- okay.  So that's -- so we're not talking

9   about CIS now.  We're talking about SEP?

10  Q   Yes.

11  A   Okay.

12  Q   What does the -- did I cut you off with respect to CIS?

13  A   No, no.

14  Q   Okay.

15  A   I just wanted to make sure that -- that we were

16  distinguishing between CIS, which has those three elements,

17  and SEP, which is -- is it clear?  I mean, I just -- it's

18  sort of a hierarchy.  There's CIS, SEP, ICE, and then CIS has

19  these subcomponents.

20         And you were asking me about SEP, sorry about that.

21  Q   No, it's okay.  It's confusing.

22         And with respect to SEP, the spoken English

23  proficiency subcomponent, what does that C2 assess?

24  A   Spoken English proficiency.

25  Q   Can you explain what that means, please?

1   A   It assesses the examinee's ability to speak English in a

2   way that is intelligible to the standardized patient.  So it

3   looks at word choice.  For example -- well, I don't know if

4   -- we score down for jargon.  If I use medical terms, as an

5   examinee, then that's problematic, but I'm not sure that

6   that's captured under SEP.  I think that's actually captured

7   as part of the CIS scale.

8          So SEP would be more focused just on do you

9   communicate in a way that the patient can understand?  Is

10  your speech too rapid or too slow?  Is the volume

11  appropriate?  Do you choose the right words?

12          Is that answering your question?

13  Q   It is.  How is that subcomponent graded?

14  A   Pass/fail.

15  Q   And does listener effort impact or effect the assessment

16  and grading of the SEP component?

17  A   Yeah, it does.

18  Q   Okay.

19  A   That's something that's contained -- in our description

20  of the examination, in our bulletin of information, we

21  identify listener effort as being one of the -- one of the

22  determinants of the SEP score.  And, in fact, that's --

23  that's something that the standardized patients are trained

24  to judge.  They're taught to listen carefully to the examinee

25  and also pay attention to the amount of effort required to

1    understand the examinee.

2    Q    There's been a suggestion in this litigation that the SEP

3    component is designed to weed out non-English speaking test-

4    takers only.  Do you agree with that?

5    A    No.

6    Q    Why not?

7    A    I would first acknowledge that the ability of a

8    non-native English speaker is important, and many

9    international graduates who fail the CS examination, fail ont

10   he basis of SEP.  But SEP is designed, as the spoken English

11   proficiency, of all of the examinees.  We don't -- we don't

12   have a different examination for international graduates

13   versus U.S. grads.  It's the same examination for everybody.

14   Q    If you would take a look at Tab 7 in the other binder,

15   the one that doesn't have a white page, that's plaintiff's

16   binder.  It's Tab 7, but it is Exhibit P-10.

17   A    Exhibit which?

18   Q    P -- it's Tab 7 for you.

19   A    Oh, okay.

20            (Witness complies.)

21            This is a letter to Dr. Farmer from Aaron Hartman?

22   Q    Correct, we're all on the same page.

23   A    Okay.

24   Q    If you would, take a moment to familiarize --

25   A    Okay.

Katsufrakis - Direct                    42

1   Q   -- yourself with that letter.  I'd like to ask you about

2   essentially the last sentence.

3   A   Okay.  Just a moment.

4            (Pause.)

5            THE COURT:  I'm sorry.  Are we talking about Mr.

6   Weiner's letter to --

7            MS. LEOPOLD-LEVENTHAL:  No.  It's in the plaintiff's

8   binder, Tab 7.

9            THE COURT:  Oh, Tab 7.

10           MS. LEOPOLD-LEVENTHAL:  Tab 7.  It's confusing, but

11  it's P-10, but Tab 7.

12           THE COURT:  I see.

13           MS. LEOPOLD-LEVENTHAL:  Sorry about that.

14           (Pause.)

15           THE COURT:  My misunderstanding is not a measure of

16  your lack of proficiency in speaking English, it's a measure

17  of my lack of understanding.

18           THE WITNESS:  Okay.  I've finished.

19  BY MS. LEOPOLD-LEVENTHAL:

20  Q   And I'm directing your attention to the last sentence

21  which is five lines up and it begins, "Also" -- it's written

22  to Dr. Farmer -- "You indicated that the fact that I passed

23  the SEP subcomponent on the prior exam is evidence against my

24  request, but the SEP accesses clarity of spoken English

25  (pronunciation, word choice, and minimizing the need to

Katsufrakis - Direct                              43

1   repeat questions or statements) and I do not have a problem

2   with clarity, so I would not expect to fail this

3   subcomponent."

4           Are you with me, Doctor?

5   A    Yup.

6   Q    Is Mr. Hartman correct with respect to what he is

7   summarizing the SEP component --

8   A    Well, he's --

9   Q    -- assesses?

10  A    -- he's correct in that it assesses clarity of spoken

11  English.  It does assess pronunciation, word choice, and

12  minimizing the need to repeat questions or statements.  But

13  his assumption that since I don't have a problem with

14  clarity, I would not expect to fail this subcomponent, I

15  mean, that's his expectation, but it's certainly possible

16  that he could have failed on the basis of listener effort, as

17  we've described previously.  That's identified as one of the

18  characteristics that we measure with SEP and he hasn't

19  mentioned that here.  So I think that's kind of a flaw in his

20  reasoning.

21  Q    Must a take-taker pass all three of the subcomponents in

22  a single administration to achieve a passing score on the

23  Step 2 CS exam?

24  A    Yes.

25  Q    And you understand that Mr. Hartman passed the ICE and

1  the SEP components, but not the CIS?

2  A    Yes.

3  Q    Is it possible that Mr. Hartman failed the CIS component

4  for reasons other than his speech dysfluency?

5           MR. WEINER:  Objection.

6           THE COURT:  Overruled.

7           THE WITNESS:  Yes.

8  BY MS. LEOPOLD-LEVENTHAL:

9  Q    Okay.  What other reasons, other than speech dysfluency,

10  could have contributed to or caused the failing grade on this

11  subcomponent?

12  A    For CIS?

13  Q    Yes, sir.

14  A    Well, as I mentioned previously, the CIS component is

15  made up of three different subscales; information gathering,

16  information sharing, and physician manner and rapport, and on

17  the basis of any of those, he could have failed it.

18           So he could have failed to ask the appropriate

19  questions to elicit the information that's needed from one or

20  more of the standardized patients.  He could have failed to

21  provide the necessary information in terms of information

22  about a recommended treatment, or patient education, or the

23  other things that are required as part of information

24  sharing.  Or he could have had a poor -- a poor manner and

25  failed at establishing good rapport with the patient.  So any

Katsufrakis - Direct                        45

1    or all of those.

2    Q    Is it possible that some aspect of Mr. Hartman's physical

3    examination or diagnostic examination of the patient could

4    have contributed to and/or caused failure on the CIS

5    subcomponent?

6    A    His performance of the physical examination would

7    typically be captured by the ICE subscale.  So the integrated

8    clinical encounter.

9           Now, when performing physical examination, you can

10   do so in a manner that is respectful, and sensitive, and

11   caring of the patient, or you can do so in brusk manner that

12   hurts the patient.  And, so, performing the physical

13   examination could have impacted the professional manner and

14   rapport scale.

15   Q    And that's captured in the CIS subcomponent, correct?

16   A    Yup.

17   Q    You testified earlier that a number of different groups

18   rely upon the USMLE results.  Did you say the state medical

19   licensing boards rely upon these results?

20   A    Oh, definitely.

21   Q    And how do they rely upon them or what do they use them

22   for?

23   A    As I mentioned previously, they used to be different

24   pathways, and the Federation of State Medical Boards and the

25   NBME created the USMLE to provide states with one standard by

1  which they could judge applicants for licenses to practice

2  medicine.  So it's really just -- it's probably the most

3  important part of the application.

4  Q    Are you familiar with the phrase "assistive devices"?

5  A    Yes.

6  Q    What does that mean in the context of this examination?

7  A    My understanding is that these are -- is that these are

8  devices that an examinee might use to help them overcome a

9  disability.

10  Q    Okay.  Before we leave the various subcomponents, and

11  move to another topic, I would ask you to turn to Exhibit 37

12  in the defendant's binder, which is the one with the white

13  cover.

14        (Pause.)

15        Actually, 36.  It's the second to the last one, and

16  it is Dr. Tetnowski's deposition transcript.  So that's

17  defendant's binder, Exhibit 36.

18  A    Okay.

19        (Witness complies.)

20  Q    And if you would turn to Page 76.

21  A    Now, when you say "76," do you -- oh, okay, the little

22  ones.

23  Q    These are minuscripts.

24  A    The four to a page.

25  Q    Right, they are four to a page.

Katsufrakis - Direct                          47

1    A    Okay.  So the page that starts, "Time to gather the

2    information"?

3    Q    Yes.

4            Directing your attention to Line 22 at the bottom of

5    Page 76, I was questioning Dr. Tetnowski at his deposition,

6    and I asked:

7            "Are there any skills that are tested on the CIS

8    component effected by Mr. Hartman's impairment?  Any skills

9    that are tested?  That's what I'm looking for.

10           "Answer:  Skills?

11           "Question:  Yes.

12           "Answer:  No, to the best that I understand the

13   exam."

14           Are you with me, sir?

15   A    Mm-hmm.

16   Q    Is Dr. Tetnowski correct with respect to his answer to my

17   question that Mr. Hartman's impairment would not effect any

18   skills tested on the CIS subcomponent?

19   A    No, he's not correct.

20   Q    Why is that?

21   A    Well, for the reasons we've talked about.  We assess

22   spoken English proficiency, we assess communication and

23   interpersonal skills.  I would think that, as I understand

24   Mr. Hartman's impairment, both of those could potentially be

25   impacted by his disability.

Katsufrakis - Direct                    48

1    Q   With respect to the text to speech device, are you

2    familiar in some respects with the device that Mr. Hartman is

3    suggesting he be permitted to use on the Step 2 CS exam?

4    A   I've not had personal experience, but I'm conceptually

5    familiar, and I've used other computer text to speech

6    simulations, yes.

7    Q   Doctor, what impact, if any, would the use of a text to

8    speech device have on the NBME's ability to assess the SEP

9    subcomponent?

10   A   There would be no spoken English, so there would be no

11   ability to assess spoken English proficiency.

12   Q   Let's say, for example, the text to speech device was

13   used intermittently throughout a particular patient encounter

14   or throughout all of the patient encounters.

15        What impact would the intermittent use of the text

16   to speech device have, if any, on the NBME's ability to

17   assess the SEP subcomponent?

18   A   Well, just talking about SEP -- let me back up a bit.

19        With any examination, what we are doing is, we're

20   asking an examinee to perform particular tasks in the belief

21   that their performance on that examination is representative

22   of their performance on some real world activity of interest.

23        For the clinical skills examination, our

24   constructive interest is the ability to interact effectively

25   with patients.  Every examination is constructed with a

1    number of assumptions made about the kinds of activities that

2    are included in the examination, the number of times those

3    exams -- those activities are assessed, how they're assessed,

4    et cetera.

5           And that whole, the whole of all of those

6    assumptions and activities, go into the score for the

7    assessment.  So if you pull out some parts of that, if you

8    limit the sample of spoken English proficiency, you

9    materially alter the conditions that underly -- the

10   assumptions that underly the examination.

11          You're -- you're -- it's like saying if you've got a

12   multiple choice question examination that has 100 questions

13   on it, and you only test 50 of those, is that the same as

14   100?  Just 50 or whatever the performance is multiplied by 2.

15          And the answer is, No, it's not.

16   Q   Would the NBME be able to assess Mr. Hartman's spoken

17   English proficiency if he were to walk into each encounter,

18   say a sentence, and then refer to his text to speech device

19   to communicate through --

20   A   No, that wouldn't even -- that wouldn't be enough.

21   Q   What would be enough?

22   A   The whole encounter would be enough.

23          Would there be a threshold below that which would be

24   enoughish, close?  I don't -- I honestly don't know the

25   answer to that.  But what I do know is that if it were less

1   than the entire encounter, then that changes the fundamental

2   assumptions that underly the way the examination was

3   structured.

4   Q   If the test were administered that way, where Mr. Hartman

5   would be permitted to utilize the text to speech device

6   intermittently, as he chose to, is it fair to say that he

7   would be evaluated differently, assessed differently than

8   every other test-taker who's ever taken this examination?

9   A   Without doubt.  It would be -- let's use a different

10  example.  Let's say he used his speech 100 percent of the

11  time for eight of the encounters, but didn't for the other

12  four.

13           Well, that's a different examination.  We can't

14  score -- we can't give a SEP score on the basis of eight

15  cases.  That's not the way the examination was developed.

16  That changes the exam.  It would be an inadequate sample.

17  Q   Are eye contact and rapport elements that are assessed in

18  the Step 2 CS examination?

19  A   Yes.

20  Q   Which subcomponent do they fall under?

21  A   CIS.

22  Q   Why are they important, important enough to be included

23  as one of the values that's assessed?

24  A   You used eye contact and rapport, and you grouped them

25  together.  I'm going to separate them out.  And, in fact, I

1    would -- I would increase eye contact and I would just talk

2    about non-verbal communication generally.

3            So eye contact, facial expression, gestures with

4    your hands, all of these are ways in which we communicate, as

5    humans we communicate.  And they're critically important in

6    the examination with a patient.  My ability to watch a

7    patient, to examine their -- to look at their faces as I'm

8    performing my examination, to watch their reaction to my

9    words, helps me gauge the understanding, their understanding

10   and whether anything I'm saying is troubling to them.

11           I can also -- and I can also assess whether or not

12   they're engaged in listening to me, so I can slow down, I can

13   back up in response to what I perceive to be as unspoken

14   questions that they're raising.  So in that way, nonverbal

15   communication is critical.

16           It gets back -- previously to what I said about

17   patient safety -- it gets back to patient safety, among other

18   things, as well as patient satisfaction, and their -- the

19   overall quality of the interaction.

20           Rapport.  Rapport is important because it feeds into

21   a patient's likelihood of complying with whatever

22   recommendations I've made.  When -- it's astounding to junior

23   medical students to think that it's not enough simply to know

24   the right answer, but you have to convince the patient that

25   your knowledge is worth changing their life, having them do

1   something, or stop doing something, that's critically

2   important to them.

3          And my ability to get you to stop smoking, if you

4   were to smoke, would be very much dependent upon the rapport

5   that I establish with you, the credibility, the trust that

6   you placed in me.

7   Q   Do you believe that intermittent use of the text to

8   speech device would or could have an impact on the rapport

9   between the patient and the doctor, and if so, how?

10          MR. WEINER:  Objection, foundation.

11          THE COURT:  I'm sorry.  What was the objection?

12          MR. WEINER:  Foundation.  How would he know, if he's

13  never seen text to speech used at a patient encounter?

14          MS. LEOPOLD-LEVENTHAL:  Well, I don't think he --

15          THE COURT:  Let him make whatever observations he

16  thinks he's in a position to make and --

17  BY MS. LEOPOLD-LEVENTHAL:

18  Q   Well, before you answer, how do you understand the text

19  to speech device working?

20  A   My understanding is that an individual could type on a

21  keyboard into a computer, which has a speaker attached to it,

22  and the software program would generate those words in an

23  audible fashion.

24  Q   Based upon that understanding, Doctor, would or could use

25  of the text to speech device impact or effect the rapport

1   between a doctor and a patient?

2   A   Almost undoubtedly.

3   Q   Why is that?

4   A   I can think of a number of reasons.  One would be the

5   rhythm of the encounter.  So my -- where I pause, and the

6   amount of time that I take to respond to something,

7   communicates to the patient -- whether I intend that or not.

8   So when I pause right now... that's different than when I

9   just continue speaking fluently without pausing.

10          So there is -- now, for good or for bad -- there is

11   -- it's part of a human communication.  We will make

12   assumptions about what that pause means.  So if I'm typing on

13   a keyboard, I'm also communicating to the patient that I'm

14   not as engaged with them.  I don't have the eye contact that

15   I would if we were having a direct conversation.

16          So, you know, think about I'm going to tell you that

17   you have cancer, and that's -- that's an overwhelming bit of

18   information for a patient.  I want to be able to -- I want to

19   be able to manage that communication in a way that allows me

20   to be fully engaged with the patient 100 percent of the time.

21   And a device, a text to speech device, would inevitably

22   change that dynamic.

23          There are other examples, too, but if I've not

24   answered your question, I --

25   Q   No, you have.

Katsufrakis - Direct                    54

1          With respect to the physical examination part of the

2    Step 2 CS exam, would use of the text to speech device impact

3    that in your opinion?

4    A    It would for me.  The way we teach students to perform an

5    examination, and the way I try to do that, is that we teach

6    -- we teach students to communicate what they're doing to the

7    patient as they're doing it.

8          So, for example, when I look in a patient's eye, I

9    explain to them that I'm looking at the blood vessels in the

10   back of their eye, that this is an opportunity for me to see

11   not just how the eye works, but also to look for signs of

12   hypertension or diabetes or some other systemic illnesses

13   that arise.  So there's an educational aspect to the physical

14   examination, and patients are generally interested and want

15   to know what you're doing.

16         There's also a more mechanical and practical aspect

17   of the physical examination, in that you need to give

18   instructions to the patient.  Imagine me examining the leg.

19   So I want to tell you to extend the knee, to hold it in

20   place, don't let me push it down, pull it down, don't let me

21   straighten it, I'm going to move it to the side, tell me --

22   I'll end there.

23   Q    And explain how you would envision the use of the text to

24   speech device as effecting that type of physical examination

25   then?

1   A    Typically what we find with patients, what we teach

2   medical students is that you should give one direction at a

3   time.  So it's -- you might imagine that you could say to the

4   patient, Okay, what I want you to do, over the course of the

5   next couple minutes, is first straighten your leg and hold it

6   straight, then bend the knee and keep it bent, then, you

7   know, et cetera.

8          In fact, you can't do that, because people remember

9   the last thing you told them, but they don't remember

10  everything else.  So what would have to happen I think by

11  using a text to speech device is that the examiner would need

12  to enter the -- enter the instruction, and then allow the

13  patient to respond, and then enter the next instruction, and

14  so on.  And if the patient has questions, and then you have

15  to respond to those, too.

