IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

AARON L. HARTMAN            :  CIVIL ACTION NO. 09-5028
                           :
           v.              :  Philadelphia, Pennsylvania
                           :  March 19, 2010
NATIONAL BOARD OF MEDICAL  :  11:04 o'clock a.m.
EXAMINERS                  :
. . . . . . . . . . . . . . . .

TELEPHONE CONFERENCE
BEFORE THE HONORABLE LOUIS H. POLLAK
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiff:      CHARLES WEINER, ESQUIRE
                        Law Offices of Charles Weiner
                        179 North Broad Street
                        Doylestown, PA  18901

For the Defendant:      JANE E. LEOPOLD-LEVENTHAL, ESQUIRE
                        Eastburn & Gray, PC
                        60 East Court Street
                        P.O. Box 1389
                        Doylestown, PA  18901

Also Present:           Shelley Green

ESR Operator:           Mark Rafferty

Transcribed By:         Paula Curran, CET
                        Laws Transcription Service

- - -

(Proceedings recorded by For the Record Gold digital sound
recording; transcript provided by above transcription
service.)

- - -

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

2

1          (The following occurred via telephone at 11:04

2    o'clock a.m.)

3          MR. WEINER:  Good morning, this is Charles Weiner

4    representing plaintiff.

5          THE COURT:  Good morning, Mr. Weiner.

6          MR. WEINER:  Good morning, your Honor, how are you?

7          THE COURT:  Good, good.

8          MS. LEOPOLD-LEVENTHAL:  Your Honor, Jane Leventhal,

9    it's great to see your Honor.

10          THE COURT:  Good morning, Ms. Leopold-Leventhal, how

11    are you?

12          MS. LEOPOLD-LEVENTHAL:  I'm well, how are you, your

13    Honor?

14          THE COURT:  Good.  And you have Ms. Green with you?

15          MS. LEOPOLD-LEVENTHAL:  I do.  Shelley, are you

16    there?

17          MS. GREEN:  Yes, I'm here, thank you.

18          THE COURT:  We have Mr. Roberts, my colleague, with

19    me today, as he has faithfully been throughout.  There appear

20    to be three issues with that are still dividing parties.  Of

21    these, I guess the most important is the question of

22    scheduling.  We're no longer -- I think we were all agreed,

23    we're no longer in a situation in which a test could be held

24    on the 18th of March.  We'll have to put that thought behind

25    us.

1          By the way, the match now, having now taken place,

2     do we have any information, Mr. Weiner, do you know about

3     that?

4          MR. WEINER:  Yes, I do, your Honor.  I'm very

5     pleased to  say that Mr. Hartman has been accepted into a

6     pathology program at Lenoxville Hospital in New York City.

7     One of the most prestigious hospitals in the country.  So,

8     it's a great pleasure to him.  I think on the date of the

9     examination, I have an opportunity now to speak with Mr.

10    Hartman and we might be able to have some resolution here.

11    And I do want to preface this by saying is that, Mr.

12    Hartman's is interested in taking the exam.  I think he has

13    been, during the course of us trying to prepare this defense

14    order, Mr. Hartman has attempted to meet some of the requests

15    of NBME.  For example, they had requested that he take the

16    non-CPS exam first, even though your opinion suggested

17    otherwise.  He has been willing to do that.  He has been

18    willing to even forego a rest day between, to leave open more

19    days that the tests could be administered.  And here, he is

20    willing to accept one of the options that has been proposed

21    and what he's willing to do is on March 24th and March 25th,

22    take the exam.  And if the NBME wishes that he take the non-

23    CPS exam first, he is willing to do that.  And then have the

24    exam administered, at least, the second time on March 31st.

25    And the date that was given -- contained in your letter was

4

1    April 2nd, is that accurate?  Not two consecutive days or

2    that a typo?

3              MS. GREEN:  No, it was not a typo, if I can jump in

4    here, this is Shelley Green.  The center is closed the first

5    Thursday of every month for IT, so that was not a typo.

6    There would be a day in between.

7              MR. WEINER:  Okay, so he's willing to take the exam

8    on March 1st and April 2nd.

9              THE COURT:  March 31st, I think you mean.

10             MR. WEINER:  Oh, I'm sorry, excuse me, March 31st

11   and April 2nd.  However, we do request that the scoring on

12   both exams be completed by April 21st.

13             THE COURT:  Well, that's --

14             MS. LEOPOLD-LEVENTHAL:  We understand that that

15   April 21st date is consistent with your Honor's order.

16             THE COURT:  I'll ask you to be a little bit louder,

17   if you will.

