# EXHIBIT 1

LAW OFFICES

# EASTBURN AND GRAY, P.C.

ARTHUR M. EASTBURN 1911-1971
CHARLES M. MARSHALL 1964-1977
SAMUEL S. GRAY, JR.  1938-2003
ARTHUR M. EASTBURN, JR.  1947-2007
WILLIAM H. EASTBURN, III 1960-2008

THOMAS F. J. MacANIFF
DEREK J. REID*+
KENNETH R. WILLIAMS
JOANNE D. SOMMER
DAVID L. MARSHALL
GRACE M. DEON*
ROBERT M. COX*
JUDITH A. ALGEO
KELLIE A. McGOWAN*
JUDY L. HAYMAN*
TIMOTHY D. CAUM, II*

JOHN A. VAN LUVANEE
ERIC R. TOBIN
D. RODMAN EASTBURN
JOHN N. SCHAEFFER, III
JANE E. LEOPOLD-LEVENTHAL
G. MICHAEL CARR*
WILLIAM T. DUDECK*
KIMBERLY LITZKE
MARC D. JONAS
JULIE L. VON SPRECKELSEN*
NATHAN D. FOX*

OF COUNSEL:
FRANK N. GALLAGHER
SEAN M. CORR*

CHARLES H. DORSETT, JR.
MARK S. CAPPUCCIO

60 EAST COURT STREET
P.O. BOX 1389
DOYLESTOWN, PA  18901-0137
215-345-7000
FAX: 215-345-9142
WWW.EASTBURNGRAY.COM

775 PENLLYN BLUE BELL PIKE
BLUE BELL, PA 19422
215-345-7000

JANE E. LEOPOLD-LEVENTHAL
E-MAIL:  JELL@EASTBURNGRAY.COM

PLEASE REPLY TO:  DOYLESTOWN OFFICE

*ALSO ADMITTED IN NEW JERSEY
*+MANAGING SHAREHOLDER-NEW JERSEY

March 16, 2010

**VIA EMAIL**

Charles Weiner, Esq.
179 N. Broad Street
Doylestown, PA 18901

Re:   *Aaron Hartman v. National Board of Medical Examiners*

Dear Charlie:

I have enclosed a revised Preliminary Injunction Order for your review.

NBME personnel have been working diligently to address the significant technical and scheduling challenges that are presented by the Court's March 9th Memorandum and Mr. Hartman's preference for testing in Philadelphia.  They have managed to arrange for the following two two-day testing sessions in Philadelphia, with at least one day between sessions and with both sessions occurring before the March 27 test completion date provided in the Court's March 9th Memorandum opinion:  (1) March 18 & 19, and (2) March 24 & 25.

While you had expressed a preference for having the first administration be the one at which Mr. Hartman uses the TTS technology, we believe that the TTS administration should occur second, so as to give NBME time to work through various technical issues that arise  from Mr. Hartman's use of a laptop computer.  In addition to ensuring that the software is operating properly, NBME needs to make sure that security mechanisms and procedures are in place so that no information can be stored on the laptop during or after a given patient encounter and no access can be obtained to the internet.

Re:   *Aaron Hartman v. National Board of Medical Examiners*

In the interest of getting the proposed Order to the Court without further delay, the enclosed draft does not address the timing of the two administrations, other than to say that both will be administered prior to March 27th.

Putting aside the scheduling issues, only one substantive issue appears to remain: payment of the testing fee for the second test administration. Paragraph 9 in the enclosed Order includes alternative language on this point. We suggest that the parties submit the Order to the Court with a cover letter that references this issue, and Judge Pollak can then decide which of the two versions of the fee provision he wants to include.

Thanks. I will look forward to hearing from you soon.

