IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

AARON L. HARTMAN,            :  CIVIL ACTION NO. 09-5028
        Plaintiff           :
                            :
        v.                  :  Philadelphia, Pennsylvania
                            :  March 8, 2010
NATIONAL BOARD OF MEDICAL   :  8:38 o'clock a.m.
EXAMINERS,                  :
        Defendant           :
. . . . . . . . . . . . . . :

PRELIMINARY INJUNCTION HEARING - DAY 5
BEFORE THE HONORABLE LOUIS H. POLLAK
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiff:      CHARLES WEINER, ESQUIRE
                        Law Offices of Charles Weiner
                        179 North Broad Street
                        Doylestown, PA  18901


For the Defendant:      JANE E. LEOPOLD-LEVENTHAL, ESQUIRE
                        Eastburn & Gray PC
                        60 E. Court Street
                        P.O. Box 1389
                        Doylestown, PA  18909-0137



- - -

Audio Operator:         Megan McDevitt

Transcribed by:         Paula L. Curran, CET

        (Proceedings recorded by The Record Player digital
sound recording; transcript provided by AAERT-certified
transcriber.)


Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

2

```
 1              (The following occurred in open court at 8:38
 2    o'clock a.m.)
 3              THE CLERK:  All rise.
 4              THE COURT:  Good morning.
 5              ALL:  Good morning, your Honor.
 6              THE COURT:  Please sit down.  So, I congratulate us
 7    all for getting here promptly.  A few minutes after 9:00, I'm
 8    going to have to recess for a few minutes for a phone that
 9    has to be made.  But it will not be a long, anything lengthy.
10              So, I take it, we are continuing with the
11    examination, I guess.
12              MS. LEOPOLD-LEVENTHAL:  I didn't know whether you
13    wanted me to call her up.
14              THE COURT:  Sure.
15              MS. LEOPOLD-LEVENTHAL:  We have Dr. Farmer and then
16    Dr. Clauser and that would be the end of defendant's case.
17              THE COURT:  Well, I'm glad to see Dr. Farmer again
18    today.
19              THE WITNESS:  Good morning, your Honor.
20              (Pause.)
21              THE COURT:  I was thinking, Dr. Farmer, as I thought
22    back to your curriculum vitae as briefly summarized at the
23    beginning of your testimony.  I thought, my goodness, we have
24    a witness who is more educated in more different disciplines
25    than one often sees.  That's very impressive.
```

3

1          THE WITNESS:  Thank you, your Honor.  Just a late

2    bloomer.

3                          DIRECT EXAMINATION

4    BY MS. LEOPOLD-LEVENTHAL:

5    Q    Good morning, Dr. Farmer.  Where we left off on Friday,

6    you had just testified with respect to the NBME's letter to

7    Mr. Hartman of September 29, 2009, granting him double times

8    and accommodations and then we had marked the scheduling

9    permit that was -- identified the eligibility period for that

10   double time as from September 28, 2009 through September 28,

11   2010.  After the NBME forwarded the information to Mr.

12   Hartman approving the double-time accommodation, did Mr.

13   Hartman then write to Elizabeth Azari, an attorney for NBME?

14   A    At some point, at some point, he did, yes.

15   Q    Okay, would you take a look at Exhibit Tab 16 in the

16   defendant's book?

17   A    I have that.

18   Q    And is this the letter that Mr. Hartman wrote to Ms.

19   Azari on October 5, 2009?

20   A    It appears to be, yes.

21          MS. LEOPOLD-LEVENTHAL:  I'd like to mark the

22   document at Exhibit Tab 16 as Defendant's Exhibit 22.

23   Although, I do believe that plaintiff may have introduced the

24   same letter in his case in chief.  And I'd like to move this

25   into evidence, at this time.

Farmer - Direct                                      4

1        THE COURT:  Fine.

2            (Defendant's Exhibit 22 admitted in evidence.)

3   Q    If you would, Dr. Farmer, please take a look at the first

4   sentence in the second paragraph.  Did Mr. Hartman request

5   that he be permitted to take the Step II CS test without any

6   oral communication, in that letter?

7   A    That's how it appears to me.

8   Q    Was there anything in Mr. Hartman's letter to suggest

9   that he wanted to utilize that particular device either as a

10  supplement or intermittently throughout the examination?

11  A    Nothing explicitly, no.

12  Q    Okay.  And ten days later, did you then receive a letter

13  from Mr. Hartman's attorney, Charles Weiner?

14  A    I'm not sure of the date, but yes, a letter came.

15  Q    Take a look at Exhibit 17, which is the next exhibit in

16  the binder.

17  A    Yes, this is the letter from Mr. Weiner.

18  Q    What's the date on that letter?

19  A    October 16, 2009.

20  Q    Do you believe that's a true and correct copy of the

21  original letter that Mr. Weiner sent to the NBME Shelly Green

22  on October 16, '09?

23  A    I do.

24            MS. LEOPOLD-LEVENTHAL:  I'd like to mark Defendant's

25  Exhibit Tab 17 as Defendant's Exhibit 23 and move it into

```
 1    evidence, at this time.

 2               THE COURT:  All right.

 3               (Defense Exhibit 23 admitted in evidence.)

 4    Q   Dr. Farmer, what did Mr. Weiner request of the NBME in

 5    his October 16th letter?

 6    A   I believe on the second page, the third paragraph from

 7    the bottom, he's requesting additional time and use of

 8    assistive technology, such as Text To Speech (ph), "Text To

 9    Speech software would enable Mr. Hartman to communicate

10    directly from a laptop computer, by typing text, which would

11    then verbalize the typed text."

12    Q   Was that request different than what Mr. Hartman

13    communicated to the NBME just 11 days earlier with respect to

14    the orator request?

15    A   I think it was different in terms of the mode.  This

16    would be a mechanical orator, the computer, rather than a

17    human orator.

18    Q   Was that the first time that anyone, on behalf of Mr.

19    Hartman, had suggested use of the Text To Speech device?

20    A   As far as I know, yes.

21    Q   Okay.  And did Mr. Weiner, in his letter, suggest that

22    the Text To Speech device would be the sole source of Mr.

23    Hartman's communication during the standardized patient

24    encounter?

25               MR. WEINER:  Objection, the letter speaks for
```

1    itself, your Honor.

2            THE COURT:  I'm sorry, I didn't get the objection.

3            MR. WEINER:  The letter is a written document, it

4    speaks for itself in terms of what I've requested.

5            THE COURT:  Sustained.

6    BY MS. LEOPOLD-LEVENTHAL:

7    Q   What did you understand Mr. Hartman was requesting on

8    behalf -- or I'm sorry -- Mr. Weiner was requesting on behalf

9    of Mr. Hartman pursuant to the October 16th letter?

10   A   My read of the letter was that instead of a human orator,

11   the use of Text To Speech was the request.

12   Q   Did Mr. Weiner include anything in his letter that a Text

13   To Speech device would be used as a supplement?

14   A   No, he did not.

15   Q   Did he indicate in his letter that a Text To Speech

16   device would be used alternatively or intermittently with

17   oral communication?

18   A   No, he did not.

19   Q   Did Mr. Weiner support that request for the Text To

20   Speech devise with any documentation or written information?

21   A   Not that I recall.

22   Q   Now, the NBME granted Mr. Hartman double time on the Step

23   II CS, correct?

24   A   Double time over two days, yes.

25   Q   Okay.  And do you believe, on behalf of the NBME, that

1   granting double time to Mr. Hartman on this exam was an

2   appropriate accommodation?

3   A   I do.

4   Q   And why is that?

5   A   All of the documentation that had been provided by Mr.

6   Hartman or on his behalf, indicated that time was the only

7   accommodation he had ever used in the past.  I believe that

8   he had sent information from the school that they had

9   provided only time for oral examinations.

10  Q   Did the fact that Mr. Hartman had passed the spoken

11  English proficiency portion of the Step II CS exam factor

12  into your decision, at all?

13  A   I think it was one more piece of information that was now

14  available to us, that indicated that he could speak and be

15  understood by others.

16  Q   In October, did you, on behalf of the NBME, review and

17  also consider Mr. Hartman's request for use of the Text To

18  Speech device?

19  A   I did.

20  Q   Okay.  And did the NBME ultimately deny that request?

21  A   That's correct, it was denied.

22  Q   Would you take a look at Exhibit 18 in the binder in

23  front of you, please?

24  A   I have that.

25  Q   And this is a letter from you, dated October 27, 2009, to

Farmer - Direct                                                8

1   Mr. Hartman, correct?

2   A    That's correct.

3   Q    Is this a true and correct copy, to the best of your

4   knowledge, of the original letter that you sent to Mr.

5   Hartman?

6   A    It is.

7           MS. LEOPOLD-LEVENTHAL:  I would like to mark Tab 18,

8   Dr. Farmer's October 27th letter, as Defendant's Exhibit 24

9   and move that into evidence, at this time.

10          THE COURT:  Surely.

11          (Defense Exhibit 24 admitted in evidence.)

12  Q    Dr. Farmer, why did the NBME deny, in that letter, Mr.

13  Hartman's request to use the Text To Speech device on the

14  Step II CS exam?

15  A    I think for the reasons I indicated in the last couple of

16  questions, that the documentation he had provided indicated

17  that time was the only accommodation that he had ever

18  requested, ever utilized.  There is no indication to support

19  the Text To Speech accommodation.

20  Q    There has been some discussion about the date of the Step

21  II examination, CK and the Step II CS examination.  Do you

22  understand that Mr. Hartman took those examinations the same

23  week, correct?

24  A    That's my understanding.

25  Q    And Mr. Hartman failed the Step I examination the first

1  time he took it, is that correct?

2  A   That's my understanding.

3  Q   What is the percentage pass rater for first-time takers

4  of the Step I examination?

5  A   Step I for first-time takers -- students and graduates of

6  schools that give the MD degree, in 2008 it was 94 percent --

7  Q   Thank you.

8  A   -- pass rate.

9  Q   Dr. Farmer, did you prepare a declaration on behalf of

10  the NBME, as related to the Hartman case?

11  A   Yes.

12  Q   Please turn to Exhibit 34 in the exhibit binder in front

13  of you.

14  A   I have that.

15  Q   And is that the declaration that you prepared in this

16  case?

17  A   It is.

18  Q   Sitting here today, Dr. Farmer, is everything set forth

19  in your declaration, true and correct to the best of your

20  knowledge today?

21  A   It is.

22         MS. LEOPOLD-LEVENTHAL:  I would like to mark Dr.

23  Farmer's declaration, at Exhibit Tab 34, as Defendant's

24  Exhibit 25 and move that into evidence, at this time.

25         THE COURT:  All right.

1          (Defense Exhibit 25 admitted in evidence.)

2   Q    Dr. Farmer, have you ever reviewed a request from other

3   applicants seeking accommodations under the ADA for speech

4   disfluency when taking the Step II CS exam?

5   A    I have, yes.

6   Q    About how many times, if you're able to estimate?

7   A    That I reviewed personally?

8   Q    Yes.

9   A    Probably less than a half a dozen.

10  Q    In each instance, what accommodation has the NBME granted

11  to those applicants with a speech disfluency?

12  A    Some amount of additional time on the patient encounter.

13  Q    And it's fair to say that the NBME has never permitted a

14  test taker to utilize either an orator or a Text To Speech

15  device when that applicant or any applicant on the Step II CS

16  examination?

17  A    That's correct.

18  Q    And is it your understanding that with the granting of

19  additional time, all of the applicants with a speech

20  disfluency passed the Step II CS examination?

21  A    That's my understanding, as best I can recall.

22  Q    Does granting additional time to a test taker on the Step

23  II CS exam, constitute a fundamental alteration of the skills

24  that are assessed on that exam?

25  A    I don't believe so, no.

                              Farmer - Direct                    11

1    Q    And why not?

2    A    I think time is not a construct being measured and I'll

3    qualify that.  My understanding is the Step II CS

4    examination, the clinical skills exam, is meant to simulate a

5    real-life encounter.  So, I believe that the staff and the

6    physician committee members, who have developed the scoring

7    of the exam, have indicated that some amount of additional

8    time is allowable for the clinical skills examination.  But

9    after a certain amount, the concern is that it might actually

10   no longer simulate real life or a real-life encounter.

11   Q    You understand that a hearing-impaired applicant applied

12   for accommodations on Step II CS, correct?

13   A    That's correct.

14   Q    And what accommodation did the NBME grant to that

15   individual?

16   A    A specific hearing-impaired individual?

17   Q    Yes.

18   A    Hearing-impaired individuals request --

19   Q    No, what did that particular applicant, what did the NBME

20   grant them, I'm sorry, as an accommodation?

21   A    There was one individual who was granted a two-way sign

22   language interpreter.

23   Q    And did that individual take the Step II CS exam two

24   times?

25   A    They did, yes.

1    Q    And were you employed with the NBME, at that time?

2    A    I believe I was employed.

3    Q    Did you hold the position that you have now, Doctor?

4    A    For the second administration, I did.

5    Q    Okay.

6              THE COURT:  Could I interject --

7              MS. LEOPOLD-LEVENTHAL:  Sure.

8              THE COURT:  -- you said a two-way sign language

9    interpreter, as I understood it.

10             THE WITNESS:  Correct.

11             THE COURT:  Could you unpack that and describe what

12   process we're talking about?

13             THE WITNESS:  Certainly, your Honor.  A one-way sign

14   language interpreter would interpret what the individual who

15   is speaking, is saying.  So, they would sign that information

16   to the deaf individual.  With a two-way sign language

17   interpreter, the individual speaking would have their spoken

18   words sign language interpreted to the deaf individual.  The

19   deaf individual, who doesn't speak, would then sign back to

20   the sign language interpreter and the interpreter would speak

21   those words to the other individual in the dyad.

22             THE COURT:  I want to be sure that I understand

23   which individual is which.  The person being tested, are we

24   talking about the person being tested as hearing impaired or

25   are we talking about the person being interviewed as hearing

Farmer - Direct                                          13

1    impaired or are we talking about both?

2              THE WITNESS:  Let's call the examinee and the SP or

3    the patient.  The examinee is hearing impaired, the SP is

4    not.  The SP is speaking, the hearing impaired individual

5    can't hear that, so the interpreter signs that information to

6    the examinee.  The examinee who is hearing impaired, who

7    doesn't speak, signs what they want to say to the patient, to

8    the sign language interpreter.  The interpreter then speaks

9    those words to the patient.

10             THE COURT:  I see.

11   Q   Did that individual receive a score on the spoken English

12   proficiency portion of the exam?

13             MR. WEINER:  Objection, foundation.

14             THE COURT:  Well, if you want to ask a couple of

15   questions to go to the witness' foundation, if any.

16             MS. LEOPOLD-LEVENTHAL:  I think I have.  She's been

17   an employee in this position for several years.

18   BY MS. LEOPOLD-LEVENTHAL:

19   Q   But do you know -- are you familiar with that

20   individual's score on the examination?

21   A   I am.

22   Q   Do you know whether or not that individual was scored on

23   the spoken English proficiency portion of the exam?

24   A   My understanding is that the accommodation provided for

25   her hearing impairment, would not allow the measurement of

Farmer - Direct                                    14

1   spoken English proficiency.

2   Q    Have there been disabled individuals --

3              THE COURT:  I'm not sure -- I thought the question

4   was how it was scored, maybe I'm wrong.

5              MS. LEOPOLD-LEVENTHAL:  My question was, was that

6   person given a score on the spoken English proficiency

7   sub-component of the exam.

8              THE WITNESS:  No, the person was not given a score

9   and because the person did not speak, spoken English could

10  not be measured.  So, no score was provided for the spoken

11  English proficiency sub-section.  The other two sections were

12  scored, however.

13             THE COURT:  And these, to your knowledge, was the

14  result reported as a failure or as a pass?

15             THE WITNESS:  I don't know, your Honor.  I don't

16  know how it was reported.  I don't know how the overall was

17  reported.  I know each sub-section then would have been

18  reported.

19             MS. LEOPOLD-LEVENTHAL:  I believe the next witness,

20  Dr. Clauser, will be able to address that question.

21             THE COURT:  All right.

22  Q    Finally, Dr. Farmer, have there been disabled individuals

23  who have been granted accommodations for a disability on the

24  medical licensing examination, whose particular disability

25  either waxes or wanes at a particular point in time?

Farmer - Direct                                    15

1   A    Yes.

2   Q    Would you give us a couple examples of situations where

3   that has occurred?

4   A    Individuals with multiple sclerosis have remitting,

5   relapsing conditions, sometimes where they need an

6   accommodation for one exam but not for the next exam.

7   Individuals with migraine headaches often say that it's

8   exacerbated with stress.  And those individuals sometimes

9   will need an accommodation for some exams, but not for

10  others.

11  Q    And what is, if there is one, does the NBME have a view

12  or a position with respect to when that disabled individual

13  should address the examination, that is, when they are in a

14  waxing or when they are in a waning period or do you provide

15  any sort of advice, at all, on that issue?

16  A    Well, we ask examinees to provide us information about

17  their current functioning.  However, if they are planning to

18  take the test three or six months in advance, they don't

19  always know how they're going to be.  We do have individuals

20  who have withdrawn from the exam or delayed their exam

21  because at the time that they were scheduled, their symptoms,

22  you know, were, you know, perhaps, more difficult for them,

23  at that time.  And they waited until their symptoms abated.

24  Q    Thank you.

25       MS. LEOPOLD-LEVENTHAL:  No further questions.

1              THE COURT:  All right.

2              (Pause.)

3                         CROSS-EXAMINATION

4    BY MR. WEINER:

5    Q   Good morning, Dr. Farmer.

6    A   Good morning, Mr. Weiner, how are you feeling today?

7    Q   I'm feeling much better, thank you very much.  The

8    weekend helped improve me.  Dr. Farmer, I'd like you to turn

9    to Tab 33 in plaintiff's binder.  And these were defendant's

10   supplemental answers to plaintiff's interrogatories, is that

11   accurate?

12   A   It could be, hang on a second.  I don't know that I

13   actually saw these.

14   Q   Okay.

15              (Pause.)

16   A   Yes, that's what it appears to be.

17   Q   And you assisted in providing the answers to the

18   supplemental interrogatories --

19   A   Yes.

20   Q   -- is that correct?

21   A   Yes.

22   Q   And in looking at that chart, there is an individual who

23   was granted a two-way signing interpreter on December 29,

24   2005?

25   A   I see that.

1    Q    Is that correct.  And then there is an individual who was

2    granted, on February 8, 2007, two-way signing for the Step II

3    CS, is that correct?

4    A    That's correct.

5    Q    And is it your testimony that was the same person?

6    A    It is.

7    Q    And that person was graded on the CIS sub-component of

8    the CS II examination?

9    A    That's my understanding.

10   Q    And that individual was graded on the ICE sub-component

11   of the Step II?

12   A    That's my understanding.

13   Q    So, it was only the SEP, where the NBME had taken the

14   position that an individual who cannot speak during the

15   examination, that that particular accommodation of two-way

16   sign would fundamentally alter the examination?

17   A    It's my understanding that the position taken by the

18   board was that the individual's accommodation of a two-way

19   sign language interpreter precluded the measurement of the

20   individual's spoken English proficiency.  That's how I

21   understand it.

22   Q    But it did not preclude the measurement of either the CIS

23   component, correct?

24   A    Not to my knowledge.

25   Q    And it did preclude the measurement of the ICE

                              Farmer - Cross                      18

1   sub-component, is that correct?

2   A    Not to my knowledge.

3   Q    And with use of the two-way sign, the individual who was

4   taking the exam was unable to speak at all, is that correct?

5   A    Again, I don't know much about the individual, other than

6   they requested a two-way sign language interpreter.

7   Q    Is it your understanding that they -- did they speak at

8   all, to your knowledge during that examination?

9   A    Again, the first pre-dated me.  Again, I'm aware of what

10  accommodations were provided.

11          THE COURT:  Excuse me, when you say the first one

12  pre-dated you, you mean the 12/29/2005?

13          THE WITNESS:  That's correct.  Your Honor, while I

14  was doing my post-graduate training, I was part time.  So, I

15  was not in this position of making a decision.

16          THE COURT:  Right, I just wanted to be sure that I

17  understood that.

18          THE WITNESS:  Oh, I'm sorry.

19          THE COURT:  We're not talking about first person who

20  was different from a second person.  The same person, we

21  understand, was examined in 2005 and 2007.

22          THE WITNESS:  That's correct.

23          THE COURT:  And you were unfamiliar with the 2005

24  situation.

25          THE WITNESS:  That's correct.

                              Farmer - Cross                          19

1          THE COURT:  Sorry, you can go ahead.

2          MR. WEINER:  That's fine, your Honor.

3    Q    Mr. Hartman has demonstrated that he is a person with a

4    disability, is that correct?

5    A    I believe so, yes.

6    Q    And Mr. Hartman has demonstrated to your satisfaction

7    that he's a person who's functionally impaired in his ability

8    to speak and communicate, is that correct?

9    A    I believe he's demonstrated that his stutter rises to the

10   level of a disability under the ADA.

11   Q    And NBME has denied Mr. Hartman's request to utilize Text

12   To Speech on Step II CS examination, is that correct?

13   A    That's correct.

14   Q    As the Manager of Disability Services Office for NBME,

15   you're the person who makes the decisions whether or not to

16   deny or grant accommodations on the Step II CS, is that

17   correct?

18   A    That's correct.

19   Q    Even the other employees who work under you do not make

20   that determination, is that correct?

21   A    That's correct.

22   Q    The final decision of whether or not to grant

23   accommodations lies with you, is that correct?

24   A    Correct.

25   Q    And even when you seek the assistance of an outside

1  consultant or an outside expert, it is not the outside

2  consultant or expert who makes that decision, is that

3  correct?

4  A   That's correct.

5  Q   It is you who makes that decision, correct?

6  A   Correct.

7  Q   You may rely upon the outside consultant to give you

8  advice, but you are the one who makes that decision, is that

9  correct?

10  A   Still correct, yes.

11  Q   You're not a speech pathologist, is that correct?

12  A   Correct.

13  Q   And you're not trained to provide speech therapy, is that

14  correct?