16  Q    And would that just be for the examination of a knee or

17  other parts of the body as well?

18  A    No, the other parts of the body as well.  Open your

19  mouth, breathe in and out, take deep breaths, no, with your

20  mouth open, because people don't listen when you tell them

21  what to do sometimes.

22  Q    Now, let's say, for example, a test-taker were using a

23  stethoscope.

24  A    Mm-hmm.

25  Q    And providing instructions to the standardized patient,

1  and that test-taker were using in part the text to speech

2  device.

3          How would you envision that impacting that

4  particular physical encounter?

5  A    It depends on what you're listening to.  So most people

6  think of using the stethoscope to listen to the heart.  When

7  you listen to the heart, and for just listening to the heart,

8  I think what you could say using the text to speech device --

9  say -- tell the patient up front, All right.  I'm going to

10  listen to your heart right.  I just need you to lie quietly

11  until I finish listening to your heart.  And that would be

12  fine.

13          We also use the heart -- the stethoscope to listen

14  to the lungs, and that was the example I gave previously

15  about, Take deep breaths in and out, hold it, okay, open your

16  mouth.  And then there are other times we listen to other

17  parts of the body with a stethoscope to the abdomen and to

18  the neck.

19          In listening to the carotid arteries to hear if

20  there's any abnormal sounds, you would need to tell the

21  patient not to breathe while you're doing that.  So you would

22  issue the command in advance, something probably like, I'm

23  going to listen to your neck.  When I place the stethoscope

24  on your skin, please stop breathing until I remove it.

25  That's how I would imagine it being used.

1   Q    And in doing that, and varying the use of the

2   stethoscope, how would the text to speech device work in that

3   setting?

4   A    Well, I'm assuming you'd have to go back and forth

5   between the exam table and the -- I'm assuming the keyboard

6   would be somewhere nearby, and just go back and forth between

7   the patient and the keyboard.

8   Q    And how, if at all, would that be impacted if, for

9   example, the physician had some sort of medical equipment in

10  his or her hands that they were utilizing?

11  A    Like a stethoscope, for example?

12  Q    Yes.

13  A    It's just -- it's another piece of equipment to have to

14  manage.  I don't think you could use a keyboard and a

15  stethoscope simultaneously.

16  Q    Are there --

17  A    I couldn't.

18  Q    -- are there any other pieces of medical equipment or

19  items that you don't believe a doctor would be able to use

20  simultaneously with the text to speech device?

21  A    My guess would be that most everything, because, I mean,

22  typically with a keyboard, you're using two hands.  I have

23  not seen somebody who can type very effectively with just one

24  hand.  So any -- and every medical -- every piece of medical

25  equipment that we use in the exam room uses at least one

1   hand, so the otoscope to look in the ears, the ophthalmoscope

2   to look in the eyes, the reflex hammer, you know.

3   Q   So, for example, if you were using the otoscope then, and

4   looking in a patient's ear, if it was a two-handed type where

5   they would have to put that instrument down, type some

6   instructions --

7   A   Correct.

8   Q   -- pick it up again, back and forth --

9   A   Right.

10  Q   -- like that?

11  A   Exactly.

12  Q   Okay.  Are you familiar with the phrase "fundamental

13  alteration," Doctor?

14  A   Yes.

15  Q   Would use of the text to speech device fundamentally

16  alter the assessment of the skills that the SEP subcomponent

17  is designed to assess in the viewpoint of the NBME?  So I'm

18  not asking for your personal opinion.  I'm asking you about

19  the NBME's view on that.

20  A   Yes.

21  Q   Why is that?

22  A   It gets to the point that you were asking me about

23  previously, if somebody were to use a text to speech device,

24  could we assess their spoken English proficiency?  And if

25  they're using that 100 percent of the time, there is no

1  spoken English, so there's no ability to assess that.

2         And, again, harkening back to the comments I made

3  previously about the sample size, you know, what if it we're

4  -- we're trying to represent with our examination a

5  prediction of an ability -- of an individual's ability to

6  perform these tasks in the real world?  And if we reduced the

7  size of the sample, we have fundamentally altered the

8  examination.

9         THE COURT:  It's ten past 1:00.  My thought would be

10 for us to recess for lunch at 1:15, if that's an

11 approximately convenient place for you to pause, but if -- if

12 needs another few minutes, that's all right, too.  But then

13 we will recess for an hour at 1:15 or at 1:20.

14        MS. LEOPOLD-LEVENTHAL:  That's fine, your Honor.

15        Dr. Katsufrakis has to be on an airplane this

16 evening and the flight is at 5:50; is that correct?

17        THE WITNESS:  Correct.  If we could -- I mean, what

18 I'd like to do is, if I could leave here by 4:30, so that I

19 can get a half hour to the airport, and then give me a chance

20 to get through security.

21        MS. LEOPOLD-LEVENTHAL:  We will do our best.  I just

22 wanted your Honor to know he --

23        THE WITNESS:  I have a funeral to go to in

24 California, so...

25             THE COURT:  Well --

1           MS. LEOPOLD-LEVENTHAL:  But this is a fine place to

2    break, and I'm not suggesting I can finish his direct

3    examination in 20 minutes, so if you would like a break, then

4    this is a good time.

5           THE COURT:  All right.  You have one other witness,

6    do you, Dr. Farmer --

7           MS. LEOPOLD-LEVENTHAL:  Two other witnesses and a

8    Dr. Clauser who's the psycho-matrition who's going to explain

9    the impact on the grading process with the text to speech

10   device, and a few other issues, but he will be very short, as

11   far as witnesses go.

12          THE COURT:  Well, it doesn't sound as if you

13   anticipate completing your case this afternoon.

14          MS. LEOPOLD-LEVENTHAL:  Maybe if we went to

15   midnight.  Probably not this afternoon, no.

16          THE COURT:  Because I'm not going to be here

17   tomorrow.

18          Well, we'll have to deal with that.

19          All right.  We'll resume then at -- let's see --

20   it's 1:15.  We'll resume at 2:15.

21          MS. LEOPOLD-LEVENTHAL:  Are we in a different

22   courtroom?

23          THE COURT:  Yes, we're in a different courtroom.

24   It's Courtroom 12A, which is just four floors down from here.

25   You'll probably see Judge Rufe's name.  It's essentially the

 1   same.
 2           So if we can see you back here at 2:15?
 3           THE WITNESS:  Of course.
 4           THE COURT:  Very good.
 5           MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.
 6           THE COURT:  We'll undertake to get you out of here
 7   today --
 8           THE WITNESS:  Thank you.
 9           THE COURT:  -- to get your plane.
10           (A luncheon recess was held from 1:14 o'clock until
11   2:24 o'clock p.m.)
12           THE COURT:  Welcome to a different courtroom with
13   different portraits on the wall, but as usual we have a
14   gallery of bad portraits of ancient white males.
15           (Laughter.)
16           Of course I don't know who those people are back
17   there, but if you want to find out, Ms. Bozzelli will tell
18   you, because she's in charge of everything in the courthouse;
19   is that right?
20           MS. BOZZELLI:  No.
21           THE COURT:  We're getting into considerable
22   difficulties about timing, and I just have too many
23   commitments.  I had really thought we were going to finish
24   this afternoon, and I can't meet with you tomorrow.
25           How close to finishing do you expect to be by 6:00

Katsufrakis - Direct                          62

1    o'clock?

2              MS. LEOPOLD-LEVENTHAL:  6:00 o'clock this evening?

3              THE COURT:  Yes.

4              MS. LEOPOLD-LEVENTHAL:  We'll be into our second

5    witness, and I don't anticipate more than an hour-and-a-half

6    of direct for her.  I can't predict the cross.  And my third

7    witness is very short.

8              THE COURT:  I see.  So you're thinking that by the

9    end of this afternoon we'll need, what, two hours to wind up,

10   between the --

11             MS. LEOPOLD-LEVENTHAL:  I think three hours to be

12   safe.

13             THE COURT:  Two or three hours.

14             Well, suppose we get started Monday at 8:30?  And

15   I'm really going to push both counsel to be succinct.  I'm

16   going to get in trouble with Ms. Bozzelli if I allow much

17   more court time.  She keeps telling me of the other matters

18   that we have to address.

19             And she's right, so --

20             MR. WEINER:  Your Honor, could we have a courtroom

21   designation for Monday?

22             MS. BOZZELLI:  Someone is working on that right now

23   and I should know in the next hour or so.

24             MR. WEINER:  Okay.

25             MS. BOZZELLI:  And I can always contact you tomorrow

1    if I don't know.

2              MR. WEINER:  That's fine.

3              THE COURT:  But I think it's going to be the one on

4    the 17th floor.

5              MS. LEOPOLD-LEVENTHAL:  And are we --

6              MR. WEINER:  I'll tour the courtrooms.

7              MS. LEOPOLD-LEVENTHAL:  -- are we going until 6:00

8    this evening?  I just want to make sure.  I'm going to call

9    another witness and make sure she's here.

10             THE COURT:  Tonight we're going to go until 6:00

11   o'clock.

12             MS. LEOPOLD-LEVENTHAL:  Okay.

13             THE COURT:  All right.  I guess we're going to bring

14   you back, sir, for more examination.

15             PETER KATSUFRAKIS, resumes the stand.

16             THE COURT:  I'm getting to see courtrooms that I

17   haven't -- not merely sat in them before, but haven't held

18   before, so that's a result of our dispersion.

19             All right.

20   BY MS. LEOPOLD-LEVENTHAL:

21   Q   In a bit of a wrap-up of the examination, Doctor, I'm

22   asking you to consider the CIS subcomponent, which you

23   described earlier this morning.

24             What impact would use of an assistive device, such

25   as text to speech, have on measuring the CIS subcomponent?

Katsufrakis - Direct                                    64

1   And when I ask you to that question, I'm asking with respect

2   to use of the device either intermittently, or throughout the

3   entire examination.

4   A   For the CIS scale, so, again, that has the three

5   components; information gathering, information sharing, and

6   physician manner and rapport, it would permit information

7   transmission, so information gathering and information

8   sharing while slower should still be able to proceed,

9   assuming there were sufficient time.  If additional time were

10  not granted, then it would probably impact the examinee's

11  ability to accomplish all the tasks needed within the

12  15-minute slot.

13          For the physician manner and rapport, it would

14  dramatically, substantially alter the interaction between the

15  examinee and the patient.  So you would have -- the richness

16  of the nonverbal communication that I described previously

17  would be fundamentally altered.

18          I feel certain that the rapport would be

19  substantially diminished.  It would change the character --

20  it would also, I think, effect the examinee's ability to read

21  the patient, and to gather the nonverbal cues that the

22  patient was providing.

23  Q   Are you also aware that Mr. Hartman had requested to use

24  an orator on the Step 2 examination?

25  A   Yes.

1    Q    And do you know how he proposed to use the orator?

2    A    No, I don't.

3    Q    Okay.  I'll tell you, he had requested to type words and

4    have the orator speak the words that he had typed.

5              Given that assumption, do you believe that was an

6    appropriate or inappropriate accommodation, use of an orator?

7    A    Again, I think it's a fundamental alteration.  It would

8    introduce a different level of complexity, because of having

9    a -- having an additional person interposed into that

10   communication chain.

11             So there would be presumably nonverbal communication

12   and vocal tone -- the other para-verbal information would be

13   the orator's and not the examinee's -- so that would -- we

14   would be assessing to some extent the orator's ability to use

15   nonverbal communication more than we would be assessing the

16   examinee's ability.

17   Q    You are aware that Mr. Hartman took the Step 2 CS exam in

18   June of 2009, correct?

19   A    Yes.

20   Q    And you understand that he passed two of the three

21   subcomponents, the ICE and SEP, correct?

22   A    That's my understanding.

23   Q    Why is it, Doctor, that the NBME can't simply take Mr.

24   Hartman's passing score on the ICE and SEP subcomponents from

25   the June '09 exam, and then Mr. Hartman would only have to

1   pass the CIS subcomponent?

2   A    So take two scores from one administration and one from

3   another?

4   Q    Yes, sir.

5   A    That would be akin to administering a multiple choice

6   examination where there's 100 questions.  And you take the

7   score on 50 of them from the first time you take it, and you

8   take the best 50 from the next time you take it.  It's not

9   the same examination.

10  Q    You're aware that the NBME granted Mr. Hartman

11  time-and-a-half on that administration, correct?

12  A    Yes.

13  Q    And you understand that since then, as of September, the

14  NBME has offered Mr. Hartman double time for the Step 2 CS,

15  correct?

16  A    That's my understanding.

17  Q    Do you believe that the offering of time-and-a-half

18  constitutes a fundamental alteration of the skills assessed?

19  A    Probably not.  Probably not.  I don't know -- and the

20  reason I pause -- there's probably a line somewhere.  So at

21  some point, given that we are trying to replicate a clinical

22  interaction between a physician and a patient, there's some

23  point at which time becomes immaterial.  Time-and-a-half,

24  probably not.  Ten times, definitely.

25          What's the line?  I don't know.

Katsufrakis - Direct                                67

1  Q   What about double time?  In the NBME's view, would that

2  fundamentally alter the examination?

3  A   I think that would still be within the acceptable limits.

4  Q   Would the NBME have offered Mr. Hartman the

5  accommodations of time-and-a-half or double time if they had

6  concluded it constituted a fundamental alteration?

7  A   No.

8  Q   Dr. Katsufrakis, did you prepare a declaration on behalf

9  of the NBME as related to the Hartman case?

10  A   Yes.

11  Q   Would you please take a look at Exhibit 35 in the white

12  binder in front of you, defendant's exhibit binder?

13  A   (Witness complies.)

14          Okay.  I'm there.

15  Q   Is this a true and correct copy, to the best of your

16  knowledge, of the declaration you prepared in this case?

17  A   Yes.

18          MS. LEOPOLD-LEVENTHAL:  I'd like to mark Tab 35 as

19  Exhibit D-6, and introduce it into evidence at this time.

20          THE COURT:  Fine.

21          (Defendant's Exhibit D-6, Tab 35, admitted.)

22  BY MS. LEOPOLD-LEVENTHAL:

23  Q   I don't plan on going through the exhibit with you, Dr.

24  Katsufrakis, but would ask you:  Is everything set forth in

25  your declaration true and correct to the best of your

1  knowledge, sitting here today?

2  A    Yeah, definitely.

3  Q    There's been an allegation that the standardized patients

4  would be biased against a person with a stutter and might

5  even assume that he's less intelligent than a test-taker

6  without a stutter.  That's sort of my way of introducing the

7  subject matter of training of standardized patients.

8        Would you, please, describe for the Court the

9  training of these standardized patients before they are

10  permitted to participate in a live encounter?

11  A    So the training begins actually before the -- the actor

12  appears, because there's -- there's a lot of work that goes

13  into developing the case, which I won't go into unless you

14  ask me to.

15        But assuming that's all taken place, a standardized

16  patient is first trained generally about the examination, so

17  familiarized with the proper behavior, the expected -- what

18  we expect of the SPs, what we expect of the examinees, what

19  to do with irregular behavior on the part of the examinee,

20  the normal kind of operating procedures for our SP program.

21        Then the patient is trained on the specifics of

22  their case, so they'll meet one-on-one for hours at a time on

23  a number of occasions with a case trainer to familiarize

24  themselves with the case.  As they become more familiar,

25  their trainer will then test them and role play with them,

1  the interaction with the SP.

2          As they get more familiar with the case, then

3  they're also trained on the scoring rubrics that are unique

4  to each case.

5          Then they go into a -- they do a practice

6  examination with some residents, or other doctors that we've

7  hired, to simulate examinees.  And then once they've passed

8  all that, they go into the live examination.

9          Now, when they're in the live examination initially,

10  they're not scored.  We tell examinees that of the 12 cases

11  they'll see in a given day, there may be one, or I think

12  maybe even up two, that are not scored.

13          So the new SP is in the real environment, but they

14  don't -- their performance and their ratings don't contribute

15  to the actual score of the examinee, until they've done some

16  number.  And I don't know what that is.  It's probably on the

17  order of 20 to 40, but I don't know exactly how many

18  portrayals they have to do before they're then released into

19  the live examination.

20          So that's the initial training, and then there's a

21  continuous quality monitoring process.  All the interactions

22  are videotaped, so we have quality assurance people who

23  sample the performances of the SPs, and if they identify any

24  training needs, we'll then pull the SP out of the live exam,

25  and retrain them and...

1          THE COURT:  I take it the examinee doesn't know

2    which interviews --

3          THE WITNESS:  No.

4          THE COURT:  -- are not scored?

5          THE WITNESS:  No.  Just -- and we do that with our

6    multiple choice questions in the exam as well.  Before we --

7    before we can use an item to contribute to an actual score,

8    we need to know how that item performs under as real

9    conditions as we can simulate.

10         So we learn for some of the multiple choice

11   questions that on average 70 percent of the people get this

12   one right, versus on average 20 percent of the people get

13   this one right.  So that we can then equate between those and

14   make sure that this collection of 300 multiple choice

15   questions is roughly about as hard as this collection that

16   this other examinee sees.

17         So, too, with the standardized patients.  We go

18   through a standardization process, not quite equivalent to

19   that, because it's not having to do with item difficulty, but

20   that's a long-winded of saying, No, the examinee doesn't

21   know.  Sorry.

22   BY MS. LEOPOLD-LEVENTHAL:

23   Q   Does the NBME continue to employ quality control measures

24   to insure that SPs are grading on content, rather than bias,

25   once the person's been trained and is continuing to be an SP?

Katsufrakis - Direct                    71

1    A    Exactly.  So part of our quality process that I referred

2    to insures that they continue to portray the content of the

3    case correctly, and that they score the various different

4    elements of the case correctly.  So we have a videotape that

5    a trained quality person can look at and compare what she or

6    he would have generated with what the SP generates.  And if

7    there's a significant discrepancy, then, you know, we deal

8    with that.

9    Q    Dr. Katsufrakis, are you aware that the NBME has granted

10   other applicants with a speech dysfluency additional time as

11   an accommodation on the Step 2 CS exam?