18             MS. LEOPOLD-LEVENTHAL:  We understand that the April

19   21st date is consistent with your Honor's order.  But as we

20   explained in the letter, it is nearly impossible to get the

21   scores at that time.  Pushing the date back, I don't see any

22   harm that there was in pushing the scoring date back.  We had

23   proposed Friday until Monday, because he needs it before he

24   graduates on May 18th.  I don't understand why putting, you

25   know, NBME to almost an impossible task is necessary, given

1   the fact that he only needs his score by the 18th and we're

2   prepared to make it the 15th, after pushing the date back for

3   testing a week.

4           THE COURT:  First of all, before we get to that.

5   The proposed March 31 to April 2 examination would be in

6   Philadelphia, would it?

7           MS. LEOPOLD-LEVENTHAL:  Yes, your Honor.

8           THE COURT:  So, both examinations would take place

9   in Philadelphia.  Mr. Weiner, I think Mr. Hartman is really

10  going to have to make a choice here.  The NBME's proposal

11  initially for a, well, apart from the examination on the

12  match day.  The next testing used to be March 22 and 23, that

13  would be next Monday and Tuesday, followed by Wednesday and

14  Thursday here in Philadelphia.  That would have gotten the

15  examination results in by the requested April 21.  The NBME

16  has suggested as the order that we just now know,  a

17  sequence, which would lead to a -- to the examination results

18  coming in on May 15th.  Now, we've known for some time that

19  it's extremely difficult to accelerate that date if the

20  examinations went beyond the 27th of March.

21          So, it would seem to me, though, I'm sure Mr.

22  Hartman would prefer to have the April 21 date.  If he is to

23  be examined on dates winding up on April 2nd, given the

24  administrative difficulties that are recited, I have no

25  reason to doubt accelerating the examination results to the

6

1  15th of May.  It strikes me that Mr. Hartman, if it's

2  important to him, vital to him, to have the results by April

3  21st and the way to do that is to take the examination in

4  Houston next Monday and Tuesday and followed by the

5  Philadelphia examinations Wednesday and Thursday.  I

6  appreciate that that's not a comfortable way to do it.  But

7  it would seem to me the way in which you get the results by

8  April 21st, if he wishes.

9          I'm not disposed to tell the NBME to accelerate the

10  examination results or prior to May 15th.  If Mr. Hartman

11  takes the examinations, winding up with the second

12  examination on March 31 and April 2.  It seems to me that the

13  choice now remains with Mr. Hartman (inaudible) and to have a

14  quite uncomfortable, hurried examination scheduled next week,

15  but one that can be done, at least, I think very fortunately

16  agreed to take the examinations without a day of rest, if

17  that could be done.  But I think he would really have to

18  elect which is more important to him, to have a relatively

19  comfortable examination sequence, one which would, indeed,

20  involve a weekend and two further days intervening, which

21  would yield a May 15th examination result or whatever you

22  prefer it and a relatively speaking, un-restful regular

23  scheduled examinations next week, where he'd be getting the

24  results at an earlier time on April 21.

25          MR. WEINER:  Well, your Honor, I think we're going

1   to go with the proposal I had set forth, which would be March

2   24th, 25th dates and then the April, I'm sorry, the March

3   31st and April 2nd dates.  My only request is to accelerate

4   the scores just a few days later.  As is their proposed May

5   15th release date for this Court is an accelerated date

6   beyond their normal reporting.  The normal reporting would

7   have been on June 24th.  May I ask that the -- just because I

8   think it keeps Mr. Hartman hanging on a little bit longer,

9   wondering what the results are.  I think that's difficult for

10  anyone and we, perhaps, have the date for reporting

11  accelerated to May 1st.

12              THE COURT:  I'll hear from Ms. Green or Ms.

13  Leopold-Leventhal.

14              MS. LEOPOLD-LEVENTHAL:  Ms. Leventhal.  You know, I

15  understand that things aggravate, waiting for results, all of

16  them.  We all have times in our life, however, I don't think

17  that that trumps the machinations that NBME would have to to

18  through to get them before.  And if Mr. Hartman has to have a

19  little anxiety over two weeks, I'm sorry for that and I don't

20  wish that on anyone.  But to require the NBME to incur all

21  kinds of costs, to jump through all kinds of hoops, which I

22  dont't even know are possible to alleviate him from a bit of

23  anxiety, I don't think that (inaudible).

24              THE COURT:  Might I inquire of Ms. Green of whether

25  acceleration before May 15th is a reasonably feasible.  I

1   don't question Ms. Leopold-Leventhal's recital of the facts,

2   but I suspect that you know the internal structures and

3   procedures best of any of us.  And I've certainly got the

4   feeling from the most recent submissions from Ms.