                            Sincerely,

                            /s/

                        Jane E. Leopold-Leventhal

Enclosure

# EXHIBIT 2

LAW OFFICES

# EASTBURN AND GRAY, P.C.

60 EAST COURT STREET
P.O. BOX 1389
DOYLESTOWN, PA  18901-0137
215-345-7000
FAX: 215-345-9142
WWW.EASTBURNGRAY.COM

775 PENLLYN BLUE BELL PIKE
BLUE BELL, PA 19422
215-345-7000

JANE E. LEOPOLD-LEVENTHAL
E-MAIL:  JELL@EASTBURNGRAY.COM

PLEASE REPLY TO:  DOYLESTOWN OFFICE

ARTHUR M. EASTBURN 1911-1971
CHARLES M. MARSHALL 1964-1977
SAMUEL S. GRAY, JR.  1938-2003
ARTHUR M. EASTBURN, JR.  1947-2007
WILLIAM H. EASTBURN, III 1960-2008

THOMAS F. J. MacANIFF
DEREK J. REID*+
KENNETH R. WILLIAMS
JOANNE D. SOMMER
DAVID L. MARSHALL
GRACE M. DEON*
ROBERT M. COX*
JUDITH A. ALGEO
KELLIE A. McGOWAN*
JUDY L. HAYMAN*
TIMOTHY D. CAUM, II*

OF COUNSEL:
FRANK N. GALLAGHER
SEAN M. CORR*

JOHN A. VAN LUVANEE
ERIC R. TOBIN
D. RODMAN EASTBURN
JOHN N. SCHAEFFER, III
JANE E. LEOPOLD-LEVENTHAL
G. MICHAEL CARR*
WILLIAM T. DUDECK*
KIMBERLY LITZKE
MARC D. JONAS
JULIE L. VON SPRECKELSEN*
NATHAN D. FOX*

CHARLES H. DORSETT, JR.
MARK S. CAPPUCCIO

*ALSO ADMITTED IN NEW JERSEY
*+MANAGING SHAREHOLDER-NEW JERSEY

March 18, 2010

*Via Fax 215-580-2133 and First Class Mail*

The Honorable Louis H. Pollak
United States District Court
Eastern District of Pennsylvania
United States Courthouse, Independence Mall West
601 Market Street, Room 16613
Philadelphia, PA  19106

　　　　　Re:　AARON L. HARTMAN v. NATIONAL BOARD OF MEDICAL EXAMINERS, U.S.D.C. (E.D. of Pa.), No. 09-5028

Dear Judge Pollak:

I am responding to the letter sent to you this afternoon by Mr. Weiner regarding the referenced matter.  Without belaboring the point, the logistics of attempting to arrange two testing sessions for Mr. Hartman on the extremely compressed time schedule provided in the Court's March 9 Memorandum decision  are enormously complicated.  The steps that the NBME is being required to undertake by the Court's preliminary injunction decision are unprecedented in our administration of the Step 2 Clinical Skills examination since its inception.

As you know, this is not a straightforward multiple-choice exam that can readily be scheduled at many testing locations.  Step 2 CS is administered only at five testing centers in the United States.  Each administration of the exam involves a dozen standardized patients ("SPs") trained to portray specific cases, with back-up standardized patients available in case of emergency (e.g., one or more SPs becomes ill).  It is sometimes necessary for centers to administer triple sessions of the examination to handle the demand for individuals to test; the Philadelphia center is doing so on March 22 and 23, requiring the services of additional standardized patients.

Letter to Judge Pollak
March 18, 2010
Page Two

Numerous NBME employees and other persons have been working hard trying to schedule Mr. Hartman's two exam administrations, within the constraints of the Court's Memorandum and Mr. Hartman's stated preferences (e.g., testing in Philadelphia with at least one day of rest between administrations). In addition, staff must endeavor to program Mr. Hartman's exams with 24 cases he has not seen previously, each matched to a trained standardized patient who is not already committed to participating in other individuals' administrations. Because Mr. Hartman's special administrations are contrary to standard USMLE procedures and the computer systems designed to safeguard them, e.g., preventing an individual from retesting before receiving the outcome of the first administration, many employees from the Information Technology group are also involved in arranging for Mr. Hartman's exams.