15  A   Correct.

16      THE COURT:  You've undercut what I said at the said

17  at the start of this morning's session.  Maybe you've

18  identified the one discipline that the witness doesn't have.

19      MR. WEINER:  And I thought I would expose that, your

20  Honor.

21  Q   And it's true that you have not made any arrangements to

22  have Mr. Hartman evaluated yourself, by any expert, is that

23  correct?

24  A   Correct.

25  Q   Mr. Hartman actually has made an offer to make himself

1  available to be evaluated by NBME, is that correct?

2  A    Yes.

3  Q    And the NBME did not take him up on that offer, is that

4  correct?

5  A    That's correct.

6  Q    And you have not evaluated Mr. Hartman in terms of his

7  use of Text To Speech, is that correct?

8  A    I have not evaluated him, no.

9  Q    And other than, maybe, your appearance in this courtroom,

10 you had never observed Mr. Hartman utilize Text To Speech is

11 that correct?

12 A    Correct.

13 Q    When Mr. Hartman had submitted his initial request for

14 accommodations on the Step II CS, that was in July of 2008?

15 A    Yes, that's correct.

16 Q    And he requested double time for each patient encounter,

17 at that time, correct?

18 A    He did, yes.

19 Q    And his application included a report from a speech

20 pathologist, is that correct?

21 A    It did, yes.

22 Q    And that was -- the report was from a Leslie Oldemeir

23 (ph) and that report was dated in 2007, is that correct?

24 A    That's my recollection, yes.

25 Q    Now, you had testified --

Farmer - Cross                              22

1          THE COURT:  I'm sorry, what date?  You've just asked

2   it, I'm not sure which date it was that this request was.

3          MR. WEINER:  The request was in July of 2008, your

4   Honor.

5          THE COURT:  And that's your understanding?

6          THE WITNESS:  That's correct, your Honor.

7          THE COURT:  Okay.

8   Q    And the report that was provided was in 2007?

9   A    I believe it was May of 2007, yes.

10  Q    And you had sent Mr. Hartman's request for

11  accommodations, at that time, to an outside consultant, is

12  that correct?

13  A    Correct.

14  Q    And you very rarely make decisions about accommodations

15  without first sending it to an outside consultant, is that

16  correct?

17  A    That's a fair statement, yes.

18  Q    And in this case, the outside consultant to whom you sent

19  Mr. Hartman's request to, was a Dr. Laura Webber, is that

20  correct?

21  A    Dr. Laura Wilber.

22  Q    Wilber, I'm sorry, Dr. Laura Wilber?

23  A    Correct.

24  Q    And Dr. Wilber did not conduct her own evaluation or

25  assessment of Mr. Hartman, is that correct?

1    A    Correct.

2    Q    She simply reviewed the records and provided some opinion

3    to NBME, is that correct?

4    A    She reviewed everything that Mr. Hartman had submitted,

5    yes.

6    Q    And is Dr. Wilber a paid consultant that NBME has used in

7    the past?

8    A    Yes.

9    Q    How many years has Dr. Wilber consulted with the NBME?

10   A    I'm not exactly sure.  I have known her since 2004.  So,

11   at least, since then.

12   Q    So, for approximately, five to six years, the NBME, at

13   least, under your direction, has been utilizing Dr. Wilber,

14   is that correct?

15   A    Correct.

16   Q    Isn't it true that Dr. Wilber's expertise is in

17   audiology?

18   A    I believe she holds certifications in both

19   speech/language and in audiology.

20   Q    Her certification in speech/language dates back to 1959

21   or why don't we first take a look at her CV.  Can you turn to

22   her CV, located in defendant's binder?  At Tab 6.

23        (Pause.)

24   Q    I'll correct myself, the certification she holds dates

25   back to 1968 for speech/language, is that correct?

1   A    What page are you on?

2   Q    I'm looking at Tab 6, I believe it's the second page of

3   Dr. Wilber's vitae.

4   A    That's correct.

5   Q    And other than perhaps being a speech therapist between

6   1958 to 1961, is there any other indication she was involved

7   in speech pathology?

8           THE COURT:  If you could help identify which

9   location?

10          MR. WEINER:  I'm sorry, on page one of Dr. Wilber's

11  vitae, where it lists her professional employment.

12          THE COURT:  All right, now, if you want to ask your

13  question again.

14          MR. WEINER:  Sure.

15  Q    Is the only indication that she was involved in speech

16  therapy between 1958 and 1961?

17  A    I'll have to take a look through the rest of it.

18          (Pause.)

19  A    Well, Mr. Weiner, it looks like that's the only date that

20  it uses the term speech therapy.  But I wonder what her

21  duties might have been in some of the others, where she was a

22  professor of communication sciences, professor of

23  otolaryngology.

24  Q    In terms of in looking at her CV, the vast amount of her

25  publications and written articles have all been in the area

Farmer - Cross                                    25

1    of audiology, is that correct?

2    A    I'll take a look.

3              (Pause.)

4    A    That looks right.

5    Q    And when you have referred individuals who are requesting

6    accommodations, who suffer from a hearing loss, you forward

7    those to Dr. Wilber, is that correct?

8    A    That's correct.

9    Q    And to your knowledge, does Dr. Wilber have a Ph.D. in

10   communicative disorders?

11   A    I believe her Ph.D. is in audiology.

12   Q    Okay.  And to your knowledge, does Dr. Wilber have board

13   recognition in speech disfluencies?

14   A    My knowledge would only be what is on the CV.

15   Q    Do you see anything on your CV -- the CV in front of you

16   to indicate that she has board recognition in speech

17   disfluencies?

18   A    What is board recognition?

19   Q    Well, Dr. Tetnowski (ph) had testified about being board

20   recognized.

21   A    I don't know what that means.

22             THE COURT:  I'm sorry, you were finding a reference

23   to board --

24             MR. WEINER:  Dr. Tetnowski, as part of his

25   expertise, had testified about being board recognized in

Farmer - Cross                                    26

1    speech disfluency.

2            THE COURT:  Oh, I'm sorry.  I thought you were --

3    okay.

4            MR. WEINER:  I was really asking if Dr. Wilber holds

5    any board recognition in speech disfluency.

6            THE COURT:  Okay.

7    Q   Is it your understanding now, that Mr. Hartman, while he

8    was in medical school, received double time on both oral

9    examinations, as well as clinical examinations?

10   A   I'm sorry, could you state that question again?  Double

11   time on clinical examinations?

12   Q   Yes, is it your understanding that Mr. Hartman had been

13   approved for double time, while he was in medical school, for

14   both oral examinations and clinical type examinations?

15   A   I believe with the Complaint that you filed with the

16   Court, there was an attachment, another copy of the

17   certification of prior test accommodations.  In which Dr.

18   Chondrin (ph) indicated some amount of time that was provided

19   for oral examinations.

20   Q   And just to be specific, that's if we go to plaintiff's

21   binder and look at Exhibit 2 -- I'm sorry, Tab 2.  And that

22   would be located at page 6 of 11.

23   A   Yes, this is the one that is dated, signed by Dr.

24   Chondrin, 8 -- looks like 30, 2008.

25   Q   2008 or 2007?

Farmer - Cross                    27

1              THE COURT:  Which page, I'm sorry.

2              MR. WEINER:  Possibly 2008.  I'm sorry, your Honor,

3      it's at page 6 of 11.

4              THE COURT:  All right.

5              THE WITNESS:  So, page 6 of 11 is a certification of

6      prior test accommodations that was provided, again, as an

7      attachment with the Complaint, I believe.  Page 7 of 11, is

8      the certification of prior test accommodations that Mr.

9      Hartman submitted to the National Board, with his request for

10     test accommodations.

11     Q   And on page 6 of 11, the certification here indicates

12     that Mr. Hartman received double time for oral examinations?

13     A   I can read it.  "Extended time for oral exams,

14     specifically for objective, standardized, clinical

15     examinations, Aaron was given double time to complete the

16     history and physical on a simulated patient encounter."

17     Q   Would you agree that when assessing an applicant's

18     request for accommodations, they must be done on an

19     individualized basis?

20     A   That's correct, yes, I'd agree with that.

21     Q   And prior accommodations out of school, there's no

22     guarantee that NBME will provide those exact accommodations,

23     is that correct?

24     A   That's correct.

25     Q   And the rationale supports the reason for denying Mr.

1    Hartman's request in 2008 over double time and approving time

2    and a half, would that be correct?

3    A    The rationale of not guaranteeing what someone gets in

4    medical school is what they'll get on the board?

5    Q    Yes.

6    A    Well, the rationale is that we do an independent review

7    of the documentation.

8    Q    And the fact that Mr. Hartman received strictly double

9    time during medical school, two or three years ago, should

10   not likewise be binding on whatever determination you are

11   making when reviewing accommodations for the USMLE Step II,

12   is that correct?

13   A    It should not be binding, no, that's correct.

14   Q    I believe you mentioned you had reviewed requests for

15   accommodations by half a dozen individuals with speech

16   disorders, is that correct?

17   A    I would say that the number of individuals who request

18   for test accommodations for Step II CS, on the basis of a

19   speech disorder, is probably less than a half a dozen, yes.

20   Q    Yes and you're talking about since 2004, when you've been

21   reviewing these, is that correct?

22   A    Since 2006.

23   Q    Since 2006?

24   A    When I've been reviewing.

25   Q    Okay.  What of the amount of different disabilities that

1    you review request for accommodations for speech disfluency

2    would make a up a small percentage, is that a fair statement?

3    A   A very small, yes.

4    Q   And prior to coming here to testify, did you review any

5    of these requests for accommodations presented by other

6    individuals?

7    A   I believe, in answering interrogatory Number 11, I did a

8    computer search of those individuals who had been

9    accommodated.  I believe the interrogatory was those who

10   received accommodations and to confirm that the individual

11   received the accommodation on the basis of the speech

12   disfluency and not some other impairment, because individuals

13   can claim multiple impairments.  I looked over some of the

14   files, that's correct.

15   Q   Did you review any of their reports demonstrating their,

16   the extent of their speech disfluency prior to coming her to

17   testify?

18   A   In preparation for testimony?

19   Q   Yes.

20   A   No.

21   Q   Are you able to state that -- whether or not these

22   individuals have the severity of disfluency that Mr. Hartman

23   has?

24   A   Not at this moment, no.

25   Q   Have you reviewed Dr. Tetnowski's report?

1   A    I looked at it, I believe, when the copy of the Complaint

2   and the attachments were forwarded to me from counsel.

3          THE COURT:  Mr. Weiner, I think I said that I would

4   have to make a phone call.

5          MR. WEINER:  Yes, your Honor.

6          THE COURT:  I'm going to make it.  We'll take a

7   brief recess.

8          (Court in recess 9:22 to 9:43 o'clock a.m.)

9          THE COURT:  All right, we're back in business.  Dr.

10  Farmer, if you want to return.

11  Q    Dr. Farmer, just to reiterate, Mr. Hartman's 2008 request

12  for accommodations, his proof of disability was the 2007

13  report from Dr. Oldemeir, is that correct?

14  A    That's correct.

15  Q    And then you submitted that report to your consultant,

16  Dr. Wilber, is that correct?

17  A    Everything that was provided by Mr. Hartman was sent to

18  Dr. Wilber, yes.

19  Q    And I think we've established that Dr. Wilber has been a

20  consultant for NBME for anywhere from five to six years, is

21  that correct?

22  A    At least, yes.

23  Q    Is Dr. Wilber familiar with the Step II CS?

24  A    Well, I'm not quite sure what you mean by familiar, but

25  we instruct the consultants on the examinations that they are

Farmer - Cross                                    31

1    consulting about.

2    A    Did she receive any training about the construct of this

3    Step II CS?

4    A    I don't know what that we would call it the construct.

5    She would have received training about how the examination is

6    delivered, what it looks and feels like, what the examinee is

7    being asked to do.

8    Q    Is she familiar with the training of the standardized

9    patients?

10   A    I don't know.

11   Q    Does she have any knowledge whether or not the

12   standardized patients receive any type of sensitivity

13   training?

14   A    I don't know what she knows.

15   Q    And in reviewing Dr. Wilber's report, which was located

16   at D-7.

17   A    I see that.

18   Q    Isn't it true that Dr. Wilber reported or advised to you

19   that stuttering can be misinterpreted as an inability or a

20   lack of knowledge?

21         THE COURT:  That what could be, I'm sorry, I didn't

22   get your question.

23         MR. WEINER:  That stuttering can be misinterpreted

24   as an inability or lack of knowledge.

25   Q    Is that what Dr. Wilber reported to you?

1   A    It is.

2   Q    Did you request that Dr. Webber address the impact of

3   stuttering may have on standardized patients?

4   A    I'm sorry, I don't understand the question.

5   Q    Let me first re-word the question.  Did you request that

6   Dr. Wilber address the impact that stuttering has on

7   listeners?

8   A    No.

9   Q    Did you request that Dr. Wilber address the impact that

10  stuttering may have on standardized patients?

11  A    No.

12  Q    And there was nothing in -- excuse me -- there was

13  nothing in Ms. Oldemier's report regarding the impact of

14  stuttering on listeners that Dr. Wilber was responding to, is

15  that correct?

16  A    I don't have the -- Ms. Oldemeir's report in front of me.

17  Q    If you turn to D-2, starting at pages 9 through 11, that

18  would be Ms. Oldemier's report.

19  A    I'm sorry, which binder are we in?

20  Q    We're in plaintiff's binder.

21        THE COURT:  We're at page 9 of --

22        MR. WEINER:  Excuse, Ms. Oldemier's report runs from

23  page 9 through page 11, of Tab 2 in plaintiff's binder.

24        THE WITNESS:  And your question again was, Mr.

25  Weiner, sorry.

Farmer - Cross                                      33

1    Q    That there was nothing in Ms. Oldemier's report regarding

2    the impact of stuttering on listeners that Dr. Wilber was

3    responding to when she made the comments about the impact on

4    listeners.

5    A    There's nothing in Ms. Oldemier's report that talks about

6    that and I'm not sure what Dr. Wilber -- that Dr. Wilber was

7    reacting to anything when she informed me of that.

8    Q    And you had indicated she is familiar with the Step II

9    CS, is that correct?

10   A    Yes.

11   Q    Mr. Hartman's initial request for Text To Speech software

12   came by way of a letter from me to NBME's general counsel.

13   Is that your understanding?

14   A    That's my understanding, yes.

15   Q    And the letter was brought to your attention to review?

16   A    That's right, it was forwarded to me from counsel.

17   Q    And it's your testimony that at the time you reviewed

18   that letter, it was your impression that Mr. Hartman was

19   going to utilize Text To Speech on the Step II CS

20   exclusively?

21   A    Mr. Hartman was, I think, specific in his request form

22   when he requested the use of an orator and to have the

23   scoring criteria changed.  I believe your letter that

24   followed, asked for Text To Speech technology.  And I had no

25   reason to believe that the request was anything other than

1  Mr. Hartman's request.  But now a change from an orator to

2  Text To Speech.

3  Q   And is it now your understanding that Mr. Hartman's

4  request for use of Text To Speech is to be intermittent on

5  the Step II CS, is that correct?

6  A   I read that in the Complaint filed with the Court, yes.

7            THE COURT:   I want to be sure that I understand

8  what was covered by the term, intermittent, as you used it.

9            MR. WEINER:  What I --

10           THE COURT:  Do you want to proceed  --

11           MR. WEINER:  Sure.

12           THE COURT:  -- so we know what the witness is

13  responding to.

14  Q   What is your understanding, based on what you've reviewed

15  or heard here in court, as to what Mr. Hartman's request is

16  concerning his use of Text To Speech on the Step II CS

17  examination?

18  A   I'd have to refer back to the Complaint.  Is that

19  somewhere in one of the binders?

20  Q   I believe the Complaint simply says use of Text To

21  Speech.  It does not state whether it's intermittent or

22  exclusive.  It just refers to use of Text To Speech.

23  What I am asking you is, based on what you've become aware of

24  through your position, do you have an understanding that Mr.

25  Hartman intends to use Text To Speech intermittently?

Farmer - Cross                                    35

1   A   Again, I believe I read that in the Complaint, because I,

2   my sense was that things had changed once again.  That the

3   request had changed from an orator to Text To Speech and then

4   in the Complaint, it was some combination of Text To Speech

5   and speaking.

6   Q   All right, so, is it your understanding that Mr. Hartman

7   does intend to speak on the Step II CS examination and when

8   needed, he would utilize the Text To Speech?

9   A   In all honesty, Mr. Weiner, I'm still a little confused

10  about what Mr. Hartman's intention is for the exam.

11  Q   Were you here during his entire testimony?

12  A   No.

13  Q   Okay.  And is there anything in the letter that I had

14  presented to Ms. Green, requesting use of Text To Speech on a

15  Step II CS, which requested Mr. Hartman's score be -- that

16  Mr. Hartman's examination would be scored any differently?

17  A   I believe you were silent on that issue, yes.

18  Q   Now, you were aware that Dr. Tetnowski's report was

19  provided to NBME, NBME's counsel in mid-December, is that

20  correct?

21  A   Again, I believe it was an attachment to the Complaint,

22  was that in December?

23  Q   Well, it wasn't an attachment to the Complaint, it came

24  after the Complaint, which was in mid-December.

25  A   I'm aware that Dr. Tetnowski's evaluation came to general

Farmer - Cross                                    36

1   counsel, at some time, yes.

2   Q   And did you see the report, at that time?

3   A   I did look at it, yes.

4   Q   And at the time of your deposition, which was in January,

5   on January 29th, you had not been asked by anyone at NBME to

6   review Mr. Hartman's request for accommodations in light of

7   Dr. Tetnowski's report, is that correct?

8   A   That's correct.

9   Q   Has that changed today?

10  A   No.

11  Q   So, you have not referred Dr. Tetnowski's report to an

12  outside consultant, is that correct?

13  A   That's correct.

14  Q   And you have not asked an outside expert to review Dr.

15  Tetnowski's report, is that correct?

16  A   That's correct.

17  Q   And your normal procedure, as you testified before, is to

18  submit requests for accommodations to outside consultants, is

19  that correct?

20  A   When they're made to me, yes, mm-hmm.

21  Q   And I believe you stated you very rarely choose not to

22  send them to outside consultants, is that correct?

23  A   That's correct.

24  Q   So, this was a break from your normal procedure, whereby

25  you did not send Dr. Tetnowski's report to an outside

1  consultant, is that correct?

2  A    No, that's not correct.

3  Q    This isn't the break from your normal procedure?

4  A    It's not, no.

5  Q    Am I correct that you have no information to present that

6  can test Dr. Tetnowski's opinion regarding the severity of

7  Mr. Hartman's speed disfluency, is that correct?

8  A    I have none, no.

9  Q    And you have no information to contest Dr. Tetonowski's

10 opinion that Mr. Hartman's stuttering is very severe, is that

11 correct?

12 A    That's correct.

13 Q    And is it true that given that Mr. Hartman has not

14 opposed using Text To Speech exclusively on the Step II CS in

15 evaluating this accommodation, you would want to know how

16 much he would speak, is that correct?

17 A    I think I did say that to you in my deposition, that his

18 request that has come to light in the Complaint, that he

19 wished to use Text To Speech intermittently, would actually

20 bring up more questions for me about how he would use it, how

21 much he would use it.

22 Q    And you'd want to know how much he was actually speaking

23 English to determine whether not this spoken English

24 deficiency sub-component can be scored, is that correct?

25 A    Well, I don't actually handle the scoring.  I would want

1    to know how he was going to use it, especially, if it might

2    actually get in the way of him being successful on the

3    examination, that it's facilitating him.

4    Q    And it would be outside your field of knowledge to know

5    how much one must speak on a Step II CS in order to be able

6    to receive a score in this spoken English deficiency, is that

7    correct?

8    A    That's correct.  I can't answer that question.

9    Q    Just going back to the initial approval of accommodations

10   back in 2008, for Mr. Hartman.  That was based on his

11   documentation, as well as the report from Ms. Oldemier, is

12   that correct?

13   A    I believe his submission was a personal statement.  The

14   report from Ms. Oldemier, three documents from the medical

15   school about the accommodations that he had been receiving

16   there.  Those are the things that come to mind in his

17   submission.

18   Q    And Ms. Oldemier's report indicated that Mr. Hartman's

19   stuttering was moderate, is that correct?

20   A    Yes.

21   Q    And Dr. Wilber acknowledged, at that time, when he

22   submitted his request in 2008, that his speech was moderate,

23   is that correct?

24   A    I believe that's what she said, yes.

25   Q    And that today, the report that we have from Dr.

1    Tetnowski, indicates that Mr. Hartman's speech disfluency is

2    very severe, is that correct?

3    A    I don't recall how he characterized it.  Is it in the

4    binder somewhere that I can refer to it?

5    Q    Yes, it would be at, I believe, plaintiff's binder, Tab

6    15.

7              (Pause.)

8    A    Yes, the SSI-3 that Dr. Tetnowski administered, he

9    reports that it's very severe.

10   Q    And while you're at the report and I'm going to refer to

11   page 7 of Dr. Tetnowski's report, he also notes that Mr.

12   Hartman, during reading text, has over eight times as slow as

13   expected speech during spontaneous tests, according to the

14   normative data.

15   A    I'm sorry, where are you reading?  On page?

16   Q    On the bottom of page 7.  It says, it appears to be the

17   last sentence.  "When assessing the length of time that it

18   takes Aaron to verbally communicate, he's two and a half

19   times as slow as expected during reading tests and over eight

20   times as slow as expected during spontaneous tests, according

21   to normative data.

22   A    I see that, yes.

23   Q    And you have no information, independently, that that

24   statement is not accurate, is that correct?

25   A    Oh, I have no reason to believe it's inaccurate, no.

1    Q    And is it fair to say that when evaluating requests for

2    accommodations, NBME is always interested in receiving

3    updated or more current information, is that correct?

4    A    I think what you are trying to say is we are looking for

5    evaluation or assessment of their current functioning.