12   A    Yes, I am.

13   Q    Assuming, for the purposes of my question, that those

14   individuals were disabled under the law, is it the NBME's

15   position that granting additional time to those applicants

16   was an appropriate accommodation?

17   A    Yes.

18   Q    Has the NBME, at any time from 2004, when the test was

19   first put in place, through today, ever approved a request

20   for an accommodation on the Step 2 CS exam, which would have

21   allowed a test-taker to use an electronic substitute for the

22   examinee's speech?

23   A    Not to my knowledge.

24   Q    On one occasion did the NBME permit a hearing impaired

25   applicant to use a dual sign language interpreter on the

1   test?

2   A    That is my understanding.

3   Q    Would you, please, briefly describe for the Court the

4   circumstances surrounding the NBME's decision to allow a

5   hearing impaired applicant to use the dual sign language

6   interpreter?

7   A    As best I understand the circumstances, there was an

8   examinee who came forward who was deaf mute, and I know that

9   there was substantial review of how best to handle this

10  situation.  I don't know the details, but I know that it fell

11  well outside of the routine way that we handle such requests.

12          My understanding is that ultimately what was allowed

13  was a -- the use of -- I guess it was a couple of

14  interpreters.  Basically -- and the way I think of it is --

15  it would be akin to a foreign language translator, so if --

16  if I didn't speak English, I spoke Mandarin Chinese, there

17  would be somebody who spoke both Mandarin and English.

18  Well, doing the same thing with ASL for this examinee.

19  Q    Was that individual scored on the SEP subcomponent?

20  A    My understanding was that -- and I think this is the only

21  time this has been done -- we issued a transcript that

22  indicates that SEP was not assessed.

23  Q    What impact, if any, did that nonreport have on the

24  individual's medical license?

25  A    I'm sorry.  I don't know the answer to that.

Katsufrakis - Direct                    73

1   Q   Okay.  If Mr. Hartman was permitted to use a TTS device,

2   would the NBME be able to compare his performance on the Step

3   2 CS exam to other test-takers who took the exam under a

4   standard administration?

5   A   No, I mean, it would not be the same examination.

6            THE COURT:  Would you excuse me?

7            Would you mind if we went back with the witness on

8   one item to the report that was made, to the extent the

9   witness knows about it, in the sign language scenario?

10            I'm not that I get a sense of what report was made.

11   Some report was made, as I understand it, from what you're

12   saying, and that this deviated from the standard the way it

13   was done.

14            THE WITNESS:  Yes, and I have not seen the

15   transcript.  My understanding is that it contains an

16   annotation saying that spoken English proficiency was not

17   assessed.

18            THE COURT:  I see.

19            THE WITNESS:  As I say, I don't think we've ever

20   done that, other than that.

21            THE COURT:  And there was a report with respect to

22   passing or not passing the other two subcomponents?

23            THE WITNESS:  That's my understanding, yes.

24            THE COURT:  Okay.

25            THE WITNESS:  And, actually, as we talk about this,

Katsufrakis - Direct                              74

1  I think that this individual has not been licensed, but I

2  don't -- I wouldn't want to swear to it further, Judge.

3  BY MS. LEOPOLD-LEVENTHAL:

4  Q   Moving from the examination setting to a real world

5  setting where doctors operate every day, are you familiar,

6  Doctor, with the phrase "undifferentiated license"?

7  A   Yes.

8  Q   Describe what that phrase means, please.

9  A   State Medical Boards throughout the U.S., typically,

10  without exception, issue an undifferentiated license to

11  practice medicine.  Now, I say "typically," because there may

12  be unique circumstances that an occasional board may

13  undertake, but in a physician's license to practice medicine,

14  their license to practice whatever kind of medicine they --

15  they are qualified to practice, and that's in their own

16  judgment.

17         So I'm Board Certified as a family physician.  I

18  could go out tomorrow -- I couldn't say that I was a Board

19  Certified Plastic Surgeon, but I could say that I perform

20  plastic surgery, and to the extent that I was able to perform

21  reasonably, and that people didn't detect that there was a

22  problem, I could continue in that practice.  The regulatory

23  mechanisms available to states are much more reactive to

24  problems than they are designed to identify and insure that

25  people are practicing within the actual scope of their

1   capabilities.

2            So an undifferentiated license really gives somebody

3   a license to practice medicine however they choose to.

4   Q   For example --

5            THE COURT:  I --

6            MS. LEOPOLD-LEVENTHAL:  No, please go ahead.

7            THE COURT:  If there's any generalization to be

8   made, I'd be glad to know it, or if there is not, the fact

9   that there's not.

10            Would it be, in your judgment, likely that most

11   hospitals to whom a -- to which a physician applies for

12   hospital privileges, would be interested in knowing the range

13   of specialties, and perhaps confining the privileges to a

14   particular aspect of practice?

15            THE WITNESS:  I would say probably without doubt.

16   Most hospitals have fairly rigorous processes of

17   credentialing, whereby they go through an initial review

18   process, and often do what's called primary source verifying.

19            So they go back -- they wouldn't take an attestation

20   from somebody else, say from another hospital that you've

21   completed medical school.  They'll go directly back to your

22   medical school and ask for the proof.

23            So most hospitals that go through that process

24   initially, and then they will recredential people on a

25   periodic basis.  Usually on a one, two, or three-year cycle

Katsufrakis - Direct                              76

1  where they'll typically ask for evidence of continued medical

2  education, and they might ask for evidence, if the surgeon,

3  ongoing practice number of cases conducted, et cetera.

4        The real problem is not the physician who's

5  practicing within the confines of a hospital, and is an

6  active member of a medical staff, but more the individual

7  who's not a hospital -- is not hospital privileged.  In a

8  practice, in solo practice, or in some setting where his or

9  her activities don't come under the same kind of scrutiny.

10       And there's nothing inherent in the practice of

11 medicine that requires hospital privileges.  In fact, right

12 now I don't have active hospital privileges, although I still

13 see patients.

14       THE COURT:  I see.  But if you were to get hospital

15 privileges in Santa Monica, the hospital would be likely to

16 make sure that you did not practice ophthalmology in that

17 hospital?

18       THE WITNESS:  To the extent that I wanted to do

19 something within that hospital, they would insure that the

20 scope of my practice was consistent with their review of my

21 records.  But I could hold myself -- and, in fact, I could go

22 through the process of obtaining privileges as a family

23 physician with my Board Certification.  It might say nothing

24 in those privileges about doing abortions.  But in my own

25 office, separate from the hospital, I could perform

Katsufrakis - Direct                    77

1    abortions.

2              THE COURT:  Mm-hmm.

3              THE WITNESS:  And those would be under nobody's

4    scrutiny.

5              THE COURT:  Got you.

6    BY MS. LEOPOLD-LEVENTHAL:

7    Q    If Mr. Hartman passes Step 1, Step 2, and Step 3 of the

8    USMLE, would he then be granted an undifferentiated medical

9    license?

10   A    Assuming he met the state's other requirements, yes.

11   Q    Mr. Hartman has testified that he hopes to become a

12   pathologist.

13             Would you describe what a pathologist does?

14   A    There's a range of things that pathologists can do, but

15   just to kind of think of it, typically a pathologist would

16   examine specimens from patients, and make a determination

17   about disease or pathologies.  So when we blood tests done,

18   those are done under the license and supervision of a -- of a

19   pathologist.

20             Now, in fact, for most of the blood tests that are

21   done these days, it's an automated process run by a computer,

22   but ultimately there's a pathologist who is responsible for

23   those results.

24             The pathologist's day-to-day activities would

25   probably be more likely involved in direct inspection of

1    pathologic specimens, either growth specimens or microscopic

2    specimens.

3    Q   Are verbal communication skills important to a

4    physician's role as a pathologist?

5    A   Certainly.

6    Q   Why?

7    A   Well, let me distinguish, when you say "verbal," do you

8    mean verbal or oral, and this is something that we talk about

9    at the NBME?

10        If you're talking about oral, there's much

11   communication that takes place, verbal communication that can

12   be written, and most communication between pathologists and

13   other physicians around laboratory results is documented in a

14   written record.  Now, there may also be oral communication.

15   Not infrequently, a physician will call and speak to the

16   pathologist.

17        I did this within the past month.  I had a patient

18   where I submitted a biopsy and they didn't cap C carcinoma.

19   I was sure it was cap C carcinoma.  Well, he hadn't done the

20   correct test for it.

21        So I had a conversation with him, and he said, Oh,

22   yeah, given that history, I'll do it, and he did it, and

23   found it, and that all worked out.

24        Probably the more critical scenario where a

25   pathologist's oral communication would be -- would come into

Katsufrakis - Direct                          79

1    play -- would be around some surgical procedure.

2              So say you had the misfortune to have breast cancer.

3    Sometimes what's done in surgical procedures is that while

4    the patient is in the OR anesthetized, a specimen is obtained

5    and sent down to the laboratory for a frozen section.  And

6    then it's -- there time is of the essence, because the longer

7    somebody is under anesthesia, the greater the chances for any

8    bad complications to occur.  So there the report is usually

9    from a pathologist directly to the surgeon telephonically

10   describing the findings.

11   Q   Are there any types of procedures or surgeries or

12   biopsies that would require that sort of instant or speedy

13   analysis and communication between the pathologist and a

14   surgeon, for example?

15   A   Any number where you want to get a frozen section like I

16   just described, and I used breast cancer, because that's

17   maybe one of the more common examples, but there are a number

18   of cancer-related diagnoses -- and I'm just trying to think

19   if there are non-cancer cases.

20             There's a -- there's a procedure called Mohs

21   surgery, M-O-H-S surgery, and that's used for some kinds of

22   skin cancer.  And that's a conservative -- conservative in

23   the sense that you want to conserve as much tissue as you

24   can.  Sometimes you've got a large lesion, or a lesion on the

25   face, or some other very prominent area where you want to

Katsufrakis - Direct                          80

1    take just as much cancer as exists and no more.

2           So the surgeon would make a first cut, and then the

3    pathologist examines all of the margins, all of the area that

4    had been cut, identifies where those -- if there are areas

5    that still have persistent tumor, so the surgeon can return,

6    carve out, and this is an interview process that may require,

7    you know, any number of excision, examination, communication,

8    excision, et cetera, until all of the tumor is removed.

9           THE COURT:  Mohs, M-O-H-S.

10          THE WITNESS:  M-O-H-S.  Yes, I think it's named

11   after the person who first described it or performed it.

12          THE COURT:  Would this kind of process be involved,

13   let say with melanomas?

14          THE WITNESS:  Yes, exactly.

15          THE COURT:  All right.

16   BY MS. LEOPOLD-LEVENTHAL:

17   Q   If, for example, Mr. Hartman was granted an

18   undifferentiated license, is it fair to say that he could

19   apply for a residency, let's say, in emergency medicine, or

20   pediatrics, or OB/GYN?

21   A   Any medical specialty.

22   Q   Okay.  What do residency programs assume when they

23   receive a passing score on the Step 2 CS examination, for

24   example?

25   A   That the individual has demonstrated competency in the

Katsufrakis - Direct                                    81

1    areas that the Step 2 CS assesses.

2    Q    Do you believe it would be appropriate to use a text to

3    speech device either intermittently or exclusively in an

4    emergency room situation?

5    A    Personally I think that you would compromise patient

6    care.

7    Q    Why is that?

8    A    Because high-quality instantaneous communication is

9    necessary.  It's critical.  Absolutely, I mean, people's

10   lives will depend on that.

11   Q    And if Mr. Hartman was granted an undifferentiated

12   license, is it fair to say that there would be nothing to

13   prevent him from going into, for example, the field of

14   emergency medicine?

15   A    The license would not limit him.  He would be free to

16   pursue training in emergency medicine.

17   Q    Doctor, are there certain medical situations, or types of

18   treatments, that would require the physician to hold medical

19   equipment in his or her hands while they're providing medical

20   treatment?

21   A    Yes.

22   Q    Would you provide just a few examples?

23   A    Revisiting those I talked about earlier, the otoscope,

24   the ophthalmoscope, the stethoscope, tuning fork, measuring

25   tape, pin prick, a soft piece of cotton, and then if we get

1   into the operating room, there's, you know, we don't have --

2   we don't -- the Judge has asked us to be succinct.

3   Q    What impact, if any, would you use of a text to speech

4   device have on those circumstances where a doctor needs to

5   either hold or work with medical equipment to administer

6   medical treatment?

7   A    I can't imagine that you would be able to use a keyboard,

8   and any of the instruments I've named, simultaneously.  So

9   you would have to shift between one or the other activity.

10  Q    Are there certain medical situations where a doctor would

11  need to impart either a sense of calm or a sense of urgency?

12  A    Oh, in the emergency -- you referred to the emergency

13  room previously, so that's perhaps the most dramatic example.

14  But I would in almost every patient encounter, it's important

15  to modulate the communication by either increasing the sense

16  of urgency, communicating to the patient that because they

17  don't have symptoms from their hypertension, that doesn't

18  mean it's not a problem, or conversely, tranquilizing them,

19  providing a calming effect to the patient who is overly

20  anxious for whatever reason.

21  Q    Similarly, are there obviously medical situations where

22  some sort of swift action would be needed to save a life?

23  A    Undoubtedly.

24  Q    Okay.

25  A    And the emergency room presents all manners of

1   opportunities for that.

2   Q   And what impact, if any, would use of a text to speech

3   device have in a situation where some sort of quick action

4   was necessary?

5   A   Well, assume bleeding.  Assume there's substantial

6   bleeding.  The text to speech device would delay whatever --

7   whatever action was needed.  If the situation required the

8   physician's direction, and most of those kinds of situations

9   do, then there would be an inevitable delay compared with the

10  ability of the physician to issue verbal -- oral

11  communication.

12  Q   Are there, Doctor, positions in the medical field that

13  Mr. Hartman could pursue, which would not require that he

14  pass the United States Medical Licensing Examination?

15  A   Undoubtedly.

16  Q   Could you --

17  A   He could pursue pathology.  Without a -- without a

18  license to practice medicine, he could not be a licensed

19  clinical pathologist.  However, he could practice in a

20  research setting, he could work in a hospital where he wasn't

21  the licensed clinical physician, he could work for a drug

22  company, besides doing medicine not related to pathology, but

23  given his expressed interest in pathology, there are other

24  avenues that are available.

25  Q   And if he were to pursue an avenue in pathology, as you

1  describe, would he be considered a research pathologist?

2  A   I guess it depends upon what his particular interest was.

3  He could, if that's what he wanted to do.

4  Q   And that wouldn't require passage of the USMLE, correct?

5  A   No, that's correct.

6  Q   Is there any danger in allowing Mr. Hartman to take the

7  Step 2 CS exam using the assistive technology, but then him

8  not using that technology when he's out in the field of

9  medical practice?

10  A   Could you ask the question again?

11  Q   Sure.

12         Assuming that Mr. Hartman utilizes the text to

13  speech on the examination and passes, is there any danger or

14  problem with him then going out into the field of medicine

15  and not using the text to speech device at all?

16  A   I understand.  Thank you.

17  Q   Sure.

18         MR. WEINER:  Your Honor, I'm going to object.  This

19  matter is about accommodations on the Step 2 CS.  There's

20  really no relevancy to what Mr. Hartman may do or intends to

21  do once he practices medicine.  There's no indication whether

22  Mr. Hartman's speech dysfluency may resolve itself at some

23  point in history.  It's really an irrelevant question and

24  it's hypothetical.

25         Quite frankly, I'm not sure how the witness has the

1   ability to testify in this area.

2        THE COURT:  Well, I don't think the -- I didn't

3   think the question is personalized necessarily with respect

4   to Mr. Hartman.  I can't remember the vocabulary that was

5   used by counsel.  Maybe she used Mr. Hartman, but I take it

6   the question addresses a general category of situations in

7   which an examinee was permitted to have this TTS apparatus

8   employed for the examination process, would it make a

9   difference if such a person were then not to use such a

10  process in the practice of medicine, or in some aspects of

11  it?

12        I think that's probably a legitimate line of

13  questioning to pursue, to the extent that it may shed some

14  light on what the goals of the examination process are.

15        So I'll allow it to be pursued and I will not take

16  the question as involving simply Mr. Hartman, but a range of

17  possible examinees.

18        And in that sense, the fact that, Mr. Weiner, that

19  you classify it as a hypothetical, I don't think that -- I

20  don't think that's troublesome.  We have an expert on the

21  stand.  I guess -- I'm not sure that we've qualified the

22  witness as an expert except, as I understand it, who is a

23  licensed a physician, at least in Pennsylvania, but for

24  courtroom purposes is an expert on everything within the

25  field of medicine, which may seem an odd ruling, but I think

1    it's true here.

2           THE WITNESS:  It's consistent with other ways an

3    M.D. license is treated.

4           Let me just restate the question, as I understand

5    it.

6           What I heard you ask me is that if an examinee were

7    to use a text to speech device for the CS examination, and

8    then not to use it in practice.  So that's the hypothetical.

9    So what's the question?

10   BY MS. LEOPOLD-LEVENTHAL:

11   Q   Is there any danger?  Is there any impact?  Does that

12   effect, in your view, that person's treatment of patients?

13   A   As I've -- as I've mentioned, that change fundamentally

14   alters the examination.  So the -- so we cannot infer what

15   that result -- what that result would be, and so we cannot

16   attest to the soundness of a license and practice that didn't

17   use the TTS based upon such a test.

18          Now, going beyond that, I think that my concern

19   would be that the individual who may have been demonstrated

20   to have a degree of proficiency while using a TTS, if that

21   individual didn't use that in the future, that proficiency

22   disappears.  So it's device dependent.

23   Q   And I believe I heard you testify earlier as to problems

24   that might be created to the extent that an individual became

25   an M.D. pathologist, where speed and quick communication

                          Katsufrakis - Direct                    87

1   might be implicated.  Do you recall that?

2   A    Correct?

3   Q    Are those same problems created to the extent that Mr.

4   Hartman, or someone else, would pursue a field as a research

5   pathologist rather than an M.D. pathologist, if I'm using the

6   words right?