5   Leopold-Leventhal that it would be a very great difficulty to

6   do anything beyond what was proposed.  Perhaps you can tell

7   us.

8          MS. GREEN:  Well, we're already accelerating the

9   score release of the administration, the March 31-April 2nd

10  which in the ordinary course, would be released June 21st.

11  Now, we understand that although Mr. Hartman has secured his

12  residency, that he requires this for graduation.  So, we have

13  -- my forum people have said that they will endeavor to do

14  this by May 15th and they can commit to that.  I don't

15  believe they can commit to May 1st.  So, they're all, given

16  that the May 15th is an accelerated schedule from the

17  ordinary course of things.  I simply can't commit.  We can

18  endeavor to do it as quickly as possible, if we can get it

19  out before, but you know, I can't promise that it will be

20  done by May 1st.

21         THE COURT:  Well, let's do it this way then.  The

22  only thing the NBME is being required to do a number of

23  things that they do not routinely do.  I think Ms. Green has

24  put the matter very well.  A commitment of May 15th is

25  feasible.  Earlier than that, an attempt would be made

1  without a commitment.  So, I think we could elect to proceed

2  on that basis and for purposes of the order could be phrased

3  in the examination results to be reported no later than May

4  15th.  And I'm sure Ms. Green is telling us that there would

5  be a good faith effort to get the results earlier than that,

6  if feasible.  But the final date to which the defendant would

7  be committed would be May 15th.

8          Well, I think that resolves the largest of the

9  problems.  That means that Mr. Hartman will take the test for

10  the first time on this coming Wednesday, I guess, Wednesday,

11  March 24th.  And as I understand it, Mr. Hartman is willing

12  to take the examinations in whichever sequence the NBME wants

13  to do it.  Is that correct?

14          MR. WEINER:  Yes, your Honor.

15          THE COURT:  All right.

16          MR. WEINER:  And if I understand you, from this

17  conversation, the 24th and 25th administration, the results

18  will be out on April 21st.  For March 31st and April 2nd

19  administration, the result will be out no later than May

20  15th?

21          MS. LEOPOLD-LEVENTHAL:  Shelley, is that correct or

22  will they both come in?

23          MS. GREEN:  We can just -- the one that's on the

24  24th and 25th, will be released April 21st.

25          MS. LEOPOLD-LEVENTHAL:  Okay.

1          MR. WEINER:  And they'll occur in Philadelphia.

2          MS. GREEN:  Yes.

3          MR. WEINER:  Very good.

4          THE COURT:  Good, good.  Now, there's a question of

5  wording in paragraph eight.  Paragraph eight, as currently

6  written, reads, "When Mr. Hartman authorizes the release of

7  the score, report or transcript, NBME may report the scores

8  achieved by Mr. Hartman on both the examination and exam

9  administration in reference to both, together with an

10  explanation of the accommodations at each administration."

11          I gather that was a difference in view according to

12  the last clause and my view is that an explanation is not an

13  optimal word.  I think description was offered as an

14  alternative.  The point to be made is that it is my view that

15  the report should be of the examination scores and only a

16  description of the accommodations under which each

17  examination was placed.  That would foreclose any history of

18  how we got to this point, the litigation and so forth.

19          But that would lead me to think that I guess a

20  description was one that was a better term.  The language

21  that I would propose would be that following the word, above

22  in the phrase, referenced above, in the third line of

23  paragraph eight, we say "and they accompanied the report with

24  a description of the accommodations at each administration,

25  since (inaudible) it didn't," somewhat balances the sentence,

1    so that it's main report and the scores and so forth and

2    then, and may accompany the report with a description of the

3    accommodations at each administration.

4              MS. LEOPOLD-LEVENTHAL:  Your Honor, if I could maybe

5    go through it?

6              THE COURT:  Surely.

7              MS. LEOPOLD-LEVENTHAL:  (inaudible) an non-standard

8    administration, this would be the first time in the NBME

9    history where two scores were reported at the same time.

10   There could be any variation on the scores.  Mr. Hartman

11   could pass those, he could fail those, he could pass his CTS

12   and fail it more times or the reverse.  The recipients of the

13   score will have no idea what those two scores mean or how it

14   got to that point.  And we're wondering why NBME can't simply

15   reference a public document, which would be the court order.

16   We're not willing to a whole description of the litigation,

17   simply a reference to your Honor's order which will be

18   entered, as of today, which is a public record and would, at

19   least, put the two scores that would be reported at the same

20   time, in some sort of context for the recipients of those

21   scores.