Given these significant operational challenges, it did not seem unreasonable for the NBME several days ago to offer Mr. Hartman the option of testing today and tomorrow (March 18-19) in Philadelphia, instead of attending Match Day events at his school. Mr. Hartman was informed on Monday that he has been matched with a residency program, the specific identity of which was available to him online at 1 pm today. (*see* Ex. "A"). His school's Match Day activities are described on the SUNY Stony Brook calendar as "Match Day Celebration." If his attendance was in fact "required" by his school, he could have asked to be excused in light of his purported emergency need to take the Step 2 CS exam on the expedited schedule that the Court's memorandum imposes on the NBME.

Of course, Mr. Hartman did not begin his first Step 2 CS exam administration today, so the option of testing him today and tomorrow no longer exists. NBME has cancelled that session and will incur the cost of paying the standardized patients who agreed to be available for his exam. Mr. Weiner has also rejected the second option that NBME presented: testing on March 22-23 at a location in another city. The remaining option is for Mr. Hartman to take one administration as currently scheduled on March 24-25 and the other after March 27, the deadline provided in the Court's March 9 decision. This is Option 3 in the letter that I sent to Mr. Weiner, which was copied to the Court yesterday.

We therefore request that you include as paragraph 9 in the proposed Preliminary Injunction Order the following language:

> If NBME elects to test Mr. Hartman as provided above in paragraph 6, NBME shall arrange for Mr. Hartman to test on March 31 and April 2 at the Philadelphia Test Center. NBME shall release the scores from this administration and from the administration using text-to-speech technology on May 15, 2010.

The May 15, 2010 date provided in this paragraph precedes the May 18, 2010 graduation date at Mr. Hartman's medical school, which was the event that he represented created his need for expedited judicial relief.

Letter to Judge Pollak
March 18, 2010
Page Three

We would appreciate the opportunity to resolve these matters in a conference call with you and Mr. Weiner at your earliest convenience. I conferred with Mr. Weiner and he is agreeable to a conference call. Also, in light of the fact that many of the issues at issue are logistical in nature and relate to the administration of the examination, I respectfully request that your Honor permit NMBE's in-house counsel, Shelley Z. Green and Suzanne Williams, Esquires, to participate in the call.

I, along with NMBE's in-house counsel, have availability to speak tomorrow. Mr. Weiner is available from 9:00 to 10:00 a.m. and then from 11:30 a.m. until the remainder of the day. Thank you for your further consideration.

              Respectfully yours,


              Jane E. Leopold-Leventhal

cc:  Charles Weiner (via facsimile)

EXHIBIT 3

2010-2011 Academic Year
Final Contract

# Lenox Hill Hospital
## HOUSE STAFF APPOINTMENT AGREEMENT

_____Aaron Lee Hartman_____, M.D./D.O. (the "Resident") accepts a Residency/Fellowship in the __Pathology__ Program of Lenox Hill Hospital, New York, New York at the PGY __1__ level of training, for the period of time from: July 1, 2010 to June 30, 2011.

The following terms and conditions apply to the Resident's appointment to the House Staff of Lenox Hill Hospital:

1. Qualifications and Credentials for Residency. This Agreement is not valid until all medical education and other qualifications and credentials as required by Lenox Hill Hospital and by applicable laws and regulations have been verified. In the event that such qualifications or credentials are not provided by the Resident to the Hospital prior to the commencement date of this Agreement or do not meet the requirements of the Hospital, this Agreement is null and void.

2. Pre-appointment Physical Examination. After all qualifications and credentials have been verified and a background check has been performed, the Resident agrees to submit to a pre-appointment physical examination, which shall include successfully taking and passing, with a negative result, a urine toxicology screening for illegal drugs, unprescribed drugs and alcohol, and to provide evidence of all required immunizations in compliance with applicable rules and regulations of the Hospital and New York State law, which demonstrate that the Resident is in sufficient physical and mental condition to perform the essential functions of his/her residency.