6    Q    Yes.

7    A    That's correct.

8    Q    And Dr. Tetnowski's report is the most current assessment

9    that Mr. Hartman's functioning, to your knowledge, is that

10   correct?

11   A    It was his functioning on 12/7/09, that's correct.

12   Q    You would agree that it's important to determine whether

13   the absence of an accommodation interferes with the

14   examinee's demonstration of the knowledge or skill being

15   tested, is that correct?

16   A    I'm sorry, say that again?

17   Q    Would you agree with the statement that it's important to

18   determine whether the absence of an accommodation interferes

19   with the examinee's demonstration of the knowledge or skill

20   being tested?

21   A    Yes.

22   Q    And would you agree with the statement that it's

23   important to determine whether an accommodation gives an

24   examinee an advantage not available to other test takers?

25   A    Yes.

Farmer - Cross                                  41

1    Q    And would you agree that Mr. Hartman's use of Text To

2    Speech does not give him an advantage over other test takers?

3    A    I really could not agree, no.

4    Q    You don't agree?

5    A    I don't know that it would or it wouldn't.

6    Q    So, you're not saying that using Text To Speech would

7    give him an advantage, is that correct?

8    A    I'm saying I don't know.  I'm saying there are probably

9    other examinees who would like the examination altered to

10   assist them in some way.

11   Q    Well, you've never received any request for Text To

12   Speech, is that correct?

13   A    Correct.

14   Q    It's not the type of thing that people are really

15   requesting to utilize on the Step II CS, is that correct?

16   A    That's correct.

17        MR. WEINER:  That's all the questions I have, your

18   Honor.

19        THE COURT:  All right.

20        (Pause.)

21        MS. LEOPOLD-LEVENTHAL:  Very brief redirect, your

22   Honor.

23        THE COURT:  All right.

24                   REDIRECT EXAMINATION

25   BY MS. LEOPOLD-LEVENTHAL:

1    Q    Has the NBME accepted that Mr. Hartman is a person with a

2    disability for purposes of evaluating his file?

3    A    Yes.

4    Q    Is it the NBME's position that any use of the Text To

5    Speech device would preclude assessment of the Step

6    sub-component?

7    A    I'm actually not sure what the NBME's position is on

8    that.

9    Q    Do you believe Dr. Clauser will address that?

10   A    Yes, I think right now, the position is that it is a

11   change to the examination.

12   Q    Mr. Weiner ask you whether or not the NBME took up or

13   accepted Mr. Hartman's suggestion that the NBME have Mr.

14   Hartman separately evaluated by a speech fluency doctor,

15   correct?

16   A    Correct.

17   Q    Why didn't the NBME have Mr. Hartman evaluated?

18   A    It's certainly not any of our standard procedure to order

19   or request an independent medical examination.   The

20   documentation that the guidelines that we have published at

21   the website, are pretty clear about instructing examinees to

22   provide all the documentation that they have.   They would

23   know the best what specialists or what evaluators they needed

24   to go to document their impairments.

25   Q    Dr. Wilber recommended that Mr. Hartman be granted more

1   time, is that correct?

2   A    The first, yes, on the first administration, that's

3   correct.

4   Q    And Mr. Hartman, himself, actually asked for more time on

5   the examination on his first application, correct?

6   A    That's correct.

7   Q    And in support of that, Mr. Hartman provided a report by

8   Ms. Oldemier.  She also suggested that Mr. Hartman be given

9   more time, is that correct?

10  A    I don't believe Ms. Oldemier made any recommendation.  I

11  believe she made a statement that it takes him longer.

12  Q    Okay.  And Mr. Weiner was asking you what accommodations

13  Mr. Hartman had received at Stoney Brook and suggested that

14  at Stoney Brook, he was uniformly given double time.  Did you

15  understand that there was one particular examination,

16  actually, where Mr. Hartman was given only time and a half,

17  rather than double time?

18  A    I have heard that, yes.

19  Q    And Mr. Hartman, when he submitted his second request for

20  accommodations, did not indicate that he had been given time

21  and a half, did he?

22  A    No, he did not.

23          MS. LEOPOLD-LEVENTHAL:  No further questions, your

24  Honor.

25          THE COURT:  All right, anything further?

1          MR. WEINER:  No, your Honor.

2          THE COURT:  Thank you very much.  Thank you, Dr.

3   Farmer.

4          THE WITNESS:  Thank you, your Honor.

5          THE COURT:  May I, just one question, if I may.  I

6   just remembered.  When you refer a request to a consultant,

7   is the consultant being asked whether the requested

8   accommodation should be granted or whether some accommodation

9   should be granted?

10          THE WITNESS:  Excellent question, your Honor.  We do

11   instruct consultants on how to review a request.  And they're

12   really looking at a number of things.  The first thing that

13   we're asking them to look at is, does the individual's

14   documentation support that they have an impairment that

15   substantially limits a major life activity.  And then the

16   second question is, if it does, is their request for

17   accommodation appropriate or is there another more

18   appropriate accommodation.  So, the consultant is free to

19   offer suggestions on an accommodation.

20          THE COURT:  May I ask this, are there instances in

21   which you have declined to follow whatever recommendation or

22   evaluation made by the consultant?

23          THE WITNESS:  There are, your Honor, in limited

24   instances.  It's usually in the favor of the examinee.

25          THE COURT:  In favor of the examinee?

Farmer - Redirect                                45

 1             THE WITNESS:  Yes.

 2             THE COURT:  All right, thank you very much.

 3             THE WITNESS:  Thank you.

 4             MS. LEOPOLD-LEVENTHAL:  Defendant calls Dr. Clauser

 5   to the stand.  He went to the rest room and he'll be back in

 6   a minute's time.  Sorry for the delay.

 7             (Pause.)

 8             BRIAN CLAUSER, Defense Witness, Sworn.

 9             THE CLERK:  Please just state your full name and

10   spell your last name for the record.

11             THE WITNESS:  Brian Errol Clauser, C-L-A-U-S-E-R.

12                         DIRECT EXAMINATION

13   BY MS. LEOPOLD-LEVENTHAL:

14   Q   Good morning, Dr. Clauser.

15   A   Good morning.

16             THE COURT:  Good morning.

17             THE WITNESS:  Thank you.

18   Q   For whom do you presently work?

19   A   The National Board of Medical Examiners.

20   Q   Please describe, if you would, what the National Board of

21   Medical Examiners actually does?

22   A   The National Board of Medical Examiners develops tests in

23   the medical and healthcare field.  Primarily, we develop the

24   United States Medical Licensing examination.

25   Q   And if you would, for the Court, briefly describe your

1    educational background?

2    A    I have a Doctorate from the University of Massachusetts

3    in measurement and assessment.  Basically, the focus of that

4    study was in test development and psychometrics.

5    Psychometrics is the theory and practice of assessment.

6    Q    What other degrees do you hold, Doctor, for example,

7    under-graduate degree?

8    A    I have a Bachelor's Degree from Lehigh University in

9    psychology and a Masters in Education from the University of

10   Massachusetts.

11   Q    What is your current position with the NBME?

12   A    I am Associate Vice President for Measurement Consulting

13   Services.

14   Q    And Doctor, how long have you held that position?

15   A    About ten years.

16   Q    If you could, give a slightly broader explanation of what

17   it is that a psychometrician does?

18   A    We are involved in trying to better understand how to do

19   assessments, so, much of the work that my department does is

20   in research and evaluation both to develop new assessment

21   formats and to evaluate the performance of those formats,

22   both before and after their introduced into the examination.

23   Q    Were you an employee of the NBME when the Step II CS exam

24   was first given to prospective medical students?

25   A    Yes, I was.

Clauser - Direct                                    47

1   Q    What other positions have you held with the NBME?

2   A    I was a psychometrician when I began there in 1992 and

3   then became senior psychometrician after a year or two there

4   and held that until I became the Vice President for

5   Measurement Consulting Services.

6   Q    What is it, generally speaking, that the Measurement

7   Consulting Services group does?

8   A    We primarily do psychometric research and as I mentioned

9   before, that has to do both with evaluating the assessments

10  that we're using now and also developing new assessment

11  formats.

12          THE COURT:  Excuse me.

13          MS. LEOPOLD-LEVENTHAL:  Yes?

14          THE COURT:  Let me interrupt.  Is there a CV of Dr.

15  Clauser among our exhibits?

16          MS. LEOPOLD-LEVENTHAL:  Yes, it is Exhibit 26 in

17  defendant's binder.

18          THE COURT:  16?

19          MS. LEOPOLD-LEVENTHAL:  26, I'm sorry.

20          THE COURT:  26.  Am I allowed to peek at it?

21          MS. LEOPOLD-LEVENTHAL:  I'm just -- absolutely.

22  Q    Would you please turn to Exhibit 26 in the exhibit binder

23  just in front of you?  Yes.

24          (Pause.)

25  Q    Do you have Exhibit 26 in front of you, Doctor?

Clauser - Direct                                48

1    A    I do.

2    Q    And to the best of your knowledge, is that a true and

3    correct copy of your current CV?

4    A    Yes, it is.

5    Q    I'm going to ask you a few questions about your CV, but I

6    would like to have Dr. Clauser's CV, which is at Exhibit Tab

7    26 marked as Exhibit D-26 and move that into evidence, at

8    this time.

9              THE COURT:  Fine.

10             (Defense Exhibit 26 admitted in evidence.)

11   Q    Briefly describe the professional positions you held

12   prior to joining the NBME in 1992.

13   A    I worked for numerous years as a psychologist, primarily,

14   at the Belchertown (ph) State School, which was an

15   institution for developmentally disabled individuals.

16   Q    Now, if you would, describe the various positions,

17   briefly for the Court, that you have held since joining the

18   NBME in 1992.

19   A    As psychometrician and senior psychometrician, I was

20   primarily involved in research activities.  When I began in

21   1992, one of my primary duties was doing research into a then

22   developmental project, which we referred to as the

23   standardized patient examination.  And that later evolved

24   into the clinical skills examination that we're administering

25   now.

Clauser - Direct                                    49

1   Q    And I see that you also have occasionally or worked part

2   time as a professor at Temple University, is that correct?

3   A    That's right.

4   Q    What course or courses have you taught at Temple?

5   A    I taught statistics course for graduate students and I

6   also taught a course on assessment, again, for graduate

7   students in the School of Educational Psychology.

8   Q    What is the United States Medical Licensing examination?

9   A    The USMLE is a series of examinations designed to assess

10  a physician's readiness for practice.  It's a series of

11  examinations that are required for all physicians holding an

12  MD Degree in order to practice in the United States.

13  Q    Please describe, if you would, the relationship between

14  that medical licensing examination and the National Board of

15  Medical Examiners?

16  A    The national board is a partner in USMLE, so they don't

17  completely control it.  They do much of the developmental

18  work, but it's a partnership with the Federation of State

19  Medical Boards.

20  Q    And as everyone understands now, the examination has

21  three steps. Both Dr. Farmer and Dr. Katzafrackas (ph) has

22  testified with respect to those steps and obviously, you're

23  familiar with them, correct?

24  A    That's right.

25  Q    Do you know why the Step II CS examination was first

Clauser - Direct                                        50

1   developed and then introduced in 2004?

2   A    There was a long-standing belief, not only of people in

3   the governance at the national board and the USMLE, but also

4   throughout the medical education community, that it was

5   important evaluate the hands-on skills of physicians and not

6   just evaluate their knowledge through multiple choice tests.

7   And particularly, of communication in interpersonal skills

8   seemed to be something that was very important.

9   Q    What do you understand the Step II CS exam is designed to

10  assess in particular?

11  A    Well, it's designed to assess a variety of proficiency

12  skills.  Your ability to take a focused history, to formulate

13  a differential diagnosis, to do a focused physical

14  examination, again, to provide support for your diagnosis.

15  But, simultaneously, it's designed to evaluate your ability

16  to speak English and to question, deliver information and

17  establish rapport with a patient.

18  Q    Let's move now from assessment, actually, to grading.

19  And if you would, describe how the ICE component, the

20  sub-component is actually graded.

21  A    The ICE component is the Integrated Clinical Encounter

22  and there are two separate parts that lead into that.  Each

23  case has a checklist, which is scored either yes or no, they

24  achieved this or they did not.  And it has to do with the

25  history questions. The areas of patient history that the

1   examinee should ask in order to appropriately collect

2   information.  It also has questions about physical

3   examination maneuvers that should be displayed by the

4   examinee.  So, those are scored, as I said, correct or

5   incorrect and essentially, there's a sum produced, a weighted

6   sum, depending on how important the items were within each

7   case and then aggregated across cases.

8           In addition to that, there is a documentation or

9   patient note component.  After the examinee finishes the

10  encounter with standardized patient, they have ten minutes to

11  record their findings in a structured patient note.  Those

12  patient notes are scored by trained physicians, who evaluate

13  both the content and form of the note and give it a score.

14  Again, those scores are aggregated across all the cases.  And

15  then those two pieces, the checklist score and the note score

16  are combined to produce the ICE score.

17  Q   With respect to the second component, the communication

18  and interpersonal skills, if you would, please describe how

19  that component is graded by the NBME.

20  A   With that component, there are three scales, each of them

21  rated from one to nine and the standardized patient scores

22  that.  The first has to do with questioning or collecting

23  information.  The second with sharing information and the

24  third with establishing rapport with the patient.  The

25  examinee is trained in how to use -- the patient, rather, is

Clauser - Direct                                52

1    trained in how to use those scales and after the encounter,

2    the score the examinee on each of those and then those three

3    scores are summed and then aggregated across cases to produce

4    the score.

5              THE COURT:  I'm afraid I missed the first of the

6    three, would you go back and --

7              THE WITNESS:  It's information gathering,

8    information sharing and then rapport in a professional

9    manner.

10   Q    Now, with respect to the spoken English proficiency

11   component, how is that component graded?

12   A    Again, that's scored by the standardized patient.  They

13   use a nine point scale and at the completion of the encounter

14   they score the examinee on the clarity of speech, the amount

15   of effort required to understand what the examinee is saying,

16   their use of language and so forth.

17   Q    Must the test taker pass all three of the sub-components

18   in a single administration to achieve a passing score on the

19   Step II CS exam?

20   A    Yes, they must and not just for convenience.  A lot of

21   effort in developing the examination went into understanding

22   the fact that it's important that you be able to display

23   these skills simultaneously.  So, you can't simply go in and

24   focus on speaking clearly this time, pass spoken English.

25   Come back next time and focus on establishing rapport.  Pass

1    this, come back a third time and say, well, now I'm going to

2    work on collecting information and getting the diagnosis.  In

3    a realistic encounter, you have to do all of these things

4    simultaneously and the emotional stress and cognitive effort

5    required to be thinking, well, what could the differential

6    diagnosis be, what question should I ask next, will likely

7    interfere with your ability to maintain rapport and speak

8    clearly.  And so, it's important that you can show that you

9    can do all of those things simultaneously within the context

10   of the encounter.

11   Q    Thank you.  How often is the Step II CS exam given in the

12   United States?

13   A    It's given pretty much throughout the year.  At least,

14   five days a week, most weeks of the year.

15   Q    If you would, take a look at Exhibit Tab 4 in the other

16   binder, not the one that's in front of you and this is the

17   plaintiff's binder.  This document has previously been marked

18   as Exhibit P-6.

19   A    You're looking at the score report?

20   Q    Yes.  And that is a two-page exhibit.  What is the first

21   page?

22   A    The first page shows the overall pass/fail outcome and

23   the pass/fail outcome for each of the sub-components.

24   Q    And then what is reflected on the second page, called the

25   performance profile?

Clauser - Direct                              54

1    A    The information on the second page shows the relative

2    performance within each of the major components and then also

3    breaks it down by sub-components within that.  So, for

4    example, for the integrated clinical encounter, as I

5    mentioned, it's data gathering and patient note and is shows

6    the kind of sub-score on the plot for each of those and

7    likewise, for the sub-components of communication and

8    interpersonal skills.

9    Q    What do the Xs indicate on the performance profile?

10   A    The Xs indicate a range representing the performance of

11   the examinee in that particular administration, so that the

12   center of that row of Xs represents the approximate score for

13   the examinee and the length of the row of Xs shows the

14   precision of the score, so the examinee can make a judgment

15   as to whether, given expected measurement error on the test,

16   they would be likely to be above, below or within the

17   marginal range on another administration.

18   Q    Taking a look at the integrated clinical encounter, the

19   ICE score on the very first level.  Am I correct to say then,

20   that the middle X essentially represents Mr. Hartman's score

21   on that component?

22   A    That would be correct.

23   Q    And that is a combination of what is subsumed within data

24   gathering and patient note, correct?

25   A    That's correct.

                         Clauser - Direct                    55

1   Q   With respect to the CIS component, which is reflected

2   second, why is it that Mr. Hartman's composite score, on his

3   profile, appears to be, at least on here, less than the

4   average of the other two components of that?

5   A   Well --

6   Q   Other three components?

7   A   -- yes, the reason is that it was designed to give

8   relative feedback to the examinees and not to demonstrate how

9   the sub-scores would add up to produce the total score.

10  Basically, this is what we refer to as a situation where

11  they're not scaled the same way.  So, there would be no

12  expectation that you could add these three scores for the

13  sub-components and produce the score for CIS overall or add

14  them and reach across them and produce that score.  They

15  don't have that same kind of meaning.

16          If you would like more of an explanation of that,

17  what they're really done here is shown relative standing for

18  those scores within the population.  So, you can see that

19  within the population, the sub-scores differ, but that won't

20  add up.  If I can give you an example of how that's true in

21  another context that might make sense.  If you think of the

22  triathlon, you could say, well, the top is standing for

23  someone in the triathlon, the CIS overall.  The sub-scores

24  would be standing within the whole group of swimming, running

25  and riding a bicycle.  And it's typical, I think, that the

Clauser - Direct                                          56

1   person who is first in the triathlon, might very well be

2   second in running, fifth or tenth in swimming and eighth in

3   the bicycle.  But when you put all of those together, it

4   moves them further up, because it's more unusual to be very

5   good in all of them.  In this case, having three scores this

6   relatively low in the sub-components, produces a overall

7   score that, relatively speaking, is lower than some of the

8   individual scores.

9   Q   Thank you.

10          THE COURT:  Okay, if I may interrupt for a moment.

11  It's very likely you're coming to this, well, why don't you

12  go ahead and then I'll jump in if there's something that I'm

13  still unsure of.

14  Q   Where, with respect to this CIS component, would Mr.

15  Hartman's middle X have needed to be in order for him to have

16  passed that component?

17  A   Well, let me begin by saying that this second page of the

18  score report is an approximation.  It is only for feedback to

19  the examinee for their own sense of where they might want to

20  give more effort in trying to pass the test in the future.

21  So, this isn't precisely true, but generally speaking, I

22  think the way the intention is that you interpret this is

23  that if the middle X is above the middle of that borderline

24  performance zone, then that would be a passing score.  And

25  again, to go back to the question of what that row of Xs

Clauser - Direct                              57

1    means, what it means in the case of this CIS score, is that

2    our expectation is that on a retest, all else being equal,

3    that the score would remain below the bottom of that

4    borderline zone.

5              MS. LEOPOLD-LEVENTHAL:  Did that address your

6    question, your Honor?

7              THE COURT:  No, let me inquire a little.  I recall

8    that you described a numerical scoring on a scale of one to

9    nine.  And so that, the patient would grade, well, with to

10   the CIS component, would grade the examinee on a scale of one

11   to nine for each of the three sub-components, questioning

12   skills, information and sharing skills and professional

13   manner and rapport.

14             THE WITNESS:  That's exactly what the patient does.

15   But those numbers are not directly reflected on this page.

16   There is a fair amount of other adjustment that's gone on and

17   the creation of a different score scale that's actually

18   reflected on the page and I'd be happy to say more about how

19   those changes occur.

20             THE COURT:  Yes, well, I think that would be

21   helpful.

22             THE WITNESS:  Okay, well, one of the -- it would all

23   be very simple if we could just add those numbers up and it

24   would be a scale from three to 27 and that's where we would

25   set our passing standard and so forth.  But, in fact, what

1  we've discovered in implementing the test, is that all cases

2  and all standardized patients are not exactly equal.  And so,

3  we go to considerable effort to make adjustments to make sure

4  that the set of standardized patients and the set of cases

5  that any individual examinee encounters are adjusted to

6  produce a similar score.

7         So, if you can think about over the course of two

8  months of testing, we take all the scores that a given

9  standardized patient playing a given case, produces.  We take

10  into consideration the examinees that that standardized

11  patient interacted with and we say, for that standardized

12  patient, you give scores that are typically higher than all

13  the other standardized patients playing this same case.  So,

14  in order to make everything fair, we're going to adjust those

15  scores down a little bit and then there will be other

16  standardized patients that are in the opposite direction.

17         Well, to make sure that you aren't unduly impacted

18  by the fact that you got a group of very stringent or very

19  lenient patients, we actually make mathematical adjustment to

20  all of those scores.  And we make those mathematical

21  adjustments, add those adjustments in to the total score and

22  then it is then that entire score is moved on to a new scale

23  from which the actual pass/fail decisions are made.

24         THE COURT:  Did you say that -- I understood you to

25  say that this is a process that requires aggregating and

1    analyzing a couple of months worth of examinations?

2                THE WITNESS:  That's correct.

3                THE COURT:  So that, for the individual examinee,

4    there's no report with -- no determination of passing or

5    failing until a couple of months may have gone by since the

6    examination?

7                THE WITNESS:  That's exactly right.

8                THE COURT:  When a patient is asked to grade the

9    examinee on a scale of one to nine, on questioning skills,

10   is the patient asked to make that scoring a comparative

11   assessment?  Does the examinee rate eight on a one to nine

12   scale as against the patient's sense of how others have fared

13   in questioning him or her?