7   A    I cannot imagine a situation where a research pathologist

8   would be required to respond to frozen sections in a --

9   coming from a live operation.  So I think there would be a

10  fundamental difference in terms of the impact.

11              MS. LEOPOLD-LEVENTHAL:  Nothing further.

12              Cross-examine.

13              (Pause.)

14                         CROSS-EXAMINATION

15  BY MR. WEINER:

16  Q    Good afternoon, Dr. Kat -- you'll have to forgive me, I

17  have a voice that's fading -- but Katsufrakis.

18  A    And, you know, people call me Dr. K.  So if that's

19  easier, save the syllables.

20  Q    Okay.  Thank you.

21              You assisted counsel with the preparation of

22  defendant's answers to plaintiff's interrogatories.  Do you

23  recall that?

24  A    Could you --

25  Q    A list of written questions that I had sent to the NBME.

Katsufrakis - Cross                                      88

1   A    I believe so.

2   Q    Okay.  And I'd like to -- if you'd refer to in

3   plaintiff's binder --

4   A    That's the black one?

5   Q    -- to Tab 32.

6   A    The black one?

7   Q    Yes, and this appears to be the first time I'm using it,

8   so I will mark it as Plaintiff's Exhibit 20.

9   A    And this is defendant National Board of Medical Examiners

10  answers to plaintiff's interrogatories?

11  A    Yes.

12  Q    Okay.

13           (Pause.)

14           And under Interrogatory No. 1, the question was:

15  "Identify each person participating in the preparation of the

16  answers to these interrogatories and supply information used

17  in such preparation and indicate the interrogatories with

18  respect to which he or she was involved."

19           And the response on -- which goes on to Page 2 has

20  your name listed last, and it indicates:  "Provided

21  information concerning reasons the use of text to speech

22  technology would fundamentally alter the nature of the

23  service provided."

24           Do you see that?

25  A    Yes.

1   Q    So is that information correct?

2   A    Yes.

3   Q    Now I'd like you to turn to Page -- it would be 4 -- and

4   the question is:  "Describe how the granting of the use of a

5   computer or electronic device with text to speech software to

6   communicate during the patient encounters would fundamentally

7   alter the measurement of the skills or knowledge the

8   examination is intended to test or to result in an undue

9   burden."

10          Do you see that question, sir?

11  A    I do.

12  Q    And the response is:  "The spoken English proficiency,

13  SEP portion of the Step 2 clinical skills, CS examination, is

14  designed to assess the effectiveness of the examinee's spoken

15  English communication within the context of the simulated

16  doctor-patient encounter.  The SEP portion of the Step 2 CS

17  includes, but is not limited to, the assessment of the

18  examinee's word pronunciation, and the amount of listener

19  effort required for the standardized patient, the SP, to

20  understand the examinee's spoken question, and spoken

21  responses.  Granting the use of a computer electronic device

22  with text to speech software to communicate during the

23  patient encounter will fundamentally alter what the SEP

24  portion is intended to measure by replacing the examinee's

25  spoken language with a written text and computer generated

Katsufrakis - Cross                              90

1    speech."

2              Did I read that correctly?

3    A    Yes.

4    Q    And Interrogatory 5, can you take a look at Interrogatory

5    5?

6    A    The same page?

7    Q    Yes, sir.

8    A    (Witness complies.)

9    Q    And there the question is:  "State in detail the reasons

10   for denying plaintiff's request for use of a computer or

11   electronic generated device with text to speech software to

12   communicate during patient encounters on the examination."

13             Did I read that correctly?

14   A    You stuck in the word "generated," according to the

15   version I have, but that's okay.

16   Q    Okay.  I'm sorry.  Other than that one correction, is

17   that the question?

18   A    I think so, yeah.

19   Q    And the response to that question is identical to the

20   response to Interrogatory 4?

21   A    I'll take your -- do you want me to look at?

22   Q    If you would like, feel free to take your time reviewing

23   the answer and comparing it with the answer to Interrogatory

24   4.

25             (Pause.)

Katsufrakis - Cross                          91

1    A    It looks like they're the same.

2    Q    Okay.  In your answers to Interrogatories 4 and 5, and

3    you were involved in the preparation of those answers; is

4    that correct?

5    A    I believe so, yes.

6    Q    And in your answer to Interrogatories 4 and 5, you do not

7    contend in those answers that text to speech software

8    fundamentally alters the integrated clinical encounter, the

9    ICE, correct?

10   A    That's correct.

11   Q    And in your answer to Interrogatories 4 and 5, you do not

12   contend that text to speech fundamentally alters the

13   communication, the interpersonal skills, or the CIS

14   subcomponent; is that correct?

15   A    That's correct.

16   Q    I'd like you to turn to Tab 1.

17   A    (Witness complies.)

18   Q    And this is the content description and general

19   information for the Step 2 clinical skills examination, and

20   this is a document that's published and put out by NBME?

21   A    It appears to be.

22   Q    And this is a document that is available for all the

23   individuals who would wish to take this examination; is that

24   correct?

25   A    Typically it's posted on the web with public access.

1    Q    Right.  So anyone could come and review this document?

2    A    Yes.

3    Q    And this provides full information available to the

4    public regarding the examination?

5    A    I'd be reluctant to say "provides full information" --

6    Q    Well, available to the public, correct?

7    A    There may be other information that's available to the

8    public about this examination that's not contained here, but

9    certainly the intent is to provide a comprehensive view of

10   what's -- what the examination involves.

11   Q    And if you turn to Page 10 of the document under Tab 1.

12   A    (Witness complies.)

13   Q    For the description of the ICE subcomponent, nowhere in

14   that description does it use the word "speech" as being

15   something that must be used on the examination, does it?

16   A    And you're looking at the top of the second column?

17   Q    Yes, I am, sir.

18   A    The first line.  The two bullets points on the next

19   paragraph?

20   Q    Yes.

21   A    Just a moment.  Let me look at that.

22        (Pause.)

23        That's correct.

24   Q    And for the description of the CIS subcomponent, nowhere

25   in the description of the CIS subcomponent is it required

Katsufrakis - Cross                          93

1   that speech be used; is that correct?

2            MS. LEOPOLD-LEVENTHAL:  Your Honor, I would object

3   to that question.

4            I don't think the witness has testified that these

5   are the requirements.  I think they are descriptive in nature

6   as to what is assessed.  I think the question as posed is

7   assuming something that there's no foundation for.

8            THE COURT:  Well, I didn't -- I guess I -- I didn't

9   appreciate that the question was put in terms of

10  requirements.  I thought we were simply dissecting a

11  description, obviously, an authorized high-level description.

12           So I'll --

13           MR. WEINER:  I could change my question, your Honor.

14           THE COURT:  -- take it as that.  What?

15           MR. WEINER:  I could change my question, if that

16  would satisfy your Honor?

17           THE COURT:  Well, that's the way I'll -- you can

18  change it if you want or I'll simply accept it in those

19  terms.

20           MR. WEINER:  Thank you.

21  BY MR. WEINER:

22  Q   Does the description for the CIS, in terms of what it

23  assesses, utilize the word "speech" as being one of the items

24  which is assessed in the CS 2 examination?

25  A   Well, the word "speech" is not used.

1          (Pause.)

2          I'm just looking to -- I didn't finish the last

3     paragraph.

4          But, for example, the first bullet point under CIS,

5     questioning scales, examples include use of open-ended

6     questions, transitional statements, facilitating remarks.

7     Those are typically manifestations of speech.

8     Q   But they could be manifestations of some other form of

9     communication; isn't that correct?

10    A   Yeah, I think so.  Facilitating remarks, maybe not, but

11    certainly open-ended questions and transitional statements.

12    Q   And going back to my question:  Nowhere does it use

13    speech as being one of the items assessed under the CIS,

14    correct?

15    A   I did not see the word "speech".

16    Q   Is it your position that --

17         THE COURT:  I'm not quite sure where this line of

18    questioning takes you.

19         Is the -- I mean, we're not construing a statute

20    here.  If the point is that as of a matter of syntax,

21    questioning skills don't have to be oral, surely that's

22    right, but --

23         MR. WEINER:  Your Honor, this goes to --

24         THE COURT:  -- I wonder if your question doesn't

25    really go to what do those who formulated this description

1    and published it --

2            MR. WEINER:  Your Honor, this witness went on --

3            THE COURT:  -- what do they have in mind.

4            MR. WEINER:  -- at length about --

5            THE COURT:  Pardon?

6            MR. WEINER:  This witness went on at length as to

7    how text to speech fundamentally alters the measures assessed

8    in the Step 2 CS, for both the ICE and CIS portions, whereas

9    their interrogatory only identifies the SEP portion, and

10   nothing in their content description indicates that assessed

11   speech.

12           THE COURT:  All right.  Okay.  Go ahead.

13   BY MR. WEINER:

14   Q    Is it your position that speaking is a skill or

15   knowledge?

16   A    Yes.

17   Q    Are you familiar with the pass rate skills for the spoken

18   English proficiency section, subcomponent for American and

19   Canadian skills?

20   A    Could you ask the question again?

21   Q    Are you familiar with the pass rate results, the

22   historical pass rate results, on the spoken English

23   proficiency subcomponent for past administrations of the Step

24   2 CS for American and Canadian schools?

25   A    I'm sure I've seen them.  I wouldn't say I was familiar

1   with them.

2            (Pause.)

3   Q    I'm going to just show you a document which is from

4   NBME's annual report.  Do you recognize this document?

5   A    I've seen if not this, something like this.

6   Q    Okay.  Does this refresh your recollection --

7   A    Yes.

8   Q    -- or knowledge about the results, the historical results

9   of the Step 2 CS examination?

10  A    Yes.

11  Q    And isn't it true that for all U.S. and Canadian schools,

12  the pass rate for the 2006-2007 year for the SEP

13  subcomponent, was 100 percent?

14  A    Yes.

15  Q    And it's true, is it not, that for all U.S. and Canadian

16  schools for the 2007-2008 year, the pass rate for the SEP was

17  greater than 99 percent?

18  A    Yes, and that applies to first takers, but that's --

19  yeah.

20  Q    And for the CIS section, for all Canadian and U.S.

21  schools for the 2006-2007, the pass rate is 99 percent?

22  A    Yes.

23  Q    And for the 2007-2008 year for all U.S. and Canadian

24  schools, the pass rate in the CIS component is 99 percent?

25  A    Yes.

1  Q   And for all U.S., Canadian, and Canadian schools for the

2  2006-2007 for the ICE subcomponent, it's 97 percent?

3  A   Yes.

4  Q   And for all U.S. and Canadian schools for the 2007-2008

5  year for the ICE subcomponent is a 98 percent pass rate?

6  A   Correct.

7  Q   And the lower pass rate for the ICE subcomponent, when

8  compared to the CIS and the SEP, that's as a result of the

9  patient note; is it not?

10 A   I actually can't say that.  It's dependent upon both the

11 patient note and information gathering and -- I'm sorry --

12 the patient note and the physical examination and history

13 checklists.  So somebody could do well on the patient note,

14 but poorly on the checklist items, and so fail the ICE, or

15 the reverse could be true.

16 Q   I guess you could say you didn't know the answer to my

17 question, whether -- whether the higher rate of failure is as

18 a result of the patient notes subsection of the ICE

19 subcomponent?

20 A   So I thought I answered that, but maybe you should

21 reframe the question, because I think you just asked the

22 question I answered.

23 Q   All right.  What I was trying to convey is that when the

24 rate of failure on the ICE is as a result of individuals

25 failing the patient note, as opposed to failing the physical

1  examination.

2  A    Okay.  So I did understand what you said, but let me

3  repeat your question to you, and then I'll answer it.

4           You're asking -- you're telling me that the -- you

5  believe that the ICE fail rate is attributable to the

6  examinee's performance on the patient note, and not to their

7  performance on the physical examination?

8  Q    That's correct.

9  A    Okay.  And that's erroneous.  The ICE component is made

10  up of the patient note and performance on the checklists

11  which are derived from the history and the physical

12  examination.  So an individual could fail on the basis of

13  poor performance on the patient note, or on either of the

14  other two.

15           (Pause.)

16  Q    And it was your understanding that the only section that

17  Mr. Hartman did not pass was the CIS subcomponent?

18  A    In the June 2009 administration?

19  Q    Yes.

20  A    That's my understanding.

21  Q    That's the only administration Mr. Hartman had taken,

22  correct?

23  A    Okay.  I guess.

24  Q    He passed his spoken English proficiency subsection --

25  A    That's my --

Katsufrakis - Cross                          99

1    Q   -- subcomponent?

2    A   That's my understanding.

3    Q   And he passed the ICE subcomponent?

4    A   That's my understanding.

5    Q   And if you'd turn to Tab 4, and that's a copy.

6            MS. LEOPOLD-LEVENTHAL:  In what binder?  Which

7    binder?

8            MR. WEINER:  That's plaintiff's binder.

9    BY MR. WEINER:

10   Q   That would be a copy of the score report for Mr. Hartman?

11           THE COURT:  I'm sorry, where are we looking?

12           MR. WEINER:  This would be Tab 4 of the plaintiff's

13   binder.

14           (Pause.)

15   BY MR. WEINER:

16   Q   Mr. Hartman's performance on the patient note fell in the

17   high performance area.  Would you agree with that?

18   A   Yeah, and actually this illustrates the point I was just

19   making.  If you look at the integrated clinical encounter,

20   you've got data gathering and patient note as the two

21   subscales that make up the integrated clinical encounter, and

22   the data gathering is dependent upon his history and physical

23   examination.

24   Q   Right.  So the patient note does not --

25           THE COURT:  Where are we looking?

1           THE WITNESS:  I'm sorry.  I jumped ahead to the

2    second page, your Honor.

3           MR. WEINER:  It's Page 2 of Tab 4.

4           THE WITNESS:  There's a -- on the second -- would

5    you like me to describe what that is?

6           MR. WEINER:  I'm sorry.

7           THE WITNESS:  Would you like me to describe this?

8    I'll just shut up and I'll wait for questions.

9    BY MR. WEINER:

10   Q   No, that's fine.  You can describe what this is.

11   A   The way --

12          THE COURT:  I think I may be at the wrong place.

13          THE WITNESS:  It's a couple pages.

14          THE COURT:  I think that -- is this at Tab 4?

15          THE WITNESS:  Yes.

16          MS. LEOPOLD-LEVENTHAL:  Of the plaintiff's binder.

17          THE COURT:  Yes.  Oh, plaintiff's binder?  All

18   right.  I beg your pardon.

19          (Pause.)

20          All right.  Can we try that again now that I have

21   the --

22   BY MR. WEINER:

23   Q   I think the doctor was going to explain what's on Page 2

24   of Tab 4.

25   A   Yeah, so just to orient us all to the score report, the

Katsufrakis - Cross                    101

1    first page shows the pass-fail outcome, and then the three

2    different components that make that up.

3              So as I think I mentioned earlier, but an examinee

4    has to pass all three of those components, ICE, CIS, and SEP,

5    and the overall pass-fail for Mr. Hartman is due to his fail

6    on the CIS score.

7              Then if we look at the next page, this is a way of

8    communicating to the examinee with a little bit more

9    precision where their areas of relative strength and weakness

10   are.

11             So you can see that the ICE, the integrated clinical

12   encounter, is broken down into data gathering and patient

13   note.  The CIS is broken down into what's called questioning

14   skills, but what I've been calling information gathering,

15   information sharing skills, and professional manner and

16   rapport, things that we've talked about previously.  And then

17   the last scale, the SEP scale.

18             And the examinee's performance is reflected by the

19   row of X's for each of those, and then the dark -- dark band

20   in the middle describes sort of borderline performance.

21   Q   Why are some of the bands longer than other bands?

22   A   The better person to ask about that would be Dr. Clauser,

23   but it has to do with the precision of our ability to measure

24   something.

25   Q   And on Mr. Hartman's score report, it reflects that on

1   the patient note he scored in the higher performance area?

2   A    Correct.

3   Q    And that's actually the highest that he has scored out of

4   all the different areas assessed; is that correct?

5   A    Yes.

6   Q    And his patient note is the one portion of the

7   examination which does not involve any form of speech; is

8   that correct?

9   A    That's correct.  Well, actually, that's not quite

10  correct, because within the patient note, he is recording

11  information that he would have obtained through speech, as

12  well as physical examination.

13          So we are capturing his -- that's his written record

14  of the interaction with the standardized patient.  So the

15  information that he is providing in that note is dependent

16  upon his ability to obtain the information, to speak to the

17  patient, and extract that information.

18  Q    And also to conduct a physical examination?

19  A    And conduct a physical examination and -- and reflect it

20  in an organized medical manner.

21          THE COURT:  May I put a question to the witness?

22          On the Page 2, performance profile, help me with a

23  question with respect to the CIS portion.

24          THE WITNESS:  Mm-hmm.

25          THE COURT:  As I understand the table, would you

1    tell me if I've got it wrong, the caption for each of the

2    three components.  Well, actually, the third only has one

3    ingredient, but the ICE, as I understand it, has the two

4    components, subcomponents of data gathering and patient note,

5    and the line of X's that follows the title "Integrated

6    Clinical Encounter," I assume it represents an aggregate of

7    the scores on data gathering and patient notes?

8           THE WITNESS:  That's correct, your Honor.  You

9    understand it correctly.  I don't think it's kind of a direct

10   arithmetic summing, but, yes, it's an aggregate.

11          THE COURT:  Well, when we go to the CIS portion, I'm

12   a little puzzled to see that the caption diagram, though I

13   think shorter than any of the subcomponent diagrams, I'd

14   assume that caption diagram after communication and

15   interpersonal skills would be undertaking roughly to

16   aggregate the three subcomponents, the questioning skills,

17   information sharing skills, and professional manner and

18   rapport.

19          And if that's correct, then I'm puzzled that the

20   aggregate score -- how shall I put it -- stops.  It's closest

21   reach into the passing range is not as extensive as any of

22   the three subcomponents.

23          THE WITNESS:  I see what you're talking about, your

24   Honor, and I think I could speculate about the explanation,

25   but I know that Dr. Clauser would be better able to address

1    that than I, and I'd rather not speculate and give you

2    misinformation.