22             MS. GREEN:  Your Honor, if I may, I have one -- if I

23   may add one other point.  The systems do not allow -- this is

24   the only time that an individual is being ordered permitted

25   to take two administrations of an exam.  After -- before, it

1    has come up, the first is known.  In other words, ordinarily,

2    because this is a pass/fail exam, if an individual passes the

3    exam, they are not permitted to re-test.  So, the transcript

4    which will show a second administration possibly to pass the

5    administration, will look to the recipient unlike any of the

6    potentially thousands of other transcripts they have

7    received, it may even look not like a legitimate transcript.

8    But certainly, it will beg an explanation because people

9    simply are not permitted to take the examination after they

10   have passed and they're not permitted to re-take the

11   examination until the outcome of the first examination is

12   known.  As Ms. Leopold-Leventhal has explained, we're not

13   expecting to belabor the point, but we believe that it is

14   appropriate, simply to put a user -- refer a user to the

15   existence of the order to explain how this extremely

16   anomalous result is created.  Since they have never seen a

17   transcript that would have a second admin that's potentially

18   after a passing score.

19           THE COURT:  Well, I appreciate the concerns you

20   voice, Ms. Green.  My view is this, what is essential for

21   each of the institutions to which the examination results are

22   reported, what is essential is a statement of what success or

23   whether there was success on the examination and the

24   framework, the accommodation framework within which the test

25   was taken.  That's vital for Stoney Brook Medical School and

1   whether these are reported to residency programs or not I

2   think is beyond the scope of anything we've determined in the

3   litigation, at least, so far.

4           But my view is that the report should confine itself

5   to what a report customarily does, give the results, and in

6   this instance, describe the accommodation context in which

7   the results were arrived at, so that the recipient of the

8   scores will have a picture of the fact that two examinations

9   were given and these are the results.  Now, it would not

10  surprise me if some of those receiving those examination

11  results, perhaps Stoney Brook, perhaps not, would be curious,

12  would be puzzled, perhaps, as to how it came about that the

13  results were reported or were not in the standard form, did

14  not confine themselves to a particular administration of the

15  examination and so forth.

16          It could well be that Stoney Brook, for example,

17  would call up you, Ms. Green, or one of your colleagues in

18  the NBME and say, hey, look, how did this happen?  And of

19  course, at that point, the NBME would be -- have the liberty,

20  quite properly, to refer to a public record, our case, and

21  report there was a lawsuit brought under the American with

22  Disabilities Act and this has been the result.  There's no

23  intention on my part nor would I have the authority to carry

24  into execution, even if I had the inference.  There's

25  certainly no intention on my part to interfere with the

14

```
 1    NBME's entitlement fully to present the litigation context,

 2    if my reference to the public documents, if inquiry is made.

 3            The stipulation is that the test results reported do

 4    not themselves then have as an accompaniment some

 5    characterization of the litigation.

 6            MS. GREEN:  Your Honor, I apologize for belaboring

 7    the point, but under the standards of the American

 8    Psychometric Association, there are certain standards.  If we

 9    are permitted to provide that information in response to an

10    inquiry, all of this is -- these score reports go

11    electronically.  Would it not be simpler and more

12    straightforward simply to be able to include a citation on

13    the score report?  We are assuming that we're going to, you

14    know, have a long test, but if we are permitted to do that

15    and it is a public record, it's difficult for me to see the

16    harm in simply being able to provide the minimum information

17    of a citation to the score user, rather than invite a phone

18    call that may or may not -- it may come to me, it may come

19    somewhere else in the organization.  I don't ordinarily

20    receive such inquiries and it seems to me, that there is more

21    potential there for confusion if an inquiry can go anywhere

22    in the organization and result in a phone conversation.  This

23    way, Mr. Hartman knows exactly what's the score report and we

24    don't have to speculate about what some other person in the

25    organization might say in a phone call.
```

1          THE COURT:  Mr. Weiner?

2          MR. WEINER:  Your Honor, I think it creates even

3    further inquiries since we have, it sounds like NBME's

4    concern here is the change from the norm here.  And here, if

5    they get a score report that has anything more than a

6    description of what the accommodation was, that's a big

7    change from the norm.  And not only is that a big change from

8    the norm, it puts out there that Mr. Hartman has filed a

9    lawsuit.  The purpose of the ADA was to end discrimination.

10   If you now put out there that he has filed a lawsuit to

11   pursue his rights under the ADA, if that's something that is

12   very different and very unusual and it puts it in front of

13   the person reviewing it.  Since in this particular case,

14   you're going to have two different electronic scores coming

15   in at two different times, I'm not so sure that one is going

16   to reach the conclusion, boy, this is really different than

17   what we've seen.