3. Fitness for Duty. The Resident shall successfully complete all pre-employment requirements, including, **for new employees:** taking and passing, with a negative result, a urine toxicology screen for illicit drugs and drugs of abuse; confirmation from a background investigation report of the accuracy and completeness of the information on his/her application and associated forms; pre-employment medical examination; reference checks; and verification of academic credentials. I agree that by signing this Resident Agreement I attest to my fitness for duty and shall be deemed to have signed and consented to the attached (1) DISCLOSURE STATEMENT AND AUTHORIZATION FOR BACKGROUND INVESTIGATION and (2) DISCLOSURE STATEMENT AND AUTHORIZATION FOR DRUG SCREEN. A failure to meet the requirements of fitness for duty may result in voiding any prior offer of employment.

4. Financial Support. The educational stipend shall be $__50,349.00__, subject to all applicable withholdings. This shall be the sole source of compensation and the Resident shall not accept any other fee of any kind for services to patients, except in connection with work performed outside the educational program and authorized by the Program Director in accordance with Paragraph 13 herein.

5. Vacation. The Resident is entitled to four (4) weeks of vacation per academic year, which shall be taken in accordance with the Hospital's House Staff vacation policy, which can be found in the House Staff Manual. Vacation does not roll over into any additional years the Resident may spend in the program.

6. Health, Life and Disability Insurance Benefits. The Hospital offers comprehensive medical and dental plans for the Resident and his/her family, some of which may require the Resident to contribute to the cost. The Hospital also provides life insurance in an amount equal to one time the stipend of the Resident. The Resident may also be entitled to New York State Disability Benefits or long term disability coverage.

For purposes of disability benefits, pregnancy is treated in the same manner as any other disability. Workers Compensation provides benefits and medical care for work-related illness or injury. The Resident should refer to the House Staff Manual and direct inquiries to the Hospital's Benefits Office for additional details.

7.  Professional, Parental and Sick-leave Benefits. The Resident is entitled to one day of paid sick leave per month, with a maximum accrual of twelve (12) days per year, in accordance with the Sick Leave policy contained in the House Staff Manual. Sick leave does not roll over into any additional years the Resident may spend in the program. The Resident is also entitled to leave in accordance with the Family and Medical Leave Act; however, the Resident will be required to use any unused paid leave before availing him/herself of the leave provided under the Act. The Resident acknowledges that the Program Director may require the Resident to make up time lost or repeat the year, depending on the effect the leave has upon the Resident's education. If the Program Director determines that it is not possible for the Resident to complete the educational requirements for the year, he/she may dismiss the Resident, but reasonable efforts will be made to assist the Resident in completing said requirements.

8.  Living Quarters, Meals and Laundry. Meal vouchers, in equivilance to the expected on-call duties, are distributed to residents twice a year to be used in the Hospital cafeteria. Shared on-call facilities are provided. Arrangements for living accommodations are the responsibility of the Resident. A limited number of apartments are available to eligible residents from the Hospital on a first-come, first-served basis, based on the set deadlines listed in the Lenox Hill Housing Policy. Those residents in Lenox Hill Hospital sponsored programs that are eligible for housing and meet the required deadlines but are not provided with apartments due to unavailability, will be issued an annual housing stipend in the amount of $3,300 which will be pro-rated in each payroll period. If a resident is offered and rejects an apartment, or does not return correspondence of the Housing Department by the set deadline, he/she will not be eligible for a housing stipend. The Resident should address housing inquiries to the Lenox Hill Housing Office. Uniforms are supplied and laundered by the Hospital and must be returned at the conclusion of the Resident's training at the Hospital.