14               THE WITNESS:  It is the intention and every effort

15   is made with the training, to try and avoid them making that

16   relative decision, because they might see very different

17   kinds of examinees with very different levels of skill over

18   the course of weeks or months.  It so happens that through

19   the annual cycle, the very best students tend to test at

20   certain times of the year and the students with lower ability

21   may either put off their examinations in a systematic way or

22   may actually try and come in earlier.  I'm not sure what the

23   specifics of the cycle look like, but I know that there are

24   real cycles in the proficiency of examinees testing.  So, we

25   try to have them scaled against a written, absolute standard

Clauser - Direct                                60

1    that they're to have in their mind.

2            THE COURT:  One other thing and I'm sure both Ms.

3    Leopold-Leventhal and Mr. Weiner will think of the question

4    that I'm about to ask is not relevant to anything.  They may

5    already have come to that conclusion, but let me try it

6    anyhow.  I was curious that you have a scale of one to nine

7    as distinct from what I think many of us are familiar with in

8    all sorts of other settings, a scale of one to ten, sometimes

9    one to five.  Is there some greater convenience about a one

10   to nine scale?

11           THE WITNESS:  Well, I actually think that there are

12   two separate sources for this.  One is more or less

13   historical.  A precursor of this examination was being

14   administered by the Educational Commission for Foreign

15   Medical Graduates before it became part of the USMLE.  And I

16   believe that the one to nine scale was what was being used

17   there.  As a practical matter, the reason that we've been

18   attracted to the one to nine scale is the part of the

19   training for how the standardized patients use the scale is

20   to ask them, first, think about this in three broad

21   categories.  This is an okay performance, this is a not so

22   good performance or this is a quite good performance.  And

23   so, they start off by thinking, one, two, three, as opposed

24   to four, five, six, as opposed to seven, eight, nine.  And

25   then we ask them to, okay, now that you have it within a

Clauser - Direct                                61

1    broad category, where does it fall within that range?  So,

2    it's a convenience for the standardized patients when they're

3    doing the rating, to have these three sort of equivalent

4    blocks.

5              THE COURT:  So, the building blocks are to be prime

6    numbers and then we can go from there.  I didn't want you to

7    think that I regarded nine as a number to be disfavored.

8    It's important in the law, because we have nine Supreme Court

9    Justices and it's even more important in American life

10   generally, because there are nine innings of a baseball game

11   and nine players on a side.  All right, thank you.

12   Q   Does any aspect of the evaluation of the CIS component,

13   assess the actual content of what the test taker is saying to

14   the standardized patient?

15   A   The CIS component does not really assess the content.

16   That's primarily taken care of in the data-gathering section.

17   Q   With respect to the evaluation and it taking

18   approximately two months, are you familiar with the phrase

19   cohort process?

20   A   Yes.

21   Q   Would you describe for the Court what that phrase means

22   as related to this test?

23   A   Well, basically, what it means is that we administer the

24   examination over a period of time.  And we then wait until

25   the end of that time frame in order to collect the

Clauser - Direct                                    62

1    information and actually produce the scores.  There are two

2    reasons for this and the one is that we want to calculate

3    those adjustments for the relative stringency or leniency of

4    standardized patients, which I referred to before.  The other

5    is that when we collect together large quantities of

6    information, it allows us to look at it statistically and be

7    sure that everything is right.  Very often, if any problems

8    have occurred in scoring, the computer did not read in the

9    information correctly, something like that and it will show

10   up when viewed against large amounts of data, whereas, if

11   you're only looking at a few scores, you'd have no way of

12   knowing that they weren't completely correct.  So, to ensure

13   that the scores are accurate and of the highest quality, we

14   wait until they are all collected.

15            MR. WEINER:  Your Honor, I'm going to object and

16   move to strike.  Dr. Clauser had not presented a declaration

17   in defendant's response and there was no argument or

18   information that was presented in defendant's response

19   concerning the amount of time it takes to score this

20   examination.  So, I request that his testimony along these

21   lines, be stricken, since it's not argued or presented, in

22   any way, in their response to plaintiff's motion for a

23   preliminary injunction.

24            MS. LEOPOLD-LEVENTHAL:  I'm not sure I --

25            THE COURT:  Are you talking about the witness'

1   recital that it takes a couple of months to score?

2           MR. WEINER:  Yes, your Honor.  It's not -- I presume

3   that where this is going is that the exam cannot be graded as

4   we've requested in our motion for a preliminary injunction,

5   that it be graded as soon as possible.  I presume that Dr.

6   Clauser's testimony is addressing that that simply can't be

7   done.  That argument was not presented in their response to

8   plaintiff's motion for a preliminary injunction.

9           MS. LEOPOLD-LEVENTHAL:  Your Honor, it's in Dr.

10  Katzafrakas' declaration at paragraphs 15 and 16 under

11  Exhibit Tab 35, which has been previously introduced as

12  Exhibit D-6.  In fact, Dr. Katzafrakas specifically addresses

13  exactly this issue and I don't know of any rule that would

14  require me to submit yet another declaration to say something

15  similar.  Certainly, Dr. Clauser is permitted to testify with

16  respect to that subject, which is really directly an issue in

17  the case.

18          THE COURT:  I'm sorry, where in the declaration is

19  it?

20          MS. LEOPOLD-LEVENTHAL:  It is paragraphs 15 and 16,

21  which are pages five and six.

22          (Pause.)

23          THE COURT:  All right, the motion to strike will be

24  denied.

25  BY MS. LEOPOLD-LEVENTHAL:

Clauser - Direct                                    64

1    Q    Does the NBME publish, on its website, the schedule for

2    school reporting for 2010?

3    A    I believe they do.

4            MS. LEOPOLD-LEVENTHAL:  May I approach the witness,

5    your Honor?

6            THE COURT:  Surely.

7    Q    Please identify that document, Dr. Clauser.

8    A    This appears to be the information from the USMLE

9    website, describing when scores will be reported, based on

10   the testing dates.

11   Q    And is this available to anyone who clicks on the USMLE

12   website?

13   A    Yes.

14   Q    And at the bottom of page one and the top to middle of

15   page two, does it identify the score reporting or score

16   window based upon when you take an examination in 2010?

17   A    Yes, it does.

18           MS. LEOPOLD-LEVENTHAL:  Your Honor, I'd like to mark

19   this document as Exhibit D-27 and move it into evidence, at

20   this time.

21           THE COURT:  D-27, all right, fine.

22           (Defense Exhibit 27 admitted in evidence.)

23   Q    This was not included in defendant's exhibit binder, so,

24   I will give it to you instead.  Now, Dr. Clauser, if an

25   individual tests between March 1st through March 27th, what

1   is the scoring window for their receipt of their score on the

2   Step II CS exam?

3   A   April 21st through May 19th.

4   Q   And now, what if an individual tests from March 28th

5   through May 15th, when will they receive their scores?

6   A   June 16th to July 14th.

7   Q   And there are additional dates indicated thereafter, if

8   the test take takes the examination after May 15th, correct?

9   A   That's correct.

10  Q   The cohort process that you described, is this done

11  across all five examination centers that exist in the United

12  States?

13  A   Yes, it is.

14  Q   Why is that?

15  A   Well, among other things, there are actually adjustments

16  made to put the scores from the different test centers on the

17  same scale, so that no one will have an advantage because

18  they tested in Philadelphia instead of Chicago.

19  Q   If Mr. Hartman took the Step II CS examination this

20  Friday, for example, would he be able to have his tests

21  scored in several weeks?

22  A   No.

23  Q   Why not?

24  A   Well, it would take until, at least, April 21st in order

25  for the steps that I've described before, to be completed as

1    say to estimate the adjustments, so that they were correct

2    for the examination as it was delivered to him.

3    Q   Dr. Clauser, if the NBME was forced to score Mr.

4    Hartman's tests on the Step II CS examination, not using the

5    cohort process, but simply scoring his test in isolation, by

6    itself, would the score that was generated be statistically

7    valid?

8    A   It would not.

9    Q   Why not?

10   A   It would not because the adjustments that would be made

11   typically either couldn't be made at all, which would mean

12   that whether or not he had a passing score, might well depend

13   on whether he was lucky or unlucky in terms of the specific

14   standardized patients that he happened to encounter.  Or we

15   would have to use old adjustments and past researches

16   indicated that those old adjustments can be even worse than

17   no adjustment at all.

18   Q   What impact, if any, on timing does the physician rater

19   component have on the grading of the Step II CS exam?

20           THE COURT:  Would you try that again, please?

21           MS. LEOPOLD-LEVENTHAL:  Sure.

22   Q   Physicians actually rate the notes that the test taker

23   creates, correct?

24   A   Yes.

25   Q   And does that impact the scoring window or the timing of

Clauser - Direct                                    67

1    the score in any way?

2    A    Well, yes, it does, because it's necessary, although, as

3    I mentioned, the standardized patient does their scoring

4    immediately after the encounter.  The notes are actually sent

5    out to these trained physicians to be rated, so, they'll be

6    sent out in weekly blocks, depending on how many people are

7    flowing through the system, at any given point.  There might

8    actually be a backlog, so, they're sent out to the

9    physicians, who do the ratings and then return those scores.

10   And for some examinees, those examinees who are close to the

11   cut score on their ICE component, those notes will then be

12   sent out again to another independent set of physicians to be

13   re-scored, so that we're sure that that final decision was

14   not the result of the specific set of raters that the

15   examinee drew.

16   Q    So, it's fair to say then that for some applicants, their

17   physician notes are rated multiple times by different

18   physicians, correct?

19   A    That's correct.

20   Q    And I guess it's possible that -- and you have no way of

21   predicting -- that Mr. Hartman's score could be required to

22   be rated by several physicians, correct?

23   A    Yes.

24            MR. WEINER:  Objection, leading.

25            THE COURT:  Well, we've spending days with leading

Clauser - Direct                    68

1    questions.

2              THE WITNESS:   That's correct.

3    BY MS. LEOPOLD-LEVENTHAL:

4    Q    Dr. Tetnowski, who was plaintiff's speech doctor,

5    testified earlier in the trial that he believed standardized

6    patients could or would be biased against a person with a

7    stutter, believing that that individual might be less

8    intelligent as a result of their stutter.  My question to you

9    is, does the NBME employ any ongoing quality control

10   procedures endeavoring to eliminate SP bias based on any

11   number of prejudicial factors?

12   A    Both the training of the standardized patients -- the

13   training of the standardized patients is designed to minimize

14   bias that results from any number of examinee

15   characteristics.  And there are also other ongoing quality

16   control procedures to identify standardized patients who

17   might behave in an unusual manner relative to an individual

18   examinee.

19   Q    Are you familiar with the Text To Speech device which Mr.

20   Hartman is requesting to use on the Step II CS exam?

21   A    I understand what the device does.

22   Q    Would you briefly describe what your understanding is as

23   to how the TTS device works?

24   A    My understanding is that an individual types words into

25   it and the device produces speech.

Clauser - Direct                                69

1    Q    You've never observed Mr. Hartman using the device, have

2    you?

3    A    No.

4    Q    And are you familiar with the phrase, fundamental

5    alteration, Dr. Clauser?

6    A    Yes, I am.

7    Q    Describe, if you know, what that phrase means with

8    respect to the Step II CS examination.

9    A    That would be a modification in the examination

10   administration or any other part of it, I guess, that

11   resulted in changing, in some important way, what the

12   examination measured or how it measured in terms of the

13   quality of that measurement.

14   Q    Please take a look at Exhibit 16 in plaintiff's exhibit

15   binder, which is the one that doesn't have the white page on

16   the front.

17        THE COURT:  I'm sorry, 18 or 16?

18        MS. LEOPOLD-LEVENTHAL:  16, your Honor and it is Dr.

19   Tetnowski's declaration.

20        THE COURT:  All right.

21   Q    If you would, turn to page five of that declaration.  And

22   I am directing your attention to paragraph 20 on page five.

23   A    Yes.

24   Q    Dr. Tetnowski states in the first sentence, "furthermore,

25   allowing Mr. Hartman to use a Text To Speech program would

                          Clauser - Direct                    70

 1   not alter the skills or knowledge the Step II CS is intended

 2   to measure."  Are you with me?

 3   A    Yes.

 4             THE COURT:  I'm sorry, which page was that?

 5             MS. LEOPOLD-LEVENTHAL:  It's page five, it's

 6   actually the last page of his declaration and it's Exhibit 16

 7   in that binder, but it's paragraph 20.

 8             THE COURT:  I'm sorry, I was looking at the report.

 9   I was at 15 and so, I was not with you.  Not, as they say, on

10   the same page.  All right, got it.

11             MS. LEOPOLD-LEVENTHAL:  And I'm asking the witness

12   about the first sentence where Dr. Tetnowski concludes that

13   the TTS program, in his opinion, would not alter the skills

14   or knowledge the Step II CS is intended to measure.  That's

15   paragraph 20, the first sentence.

16             THE COURT:  All right.

17   Q    Do you agree with that statement?

18   A    I do not.

19   Q    Why not?

20   A    Well, it seems to me, to completely clear, that one of

21   the skills the test is intended to measure is spoken English.

22   And using a device to replace the individual's own speech

23   would be a fundamental alteration.

24   Q    But what if, for example, Mr. Hartman just used the Text

25   To Speech device intermittently throughout the Step II CS

1  exam?  Assume that for the purposes of my question.  Would

2  the use of the TTS device, in some intermittent fashion,

3  fundamentally alter the NBME's ability to measure Mr.

4  Hartman's spoken English proficiency?

5          MR. WEINER:  Objection.  This testimony is

6  cumulative.  Dr. Katzafrakas is and also testified along

7  these lines and I believe Dr. Farmer had also testified.

8  This is now the third person to testify about fundamental

9  alteration.

10          MS. LEOPOLD-LEVENTHAL:  Well, actually, this witness

11  is testifying with respect to the measurement and grading

12  process.  The others were testifying actually with respect to

13  the skills that the Step is designed to assess.  So, I am

14  asking Dr. Clauser, who is our psychometrician, whether or

15  not intermittent use of the device would affect the

16  measurement of the set component.

17          THE COURT:  Well, I'll overrule the objection.  Go

18  ahead.

19          THE WITNESS:  I believe it would interfere with the

20  measurement.

21  BY MS. LEOPOLD-LEVENTHAL:

22  Q   And why is that?

23  A   Well, to go back to an answer that I believe I gave

24  before, the examination is designed to evaluate how an

25  examinee will behave, won't display all of these skills

1    simultaneously in a very realistic encounter.  And if I can

2    use another device so that I don't have to speak at a point

3    that I'm having trouble for one reason or another, be that

4    the cognitive effort required because I'm thinking about the

5    diagnosis or be that the emotional effort required because of

6    some aspect of the case.  The additional effort that might

7    lead to in terms of maintaining rapport, it's at those very

8    moments that we're most interested in seeing that you can

9    continue to speak fluently or at those very moments that

10   we're interested in seeing that you can continue to maintain

11   rapport.  So, it is this total performance throughout the

12   entire encounter that we're interested in evaluating.

13   Q   Are you able to identify, Dr. Clauser, what percentage

14   Mr. Hartman would have to actually speak versus using the

15   Text To Speech device, which would be enough to allow the

16   NBME to measure the set component?  What would be enough

17   spoken English?

18   A   I don't think that there's actually an answer to that,

19   because if you're using this device, you are more or less, by

20   definition, using it at the point that this cognitive load or

21   emotional load is at it's maximum, so, we're changing the

22   nature of the sample. It isn't just a question of having

23   enough samples of speech, it's having the samples of speech

24   over this entire range of the interaction and the difficulty

25   of that, the multi-tasking involved in doing these things

Clauser - Direct                                73

1    simultaneously.

2    Q    Plaintiff and his attorney have suggested that if

3    plaintiff used the Text To Speech device, he would actually

4    be able to communicate more and as a result, that would

5    increase your sample size.  Would that, then, if you consider

6    the Text To Speech intermittent use that way, allow the NBME

7    to measure the set component, if it actually enabled Mr.

8    Hartman to speak more?

9    A    It isn't a question of more.  As I've just said, it's a

10   question of being able to sample that speech throughout the

11   encounter so that you can see what the speech is like as the

12   other demands of the encounter are taking place.  So, it

13   isn't a question of simply more.

14   Q    Plaintiff and his attorney have also suggested that some

15   examinees speak less during the encounter and some examinees

16   might speak more.  Would you agree with that?

17   A    I'm sure they do.

18   Q    Well, if you have an examinee that speaks on the low end

19   of that, just a little bit and Mr. Hartman actually

20   articulates -- actually speaks more than that test taker, why

21   can't you then evaluate his spoken English, because he spoke

22   more than another test taker during that encounter?

23   A    Well, again, it isn't simply how much you speak.  Some

24   people are very chatty, they use a lot of words to say what

25   other people can say in brief phrases.  It isn't how much you

Clauser - Direct                                      74

1    speak, it's how you speak throughout this integrated

2    encounter.  Integrated in the sense that you have to be doing

3    all of these skills simultaneously.

4    Q    What impact, if any, would elimination of the set score

5    from Mr. Hartman's score report have, if you know?

6    A    My assumption is that eliminating the set score would

7    make it impossible to receive a passing score on the

8    examination.

9              MR. WEINER:  I'm going to object and move to strike,

10   your Honor.  The doctor just testified about an assumption.

11   It's not based on actual knowledge.

12             THE COURT:  I'll sustain the objection.

13   BY MS. LEOPOLD-LEVENTHAL:

14   Q    You're aware that the NBME has granted other applicants

15   with a speech disfluency additional time as an accommodation

16   on this examination, correct?

17   A    Yes.

18   Q    In fact, you understand that the NBME granted Mr. Hartman

19   time and a half for the entire clinical skills test, correct?

20   A    Yes.

21   Q    Assuming that those individuals were disabled, does the

22   NBME believe that granting a test taker additional time was

23   an appropriate accommodation?

24   A    Yes.

25   Q    And why is that?

Clauser - Direct                              75

1   A    I believe that the decision was made based on wanting to

2   allow the individual to display their skills, but still

3   maintain the basic integrity of the encounter.

4   Q    Does the NBME believe that granting a test taker double

5   time when they exhibit a speech disfluency fundamentally

6   alters the ability of the NBME to measure their performance

7   on this examination?

8   A    No.

9   Q    Are you aware that on one occasion, the NBME allowed a

10  hearing-impaired test taker to utilize a dual sign language

11  interpreter on the Step II CS exam?

12  A    I am.

13  Q    And does the NBME believe that use of a dual sign

14  language interpreter fundamentally alters assessment of the

15  skills on the Step II CS exam?

16  A    The NBME drew the conclusion that with that

17  accommodation, it was impossible to assess spoken English

18  proficiency.

19  Q    Why did the NBME, if you know, permit that accommodation

20  to the hearing-impaired test taker?

21  A    I believe that their intention was to allow that person

22  to display the skills that they were able to display and they

23  recognize that they would not be able to display that one

24  skill, it wouldn't be able to be measured.

25  Q    If Mr. Hartman used the Text To Speech device only to

Clauser - Direct                                          76

1   supplement his speech, can't the NBME score or evaluate or

2   assess Mr. Hartman's written English proficiency in

3   conjunction with his spoken English proficiency?

4   A   I think it's clear that the intention of the spoken

5   English proficiency score is to provide an assessment of

6   spoken English proficiency and it is well understood by the

7   content experts, who developed the test, that a spoken

8   English proficiency and reading and writing proficiency in

9   English are two very different things.

10  Q   And is a perspective medical doctor's written English

11  proficiency in part, assessed on other parts of the USMLE?

12  A   Written English proficiency is specifically assessed in

13  the context of the patient note or documentation score on the

14  clinical skills evaluation.

15  Q   If Mr. Hartman utilized the Text To Speech device, either

16  in part or throughout the entire examination, would measuring

17  the skills on the other two sub-components, ICE and CIS,

18  would they be affected or impacted by use of the TTS device?

19  A   I think that it's kind of likely that the ICE component

20  would be affected.  It may well be the case that the CIS

21  component would be affected.

22  Q   Would you agree with me that most United States and

23  Canadian examinees passed the sub-component?

24  A   Yes.

25  Q   Well, if this is the case, wouldn't you agree with me

1   that the Step II CS exam is really only weeding out those

2   international and medical students who have some sort of

3   accent that might be thick and difficult to understand?

4   A   It is my understanding that the committees that

5   established the test made an affirmative decision that

6   everyone needed to display the spoken English proficiency.

7   The fact that it wasn't displayed, it wasn't evaluated

8   earlier, is more likely to have to do with the fact that

9   there weren't that many people who would fail, not with the

10  fact that it wouldn't be important to identify those people.

11  My understanding is that there has, at least, been some U.S.

12  students who have failed in the past.  I don't know how many.

13  Q   Why does the NBME believe that spoken English proficiency

14  and communication with the patient and rapport building are

15  important skills to evaluate in determining whether or not a

16  particular individual should be licensed as a medical doctor?

17  A   There is a great deal of literature suggesting that being

18  able to communicate with patients and establish that rapport,

19  directly impacts patient outcomes.  That physicians who

20  communicate better and establish rapport are much more likely

21  to have compliance with treatment and they are much more

22  likely to have patients who make informed decisions about

23  their treatment.  And this again, is one of the primary

24  forces that led to introducing this examination.

25  Q   Thank you, Dr. Clauser, no further questions.

1          THE COURT:  Shall we take a recess before you
2    cross-examine?
3          MR. WEINER:  I would appreciate that, your Honor.  I
4    was about to ask for one.
5          THE COURT:  All right, we'll take ten minutes.
6          (Court in recess 11:08 to 11:29 o'clock a.m.)
7          THE COURT:  Does it seem chilly in here or is it --
8          MR. WEINER:  I'm comfortable, but I know --
9          THE COURT:  It is chilly, yes.
10         MS. LEOPOLD-LEVENTHAL:  It is chilly.
11         THE COURT:  I'm going to see if we can get in touch
12   with the landlord.  Be right back.
13         (Court in recess 11:29 to 11:37 o'clock a.m.)
14         THE COURT:  Please sit down.  I'm not sure how quick
15   a response we'll get, but we'll try.  All right, Mr. Weiner.
16         MR. WEINER:  May I, your Honor?
17         THE COURT:  Go ahead.
18                        CROSS-EXAMINATION
19   BY MR. WEINER:
20   Q   Good morning, Dr. Clauser.  We haven't had an opportunity
21   to meet.  I'm Charles Weiner and I represent Mr. Hartman.
22   A   Good morning.
23   Q   Is it fair to say that you're unable to state that Mr.
24   Hartman's disability was not a factor in his performance on
25   this Step II CS examination?