3            THE COURT:  All right.  Now that I've put an

4    incoherent question on the record --

5            THE WITNESS:  No, it's a coherent question.  It's

6    just not one the witness can answer.

7            THE COURT:  -- that will be worked out by a later

8    witness.

9            All right.  Thank you.

10   BY MR. WEINER:

11   Q    Doctor, are you familiar with the USMLE composite

12   committee?

13   A    It depends on what you mean by "familiar," but I know

14   they exist and I have some sort of a sense of what they do.

15   Q    What do they do and what is the purpose?

16   A    They're the -- they're the governing committee for the

17   USMLE program.  Now, there's a higher level of governance,

18   because each of the parent organizations, the Federation of

19   State Medical Boards, and the National Board of Medical

20   Examiners, have authority over the composite committee.  But

21   if you were going to identify one committee that's

22   responsible for USMLE governance, I think it would be the

23   composite committee.

24   Q    Are you on the composite committee?

25   A    No.

1  Q   Do you review any of their records or minutes of

2  meetings?

3  A   Not rout -- well, I take that back.  I was going to say

4  not routinely.  In the past I have not routinely, because of

5  my fairly recent assumption of responsibility for revising

6  the USLME, I try to keep more abreast of their activities

7  than I did when I first started at the NMBE.

8  Q   Does the composite committee establish or set forth

9  policies that the NBME follows?

10 A   Yes.

11          THE COURT:  Mr. Weiner, it's 3:30.  I think this

12 would be a good time to take an afternoon recess.

13          We'll recess for 15 minutes.

14          MR. WEINER:  Okay.

15          THE COURT:  You may step down, sir.

16          THE WITNESS:  Thank you, sir.

17          (A recess was taken from 3:30 o'clock p.m. until

18 4:01 o'clock p.m.)

19          THE COURT:  Go ahead.

20          MR. WEINER:  Thank you, your Honor.

21          THE COURT:  Pardon?

22          MR. WEINER:  Thank you, your Honor.

23          THE COURT:  Yup.  All right.

24 BY MR. WEINER:

25 Q   Doctor, you were --

1          THE COURT:  I just want to be sure.  Yes?

2          ESR OPERATOR:  Yes, yes.

3          THE COURT:  All right.  Very good.

4    BY MR. WEINER:

5    Q    Doctor, you had testified that you're aware of one case

6    where an individual who was hearing impaired utilized a sign

7    language interpreter on the Step 2 CS; is that correct?

8    A    That's correct.

9    Q    I'd like you turn to Tab 32 of plaintiff's binder -- I'm

10   sorry -- 33 of plaintiff's binder.

11   A    (Witness complies.)

12         MR. WEINER:  And I'm going to mark that as Exhibit

13   21, your Honor.

14         THE COURT:  All right.

15         THE WITNESS:  And this is the one titled,

16   "Supplemental Answers to Plaintiff's Interrogatories"?

17   BY MR. WEINER:

18   Q    Yes.

19         (Pause.)

20         Interrogatory No. 11 says:  "State the nature and

21   type of accommodation or auxiliary aids approved by defendant

22   for persons with impaired speaking, hearing, or vision, that

23   has been provide to other examinees on the examination for

24   each accommodation or auxiliary aid identified in

25   Interrogatory 11 above, state the dates and/or frequency, the

1   accommodation, or auxiliary aides was approved."

2          Do you see that as Question 11?

3   A   Yes, yes.

4   Q   And if you turn to Page 2, there is a chart there.

5   A   Okay.

6   Q   There's an entry there for 12/29/2005.  Do you see that?

7   A   Yes.

8   Q   Then it says, "Hearing Impairment" in the next column?

9   A   Yes.

10  Q   And it says, "Signing two way interpreter, additional

11  five minutes for patient encounter."

12  A   Right.

13  Q   Signing two way means that the examinee is signing to an

14  interpreter and then the interpreter is signing to the

15  standardized patient, correct?  And vice-versa, the

16  standardized patient will communicate with the interpreter

17  who will then sign to the examinee?

18  A   Correct.

19  Q   And in that particular case, the standardized patient is

20  not speaking at all -- I'm sorry -- the examinee is not

21  speaking at all to the standardized patient, correct?

22  A   Correct.

23  Q   And in that particular case, the spoken English

24  proficiency could not be assessed, correct?

25  A   Correct.

1   Q    And there's a second entry there for 2/8/2007?

2   A    I see that.

3   Q    And this is for a hearing impairment?

4   A    Yes.

5   Q    And it says, "Additional five minutes for patient

6   encounter.  Signing two ways interpreter."

7   A    Yes.

8   Q    So here's a second case where there was a two-way

9   interpreter, correct?

10  A    That -- that's what the record suggests, yes.

11  Q    All right.  And so this is a second case where sign

12  language was being used for the Step 2 CS examination?  Is

13  that a yes?

14  A    It seems -- yes -- that seems to be the case.

15  Q    And --

16          THE COURT:  I'm not -- I want to be sure you're -- I

17  understand your questions.

18          In the two way as distinguished from the one way

19  signing, you're talking about a situation in which the --

20  both the examinee and the standardized patient -- well, I

21  guess I don't -- I'll try it again.

22          Can you find out from the witness --

23          MR. WEINER:  Sure, your Honor.

24          THE COURT:  -- what's going on in the two way

25  interpretation?

1   BY MR. WEINER:

2   Q    With a two way sign language interpreter, the examinee,

3   the test-taker in other words, is signing to an interpreter,

4   correct?

5   A    If you're trying to distinguish between the two way and

6   the one way entries, I would just suggest that you'd be

7   better off asking the next witness, because I'm not -- I'm

8   not knowledgeable about the details that underly the

9   information in this table.

10  Q    Again, you're not familiar with the distinguishing

11  difference between a one way --

12  A    I --

13  Q    -- sign and two way sign?

14  A    -- I can speculate, but I don't know how that was applied

15  at the NBME to create this table, and so I think my answers

16  might mislead you.

17  Q    Okay.  But going back to your previous testimony, you

18  said there was only one case where a sign language

19  interpreter was used?

20  A    That was my understanding, yeah.

21  Q    The answers to these interrogatories suggest that there

22  were two cases; is that correct?

23  A    They do to the extent that my interpretation of these is

24  correct, but as I've just indicated, I -- I wouldn't trust

25  that, because I don't know what went into preparing this

1    table.

2    Q    Have you, in the past, reviewed any of the composite

3    committee reports to get an understanding of what a

4    particular policy was that has been set forth by the NBME?

5    A    I don't think so.  I think when I reviewed the composite

6    committee minutes in the past, it's mostly been to have a

7    general understanding of what the issues were that the

8    composite committee considered.  As I mentioned previously,

9    most particularly where those issues pertain to changes to

10   the USMLE exam.

11   Q    When you were talking before about the sign language

12   interpreter, and that individual did not receive a license,

13   what was that based on?

14   A    A conversation with other NBME staff.

15   Q    Okay.  So you haven't reviewed any official policy or any

16   official information about what really occurred, did you?

17   A    That's correct.

18   Q    Okay.  Have you reviewed any composite committee reports

19   regarding the policy on how the NBME will handle sign

20   language interpreters?

21   A    No, I can't think of one.

22   Q    Would you agree that some students taking the Step 2 CS

23   may speak more than others?

24   A    Almost certainly.

25   Q    And is it fair to say that some test-takers may speak

1    many words while others may speak fewer words?

2    A    Yes.

3    Q    And the standardized patient's able to assess both those

4    individuals?

5    A    Yes.

6    Q    Has there ever been an occasion where a test-taker, under

7    standardized conditions, could not be assessed under the

8    spoken English proficiency section, because they didn't speak

9    enough?

10   A    I -- I don't know of one.  It would be hard for me to

11   imagine the situation that would meet those conditions.

12   Q    How much must one speak to be assessed on the spoken

13   English proficiency subcomponent?

14   A    Enough.

15   Q    What does that mean?

16   A    It means that you need to speak enough to accomplish the

17   tasks that the particular case demands.

18   Q    Well, do the standardized patients do any kind of a

19   measurement of that, in terms of minutes, or the amount of

20   words that one speaks?

21   A    I'm not aware of any quantitative measure like that, that

22   standardized patients use to -- to assist them in coming up

23   with their SEP score.

24   Q    Do the score sheets or rating sheets that the

25   standardized patients use reflect how much a test-taker must

1   speak?

2   A    I think not -- probably not in the way that you're

3   saying.  I think that behind your question is -- I wish to

4   try to understand -- if there's sort of a quantitative

5   requirement that a patient speak X number of words per minute

6   or in total that they speak X number of words.

7            I think the way the standardized patients address

8   SEP is that of the communication that occurs, in the context

9   of fulfilling the other elements of the case.

10           So I mentioned previously that what we try to do

11   with the clinical skills examination is predict how

12   effectively a physician will interact with patients in an

13   ambulatory clinical setting by -- by mirroring that, to the

14   extent that we can -- in standardizing that using the

15   procedures that we've discussed today.

16           The scales that we use, to some extent, are -- well,

17   they're imprecise.  If we had a way that we could measure the

18   totality of the interaction, that's what we want.  Lacking

19   that, we -- we have identified -- we have created these

20   artifacts, if you will, really, these constructs that attempt

21   to get at the issues that we think are most important, the

22   competencies that we're wishing to measure.

23           So we've created something that we call SEP, because

24   we think measuring spoken English proficiency is important,

25   but it's not something that's measured in the abstraction or

Katsufrakis - Cross                      113

1   in isolation from the rest of the encounter.  And it sort of

2   gets back to, I think, you're questioning about passing the

3   SEP score on one occasion, and passing CIS on another, or

4   something like that.

5           We really are considering the whole encounter, or

6   the whole body of 12 encounters, and the scores that we

7   create are just a systematic kind of standardized way that we

8   use to capture this performance.

9   Q   All right.  When Mr. Hartman took the examination in June

10  2009, he had time-and-a-half for each patient encounter; is

11  that your --

12  A   That's my understanding.

13  Q   And they were able to assess his speech in that

14  particular encounter?

15  A   My understanding is that the passed the SEP.

16  Q   And they were able to assess the amount he spoke

17  directly?

18  A   Correct, correct.

19  Q   And if you would turn to Tab 15 of plaintiff's binder,

20  and I'm directing you to Page 7.

21  A   (Witness complies.)

22  Q   This is a copy of Dr. Tetnowski's report who had assessed

23  Mr. Hartman.

24          Had you ever reviewed this report?

25  A   No, I have not.

1   Q   On Page 7 Dr. Tetnowski wrote, "Aaron indicated that he

2   had been practicing using a small text to speech" --

3   A   I don't know where you're reading.

4   Q   I'm sorry.  On Page 7.

5   A   Yes, where?

6   Q   Under "Additional Information" --

7   A   Okay.

8   Q   -- the second sentence.

9   A   Okay.

10   Q   And it begins with:  "Aaron indicated."

11   A   I see that.

12   Q   All right.  It says, "Aaron indicated that he had been

13   practicing using a small text to speech device that would

14   allow him to communicate more readily.  Since Aaron was not

15   able to effectively and independently communicate in any

16   other fashion, a role-playing scenario was played out between

17   the examiner and Aaron.  During this task, Aaron spoke short

18   words using many nonverbal behaviors, nodding for

19   information, et cetera.  He often attempted to speak, but

20   when he came across a severe block or repetition, he would

21   type a response on his portable computer, which converted his

22   ideas to computerized speech output.  Although the method was

23   somewhat slow, it was indeed faster than any other form of

24   communication that Aaron exhibited prior to his attempt."

25           Do you see where it says that?

1   A    Mm-hmm, I do.

2   Q    So in Dr. Tetnowski's opinion, he's indicating that Mr.

3   Hartman can speak more than he would be able to speak

4   spontaneously.  Do you understand that?

5   A    What I understood was that Dr. Tetnowski said that Aaron

6   could communicate faster, more than he could speak.

7   Q    Yes.

8   A    Yeah.

9   Q    But, no, he's saying he can speak more than utilizing the

10  text to speech than he would if he was just to speak by

11  himself.

12  A    Well, that's not what I read.  He said, "Although the

13  method was somewhat slow, it was indeed faster."

14          So I don't see him saying Aaron spoke faster.  What

15  he said was the method.  It was faster.

16  Q    If Mr. Hartman can speak more utilizing the text to

17  speech, wouldn't the standardized patients have as much or a

18  better ability to assess the spoken English proficiency than

19  he would at time-and-a-half?

20  A    I think you're conflating things.  You're saying speech

21  using the machine and that's not speech in the context of the

22  construct we're measuring with the CS exam.

23  Q    Let me correct you.

24          If he can speak more, when utilizing text to speech,

25  they would be able to assess him just as well, if not better

1    on such an examination, than they did when he had

2    time-and-a-half and spoke spontaneously.

3    A    Let me make sure I understand the -- the hypothesis.

4          You're saying that if he were to speak orally, and

5    when he gets -- when he has difficulty doing that -- he

6    resorts to the text to speech device, and that situation,

7    that system would allow more words to come out of his mouth

8    than if he didn't have the device; is that what you're asking

9    me?

10   Q    That's correct.

11   A    Okay.  So could you frame the question again then?

12   Q    So under those circumstances that you just said, wouldn't

13   he be able to be assessed just as well, if not better, on

14   spoken English proficiency on the Step 2 CS examination?

15   A    I'm not sure that it would be better.  It would be

16   different.

17   Q    But they would be able to assess his ability to speak

18   English, wouldn't they?

19   A    As they would in the other case.  I mean, I think -- if

20   the assessment would still take place, I think the challenge

21   would be training the SP's how to use or not use information

22   coming from the machine.

23   Q    What's the problem if he's able to write the words in

24   English, and have the text to speech generate English words,

25   what's the problem?

1          He's still showing a command of the English

2    language.

3    A    It's just not the construct that we're measuring.

4    Q    You've never evaluated Mr. Hartman's use of text to

5    speech, have you?

6    A    Other than what we've talked about today, no.

7    Q    All right.  And you haven't seen him utilize text to

8    speech; is that correct?

9    A    That's correct.

10   Q    Are you familiar with how the Step 2 CS was developed?

11   A    It depends on how you define "developed."  To some

12   extent, yes.

13   Q    Well, in developing the Step 2 CS, do they coordinate

14   with other medical schools, or officials from medical

15   schools, to get an understanding of what their curriculum is?

16   A    I don't know that they did it to -- I honestly don't know

17   whether they tried to understand curriculum.

18          I know that there was some testing of cases that the

19   NBME had developed in medical school settings where the

20   schools had up and running standardized patient programs.

21   Q    All right.  Well, is it fair to say that the Step 2 CS

22   examination would not be testing or would not provide a

23   situation which was not part of a curriculum in medical

24   school?

25   A    Well, the way I would -- the way I would frame -- the way

Katsufrakis - Cross                    118

1    I would address what you're raising is that typically the

2    USMLE tries to measure the constructs that are important to

3    patient care, where we can do that reliably and in a valid

4    fashion.  And typically by the time the NBME is able to do

5    that, other medical schools are doing that as well.

6            So medical schools, to some extent, serves as a

7    breeding ground for innovation.  That's probably a good way

8    to think about it.

9    Q   I'm not sure I understood what you meant.

10   A   Okay.  There are now robots that cost a quarter of a

11   million dollars, that some schools are using to simulate

12   physiologic responses that patient's have.  So we no longer

13   have to sacrifice dogs to teach medical students how

14   different drugs work.

15           That's probably not something that the NBME is going

16   to be doing in the foreseeable future, but schools are

17   working on simulations, and it may well be at some point in

18   the future the NBME would adopt some -- some form of

19   simulation as part of our USMLE examination.

20   Q   Okay.  Let me try to simplify this:  If it is something

21   that is taught in medical school, it's something that would

22   possibly show up on the Step 2 CS examination?

23   A   I would say that the universe of what's taught in medical

24   schools is bigger than what would necessarily show up on our

25   examinations.

1   Q   Okay.  And going the other way, it's not like they let

2   you have something on your examinations that wouldn't be

3   taught in medical school; is that correct?

4   A   At least not in -- at least not in some medical schools,

5   that's correct.  Maybe not in all.

6   Q   Do American medical schools teach you how to speak

7   English?

8   A   Not that -- I'm not aware of it being a formal part of

9   any medical school's curriculum.

10  Q   Okay.  When you went to medical school, they didn't teach

11  you how to speak English --

12  A   No.

13  Q   -- is that correct?

14  A   That's correct.

15  Q   And there's no test administers that you're aware of in

16  American medical schools that tests your English proficiency?

17  A   I don't know what medical schools do for applicants

18  coming from other countries.

19  Q   I was referring to American medical schools.

20  A   But American medical schools will admit people from other

21  countries, so I would say I don't know what -- what they do

22  in that situation.

23  Q   Would you agree that the purpose of the Step 2 CS is to

24  assess the ability of examinees to apply medical knowledge,

25  skills, and understanding of clinical science essential for

1    the provision of patient care under supervision, and includes

2    emphasis on health promotion and disease prevention?

3    A    I think you're reading from our bulletin, so --

4    Q    Yes.

5    A    -- I'd be a fool to disagree with that.

6    Q    Okay.  And the SEP assesses frequency of pronunciation or

7    word choice errors?

8    A    Amongst other things, yes.

9    Q    Right.  And also how it effects listener comprehension?

10   A    Among other things, yes.

11   Q    And the SEP also assesses the amount of listener effort

12   required to understand the examinee's questions; is that

13   correct?

14   A    Correct.  Questions, and I think other things the

15   examinee says, too, not just questions.

16   Q    Let me provide an example.

17        If I took a complete medical history of a

18   standardized patient, it would not be assessed in the SEP

19   subcomponent; is that correct?

20   A    Well, we actually don't require a complete medical

21   history as part of our CS exam.  We have a focus history.

22   Q    Okay.  Let me rephrase.

23        If I were to take a medical history --

24   A    A focus history.

25   Q    A focus history on the Step 2 CS, that would not be

1   assessed under the SEP portion; is that correct?

2   A   Well, it would, because you're going to be taking a

3   history and speaking to the patient, collecting the

4   information, so --

5   Q   If I did it improperly, that wouldn't adversely effect

6   the SEP portion; is that correct?