18          But if you put on the report that the description of

19   the accommodation, plus some citation to a lawsuit, you've

20   really put something out there different.  And it's something

21   that really has no relevance.  The purpose of the stip

22   disclosing the accommodations, is to disclose the conditions

23   under which the test taker has taken the exam.  Disclosing

24   the lawsuit has nothing to do with the conditions under which

25   Mr. Hartman will be taking the exam.  So, I'm very much

1    opposed to it.

2            MS. LEOPOLD-LEVENTHAL:  If I may, I don't think that

3    simply providing the description of the accommodations

4    received at the end of the -- by the end user were to

5    receive, I believe that's part of a (inaudible) description.

6    But I'm unsure as to what harm there is fighting the order.

7    All it does is put it into context and then to use it -- oh,

8    now I can see why this is the first time in history we've

9    ever received two scores.  It doesn't prejudice him.  He's

10   the one who filed the lawsuit.  He wanted this order, he

11   asked for it, he received it.  What harm is there referring

12   to a public record that, at least, puts the scores in

13   context.

14           THE COURT:  Well, I've said that the NBME is

15   entirely free, of course, to respond to any questions.  Mr.

16   Robbins has just made a suggestion to me, which it seems to

17   me probably takes care of the details of the matter, one way

18   or another.  Let me, before I say that, before we go further,

19   Mr. Weiner, surely the statute is designed to protect against

20   discrimination.  But the statute is a public remedy and it

21   certainly is a matter of public record and public importance

22   who litigates what.  My only concern here is that the

23   rendition of the scores not be made more complex by trying in

24   a sentence or two to provide some background for how it is

25   that two different scores are being reported.  What's vital

17

1    for an entity that's receiving the scores, what's vital for

2    that institution, is to know what the setting was and to know

3    that as to one setting, Mr. Hartman was entitled to use a

4    Text to Speech device and in the other setting, that was not

5    done.  However, there were extensions of time that were

6    provided.

7           Now, an entity that is simply interested in what the

8    examination results are under the two contexts, will stop at

9    that point, the information will have been provided.  An

10   entity that wants to go beyond that and say, well, how did it

11   happen that Mr. Hartman had two examinations, and as I say,

12   be in touch with NBME.  And Ms. Green has explained that if

13   inquiry is made, as I said was entirely proper for NBME to

14   respond.  There's no way of knowing who the respondent would

15   be, who the person would be.  That's how it would be

16   identified and described.

17           And Mr. Robbins has made what I think is a very good

18   suggestion, that what should be done and is and after

19   accompanying the statement of the results, would simply be a

20   sentence saying that if the recipient of the scores has any

21   questions, that recipient should telephone or e-mail to

22   communicate with a specified person, whether Ms. Green or who

23   I think would probably be an optimal subject or a colleague

24   who will render a background explanation that would have been

25   discussed with Ms. Green, so that its accuracy in our legal

18

1    terms would be assured.  So, I think that's the way out of

2    the puzzle.  And so, I will ask you to draft that portion of

3    the order, I think in conformity with that structure.

4              MR. WEINER:  Your Honor, that's certainly an option

5    and I thank Mr. Robbins for making that suggestion.  I also

6    have another potential option, which I'm not sure how the

7    NBME feels about this.  But it seems to be the concern here

8    that we made out two exam scores being reported, which may

9    create confusion.  If under the scenario that Mr. Hartman

10   passes the first exam and as I understand NBME's request, is

11   that the first exam be administered on the 24th, is the non-

12   Text to Speech exam and Mr. Hartman's willing to take that,

13   as I've indicated, if he passes that exam, under that

14   scenario, it would seem to render the second administration

15   moot.  And at that point, they could simply cancel any

16   further scoring or reporting of that second exam, since it's

17   coming out on May 15th, so it's not later than May 15th.

18   That's certainly another option, your Honor -- would your

19   Honor either entertain that as an option and if so, would

20   NBME be agreeable to it?

21             THE COURT:  What do you think, Ms. Leopold-

22   Leventhal?

23             MS. LEOPOLD-LEVENTHAL:  Do you want to respond to

24   that?

25             MS. GREEN:  Well, if he passed the first exam, he

1    would -- we will not know that he passed the first exam at

2    the point that he takes the second exam.

3                MS. LEOPOLD-LEVENTHAL:  Right.

4                MS. GREEN:  So, he --

5                THE COURT:  Well, I think Mr. Weiner is not

6    proposing that be not take the second exam.

7                MS. GREEN:  I understand that.  He's proposing that

8    the -- what I'm concerned about and I have to go back,

9    because it is our practice because we want to present the

10   licensing authorities with a complete record, a complete

11   record of when people had access to test materials.  If

12   anyone takes an exam, even if they take part of it and then

13   they leave early, they cancel it.  Even if they only -- they

14   take an incomplete or any difficulty happens, we provide the

15   licensing authority with a complete record, so that it might

16   show as an incomplete, but they always get the information of

17   every time the person's let into the room.