9.  Professional Liability. The Hospital shall provide the Resident with professional liability insurance covering all professional medical activities arising out of the performance of his/her duties for the Residency Program. Only those activities that are part of the Resident's assigned duties are covered by the insurance provided by the Hospital. Such coverage shall include legal defense and indeminification for claims reported or filed during or after the completion of graduate medical education if the alleged acts or omissions of residents arose during activities performed within the scope of the education and training program and during their period of employment. Primary insurance is currently provided under the Hospital's claims made policy with shared coverage limits of $1 million per occurrence/$15 million in the aggregate. Claims in excess of the primary insurance policy limits are covered by excess commercial insurance policies and/or by the Hospital's professional liability self-insurance. The Resident is not responsible for obtaining tail coverage at the end of employment and as coverage is provided under a group policy an individual tail endorsement is not available. Insurance coverage is subject to modification at the Hospital's sole discretion. It is a condition of this coverage that the Resident agrees to cooperate fully in the investigation of any actual and potential claims and in the defense of any claims that arise during his/her Residency training and employment, including claims in which the resident may not be a named defendant. The Resident agrees to forward to the Legal/Risk Management Department any summonses, subpoenas, letters or legal papers received. A failure to comply with these provisions may result in a denial of coverage.

10. Counseling and Other Support Services. The Hospital makes available an Employee Assistance Program, which is voluntary, confidential and cost-free to the Resident. This program provides counseling for marital and family difficulties, emotional stress, alcohol and drug abuse, legal and financial matters and

other personal problems. Referral for confidential psychological treatment is also available through the Department of Psychiatry. The Hospital agrees to provide the Resident with an educational program regarding physician impairment, including substance abuse. The Hospital's Physician Impairment policy pertaining to residents is contained in the House Staff Manual. The Hospital may require the Resident to undergo tests or evaluation for suspected impairment, including unprescribed drug or alcohol use, as provided in the House Staff Physician Impairment Policy.

11.    Policies on Sexual or Other Harassment. It is the policy of the Hospital to require that each of its departments maintain a work environment that is free of any form of discrimination prohibited by law, including sexual harassment; and sexual and other unlawful harassment is expressly prohibited. The Hospital's procedure for handling complaints of harassment pertaining to residents is contained in the House Staff Manual.

12.    Resident Responsibilities. The Resident acknowledges responsibility for the faithful and satisfactory performance of his/her duties as a resident. He/she agrees to abide and be governed by all rules, regulations, policies and procedures set forth in the Lenox Hill Hospital Staff Manual and all applicable provisions of the Corporate Bylaws of Lenox Hill Hospital, as well as all pertinent ACGME requirements and New York State regulations. The Resident further agrees to participate in the educational and scholarly activities of the Program, which may include a combination of supervised, progressively more complex and independent patient care responsibilities commensurate with his level of skill and training, formal educational activities, supervision and teaching of other residents and students, and participation in Hospital and Medical Staff committees. In performing his/her duties as a Resident, he/she agrees to cooperate fully with the Hospital in the timely completion of patient medical records, operative logs, program evaluations, duty hours or other documentation required by the Hospital, the ACGME or the Residency Program.

13.    Duration of Appointment and Conditions for Reappointment. This Agreement shall be effective for a maximum period of twelve (12) months, but may be terminated by the Hospital at any time under the circumstances outlined herein. The term of this Agreement will not be automatically renewed. Renewal of appointment will be based on the Resident's satisfactory educational progress, ACGME requirements and/or other factors which the Hospital in its sole discretion may lawfully consider.

14. Dismissal or Non-reappointment.
a. If dismissal or non-reappointment is contemplated based on the Resident's unsatisfactory performance of his/her responsibilities, the Program Director shall take all appropriate steps as outlined in the Hospital's policies on Evaluation, Promotion and Dismissal. The dismissal or non-reappointment of the Resident for reasons related to the performance of the Resident's duties shall be subject to the appeals process provided for in the Hospital's Resident Policy on Due Process, and shall not be subject to further review.

b.    If the decision of non-reappointment is a result of the closure or reduction of size of the Residency Program, the Hospital will notify the Resident as soon as possible and either allow the Resident to complete his/her training at the Hospital or assist the him/her in enrolling in a program in which he/she can continue his/her education. The determination of non-reappointment of the Resident for institutional reasons shall be final and shall not be subject to further appeal or review or grievable under Paragraph 14.

c.    The Resident may be dismissed upon the suspension, termination or final rejection of his application for New York State licensure.

d.    Upon dismissal, the Program Director shall recommend to the Hospital whether to extend credit to the Resident for his/her participation in the Program. The Hospital shall determine whether to extend such credit to the Resident, and is under no obligation to do so.

e.  Upon dismissal, the Resident is entitled to the portion of his/her stipend accrued up to the effective date of his dismissal, minus any monies owed the Hospital. He/she shall vacate any Hospital owned housing in accordance with his/her lease, and return any property owned by the Hospital by the effective date of his/her dismissal.