1          THE COURT:  The question, as I understand it was, is

2    the witness unable to say that the disability was not a

3    factor?

4          MR. WEINER:  Yes.

5          THE COURT:  I always have to work my way through

6    double negatives, but we'll -- all right.

7          THE WITNESS:  In the very strict sense of that, yes.

8    Q    Are you familiar with the USMLE composite committee?

9    A    Yes.

10   Q    And what is its purpose?

11   A    The composite committee contains representatives of the

12   organizations that put on USMLE and they make policy

13   decisions that are at a higher level than those that are made

14   by the individual committees managing the specific

15   examinations.

16   Q    Then there would be a representative from the NBME on the

17   composite committee, is that correct?

18   A    There would.

19   Q    Are you one of the members of the composite committee?

20   A    I am not.

21   Q    Have you ever been?

22   A    No.

23   Q    Have you ever been an advisor to the composite committee?

24   A    Insofar as I have been advisor to the NBME

25   representatives, they perhaps would say yes.  I'm not aware

1    that there are formal advisors.

2    Q    Have you made any presentations to the composite

3    committee?

4    A    No.

5    Q    Were you present at the January 16 through 18, 2004

6    composite committee retreat?

7    A    No.

8    Q    Do you ever view any of the composite committee reports

9    to get an understanding of what policy decisions have been

10   made?

11   A    Yes.

12   Q    Did you review the minutes from the composite committee

13   retreat that took place in January 16th through 18th, 2004?

14   A    Without knowing the specifics of the content, I couldn't

15   tell you based only on a date.

16   Q    I'd like you to go to the plaintiff's binder.  That's the

17   binder that is black in front.  And turn to Tab 26.

18          (Pause.)

19   A    Yes.

20   Q    Do you recognize this as being the minutes from the

21   January 16 through 18, 2004 composite committee retreat or at

22   least, a redacted version of it?

23   A    I recognize it because that's what it says.  I'm

24   certainly familiar with the content as something that was

25   discussed in some detail at the national board in preparation

Clauser -  Cross                          81

1   for the discussions by the composite committee.

2   Q   If you turn to the third page.  There is a middle

3   paragraph identified or with the header of signers and

4   assisted communication devices, ACDs.  Do you see where I'm

5   reading from?

6   A   Yes, I do.

7   Q   And in this report, it says staff and sub-committee

8   members discussed the fact that signers or ACDs, example Text

9   To Speech device, might vary in appropriateness as an

10  accommodation, depending on the direction of the

11  communication.  For example, for the purposes of

12  communications from SP to the examinee, there seems to be

13  some agreement that such accommodations might be appropriate.

14  However, allowing a signer or ACD as part of the

15  communication from the examinee to the SP, may make it

16  difficult for the SP to assess the examinee on such things as

17  history taking, communication or interpersonal skills.  The

18  use of these accommodations for communication from examinee

19  to SP, has not yet been resolved.  Is that -- was that your

20  understanding of the report data of the composite committee

21  back in January, 2004?

22  A   Yes.

23  Q   And if we turn to Tab 28 of plaintiff's binder.  These

24  are the redacted minutes from a June, 2004 meeting of the

25  composite committee.  Do you recognize this?

                          Clauser - Cross                    82

1          THE COURT:  Maybe, if you're going to address this,
2    Mr. Weiner and I won't interrupt, at this point.  But you're
3    moving to another tab, which tab is that?
4          MR. WEINER:  Yes, I'm sorry, your Honor, it's Tab
5    28.
6          THE COURT:  All right, go ahead.
7    Q    And do you recognize this as being the minutes of the
8    June, 2004 composite committee meeting?
9    A    I imagine they are.
10   Q    Is there any statement in these minutes, indicating
11   whether or not the concern expressed in the January minutes,
12   has been resolved with respect to use of ACDs, such as Text
13   To Speech?
14   A    I'm not familiar with the specific decision regarding
15   that, so, I'd have to review these.
16   Q    Please do.
17          (Pause.)
18   A    I don't see this directly addresses the use of a device.
19   Perhaps I missed something.
20   Q    My question is, would you agree that there's no mention
21   of any decision with respect to ACDs or Text To Speech in the
22   June, 2004 meeting minutes?
23   A    There doesn't appear to be.
24          MR. WEINER:  And your Honor, just to retrace my
25   steps, I'd like to mark as Exhibit 22, the document contained

                          Clauser -  Cross                    83

1    under Tab 26.

2               THE COURT:  All right.

3               (Plaintiff's Exhibit 26 admitted in evidence.)

4               MR. WEINER:  And I would like to mark as Exhibit 23,

5    the document contained under Tab 28.

6               THE COURT:  All right.

7               (Plaintiff's Exhibit 23 admitted in evidence.)

8    Q    Doctor, can you turn now to the document contained under

9    Tab 30 and please take however much time you need to review

10   that document, as well.

11              (Pause.)

12   A    I believe I'm familiar with this.

13   Q    All right.  And would you agree that there is no mention

14   in the January 2005 minutes of any decisions with respect to

15   ACDs and Text To Speech?

16   A    That's correct.

17   Q    Now, these are the latest minutes that I have received

18   from the composite committee from defendant's counsel.  Are

19   there no other minutes of the composite committee after

20   January, 2005?

21   A    I would presume that there are minutes.

22   Q    Are there any decisions in those minutes with respect to

23   ACDs or Text To Speech?

24   A    Since I don't attend those meetings, I wouldn't have a

25   way of actually knowing that.

Clauser - Cross                          84

1    Q    Are you aware of any decision, at any meeting subsequent

2    to January of 2005, regarding decisions on use of ACDs or

3    Text To Speech by the composite committee?

4    A    I'm not aware of them having a discussion on that topic.

5    Q    Are you on the Step II committee?

6    A    I am not.

7    Q    And referring to the document contained under Tab 30?

8    A    Mm-hmm.

9    Q    And looking at the second page under the heading, Update

10   on Testing Accommodations for Step II CS.

11   A    Yes.

12   Q    It states there, Dr. Dillon provided an update on recent

13   efforts by staff and the Step II committee, to consider

14   whether a certain testing accommodation, i.e., the sign

15   language interpreter for communications for the examinee to

16   the standard patient, might alter the communication and

17   interpersonal skills CIS component of the Step II.

18            THE COURT:  I'm sorry, which -- where are we now?

19            MR. WEINER:  We are under Tab 30 and this is page

20   two.

21            THE COURT:  Tab 30, page two.

22            (Pause.)

23            THE COURT:  Oh.

24            MR. WEINER:  Okay, your Honor, I wasn't sure if you

25   wanted me to proceed.

1          THE COURT:  I'm sorry, I didn't --

2    Q    Dr. Clauser, did you see where I was reading from there?

3    A    Yes.

4    Q    Okay.  And further down in that same paragraph, it says,

5    "the composite committee approved the recommendation of the

6    Step II committee that the CIS sub-component can be reported.

7    Provided that the score report and transcript are annotated

8    to reflect the accommodation."  Was that your understanding

9    of the composite committee's decision?

10   A    Yes.

11   Q    So, at that time, the composite committee made a policy

12   decision that when one has a two-way sign language

13   interpreter, that the CIS sub-component can be reported, is

14   that correct?

15   A    Yes.

16   Q    And that what would be done in terms of the score report,

17   is it would be annotated to reflect that type of an

18   accommodation, correct?

19   A    That's correct.

20   Q    And if we go, still on page three, to the last sentence,

21   I believe, it says, "the composite committee determined that

22   the pass/fail status for such individuals will be pass, ICE

23   and CIS only.  That the score report and transcripts will

24   indicate that this status will be determined by the

25   performance on the CIS and ICE sub-components only.  And that

Clauser - Cross                          86

1    the score report and transcripts will be annotated to reflect

2    the testing accommodations."  Do you see where I'm reading?

3    A    Yes, I do.

4    Q    So, for an individual who has received a two-way sign

5    language, they will be scored on the CIS sub-component and

6    the ICE sub-component, correct?

7    A    Yes.

8    Q    And that the test would reflect that the individual

9    received a sign language interpreter on their score report,

10   is that correct?

11   A    Correct.

12           MR. WEINER:  And I would like to have the document

13   under Tab 30 marked as Exhibit 24, your Honor.

14           THE COURT:  Fine.

15           (Plaintiff's Exhibit 24 admitted in evidence.)

16   Q    Doctor, I'm trying to get a bit of a visual of the score

17   sheets that you've referred to, that these standardized

18   patients use.  Is this a single piece of paper or multiple

19   pieces of paper?

20   A    I actually think they do this on a computer.

21   Q    Okay.  So, what occurs is the standardized patient is

22   examined by a student and then they leave the exam room and

23   put their scores into a computer?

24   A    The examinee leaves the room and the standardized patient

25   moves to the computer and enters their scores.

1  Q   All right.  How many different, let's say, under the SEP

2  section, how many different criteria is the standardized

3  patient putting the one through nine number system to?

4  A   What they have is a list of descriptors that is their --

5          THE COURT:  Excuse me, just one second.

6          (Pause.)

7          THE COURT:  My apologies, there is -- which I had

8  neglected to note was due at noon,  not a very long one.

9  It's a matter of swearing somebody in to our District Court

10  bar.  But I am going to have to take, I'm sorry, a ten-minute

11  recess and this time, I do mean ten minutes.

12          MR. WEINER:  Will that be in this courtroom?

13          THE COURT:  No, nothing that needs to disturb any of

14  you.  But it's an accommodation I would appreciate.

15          (Court in recess 11:58 to 12:09 o'clock p.m.)

16          THE COURT:  All right.

17          MR. WEINER:  May I proceed, your Honor?

18          THE COURT:  Please.

19  Q   Dr. Clauser, you, before the break, had indicated that on

20  the score sheet or on the computer screen, there's a list of

21  descriptors that the standardized patient put some type of a

22  numerical rating to, is that correct?

23  A   That's correct.

24  Q   And are the descriptors segmented by the different, the

25  three different assessment areas, such as SEP, CIS and ICE?

Clauser - Cross                                88

1   A    No, we're talking about a specific scale.  So, there will

2   be a spoken English scale and the descriptors are all within

3   that scale relevant to spoken English proficiency.   The

4   descriptors in the communication and interpersonal skills

5   scales, those three scales are specific to the components of

6   those three scales.  So, information gathering, information

7   sharing and professional manner and rapport, in that case.

8        The data gathering aspect of this is not one of

9   those scales.  It's, as I mentioned before, a checklist that

10  shows whether you actually did ask specific questions or not.

11  Q    Okay.  And so, the standardized patient would know, in

12  terms of attributing some type of a rating, whether it was an

13  SEP sub-component that they were scoring, as opposed to a CIS

14  sub-component issue --

15  A    Yes.

16  Q    -- they were scoring, is that correct?

17  A    That's correct.

18  Q    So, under the SEP, how many descriptors are there that

19  are rated by the standardized patient?

20  A    I couldn't tell you without actually looking at the form.

21  There are several descriptors though, that describe how

22  difficult it is to understand the speech fluency, choice of

23  words and that sort of thing.  The descriptors are, however

24  to remind the standardized patient of the training they've

25  had and what the scale actually means.

1   Q    And for each descriptor, is there a numerical rating that

2   the --

3   A    No.

4   Q    Okay, what is it that they give a numerical rating to?

5   A    They give an overall numerical rating to that scale. In

6   the case of spoken English, it is an overall numerical rating

7   that reflects the individual's speech in the context of that

8   encounter.

9   Q    Okay, so, they're not looking at, for example, these

10  various descriptors and saying, I had difficulty listening to

11  the test taker, I'll give him a nine on this.  The test taker

12  had to repeat himself five or six times, I'll give him a nine

13  for that.  It's not scored that way, am I correct?

14  A    That's correct.

15  Q    It's just one numerical rating for the SEP section,

16  correct?

17  A    That's correct.  Well, it's one numerical rating times 11

18  different standardized patients, yes.

19  Q    Are you familiar with the Committee to Evaluate the USMLE

20  Program?

21  A    Yes.

22  Q    And did they prepare a report on their recommendations in

23  June of 2008?

24  A    I know they prepared a report.  I couldn't speak to the

25  date associated with it.

1          (Pause.)

2          MR. WEINER:  May I approach the witness, your Honor?

3          THE COURT:  Please, go ahead.

4     Q    I'm showing you a report which is entitled Comprehensive

5     Review of USMLE.  Doctor, can you take some time to take a

6     look through this report?

7     A    Sure.

8          MS. LEOPOLD-LEVENTHAL:  Objection, your Honor, I

9     don't know that Mr. Weiner has laid any foundation.  Dr.

10    Clauser has said he's familiar with the fact that a report

11    was generated, but unless he has some familiarity with this

12    particular report, I don't know that any questions that he

13    would be asked right now, are either relevant or within the

14    scope of what he has a foundation for.

15         MR. WEINER:  I was about to ask if he was familiar

16    with the report, but will do so after he reviews.

17         THE COURT:  All right.

18         MS. LEOPOLD-LEVENTHAL:  Could we, perhaps, have him

19    ask the witness that before he spends a lot of time

20    familiarizing himself with it.  If he's never seen it before,

21    I don't know what he could say about it.

22         MR. WEINER:  That's fine with me, your Honor.

23         THE COURT:  Okay.

24    BY MR. WEINER:

25    Q    Dr. Clauser, have you seen and reviewed this report

1    before?

2    A    I have not reviewed the report.  I'm familiar with the

3    work of the committee.

4    Q    Okay.  And would the work of the committee be summarized

5    in this particular report?

6    A    Yes.

7    Q    And do you know whether or not this report is available

8    on NBME's website?

9    A    I would assume that it is.

10              (Pause.)

11   Q    Were you on the committee that provided this report?

12   A    My recollection is that this was an external committee.

13   Q    Were you involved, at all, in the findings or

14   recommendations that were made by this committee?

15   A    I was present at many of the meetings.  I wouldn't have

16   been involved in actually producing the report.

17   Q    I would like you to turn to page five of this report.

18   And I'm looking under the column, review of survey data.

19   A    Yes.

20   Q    It says, "Staff and CEUP" (ph) and CEUP is an acronym for

21   the committee, correct?

22   A    Yes.

23   Q    "Staff and CEUP member review of the data gathered

24   through surveying revealed some general trends described

25   below."  Were you part of the staff that's referred to in

1   that particular sentence?

2   A    No.

3   Q    Is the information contained in this report something

4   that your staff would be involved in?

5   A    My staff?

6   Q    Yes.

7   A    No.

8   Q    Why is that?

9   A    This is the kind of thing that would have been handled in

10  another part of the organization.

11  Q    Under number two --

12              THE COURT:  Another part of your organization?

13              THE WITNESS:  Correct.

14  Q    Under number two, in the same column, there's a statement

15  there and it says, "qualify of USMLE in assessing knowledge

16  and skills needed for licensure, there was sense that UMLE

17  did a good job in assessing all of these areas with the

18  exception of the Step II CS."  Were you aware of that

19  particular finding from this report?

20  A    I'm not sure what you mean by finding.  What I believe

21  this is telling us is that that is the impression of external

22  individuals or groups and not a decision by this committee.

23  Q    All right, so, the impression by this outside review

24  group --

25  A    No.  No, this is our survey data, so, they are -- when we

1   went out into the community, if you will, that is to say, to

2   survey individuals or have meetings with groups that these

3   are some of the points that individuals external to the

4   organization and by and large, individuals who would know

5   nothing about the specifics of the assessment.  This would

6   represent their opinion.

7   Q    The individuals that you're referring to, are they

8   physicians?

9   A    They may very well have been medical students, deans, who

10  would have a concern that as many of their students as

11  possible passed the test.  A broad group of people who have

12  specific interests and are constituency groups in that we

13  reach out to them.  But people who have clear interests that

14  are often at odds and very strongly at odds with protecting

15  the public.

16  Q    Are you saying medical schools are not interested in or

17  have different views that the NBME has with respect to

18  protecting the public?

19  A    I can tell you that when we survey student affairs deans,

20  they all believe that the cut score should be lowered because

21  the very fact that they graduated a student means that they

22  must be eligible to receive a license.  And other

23  constituency groups have very different points of view.  And

24  the wise, I believe, individuals who staff the external

25  committee who actually establish the cut scores, have very

1    different points of view.  So, and again, students, if you

2    ask Step I students whether the standards, people who have

3    taken Step I, whether the standards for Step II are too high,

4    they haven't taken that yet.  They're likely to say yes.  If

5    you ask them whether the standards for Step I were too high,

6    they're likely to say no, because they've already passed.  We

7    see clear patterns of people responding in their own personal

8    perspective.  It also happens to be their personal self

9    interest, whether the two are clouded, I can't say.  But

10   medical education, as political an activity as most other

11   activities and you get all kinds of perspectives.

12   Q    It sounds like you've done some surveying of the various

13   groups yourself?

14   A    Yes.

15   Q    Okay.  And the survey referred to here, these are surveys

16   done of individuals who are associated with the medical

17   profession, is that correct?

18   A    I imagine they were.

19   Q    All right, so, it might be deans of different medical

20   schools, correct?

21   A    It might be.

22   Q    And it might be students in medical school, correct?

23   A    It might be.

24   Q    And it might be physicians who are practicing medicine,

25   is that correct?

                          Clauser - Cross                    95

1   A    Might be.

2   Q    Okay.  Thank you, that's all I have, your Honor.

3             MS. LEOPOLD-LEVENTHAL:  No redirect, your Honor.

4             THE COURT:  No redirect?

5             MS. LEOPOLD-LEVENTHAL:  No redirect.

6             THE COURT:  All right, I think you are excused, Dr.

7   Clauser, thank you very much.

8             (Pause.)

9             MR. WEINER:  Your Honor, one bit of housekeeping,

10  there was a document which was presented to Mr. Hartman by

11  defendant's counsel when he was on the stand and I was under

12  the belief it was put in as an exhibit and it wasn't.

13  Counsel and I have stipulated that this document can be

14  introduced and there won't be a need to have Mr. Hartman come

15  up and --

16            THE COURT:  I see.

17            MR. WEINER:  -- to testify about the document.

18            THE COURT:  All right.

19            MR. WEINER:  And this document will be marked as

20  Exhibit 25.

21            THE COURT:  Plaintiff's 25?

22            MR. WEINER:  Yes, your Honor.

23            THE COURT:  What is that document?

24            MR. WEINER:  It is an October 5th letter from Dean

25  Chondrin of Stoney Brook University Medical Center,

1    concerning the licensing requirements.

2            (Pause.)

3            THE COURT:  All right.

4            MS. LEOPOLD-LEVENTHAL:  Defense rests, your Honor.

5            THE COURT:  Well, how do counsel wish to proceed?

6    Is it, now that we've completed all the testimony, is it your

7    wish to have argument?

8            MR. WEINER:  Yes, your Honor.

9            THE COURT:  Well, it will be 12:00 o'clock.  Should

10   we -- do you want to commence argument now, with a view of

11   recessing at 12:30 or thereabouts or would it not be sensible

12   for -- oh, it's already, I'm sorry, I guess I misread that

13   clock.

14           MS. LEOPOLD-LEVENTHAL:  I'm not sure what your

15   schedule is or how hungry your are.  Mr. Weiner and I are

16   both happy to finish our closing now and then be finished.

17   If you'd like to take a lunch breach, that's certainly up to

18   you.

19           THE COURT:  Well, how long would anticipate your

20   arguments would be?

21           MR. WEINER:  I surmise my argument is probably in or

22   around ten or 15 minutes, your Honor.

23           THE COURT:  10 or 15 minutes.

24           MS. LEOPOLD-LEVENTHAL:  Maybe about 20.

25           THE COURT:  Well, let's go ahead then, now.

1          (Pause.)

2          MR. WEINER:  Your Honor, we are here requesting that

3    the Court grant the plaintiff's motion for a preliminary

4    injunction.  In order to establish the necessary elements of

5    a preliminary injunction, three elements must be -- four

6    elements must be met.

7          First, Mr. Hartman's -- that Mr. Hartman is likely

8    to succeed on the merits.  Two, that Mr. Hartman is likely to

9    suffer irreparable harm in absence of the preliminary relief.

10   Three, that the balance of equities tips in Mr. Hartman's

11   favor and four, an injunction is in the public interests.

12         In order to establish the merits, we first go to the

13   Americans With Disabilities Act, which requires that private

14   entities, such as NBME, that administer examinations, do so

15   in place and manner accessible to persons with disabilities

16   and offer alternative accessible arrangements for such

17   individuals.

18         The regulations that codify that particular

19   provision indicate and this is Regulation 29 CFR,

20   36.309(b)1(i), which mandates that the "examination is

21   selected and administered so as to best ensure, to best

22   ensure that when the examination is administered to an

23   individual with a disability that impairs sensory, manual or

24   speaking skills, the examination results accurately reflect

25   the individual's aptitude or achievement level, rather than

98

1    reflecting the individual's impaired sensory or manual

2    speaking skills."

3          The regulation further mandates, your Honor, that

4    NBME provides appropriate auxiliary aids for persons with

5    impaired speaking skills, unless they can demonstrate that

6    offering a particular auxiliary aid would fundamentally alter

7    the measurement of the skill or knowledge the examination is

8    intended to test or would result in an undue burden.

9          In the context of testing accommodations, plaintiff

10   establishes a prima facia case when plaintiffs shows, one, he

11   is disabled.  Two, the request is reasonable, the request for

12   the accommodation is reasonable.  And three, that the request

13   has been denied.  There has been absolutely no dispute that

14   Mr. Hartman is disabled.  We have heard testimony from Mr.

15   Hartman, certainly just observing his testimony, that can be

16   determined.  We've heard the expert testimony, unrefuted

17   expert testimony of Dr. Tetnowski, that he is disabled and in

18   fact, his speech is severe, as he has a severe disfluency as

19   Dr. Tetnowski had testified.  And even Dr. Farmer had

20   concluded that Mr. Hartman has demonstrated to her

21   satisfaction that he is a person with a disability.