7   A   If you did what improperly?

8   Q   Take a history.  That would be some other subcomponent

9   that --

10  A   It would depend upon the nature -- and when you're saying

11  "improperly," I would need to have more specificity.  So if

12  you told me -- if you could describe more clearly what's

13  improper, then I could tell you whether or not it would fall

14  into SEP or something else.

15  Q   Well, a medical history isn't scored by -- under the SEP;

16  is that correct?

17  A   The taking of a medical history is part of the

18  interaction with the patient, so it does contribute to the

19  SEP.

20  Q   But if someone does it wrong, it's not SEP that would

21  give you an adverse --

22  A   If they ask --

23          THE COURT:  What do you mean by "wrong"?  Maybe that

24  would help.

25  BY MR. WEINER:

1    Q    If someone takes an incomplete history.

2    A    If they had -- if they spoke English clearly, used

3    appropriate words, were not overly difficult in their

4    conversation for the SP to understand, et cetera, and they

5    failed to ask sufficient numbers of questions, or the right

6    kinds of questions, or focus on the right areas, then

7    assuming that behavior generalized to all 11 other cases,

8    they should pass the SEP, and the deficiency in the history

9    gathering would probably be reflected both in the -- the ICE,

10   the part that depends upon information gathering, and could

11   also be reflected on the patient note, because they may have

12   not collected the information that they needed to record on

13   the patient note. It might have also been reflected in the

14   information gathering subscale of CIS.

15   Q    Okay.  And if I was taking the Step 2 CS, if my

16   examination was incomplete, that would not be adversely

17   reflected in the SEP; is that correct?

18   A    Sorry, if your exam -- say that again, please?

19   Q    If my examination was incomplete --

20   A    Physical examination?

21   Q    Physical examination was incomplete, that would not be

22   reflected in the SEP; is that correct?

23   A    If it were incomplete, no.

24   Q    Okay.  If I wrote the wrong diagnostic examination, that

25   would not be adversely effected in the SEP; is that correct?

1  A   Assuming that you either didn't talk about it with the

2  patient, or if you did talk about it, your speech was fluent,

3  and appropriate words, you know, they're the things --

4  they're the qualifiers I made about SEP.

5  Q   Right.  If I used medical jargon, that would not

6  adversely effect the SEP; is that correct?

7  A   No, the medical jargon would typically be captured under

8  CIS.

9  Q   And if I asked close-ended questions, or leading

10 questions, that would not adversely effect the SEP; is that

11 correct?

12 A   Correct.

13 Q   However, if I was to a student from India, and I, during

14 the course of the examination spoke Indian, that would be

15 adversely effected in the SEP, correct?

16 A   If that's all you spoke?

17 Q   Or I spoke a sentence in Indian.  Wouldn't that

18 potentially adversely effect my SEP score?

19 A   I'm not sure.  I guess we'd have to -- I think we'd have

20 to look at the entire encounter in its totality.  I don't

21 think we could --

22 Q   I'm not saying it would necessarily be a failure, but

23 what I'm saying is the standardized patient would look at

24 that and perhaps give me an adverse mark or something,

25 because my word choice was wrong, correct?

1    A    Or perhaps not.  I can imagine a circumstance where an

2    examinee might do that inadvertently, or even consciously

3    translate it for the SP or for the -- yeah, for the SP -- and

4    then make a joke about, you know, sorry, I was thinking in

5    Indian, and didn't translate it, you know, sort of laughing

6    at himself.

7    Q    If, for example, I was a Japanese student, and I had a

8    very heavy accent, and it was difficult to understand me,

9    that would be something that would be adversely reflected in

10   the SEP; is that correct?

11   A    If -- if -- if an SP has difficulty understanding

12   somebody who has a very pronounced accent, such that it makes

13   understanding the words difficult, then that would be

14   reflected in the SEP.

15   Q    Right.  And if I was a Russian student, and the SEP -- I

16   mean the standard patient asked me to repeat my communication

17   to them over and over again, that would be something

18   adversely effected in the SEP; is that correct?

19   A    It might be.  It could be that we would build that

20   behavior into the case to see how the examinee responded to

21   that kind of challenge by the examinee -- the SP.

22   Q    Well, in the content description, doesn't it say

23   repeating information would be something that would -- would

24   be adverse in the SEP?

25   A    Well, the situation you posed was asking the examinee to

Katsufrakis - Cross                          125

1   be responsive to a request from the SP.

2          I think when you talk about the repeating

3   information, the intent there is more of the situation where

4   an individual just keeps asking -- keeps asking questions as

5   if they're not even paying attention to the answers, or says

6   the same thing over and over again.

7          MS. LEOPOLD-LEVENTHAL:  Your Honor, if I could

8   interrupt for a moment?  Dr. Katsufrakis has to catch a plane

9   and I know he was trying to leave by 4:30 in order to make

10  that plane.

11         MR. WEINER:  I probably have less than five minutes.

12         THE COURT:  All right.  Let's make --

13         MS. LEOPOLD-LEVENTHAL:  I have a few follow-up

14  questions, too.  I don't know what we want to do.  I don't

15  want to jeopardize his plane.

16         THE COURT:  Let's try and make it two minutes.

17         MR. WEINER:  Two minutes?  All right.

18         THE WITNESS:  And I'm the most interested, so I'll

19  be happy to keep time if you guys would like?

20  BY MR. WEINER:

21  Q   The SEP, is it fair to say that it's more about the

22  delivery of the communication, and not the content of the

23  communication?

24  A   No, I wouldn't say that.  The content -- if you think

25  about the effort that the SP must exert to understand, that's

1    going to be dependent upon the content.

2    Q   Yes, but the content is really measured more in the CIS

3    and the ICE; isn't that true?  I mean, that's the true

4    medical information that's being communicated.

5    A   I think the -- my sense is that the CIS, the CIS, is

6    focused on content, yeah.

7    Q   Is it your understanding that the Step 2 CS was developed

8    from a previous test which was from the --

9    A   ECFMG.

10   Q   Yes.

11   A   Yes.

12   Q   And that was --

13   A   I don't know if it was developed from.  I would say that

14   it was developed in consultation with the ECFMG, and that the

15   -- I'm assuming that the development benefitted from the

16   experience that the ECFMG had.

17   Q   And just so his Honor knows, the ECFMG is the Educational

18   Commission for Foreign Medical Graduates, Clinical Skills

19   Assessment?

20   A   Correct.

21   Q   And that has some of the same subcomponents as the USMLE

22   Step 2; is that correct?

23   A   I'm actually not familiar with what he clinical skills

24   assessment had.

25   Q   Are you familiar with the fact that the ECFMG was just

1   administered to foreign students?

2   A    I knew that that's the -- that's the ECFMG's business,

3   yeah.  They certify international medical students.  And it's

4   not just actually foreign students, because it's students

5   graduating from medical schools outside the U.S.  Many U.S.

6   students, U.S. citizens, who are unable to get into U.S.

7   medical schools would pursue international education, and

8   they would come back and also be subject to the ECFMG's

9   clinical skills examination.

10  Q    In your discussion about the undifferentiated license,

11  when you had mentioned that could virtually practice anything

12  you want to do once you have that license.  Do you recall

13  that testimony?

14  A    Yeah.

15  Q    The reality is, the practical reality is, if you're a

16  family doctor, such as yourself, and you want to do surgery,

17  you're going to go into a surgical residence; isn't that

18  true?

19  A    Actually family medicine encompasses surgery as well, and

20  I was --

21  Q    Well, it's --

22  A    -- I was trained -- actually I've done probably two dozen

23  Cesarian sections in my life.

24  Q    Well, what --

25  A    And could go out and do abortions today if I wanted to.

1   Q    Well, what about orthopedic surgery?  You're going to go

2   through a five-year orthopedic surgery --

3   A    No.

4   Q    -- to do that; is that correct?

5   A    If I were going to do a hip joint replacement?

6   Definitely.

7   Q    And the reality is in this world, is that people who are

8   family practitioners, are not doing orthopedic surgery?

9   A    That's not true.  That's not true.

10  Q    Wouldn't that be unethical to do that?

11  A    Not at all.  Family physicians have a very broad scope of

12  practice, and so it's routine, particularly in rural areas,

13  for family physicians to assist on all manner of cases.

14  Right out of residency, I assisted on neurosurgery.  I was

15  doing a locum tenens for a physician.

16  Q    You said "assisted."  You were not doing neurosurgery

17  yourself; is that correct?

18  A    I wasn't doing neurosurgery independently.  That's

19  correct.

20  Q    But the fast majority --

21          THE COURT:  Mr. Weiner, we really owe it to the

22  witness --

23          MR. WEINER:  Okay.

24          THE COURT:  -- to wind up.  You have two, three,

25  critical questions?

1          MR. WEINER:  I will finish there, your Honor.

2          THE COURT:  Pardon?

3          MR. WEINER:  I will finish with what I just said.

4          THE COURT:  All right.  Well, then, I take it that

5    you have nothing further for the witness?

6          (Pause.)

7          MS. LEOPOLD-LEVENTHAL:  Two questions.

8                        REDIRECT EXAMINATION

9    BY MS. LEOPOLD-LEVENTHAL:

10   Q   The Step 2 CS does not measure someone's ability to write

11   English, it's speaking English, correct?

12   A   Correct, except there's also writing that's involved with

13   patient note.

14   Q   For assessment purposes, is there a difference between

15   speaking less than another test-taker and typing and

16   speaking?

17   A   Yes.

18   Q   Okay.

19          MS. LEOPOLD-LEVENTHAL:  Thank you.  No further

20   questions.

21          THE COURT:  Okay.  Thank you, sir.

22          THE WITNESS:  Thank you, your Honor.

23          THE COURT:  I hope you catch your plane.

24          THE WITNESS:  Oh, I shouldn't have any problem, as

25   long as there's no traffic.

1          Thank you, all.

2          (Witness excused.)

3          (Discussion held off the record.)

4          THE COURT:  Before you get started with your next

5   witness, I apologize for doing this, but I'm going to have to

6   take ten minutes to get things in order back in the office,

7   since I'm not going to be here tomorrow.

8          So we'll take ten minutes and my thought is then

9   that we will go on until about quarter of 6:00, all right?

10          (A recess was taken from 4:33 o'clock p.m. until

11   4:55 o'clock p.m.)

12          THE COURT:  Please sit down.

13          It's really, from my point, not necessary for

14   everybody to rise when I come in, and I know that's expected

15   protocol, but I've never quite figured out what the reason

16   for it is.

17          (Laughter.)

18          I just say that in the confidence of this room.  You

19   won't tell any of my colleagues, certainly no other lawyers.

20          Very good.  Do you want to call your next witness?

21          MS. LEOPOLD-LEVENTHAL:  Dr. Farmer.

22          CATHERINE FARMER, after having been first duly sworn

23   as a witness, was examined and testified as follows:

24          THE COURT:  Catherine with a C?

25          THE WITNESS:  With a C.

1          THE COURT:  In my family it's with a K.

2          THE WITNESS:  I won't hold that against you, your

3   Honor.

                        DIRECT EXAMINATION

4

5   BY MS. LEOPOLD-LEVENTHAL:

6   Q    For whom do you work, Dr. Farmer?

7   A    I work for the National Board of Medical Examiners.

8   Q    Would you briefly describe for his Honor your educational

9   background?

10  A    I have a Doctorate in Clinical Psychological, a Master's

11  of Health Education, Bachelor's in Biology, and I'm a

12  licensed practical nurse by training.

13  Q    What is your current position with the NBME?

14  A    The title is the manager of Disability Services and the

15  ADA compliance officer for testing programs.

16  Q    For how long have you held that position?

17  A    I've been in that position since September 2006.

18  Q    What does the Disability Services group at the NBME do?

19  A    We're tasked with receiving requests for test

20  accommodations for examinations.  We review those requests.

21  Grant or deny the request for accommodations.  And if it's

22  granted, assure that the appropriate accommodation is

23  delivered.

24  Q    What are your job duties and responsibilities as the

25  manager of Disability Services and ADA compliance officer?

Farmer - Direct                    132

1   A   I'm responsible for overseeing the day-to-day operations

2   of the unit, for developing procedures and policies of the

3   unit.  I'm also responsible for reviewing each individual

4   request and making -- rendering a decision whether to deny or

5   to grant the request.

6   Q   Have you provided me with your current curriculum vitae

7   in the context of this litigation?

8   A   I have.

9   Q   And if you would turn to Exhibit 24 in the defendant's

10  exhibit binder, the one with the white page on top.

11  A   I'm sorry.  Which tab?

12  Q   24, please.

13  A   (Witness complies.)

14          I have it.

15  Q   Do you believe this to be a true and correct and accurate

16  copy of your current C.V.?

17  A   Yes.

18          MS. LEOPOLD-LEVENTHAL:  I'd like to mark Dr.

19  Farmer's C.V. at Exhibit Tab No. 24, as D-7, and unless

20  there's any objection, I'd move it into evidence at this

21  time.

22          MR. WEINER:  No objection.

23          THE COURT:  Of course.  Glad to have it.

24          (Defendant's Exhibit No. 7, Tab 24, admitted.)

25  BY MS. LEOPOLD-LEVENTHAL:

1    Q    Briefly describe for his Honor the professional positions

2    you've held prior to joining the NBME.

3    A    Prior to joining the National Board?

4    Q    Yes, please.

5    A    I had worked as a licensed practical nurse for several

6    years, in clinical settings, inpatient settings.  I've also

7    done home care nursing for individuals who are infirmed or

8    ill who wish to stay at home.

9    Q    You've been in the courtroom for much of this trial, and

10   I may be asking you questions referencing prior testimony.  I

11   had intended to ask you about the Step 2 CS examination, but

12   Dr. Katsufrakis went first and he already answered those

13   questions.  So let's jump right into that examination.

14             Very briefly, if you would, describe what the Step 2

15   CS examination examines or assesses?

16   A    It's a clinical skills examination that utilizes

17   standardized patients, and it's measuring the application of

18   skills and knowledge by individuals who are seeking initial

19   licensure to practice medicine, and it's looking for their

20   ability to gather information, synthesize that information,

21   communicate that information, to the standardized patient and

22   to other healthcare professionals.

23   Q    Does the NBME have a website that describes the Step 2 CS

24   examination?

25   A    Yes.

1  Q    And is there a document that a prospective student or

2  anyone can click on to -- which provides a description of

3  that examination?

4  A    Yes.

5  Q    What is that called?

6  A    For each individual examination, there are content

7  descriptions and I believe it's called an information

8  booklet.

9  Q    Would you take a look at Exhibit 1 in the same binder?

10  A    (Witness complies.)

11           I have it.

12  Q    And is that the content description and general

13  information booklet 2009 for the Step 2 CS examination?

14  A    Yes, it is.

15  Q    Okay.  And then if you'd look beyond the end of that

16  document, there's another one in the same -- under the same

17  tab, and that's the 2010 booklet, correct?

18  A    That's correct.

19           MS. LEOPOLD-LEVENTHAL:  I'd like to mark the 2009

20  and 2010 content and description and general information

21  booklet as D-8, and move it into evidence at this time.

22           THE COURT:  All right.

23           (Defendant's Exhibit No. 8 was admitted.)

24  BY MS. LEOPOLD-LEVENTHAL:

25  Q    Directing your attention to Pages 10 and 11 of either the

1    2009 or 2010 booklet, do these pages describe the scoring or

2    the skills that are assessed for the three subcomponents of

3    the Step 2 CS exam?

4    A    They do.

5    Q    And we understand that Step 2 CS is broken down into

6    three subcomponents, and that's just for grading purposes,

7    correct?

8    A    That's correct.

9    Q    What information, generally speaking, is provided in that

10   information booklet?

11   A    The information, I think, contains -- the information is

12   provided to students so that they can prepare themselves to

13   take the examination.  It talks about the way the exam is

14   administered, and obviously the way that -- that it's scored.

15   And I think it even gives examples of the patient note

16   format, and some abbreviations and acronyms that are

17   acceptable.

18   Q    How many locations are there in the United States where a

19   prospective student can take the Step 2 CS examination?

20   A    There are five locations.

21   Q    And how frequently are the examinations available on the

22   Step 2 CS to a prospective test-taker?

23   A    My understanding is it's continuously delivered.  That

24   there may be a couple of weeks during the year where the

25   centers close down for retraining of the staff.

1    Q    Doctor, do you have an understanding of what the legal

2    definition of a disability is?

3    A    I believe so, yes.

4    Q    And what is your understanding of that term?

5    A    My understanding is from the Americans With Disabilities

6    Act, as it's been amended in 2008, that the definition of a

7    disability briefly stated is a substantial limitation in a

8    major life activity.

9    Q    Doctor, how did you come to have that understanding?

10   Where did you learn that information?

11   A    It's really been on-the-job training.  With this position

12   at Disability Services that I've come to be informed and

13   educated about the -- our responsibilities as a testing

14   agency under the Americans With Disabilities Act.

15   Q    Describe briefly the training you've received while with

16   the NBME, which had educated you regarding what the ADA's

17   definition of a disability is.

18   A    It's been both informal and formal training.  I work

19   directly -- my supervisor is an attorney, and I work closely

20   with general counsel in the Office of Legal Services at the

21   National Board, again, to be informed and educated about the

22   relevance of the ADA for testing programs.

23          I also attend seminars, and trainings to keep up to

24   date with the changes in the ADA, and the regulatory

25   guidelines that seem to be changing regularly as well.

                                    Farmer - Direct                    137

1   Q   So you've received, then, specific training while with

2   the NBME about how the ADA is interpreted and applied with

3   respect to the testing situation in particular?

4   A   That's correct.

5   Q   Doctor, is this a one-time training that you receive on

6   the ADA, and on disability, or is this more of an ongoing

7   process?

8   A   It's an ongoing process.

9   Q   Are you familiar with the phrase "auxiliary aids"?

10  A   I have heard that, yes.

11  Q   Okay.  And what does that phrase mean in the context of

12  the ADA?

13  A   I think of it -- as auxiliary aids as being sort of

14  external devices, or mechanical devices, or something that an

15  individual might use to help bridge the gap of their

16  impairment, so that they could function more normally.