18                I would have to check there whether, you know, what

19   the policy would be.  Because, in this instance, he would

20   have gone into the room.  He would have had a full

21   administration.  Our ordinary practice is that that is always

22   reported, whatever the outcome.  Even if it's incomplete,

23   even if someone sits for --

24                THE COURT:  Well, Ms. Green, I'm not quite sure that

25   the --

1          MS. GREEN:  Plus, the state always counts the

2     numbers and the record is the complete historical record.

3     So, I really do have to check, because there are internal

4     documents from the Government to me, that dictate what you do

5     in every situation like this.  And I simply don't know how

6     they'd deal with this situation.

7          THE COURT:  Well, Ms. Green, I appreciate that

8     without consultation, you don't have authority to commit.

9     But if you feel that it's necessary to consult with your

10    colleagues in administration, first of all, I would hope that

11    that would be done immediately after this phone conference.

12         And second, if you would explain Mr. Weiner's point,

13    which seems to have a good deal of logic on it, that a

14    successful taking of the examination as the NBME wanted it to

15    be administered, would obviate any need to report what

16    happened on the second examination.  Indeed, if the timing

17    were different, it would obviate his taking the examination.

18         MS. GREEN:  Exactly, your Honor.

19         MS. LEOPOLD-LEVENTHAL:  This is Ms. Leventhal, if I

20    may.  I don't really understand the flipping of that issue.

21    First of all, candidly, we had suggested over the last five

22    months that Mr. Hartman take the test with double-time

23    accommodation and then it might be appropriate for the

24    purpose of the Court.  He refused and as I understood, your

25    Honor or maybe I mischaracterized him, the ability to give

21

1     Mr. Hartman the test with the double time, rather than the

2     Text to Speech, I think was done as an accommodation.  I

3     thought it was done as a bit of an accommodation for the

4     NBME's position that they would be unable to score the spoken

5     English deficiency, so, therefore, they were being given the

6     opportunity to give it twice.  But now, we're saying, okay,

7     well, let's just give it to him the way that the NBME offered

8     in September and if he passes, then there's no more need for

9     this accommodation.  I don't see the logic in that.

10          MS. GREEN:  Yes, if I might add, your Honor, I think

11     that, first of all, I will check immediately, as soon as

12     we're off the phone, about what the policies are.  But, I

13     believe you expressed and Ms. Leopold-Leventhal just

14     expressed what we had been offering all along.  Take it with

15     double time.  If you pass, this is all over.  If you don't,

16     then there's time to deal with the TTS administration.

17          The difficulty I have, the area where it becomes a

18     policy consideration, is that the NBME reports or the USMLE

19     program has an obligation to report not just the scores, but

20     we customarily report all exposure to test materials.  So

21     that, if one begins taking an exam, doesn't complete it,

22     there isn't a score that will ever be reported, but the

23     transcript would still report the incomplete that there was

24     the administration.  So, if they were trying to say take it

25     first one way and then maybe you don't even have to take it

1   the second way, that would have been consistent with our

2   practices, our policies and I would know how to treat that on

3   the score report and on the transcript.

4           What I don't know, because, again, it's

5   unprecedented, is if the individual takes it and then has

6   retaken it.  Ordinarily, we are committed to reporting both

7   administrations, even if there is not a score that results

8   from one of them and that's what I'm grappling with.

9           THE COURT:  Well --

10          MS. GREEN:  So, even if we had the option of not --

11  I don't know whether we have the option once he sits for the

12  second administration, we always report every administration.

13          THE COURT:  All right.

14          MS. GREEN:  But I will look into it as soon as we're

15  off the call.

16          THE COURT:  I'm not going to push that solution.

17  Unless your consultation, Ms. Green, leads to a conclusion

18  that the NBME would either be neutral or would only prefer

19  not to report a second set of scores, when the first one has

20  been successful, I will not insist on pursuing Mr. Weiner's

21  proposal.  I would leave that in the province of the NBME to

22  decide whether a second set of scores would be reported if

23  the first score is successful.