15.  Grievances. The Resident is encouraged to seek resolution of grievances relating to his/her appointment or responsibilities in accordance with the procedures outlined in the Hospital's Policy on Resident Grievances and Complaints. Likewise, if the activities or professional conduct of the Resident result in the taking of an adverse action, the procedures contained in the Hospital's Policy on Resident Due Process will be initiated. This includes meetings with the involved parties, the possible appointment of an Ad Hoc Committee to investigate the matter, submission of findings to the Medical Board and final action by the Medical Board.

16.  Duty Hours, Call Schedules and Reporting Requirements. The Resident shall perform his/her duties under this Agreement during such hours and in accordance with the call schedule that the Program Director may assign, in compliance with ACGME and New York State requirements. Hopsital reporting requirments mandate that all Residents keep track of duty hours and must report said hours in the New Innovations system within seven days of the completion of the month. Failure to do so will result in disciplinary actions as set forth in the House Staff Manual.

17.  Professional Activities Outside the Educational Program. Responsible and successful performance of the duties of a Resident is a full time endeavor, requiring time for patient care responsibilities, educational and research pursuits and appropriate amounts of rest to accomplish these. As such, the Hospital prohibits residents from undertaking professional activities outside the educational program at Lenox Hill Hospital. If the Resident seeks to engage in any outside professional activities, he/she must obtain the advance written permission of his/her Program Director and Hospital Administration. In the case of such permission, the Resident may only work at outside activities for a number of hours which, when combined with his/her duties at the Hospital, does not exceed the maximum number of hours permitted under New York State law. Any outside professional activities and the number of hours devoted thereto must be reported to the Program Director. All approved moonlighting activities will be monitored by the Program Director, who may withdraw permission if in his sole discretion adverse effects are noted. If the professional activities are not performed at Lenox Hill Hospital or at the request of Lenox Hill Hospital, such activities will not be covered under the Hospital insurance program and the Resident will be required to provide proof of insurance coverage prior to obtaining written approval from the program director. If the activities are supported and paid for by Lenox Hill Hospital, the Resident must apply for insurance coverage for the additional activities through the Department of Risk Management by submitting a completed application and providing a copy of the written permission from the Program Director. Once approved for insurance the Resident/Fellow will need to submit the required documents and applications to the Department of Medical Affiars and Credentialling for approval.

18.  Restrictive Covenants:   The Resident is not required to sign a non-competition guarantee under this Agreement.

19.  OBRA. In accordance with Section 952 of the Omnibus Reconciliation Act of 1980, the Resident agrees to make available for a period of four (4) years following completion of the term of this Agreement, upon request of the Secretary of Health and Human Services of the United States or the United States Comptroller General or any of their authorized agents, all books, documents and records necessary to certify the nature and extent of the cost of services rendered pursuant to this Agreement as required by federal statute or duly promulgated regulations.

2010-2011 Academic Year
Final Contract

20.     Approval of Board of Trustees. Notwithstanding the execution of this Agreement by the Resident, the Program Director and the Coordinator of Medical Education, this Agreement is conditioned upon final approval by the Board of Trustees of Lenox Hill Hospital.

| PROGRAM DIRECTOR: | RESIDENT: | FOR LENOX HILL HOSPITAL: |
|---|---|---|
| _____ | _____ | _____ |
| William H. Rodgers, PhD, MD<br>Program Director | Aaron Lee Hartman, MD | Sherine Lazarow<br>Director, Medical Education |
| _____ | _____ | _____ |
| (date) | (date) | (date) |

[rev 03/10]