22         There is no dispute that the Text To Speech has been

23   denied as an accommodation.  We have heard throughout this

24   trial, throughout this hearing, excuse me, that the Text To

25   Speech was being denied by the NBME.

99

1          So, the only issue that appears to be in dispute, in

2   terms of plaintiff's prima facia case, is whether or not that

3   request is reasonable.  The determination of whether

4   modification is reasonable involves fact-specific case by

5   case inquiry.  That considers, among other factors, the

6   effectiveness of the modification and the cost to implement.

7   And that was the decision that was rendered in D'Amico versus

8   New York Board of Law Examiners.

9          The regulations on this particular issue, which is

10  28 CFR, Part 36, Appendix B, states, "the auxiliary

11  requirement is a flexible one."  And various alternatives may

12  be considered "as long as the result is effective

13  communication.  The central question is whether or not the

14  individual with the disability is able to employ an effective

15  method."  And the emphasis here is on effective

16  communication.

17         Dr. Tetnowski had testified, your Honor, that due to

18  the severity of Mr. Hartman's speech, that additional time is

19  just simply not an effective method of communicating for him

20  at the present.  There has been no expert testimony, no

21  consultant, no one from NBME's perspective, who has reviewed

22  any of the reports from Dr. Tetnowski to state otherwise.

23  There has been no one who has evaluated Mr. Hartman

24  presently, to state otherwise.  And Dr. Tetnowski had

25  indicated and had testified that Mr. Hartman is severely

1    impaired.  In fact, he is one of the most impaired

2    individuals he has encountered in his practice.

3         He had also indicated and noted that the rate of

4    speech is eight times slower and that blocks last as long as

5    two minutes.  There has been no testimony here presented that

6    indicates that double time would be effective.

7         Because of this determination -- because of the

8    determination whether an accommodation is reasonable, one

9    should be reviewing, the Court should be reviewing the

10   medical or professional opinion.  And the Court relies upon

11   those opinions, particularly of the claimant's evaluator and

12   that claimant's evaluator is to be given or accorded great

13   weight.  And that's also contained in the D'Amico decision.

14        In NBME's defense as to the reasonableness of the

15   accommodation is really based on the fact that he has

16   received double time accommodations for numerous oral

17   examinations as well as some clinical examinations while he

18   was in medical school.  That data is old data.  It was based

19   on a 2007 report from Ms. Oldemier, which is contained in the

20   exhibits.  That particular report notes that Mr. Hartman's

21   speech, at that particular point in time, was moderate

22   disfluency.  Dr. Tetnowski has indicated, based on his

23   evaluation, that has completely changed in numerous respects.

24        Ms. Oldemier's report indicated that Mr. Hartman's

25   disfluency often contains blocks on the average of three

1    seconds.  It's much more significant presently.  Ms.

2    Oldemier's report indicates that Mr. Hartman has a more

3    difficult time reading, rather than producing spontaneous

4    speech.  That's completely different from the present.

5           So, in terms of assessing Mr. Hartman's performance

6    on all examinations, the clinical examinations that occurred

7    several years ago in medical, that's simply not an

8    appropriate comparison.  Secondly, Mr. Hartman testified in

9    great detail regarding the numerous differences between the

10   Step II CS examination, as well as every examination he had

11   taken while he was in medical school.  Some of those

12   differences were particularly key to the ability that he has

13   -- to the manner in which he is assessed and the manner in

14   which he is able to communicate.  One of those big

15   differences is that the standardized patients or perhaps, the

16   acting patients that are utilized in medical school were

17   individuals who were familiar to him.  And Mr. Hartman's

18   stutter is not as severe when speaking with individuals who

19   are familiar to him.

20          Whereas, the standardized patients utilized on the

21   Step II CS would be entirely unfamiliar to him, as he

22   testified in speaking with strangers, his speech becomes much

23   more disfluent.  So, there is really no comparison between

24   the exams in which he received double time several years ago

25   and the Step II CS exam, which is to be administered

1    presently.

2           (Pause.)

3           MR. WEINER:  Furthermore, your Honor, Mr. Hartman

4    has established that the Text To Speech is effective.  He

5    testified at allows him to feel more relaxed, knowing there

6    is an auxiliary aid that allows him to get through a long

7    block.  He indicated that it would likely put the patient at

8    ease, because it wouldn't put them on edge when dealing with

9    one of the blocks that he encounters.  Furthermore, your

10   Honor, it provides no advantage, whatsoever, to Mr. Hartman

11   when compared to other test takers.

12          One thing I'd like to bring to your Honor's

13   attention, is on February 4th, a California District Court

14   granted a preliminary injunction for a plaintiff who sued the

15   National Conference of Bar Examiners for certain

16   accommodations.  I'm going to hand up a copy of the opinion

17   to your Honor and provide one to opposing counsel.

18          The case recently decided is Enyart (ph) versus the

19   National Conference of Bar Examiners.  And the considered

20   issues of preferred accommodations that Ms. Leopold-Leventhal

21   had mentioned to you the other day.  And it considered the

22   same issues that your Honor will be faced with in terms of,

23   with the exception of fundamental alteration, it dealt with

24   many of the same issues such as irreparable harm and the

25   balancing of equities, as well as the public interest.  So,

1   this is an opinion which is very current and discusses many

2   of the issues that your Honor will be faced with.

3         THE COURT:  I'm sorry, did you say it does not

4   address questions of fundamental alteration?

5         MR. WEINER:  No, it does not, your Honor.  In the

6   Enyart case, plaintiff who has a vision impairment received

7   accommodations which he was in law school, as well as

8   previously, which were similar or the same type of

9   accommodations that were approved by the National Conference

10  of Bar Examiners.  She was looking for an additional or an

11  enhanced accommodation that reflected a more modern

12  technology for her to use when taking the bar examination.

13  The court reviewed her prior accommodations and found that

14  because of the differences, that those accommodations can't

15  be -- those accommodations are not appropriate accommodations

16  and that the accommodations that they were requesting in that

17  case were the appropriate accommodations.

18        With respect to the fundamental alteration, once

19  plaintiff has established a prima facia case, the burden then

20  shifts to defendant to either provide the accommodation or

21  prove that the accommodation creates a fundamental

22  alteration.

23        The only section or sub-component of this exam that

24  defendant can honestly claim a fundamental alteration to is

25  the SEP.  We have provided in defendant's answers to

1    plaintiff's interrogatories, which is contained under Tab 32,

2    the answers in four and five.  Those interrogatories indicate

3    that only the SEP is being affected or that they are claiming

4    is being fundamentally altered.  So, accordingly, the

5    speaking is not a required part of either the CIS or ICE

6    component.  I would like to note that the SEP, historically,

7    the experience or pass rate on this exam for American

8    students is 100 percent.

9        The cases involving fundamental alterations have

10   either involved a plaintiff's request to change the manner in

11   which the exam is scored or that the plaintiff has requested

12   the entire elimination of a particular section on the exam.

13   Mr. Hartman is not requesting that the score be altered with

14   the use of Text To Speech.  Nor is he requesting that the SEP

15   component be removed as a section on which he can be assessed

16   on.  We believe that Mr. Hartman can be assessed.  You heard

17   him speak here for roughly ten to 12 hours, your Honor.

18   Certainly it can be determined that he speaks English.

19       We believe that the testimony of Dr. Clauser and Dr.

20   Katzakaras with, where they say it minimizes the sample,

21   there is no amount of speech that is required on this

22   particular exam.  There is no threshold, there is no minimum.

23   If one speaks a lot, if one speaks a little, one can be

24   assessed.  If Mr. Hartman is utilized -- is speaking and

25   utilizes on an occasional basis, the Text To Speech,

105

1    certainly the standardized patient can assess that.  I had

2    asked Dr. Clauser how detailed are the assessments or

3    numerical value that these standardized patients place on the

4    SEP portion and it's just one overall score.  So, when Dr.

5    Clauser talks about that it's these transitions that are

6    important, I don't believe that that's the case, your Honor.

7    I think it seems a bit contrived and over intellectualizing

8    what it is these SEPs are doing.  It's merely a matter of

9    them of understanding whether or not the person is speaking

10   clearly and whether or not it is the ease at which they have

11   to deal with the examinee being tested.

12          I'd also like to note that --

13          THE COURT:  I guess I have to ask you precisely what

14   is the request that you make on Mr. Hartman's behalf?  As I

15   understand it, the focus is to authorize Mr. Hartman to use

16   the Text To Speech mechanism intermittently.  And then is

17   there -- your contention is that and the scoring process not

18   be affected.

19          MR. WEINER:  We're not asking that the scoring

20   process be affected.  We believe that the standardized

21   patients will be assess his spoken English proficiency,

22   because he will, indeed, be speaking.  Just as we observed

23   him in court, he spoke, he utilized his Text To Speech.  I

24   think we all can assess and determine that Mr. Hartman does,

25   indeed, speak English and when he does, it's clear.

1          THE COURT:  Am I not right that to the extent that

2     this morning we were able to get the committee's assessment

3     of all of this -- a combined committee, is that what it's

4     called?

5               MR. WEINER:  I'm sorry, your Honor?

6               THE COURT:  Is it combined committee?

7               MR. WEINER:  Composite committee.

8               THE COURT:  Oh, composite committee.  The composite

9     committee thought that the use of auxiliary aids of one sort

10    or another, could well be found to be appropriate, but that

11    the report of the examination should state that the

12    accommodation of whatever sort was utilized and that that

13    report also should be noted on the transcript by which, I

14    suppose, I mean the student transcript.

15              Now, are you taking exception to that?

16              MR. WEINER:  No, I'm not, your Honor.  That

17    particular determination in terms of the report was really

18    referring to use of two way sign language.  So, in the

19    context of signing, here is an individual and it would appear

20    that moving forward, that the NBME would view it the same way

21    in light of the composite committee's recommendation, that

22    with a two way sign language, that individual is not speaking

23    at all.  So, the SEP is not being assessed at all.  They will

24    receive the score for the CIS and the ICE portion and their

25    score would be marked to indicate the nature of their

107

1    accommodation.  We feel that that would be appropriate with

2    Mr. Hartman, as well.  We feel though, that they can and

3    should be able to assess his spoken English proficiency.

4           THE COURT:  Well, when the composite committee says,

5    as I understand it to say, you tell me if I've got it wrong,

6    that the report should note the conditions under which the

7    examination was taken, but should not designate a pass or

8    fail with respect to that component.

9           MR. WEINER:  If the person isn't speaking, I think

10   that that's what the composite committee had determined.

11   That was with respect to a person who was using exclusively

12   sign language.  So, that's correct.  But the person would

13   receive a pass or fail on the CIS and ICE sub-components.

14          THE COURT:  So, you think the consensus with respect

15   to the non-assessment relates -- the non-assessment

16   accompanied by a report of the accommodation, relates for our

17   purposes, only to the signing accommodation?

18          MR. WEINER:  No, your Honor, I think it certainly

19   would be appropriate if your Honor would enter an order

20   granting the accommodation that NBME can identify the type of

21   accommodation that Mr. Hartman receives.

22          THE COURT:  But one step further and here I'm not

23   sure that I know your position.  Would you quarrel with the

24   conclusion, if it were the conclusion, that the report should

25   be made, as it is, descriptively of how the examination

1    should be -- was taken, but should not report a result of

2    passing or failing with respect to that aspect?

3            MR. WEINER:  If I understand your Honor's question,

4    are you asking whether if Mr. Hartman were to take -- be

5    granted use of Text To Speech, that he would be scored on the

6    CIS and ICE portion, but not the SEP and his report would

7    reflect that?

8            THE COURT:  That's what I'm asking now.

9            MR. WEINER:  I think that's certainly an alternative

10   that your Honor can order.  I believe that, you know, my

11   first line argument is I believe they can assess his spoken

12   English proficiency, so they don't need to go there.  But if,

13   for example, the standardized patients determined that they

14   were unable, for whatever reason, to assess his spoken

15   English proficiency, then that would be the result, your

16   Honor, that he not be scored and that be reported

17   accordingly.

18           THE COURT:  At least, a part of my question suggests

19   that your assessment of how an examination should be graded,

20   may have very solid grounding in common sense.  And assume

21   for purposes of discussion, that I would agree with you,

22   instinctively, that one ought to be able to measure spoken

23   English proficiency rather simply.  But the board supported,

24   we'll say, by the composite committee, they feel otherwise.

25   And I suppose, at that point, the question arises whether a

1   Court, in determining what is a reasonable accommodation, is

2   in a position to override the test giver's assessment of how

3   to measure the results.

4           MR. WEINER:  I think the Court is empowered to do

5   that, because the Americans with Disabilities Act, as one of

6   its goals, is to end discrimination.  If the composite

7   committee is discriminating against a class of citizens and

8   in this case, individuals who have speech impairments, then

9   the Court is empowered to, by virtue of its -- by virtue of

10  the Americans with Disabilities Act.

11          THE COURT:  All right.

12          MR. WEINER:  The next step of the -- or the next

13  prong, in analyzing whether or not to grant a preliminary

14  injunction, is to determine whether there is irreparable

15  harm.  Mr. Hartman has clearly showed irreparable harm if the

16  injunction is not granted.  He won't graduate.  He'll have to

17  re-enroll, that's at a cost of $25,000.  He'll lose out on

18  all his efforts in studying.  Not only all the efforts of

19  studying throughout the four years of medical school, but all

20  the efforts he had put into studying for this particular

21  examination.  He'll be denied a residency, as well as the

22  stigma and the impact associated with that particular

23  failure.

24          THE COURT:  Are we talking about denial or delay?

25          MR. WEINER:  Your Honor, it could be both, because

110

1    there is no guarantee that, let's say for example, Mr.

2    Hartman were to fail a second time.  Clearly he will not get

3    into his residency this year.  And there's a serious question

4    whether or not he would ever be able to get into one after

5    that.  He would have to demonstrate his qualifications and he

6    would be in a class of a new set of students.  The purpose of

7    the match is to match the medical students that are currently

8    enrolled.  So --

9              THE COURT:  Don't --

10             MR. WEINER:  -- it could be a denial.  I would

11   think, I think there's really no difference.  I think a delay

12   of this nature, I mean, this is employment, this isn't just a

13   small delay, but it could be a delay of employment or it

14   could be a total denial of employment.  But one of this

15   nature, I think, rises to the level of irreparable harm.

16             THE COURT:  Is it your understanding, does the

17   record tell us this, if it be the case that Mr. Hartman can

18   take the examination on Wednesday of this week.  If it be the

19   case that the examination can't be graded until April 21,

20   because the grading requires an assessment of Mr. Hartman's

21   examination together with whatever it is, the 80 or 200 or 40

22   others taking the examination within a two month period.  Is

23   it your understanding that the residency opportunity is

24   foreclosed or is it your understanding that the matching on

25   March 19th is a process that's independent of any assurance,

1   one way or another, that an applicant has demonstrated what's

2   needed to graduate from medical school and to go forward.

3   I'm not now asking whether those who are determining

4   residencies, condition acceptance into the residency on the

5   taking of the examination and a showing of some demonstration

6   of satisfaction with the examination.  I'm really asking a

7   question of timing.  Are you contending that the

8   determinations of match on March 18th, if that's the date,

9   require that as of that date, that there's evidence of a

10  successful achievement on the examination?

11          MR. WEINER:  I think there are, perhaps, two

12  distinct analyses to look at and what it is, is the match

13  occurs and one is matched with a residency.  The residency,

14  according to Mr. Hartman's testimony, has their own

15  requirements.  So, for example, three e-mails were presented

16  as to what was required and the requirement of those

17  particular residencies and we don't know whether or not

18  they'll be accepted in any of those residencies.  But that

19  there be a pass of the Step II CS.  It's not clear whether

20  they want to see that pass before the match or before Mr.

21  Hartman would start his residency.  That wasn't made clear in

22  those e-mails, but just that he passed the Step II CS prior

23  to the initiation of that residency.

24          It may be, though, certain residency programs do

25  require a pass before the match and in fact, while not

112

1   presented as evidence in this case, there was one residency

2   program that required a pass on the first attempt of the CS.

3   Since that didn't occur, that was not need to present that as

4   evidence.  So, different programs require different issue in

5   the field of their various residency programs, but we believe

6   that he would be precluded from certain residency programs if

7   a score was not presented before March 18th.  Some residency

8   programs, he may --

9          THE COURT:  I'm not clear the record thus far tells

10  us clearly one way or another.  And for example, doesn't tell

11  us what the answer is with respect to any of the, is it nine

12  potential residencies in pathology that Mr. Hartman has been

13  interviewed with respect to?

14         MR. WEINER:  No, your Honor, we've presented three

15  e-mails from residencies that Mr. Hartman had shown interest

16  in and they indicated that the Step II CS must be passed

17  before commencement of his program.

18         THE COURT:  Before commencement of the program, yes.

19         MR. WEINER:  Yes, in terms of --

20         THE COURT:  But before the matching process takes

21  place?

22         MR. WEINER:  Not from those particular -- not from

23  those particular programs.  They're not -- they haven't

24  stated one way or the other.

25         THE COURT:  Well, that seems to me to go to a

113

1    degree, to the question of whether we're talking about, as

2    you would say denial, as I would suggest delay or the

3    possibility that there's not even a delay.  If we assume that

4    Mr. Hartman were in a position to show by April 21st results

5    on the examination, which would satisfy the residencies

6    determination as to whether that's a satisfactory result for

7    its purposes.  Am I making any sense?

8          MR. WEINER:  Yes, your Honor, one of the concerns is

9    if, for example, Mr. Hartman were to take the exam again and

10   were to fail, at that point, he would be denied acceptance to

11   a residency, because he would not be able to retake the exam

12   again and receive a score prior to the start of that

13   residency, if he had to wait, for example, until April to

14   find out the results of that score, he would not be able to

15   take the exam again and receive a score before the start of

16   that residency program.

17         THE COURT:  However, if he were to receive a passing

18   grade for the test or perhaps, in the alternative a passing

19   grade on two components and no verdict with respect to the

20   other one, since even the report that there was an

21   accommodation provided and what it was.  If that information

22   is forthcoming by April 21st and then conveyed to wherever

23   the hospitals are that Mr. Hartman is interested in having a

24   residency at, he would not necessarily be precluded from

25   initiating a residency right away or whenever they begin, in

114

1  June or whatever.

2          MR. WEINER:  I will admit, your Honor, if Mr.

3  Hartman passes, that there may be some residency programs

4  based on their particular requirements, which may allow him

5  to commence the residency if the passing score came out in

6  April.

7          THE COURT:  All right, thank you.

8          MR. WEINER:  With respect to irreparable harm, in

9  your Honor's review of the Enyart case, you will see that the

10  harm to that plaintiff, I think it was when assessing the

11  different harms, was less than the type of harm that Mr.

12  Hartman will experience.  What occurred in the Enyart case,

13  the court found significant was the amount of time and

14  preparation that Ms. Enyart put into studying for the bar

15  examination would be lost and the stigma associated with

16  failing the exam.  That's what was considered irreparable

17  harm and that's what moved the court, on that issue, to grant

18  the preliminary injunction.

19          THE COURT:  Do we have any record that in the

20  framework that we're here discussing, in this case, there's a

21  stigma involved in not passing the examination?

22          MR. WEINER:  No, Mr. Hartman had not testified about

23  the stigma, but he did testify concerning the amount of

24  effort that he has put in med school and the amount of effort

25  he has put in, in his preparation.

115

1            The third prong is the balancing of the equities.

2    That favors Mr. Hartman because the need to appropriately

3    accommodate Mr. Hartman's severe disability, coupled with the

4    irreparable harm he's suffer if the injunction is granted,

5    supports the need for this injunction.  The equities in the

6    Enyart case, as well as other cases, in fact, there was a

7    case involving NBME which is the Rush versus NBME, where the

8    equities, the court found the equities favors the plaintiff

9    in those cases.

10           The evidence presented by NBME really came from Dr.

11   Katzafrakas and Dr. Katzafrakas is a very affable individual.

12   He made a very good appearance.  But when, in his particular

13   field is that on -- that the equities favors NBME because

14   their report leads to licensing and that's simply not true,

15   your Honor.  This is one examination, as Exhibit 25, which we

16   just presented to you, indicates.  There are numerous steps

17   and even Dr. Katzafrakas testified to this, as well.  There

18   are numerous steps to become a licensed physician.  You must

19   pass Step I.  You must pass Step II.  So, yes, Step II CK,

20   Step III, you must complete a year of residency and then  you

21   must also pass the different requirements of the various

22   states such as not having a criminal history and that you're

23   a person of strong moral character.  These are the different

24   requirements.  So, in terms of passing this one particular

25   examination, the scenario that Dr. Katzafrakas presented is

1    just simply non-existent in this case.

2            THE COURT:  I must have missed something here, Mr.

3    Weiner.  Maybe anyone should know this as a matter of general

4    awareness, sometimes called judicial notice.  Are you saying

5    that somebody who is in a residency is not, at that point, or

6    at least, not necessarily admitted to practice?  Doesn't

7    have licensure from whatever state it is that the residency

8    is occupied?

9            MR. WEINER:  Well, I believe the letter that's been

10   presented to your Honor outlines what's required and it's a

11   year of residency before you can be licensed.  The scenario

12   that I heard Dr. Katsafrakas present was that after passing

13   the various USMLE examinations and completing medical school,

14   one can go out, establish their own office, conduct

15   orthopaedic surgery or neuro-surgery, provided they're not

16   doing it in a hospital.  And that's just really not the

17   reality of medical practice.  The reality of medical

18   practice, it is as a long road involving multiple years of

19   education.  Involving --

20           THE COURT:  Your understanding is that, at least, as

21   a matter of general practice, if you have secured a residency

22   in internal medicine and that's going to take place at

23   Jefferson, for the first year of your residency at Jefferson,

24   if you're called doctor, it's only a courtesy statement, it's

25   not that you really are?