17  Q   Would you please provide the Court with some examples of

18  auxiliary aids that the NBME has provided to test-takers with

19  disabilities for the Step 2 CS examination?

20  A   Certainly.  For the Step 2 CS examination, individuals

21  with hearing impairments have requested the use of something

22  as simple as their hearing aids.  They also would ask for an

23  amplified stethoscope that would help augment the sound over

24  that of a standard stethoscope.

25          Individuals with vision impairments have asked for

1    things like as simple as a magnifying glass, some use some

2    higher technology, telescopes I believe they call them, so

3    that they can augment their vision.

4         I would even expand the terminology of auxiliary

5    devices to assistive devices for individuals who have some

6    medical conditions such as chronic pain conditions use

7    something called a TENS device.  It's a bit of a nerve

8    stimulator that, again, helps them stay more pain free during

9    the course of the examination.  Diabetics use their insulin

10   pump, administer insulin, and check their blood glucose

11   during the exam.

12        So I think of those as examples of assistive or

13   auxiliary aids.

14   Q   Are you familiar with a Speech Easy device?

15   A   I am,  And we, in the context of the Step 2 examination,

16   the first time.

17   Q   And is that an auxiliary aid as well?

18   A   I would consider that an auxiliary aid.

19   Q   What is that device?

20   A   My understanding is that it's a device that fits into an

21   individual's ear.  Individuals who have a stutter use this

22   device.  It provides really their own voice as feedback,

23   slightly delayed, I believe, so that they're essentially

24   speaking with their own voice.  My understanding is that for

25   some individuals who stutter, it deceases the dysfluencies

1    for them significantly.

2              THE COURT:  What was it called?  I guess I didn't

3    get its name?

4              THE WITNESS:  It's called a Speak Easy.  I think

5    that's the --

6              THE COURT:  Speak Easy.

7              THE WITNESS:  -- trade or the proprietary name, your

8    Honor.

9    BY MS. LEOPOLD-LEVENTHAL:

10   Q   Is it your understanding that when a test-taker with a

11   stutter uses the Speak Easy device, that that doesn't impair

12   or effect their ability to continue to maintain eye contact

13   with the standardized patient?

14   A   Not to my knowledge.

15   Q   Okay.  What is the purpose of the NBME granting a

16   test-taker the use of an auxiliary aid like those you've

17   described?

18   A   Again, I think the individual requests these things to

19   help bridge the gap or to ameliorate a condition or a symptom

20   that they might have.  Probably very similar to that of an

21   accommodation.  It's to remove a barrier actually that that

22   individual has in interacting with the examination.

23   Q   Briefly describe for the Court the procedure that the

24   NBME Disability Services group follows each time a request

25   for an accommodation is received?  And these are in general

1    terms.

2    A    Certainly.  Without belaboring the point for the Court,

3    individuals will submit their documentation, their request

4    for us.  We do a review inside to audit it to make sure that

5    there's enough information for us to make an informed

6    decision about the accommodation.  If we believe there is not

7    enough information, we'll communicate with the examinee to

8    provide us more detailed information.

9         Once we've received complete submission, we may send

10   it out to -- we usually send it out to an external consultant

11   who's an expert in that area of disability.  That individual

12   writes a written report, which I'll review, along with

13   reviewing the individual's complete documentation and

14   submission, and at that time I'll make a decision whether to

15   grant or deny.

16   Q    How do you determine when to send a file out to an

17   outside consultant for review?

18   A    I would say more often or actually I would say quite

19   frequently the requests need to be sent out.  Occasionally an

20   individual will make a request, and their own expert, or

21   they, themselves, will indicate that they do not have a

22   disability, a condition that rises to the level of a

23   disability.  And in that case, I would not send it out.

24   Q    When was your first involvement with Aaron Hartman's

25   request for accommodations on the Step 2 CS examination?

1    A    I believe his first request was received by us in July of

2    2008.

3    Q    Would you, please, turn to Exhibit 2 in that same exhibit

4    binder?

5    A    (Witness complies.)

6              I have it.

7    Q    What is this document?

8    A    This is the United States Medical Licensing Step 2

9    Clinical Skills Application for Test Accommodations.  This is

10   a form that an individual who's requesting accommodations

11   would fill out to indicate their biographic information, what

12   type of disorder or impairment they have, what type of

13   accommodation they're requesting, and a little bit of history

14   about how they've been or not been accommodated in the past.

15   Q    And is it fair to say this was Mr. Hartman's first

16   request, formal request form that he submitted for

17   accommodations on the Step 2 CS?

18   A    It is.

19   Q    And he submitted that when?

20   A    It looks like we time-stamped it July 24th, 2008.  That's

21   the date we received it.

22   Q    And if you turn to Page 3 of Mr. Hartman's request, what

23   did he indicate he had been granted at Stoneybrook as an

24   accommodation for his speech dysfluency?

25   A    It looks like that's on Page 4 under the medical school

1    accommodations.

2    Q    Yes.

3    A    I'll read the submission.  It says he was -- in the

4    clinic area, received extended time for oral exams, for

5    objective standardized clinical exams, I was given two times

6    to complete the history and physical on a standardized

7    patient.

8    Q    And this was Mr. Hartman's description of the

9    accommodations he had previously received with respect to his

10   speech dysfluency; is that correct?

11   A    That's correct.

12   Q    Why is it that the NBME asks applicants for

13   accommodations to describe the accommodations he had been

14   granted prior or another setting?

15   A    Well, it's helpful information to understand what they

16   have or haven't needed in the past, and what they've used,

17   and whether those accommodations have been given consistently

18   or intermittently.

19   Q    What accommodation was Mr. Hartman seeking in this first

20   application for accommodations?

21   A    He requested double time on the CS patient encounter

22   section, so that would be 30 minutes for the encounter.

23            MS. LEOPOLD-LEVENTHAL:  I'd like to mark Exhibit 2

24   as Defendant's Exhibit 9.  I'd move that into evidence at

25   this time.

1            THE COURT:  All right.

2            (Defendant's Exhibit No. 9 was admitted.)

3     BY MS. LEOPOLD-LEVENTHAL:

4     Q    What else did Mr. Hartman submit in June of 2008, in

5     support of his request for accommodations?

6     A    In July of 2008, in addition to the request form, we

7     received a personal statement written by Aaron to describe

8     the accommodation he was seeking and the reason for that.

9     I believe we also received some documentation from

10    Stoneybrook, his medical school, confirming that he had

11    received accommodations prior at medical school.  I believe

12    there was a report from a Leslie Oldemeyer.

13    Q    Was that the sum total of the documents he submitted at

14    that time?

15    A    I believe so.

16    Q    And in that application, Mr. Hartman was not requesting

17    use of either an orator, or a text to speech device, or any

18    other assistive device; is that correct?

19    A    That's correct.

20    Q    Did you review all of those documents in conjunction with

21    Mr. Hartman's accommodations request?

22    A    Yes, I did.

23    Q    How much time, if you know, did you spend reviewing Mr.

24    Hartman's request and those materials that you identified?

25    A    Oh, gee, it's hard to say now retrospect.  I, like I

1   said, review each request personally.  Then I review it a

2   second and a third time when I get the recommendation back

3   from the consultants.  So it was probably several hours.

4   Q    Please turn to Exhibit 3.

5   A    (Witness complies.)

6         Okay.

7   Q    Would you identify that document, please?

8   A    This is Mr. Hartman's personal statement that was

9   received July 24th along with his request form.

10  Q    Do you believe that's a copy of the original personal

11  statement that he submitted?

12  A    I do.

13        MS. LEOPOLD-LEVENTHAL:  I would like to mark the

14  document at exhibit Tab 3, as Defendant's Exhibit 10, and

15  move that into evidence at this time?

16        THE COURT:  Sure.

17        (Defendant's Exhibit No. 10 was admitted.)

18        THE COURT:  All right.

19  BY MS. LEOPOLD-LEVENTHAL:

20  Q    Directing your attention, Dr. Farmer, to the last two

21  sentences of Mr. Hartman's personal statement, and this

22  appears four lines from the bottom.

23  A    I see that.

24  Q    Okay.  Did Mr. Hartman indicate he received double time

25  in medical school for clinical exams?

1    A    Yes, he did.

2    Q    And did Mr. Hartman also indicate that that was

3    sufficient, that double-time accommodation, to enable him to

4    complete the history and the physical examinations on those

5    patients?

6    A    That's my view of it, yes.

7    Q    Okay.  You also mentioned a speech pathology report from

8    Stoneybrook from a Ms. Oldemeyer; is that correct?

9    A    Yes, from Ms. Oldemeyer.

10   Q    Please turn to Exhibit Tab 4.

11   A    (Witness complies.)

12            I have it.

13   Q    Is this Ms. Oldemeyer's report that Mr. Hartman submitted

14   along with his accommodations request?

15   A    Yes, it looks like it's all here.

16   Q    And did you review that report in conjunction with your

17   review of Mr. Hartman's accommodations request?

18   A    Yes, I did.

19            MS. LEOPOLD-LEVENTHAL:  I'd like to mark the

20   document as Tab 4 as Defendant's Exhibit 11, and move it into

21   evidence at this time.

22            THE COURT:  All right.

23            (Defendant's Exhibit No. 11 was admitted.)

24   BY MS. LEOPOLD-LEVENTHAL:

25   Q    Please, if you would, Doctor, turn to Page 3 of Ms.

1    Oldemeyer's report?

2    A    (Witness complies.)

3         I have it.

4    Q    And there's only one section there and it's entitled

5    "Recommendations."

6         What did Ms. Oldemeyer recommend at that time in her

7    report with respect to Mr. Hartman's speech dysfluency?

8    A    Actually, she didn't recommend anything.  Her

9    recommendations actually seem to indicate that she was

10   summing up.

11        If I can read, the first recommendation states:

12   "Patient requires more time to verbally communicate, to

13   familiar and unfamiliar listeners, due to his dysfluencies,

14   including halting speech and sound repetition."

15   Q    Did you understand Ms. Oldemeyer's report was being

16   submitted in support of Mr. Hartman's request for more time

17   on a Step 2 CS exam?

18   A    Well, given the date on the evaluation was a year prior,

19   that it was not addressed -- did not address the Step 1 CS,

20   my understanding was that he had received this, perhaps, for

21   another purpose, but was submitting it on behalf as

22   supporting documentation.

23   Q    And I believe you testified that Mr. Hartman also

24   submitted a certification of prior test accommodations; is

25   that correct?

1   A    That's correct.

2   Q    Please turn to Exhibit Tab 5 in the binder in front of

3   you?

4   A    (Witness complies.)

5            I have that.

6   Q    Identify that document for the Court?

7   A    This is a form that the National Board uses.  It's called

8   a certification of prior test accommodations, and we ask

9   individuals requesting test accommodations to have their

10  school or schools complete this form, just to inform us what

11  accommodations they have provided for the student in the

12  past.

13  Q    And who signed this certification on behalf of

14  Stoneybrook?

15  A    I read the name as Letha Shongrin (ph), M.D., Associate

16  Dean for Academic and Faculty Affairs.

17  Q    And that was dated July 2008, correct?

18  A    That's correct.

19  Q    So was it your understanding that that was prepared

20  somewhat contemporaneously with Mr. Hartman's accommodations

21  request?

22  A    That's my assumption, yes.

23  Q    And do you believe this is a true and correct copy of the

24  original certification that Mr. Hartman submitted?

25  A    It looks like it, yes.

1           MS. LEOPOLD-LEVENTHAL:  I would like to mark the

2    document as Exhibit Tab 5, as Defendant's Exhibit 12, and

3    move it into evidence at this time.

4           THE COURT:  All right.

5           (Defendant's Exhibit No. 12 was admitted.)

6    BY MS. LEOPOLD-LEVENTHAL:

7    Q   And did Associate Dean Shongrin confirm that Mr. Hartman

8    had received extended time for oral examinations?

9    A   Yes, she did.

10   Q   And what did she indicate was the reason for the extended

11   time on those oral examinations?

12   A   Moderate speech dysfluency.

13   Q   Now, you indicated that Mr. Hartman was seeking double

14   time in this July 2008 request, correct?

15   A   Correct.

16   Q   And how much time is included in the standard

17   administration for each SP encounter?

18   A   The standard patient encounter is 15 minutes.

19   Q   So if my math is correct, he was asking basically for

20   double time?

21   A   He was asking for 30 minutes.  Double time, correct.

22   Q   Okay.  Did you, after you received Mr. Hartman's request

23   for more time, consult with an outside consultant, as to

24   whether an accommodation for Mr. Hartman's speech dysfluency

25   was appropriate?

1    A    I did, yes.

2    Q    And whom did you consult with?

3    A    Dr. Laura Wilbur.

4    Q    Why did you select Dr. Wilbur?

5    A    Dr. Wilbur consults for us in instances from speech,

6    language, and hearing impairments.

7    Q    Were you familiar with Dr. Wilbur's credentials at the

8    time you submitted Mr. Hartman's file to her for review?

9    A    I was.

10   Q    How many times per year, approximately, do you consult

11   with Dr. Wilbur regarding speech issues and accommodations?

12   A    Regarding speech issues and accommodations?

13   Q    Yes.

14   A    Mm, probably less than five times a year.

15   Q    Why did you believe that she was an appropriate person

16   with whom to consult with respect to Mr. Hartman's

17   accommodation request?

18   A    That is her training and experiences in both otology and

19   speech language.

20   Q    If you would, please, turn to Exhibit 6 in the binder in

21   front of you?

22   A    (Witness complies.)

23            I have that.

24   Q    Identify this document, please?

25   A    This appears to be Dr. Laura Ann Wilbur's data.

1    Q    And do you believe, to the best of your knowledge, that

2    this is a current copy of the C.V.?

3    A    Yes, I do.

4    Q    Okay.

5              MS. LEOPOLD-LEVENTHAL:  I'd like to mark Dr.

6    Wilbur's C.V. at Tab No. 6 as Defendant's Exhibit 13, and

7    move it into evidence?

8              THE COURT:  Good.

9              (Defendant's Exhibit No. 13 was admitted.)

10   BY MS. LEOPOLD-LEVENTHAL:

11   Q    And do you understand that the NBME produced this

12   curriculum vitae to the plaintiff in this case?

13   A    I do.

14   Q    Did Dr. Wilbur -- first, what information did you provide

15   to Dr. Wilbur in order to educate her with respect to Mr.

16   Hartman's accommodations request?

17   A    Dr. Wilbur was provided with all the documentation that

18   Mr. Hartman submitted to the National Board.

19   Q    Incidentally, was Mr. Hartman requesting an accommodation

20   about the same time on another examination under the USMLE

21   heading?

22   A    Yes, he was.

23   Q    And what test was he seeking accommodations for in

24   addition to the Step 2 CS?

25   A    A Step 2 CK, the clinical knowledge exam.

1  Q    And what was the basis for Mr. Hartman's request for

2  accommodations on the Step 2 CK exam?

3  A    That was also a reading disorder.  In fact, I think it's

4  also on the certification of prior test accommodations that

5  Dr. Shondra indicated the school provided him accommodations

6  on that basis.

7  Q    Are you familiar with the MCAT examination?

8  A    Somewhat, yes.

9  Q    Is that a written examination?

10 A    That's my belief, yes.

11 Q    Okay.  And with respect to the MCAT examination, and the

12 SATs, is it your understanding when Mr. Hartman submitted his

13 application, that he had not received any type of

14 accommodation on either one of those examinations for any

15 reading disorder?

16 A    My recollection is he had not received any accommodations

17 on anything prior to the second year of medical school.

18 Q    For a reading disorder, correct?

19 A    For a reading disorder.

20 Q    Okay.  Did Dr. Wilbur provide you with a written

21 assessment after she reviewed Mr. Hartman's accommodation

22 request?

23 A    Yes, she did.

24 Q    Would you please turn to Exhibit 7?

25 A    (Witness complies.)

1       I have it.

2   Q   This is a two-page document and it's marked on the second

3   page and the first page "Received August 19th, 2008, from

4   Disability Services"; is that correct?

5   A   That's correct.

6   Q   And is this the evaluation/assessment report that Dr.

7   Wilbur submitted?

8   A   I would actually define it as her review of the

9   documentation and her recommendation to me.

10  Q   And to the best of your knowledge, is this review and

11  recommendation a true and correct copy of the original

12  submitted to the NBME in August of '08?

13  A   Yes, it is.

14          MS. LEOPOLD-LEVENTHAL:  I'd like to mark this review

15  and recommendation at Exhibit Tab 7, as Defendant's Exhibit

16  14, and move it into evidence at this time.

17          THE COURT:  All right.

18          (Defendant's Exhibit No. 14 was admitted.)

19  BY MS. LEOPOLD-LEVENTHAL:

20  Q   Dr. Farmer, what did Dr. Wilbur conclude and recommend in

21  this two-page report?

22  A   She concluded that based on the documentation that was

23  provided by Mr. Hartman, that he had moderate speech

24  dysfluency, and recommended time-and-one-half on the Step 2

25  CS exam.

1  Q    If you'd take a look at Page 2 of that exhibit, and I am

2  directing you to Paragraph 4, the fifth line down.

3  A    (Witness complies.)

4           I see that.

5  Q    The sentence begins, "Like most communication, handicap

6  stuttering is not visible, and thus may be misinterpreted by

7  those who have not known persons who stutter as an inability

8  (lack of knowledge) to answer a question, or as an inability

9  to speak English (word finding problem)."

10          Do you know why Dr. Wilbur included that information

11 in this review and recommendation report?

12 A    I think Dr. Wilbur is a professor at heart, and as a

13 consultant for us, she has in the past provided us additional

14 information on different types of impairments.  It's, I

15 think, her opportunity to inform and educate me, and the unit

16 and I actually solicit information like this from the

17 consultants pretty regularly.

18 Q    Could you take a look at the last sentence of that same

19 paragraph.  It provides:  "For most people who stutter,

20 stress can exacerbate the problem, thus a time oral exam

21 becomes much more difficult for them and for others who do

22 not stutter."