24          MS. GREEN:  Thank you, your Honor.

25          MR. WEINER:  Thank you, your Honor.  And we have our

23

```
1    third issue, which was the payment of the registration fee.

2    Mr. Hartman had already paid a previous registration fee and

3    I believe it's $1,000.  And your Honor's opinion indicated

4    that it's NBME's option whether or not to request that he

5    take it a second time.  It appears that they are exercising

6    that option in this case.  He feels that he shouldn't have to

7    pay a second fee because they're exercising this option.  He

8    has already had to incur additional expenses for the second

9    option, which will include his travel expenses, as well as

10   lodging expenses, to, you know, particularly, the payment of

11   $1,000 is a considerable amount.  He's already putting up the

12   $2,500 bond.  I don't think it's necessary.

13            THE COURT:  I'm not sure I understand about the

14   lodging and travel.  That had some relevance to taking it in

15   Houston and then taking it in Philadelphia, but --

16            MR. WEINER:  But, Mr. Hartman lives in Long Island.

17   It's about a three and a half hour trip from -- which means

18   he would drive, let's say, the second exam --

19            THE COURT:  Well, I can't -- I don't see, I frankly

20   don't see how that bears on the --

21            MR. WEINER:  No, I'm just saying that he's already

22   incurring expenses because the NBME is requesting that he

23   take a second examination, then it was to do an order an

24   option --

25            THE COURT:  I will say that, as I sit here, I find
```

1   the notion of paying two fees, rather than just one, is

2   somewhat puzzling.  That may be -- Ms. Leopold-Leventhal or

3   Ms. Green wants to address that.  It struck me, sitting here,

4   that it was an oddity for -- as between two possible payors

5   that are requiring Mr. Hartman to pay a second fee by the

6   board, excepting whatever incidental additional costs would

7   be required.  I would have thought that the enterprise with

8   the substantially larger resources, the NBME, in these

9   circumstances, ought to not charge a fee for the second

10  examination, whatever the sequence of the  examinations is.

11  But I'll hear from the defendant on that issue.

12          MS. LEOPOLD-LEVENTHAL:  Your Honor --

13          THE COURT:  It's certainly the least important of

14  the issues that we have discussed.

15          MS. LEOPOLD-LEVENTHAL:  -- for an explanation?  The

16  first is that it's not because it's been made clear yet that

17  the NBME has to (inaudible) the cost each time of his

18  administration.  The logistics and location of paying the

19  standardized (inaudible) training and everything else, that's

20  $1,000 that every test taker has to pay, to pay his expenses.

21          But secondly, Mr. Hartman is going to be the

22  beneficiary taking those examinations.  He may fail the TTS

23  and pass the double time or the reverse.  He's been given

24  basically two bites of the apple here, an opportunity to test

25  twice.  I'm not sure why his opportunity to test a second

1   time should come out of NBME's pocket.  Certainly, he's going

2   to be (inaudible), your Honor.  The NBME incurred significant

3   expense each time that it administers this examination.  This

4   one is even more unique, because the test has been scheduled

5   over two says and the cost to hire the standardized patients

6   to portray, in these scenarios, that it would be too late to

7   (inaudible) administration.

8          THE COURT:  Well, let me phrase it, I remain

9   unpersuaded.  I think that's between the two on the

10  (inaudible) investment that Mr. Hartman has paid and the fact

11  that under the particular circumstances of this examination,

12  an accommodation is called for, which requires the NBME to

13  adjust its arrangements.  One could talk a lot about two

14  bites of the apple and Mr. Hartman getting the benefit of

15  this or that or why should the extra cost be a burden to the

16  defendant.  We would like to turn that logic around and say,

17  well, the NBME was found, under the law, to be in error,

18  thinking that it could decline to administer the examination

19  the way that was proposed by Mr. Hartman.  So, I don't think

20  it's going to advance the discussion one way or another to

21  assign either blame or credit to Mr. Hartman, on the one hand

22  and the board, on the other.

23          I guess I would have to say that I think it's a

24  little un-gracious of the board to want to impose a second

25  fee on somebody whose resources are obviously minimal as

1   compared to the board.  Having said that, I suppose I should

2   acknowledge that it's not my function to decide what's

3   gracious or not.  I think you're entitled to know that I did

4   have that feeling when I saw that the board was taking this

5   position.  I think it appropriate in the framework of the

6   decision on the accommodation that's being made.  I think

7   it's appropriate for the board to grant a responsibility,

8   including the dollar responsibility of instructing the

9   examination process in the way I've described.  And carrying

10  the modest cost, no legitimate claim to be made that the

11  failure of NBME to require an additional $1,000 results in an

12  unreasonable burden on the NBME or a fundamental alteration

13  of its processes.  I think this is part of the responsibility

14  that the statute imposes on the board and so that's the way

15  it's going to be done.

16          I failed to detect a rising chorus of enthusiasm for

17  what I've just said, but that's not unheard of in courtrooms

18  or even telephone conferences.  I believe we've covered now

19  the three issues.