117

1          MR. WEINER:  No, you are a doctor, you're just not,

2     you do not have your license.  When you graduate medical

3     school, you receive the moniker of doctor.

4          THE COURT:  So, you're practicing medicine without a

5     license, at that point?

6          MR. WEINER:  I suppose that's, in terms of the

7     particular state licensing, when you're a resident, that's

8     correct.

9          THE COURT:  All right, go ahead.  Maybe it doesn't

10    matter for our purposes.  All right, I've probably

11    interrupted you too often.

12         MR. WEINER:  Finally, your Honor, the public

13    interest standard has been met here, as well.  There have

14    been numerous cases where preliminary injunctions have been

15    granted against testing agencies, including the NBME.  You

16    have the Enyart case before you.  The purpose of the

17    Americans with Disabilities Act is to serve the strong public

18    interest of providing a clear and comprehensive national

19    mandate for the elimination of discrimination against

20    individuals with disabilities and to provide broad coverage

21    for individuals with disabilities.

22         Granting plaintiff's motion for a preliminary

23    injunction, the Court will be eliminating the type of

24    discrimination that Congress set forth to protect.

25         Your Honor, the Americans with Disabilities Act has

1   opened up to hundreds of people with disabilities, to

2   practice medicine.  Such as Chris Norton who is an

3   individual, who is a licensed and board certified intern.

4   He's hearing impaired.  On a daily basis, he communicates

5   with patients with the aid of a sign language interpreter.

6          Or Dr. Wainkel (ph), who is a licensed physician and

7   he's a physiatrist, which is involved in rehabilitative

8   medicine.  He sees approximately 150 patients a month.  The

9   ADA has helped improve the standards of medical care in the

10  country, by allowing hundreds of extremely talented,

11  intelligent people to enter medical school and practice

12  medicine.

13         THE COURT:  Mr. Weiner, I don't want to make too

14  much of a point of it, you've introduced a couple of

15  important examples, but I don't think they're part of our

16  record.

17         MR. WEINER:  No, your Honor, I'm just speaking more

18  in an anecdotal sense, that the ADA has been designed to

19  allow people with disabilities to practice medicine, smart,

20  intelligent people, such as Mr. Hartman.  Mr. Hartman has now

21  has this -- the gates closed by defendant on moving forward

22  with this medical career.  His medical school had determined

23  that he is a very, very competent individual.  We have heard

24  a considerable amount of testimony regarding how well he did,

25  particularly, on clinical examinations.  But that was at a

1   time when his speech was less impaired than it is now.   And

2   we are requesting that he be given this particular

3   accommodation.

4          And your Honor, I suppose what I would like to

5   direct your attention to is the very first thing that

6   occurred when Mr. Hartman took the stand.   He was asked to

7   say his name.   And for three minutes, he experienced a block

8   and during that three-minute time period, your Honor, while

9   Mr. Hartman struggled to get out his name, I saw your Honor

10  stand up, walk over to the right side of your bench, pour

11  one, perhaps two cups of water.   Walk over to the left side

12  of your bench and put those cups of water in front of Mr.

13  Hartman and comment that something humorous about you're just

14  a fellow who works here and pours the water.   And then you

15  returned to your seat and sat down.   And during that period

16  of time, Mr. Hartman was still unable to get out those words.

17         If that were to occur in the context of the CS

18  examination, imagine how difficult it would be for him to

19  conduct the rest of that examination.   But if he were to

20  utilize Text To Speech and be allowed to get through that

21  small block of just saying his name, it would get him through

22  that part.   He would speak more effectively, more

23  efficiently.   He would put the patient at ease and they would

24  still be able to assess the manner in which he spoke,

25  particularly, this spoken English proficiency.

1          What we request, your Honor, in this preliminary

2    injunction is that Mr. Hartman be allowed to use the computer

3    or an electronic device with Text To Speech, to communicate

4    and to augment his spoken English during the patient

5    encounters.  We ask for the additional 15 minutes for each

6    patient encounter that he's already been granted.  That he be

7    given a face to face encounter instead of a telephone

8    encounter as he was previously granted.  And to permit Mr.

9    Hartman to take the step to CS. Report the grade to Mr.

10   Hartman shortly after a test administration and that the exam

11   accommodations in scoring be executed with fidelity.  Thank

12   you, your Honor.

13         THE COURT:  All right, thank you.  I think we've

14   gone a little longer than anticipated.  And plaintiff's

15   argument, you tell me what you'd like to do.  We can take a

16   luncheon recess and postpone your argument until the early

17   afternoon.  Or we could, I suppose, drive ahead and complete

18   it now.

19         MS. LEOPOLD-LEVENTHAL:  A lunch break is fine, your

20   Honor.

21         THE COURT:  Pardon?

22         MS. LEOPOLD-LEVENTHAL:  A lunch break is fine, your

23   Honor.

24         THE COURT:  Lunch break is fine.  All right, then

25   we'll -- it's 1:15, we'll resume at 2:00 o'clock then.

121

1          MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

2          MR. WEINER:  Thank you, your Honor.  2:00 o'clock,

3    your Honor?

4          THE COURT:  2:00 o'clock.

5          (Court in recess 1:14 to 2:13 o'clock p.m.)

6          THE COURT:  Please sit down.  Welcome back to the

7    lectern.

8          MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

9    Thank you for your patience.  A trial that was supposed to go

10   a day and a quarter is now winding up its fifth day, I think.

11   It's taken a lot longer than we all would have anticipated.

12   Thank you for your indulgence.

13          As I sat through the trial and especially, the

14   closing argument and thought about this case over the

15   weekend, it occurred to me that it's as though we are talking

16   about some sort of abstract, philosophical discussion that

17   really has no application in the real world.  How will he do

18   if we give him this.  How will he do if we give him this

19   accommodation.

20          The one aspect or feature or perhaps, component that

21   has been conspicuously absent from the plaintiff's case in

22   chief, is any reference to the public.  This examination,

23   your Honor, was not created for Mr. Hartman.  It wasn't even

24   created for all of the test takers who are going to embark

25   upon the Step II CS examination.  The USMLE exam, including

1    Step II CS, was created to protect the public and you know,

2    the mention of the work public, it was hardly audible

3    throughout this entire trial.  The USMLE has decided and is

4    continuously revising its examination to ensure that those

5    who graduate medical school and become medical doctors, have

6    the skills and knowledge and I know we use those words a lot,

7    but the report -- the skills and knowledge to be effective

8    medical doctors.

9             We're not talking about some abstract examination

10   that has no application in life.  This examination, the Step

11   II CS exam and all of the other components, I, II CK and Step

12   III, are in place to make sure that the people who graduate

13   medical school have the skills to treat patients, to save

14   patients' lives, to address an emergency that might come up,

15   to be qualified in a particular field.  And all I've heard in

16   the plaintiff's case in chief, really, is what can we do to

17   make sure Aaron gets over this hurdle.  This isn't about

18   making sure Aaron gets over a hurdle and I don't mean to be

19   insensitive and I don't mean to be harsh.  But this isn't a

20   case about sympathy, it's really not.

21            Do I feel badly that he spent four years in medical

22   school?  I suppose so.  I have children and I might feel

23   badly if they finished medical school and couldn't get their

24   license.  But this trial and this test isn't about making

25   sure Mr. Hartman gets over this hurdle.  This is about making

123

1    sure every test taker who gets over this hurdle, has the

2    skills and the competence to be doctors.  And who is best

3    situated to evaluate and determine what the critical skills

4    are to become a doctor in the USMLE and the National Board of

5    Medical Examiners.  And all of the committees that meet month

6    after month, year after year, decade after decade, revising

7    the examination, to make sure that they appreciate the

8    evolving skills that are necessary to become a medical

9    doctor.  And rather than look at this in some sort of

10   abstract, philosophical way, let's talk about what this

11   really means in real life.

12         I heard Mr. Weiner say, in his closing argument,

13   that there was a two-minute delay and then a three-minute

14   delay in Mr. Hartman's stating his name.  And Mr. Weiner said

15   to you, if that were to occur in the context of the exam, can

16   you imagine how much time that would have eaten up.  Your

17   Honor, if that would happen in real life, can you imagine the

18   impact of that three-minute delay in an emergency room

19   setting, in a setting where Mr. Hartman is being called upon

20   to be a pathologist.  And as Dr. Katzafrakas explained, a

21   pathologist isn't a mute, they're not never expected to

22   speak.  They have encounters with nurses, doctors, patients.

23   Very frequently, a patient is under anesthesia and they are

24   doing a biopsy, let's say it's a breast biopsy, there's a

25   concern about breast cancer.  They take a cut out of the

124

1    skin, they run it down to the pathologist, the pathologist

2    does a report, they run back up and they tell them what they

3    found and they could have to do that three, four, five or six

4    times.  The last thing you want to do is keep that patient

5    under anesthesia for too long.

6          And so, my point is, we've been thinking about this

7    kind of out there, as if it has no real application.  It does

8    have real world application and I, you know, I tried to look

9    over the course of the case and try to say to myself, now,

10   how is it that this young man got to this point, where he's

11   asking for the Text To Speech technology.  And the first

12   thought that occurred to me was, in 27 years of his life, 27

13   years, he never used the Text To Speech device.  Never, not

14   once.  He always used his spoken English.  Why would he want

15   to use it now?  Because he's looking for the accommodation

16   that is going to ensure that he passes this examination.

17         Well, if we're looking for an accommodation that

18   ensures that he passes it, let's just throw the examination

19   out.  I mean, what's the point of even having the exam if

20   we're going to give him alternatives.  Well, let's try it

21   with time and a half, now we'll try double.  If that doesn't

22   work, let's give it to him with the Text To Speech and

23   additional time.  If that doesn't work, why don't we just let

24   him write the questions.  Why?  Because Dr. Katzafrakas spent

25   a good bit of his testimony explaining why this particular

1   exam, the Step II CS, is so important and he explained the

2   study that supported it and the years of development that

3   went into this examination.  And part of his explanation was

4   this.  Patients are more likely to follow the advice of their

5   doctors, do the diagnostic examinations that the doctor is

6   suggesting, take the medication that's being offered, do the

7   follow-up examinations and have a good rapport between the

8   doctor and the patient, if there is that rapport that's

9   developed.  If there is an understandable dialogue between

10  them.  If there isn't an understandable dialogue, then you

11  have the patient that's less likely to take the medicine,

12  less likely to go for the follow-up tests that they're

13  supposed to and less likely to follow up on that doctor's

14  advice.

15          So, they developed this examination because they

16  realized that rapport was a critical skill that medical

17  doctors needed to have and it wasn't subsumed within either

18  any of the written examinations for Step I, the Step II CK or

19  the Step III.  So, they specifically evaluated those skills

20  and after years of development, they came up with this

21  particular examination.  And I ask you, is it Mr. Weiner's

22  role to substitute his judgment for the committees of medical

23  doctors and health professionals who, for years, have

24  evaluated and developed this examination.  He would suggest

25  that it is, because how did we get here after 27 years of

126

1    oral communication?  Mr. Hartman failed the test.  He spent
2    several years in medical school and he was looking for a way
3    to get over the hurdle.

4           So, rather than asking for additional time, which
5    seems to be discounted today, but I would remind you, Mr.
6    Hartman used additional time on eight examinations in medical
7    school and passed all eight of them with additional time.  In
8    fact, on one of those examinations, he got time and a half.
9    The NBME is offering him double time.  He took an examination
10   that was designed to mirror this exact test.  Took it with
11   time and a half and he passed.  When he submitted his
12   paperwork to the NBME and even in his Complaint and
13   declaration, he swore that he had only been given double
14   time.  That's not true, he was given time and a half.  But
15   even if you use the double time, that's not good enough.

16          So, Mr. Weiner said we have to come up with
17   something else.  So, they had this orator.  NBME rejected
18   that.  Then the lawyer, not a doctor, not a speech
19   pathologist, not anyone experienced in speech disfluency,
20   called an engineer and there's testimony about that.  What
21   can we do to help him?  Well, how about this Text To Speech
22   device.  That person never met Aaron Hartman.  That person
23   doesn't know a thing about the U.S. medical licensing
24   examination.  Mr. Weiner probably called and said, listen, we
25   need something that can help him get over this examination,

1   they're not accepting an orator.  You're an engineer, you're

2   familiar with this equipment, have any ideas?  And they put

3   it in their interrogatory responses.  The first time they

4   came up with the Text To Speech device was because the

5   engineer suggested it to Mr. Weiner.

6        Then what happened?  They don't have any expert

7   report to support it.  Mr. Weiner writes a letter to the NBME

8   and says, okay, we have something new.  Now we want you to

9   use the Text To Speech device.  Not supported by any expert

10  report.  They realize that.  So, then Mr. Hartman takes that

11  device and goes and sees Dr. Tetnowski.  And says to him, I'd

12  like you to recommend this device for me on the USMLE.  And

13  individual who knows nothing about the examination.  There's

14  nothing about the skills that its designed to assess.  He's

15  there to evaluate the speech disfluency.

16       We are not disputing that Mr. Hartman is disabled.

17  He didn't put an expert on and I, you know, for the purposes

18  of this trial, we accept all of Dr. Tetnowski's testimony

19  with respect to the severity of Mr. Hartman's speech

20  disfluence.  So, what happened?  He takes the device to Dr.

21  Tetnowski and says, Dr. Tetnowski, I'd like you to make a

22  recommendation that I be permitted to use this on the

23  examination.  And what does Dr. Tetnowski do?  Does he say to

24  Mr. Hartman, well, gee, how have you functioned before this?

25  Didn't you have to take oral exams in medical school?  What

128

1    kind of accommodations did they give you there?  Were the

2    examinations similar?  You must have had a lot of, in your

3    rotations, a lot of oral communication with the patients and

4    doctors?  No.  He doesn't ask for a thing and Mr. Hartman

5    doesn't offer it.  He ignores 27 years of his life.  He spent

6    six hours with Mr. Hartman and based on that six hour

7    evaluation, he says, okay, I'm recommending the Text To

8    Speech.  So, now he's discounted Mr. Hartman's entire life.

9    He knows nothing about the examination, but he's going to

10   redesign our examination and substitute his opinion for that

11   of the medical doctors who have developed it.

12            And Dr. Tetnowski says something else.  When I asked

13   him, why didn't you look at those sources and he said and he

14   was candid about it.  He said, you know, in retrospect, I

15   would have liked to have seen all that, but the truth is, I

16   didn't really want to see what happened before, because I'm

17   looking at a slice in time.  I want to look at this one day,

18   I doesn't matter to me how Mr. Hartman functioned in grade

19   school or how he did in college or even how he did on similar

20   medical examinations.  This is a variable disease and I want

21   to see how Mr. Hartman functioned on this day and I don't

22   want to be tainted by what happened before it, because it's

23   not predictive.

24            Okay, let's accept that premise for a moment.  Then

25   what value is Dr. Tetnowski's report and evaluation that he

1    conducted on December 7th, what value does that have in

2    January, February, March, June?  He's the one who said

3    variability is a key factor in evaluating people with speech

4    disfluencies.  So, he's telling us he ignores everything in

5    favor of one day, because none of the rest of it's

6    predictive.  Well, how predictive is what he's saying on that

7    one day, for the next six months or the next year.

8         And what's very interesting about Dr. Tetnowski's

9    testimony is that I asked him, at his deposition, what

10   accommodation do you think Mr. Hartman should get?  And Dr.

11   Tetnowski said, whatever accommodation "best assures his

12   success".  I would submit to you that that's not the

13   standard.  The standard is what's reasonable, not what best

14   assures his success.  I made probably the typical mistake a

15   first-year lawyer would make when I took his deposition and I

16   actually, instead of just leaving that there, I said, what do

17   you mean by best assures his success?  I shouldn't have said

18   anything, but I asked him.  And the next thing he said is, I

19   think we should give Mr. Hartman everything he needs to be

20   successful.  Everything he needs to be successful?  Let's

21   just throw out the test then, because, basically what you're

22   saying is, we're going to keep trying different options and

23   if none of those options work, we'll keep trying another one

24   until he gets over the hurdle.  Forget it, just throw the

25   hurdle out and just give him his medical license.

130

1        What's also interesting is that Mr. Hartman was

2   honest and he said he'd never used the Text To Speech device

3   in any patient encounters other than in three this fall.

4   Now, I'm not debating Mr. Hartman's -- the severity of his

5   speech disfluency, however, I think it is very important to

6   point out that all during this entire time period, when Mr.

7   Hartman is claiming that his speech disfluency is at its most

8   severe, he participates in eight, out of nine, residency

9   interviews.  Each one including a panel of medical doctors,

10  who are interviewing him and in probably not a very

11  comfortable setting.  And he chooses to use his Text To

12  Speech device in one out of nine.  Why would he do that?  His

13  own attorney, today, said when he meets with strangers, his

14  disfluency gets much worse.  Why didn't he use the device?

15  He didn't use the device because he knew he could get over

16  those interviews without using it.  He knew that he could

17  communicate in an understandable fashion.  Albeit, not

18  perfect.  I'm not suggesting he has perfect speech, but he,

19  himself, decided not to use that device in those interviews.

20  And I suggest to you that if he's allowed to use this Text To

21  Speech device on this examination, he's going to use it on

22  one day and after that, he's going to go out into the medical

23  profession and he's never going to use it again.

24        THE COURT:  What's the rationale for providing him

25  with more time when it's ordinarily stipulated for double

1    time on the examination?

2         MS. LEOPOLD-LEVENTHAL:  Good question.  The

3    committee that evaluates what an appropriate accommodation is

4    and whether a certain accommodation fundamentally alters the

5    examination where another one doesn't, considered more time.

6    And they've decided that time and a half or double doesn't

7    necessarily -- doesn't fundamentally alter that exchange.

8    So, when you go in for a doctor/patient encounter, it could

9    last 30 minutes and that's not really unreasonable.  We've

10   all been to doctors and specialists where the initial

11   encounter might last that long.  They have decided, however,

12   that any longer than that no longer represents an accurate

13   depiction of the doctor/patient encounter.  So, their

14   rationale is they're trying to be fair and they realize that

15   everyone doesn't talk at the exact same speed.  And there

16   have been, you know, five or six other test takers who have

17   stuttered and they didn't want to shut them out by saying,

18   well, you don't speak as quickly as he or she does, so,

19   you're out.  So, they met and they discussed and they agreed

20   that by providing more time, that's a reasonable

21   accommodation.  That doesn't alter the skills.  And that's

22   really what's at the crux of this analysis.  They're decision

23   to give more time is reasonable because it doesn't take the

24   spoken part out of the encounter.

25         Mr. Weiner tried to draw distinctions between oral

132

1    and verbal and written and non-written communication.   The

2    third component is called spoken English proficiency.   I

3    can't imagine anything that alters that more than taking away

4    the spoken part.  So, we have Mr. Hartman, who, for all

5    intents and purposes, probably never intends to use this

6    device again.  But let's say he does.  What did Dr.

7    Katzafrakas tell us?  He told us that Mr. Hartman will

8    receive an undifferentiated medical license, that's a general

9    medical license.  He could become a surgeon, he could be a

10   pediatric doctor, he could become an oncologist.  He could do

11   anything he wants.

12          You ask Dr. Katzafrakas questions with respect to,

13   well, I mean, is really going to be board certified?  Is a

14   hospital going to accept him?  And truthfully, the answers

15   are no, he's not going to be board certified unless he has a

16   residency and passes the examinations.  And he probably won't

17   be admitted into a hospital to be surgeon, to the extent that

18   he hasn't completed a residency.  But he will have the

19   license that will allow him to practice any type of medicine

20   he wants and I, you know, you try to envision in your mind,

21   how is the Text To Speech device going to work in just a

22   basic medical examination where you have to hold equipment?

23   I mean, you're holding, you know, an arm cuff to take

24   somebody's blood pressure, you're examining their knee.

25   There's all kinds of medical equipment.  Certainly, in

1   surgery, there's, you know, a whole more equipment.  How is

2   it that you're going to manage a Text To Speech device, which

3   requires two hands to type and also the equipment, at the

4   same time, going back and forth between the two?

5        And I think the point is that the plaintiff is

6   looking for whatever accommodation it is that best assures

7   his success, whether or not it bears any relationship, at

8   all, to the practice of medicine.  He views this as a hurdle

9   that he has to overcome and once he is able to do that, he's

10  not gotten his license and his, you know, ability to speak or

11  speak rapidly or speak clearly really are irrelevant.  And

12  you know, one thing the Court has to consider is even if the

13  NBME was ordered to give Mr. Hartman this examination and

14  ignore the spoken English proficiency portion, okay, he

15  doesn't get a score in that.  Now, he has -- he doesn't have

16  a pass, what he has is a pass for those two sections.

17       Now, what needs to happen is, because Exhibit P-25,

18  the Stoney Brook Medical Center confirmed that they required

19  a pass of a Step II CS in order to graduate Mr. Hartman.  So,

20  what happens?  He passes the test without the SEP.  Now, the

21  Court has to order Stoney Brook to accept that examination

22  and that score and ignore the SEP component.  Okay, let's say

23  Stoney Brook agrees to do that.  Now, we have to go to the

24  state licensing board and Mr. Hartman has to ask you to order

25  the state licensing board, ignore that he didn't pass the SEP

1   component, I'm ordering you to accept this Step II CS score,

2   even though it's not a passing score.  And then --

3          THE COURT:  Why do I have to go through all of these

4   postscripts?  I'm not clear.

5          MS. LEOPOLD-LEVENTHAL:  Ordering that the NBME give

6   Mr. Hartman the examination without the SEP component isn't

7   the end of the day.  All that says now is he's passed two of

8   the sections, hasn't even been evaluated on the third and

9   according to Stoney Brook, he can't graduate from medical

10  school.  I'm not saying you have to do that, but I'm saying

11  if he wants to practice medicine, he's going to need waivers

12  from all these institutions, waivers of the exact skill that

13  this test is designed to assess.  So, now, they're going to

14  say, well, we're waiving the English proficiency portion.