23          Do you see that?

24 A    I do.

25 Q    Did Mr. Hartman at any time submit a request for

1    accommodations based upon an anxiety disorder?

2    A    Not to my knowledge.

3         (Pause.)

4    Q    Are you familiar with what, if any, instructions a

5    standardized patient is given with respect to rating a

6    candidate if the candidate is disabled or using some sort of

7    assistive device?

8    A    Well, my understanding about instructions to the

9    standardized patients is that they are trained on the use of

10   the rating scales, and that they are trained to apply the

11   rating scales consistently across every examinee, regardless

12   of how the examinee looks, or what assistive devices they may

13   use, or what accommodation they may have.

14   Q    And you understood Dr. Wilbur was recommending

15   time-and-a-half to Mr. Hartman?

16   A    That's my understanding, yes.

17   Q    And then what did you do once you reviewed the document

18   that Dr. Wilbur provided, recommending the time-and-a-half

19   accommodation?

20   A    I reviewed the file again in its entirety.  What I'm

21   looking for, again, is just any inconsistencies that might be

22   there.  My decision at that time was that time-and-a-half was

23   consistent with what had been provided, and I granted the

24   accommodation of time-and-a-half.

25         I will say that I gave eight minutes rather than

Farmer - Direct                                    155

1   7-1/2 minutes, which would be the 50 percent additional time.

2   And a letter was sent to Mr. Hartman confirming that that

3   accommodation was approved.

4   Q    Why did you approve 50 percent additional time rather

5   than the double time that Mr. Hartman was seeking at that

6   time?

7   A    Again, after reviewing the file more than once, there was

8   nothing in the file that I could find that confirmed Mr.

9   Hartman's report that he had received double time.  All the

10  confirmation or all the information from his medical school

11  was not in specific about the amount of time he was given for

12  clinical or objective OSCEs.

13  Q    Once you determined that 50 percent additional time was

14  an appropriate accommodation, what did you do next?

15  A    A letter was generated to Mr. Hartman that informed him

16  of the accommodation that he would receive eight additional

17  minutes on the examination.

18  Q    Please turn to Exhibit 8 in the binder in front of you.

19  A    (Witness complies.)

20        I see that.

21  Q    And is that the letter that the NBME forwarded to Mr.

22  Hartman granting him 50 percent additional time?

23  A    It is.

24  Q    And when did you say that was dated?

25  A    That letter's dated August 21st, 2008.

Farmer - Direct                    156

1         MS. LEOPOLD-LEVENTHAL:  I'd like to mark that

2    document under Tab 8 as Defendant's Exhibit 15, and move it

3    into evidence at this time.

4         THE COURT:  All right.

5         (Defendant's Exhibit No. 15 was admitted.)

6    BY MS. LEOPOLD-LEVENTHAL:

7    Q   Did the NBME also communicate the granting of that

8    request to Mr. Hartman in letter form?

9    A   That is the letter.  The August 21st, 2008 letter.

10   Q   I'm sorry about that.

11        After time-and-a-half was granted, did Mr. Hartman

12   then request an additional accommodation on the Step 2 CS

13   examination?

14   A   He did, yes.

15   Q   What did he request?

16   A   He wrote back to us with a new request form asking for

17   something called a TTY or teletypewriter, and for that to be

18   used should he have a telephone encounter on the examination.

19   Q   And when you received that request, what did you do, if

20   anything, as a result?

21   A   I believe along with that request was a letter from a Ms.

22   McCafferty (ph), I believe a speech therapist that works with

23   Mr. Hartman.  I reviewed that documentation.

24        Rather than a TTY device, the accommodation that was

25   approved for Mr. Hartman, in addition to the time-and-a-half,

1   was to substitute a face-to-face encounter with a live SP for

2   a telephone encounter.

3   Q   Please turn to Exhibit 9.

4   A   (Witness complies.)

5           I have that.

6   Q   And that's a letter dated December 2nd, 2008, from the

7   NBME to Mr. Hartman, correct?

8   A   That's it, yes.

9   Q   And is that the NBME's communication to Mr. Hartman with

10  respect to the accommodation on the telephone encounter?

11  A   It is.

12          MS. LEOPOLD-LEVENTHAL:  I'd like to mark the

13  document at Exhibit Tab 9 as Defendant's Exhibit 16, and move

14  it into evidence at this time.

15          THE COURT:  All right.

16          (Defendant's Exhibit No. 16 was admitted.)

17  BY MS. LEOPOLD-LEVENTHAL:

18  Q   Dr. Farmer, did the elimination of the telephone

19  encounter constitute a fundamental alteration of the Step 2

20  clinical skills exam?

21  A   No.

22  Q   Why not?

23  A   Telephone encounters are not on every form of the

24  examination, which means that when the exams are randomly

25  assigned to examinees, not every examinee will receive a

1    telephone encounter.

2    Q    And is it your understanding then that Mr. Hartman took

3    the Step 2 clinical skills examination in June of 2009?

4    A    That's my understanding, yes.

5    Q    And how did Mr. Hartman do on that exam?

6    A    He failed the overall examination.

7    Q    Do you know how he did on the three subcomponents that

8    comprise the overall grade?

9    A    Yes, he passed the spoken English proficiency or SEP

10   portion, the integrated clinical encounter or ICE portion,

11   and he failed the CIS, the communication and interpersonal

12   skills portion.

13   Q    To the best of your knowledge, did anyone from the NBME

14   hear from Mr. Hartman after he took the Step 2 CS examination

15   in June, but before his actual score was released?

16   A    No, not to my knowledge.

17   Q    So is it fair to say that Mr. Hartman, to the best of

18   your knowledge, didn't contact the NBME either in writing, or

19   over the telephone, to complain about not having enough time,

20   or feeling rushed during a patient encounter, or complaining

21   about any other aspect of the administration of that exam?

22   A    My understanding is that we received no information from

23   Mr. Hartman about that, no.

24   Q    Do you understand that Mr. Hartman took the Step 2 CK and

25   the Step 2 CS examinations the same week?

1    A    That's my understanding, yes.

2    Q    Do you know how many hours the administration of the Step

3    2 CK takes?

4    A    A Step 2 CK is a nine-hour examination.  It's a nine-hour

5    day.  Eight one-hour test blocks and 45 minutes of break

6    time.

7    Q    And how long is the Step 2 CS examination?

8    A    Well, the standard administration would be also around

9    eight hours.  With time-and-a-half accommodation, it would

10   add another 50 percent time to that.

11   A    And, so, when Mr. Hartman took the Step 2 CS examination

12   in June of 2009, with the time-and-a-half, did he take that

13   examination all in one day?

14   A    I believe so, yes.

15   Q    And after Mr. Hartman's score was released then, did he

16   submit a letter with a request for different accommodations

17   to the NBME?

18   A    After his score was released, yes, he submitted a letter

19   and a new request form.

20   Q    Please turn to Exhibit 13 in the binder in front of you.

21   A    (Witness complies.)

22            I have that.

23   Q    And what is that document, Dr. Farmer?

24   A    This is a one-page letter dated September 17th, 2009,

25   from Aaron Hartman to the testing coordinator.

1  Q   And, to the best of your knowledge, is this a true and

2  correct copy of the original that Mr. Hartman submitted to

3  the NBME at that time?

4  A   Yes, it is.

5          MS. LEOPOLD-LEVENTHAL:  I'd like to mark this

6  document as Exhibit Tab 13, as Defendant's Exhibit 17, and

7  move it into evidence at this time.

8          THE COURT:  All right.

9          (Defendant's Exhibit No. 17 was admitted.)

10  BY MS. LEOPOLD-LEVENTHAL:

11  Q   Dr. Farmer, please take a look at the second paragraph of

12  Mr. Hartman's letter, and I'm directing your attention to the

13  first sentence, which provides:  "I have reapplied for the

14  Step 2 CS examination with alternative accommodations.  I

15  would like to type my questions and responses to the SP via a

16  laptop computer and have a orator verbalize what I type to

17  the SP.  I would also like the SP rating scales to be

18  modified."

19          And is it fair to say that your understanding at

20  that time was that Mr. Hartman was asking both for a

21  modification of the rating scales, and also that he be

22  permitted to type his communication on a computer, and then

23  another individual would speak what was typed?

24  A   That is my understanding, yes.

25  Q   Did Mr. Hartman also request that he be permitted to

1   speak one sentence to the SP, and then type the rest of the

2   encounter with the use of the orator, as I've described?

3   A   Yes, in the next to the last paragraph in this letter, it

4   appears that Mr. Hartman is attempting to provide some

5   suggestions on how the spoken English proficiency portion of

6   the exam might be handled, and in that case it was to speak a

7   limited amount to the SP.

8   Q   Did Mr. Hartman submit a request for accommodations form

9   along with that letter seeking the orator?

10  A   Yes, he did.

11  Q   Please turn to Exhibit 11.  I'm sorry.  I'm a little out

12  of order here.

13  A   (Witness complies.)

14          I have that.

15  Q   And is that the request for accommodations form that Mr.

16  Hartman submitted that time?

17  A   It is.

18          MS. LEOPOLD-LEVENTHAL:  I'd like to mark that

19  request for accommodations as Defendant's Exhibit 18.  It's

20  at Tab No. 11.  And move it into evidence at this time.

21          (Defendant's Exhibit No. 18 was admitted.)

22          THE WITNESS:  Ms. Leopold-Leventhal, may I clarify?

23  BY MS. LEOPOLD-LEVENTHAL:

24  Q   Please.

25  A   -- the date stamp on this document is October 5, 2009.

1  We received this form in September.  I believe this is a copy

2  that Mr. Hartman also sent along with a letter to somebody

3  else at the National Board, perhaps Ms. Osring (ph), but it

4  is a copy of the same form that he submitted with his letter

5  that we received in September.

6  Q   And if you'd turn to Page 3 of that exhibit, what

7  accommodation was Mr. Hartman requesting?

8  A   On the patient encounter section, he was requesting to

9  type his questions and responses to the SP via a laptop

10  computer, and have an orator verbalize what he typed to the

11  SP.  He was also asking that the SP rating scales be

12  modified, so that the use of the orator would not negatively

13  impact his score.

14  Q   Could you take a look at the next page.  Does Mr. Hartman

15  describe the accommodations he had previously received with

16  respect to oral examinations?

17  A   Yes, he does.

18  Q   And what did he indicate?

19  A   In medical school he received extended time for oral

20  exams, for objective standardized clinical exams or OSCEs, he

21  was given double time to complete the patient encounter.

22  Q   Have you since learned, Dr. Farmer, that, in fact, at

23  least on one examination Stoneybrook Medical School granted

24  Mr. Hartman only time-and-a-half and not double time to

25  complete an oral examination?

1    A    I have.

2    Q    Did he ever -- did Mr. Hartman ever supplement his

3    request for accommodations to provide the NBME with that

4    piece of information?

5    A    Not the Office of Disability Services, no.

6    Q    Okay.  And did Mr. Hartman also submit a letter from a

7    new speech pathologist at that time in support of his orator

8    request?

9    A    I believe what he submitted was another letter or a

10   letter from Ms. McCafferty, his speech therapist.  Ms.

11   McCafferty had written a brief letter supporting his request

12   for TTY the year before.

13           With this request, she wrote a longer letter

14   supporting his -- well, actually come to think of it, I don't

15   know that she actually made any request or recommendation for

16   accommodation.

17   Q    If you would, take a look at the document at Exhibit Tab

18   14.

19   A    (Witness complies.)

20           I see that.

21   Q    Is that, to the best of your knowledge, a true and

22   correct copy of the letter that Mr. Hartman submitted to the

23   NBME from Ms. McCafferty in support of his orator request?

24   A    Yes, it is.

25           MS. LEOPOLD-LEVENTHAL:  I'd like to mark Ms.

Farmer - Direct                              164

1    McCafferty's letter at Exhibit Tab 14, as Defense Exhibit 19,

2    and move it into evidence at this time.

3              THE COURT:  All right.

4              (Defendant's Exhibit No. 19 was admitted.)

5              (Pause.)

6    BY MS. LEOPOLD-LEVENTHAL:

7    Q    Did Ms. McCafferty indicate in her letter that stress

8    exacerbates Mr. Hartman's speech dysfluency?

9    A    Yes, she did.

10   Q    And at that time did Mr. Hartman supplement his

11   accommodations request with any information supporting an

12   anxiety disorder?

13   A    No, he did not.

14   Q    Did Mr. Hartman produce any documentation at that time to

15   establish that he had ever used an orator in any point in his

16   life up until that point in time?

17   A    No, he did not.

18   Q    What did the NBME decide with respect to Mr. Hartman's

19   orator request?

20   A    That the request was not supported by the documentation

21   he had provided up until that point.

22   Q    And what did you -- what did the NBME base that decision

23   on?

24   A    Well, the request was actually denied, and what was

25   granted was a double time examination, or a 30 minutes per

1   patient encounter.

2   Q    Why did the NBME grant Mr. Hartman double time at this

3   point in time?

4   A    I think I was persuaded by both his letter, and Ms.

5   McCafferty's letter, that Mr. Hartman's speech dysfluencies

6   are effected by situations and vary from time-to-time.

7   Q    Did the NBME communicate the denial of the orator request

8   and the granting of double time to Mr. Hartman?

9   A    Yes.

10  Q    Take a look at Exhibit -- the document at Exhibit Tab 15,

11  please.

12  A    (Witness complies.)

13          I have that.

14  Q    And what is that document?

15  A    That is a letter dated September 29, 2009, from me to Mr.

16  Hartman, and it is informing him that he's been granted an

17  additional 15 minute for patient encounter, but that we are

18  unable to grant his request for an orator, or to modify the

19  rating scales.

20  Q    Well, he was still asking that the rating scales be

21  modified for him?

22  A    I believe that was contained in his request form, yes.

23          MS. LEOPOLD-LEVENTHAL:  I'd like to mark that

24  September 29th, 2009, letter at Exhibit Tab 15 as Defendant's

25  Exhibit 20, and move it into evidence at this time.

1          THE COURT:  All right.

2          (Defendant's Exhibit No. 20 was admitted.)

3   BY MS. LEOPOLD-LEVENTHAL:

4   Q   Did the NBME issue Mr. Hartman a document called a

5   scheduling permit?

6   A   We did.

7   Q   And what is that document?

8   A   The scheduling permit is required for an examinee to

9   schedule their examination.  It tells them what eligibility

10  period they have, so which period of time they have to take

11  their test.  It gives them information about how to schedule

12  their examination.

13          MS. LEOPOLD-LEVENTHAL:  May I approach the witness,

14  your Honor?

15          THE COURT:  Yes, indeed.

16  BY MS. LEOPOLD-LEVENTHAL:

17  Q   Dr. Farmer, is that the scheduling permit that you just

18  referred to with respect to Mr. Hartman?

19  A   This is a copy of his scheduling permit, yes.

20  Q   Okay.  And with respect to the eligibility period, what's

21  identified?

22  A   Mr. Hartman is currently eligible to take the Step 2 CS

23  examination between September 28, 2009, and September 28,

24  2010.

25  Q   So, as I understand it then, the double time

1  accommodation that the NBME granted to Mr. Hartman on

2  September 28th, 2009, that basically has an effective date

3  for a year through September 28, 2010; is that correct?

4  A    That's correct.

5           MS. LEOPOLD-LEVENTHAL:  Your Honor, this document is

6  not in my exhibit binder, but I would like to mark it as

7  Exhibit 21, and move it into evidence at this time.

8           THE COURT:  All right.

9           (Defendant's Exhibit No. 21 was admitted.)

10          THE COURT:  Thank you.

11          MS. LEOPOLD-LEVENTHAL:  Your Honor, it's -- this may

12  be a good time for me to break, if that's okay with you.

13  It's about quarter of 6:00.  I have probably less than a half

14  an hour left of the witness, but --

15          THE COURT:  All right.

16          MS. LEOPOLD-LEVENTHAL:  -- I would be happy to begin

17  that Monday morning at 8:30, if that's acceptable to you?

18          THE COURT:  All right.  Now, in addition to Dr.

19  Farmer, you have --

20          MS. LEOPOLD-LEVENTHAL:  Dr. Clauser who is going to

21  talk about the psychometrics involved.  His testimony will be

22  the shortest of the three witnesses for sure.

23          THE COURT:  I see.

24          MS. LEOPOLD-LEVENTHAL:  And that's all.

25          THE COURT:  All right.  Do you have a sense of how

168

1  long your cross is going to be?

2           MR. WEINER:  I would put it in the neighborhood of a

3  half hour to 45 minutes of Dr. Farmer.

4           THE COURT:  All right.  Good.  Well, we'll meet then

5  at 8:30 Monday morning.  We will be meeting in Judge Bartle's

6  -- back in Judge Bartle's courtroom, which is on the 16th

7  floor.

8           I was about to say I should apologize to you

9  institutionally for shifting the venues so frequently, but

10 maybe you can take it as a tourist opportunity to see various

11 work sites in the court.

12          Very good.  Have good weekends, folks.

13          MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

14          MR. WEINER:  Thank you, your Honor.

15          THE WITNESS:  Thank you.

16          MR. WEINER:  Have a good weekend.

17          (Court adjourned at 5:46 o'clock p.m.)

18                               * * *

```
 1                    I N D E X

 2   WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS

 3   Peter Katsufrakis, M.D.

 4       By Mr. Leopold-Leventhal  14              124

 5       By Mr. Weiner                    84

 6   Catherine Farmer

 7       By Ms. Leopold-Leventhal 125

 8                       - - -

 9                  E X H I B I T S

10   NUMBER                    ADMITTED INTO EVIDENCE

11   D-1 to 4                       14

12   D-5                            17

13   D-6                            65

14   D-7                            127

15   D-8                            129

16   D-9                            137

17   D-10                           138

18   D-11                           140

19   D-12                           142

20   D-13                           144

21   D-14                           146

22   D-15                           150

23   D-16                           151

24   D-17                           154

25   D-18                           155
```

1                              INDEX (Continued)

2                             E X H I B I T S

3    NUMBER                                    ADMITTED INTO EVIDENCE

4    D-19                                              157

5    D-20                                              159

6    D-21                                              160

7                                  *   *   *