20          MR. WEINER:  Yes, your Honor.

21          THE COURT:  Is that correct?

22          MS. LEOPOLD-LEVENTHAL:  That's correct.

23          MR. WEINER:  That's correct, your Honor.

24          THE COURT:  All right, well, then I encourage you to

25  go forward and move things along.

1          MS. LEOPOLD-LEVENTHAL:  Two brief items.

2          Mr. Weiner, I would ask that you make the

3   modifications and send the orders through and then we'll take

4   a look at them and hopefully get it over.  Unless the Court

5   is making that --

6          THE COURT:  Unless what?

7          MS. LEOPOLD-LEVENTHAL:  Are the parties expected to

8   make the modifications and then provide the modified order to

9   the Court for entering?

10          THE COURT:  Yes.

11          MS. LEOPOLD-LEVENTHAL:  Okay, I'll talk to Mr.

12   Weiner about that after.

13          MR. WEINER:  Yes, and we can, after we hang up with

14   your Honor, could I just have a brief telephone call with Ms.

15   Green and --

16          MS. LEOPOLD-LEVENTHAL:  Sure, I'll call you back.

17   One last item, your Honor and I'm -- I don't know if this is

18   the context for the (inaudible).  Probably not unexpected and

19   it's not going to hurt anybody's feelings, but the NBME is

20   more than likely going to be requesting a stay from your

21   Honor of his granting of the preliminary injunction hearing

22   this.  This phone conference is not the forum for that.  We

23   would be filing a proper motion with your Honor and would

24   only ask that, to the extent possible, that any briefing

25   required or disposition of that be done on an expedited

28

1    basis.

2            THE COURT:  You would be asking for a stay of an

3    order under which Mr. Hartman is to start taking the

4    examination a week from what, next Thursday?

5            MS. LEOPOLD-LEVENTHAL:  Yes, and to the extent

6    possible, I'm not demanding that it be heard and decided

7    before the March 24th date.  I understand it's going to be

8    presented late, because the order hasn't been entered yet and

9    the stay of an order would have to have been entered.  I just

10   wanted to just basically put that out there, so that everyone

11   (inaudible).

12           THE COURT:  I'm not even quite sure what the concept

13   would be.  A motion for a stay filed after the examinations

14   begin.  What would that mean, would the stay -- the stay

15   would then have the effect of suspending the obligation to

16   continue the examination?

17           MS. LEOPOLD-LEVENTHAL:  Yes.

18           THE COURT:  In mid-examination?

19           MS. LEOPOLD-LEVENTHAL:  You'll probably be entering

20   the order either today or Monday and our expectations would

21   be to file the request for a stay as soon as the order is

22   entered.  So, it could filed Monday as well.

23           THE COURT:  Well --

24           MS. LEOPOLD-LEVENTHAL:  I'm sure you'll dispose of

25   that.

1    THE COURT:  Yes, well, of course, any litigant is

2    entitled to file a motion.  And your motion is one which, of

3    course, Mr. Weiner will have the opportunity to oppose, if he

4    chooses to do so.  I think it would require a relatively

5    quick disposition.  So, are you telling me, Ms. Leopold-

6    Leventhal, that we should expect such a motion to be filed on

7    Monday or --

8    MS. LEOPOLD-LEVENTHAL:  According to the

9    (inaudible), yes.  The minute your Honor enters the order.

10   THE COURT:  I'm sorry, I'm not hearing you.

11   MS. LEOPOLD-LEVENTHAL:  Can you hear me now?

12   THE COURT:  Yes.

13   MS. LEOPOLD-LEVENTHAL:  Hello?

14   THE COURT:  Yes, I can.

15   MS. LEOPOLD-LEVENTHAL:  I'm sorry, I did not hear

16   you.  Yes, your Honor.

17   THE COURT:  All right.  All right, well, we'll await

18   whatever you choose to file.

19   Ms. Green, I hope I've made it clear in our

20   discussion of the question of whether a second examination

21   would be scored and reported on.  Whether that should be done

22   or not is something that I leave in your hands.  That is

23   yours and your fellow administrators.  I'm certainly not

24   going to -- I'm not going to direct that the NBME desist from

25   reporting the second score, if the first score is successful.

1    I think that should be a matter for the NBME to determine on

2    its own.  Am I making myself clear?

3              MS. GREEN:  Yes, your Honor, that's quite clear.  I

4    appreciate the clarification.

5              THE COURT:  All right.  Well, thank you very much,

6    and we are in recess.

7              MR. WEINER:  Thank you, your Honor.

8              MS. GREEN:  Thank you.

9              (Proceeding adjourned 12:03 o'clock p.m.)

10                            *  *  *

<u>CERTIFICATION</u>

      I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET      Dated 3/24/10
Laws Transcription Service