15  We're waiving, you know, the communication part.  We're just

16  going to waive it and let you become a doctor.

17         THE COURT:  Well, is that, in a framework which

18  involves the use of the TTS intermittently, it would appear

19  to be substantial opportunities then for the patient, those

20  doing the observation and testing, to score -- to measure the

21  spoken language, right?

22         MS. LEOPOLD-LEVENTHAL:  I'm not sure I understood

23  your question, I'm sorry.

24         THE COURT:  The request, as I understand it, is for

25  the opportunity to use the Text To Speech device

135

1   intermittently in the examination.  Not preclusive of any

2   conversation orally, but at various intervals, however to be

3   determined.  In between such intervals, Mr. Hartman would be

4   undertaking to speak very slowly, to be sure, but undertaking

5   to speak and those who he is interviewing can make -- well,

6   it's not a very hard determination to make, as to whether

7   they're with a person who speaks English intelligently.  Why

8   doesn't that accomplish the goal of ascertaining whether the

9   person can speak English in an adequate fashion?

10          MS. LEOPOLD-LEVENTHAL:  There are number of flaws in

11  the question and I'm sorry for putting it that way.  But

12  first of all, we don't know how much Mr. Hartman is going to

13  speak.  That's answer number one.  And Mr. Weiner has told

14  you that when he approaches strangers, his speech disfluency

15  is much worse.  When he is in a stressful situation, that

16  again, exacerbates the stuttering condition.  So, now you put

17  him in a standardized patient encounter and as Dr. Clauser

18  explained, there's even heightened anxiety and stress because

19  you have a patient who's presenting, you have a limited

20  amount of time to interact with them, ascertain what their

21  problem is, answer their questions.  I mean, you might have a

22  standardized patient saying, Doctor, am I going to die?  I

23  mean, it is an encounter that is fraught with anxiety.  So,

24  then the question becomes, well, how much is he really going

25  to speak during that encounter and what percentage is enough

1    to then evaluate him.

2          And truthfully, your Honor, Dr. Clauser gave very

3    clear and uncontroverted testimony that made a lot of sense.

4    How much do they need?  They need 100 percent of it.  There

5    was a comparison between Mr. Hartman and other test takers

6    and the question was asked, well, if these test takers talk

7    just a little bit and Mr. Hartman's Text To Speech talk is

8    more than those, haven't the standardized patients been given

9    a big enough sample.  Can't they evaluate his spoken English

10   proficiency on that?  And the answer is no.

11         Psychometrically, you're not able to pull out

12   portions of it.  I mean, can you predict whether in one

13   encounter he'll speak the whole time and another encounter,

14   he'll use the Text To Speech?  If that happens, the second

15   standardized patient can't evaluate him at all.  Then you

16   have, you've introduced the Text To Speech, which is a

17   computerized voice.  It can be inaudible at times.  Sometimes

18   it runs the words together.  If that happens, is Mr. Hartman

19   then marked down because his spoken English is a little less

20   clear, a little more difficult to understand.  How does one

21   evaluate the spoken English of a computer voice?  You can't.

22   And that's why the examination is called spoken, it's not

23   called typed.

24         And also, one other point, Dr. Clauser explained

25   that there is a difference between a written English

137

1   proficiency and spoken.  And in fact, the Step III exam

2   evaluates written answers.  The Step II exam is not designed

3   to evaluate written answers and Dr. Clauser testified that

4   written English is different than oral English.  But my

5   answer to you is, how do we control that?  How do we know

6   what's a big enough sample?  Haven't we fundamentally altered

7   now, the entire exchange, that it no longer represents what

8   is a normal doctor/patient encounter?

9          And you know, this isn't the first court that's

10  going to be addressing the fundamental alteration question.

11  Mr. Weiner brought out a case that was decided about a month

12  ago and actually, that case didn't even address fundamental

13  alteration.  But there are a number of instructive tools and

14  decisions that the NBME cited in its brief, that provide, you

15  know, a tremendous amount of guidance as to what the phrase,

16  fundamental alteration, means.

17         The Department of Justice provided, I think, some

18  very tangible examples.  An individual who suffers from

19  dyscalculia, which is a learning disability in mathematics,

20  they're not entitled to use a calculator on that test to

21  measure math skills when the math skills are what is being

22  assessed.  Quoted directly from the Department of Justice's

23  manual, "If a test is designed to measure the ability to read

24  written material, it's entirely proper for that exam to be

25  administered in a written form, to an individual with a

138

1   vision impairment."  They're impaired, they're disabled.  No

2   one is disputing that.  But when the test examines the

3   ability to read, unfortunately, that person's impairment

4   affects that and to change that construct, would

5   fundamentally alter that examination.

6          There are a number of cases that we cite in the

7   brief, as well, that address exactly those situations where

8   the skill that is being assessed is the exact skill that the

9   plaintiff is asking the Court to order the testing agency

10  alter and change, just so that that particular individual can

11  get over that hurdle of that examination.  You know, we're

12  not talking about an exam to license a CPA or a realtor.

13  We're talking about an examination that is effectively going

14  to give Mr. Hartman a license to treat patients for the rest

15  of his life.

16          It, first of all, is not the kind of case where

17  mandatory injunctive relief is appropriate.  What do we do if

18  we've given Mr. Hartman the opportunity to take the test,

19  with the Text To Speech device, doesn't have a SEP component.

20  He passes, he gets out in his residency and then they decide

21  no, it shouldn't have been an injunction, we're going to

22  reverse that.  How is it that you go and un-ring that bell

23  once Mr. Hartman is now out in the field treating patients?

24          THE COURT:  I guess, at this point, I'm not quite

25  clear what you mean.  Are you suggesting that there's no

1   effective review in the Appellate Court of an injunction to

2   which one objects, is that your thoughts?

3          MS. LEOPOLD-LEVENTHAL:  No, what I'm suggesting is

4   that once he has his medical license and is out treating

5   patients, let's say, he gets in a situation where clear rapid

6   speech is a problem and someone is injured, someone dies as a

7   result of his inability to communicate.  Now, the case is on

8   appeal, it gets reversed.  How do we take that position back?

9   I mean, there are, candidly, certain jobs where clear,

10  somewhat rapid speech is important.  You have a 911 operator,

11  9-1-1.  Emergency medical technicians, fire fighters, pilot,

12  these are all individuals where rapid, clear communication is

13  important.  I certainly wouldn't want the pilot of my

14  airplane to have a severe stutter so severe, that he or she

15  couldn't communicate with the control tower.

16          And it's sad, but true, I mean, people have

17  disabilities that might prevent them from entering a

18  particular field.  You have a young man who is born with one

19  leg and he wants to be, you know, the Phillies short stop.

20  Unfortunately, he has a disability and he's not going to be

21  able to perform that job.  However, Dr. Katzafrakas had a lot

22  of examples of physicians in the medical field that would be

23  perfect for Mr. Hartman.  He could be a research pathologist.

24  He could do exactly the same kind of thing that he would like

25  to do without having the patient interaction.  Then every

140

1    concern is addressed.  He doesn't have to worry about passing

2    this examination.  He doesn't have to worry about rapid

3    speech.  He can still be a scientist, a pathologist, as he

4    would like.  But we're not putting him in a position where

5    people's lives are at risk.

6         And you know, this isn't an examination that just

7    came into fruition this year.  This was in place in 2004.

8    Mr. Hartman, who has had a speech disfluency his whole life,

9    has known that he would have to encounter and pass this

10   examination in order to achieve his medical license.  And to

11   give him, you know, a leg up or an excuse, because he has now

12   invested four years in medical school, really doesn't

13   appreciate the patients that he's going to be treating.  I

14   mean, Mr. Weiner suggested that the NBME is the gatekeeper.

15   They are the gatekeeper and I want them keeping the gate.  Is

16   this examination rigorous?  Absolutely.  I have two children.

17   If they're in the emergency room, one of them, I want a

18   doctor, I want the best doctor there and I want the doctor

19   who can communicate in a clear, meaningful way to give my

20   child or whomever else is on the table, the best chance of

21   surviving that encounter.  And it doesn't have to be in the

22   emergency room setting.  My point is --

23        THE COURT:  Is that a mistake for Stoney Brook to

24   admit Mr. Hartman?

25        MS. LEOPOLD-LEVENTHAL:  What I think happened, your

1   Honor, is that Mr. Hartman's speech disfluency has become far

2   more severe as time has gone on.  Do I think it was a

3   mistake?  I don't know if they provided him with an

4   interview.  I would assume that they did.  But perhaps his

5   speech disfluency was much less severe.  I think the evidence

6   would establish that over almost four years of medical school

7   it was moderate.  We have evidence from Mr. Hartman's own

8   speech pathologist suggesting that it was just a moderate

9   speech disfluency.  And it was probably moderate throughout

10  medical school.  Do I think it was a mistake?  I don't know.

11          What I do think is that Mr. Hartman has made the

12  decision not to try to take the examination with double time.

13  He was offered that opportunity in September.  Now, five

14  months later and he's chosen to delay his own entrance into a

15  residency program.  He's chosen not to try to take the test

16  with the exact same or better accommodation than he was given

17  in medical school.  And he's chosen to do that, I think,

18  because he wants some sort of guarantee that when he takes

19  the examination, he's going to pass it and he's come to this

20  Court and he's saying, give me a guarantee.  Give me the

21  accommodation that best assures that I'll complete this exam

22  and that your Honor is allowing me to type, rather than

23  forcing me to speak.

24          His choice not to take it is a little hard to

25  explain.  Stoney Brook would allow him to take the test three

142

1    times.  He's only taken it once.  Why didn't he try to take

2    the examination with the double time and then if he failed, I

3    guess arguably, he could come to court and we might be having

4    the same debate.  A few issues would be excised from that

5    debate, but you know, he's chosen to delay his entrance into

6    the residency program by not even trying to utilize the

7    accommodation that he requested from the NBME.  Let's not

8    forget, when he first approached the NBME, he asked for

9    double time.  He asked for the exact accommodation that he's

10   being offered now and has elected not to do so.

11           I would address the irreparable harm issue, but you

12   know, I don't think that the plaintiff has made out the case.

13   They've talked about some sort of stigma and some sort of

14   delay in entering the profession and there might be an

15   additional monetary cost.  All of those, there are lots and

16   lots of cases that have addressed whether or not those

17   particular allegations, even if proven, would establish

18   irreparable harm and frankly, they don't.

19           And this brings me around to my conclusion, which is

20   basically, where I began.  We're not talking about something

21   in the abstract here.  We're not talking about allowing Mr.

22   Hartman to get over this hurdle.  A hurdle which will then be

23   totally irrelevant in the medical profession.  This is a

24   hurdle and a skill that is critical to the medical

25   profession.  Is it fair that Mr. Hartman was born with a

1    speech disfluency?  No, it's not fair.  It's not fair that he

2    has a disability and I'm sad for him.  He has a whole lot of

3    other attributes, though.  He graduated under-grad with a

4    3.9.  He's done extremely well in medical school.  He could

5    be, among other professions, a research pathologist.  There

6    are all kinds of other professions that he could pursue in

7    the medical field, not as a medical doctor.

8            But to come to this Court and ask you to help him

9    get over a hurdle, so he can now enter the medical profession

10   and treat patients who are relying on the NBME as the

11   gatekeeper.  Relying on the NBME to give a rigorous

12   examination, because, let's face it, everybody in this

13   courtroom wants to make sure that when they have a trauma or

14   a family member of theirs has a serious medical condition,

15   that the person who is treating them has passed every step

16   that they're required to pass and has shown competency in

17   each one of those examinations.  We certainly wouldn't want

18   the person treating our wife or our husband or our children,

19   to have been given an accommodation that so alters the test,

20   that it's no longer recognizable.  And it no longer assesses

21   the skills that these medical doctors have determined are

22   fundamental to becoming a medical doctor.  Thank you.

23           THE COURT:  Thank you.  Mr. Weiner, is there a

24   response you'd like to make?

25           MR. WEINER:  I'll be very brief, your Honor, yes.

144

1              THE COURT:  All right.

2              MR. WEINER:  Thank you, your Honor.  Defendant's

3    counsel would like you to believe that if you grant this

4    injunction, you are giving Mr. Hartman a license.  You

5    aren't.  You grant this injunction, you are allowing Mr.

6    Hartman to take this exam with an accommodation.  He must

7    still test, he must still pass, he must still demonstrate the

8    proficiencies in the various areas that this exam is looking

9    for.  This isn't a free ride.  This isn't an advantage.  In

10   fact, there has been no testimony whatsoever, that this

11   accommodation provides him with an advantage.  I can't

12   imagine that it does.  No one has ever asked for it.  I'm

13   sure that if Mr. Hartman had fluent speech, even a little bit

14   better than what he has now, he would much prefer to be able

15   to speak the entire time, than to utilize this Text To

16   Speech.

17             And even assuming that somehow this accommodation

18   gave him a leg up, it doesn't given him a license.  As the

19   exhibit that I presented to you last, your Honor, presents,

20   there is a whole slew of steps, a whole slew of hurdles that

21   an individual must go through in order to become licensed.

22   We are merely asking that Mr. Hartman be given an opportunity

23   to be put on an even or level playing field.  I don't even

24   think the Text To Speech levels the playing field.  But it

25   levels the playing field more than just allowing him to speak

1    in the way he does.

2          One of the things that -- and this came from Dr.

3    Katzafrakas, he stated is that I can't imagine a physician

4    going into an office and holding this laptop computer and

5    being able to use a stethoscope or an ophthalmoscope or

6    whatever instrument.  Your Honor, one of the tenets that Dr.

7    Katzafrakas talked about was being updated with the various

8    systems that are involved in medicine.  I've been to the

9    doctor plenty of time.  I have children who go to the doctor.

10         Every doctor I've been to these days, either has a

11   computer in the exam room or they bring in a laptop and they

12   do a whole slew of things with their laptop.  They take

13   notes.  The order the prescriptions for you, utilizing their

14   computer.  They provide you with instructions regarding

15   post-wound care or post-operative care.  There are a whole

16   number of things that physicians are doing utilizing

17   computers.  THE COURT:  I don't think the defendant's

18   position involves any condemnation of computers for a whole

19   array of other settings.  I think we do know that it's a

20   common piece of the furniture now in the doctor's office to

21   have a computer.  But it's, at least, I think it's a rarity,

22   which I haven't encountered and perhaps, you have, for the

23   computer to be the medium of verbal exchange --

24         MR. WEINER:  That's probably true --

25         THE COURT:  -- between a patient and doctor.

1          MR. WEINER:  Certainly, that's probably true, your

2     Honor.  But on the other hand, this particular level of

3     speech disfluency is extremely rare.  It's extremely rare

4     that it exists out there, altogether, as Dr. Tetnowski had

5     indicated.  And as you move up academic ladder and then

6     segregate the various professions that people enter into, it

7     becomes even a greater rarity.  It doesn't mean that it can't

8     be workable in the medical practice.

9          But this exam isn't about how Mr. Hartman intends to

10    practice.  This is about him being able to take an exam and

11    have an accommodation on exam that levels the playing field.

12    And this exam, by giving this accommodation, it doesn't give

13    him a pass on this exam.  He still to demonstrate the various

14    competencies.

15         THE COURT:  And the proposition you're arguing is

16    not that or at least, in any form, there may be a variety of

17    forms.  Is not, in any form, a submission that to test --

18    spoken proficiency in English -- is not an appropriate skill

19    to measure.  You're not suggesting that it's a kind of a

20    superfluous ornament to inquire whether an applicant can

21    speak English intelligently.

22         MR. WEINER:  Well, your Honor, I don't want to

23    discredit this examination, but the examination is intended

24    to test for one's competence in the clinical skills and

25    practice of medicine.  The spoken English proficiency is

1   content neutral.  It does not examine any of the type of

2   content of the speech, it is looking at, really, the delivery

3   of the speech.  The type of examination that Mr. Hartman took

4   while he was in medical school, that's probably the more

5   appropriate examination.  But we didn't even go in that area,

6   your Honor, merely because Mr. Hartman can speak on this

7   exam.  He intends to speak on this exam.  He just intends to

8   do so with the aid of this auxiliary device.  So, we didn't

9   really need to go there.

10          THE COURT:  Maybe I misconstrued what you were

11  saying, but it sounds to me as if you were saying really,

12  that there is no significant purpose to the piece of an

13  examination that tests whether somebody can speak English.

14          MR. WEINER:  That's my opinion, your Honor, it's not

15  a -- it has not been deleting argument we've presented in

16  this case.

17          THE COURT:  What --

18          MR. WEINER:  I mean the leading argument we've

19  presented in this case is that Mr. Hartman take the exam,

20  with the spoken English proficiency, the CIS and the ICE and

21  he -- be scored in those areas utilizing the Text To Speech.

22          THE COURT:  Intermittently?

23          MR. WEINER:  Yes, your Honor.

24          THE COURT:  By which you mean what?

25          MR. WEINER:  By which I mean he will speak and when

1    he suffers a block, as he did here in court, that he utilize

2    the Text To Speech.

3         THE COURT:  And it's the interviewee says yes, says

4    to herself, trying to assess what she's heard, well, yes, the

5    candidate didn't use the TTS throughout, but it was used so

6    much of the time, that I really couldn't get a grasp of the

7    candidate's fluency in English.  Would that be --

8         MR. WEINER:  That would be assessed.

9         THE COURT:  -- that would be a legitimate

10   determination.

11        MR. WEINER:  Absolutely, your Honor.  That would be

12   assessed by they provide a numerical score from one to nine

13   and they would assess that accordingly.

14        THE COURT:  Okay.

15        MR. WEINER:  Thank you, your Honor.

16        THE COURT:  All right, thank you.

17        MR. WEINER:  And I do want to remark and I'm not

18   sure if counsel had any additional points.  It's not about

19   the case itself, it was a pleasure to be before your Honor.

20   Ms. Leventhal and I have had a number of cases together, with

21   different respective clients.  And we were commenting that it

22   was a pleasure being in your courtroom.  The demeanor you had

23   extended to us and the respect that you extended to us and

24   our witnesses was greatly appreciated.  And it made -- it was

25   a pleasure to be before you and it was lively and I'm sure

149

1  that counsel would want to either echo or add some more

2  comments.  Thank you, your Honor.

3          THE COURT:  Well, I thank you and --

4          MS. LEOPOLD-LEVENTHAL:  Ditto what he said.

5          THE COURT:  I won't require, I found myself tempted

6  to add, when you said it was a pleasure to be in this

7  courtroom, I'll tell Judge Bartle that you liked the

8  courtroom.  That was very kind of you to say that.  It was

9  gracefully said by you both and I'll even undertake to

10 persuade myself that you meant it.  But I do want to thank

11 both of you for a really high-level professional performance.

12         The issues are real issues, real issues, indeed and

13 that came very, very clear as one thinks about the purposes

14 of the statute and the demands of public interest.  And one

15 would hope that those are not antithetical.  I don't think

16 Congress thought it was running counter to the public

17 interest in enacting the legislation.  But that doesn't mean

18 that simply by carrying the flag of the statute, one has

19 assumed total control of where the public interest lies.

20         So, you've presented an extraordinarily interesting

21 and significant issue.  And both sides have spent very useful

22 time in shedding light on what the issues are, so, I can't

23 begrudge the several days that this has consumed.

24         I'll ask, if you will, to come back tomorrow morning

25 at about 11:30.  I hope that will be convenient for you.

150

1    Would it be, is that consistent with counsels' calendars?

2              MR. WEINER:  I believe so, your Honor, mine's open.

3              THE COURT:  Not difficult for you?

4              MS. LEOPOLD-LEVENTHAL:  Would it be possible to make

5    it in the afternoon, maybe about 1:00 o'clock.  I have

6    another trial in the morning that's only going to take about

7    a half an hour.  If not, I can ask that judge to shift it

8    around.

9              THE COURT:  Hold on, let me see.  When would be

10   convenient for you?

11             MS. LEOPOLD-LEVENTHAL:  1:00 o'clock would be great,

12   your Honor.

13             THE COURT:  Let's make it 2:00 o'clock.  Does that

14   make things fit?

15             MS. LEOPOLD-LEVENTHAL:  That's fine.

16             THE COURT:  You have a four-day trial tomorrow

17   morning, is that right?

18             MS. LEOPOLD-LEVENTHAL:  I have a 30-minute trial.

19   It won't compare with this one.

20             THE COURT:  All right, very good.  I'll look forward

21   to seeing you tomorrow.

22             MR. WEINER:  Your Honor, in this courtroom?

23             THE COURT:  What a very good question.

24             THE CLERK:  Donna had said that we were going to be

25   in 11-B for the next three days.

151

1          THE COURT:  11-B?

2          THE CLERK:  That's what she had said.  I believe it

3     will be 11-B.

4          THE COURT:  All right.  Well, the 11th floor and in

5     that direction.  Very good.  I will see you then.

6          MS. LEOPOLD-LEVENTHAL:  Thank you, your Honor.

7          MR. WEINER:  Thank you, your Honor.

8          (Court adjourned 3:00 o'clock p.m.)

9                              -  -  -

152

1                          I N D E X

2    DEFENSE WITNESSES          D        C        RD        RC

3    Catherine Farmer

4     By Ms. Leopold-Leventhal  3                 41

5     By Mr. Weiner                      16

6    Brian Clauser

7     By Ms. Leopold-Leventhal  45

8     By Mr. Weiner                      78

9                              - - -

10   CLOSING ARGUMENTS                         PAGE

11   Mr. Weiner                                97, 144

12   Ms. Leopold-Leventhal                     122

13                              - - -

14   DEFENSE EXHIBITS                  ADMITTED IN EVIDENCE

15   D-22                                   4

16   D-23                                   5

17   D-24                                   8

18   D-25                                   10

19   D-26                                   48

20   D-27                                   64

21   PLAINTIFF'S EXHIBITS             ADMITTED IN EVIDENCE

22   P-26 and P-23                          83

23                          * * *

CERTIFICATION

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

s:/Geraldine C. Laws, CET                    Dated 5/21/10
Laws Transcription Service